**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MATTRESS FIRM, INC., *et al.*,[1] | Case No. 18-12241 (BLS) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF DURC A. SAVINI IN SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO SECTION 364 OF BANKRUPTCY CODE AND (B) UTILIZE CASH COLLATERAL; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) GRANTING ADEQUATE PROTECTION; (IV) MODIFYING AUTOMATIC STAY; (V) SCHEDULING FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

I, Durc A. Savini, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

1. I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Secured Financing Pursuant to Section 364 of Bankruptcy Code and (B) Utilize Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying Automatic Stay; (V) Scheduling Final Hearing; and (VI) Granting Related Relief* (the "DIP Motion"),[2] which, among other things, seeks approval of (I) a proposed postpetition debtor-in-possession financing, consisting of (a) a senior secured revolving credit

---

[1] The last four digits of Mattress Firm, Inc.'s federal tax identification number are 6008. The Debtors' mailing address is 10201 S. Main Street, Houston, Texas 77025. Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. This information may be obtained on the website of the Debtors' noticing and claims agent at http://dm.epiq.com/MattressFirm or by contacting counsel for the Debtors.

[2] Capitalized terms used but not defined herein have the meanings given to such terms in the DIP Motion, DIP Order, or the DIP Credit Agreement, as applicable.

01:23704350.1

facility in the aggregate amount of up to $150,000,000 and (b) a senior secured term loan in the principal amount of $100,000,000 and (II) the postpetition use of Cash Collateral.[3]

2.  In particular, I submit this Declaration in support of my view that the DIP Facilities: (a) are each the product of arm's-length, good-faith negotiation processes; (b) are collectively and individually, in light of the marketing process described below, the best presently available postpetition financing option for the Debtors; and (c) each contain reasonable and appropriate financial terms and conditions under the circumstances.

3.  The statements in this declaration are, except as otherwise indicated, based on my personal knowledge or views, on information that I have obtained from the Debtors and their other advisors, the Debtors' books and records, and employees of Guggenheim Securities, LLC ("Guggenheim Securities") working directly with me and under my supervision. I am not being specifically compensated for this testimony other than through payments to be received by Guggenheim Securities as a professional the Debtors are seeking to retain pursuant to an application to be filed with this Court at a later date. I am over the age of 18 years and authorized to submit this declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

**Background and Qualifications**

4.  I am a Senior Managing Director in the Restructuring Advisory Group at Guggenheim Securities, an investment and financial advisory firm with principal offices located at 330 Madison Avenue, New York, New York 10017. I have been in this position since early 2016. Guggenheim Securities, a subsidiary of Guggenheim Partners, LLC, is a full-service

---

[3] The material terms of the proposed DIP Facilities are set forth in detail in the DIP Motion. For the avoidance of doubt, any description of the proposed terms of the DIP Facilities herein or in the DIP Motion is qualified in its entirety by reference to the DIP Credit Agreements.

independent investment banking firm providing financial advisory services, including with respect to mergers and acquisitions, capital raising, and restructuring advice, across a broad range of industries. Guggenheim Securities and its senior professionals have extensive experience with respect to the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings.

5. I received a Bachelor of Arts degree in Economics from Columbia University. I also received a Master of Business Administration degree, with concentrations in finance and accounting, from the University of Chicago Graduate School of Business.

6. I started my career in investment banking in the automotive and leveraged finance groups at CIBC Wood Gundy Securities. I then moved to Bear Stearns & Co., Inc. where I represented numerous companies in the automotive supplier, telecommunication, biopharmaceutical, food, consumer products, chemical, business outsourcing, and building products industries. In 1999, after leaving Bear Stearns, I joined the financial restructuring group of Wasserstein Perella, a predecessor of Miller Buckfire & Co., LLC. I was with Miller Buckfire for approximately 11 years where I advised clients, both debtors and creditors, across a wide range of industries.

7. From 2010 to 2015, I was a Managing Director and head of the Restructuring and Recapitalization Group of Peter J. Solomon Company, another leading investment banking firm. I advised companies with respect to corporate restructurings, recapitalizations, sale transactions, obtaining credit facilities, refinancings, and negotiations with interested purchasers, credit providers, and creditors, among other constituents. I routinely assisted my clients in addressing financial challenges inside and outside of the bankruptcy process.

8. I am a member of the American Bankruptcy Institute and the Turnaround Management Association.

9. In addition to working with the Debtors in the above-captioned cases, my restructuring and financial advisory engagements have included representations of the following companies: Allied Holdings; Bluewater Automotive Systems; Breed Technologies; Cambridge Industries; Citation Corporation; Dana Corporation; Dura Automotive Systems, Inc.; EaglePicher Holdings; JL French Automotive Castings, Inc.; Oxford Automotive; The Dolan Company; Radioshack Corporation; Avado Brands; IMPATH Inc.; Burlington Industries; CenterPoint Energy; Sunbeam Corporation; Polaroid Corporation; Railworks Corporation; Favorite Brands International; and Quiksilver, Inc.

10. In connection with the above-referenced restructuring engagements, I have advised distressed companies with respect to obtaining financing, including assisting such companies in determining financing needs, identifying potential sources of financing, and negotiating the terms of such financing.

11. I closely follow developments in the financial markets and, in particular, the credit markets, and keep abreast of the terms of current financing transactions in distressed and bankruptcy situations.

### Guggenheim Securities Retention

12. Guggenheim Securities was initially engaged by the Debtors on February 12, 2018 to act as the Debtors' investment banker in connection with financing advisory activities. The engagement was amended and restated as of August 1, 2018 to incorporate additional terms relating to the expansion of Guggenheim Securities' role to include restructuring advisory and related financing advisory activities. Since being engaged, Guggenheim Securities has provided


financial advisory and investment banking services to the Debtors in connection with the Debtors' evaluation of various strategic alternatives for refinancing and/or restructuring their debt obligations and improving their liquidity and overall financial condition. Additionally, Guggenheim Securities has worked closely with the Debtors' management and other professionals retained by the Debtors with respect to the Debtors' restructuring efforts and has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

## The Debtors' Prepetition Capital Structure

13. As noted in the DIP Motion, as of the Petition Date, the Debtors owed approximately $88 million under the Prepetition ABL Facility, in addition to approximately $13 million in outstanding letters of credit, and approximately $83 million under the Prepetition Term Loan. In addition, I understand that most of the Debtors are guarantors of approximately $3.1 billion of unsecured debt owed by Stripes under the Intra-Group Loan Agreement (as defined below).

## The Debtors' Need for DIP Financing and Access to Cash Collateral

14. As described in the First Day Declaration, the Debtors operate approximately 3,230 retail store locations, which also include approximately 125 franchisee-operated stores in Alaska, Montana, New Mexico, North Dakota, South Dakota and West Virginia, as well as certain franchised markets in Georgia, Iowa, Mississippi, New York, Oklahoma, South Carolina and Texas, all under the *Mattress Firm*® brand name. Including these franchisee-operated stores, the Company has a retail presence in 49 states. The Debtors rely on their network of 76 nationwide distribution centers to make deliveries to customers. *See* First Day Declaration at Part I (C).

15. As further detailed in the First Day Declaration, the Debtors suffer from two structural challenges. First, the Debtors are not able to obtain additional funding outside of these Chapter 11 Cases as a result of a complex capital structure that restricts new investments, even in the form of junior secured or unsecured debt. *See* First Day Declaration at Preliminary Statement. Second, an aggressive "roll up" acquisition strategy has resulted in the Debtors having too many newly-branded stores in close proximity to existing stores, thus leading to an increase of occupancy and related costs while negatively impacting the profitability of hundreds of stores. *See* First Day Declaration at Id.

16. Guggenheim Securities has worked with the Debtors in connection with the Debtors' evaluation of their financing needs and funding alternatives.

17. I understand that the Debtors need additional liquidity to pay vendors, landlords, utility providers, insurers, to satisfy payroll obligations, to honor obligations to their customers, and to make any other payments that are essential or appropriate for the continued management, operation, and preservation of the Debtors' businesses and assets.

### The Proposed DIP Facilities Represent the Best Currently Available Financing Options for the Debtors

18. As more fully described in the paragraphs below, to secure postpetition financing, the Debtors, with the assistance of Guggenheim Securities, initially contacted eighteen potential financing parties with familiarity of mattress industry dynamics and experience investing in the retail and consumer industry. The potential financing parties contacted included the Prepetition ABL Lenders under the Company's existing ABL credit facilities, other traditional lending institutions, and alternative investors.

19. Specifically, the Debtors, with the assistance of Guggenheim Securities, solicited indications of interest from six traditional lending institutions that routinely provide

debtor-in-possession financing to gauge their interest in providing a postpetition revolving credit facility and/or term loan to the Debtors. The Debtors were seeking both debtor-in-possession as well as exit financing commitments to fund the Debtors entry into and exit from these Chapter 11 cases. Following the outreach to the six parties, four of the parties executed confidentiality agreements with the Debtors ("NDAs") or had already executed NDAs. Parties that executed NDAs received access to a data room containing non-public information.

20. Contemporaneously, the Debtors, with the assistance of Guggenheim Securities, solicited twelve alternative investors (including hedge funds, specialty finance institutions, and distressed-oriented investors with experience in the retail industry), to gauge their interest in providing debtor-in-possession and/or exit financing capital to the Debtors. Following the initial outreach to the twelve parties, nine parties requested NDAs, seven of which executed NDAs. Parties that executed NDAs received access to a data room containing non-public information.

21. Ultimately, the Debtors received financing proposals from five parties, including exit term loan proposals from two parties. One of the exit term loan proposals was received from the SEAG Creditors, which were provided the right to match the terms of any third-party financing to the Debtors under the terms of the Steinhoff Lockup Agreement (as defined in the Plan), including the proposed DIP Facilities (i.e., a "last look"). After reviewing the proposals, the Debtors and their advisors determined that the proposed DIP Facilities are the best available path to obtain debtor in possession financing.

22. As described in the DIP Motion, the DIP Agreements contemplate postpetition financing in the form of (a) a senior secured revolving credit facility in the aggregate amount of up to $150,000,000 and (b) a senior secured term loan in the principal amount of $100,000,000. It is my understanding that the Prepetition Secured Parties have consented to the Debtors' use of

their Cash Collateral and the priming of their prepetition liens by the DIP Liens as required by the DIP Lenders.

23. I believe the DIP Facilities are the product of arm's-length, good-faith negotiations with the DIP Lenders.

## Conclusion

24. In sum, based on my experience in general and my involvement in assisting the Debtors with the marketing and negotiation of the DIP Facilities in this matter, it is my view that the DIP Facilities represent the best presently available postpetition financing option for the Debtors and contain terms that are reasonable under the circumstances. Further, I believe that the negotiation process was conducted at arm's length and in good faith.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

New York, New York  
October 5, 2018

/s/ Durc A. Savini  
DURC A. SAVINI  
Senior Managing Director  
Guggenheim Securities, LLC

*Proposed Financial Advisor and*  
*Investment Banker to the Debtors*