## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MATTRESS FIRM, INC., *et al.*,[1] | Case No. 18-12241 (BLS) |
| Debtors. | (Joint Administration Requested) |

## JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION
## FOR MATTRESS FIRM, INC. AND ITS DEBTOR AFFILIATES

SIDLEY AUSTIN LLP
Bojan Guzina
Matthew E. Linder
Blair M. Warner
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

-and-

SIDLEY AUSTIN LLP
Gabriel R. MacConaill (No. 4734)
Michael Fishel
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Ashley E. Jacobs (No. 5635)
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

*Proposed Attorneys for the Debtors and Debtors in Possession*

**Dated:  October 4, 2018**

---

[1] The last four digits of Mattress Firm, Inc.'s federal tax identification number are 6008.  The Debtors' mailing address is 10201 S. Main Street, Houston, Texas 77025.  Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  This information may be obtained on the website of the Debtors' noticing and claims agent at http://dm.epiq.com/MattressFirm or by contacting counsel for the Debtors.

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

ARTICLE I.  DEFINED TERMS AND RULES OF INTERPRETATION.................................1

    A.    Defined Terms ........................................................................................1
    B.    Rules of Interpretation...........................................................................14
    C.    Computation of Time ............................................................................14
    D.    Deemed Acts.........................................................................................14

ARTICLE II.  ADMINISTRATIVE EXPENSE CLAIMS, DIP CREDIT FACILITIES
CLAIMS, PRIORITY TAX CLAIMS, AND QUARTERLY FEES ..............................15

    A.    Administrative Expense Claims .............................................................15
    B.    DIP Credit Facilities Claims..................................................................16
    C.    Priority Tax Claims ..............................................................................16
    D.    Post-Effective Date Fees and Expenses ..................................................16

ARTICLE III.  CLASSIFICATION AND TREATMENT  OF CLASSIFIED CLAIMS AND
INTERESTS............................................................................................17

    A.    Classification of Claims and Interests....................................................17
    B.    Treatment of Claims and Interests .........................................................18
    C.    Special Provisions Regarding Unimpaired Claims...................................21
    D.    Alternative Treatment ..........................................................................22

ARTICLE IV.  ACCEPTANCE OR REJECTION OF PLAN .................................................22

ARTICLE V.  MEANS FOR IMPLEMENTATION OF PLAN ...............................................22

    A.    Sources of Cash Consideration for Plan Distributions..............................22
    B.    Exit Facilities......................................................................................23
    C.    Intra-Group Loan Facilities ..................................................................23
    D.    Corporate Action..................................................................................23
    E.    Reorganized Debtors' Directors and Officers ..........................................23
    F.    Continued Legal Existence and Vesting of Assets in the Reorganized Debtors...24
    G.    Cancellation of Liens ...........................................................................24
    H.    Preservation of Causes of Action...........................................................24
    I.    Exemption from Certain Transfer Taxes and Recording Fees ...................25
    J.    Management Incentive Plan ...................................................................25
    K.    Workers' Compensation Programs .........................................................26
    L.    Operations Between the Confirmation Date and the Effective Date ...................26
    M.    Dissolution of Creditors' Committee......................................................26

ARTICLE VI.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ............................................................................................................26

    A.     Assumption of Executory Contracts and Unexpired Leases ................................26
    B.     Rejection of Executory Contracts and Unexpired Leases ...................................27
    C.     Compensation and Benefits Programs .............................................................28
    D.     Indemnification Obligations ..........................................................................28
    E.     Modifications, Amendments, Supplements, Restatements, or Other
          Agreements .................................................................................................28
    F.     Reservation of Rights ...................................................................................28

ARTICLE VII.  PROVISIONS FOR RESOLVING DISPUTED CLAIMS ..............................29

    A.     Claims Other than Rejection Damages Claims .................................................29
    B.     Rejection Damages Claims.............................................................................29

ARTICLE VIII.  PROVISIONS GOVERNING DISTRIBUTIONS .........................................30

    A.     Allowed Claims and Interests........................................................................30
    B.     Interest and Penalties on Claims ....................................................................30
    C.     Means of Cash Payment ...............................................................................30
    D.     Withholding and Reporting Requirements.......................................................31
    E.     Setoff and Recoupment ................................................................................31
    F.     Undeliverable or Non-Negotiated Distributions...............................................31
    G.     Claims Paid by Third Parties ........................................................................31

ARTICLE IX.  CONFIRMATION AND CONSUMMATION OF PLAN ...............................31

    A.     Conditions to the Effective Date.....................................................................31
    B.     Waiver of Conditions ...................................................................................32
    C.     Vacatur of Confirmation Order; Non-Occurrence of Effective Date .................32

ARTICLE X.  EFFECT OF PLAN CONFIRMATION ........................................................33

    A.     Binding Effect.............................................................................................33
    B.     Vesting of Assets in the Reorganized Debtors .................................................33
    C.     Discharge ....................................................................................................33
    D.     Releases .....................................................................................................34
    E.     Exculpation ................................................................................................36
    F.     Injunctions .................................................................................................36
    G.     Term of Bankruptcy Injunction or Stays.........................................................37

ARTICLE XI.  RETENTION OF JURISDICTION ...............................................................38

ARTICLE XII.  MISCELLANEOUS PROVISIONS ............................................................39

    A.     Amendment or Modification of this Plan.........................................................39
    B.     Effectuating Documents and Further Transactions ...........................................40

C.      Successors and Assigns ...................................................................40
D.      Revocation, Withdrawal or Non-Consummation .................................................40
E.      Notice ................................................................................40
F.      Nonseverability of Plan Provisions.........................................................41
G.      Governing Law .......................................................................41
H.      Tax Reporting and Compliance .........................................................42
I.      Closing of Chapter 11 Cases; Caption Change ..................................................42

## INTRODUCTION

Mattress Firm, Inc. and its Affiliated debtors and debtors in possession (collectively, the "Debtors"), hereby propose the following joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code for the resolution of the outstanding Claims against and Interests in the Debtors. Capitalized terms used but not defined in this paragraph have the meanings assigned to such terms in Article I. The classification and treatment of Claims against and Interests in the Debtors are set forth in Article II and Article III. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement, distributed contemporaneously herewith, for a discussion of the Debtors' history, business, results of operations, projections for those operations, risk factors, a summary and analysis of this Plan, and certain related matters.

## ARTICLE I.

## DEFINED TERMS AND RULES OF INTERPRETATION

A.    Defined Terms.

1.    "Administrative Expense Claim" means a Claim (other than a DIP Credit Facilities Claim) for costs and expenses of administration of the Estates arising on or after the Petition Date and prior to the Effective Date under sections 327, 328, 330, 365, 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the business of the Debtors; (b) Professional Fee Claims, to the extent Allowed by the Bankruptcy Court; and (c) any Quarterly Fees.

2.    "Affiliate" has the meaning ascribed to such term in section 101(2) of the Bankruptcy Code. "Affiliated" shall have a correlative meaning.

3.    "Allowed" means any Claim or Interest or any portion thereof (a) that the Debtors have not disputed, either formally or informally, or (b) that has been (i) allowed by a Final Order of the Bankruptcy Court, (ii) allowed pursuant to the terms of this Plan, or (iii) allowed by agreement between the Holder of such Claim or Interest, on one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand; provided, however, that notwithstanding anything in this Plan to the contrary, by treating a Claim as an "Allowed Claim" for purposes of the Plan, the Debtors do not waive, and shall not be deemed to have waived, their rights to contest the amount and/or validity of any disputed, contingent, or unliquidated Claim in the manner and venue in which such Claim would have been determined, resolved, or adjudicated if the Chapter 11 Cases had not been commenced; provided further, that the amount of any "Allowed Claim" for purposes of the Plan shall be determined in accordance with the Bankruptcy Code, including sections 502(b)(6), 503(b), and 506 of the Bankruptcy Code.

4.    "Assumed Contract" has the meaning ascribed to such term in Article VI.A.

5.    "Assumed Lease" has the meaning ascribed to such term in Article VI.A.

6.      "Avoidance Actions" means any and all actual or potential claims or causes of action to avoid a transfer of property or an obligation incurred by the Debtors arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 552 or 553(b) of the Bankruptcy Code, or under similar or related state or federal statutes or common law, including preference and fraudulent transfer and conveyance laws, in each case whether or not litigation to prosecute such claim(s) or cause(s) of action was commenced prior to the Effective Date.

7.      "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as in effect on the Petition Date, together with any amendments and modifications thereto that may subsequently be made applicable to the Chapter 11 Cases.

8.      "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases.

9.      "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

10.     "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

11.     "Cash" means the legal tender of the United States of America.

12.     "Cause of Action" means any claims, interests, damages, remedies, causes of action, demands, rights, actions (including, without limitation, any Avoidance Actions), suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims that may be pursued under sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any fraudulent transfer or similar claims arising under any state or foreign law.

13.     "Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the chapter 11 case filed for such Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases of all of the Debtors.

14.     "Claim" means any "claim," as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

15.    "Claims and Noticing Agent" means Epiq Corporate Restructuring, LLC, in its capacity as claims and noticing agent for the Debtors.

16.    "Claims Objection Deadline" means the deadline for objecting to a Rejection Damages Claim, which shall be the date that is 180 days after the applicable Rejection Damages Bar Date, subject to extension by order of the Bankruptcy Court.

17.    "Claims Register" means the official register of Claims and Interests maintained by the Claims and Noticing Agent.

18.    "Class" means each category of Holders of Claims or Interests as set forth in Article III pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

19.    "Compensation and Benefits Programs" means all compensation and benefit plans, policies, and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, and incentive plans, deferred compensation plans and life, accidental death and dismemberment insurance plans.

20.    "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court.

21.    "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

22.    "Confirmation Hearing" means the hearing held by the Bankruptcy Court on confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

23.    "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

24.    "Creditors Committee" means the statutory committee of unsecured creditors, if any, appointed by the Office of the United States Trustee pursuant to section 1102 of the Bankruptcy Code.

25.    "DIP ABL Agent" means Barclays Bank PLC as administrative agent and co-collateral agent, issuer, joint book runner, joint lead arranger, and Citizens Bank, N.A. as co-collateral agent under the DIP ABL Credit Facility.

26.    "DIP ABL Credit Facility" means that certain $150 million first priority Senior Secured Superpriority Debtor-in-Possession Asset-Based Revolving Credit Facility, by and among the Debtors, the DIP ABL Agent and various lenders as approved by the DIP Orders.

27.    "DIP Agents" means collectively, the DIP ABL Agent and the DIP Term Loan Agent.

28.    "DIP Credit Facilities" means the DIP ABL Credit Facility and the DIP Term Loan Credit Facility as approved by the DIP Orders.

29.    "DIP Credit Facilities Claims" means any Claim derived from, arising under, based upon, or secured by the DIP Credit Facilities or the DIP Orders, including claims for all principal amounts outstanding and all interest, fees, expenses, costs and other charges arising under or in connection with the DIP Credit Facilities.

30.    "DIP Lenders" means the DIP Agents and those lenders in any lender capacity from time to time party to the DIP Credit Facilities.

31.    "DIP Orders" means the Interim DIP Order and the Final DIP Order, collectively.

32.    "DIP Term Loan Agent" means Barclays Bank PLC as administrative agent and collateral agent, book runner and lead arranger under the DIP Term Loan Credit Facility.

33.    "DIP Term Loan Credit Facility" means that certain $100 million second priority Senior Secured Superpriority Debtor-in-Possession Term Loan Credit Facility, by and among the Debtors, the DIP Term Loan Agent and various lenders, as approved by the DIP Orders.

34.    "Disallowed" means any Claim, or any portion thereof, that (a) has been disallowed by Final Order or pursuant to a settlement among the Debtors and the holder thereof; or (b) as to which, in respect of a Rejection Damages Claim, no Proof of Claim has been filed by the Rejection Damages Bar Date or has been deemed timely filed pursuant to a Final Order of the Bankruptcy Court. "Disallow" and "Disallowance" shall have correlative meanings.

35.    "Disclosure Statement" means the disclosure statement that relates to this Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

36.    "Disputed" means, with respect to a Claim, a Claim that is not yet Allowed or Disallowed.

37.    "Effective Date" means, and shall occur on, the Business Day on which each of the conditions precedent to the effectiveness of the Plan as set forth in Article IX has been satisfied or waived in accordance with the terms thereof.

38.    "Entity" means an entity as defined in section 101(15) of the Bankruptcy Code.

39.    "Estate" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code.

40.     "Exculpated Fiduciaries" means each of the following solely in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; and (c) with respect to each of (a) and (b), to the extent employed in such capacities on or after the Petition Date, each of their respective directors, officers, partners, managers, trustees, assigns, employees, agents, advisory board members, attorneys, financial advisors, investment bankers, accountants, consultants and other professionals or representatives.

41.     "Exculpated Parties" means, collectively, the Exculpated Fiduciaries and the Section 1125(e) Parties.

42.     "Executory Contract" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

43.     "Exit ABL Agent" means Barclays Bank, PLC as administrative agent and collateral agent, issuer and sole lead arranger.

44.     "Exit ABL Documents" means the Exit ABL Facility and such other financing documents to be entered into in connection with the Exit ABL Facility, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements and other security documents.

45.     "Exit ABL Facility" means a senior secured credit facility in a principal amount of up to $125 million to be entered into between the Reorganized Debtors and the Exit ABL Lenders on the Effective Date.

46.     "Exit ABL Lender" means any lender in any lender capacity under the Exit ABL Facility.

47.     "Exit Agents" means, collectively, the Exit ABL Agent and the Exit Term Loan Agent under each of (a) the Exit ABL Facility and (b) the Exit Term Loan Facility, including any successors thereto.

48.     "Exit Facilities" means, collectively, the Exit ABL Facility and the Exit Term Loan Facility.

49.     "Exit Facility Documents" means, collectively, the Exit ABL Documents and the Exit Term Loan Documents.

50.     "Exit Lenders" means, collectively, in their respective capacities as such, the Exit ABL Lenders and the Exit Term Loan Lenders.

51.     "Exit Term Loan Agent" means Barclays Bank PLC as administrative agent, collateral agent and sole lead arranger.

Case 18-12241-CSS    Doc 22    Filed 10/05/18    Page 10 of 47

52. "Exit Term Loan Lender" means any lender under the Exit Term Loan Facility.

53. "Exit Term Loan Lender Election" means the election available to the Exit Term Loan Lenders pursuant to the Exit Term Loan Documents to receive either (i) the Stripes Stock and the Stripes PIK Debt or (ii) the MF Holdco Stock and the MF Holdco PIK Debt on the Effective Date; provided, however, that if the Stripes Restructuring shall have been consummated on or before the Effective Date, the Exit Term Loan Lenders shall receive the Stripes Stock and the Stripes PIK Debt.

54. "Exit Term Loan Documents" means the Exit Term Loan Facility and such other financing documents to be entered into in connection with the Exit Term Loan Facility, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements and other security documents.

55. "Exit Term Loan Facility" means the senior secured term loan facility in the principal amount of $400 million to be entered into between the Reorganized Debtors and the Exit Term Loan Lenders on the Effective Date.

56. "Final DIP Order" means the order of the Bankruptcy Court authorizing the Debtors to enter into the DIP Credit Facilities on a final basis.

57. "Final Order" means an order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, new writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order to not be a Final Order.

58. "General Unsecured Claim" means a Claim against the Debtors that is not an Administrative Expense Claim, a DIP Credit Facilities Claim, Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, a Prepetition ABL Claim, a Prepetition Term Loan Claim, or an Intercompany Claim.

59. "Governmental Unit" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

60.    "Holder" means an Entity holding a Claim against, or Interest in, one or more of the Debtors.

61.    "Impaired" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.  "Impair" shall have a correlative meaning.

62.    "Indemnification Obligations" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, or other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, or otherwise, for the past and present directors, officers, employees, attorneys, accountants, investment bankers, and other professionals and agents who provided services to the Debtors before or after the Petition Date.

63.    "Intercompany Claim" means any Claim held by a Debtor against another Debtor.

64.    "Intercompany Interest" means an Interest in a Debtor held by another Debtor.

65.    "Interest" means any equity security within the meaning of section 101(16) of the Bankruptcy Code, including any issued and outstanding common stock, preferred stock, limited liability company interest, partnership interest, or any other instrument evidencing an ownership interest in a Debtor that existed immediately before the Effective Date, whether or not transferable, and any restricted stock units, calls, rights, puts, awards, commitments, repurchase rights, unvested or unexercised options, rights of conversion, warrants, unvested common interests, unvested preferred interests or any other agreements of any character related to the common or preferred interests of a Debtor, obligating such Debtor to issue, transfer, purchase, redeem, or sell any equity interests or other equity securities, and any rights under any equity incentive plans, voting agreements and registration rights agreements regarding equity securities of the Debtor.

66.    "Interim DIP Order" means the order of the Bankruptcy Court authorizing the Debtors to enter into the DIP Credit Facilities on an interim basis.

67.    "Intra-Group Lenders" means, collectively, SEAG, Steinhoff Finance, and Möbel in their capacities as lenders under the Intra-Group Loan Agreement.

68.    "Intra-Group Loan Agreement" means that certain Intra-Group Loan Agreement, dated as of September 16, 2016, between Stripes, as Borrower, certain of the Debtors, as Guarantors, and SEAG, Möbel, and Steinhoff Finance, as Lenders (as amended, restated, modified, supplemented, or assigned from time to time, including by that certain Amendment Agreement dated as of December 22, 2017), and all related amendments, supplements, ancillary agreements, notes and other documents and instruments executed or delivered in connection with the Intra-Group Loan Facilities, in each case as amended, amended and restated, supplemented or otherwise modified prior to the date hereof.

7

69.    "Intra-Group Loan Claims" means any Claims derived from, based upon, or relating to the Intra-Group Loan Guarantees.

70.    "Intra-Group Loan Facilities" means, collectively: (a) that certain senior unsecured Facility A Loan from Steinhoff Finance to Stripes in the original aggregate principal amount of up to $850,000,000, as such Facility A Loan was subsequently assigned by Steinhoff Finance to SEAG pursuant to the terms of that certain Assignment Agreement dated as of September 16, 2016; (b) that certain senior unsecured Facility B Loan from Möbel to Stripes in the original aggregate principal amount of up to $2,000,000,000; and (c) that certain senior unsecured Facility C Loan from Möbel and SEAG to Stripes in the original aggregate principal amount of up to $275,000,000, in each case as available or outstanding from time to time in accordance with the terms of the Intra-Group Loan Agreement.

71.    "Intra-Group Loan Guarantees" means the unsecured guarantees by certain of the Debtors of Stripes' obligations under the Intra-Group Loan Facilities.

72.    "Lease Rejection Notice" means any notice of rejection of one or more Unexpired Leases of nonresidential real property pursuant to section 365 of the Bankruptcy Code that the Debtors file and serve in accordance with the Lease Rejection Procedures.

73.    "Lease Rejection Procedures" means the procedures for the rejection of Unexpired Leases as approved by the Bankruptcy Court pursuant to the Lease Rejection Procedures Order.

74.    "Lease Rejection Procedures Order" means the *Order (I) Approving Procedures for Rejecting Unexpired Leases of Nonresidential Real Property, (II) Authorizing the Debtors to Enter Into Amendments to Certain Unexpired Leases of Nonresidential Real Property, and (III) Granting Related Relief*, entered by the Bankruptcy Court.

75.    "Lien" means, with respect to any interest in property, any mortgage, "lien" as defined in section 101(37) of the Bankruptcy Code, pledge, charge, security interest, easement or encumbrance of any kind whatsoever affecting such interest in property.

76.    "Management Incentive Plan" means the post-Effective Date management incentive plan to be implemented by the Reorganized Debtors as defined in Article V.J.

77.    "MFHC" means Mattress Firm Holding Corp., a non-Debtor Affiliate of the Debtors and the direct parent company of MF Holdco.

78.    "MF Holdco" means Mattress Holdco, Inc., a Delaware corporation and a Debtor herein, and the direct or indirect parent of each of the other Debtors.

79.    "MF Holdco PIK Debt" means the $150 million face amount payment-in-kind debt, which may be issued by MF Holdco to the Exit Term Loan Lenders on the Effective Date pursuant to the terms of the Exit Term Loan Documents.

80.    "MF Holdco Stock" means 49.9% of the common stock of MF Holdco on a fully-diluted basis, which may be issued to the Exit Term Loan Lenders on the Effective Date pursuant to the terms of the Exit Term Loan Documents.

81.    "Möbel" means Steinhoff Möbel Holding Alpha GmbH, the direct parent of SEAG.

82.    "Notice of Effective Date" means the notice that all conditions to the Effective Date have been satisfied or waived in accordance with Article IX.

83.    "Opt-Out Election Form" means that certain form by which a Releasing Party may "opt out" of the release set forth in Article X.D.2, in substantially the form approved by the Bankruptcy Court, to be served on all Holders of Claims and Interests with the Notice of Effective Date.

84.    "Other Priority Claim" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

85.    "Other Secured Claim" means any Secured Claim against the Debtors other than a DIP Credit Facilities Claim, a Prepetition ABL Claim, or a Prepetition Term Loan Claim.

86.    "Petition Date" means October 4, 2018.

87.    "Plan" means this joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules.

88.    "Plan Support Agreement" means the Plan Support Agreement entered into by Steinhoff Holdings, Steinhoff Finance, Möbel, SEAG, Stripes, MFHC, MF Holdco, Mattress Holding Corp., and Mattress Firm, Inc. (collectively with each subsidiary of Mattress Firm, Inc. that is a guarantor under the Intra-Group Loan Agreement) prior to the Petition Date, and consented to by the requisite majority of Participants to the Steinhoff Lockup Agreement.

89.    "Plan Support Parties" means Steinhoff Holdings, Steinhoff Finance, Möbel, SEAG and Stripes.

90.    "Post-Effective Date Lease Negotiation Period" means the ninety (90) day period immediately following the Effective Date, during which time the Debtors shall be entitled to file one or more Lease Rejection Notices with respect to the Unexpired Leases of nonresidential real property listed on the Schedule of Post-Effective Date Negotiated Leases.

91.    "Prepetition ABL Agent" means, collectively, Barclays Bank PLC as Administrative Agent and Co-Collateral Agent, Issuer, Book Runner and Lead Arranger and Citizens Bank, N.A. as Co-Collateral Agent, under the Prepetition ABL Facility.

92.    "Prepetition ABL Agreement" means that certain ABL Credit Agreement dated as of December 22, 2017, as amended by that certain Amendment No. 1 dated as of January 31, 2018, that certain Amendment No. 2 dated as of February 2, 2018, and that certain Amendment No. 3 dated as of March 26, 2018, among Mattress Firm, Inc. as Borrower, certain of the other Debtors as Guarantors, the Prepetition ABL Agent, and the Prepetition ABL Lenders.

93.    "Prepetition ABL Claim" means any Claim derived from, based upon, or relating to the Prepetition ABL Documents.

94.    "Prepetition ABL Documents" means the Prepetition ABL Agreement and any other agreements or documents executed in connection therewith or related thereto.

95.    "Prepetition ABL Facility" means the prepetition senior secured revolving financing in the aggregate principal amount of up to $150,000,000 provided by the Prepetition ABL Lenders pursuant to the Prepetition ABL Documents.

96.    "Prepetition ABL Lenders" means the Prepetition ABL Agent and the other lenders in any lender capacity from time to time party to the Prepetition ABL Facility.

97.    "Prepetition Debt Documents" means, collectively, the Prepetition ABL Documents and the Prepetition Term Loan Documents.

98.    "Prepetition Term Loan Agreement" means that certain Term Loan Agreement, dated as of March 26, 2018 (as amended, restated, modified or supplemented from time to time) among Mattress Firm, Inc., as Borrower, certain of the other Debtors, as guarantors, and the Prepetition Term Loan Lender.

99.    "Prepetition Term Loan Claim" means any Claim held by the Prepetition Term Loan Lender that arises under, is derived from, based upon, or related to the Prepetition Term Loan Facility.

100.    "Prepetition Term Loan Documents" means the Prepetition Term Loan Agreement and any other agreements or documents executed in connection therewith or related thereto.

101.    "Prepetition Term Loan Facility" means the prepetition senior secured term loan credit facility in the original aggregate principal amount of up to $80,000,000 provided by the Prepetition Term Loan Lender pursuant to the Prepetition Term Loan Documents.

102.    "Prepetition Term Loan Lender" means Steinhoff International Holdings N.V. in its capacity as the lender under the Prepetition Term Loan Facility.

103.    "Priority Tax Claim" means any Claim of a Governmental Unit entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

104.    "Professional" means any Entity retained by the Debtors or a statutory committee, if any, pursuant to a Final Order of the Bankruptcy Court entered pursuant to sections 327, 328 and/or 1103 of the Bankruptcy Code.

105.    "Professional Fee Claim" means any Claim of a Professional for allowance and award by the Bankruptcy Court of compensation for services rendered and/or reimbursement of costs or expenses incurred in the Chapter 11 Cases on or before the Effective Date under sections 328, 330, 331, 363, or 503(b) of the Bankruptcy Code.

106.    "Proof of Claim" means a proof of Claim filed against any Debtor in the Chapter 11 Cases.

107.    "Quarterly Fees" means all fees due and payable pursuant to section 1930(a)(6) of title 28 of the United States Code.

108.    "Reinstate," "Reinstated" or "Reinstatement" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest, or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate under a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Interest (other than the Debtors or an "insider" of the Debtors within the meaning of section 101(31) of the Bankruptcy Code) for any actual pecuniary loss incurred by such Holder as the result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim or Interest entitles the Holder thereof.

109.    "Rejection Damages Bar Date" means, with respect to each applicable Executory Contract or Unexpired Lease, 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after the Effective Date; provided, however, that, solely in respect of Unexpired Leases included on the Schedule of Post-Effective Date Negotiated Leases that are rejected by an order of the Bankruptcy Court after the Effective Date, the Rejection Damages Bar Date shall be the latest to occur of (a) 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after entry of the order approving the rejection of such Unexpired Lease, and (b) 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after the effective date of the rejection of such Unexpired Lease.

110.    "Rejection Damages Claim" means a Claim resulting from the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

111.    "Rejection Motion" means any motion requesting authorization to reject one or more Executory Contracts or Unexpired Leases pursuant to section 365 of the Bankruptcy Code.

112.    "Related Parties" means, with respect to any Entity, such Entity's predecessors, successors and assigns (whether by operation of law or otherwise) and their respective present Affiliates and subsidiaries and each of their respective current members, partners, equity holders, controlling persons, officers, directors, employees, managers, shareholders, partners, financial advisors, attorneys, accountants, investment bankers, consultants, agents and professionals each acting in such capacity (solely in their capacity as such), and any Entity claiming by or through any of them (including their respective officers, directors, managers, shareholders, partners, employees, equity holders, members, and professionals).

113.    "Released Parties" means, collectively, the following Entities, solely in their capacities as such: (a) the Debtors, (b) the Reorganized Debtors, (c) the Prepetition ABL Agent, (d) the Prepetition ABL Lenders, (e) the Prepetition Term Loan Lender, (f) the Intra-Group Lenders, (g) the DIP Agents, (h) the DIP Lenders, (i) the Exit Agents, (j) the Exit Lenders, (k) the Plan Support Parties, and (l) MFHC, and, with respect to each of the foregoing Entities specified in clauses (a) through (l), such Entities' Related Parties; provided, however, that any Holder of a Claim or Interest that validly "opts out" by timely returning an Opt-Out Election Form shall not be a "Released Party".

114.    "Releasing Parties" means, collectively, the following Entities, solely in their capacities as such: (a) the Debtors, (b) the Reorganized Debtors, (c) the Prepetition ABL Agent, (d) the Prepetition ABL Lenders, (e) the Prepetition Term Loan Lender, (f) the Intra-Group Lenders, (g) the DIP Agents, (h) the DIP Lenders, (i) the Exit Agents, (j) the Exit Lenders, (k) the Plan Support Parties, (l) MFHC, and (m) all Holders of Claims or Interests that are presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, with respect to each of the foregoing Entities specified in clauses (a) through (m), such Entities' Related Parties; provided, however, that any Holder of a Claim or Interest that validly "opts out" by timely returning an Opt-Out Election Form shall not be a "Releasing Party."

115.    "Remaining Property" shall have the meaning set forth in the Lease Rejection Procedures Order.

116.    "Reorganized Debtors" means the Debtors, as reorganized pursuant to and under this Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Effective Date, after giving effect to the transactions implementing this Plan.

117.    "Schedule of Post-Effective Date Negotiated Leases" means the schedule of all Unexpired Leases, including any amendments or modifications thereto, as to which the applicable counterparty has consented in writing to the Debtors' deferral of their decision on assumption or rejection during the Post-Effective Date Lease Negotiation Period, as such schedule may be amended from time to time until the occurrence of the Effective Date.

118.    "SEAG" means Steinhoff Europe AG, the direct parent company of Stripes.

119. "Section 1125(e) Parties" means each of the following, solely in their respective capacities as such: (a) the Prepetition ABL Agent, (b) the Prepetition ABL Lenders, (c) the Prepetition Term Loan Lender, (d) the Intra-Group Lenders, (e) the DIP Agents, (f) the DIP Lenders, (g) the Exit Agents, (h) the Exit Lenders, and (i) the Plan Support Parties, and, with respect to each of the foregoing parties under (a) through (i), such Entities' Related Parties, directors, officers, and professionals.

120. "Specified Unimpaired Claim" has the meaning ascribed to such term in Article III.C.1.

121. "Steinhoff Finance" means Steinhoff Finance Holding GmbH, the direct parent company of Möbel.

122. "Steinhoff Global Restructuring" means the restructuring transactions contemplated by the Steinhoff Lockup Agreement.

123. "Steinhoff Holdings" means Steinhoff International Holdings N.V.

124. "Steinhoff Lockup Agreement" means that certain Lock-Up Agreement dated July 11, 2018 between Steinhoff International Holdings N.V. and certain direct and indirect subsidiaries thereof as the Obligors and certain lenders to such Obligors as the Participants.

125. "Stripes" means Stripes US Holding, Inc., a non-Debtor Affiliate of the Debtors and the direct parent company of MFHC.

126. "Stripes PIK Debt" means the $150 million face amount payment-in-kind debt, which may be issued by Stripes to the Exit Term Loan Lenders on the Effective Date pursuant to the terms of the Exit Term Loan Documents.

127. "Stripes Restructuring" means the restructuring of Stripes pursuant to the Steinhoff Lockup Agreement, that will be implemented with the consent of the lenders under a revolving loan facility in the original aggregate principal amount of $200,000,000 under the $4 billion acquisition facilities agreement dated August 5, 2016 (as amended or restated from time to time) between, among others, Stripes, Steinhoff Finance, Möbel, SEAG, Steinhoff Holdings and J.P. Morgan Europe Limited (as Agent) or pursuant to a scheme of arrangement for Stripes in the United Kingdom.

128. "Stripes Stock" means 49.9% of the common stock of Stripes on a fully-diluted basis, which may be issued to the Exit Term Loan Lenders on the Effective Date pursuant to the terms of the Exit Term Loan Documents.

129. "Unexpired Lease" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

130.    "Unimpaired" means any Claim or Interest that is not Impaired, including any Claim or Interest that is Reinstated.

131.    "United States Trustee" means the Office of the United States Trustee for the District of Delaware.

B.    Rules of Interpretation.

For purposes of this Plan, unless otherwise provided herein:  (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (2) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (3) any reference in this Plan to an existing document, schedule or exhibit filed or to be filed means such document, schedule or exhibit, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (4) any reference to an entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) all references in this Plan to Articles are references to Articles of this Plan, as the same may be amended, waived or modified from time to time; (6) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular Article, paragraph, or clause contained in this Plan; (7)  the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation and shall be deemed to be followed by the words "without limitation;" (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (9) the rules of construction set forth in section 102 of the Bankruptcy Code (other than section 102(5) of the Bankruptcy Code) will apply; and (10) any reference to an Entity's "subsidiaries" means its direct and indirect subsidiaries

C.    Computation of Time.

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.  In the event that any payment, distribution, act or deadline under this Plan is required to be made or performed or occurs on a day that is not a Business Day, then such payment, distribution, act or deadline shall be deemed to occur on the next succeeding Business Day, but if so made, performed or completed by such next succeeding Business Day, shall be deemed to have been completed or to have occurred as of the required date.

D.    Deemed Acts.

Whenever an act or event is expressed under this Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred by virtue of this Plan and/or Confirmation Order without any further act by any party.

## ARTICLE II.

## ADMINISTRATIVE EXPENSE CLAIMS, DIP CREDIT FACILITIES CLAIMS, PRIORITY TAX CLAIMS, AND QUARTERLY FEES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Credit Facilities Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III.

A.    Administrative Expense Claims.

1.    *General.*

Subject to the terms of the Confirmation Order and Article II.A.2 and Article II.A.3, except to the extent that a Holder of an Allowed Administrative Expense Claim and the applicable Debtor(s) agree to less favorable treatment with respect to such Allowed Administrative Expense Claim, each Holder of an Allowed Administrative Expense Claim shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Administrative Expense Claim, payment of Cash equal to the full unpaid amount of such Allowed Administrative Expense Claim: (a) on the Effective Date or as soon as reasonably practicable thereafter, or, if not then due, when such Allowed Administrative Expense Claim is due or as soon as reasonably practicable thereafter; (b) if an Administrative Expense Claim is Allowed after the Effective Date, on the date such Administrative Expense Claim is due or as soon as reasonably practicable thereafter; (c) on such other date and upon such terms as such Holder and the Debtors or the Reorganized Debtors shall have agreed; or (d) as otherwise ordered by the Bankruptcy Court; provided, however, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' business during the Chapter 11 Cases shall be paid in full in Cash in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations, course of dealing, course of business, or industry practice.

2.    *Professional Fee Claims.*

All Professionals or other Entities requesting compensation or reimbursement of expenses pursuant to sections 328, 330, 331, 503(b) and/or section 1103 of the Bankruptcy Code for services rendered before the Effective Date (including, without limitation, any compensation requested by any Professional or any other entity for making a substantial contribution in the Chapter 11 Cases) shall file and serve final requests for allowance and payment of Professional Fee Claims no later than the first Business Day that is forty-five (45) days after the Effective Date. Objections to any Professional Fee Claim must be filed and served on the Reorganized Debtors and the applicable Professional within thirty (30) days after the filing of the final fee application with respect to the Professional Fee Claim. Any such objections that are not consensually resolved may be set for hearing on twenty-one (21) days' notice by the Professional asserting such Professional Fee Claim. The Reorganized Debtors shall promptly pay all amounts owed on account of Professional Fee Claims upon entry of an order of the Bankruptcy Court allowing such Claims on a final basis.

3.    *Payment of Quarterly Fees.*

The Debtors shall pay on the Effective Date all Quarterly Fees due and payable prior to the Effective Date.  On and after the Effective Date, the Reorganized Debtors shall pay any and all Quarterly Fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee.  Each Debtor shall remain obligated to pay Quarterly Fees to the United States Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  The United States Trustee shall not be required to file a Proof of Claim or any other request for payment of Quarterly Fees.

B.    <u>DIP Credit Facilities Claims</u>.

The DIP Credit Facilities Claims shall be Allowed Claims in the full amount outstanding under the DIP Credit Facilities, including principal, interest, fees, and expenses.  Except to the extent that a Holder of an Allowed DIP Credit Facilities Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed DIP Credit Facilities Claim shall receive, on account of and in full and final satisfaction, settlement, release, and discharge of each Allowed DIP Credit Facilities Claim, indefeasible payment in full in Cash.  Upon the payment or satisfaction of the Allowed DIP Credit Facilities Claims in accordance with this Article II.B, all Liens and security interests granted to secure the Allowed DIP Credit Facilities Claims shall be automatically terminated and of no further force or effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  As used in this Article II.B, "indefeasible payment in full in Cash" shall mean the indefeasible payment in full in Cash of all Allowed DIP Credit Facilities Claims (including all fees and expenses of the DIP Agents through the Effective Date in accordance with the payoff letter), the cancellation, backing, or cash collateralization of letters of credit under the DIP Credit Facilities in accordance with terms of the DIP Credit Facilities, the termination of the DIP Agents' and DIP Lenders' commitments to extend credit under the DIP Facility, and the receipt by the DIP Agents of a countersigned payoff letter in form and substance reasonably satisfactory to the DIP Agents.

C.    <u>Priority Tax Claims</u>.

Except to the extent that each Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, payment in full in Cash in accordance with the terms of any agreement between the applicable Debtor or Reorganized Debtor, as applicable, and such Holder, or as such Allowed Priority Tax Claim may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

D.    <u>Post-Effective Date Fees and Expenses</u>.

Except as otherwise specifically provided in this Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the legal, professional, or

other fees and expenses related to the implementation and consummation of this Plan incurred by the Reorganized Debtors following the Effective Date. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Reorganized Debtor may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND INTERESTS

A.    <u>Classification of Claims and Interests</u>.

1.    *General*.

This Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. Except for the Claims addressed in <u>Article II</u> (or as otherwise set forth herein), the Debtors have placed all Claims and Interests into Classes for each of the Debtors. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Credit Facilities Claims, or Priority Tax Claims, as described in <u>Article II</u>.

The Classes of Claims and Interests set forth below classify Claims and Interests for all purposes, including Confirmation and distribution pursuant to this Plan, as set forth herein. This Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and any Claim or Interest shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid, released, or otherwise settled prior to the Effective Date.

2.    *Summary of Classification and Treatment of Claims and Interests*.

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 3 | Prepetition ABL Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 4 | Prepetition Term Loan Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 7 | Interests in MF Holdco | Impaired | Entitled to Vote |
| 8 | Intercompany Interests | Unimpaired | Presumed to Accept; Not Entitled to Vote |

17

B.       Treatment of Claims and Interests.

1.       *Class 1 – Other Priority Claims.*

a.       Classification:  Class 1 consists of all Other Priority Claims.

b.       Treatment:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash of such Allowed Other Priority Claim on or as soon as reasonably practicable after the last to occur of (i) the Effective Date, (ii) the date such Other Priority Claim becomes and Allowed Claim, (iii) the date on which such Allowed Other Priority Claim is due to be paid in the ordinary course of business of the Debtors or Reorganized Debtors, if applicable, and (iv) the date on which the Holder of such Allowed Other Priority Claim and the Debtors or Reorganized Debtors shall otherwise agree in writing.

c.       Voting:  Allowed Other Priority Claims in Class 1 are Unimpaired. Each Holder of an Allowed Other Priority Claim shall be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

2.       *Class 2 – Other Secured Claims.*

a.       Classification:  Class 2 consists of all Other Secured Claims.

b.       Treatment:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall, in the discretion of the Reorganized Debtors, receive (i) treatment of such Allowed Other Secured Claim in any manner that renders the claim Unimpaired, including Reinstatement, (ii) payment in full in Cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, or (iii) the collateral securing such Allowed Other Secured Claim, in each case on or as soon as reasonably practicable after the Effective Date.

c.       Voting:  Allowed Other Secured Claims in Class 2 are Unimpaired. Each Holder of an Allowed Other Secured Claim shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

3.      *Class 3 – Prepetition ABL Claims*.

a.      <u>Classification</u>:  Class 3 consists of all Prepetition ABL Claims.

b.      <u>Allowance</u>:  The Prepetition ABL Claims are Allowed and will be paid in full by being deemed to roll-up into the DIP ABL Credit Facility pursuant to the DIP Orders in the full principal amount plus all accrued and unpaid fees, costs, expenses, interest (at the non-default rate), charges, premiums and other obligations due under the Prepetition ABL Facility and such Prepetition ABL Claims shall not be subject to recharacterization, subordination, avoidance or any other claim or defense.

c.      <u>Treatment</u>:  In exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed Prepetition ABL Claim, each Holder of an Allowed Prepetition ABL Claim will receive indefeasible payment in full of such Allowed Prepetition ABL Claim through the consensual roll-up of the Allowed Prepetition ABL Claims into the DIP ABL Credit Facility in accordance with the terms of the DIP Orders and the DIP ABL Credit Facility; <u>provided</u>, <u>however</u>, that all indemnification obligations of the Debtors arising under the Prepetition ABL Documents in favor of the Prepetition ABL Agent or any Prepetition ABL Lender, or any of their directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, shall remain in full force and effect and be assumed by and enforceable against the Reorganized Debtors on and after the Effective Date.

d.      <u>Voting</u>:    Allowed Prepetition ABL Claims in Class 3 are Unimpaired.  Each Holder of an Allowed Prepetition ABL Claim shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

4.      *Class 4 – Prepetition Term Loan Claims*.

a.      <u>Classification</u>:    Class 4 consists of all Prepetition Term Loan Claims.

b.      <u>Allowance</u>:  The Prepetition Term Loan Claims are Allowed in the full principal amount plus all accrued and unpaid fees, costs, expenses, interest (at the non-default rate), charges, premiums and other obligations due under the Prepetition Term Loan Facility, and such Prepetition Term Loan Claims shall not be subject to recharacterization, subordination, avoidance or any other claim or defense.

c.      <u>Treatment</u>:  In exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed Prepetition Term Loan Claim, each Holder of an Allowed Prepetition Term Loan Claim shall receive indefeasible payment in full in Cash of such Allowed Prepetition Term Loan Claim on the Effective Date; <u>provided</u>, <u>however</u>, that all indemnification obligations of the Debtors arising under the Prepetition Term Loan Documents in favor of the Prepetition Term Loan Lender, or its directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, shall remain in

19

full force and effect and be assumed by and enforceable against the Reorganized Debtors on and after the Effective Date.

            d.    <u>Voting</u>:  Allowed Prepetition Term Loan Claims in Class 4 are Unimpaired.  Each Holder of an Allowed Prepetition Term Loan Claim shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

          5.    *Class 5 – General Unsecured Claims.*

            a.    <u>Classification</u>:  Class 5 consists of all General Unsecured Claims.

            b.    <u>Allowance</u>:  On the Effective Date, the Intra-Group Loan Claims shall be Allowed.

            c.    <u>Treatment</u>:

            (i)    Subject to <u>Article III.B.5.c(ii)</u> and <u>Article III.B.5.c(iii)</u> in respect of Allowed General Unsecured Claims that are Rejection Damages Claims or Intra-Group Loan Claims, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive payment in full of such Allowed General Unsecured Claim in Cash on or as soon as reasonably practicable after the last to occur of (x) the Effective Date, (y) the date on which an Allowed General Unsecured Claim is due to be paid in the ordinary course of business of the Debtors or the Reorganized Debtors, or (z) the date on which the Holder of an Allowed General Unsecured Claim and the Debtors or Reorganized Debtors shall otherwise agree in writing.

            (ii)    Except to the extent that a Holder of an Allowed General Unsecured Claim that is a Rejection Damages Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Rejection Damages Claim, each Holder of an Allowed Rejection Damages Claim shall receive payment in full of such Allowed Rejection Damages Claim in Cash on or as soon as reasonably practicable after the last to occur of (x) the date such Rejection Damages Claim becomes an Allowed Claim pursuant to <u>Article VII.B.2</u> or (y) the date on which the Holder of an Allowed Rejection Damages Claim and the Debtors or Reorganized Debtors shall otherwise agree in writing.

            (iii)    Each Holder of an Allowed General Unsecured Claim that is an Intra-Group Loan Claim has, in accordance with section 1123(a)(4) of the Bankruptcy Code, agreed to less favorable treatment of such Allowed Intra-Group Loan Claim.  Specifically, each Holder of an Allowed Intra-Group Loan Claim against each Debtor has agreed to receive no distributions under the Plan solely on account of such Allowed Intra-Group Loan Claims, and the Intra-Group Loan Guarantees by such Debtors shall be released on the Effective Date.

d.      Voting:    Allowed General Unsecured Claims in Class 5 are Unimpaired.  Each Holder of an Allowed General Unsecured Claim shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

6.      *Class 6 – Intercompany Claims.*

a.      Classification:  Class 6 consists of all Intercompany Claims.

b.      Treatment:  On the Effective Date, all Intercompany Claims shall be Reinstated.

c.      Voting:  Allowed Intercompany Claims in Class 6 are Unimpaired. Each Holder of an Allowed Intercompany Claim shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

7.      *Class 7 – Interests in MF Holdco.*

a.      Classification:  Class 7 consists of all Interests in MF Holdco.

b.      Treatment:  On the Effective Date, all Interests in MF Holdco shall be Reinstated; provided, however, that such Interests shall, if the MF Holdco Stock is issued to the Exit Term Loan Lenders pursuant to the Exit Term Loan Lender Election, be subject to dilution by (i) the MF Holdco Stock and (ii) the Interests reserved by MF Holdco for the Management Incentive Plan.

c.      Voting:   Interests in MF Holdco in Class 7 are Impaired.   Each Holder of an Interest in MF Holdco shall be entitled to vote to accept or reject this Plan.

8.      *Class 8 – Intercompany Interests.*

a.      Classification:  Class 8 consists of all Intercompany Interests.

b.      Treatment:  On the Effective Date, Intercompany Interests shall be Reinstated, and the legal, equitable, and contractual rights to which Holders of Intercompany Interests are entitled shall remain unaltered to the extent necessary to implement this Plan.

c.      Voting:  Intercompany Interests in Class 8 are Unimpaired.  Each Holder of an Intercompany Interest shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

C.      Special Provisions Regarding Unimpaired Claims.

1.    *Specified Unimpaired Claims.*

Notwithstanding anything to the contrary in this Plan, each Holder of an Allowed Other Priority Claim in Class 1, an Allowed Other Secured Claim in Class 2, an Allowed General Unsecured Claim in Class 5 other than a Rejection Damages Claim or an Intra-Group Loan Claim, or an Allowed Intercompany Claim in Class 6 (each such Allowed Claim, a "Specified Unimpaired Claim") shall be entitled to enforce its rights in respect of such Specified Unimpaired Claim against the Reorganized Debtors until such Specified Unimpaired Claim has been either (a) paid in full in accordance with applicable law, or on terms agreed to between the Holder of such Specified Unimpaired Claim and the Debtors or Reorganized Debtors, or in accordance with the terms and conditions of the applicable documentation or laws giving rise to such Specified Unimpaired Claim or (b) otherwise satisfied or disposed of as determined by a court of competent jurisdiction.

2.    *Rights and Defenses of the Debtors and the Reorganized Debtors.*

Except as otherwise provided in this Plan, the Debtors and the Reorganized Debtors shall retain all rights and defenses, both legal and equitable, under the Bankruptcy Code or other applicable bankruptcy and non-bankruptcy law with respect to any Unimpaired Claim (other than the power to Impair an Unimpaired Claim within the meaning of section 1124 of the Bankruptcy Code), including, but not limited to, legal and equitable rights of setoff and/or recoupment with respect to the Unimpaired Claims.

D.    Alternative Treatment.

Notwithstanding any provision herein to the contrary, any Holder of an Allowed Claim may receive, in lieu of the distribution or treatment to which it is entitled hereunder, any other distribution or treatment to which such Holder and the Debtors or Reorganized Debtors may agree in writing prior to or during the Chapter 11 Cases, including the Plan Support Agreement.

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF PLAN

Holders of Claims or Interests in Classes 1–6 and Holders of Interests in Class 8 are Unimpaired under this Plan and are therefore conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, no Holders of Claims or Interests in such Classes shall be entitled to vote to accept or reject this Plan. Class 7 is Impaired under this Plan, and the Holders of Interests in Class 7 are entitled to vote to accept or reject this Plan.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF PLAN

A.    Sources of Cash Consideration for Plan Distributions.

22

All Cash necessary for the Reorganized Debtors to make payments required by this Plan shall be obtained from (1) Cash on hand, including Cash from operations and the proceeds of the DIP Credit Facilities, and (2) the proceeds of the Exit Facilities.

B.    Exit Facilities.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities and provide any related guarantees, and the Exit Facilities shall be made available to the Reorganized Debtors pursuant and subject to the terms and conditions set forth in the Exit Facility Documents. Pursuant to the terms of the Exit Term Loan Facility the Exit Term Loan Lenders shall make the Exit Term Loan Lender Election on or prior to the Effective Date and shall receive either the (1) the Stripes Stock and the Stripes PIK Debt or (2) the MF Holdco Stock and the MF Holdco PIK Debt on the Effective Date.

The Confirmation Order shall constitute approval of the Exit Facilities (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith), and authorization for the Reorganized Debtors to enter into and perform under the Exit Facility Documents and such other documents as may be required or appropriate.

C.    Intra-Group Loan Facilities.

For the avoidance of doubt, except as provided in Article III.B.5.c.iii with respect to the release of the Intra-Group Loan Guarantees, no provision of this Plan including the releases granted under Article X.D.2 of this Plan, shall constitute a discharge, release, or other modification of the Intra-Group Loan Facilities or the obligations of Stripes or its non-Debtor Affiliates thereunder. Pursuant to the Plan Support Agreement, SEAG and Möbel have agreed to contribute the Intra-Group Loan Claims (other than the Intra-Group Loan Guarantees, which are released hereby) to the share capital of Stripes, and to release the guarantee by MFHC in respect of the Intra-Group Loan Facilities, provided that the conditions to such contribution and release specified in the Plan Support Agreement are met.

D.    Corporate Action.

Upon the Effective Date, all actions contemplated by this Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors, the Reorganized Debtors, or any other Entity.

E.    Reorganized Debtors' Directors and Officers.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent that there are anticipated changes in the Reorganized Debtors' Directors and Officers under the terms of the Exit Term Loan Facility or otherwise, the Debtors will identify those changes in their brief in support of Confirmation of the Plan to be filed in these Chapter 11 Cases. After the Effective Date, the

Reorganized Debtors' organizational documents, as each may be amended thereafter from time to time, shall govern the designation and election of directors of the Reorganized Debtors.

F.    Continued Legal Existence and Vesting of Assets in the Reorganized Debtors.

Except as otherwise provided in this Plan, each of the Debtors shall continue to exist on and after the Effective Date as a separate corporation, limited liability company, or other form of Entity, as the case may be, with all of the powers of such Entity under applicable law in the jurisdiction in which each Debtor is organized, incorporated, or otherwise formed and pursuant to such Debtor's articles of incorporation or formation, operating agreement, by-laws (or other analogous formation and governance documents) in effect immediately prior to the Effective Date (provided that such organizational documents shall be amended to prohibit the Reorganized Debtor from issuing non-voting equity securities, to the extent necessary to comply with section 1123(a) of the Bankruptcy Code), without prejudice to any right of the Reorganized Debtors to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date. In accordance with Article X.B, and except as explicitly provided in this Plan, on the Effective Date, all property comprising the Estates shall vest in the Reorganized Debtors.

G.    Cancellation of Liens.

Except as otherwise provided in this Plan, or in any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, on the Effective Date, in consideration for the distributions to be made on the Effective Date pursuant to this Plan, all Liens, charges, and encumbrances related to any Claim (other than any Lien securing an Other Secured Claim, solely to the extent such Claim is not Reinstated pursuant to this Plan), shall be terminated, null and void and of no force or effect. Each Holder of an Allowed Other Secured Claim (to the extent such Claim is not Reinstated pursuant to this Plan), an Allowed Prepetition ABL Claim, and/or an Allowed Prepetition Term Loan Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such Holder and to take such actions as may be requested by the Debtors (or the Reorganized Debtors as the case may be) to evidence the release of any Liens, including the execution, delivery, and filing or recording of such release documents as may be requested by the Debtors (or the Reorganized Debtors, as the case may be). The Debtors (or the Reorganized Debtors as the case may be) and any of their respective agents, attorneys or designees, shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements, intellectual property assignments, mortgage or deed of trust releases or such other forms or release documents as may be necessary or appropriate to implement the provisions of this section.

H.    Preservation of Causes of Action.

In accordance with section 1123(b)(3) of the Bankruptcy Code, but subject to the releases set forth in Article X.D.1, all Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the

foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. **No Entity may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any specific Cause of Action as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in this Plan**, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to any Cause of Action upon, after, or as a consequence of the Confirmation or the occurrence of the Effective Date.

I.    Exemption from Certain Transfer Taxes and Recording Fees.

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to this Plan (including, without limitation, the execution and delivery of the Exit Facilities) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and, upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and are allowed to accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

J.    Management Incentive Plan.

In accordance with the terms of the Plan Support Agreement and the Exit Term Loan Facility, certain of the Reorganized Debtors' senior management shall be entitled to participate in the Management Incentive Plan, the terms of which shall become effective only after the Effective Date. The Management Incentive Plan is a post-bankruptcy incentive plan and provides no awards for actions taken by any of the Debtors' employees during the Chapter 11 Cases. Pursuant to the terms of the Plan Support Agreement, Steinhoff Holdings, Steinhoff Finance, Möbel, SEAG, Stripes, and MFHC consent to (A) the issuance of 10% (on a fully-diluted basis) of the stock in either (1) Stripes, if the Stripes Stock is issued pursuant to the Exit Term Loan Lender Election, or (2) MF Holdco, if the MF Holdco Stock is issued pursuant to the Exit Term Loan Lender Election to members of senior management of the Reorganized Debtors following the Effective Date, with all matters relating to vesting of such stock based on time and performance to be determined by a majority vote of the board of directors of Stripes or MF Holdco, as applicable, with respect to which each of the directors is provided an opportunity to vote following the Effective Date, and (B) the issuance of 10% of the principal amount of (1) the Stripes PIK Debt if the Stripes PIK Debt is issued pursuant to the Exit Term Loan Lender Election, or (2) the MF Holdco PIK Debt, if the MF Holdco PIK Debt is issued pursuant to the Exit Term Loan Lender Election, to members of senior management of the Reorganized Debtors following the Effective Date, with the allocations thereof to be determined by a majority vote of the board of directors of Stripes or MF Holdco, as applicable, with respect to which each of the directors is provided an opportunity to vote following the Effective Date of the Plan in a way that avoids triggering adverse tax consequences for such

members of senior management or, in the alternative, compensation of comparable value in a form to be reasonably agreed upon ((A) and (B) collectively, the "Management Incentive Plan").

K.    Workers' Compensation Programs.

As of the Effective Date, the Reorganized Debtors shall continue to honor their obligations under (1) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (2) the Debtors' (a) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation, (b) self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance.

L.    Operations Between the Confirmation Date and the Effective Date.

During the period from the Confirmation Date to and including the Effective Date, the Debtors may continue to operate their business as debtors in possession in the ordinary course, subject to all applicable orders of the Bankruptcy Court and the provisions of the Bankruptcy Code.

M.    Dissolution of Creditors' Committee.

The Debtors do not anticipate that a Creditors' Committee will be formed in the Chapter 11 Cases because all Holders of Allowed General Unsecured Claims are Unimpaired under this Plan. Notwithstanding the foregoing, a Creditors' Committee, if appointed, shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and shall perform such other duties as it may be assigned by the Bankruptcy Court prior to the Effective Date. On the Effective Date, the Creditors' Committee, if appointed, shall be dissolved and the Creditors' Committee members shall be deemed released of all of their duties, responsibilities, and obligations in connection with the Chapter 11 Cases or this Plan and its implementation, and the retention and employment of the Creditors' Committee's attorneys, accountants, professionals and other agents shall terminate.

## ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    Assumption of Executory Contracts and Unexpired Leases.

On the Effective Date, all Executory Contracts or Unexpired Leases, including the Plan Support Agreement, shall be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code (each an "Assumed Contract" or "Assumed Lease"), unless any such Executory Contract or Unexpired Lease:

(1)    has previously been rejected by a Final Order of the Bankruptcy Court;

(2)    has previously been rejected by an order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date;

(3)    is the subject of a Rejection Motion or Lease Rejection Notice pending as of the Effective Date and is subsequently rejected by a Final Order of the Bankruptcy Court; or

(4)    is identified on the Schedule of Post-Effective Date Negotiated Leases as an Unexpired Lease as to which the counterparty has consented in writing to the Debtors' deferral of their decision to assume or reject for a period of up to ninety (90) days after the Effective Date; provided, however, that the Debtors or the Reorganized Debtors, as applicable, may assume any Unexpired Lease identified on the Schedule of Post-Effective Date Negotiated Leases at any time before termination of the Post-Effective Date Lease Negotiation Period on such terms as may be agreed with the relevant counterparty thereto.

The Debtors will not assign any Executory Contracts or Unexpired Leases pursuant to this Plan.

Entry of the Confirmation Order shall constitute findings by the Bankruptcy Court that (a) the Reorganized Debtors have properly provided for the cure of any defaults that might have existed consistent with the requirements of section 365(b)(1) of the Bankruptcy Code; (b) each assumption is in the best interest of the Reorganized Debtors, their Estates, and all parties in interest in the Chapter 11 Cases; and (c) the requirements for assumption of any Executory Contract or Unexpired Lease to be assumed have been satisfied.  Except as otherwise provided in the following sentence, defaults under Assumed Contracts and Assumed Leases will be cured by being Reinstated, and all Claims under any Assumed Contract or Assumed Lease shall be paid by the Reorganized Debtors on the Effective Date or as soon as reasonably practicable thereafter.  In the event of a dispute as to the amount necessary to satisfy any Claim under section 365(b)(1) of the Bankruptcy Code, such Claim shall be paid upon the later of (i) a settlement of such dispute between the Reorganized Debtors and the relevant Holder and (ii) entry of a Final Order resolving such dispute; provided, however, that if a counterparty's objection to the amount necessary to satisfy a Claim under section 365(b)(1) of the Bankruptcy Code is sustained, the Reorganized Debtors may elect, in their discretion, to reject such Executory Contract or Unexpired Lease in lieu of assuming such Executory Contract or Unexpired Lease.

B.    Rejection of Executory Contracts and Unexpired Leases.

Executory Contracts and Unexpired Leases that are the subject of a Rejection Motion or a Lease Rejection Notice shall be deemed rejected on the date specified in the Final Order authorizing such rejection.  The Debtors reserve the right, at any time prior to the Effective Date (subject to the following paragraph in respect of the Schedule of Post-Effective Date Negotiated Leases), to file one or more motions requesting authorization to reject any Executory Contract or Unexpired Lease and/or file one or more Lease Rejection Notices, and to remove any Executory Contract or Unexpired Lease from any such Rejection Motion or Lease Rejection Notice.  The Debtors are authorized to abandon any Remaining Property at or on the leased premises subject to an Unexpired Lease rejected by a Final Order, and the counterparties to the rejected Unexpired Leases may dispose of any such Remaining Property at or on the subject premises on the applicable lease rejection effective date in accordance with the terms and provisions of the Lease Rejection Procedures Order or any Final Order authorizing such rejection.

Notwithstanding anything to the contrary in this Plan, the Debtors and Reorganized Debtors shall be entitled to file one or more Lease Rejection Notices after the Effective Date up to and including the third Business Day after the termination of the Post-Effective Date Lease Negotiation Period to reflect their decision, if any, to reject Unexpired Leases of nonresidential real property listed on the Schedule of Post-Effective Date Negotiated Leases.

C.    Compensation and Benefits Programs.

All of the Compensation and Benefits Programs entered into before the Petition Date and not since terminated shall be deemed to be, and shall be treated as though they are, Assumed Contracts under Article VI.A, and the Debtors' and Reorganized Debtors' obligations under the Compensation and Benefits Programs will survive Confirmation of this Plan and be fulfilled in the ordinary course of business.

D.    Indemnification Obligations.

Notwithstanding anything in this Plan to the contrary, each Indemnification Obligation shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 356 and 1123 of the Bankruptcy Code or otherwise. Each Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose. For the avoidance of doubt, this Article VI.D affects only the obligations of the Debtors and Reorganized Debtors with respect to any Indemnification Obligations owed to or for the benefit of past and present directors, officers, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors, and shall have no effect on nor in any way discharge or reduce, in whole or in part, any obligation of any other Entity owed to or for the benefit of such directors, officers, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors.

E.    Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided in this Plan, each Assumed Contract or Assumed Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Assumed Contract or Assumed Lease, and Executory Contracts and Unexpired Leases related thereto, if any, unless the Debtors reject or repudiate any of the foregoing agreements. Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.    Reservation of Rights.

Neither the inclusion of any Executory Contract or Unexpired Lease in a Rejection Motion or a Lease Rejection Notice, nor anything contained in this Plan, shall constitute an admission by

the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**ARTICLE VII.**

**PROVISIONS FOR RESOLVING DISPUTED CLAIMS**

On and after the Effective Date, the Debtors or the Reorganized Debtors shall retain any and all of their rights and defenses such Debtor had with respect to any Claim that existed immediately before the Effective Date.

A.      Claims Other than Rejection Damages Claims.

Subject to Article VII.B in respect of Rejection Damages Claims, the Debtors and the Reorganized Debtors may contest the amount and validity of any disputed, contingent, or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved, or adjudicated if the Chapter 11 Cases had not been commenced.  **No Proofs of Claim need be filed for any Claims other than Rejection Damages Claims**.

B.      Rejection Damages Claims.

1.      *Proofs of Claim for Rejection Damages Claims.*

If the rejection of an Executory Contract or Unexpired Lease results in a Rejection Damages Claim, then such Claim shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors or their properties, or any of their interests in properties as agent, successor or assign, unless a Proof of Claim is filed with the Claims and Noticing Agent and served upon counsel to the Reorganized Debtors no later than the Rejection Damages Claims Bar Date.  The Debtors shall give notice of the Rejection Damages Claims Bar Date established by this Article VI.B and provide a Proof of Claim form (i) to the counterparties to rejected Executory Contracts or Unexpired Leases as of the Effective Date by service of the Notice of Effective Date, and (ii) to the counterparties to the Unexpired Leases of nonresidential real property listed on the Schedule of Post-Effective Date Negotiated Leases that are subject to Rejection Notices after the Effective Date by service of such Rejection Notice.

2.      *Allowance of Rejection Damages Claims.*

No Rejection Damages Claim shall become an Allowed Claim unless and until (i) a Proof of Claim is timely filed on account of such Claim and (ii) such Claim is (x) Allowed pursuant to a Final Order or (y) settled or compromised between the applicable Debtor and the counterparty to the applicable Executory Contract or Unexpired Lease.

3.      *Administration of Rejection Damages Claims.*

Except as otherwise provided in this Plan and notwithstanding any requirements that may be imposed by Bankruptcy Rule 9019, after the Effective Date the Reorganized Debtors shall have the authority to: (a) file, withdraw, or litigate to judgment objections to Rejection Damages Claims; (b) settle or compromise any Disputed Rejection Damages Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without further notice to or action, order, or approval by the Bankruptcy Court.

4.      *Time to File Objections to Rejection Damages Claims.*

Any objection to a Rejection Damages Claim shall be filed on or before the Claims Objection Deadline, as such deadline may be extended from time to time.

5.      *Adjustment to Claims Register without Objection.*

The Debtors or the Reorganized Debtors may adjust and expunge any duplicate Claim, any Claim that has been paid or satisfied, or any claim that has been amended or superseded, upon stipulation between the parties without the need for a Claims objection to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VIII.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.      <u>Allowed Claims and Interests</u>.

Notwithstanding any provision herein to the contrary, the Debtors or the Reorganized Debtors shall make distributions only to Holders of Allowed Claims.  A Holder of a Disputed Claim shall receive only a distribution on account thereof when and to the extent that such Holder's Disputed Claim becomes an Allowed Claim.

B.      <u>Interest and Penalties on Claims</u>.

Unless otherwise specifically provided for in this Plan or the Confirmation Order, required by applicable bankruptcy law, or necessary to render a Claim Unimpaired, post-petition interest and penalties shall not accrue or be paid on any Claims, including Priority Tax Claims, Other Priority Claims, and General Unsecured Claims, and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the petition Date through the date such Claim is satisfied in accordance with the terms of this Plan.

C.      <u>Means of Cash Payment</u>.

Payments of Cash made pursuant to this Plan shall be made, at the option and in the sole discretion of the Reorganized Debtors, by checks drawn on or wire transfers from a bank selected by the Reorganized Debtors.

D.      Withholding and Reporting Requirements.

In connection with this Plan and all distributions hereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.   The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

E.      Setoff and Recoupment.

The Reorganized Debtors may, pursuant to sections 553 and/or 558 of the Bankruptcy Code or applicable non-bankruptcy laws, but shall not be required to, set off and/or recoup against any Claim the payments or other distributions to be made pursuant to this Plan in respect of such Claim, or claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim; provided, however, that neither the failure to assert such rights of setoff and/or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any claim that the Debtors or the Reorganized Debtors may assert against any Holder of an Allowed Claim, and all setoff and/or recoupment claims of the Debtors and/or the Reorganized Debtors are hereby preserved.

F.      Undeliverable or Non-Negotiated Distributions.

All undeliverable distributions under this Plan that remain unclaimed for one year after attempted distribution shall indefeasibly revert to the Reorganized Debtors.  Upon such reversion, the relevant Allowed Claim shall be automatically discharged and forever barred, notwithstanding any federal or state escheatment laws to the contrary.

G.      Claims Paid by Third Parties.

To the extent a Holder receives a distribution on account of a Claim and also receives payment from a party other than the Debtors or the Reorganized Debtors on account of such Claim, such Holder shall, within thirty (30) days of receipt thereof, repay or return the distribution to the Reorganized Debtors, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of the Claim as of the date of any such distribution under this Plan.

## ARTICLE IX.

### CONFIRMATION AND CONSUMMATION OF PLAN

A.      Conditions to the Effective Date.

The Effective Date shall not occur unless and until the following conditions shall have been satisfied or waived in accordance with Article IX.B:

1.    The Confirmation Order, in form and substance reasonably satisfactory to the Debtors, the Exit Term Loan Lenders, and the Plan Support Parties shall have become a Final Order and shall, among other things, provide that the Debtors and the Reorganized Debtors are authorized to take all actions necessary or appropriate to enter into, implement, and consummate the Exit Facilities and other agreements or documents contemplated by this Plan.

2.    The Exit Term Loan Documents shall have been executed and delivered, and all conditions precedent thereto shall have been satisfied (other than the occurrence of the Effective Date), including that either:

        a.    The Stripes Restructuring shall have been consummated (in which case the Stripes Stock and the Stripes PIK Debt shall be issued to the Exit Term Loan Lenders pursuant to the Exit Term Loan Lender Election); or

        b.    If the Stripes Restructuring has not been consummated, the Exit Term Loan Lenders shall be satisfied, in their sole and absolute discretion, with the results of their diligence into the potential U.S. tax impacts of the Plan and the transactions contemplated hereby (in which case the MF Holdco Stock and the MF Holdco PIK Debt shall be issued to the Exit Term Loan Lenders pursuant to the Exit Term Loan Lender Election).

3.    Any and all authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement this Plan on the Effective Date shall have been obtained or shall have occurred.

4.    The Confirmation Order shall provide that all Claims for damages resulting from the rejection or termination of an Unexpired Lease of nonresidential real property shall be Allowed only to the extent provided under section 502(b)(6) of the Bankruptcy Code.

B.    <u>Waiver of Conditions</u>.

Each of the conditions to the occurrence of the Effective Date set forth in Article IX.A may be waived in whole or in part by the Debtors with the prior written approval of the Exit Term Loan Lenders and the Plan Support Parties, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan.  The failure to satisfy or waive any condition to the Effective Date may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied.

C.    <u>*Vacatur* of Confirmation Order; Non-Occurrence of Effective Date</u>.

If the Confirmation Order is vacated or the Effective Date does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall (1) constitute a waiver or release of any Causes of Action by or Claims against or Interests in the

Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest or any other Entity; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect; or (4) be used by the Debtors or any other Entity as evidence (or in any other way) in any litigation, including with respect to the strengths and weaknesses of positions, arguments or claims of any of the parties to such litigation.

## ARTICLE X.

## EFFECT OF PLAN CONFIRMATION

A.    Binding Effect.

On the Effective Date of this Plan, all provisions of this Plan, including all agreements, instruments and other documents filed in connection with this Plan by the Debtors or the Reorganized Debtors, shall be binding upon the Debtors, the Estates, the Reorganized Debtors, all Holders of Claims against and Interests in the Debtors and each such Holder's respective successors and assigns, and all other parties that are affected in any manner by this Plan. Except as expressly provided otherwise in this Plan, all agreements, instruments and other documents filed in connection with this Plan shall be given full force and effect, and shall bind all parties referred to therein as of the Effective Date, whether or not such agreements are actually issued, delivered or recorded on the Effective Date or thereafter and whether or not a party has actually executed such agreement.

B.    Vesting of Assets in the Reorganized Debtors.

Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estates—including, without limitation, all Causes of Action not released in Article X.D.1, all Executory Contracts and Unexpired Leases assumed by any of the Debtors, and any property acquired by any of the Debtors, but excluding all Remaining Property that has been abandoned pursuant to an order of the Bankruptcy Court (including without limitation, the Lease Rejection Procedures Order)—shall vest in each respective Reorganized Debtor free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided by this Plan or the Confirmation Order. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

C.    **Discharge**.

1.    ***Discharge of the Debtors***.

**Except as expressly provided in this Plan or the Confirmation Order (including to the extent any Claims are Reinstated under this Plan), all consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties and, regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to this Plan on account of such**

Claims, upon the Effective Date, each of the Debtors shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (c) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (d) the Holder of a Claim based upon such debt is deemed to have accepted this Plan.

2.      *Discharge Injunction*.

As of the Effective Date, except as expressly provided in this Plan or the Confirmation Order, all Entities shall be precluded from asserting against the Debtors or the Reorganized Debtors any Claims, debts, rights, causes of action, claims for relief, liabilities, or equity interests relating to the Debtors that have been released, discharged, or exculpated pursuant to the Plan and which are based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as explicitly provided in this Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all Claims and other debts and liabilities against the Debtors pursuant to section 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time to the extent such judgment relates to a discharged Claim.

D.      **Releases**.

1.      *Releases by the Debtors*.

As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents or an assumed contract that remains in effect or becomes effective after the Effective Date or (ii) as expressly provided in this Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate and implement the reorganization of the Debtors, as an integral component of the Plan, as of the Effective Date, the Debtors, the Reorganized Debtors, and each of their respective current and former Affiliates (with respect to non-Debtors, to the extent permitted by applicable law), on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to the Bankruptcy Code, shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, void, extinguish, and discharge, each and all of the Released Parties of and from any and all Causes of Action (including, without limitation, Avoidance Actions), any and all other Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever (including any derivative claims or Causes of Action asserted or that may be asserted on behalf of the Debtors, the Reorganized Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or

hereinafter arising, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors, the Reorganized Debtors, their respective assets and properties, and the Estates, the Chapter 11 Cases, the Plan Support Agreement, the DIP Credit Facilities, Intra-Group Loan Guarantees, the Prepetition Debt Documents, this Plan, the Disclosure Statement, and any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of this Plan, including the distribution of property under this Plan, the execution and delivery of the Exit Facilities, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in this **Article X.D.1** shall not be construed as (a) releasing any Released Party from Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, or (b) releasing any post-Effective Date obligations of any Entity under this Plan or any document, instrument, or agreement executed to implement this Plan or Reinstated under this Plan.

2.    *Releases by Certain Holders of Claims*.

Except as expressly provided in this Plan or the Confirmation Order, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors, as an integral component of the Plan, each Releasing Party shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, void, extinguish, and discharge each Debtor, Reorganized Debtor, and other Released Party from any and all Claims, Interests, obligations, rights, demands, suits, judgments, Causes of Action, damages, debts, remedies, losses and liabilities of any nature whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors, the Reorganized Debtors, or their Estates, that such Releasing Party would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors, the Reorganized Debtors, their respective assets and properties, and the Estates, the Chapter 11 Cases, the Plan Support Agreement, the DIP Credit Facilities, the Intra-Group Loan Guarantees, the Prepetition Debt Documents, this Plan, the Disclosure Statement, the Exit Facilities, and any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Cases the pursuit of Confirmation, the administration and implementation of this Plan, including the distribution of property under this Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before

the Effective Date related or relating to the foregoing; **provided**, **however**, that the releases set forth in this **Article X.D.2** shall not constitute a release of any claims held by the Intra-Group Lenders other than with respect to the Intra-Group Loan Guarantees. Notwithstanding the foregoing, the releases set forth in this **Article X.D.2** shall not be granted or be deemed to have been granted by any Entity who returns the Opt-Out Election Form, within thirty (30) days after entry of the Effective Date, to the address specified on the Opt-Out Election Form, specifying that such Entity elects not to grant the releases contained in this **Article X.D.2**.

E.  **Exculpation.**

From and after the Effective Date, the Exculpated Fiduciaries and, solely to the extent provided by section 1125(e) of the Bankruptcy Code, the Section 1125(e) Parties, shall neither have nor incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective Affiliates, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or any of their successors or assigns, for any act, omission, transaction, event, or other circumstance in connection with or related to the Debtors, the Reorganized Debtors, their respective assets and properties, and the Estates, the Chapter 11 Cases, the Plan Support Agreement, the DIP Credit Facilities, the Intra-Group Loan Guarantees, the Exit Facilities, the Prepetition Debt Documents, this Plan, or the Disclosure Statement, the pursuit of Confirmation, the administration and implementation of this Plan, including the distribution of property under this Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to the foregoing; **provided**, **however**, that this **Article X.D** shall not apply to release (1) obligations under this Plan and the contracts, instruments, releases, agreements, and documents delivered, Reinstated or assumed under this Plan or (2) any Claims or Causes of Action arising out of fraud, willful misconduct or gross negligence as determined by a Final Order.

Each of the Exculpated Parties shall be entitled to rely, in all respects, upon the reasonable and informed advice of counsel with respect to their duties and responsibilities under this Plan.

F.  **Injunctions.**

1.  ***Injunction Related to Releases.***

Except as expressly provided in this Plan or the Confirmation Order, as of the Effective Date, all Entities that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, Cause of Action or liability of any nature whatsoever, of the types described in **Article X.D.2** and relating to the Debtors, the Reorganized Debtors or any of their respective assets and property and/or the Estates, the Chapter 11 Cases, the Plan Support Agreement, the DIP Credit Facilities, the Intra-Group Loan Guarantees, the Exit Facilities, this Plan and/or the Disclosure Statement are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Released Party or its property on

account of such released liabilities, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under **Article X.C**; and/or (e) commencing or continuing in any manner any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order.

2.    *Injunction Related to Exculpation.*

Except as expressly provided in this Plan or the Confirmation Order, as of the Effective Date, all Entities that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, Cause of Action or liability of any nature whatsoever, of the types described in **Article X.E** and relating to the Debtors, the Reorganized Debtors or any of their respective assets and property and/or the Estates, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Exculpated Party or its property on account of such released liabilities, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under **Article X.C**; and/or (e) commencing or continuing in any manner any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order.

G.    Term of Bankruptcy Injunction or Stays.

All injunctions or stays provided for in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and this Plan pursuant to sections 105(c) and 1142 of the Bankruptcy Code and to the fullest extent permitted by law, including, among other things, jurisdiction to:

1.     resolve any matters related to the assumption or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine the Allowed amount of, and, if necessary, liquidate any Claims (including Rejection Damages Claims) arising therefrom.

2.     ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and adjudicate any and all disputes relating to distributions under this Plan.

3.     decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date (which jurisdiction shall be non-exclusive as to any such non-core matters);

4.     enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases and other agreements or documents created in connection with this Plan, the Disclosure Statement, or the Confirmation Order, and issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of this Plan or the Confirmation Order;

5.     resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or any contract, instrument, release or other agreement or document that is executed or created pursuant to this Plan, or any Entity's rights arising from or obligations incurred in connection with this Plan or such documents;

6.     approve any modification of this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or approve any modification of the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan, the Disclosure

Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

7.      hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge;

8.      hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under sections 330, 331, 503(b), 1103 and 1129(a)(9) of the Bankruptcy Code, which shall be payable by the Debtors only upon allowance thereof pursuant to an order of the Bankruptcy Court.

9.      hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

10.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if distributions pursuant to this Plan are enjoined or stayed;

11.      determine any other matter that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order;

12.      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

13.      hear and determine all matters related to the property of the Estates from and after the Confirmation Date;

14.      enter a Final Order or decree concluding or closing the Chapter 11 Cases; and

15.      hear any other matter related hereto that are not inconsistent with the Bankruptcy Code or title 28 of the United States Code.

## ARTICLE XII.

### MISCELLANEOUS PROVISIONS

A.      <u>Amendment or Modification of this Plan</u>.

Subject to section 1127 of the Bankruptcy Code, the Debtors may alter, amend or modify this Plan at any time prior to or after the Confirmation Date but prior to the Effective Date.  Each Holder of a Claims or Interest shall be presumed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

39

B.    <u>Effectuating Documents and Further Transactions.</u>

The Debtors and the Reorganized Debtors are authorized to execute, deliver, file or record such contracts, instruments, certificates, notes, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of this Plan (including, without limitation, the Exit Facility Documents).

C.    <u>Successors and Assigns</u>.

The rights, benefits and obligations of any Entity named or referred to in this Plan or the Confirmation Order shall be binding on, and inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiary, or guardian, if any of each such Entity.

D.    <u>Revocation, Withdrawal or Non-Consummation</u>.

This Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. Accordingly, this Plan may be confirmed and consummated for any Debtor, and the fact that this Plan is confirmed or consummated for any particular Debtor shall have no impact on the ability or right of any other Debtor to confirm or consummate this Plan as to that Debtor.

The Debtors reserve the right to revoke or withdraw this Plan at any time prior to the Confirmation Hearing and to file other plans of reorganization.  If the Debtors revoke or withdraw this Plan, or if Confirmation or consummation of this Plan fails to occur, then (1) this Plan shall be null and void in all respects, (2) any settlement or compromise embodied in this Plan (including the fixing of the amount of any Claim or Class of Claim), assumption of Executory Contracts or Unexpired Leases under this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (3) nothing contained in this Plan, and no acts taken in preparation for consummation of this Plan, shall (a) constitute or be deemed to constitute a waiver or release of any Claims or Causes of Action, (b) prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors, or (c) constitute an admission by the Debtors or any other Entity.

E.    <u>Notice</u>.

All notices, requests, and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered, addressed as follows:

Debtors:                    Mattress Firm Holding Corp.
                            10201 S. Main Street
                            Houston, Texas 77025
                            Attn: Kindel Elam
                            kindel.elam@mfrm.com

                            <u>with copies to</u>:

40

| Attorneys | Sidley Austin LLP |
|-----------|-------------------|
| for the Debtors: | One South Dearborn Street |
| | Chicago, Illinois 60603 |
| | Attn:  Bojan Guzina and Matthew E. Linder |

-and-

Sidley Austin LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Attn: Gabriel R. MacConaill and
Michael Fishel

-and-

Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, Delaware 19801
Attn: Edmon L. Morton and Ashley E. Jacobs

F.    Nonseverability of Plan Provisions.

If, prior to Confirmation, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted; provided, that any such alteration or interpretation shall be reasonably satisfactory to (1) the Debtors, (2) the Exit Term Loan Lenders, (3) the Plan Support Parties and (4) the DIP Agents solely to the extent the provisions therein affect the legal and/or economic rights of the DIP Agents. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

G.    Governing Law.

Subject to the provisions of any contract, certificates or articles of incorporation, by-laws, instruments, releases, or other agreements or documents entered into in connection with this Plan, and subject further to Article XI, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with (1) the Bankruptcy Code, the Bankruptcy Rules or other federal law to the extent applicable and (2) if none of such law is

41

applicable, the laws of the State of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

H.      Tax Reporting and Compliance.

The Reorganized Debtors are hereby authorized, on behalf of each of the Debtors, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date to and including the Effective Date.

I.      Closing of Chapter 11 Cases; Caption Change

On or after the occurrence of the Effective Date, the Reorganized Debtors may submit a proposed final decree order (the "Final Decree Order") to the Bankruptcy Court under certification of counsel closing the Chapter 11 Cases of all of the Debtors except one remaining Debtor to be identified in the Final Decree Order (the "Remaining Debtor").  All contested matters relating to each of the Debtors, including objections to Rejection Damages Claims, shall be administered and heard in the Chapter 11 Case of the Remaining Debtor.  Further, for the avoidance of doubt, the Remaining Debtor shall make payments of Quarterly Fees.  In addition, the Reorganized Debtors shall submit, under certification of counsel, a proposed order amending the case caption as of the Effective Date, subject to the entry of the Final Decree Order.

*[Remainder of Page Intentionally Left Blank]*

Respectfully submitted as of
October 4, 2018

Mattress Firm, Inc.
(on behalf of itself and its Affiliated Debtors)

*/s/ Hendré Ackermann*
Hendré Ackermann
Chief Operating Officer and
Chief Financial Officer