SOLICITATION VERSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| MATTRESS FIRM, INC., *et al.*,[1] | Case No. 18-12241 (___) |
| Debtors. | (Joint Administration Requested) |

## DISCLOSURE STATEMENT FOR THE JOINT
## PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION
## FOR MATTRESS FIRM, INC. AND ITS DEBTOR AFFILIATES

THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT A CHAPTER 11 PREPACKAGED PLAN OF REORGANIZATION FOR MATTRESS FIRM, INC. AND ITS DEBTOR AFFILIATES.   MATTRESS FIRM, INC. AND ITS DEBTOR AFFILIATES HAVE NOT FILED FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AND THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR APPROVED BY THE BANKRUPTCY COURT OR THE SECURITIES AND EXCHANGE COMMISSION.   IN THE EVENT THAT THE DEBTORS FILE PETITIONS FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND SEEK CONFIRMATION OF THE PLAN DESCRIBED HEREIN, THIS DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL. THE DEBTORS RESERVE THE RIGHT TO AMEND, SUPPLEMENT, OR OTHERWISE MODIFY THIS DISCLOSURE STATEMENT.

---

[1] The last four digits of Mattress Firm, Inc.'s federal tax identification number are 6008.  The Debtors' mailing address is 10201 S. Main Street, Houston, Texas 77025.  Due to the large number of Debtors in these chapter 11 cases, for which the Debtors will request joint administration, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  This information may be obtained by contacting counsel for the Debtors.

SIDLEY AUSTIN LLP
Bojan Guzina
Matthew E. Linder
Blair M. Warner
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Ashley E. Jacobs (No. 5635)
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

-and-

SIDLEY AUSTIN LLP
Gabriel R. MacConaill (No. 4734)
Michael Fishel
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600

*Proposed Attorneys for the Debtors and Debtors in Possession*

**Dated:  October 4, 2018**

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

Mattress Firm, Inc. ("Mattress Firm") and its affiliated debtors and debtors in possession (collectively, the "Debtors") are providing this document and the accompanying materials (this "Disclosure Statement") because you may be a creditor entitled to vote to accept or reject the *Joint Prepackaged Chapter 11 Plan of Reorganization for Mattress Firm, Inc. and Its Debtor Affiliates* (as such may be amended, altered, modified or supplemented from time to time, the "Plan"),[2] a copy of which is attached hereto as **Exhibit A**. The Debtors are commencing the solicitation of votes to approve the Plan (the "Solicitation") before the Debtors commence voluntary cases under chapter 11 of the Bankruptcy Code. The Disclosure Statement sets forth information: (a) regarding the history of the Debtors and their business; (b) describing the Plan; (c) concerning the Plan and alternatives to the Plan; and (d) advising the Holders of Claims against or Interests in the Debtors of their rights under the Plan.

Because the Debtors have not yet commenced chapter 11 cases, this Disclosure Statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code. The Debtors will, upon the Debtors' commencement of any chapter 11 cases, promptly seek entry of an order of the Bankruptcy Court (a) approving this Disclosure Statement as having contained "adequate information," (b) approving the Solicitation as having been in compliance with section 1126(b) of the Bankruptcy Code, (c) confirming the Plan and (d) granting related relief.

**THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST AVAILABLE RECOVERY FOR THEIR STAKEHOLDERS. NO HOLDERS OF ANY CLAIMS, INCLUDING HOLDERS OF GENERAL UNSECURED CLAIMS, ARE IMPAIRED UNDER THE PLAN. ACCORDINGLY, THE PLAN DOES NOT ALTER THE RIGHTS OF HOLDERS OF CLAIMS TO RECEIVE PAYMENT ON ACCOUNT OF EXISTING OBLIGATIONS IN FULL IN ACCORDANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE. DURING THE CHAPTER 11 CASES, THE DEBTORS WILL CONTINUE TO OPERATE THEIR BUSINESS IN THE ORDINARY COURSE SUBJECT TO AUTHORIZATION FROM THE BANKRUPTCY COURT.**

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

**This Disclosure Statement and the Plan have not been filed with, approved or disapproved by the United States Securities and Exchange Commission (the "SEC") under the United States Securities Act of 1933 (as amended, the "Securities Act") or any securities regulatory authority of any state under any state securities law, nor has the SEC or any state regulatory authority passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense.**

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

## **DISCLAIMER**

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, and certain anticipated events in the Chapter 11 Cases. Although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such anticipated events. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes. Factual information contained in this Disclosure Statement has been provided by the Debtors' management except where otherwise specifically noted.

The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there can be no assurance that the statements contained herein will be correct at any time after this date. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, except as otherwise provided in the Plan or in accordance with applicable law. The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtors and their non-debtor affiliates, the financial information regarding the Debtors, is included for purposes of disclosing information related to the Plan, but, as to contested matters, adversary proceedings, and any other litigation or disputes, is not to be construed as an admission or stipulation, but rather as a statement made in settlement negotiations as part of the Debtors' attempt to settle and resolve claims and controversies pursuant to the Plan. This Disclosure Statement will not be admissible in any non-bankruptcy proceeding, nor will it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan as to Holders of Claims against, or Interests in, either the Debtors or the Reorganized Debtors. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission. Except where specifically noted, the financial information contained in this Disclosure Statement and the exhibits hereto have not been audited by a certified public accountant and have not been prepared in accordance with generally accepted accounting principles in the United States.

The Debtors have not authorized any person or Entity in connection with this Disclosure Statement or the Plan to give any information or make any representation or statement regarding this Disclosure Statement or the Plan, in each case, other than that which is contained in this Disclosure Statement and the exhibits hereto or as otherwise incorporated by reference or referred to herein. If any such information, representation or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

The Debtors' management, in consultation with the Debtors' financial advisors, prepared the financial projections provided in this Disclosure Statement. While the Debtors have presented these projections with numerical specificity, they have necessarily based the projections on a variety of estimates and assumptions that, although considered reasonable by management at the time of preparation, may not be realized, and are inherently subject to significant business, economic, competitive, industry, regulatory, market and financial uncertainties and contingencies, many of which will be beyond the Debtors' or the Reorganized Debtors' control. The Debtors

caution that they cannot make any representations as to the accuracy of these projections or to the Debtors' or Reorganized Debtors' ability to achieve the projected results.  Some assumptions inevitably will not materialize.  Further, events and circumstances occurring subsequent to the date on which these projections were prepared may differ from any assumed facts and circumstances.  Alternatively, any events and circumstances that come to pass may well have been unanticipated, and thus may affect financial results in a materially adverse or materially beneficial manner.  The projections, therefore, may not be relied upon as a guaranty or other assurance of the actual results that will occur.

Certain of the information contained in this Disclosure Statement is by its nature forward looking and contains estimates, assumptions and projections that may be materially different from actual future results.  The words "believe," "may," "will," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements.  These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described in Article VII, "Risk Factors."  In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements.  Except as required by law, the Debtors disclaim any obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

*[Remainder of Page Intentionally Left Blank]*

## **TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................................1

ARTICLE I. OVERVIEW OF THE PLAN ......................................................................2

    A.      New Capital Structure..............................................................................2
    B.      Sources of Cash Consideration for Plan Distributions............................2
    C.      Treatment of Unclassified Claims ...........................................................2
    D.      Classification of Claims and Interests.....................................................4

ARTICLE II. ACCEPTANCE OR REJECTION OF THE PLAN ...................................10

    A.      Class Entitled to Vote on the Plan ........................................................10
    B.      Votes Required for Acceptance by a Class ...........................................10
    C.      Certain Factors to Be Considered Prior to Voting................................10
    D.      Classes Not Entitled to Vote on the Plan ..............................................11
    E.      Solicitation Procedures..........................................................................12
    F.      Voting Procedures..................................................................................12

ARTICLE III. BUSINESS OVERVIEW AND CORPORATE HISTORY ......................13

    A.      Overview of the Debtors' Business .......................................................13
    B.      Corporate History..................................................................................13
    C.      Retail Store Network .............................................................................14
    D.      Retail Operations and Employees..........................................................14
    E.      Steinhoff's Acquisition of Mattress Firm..............................................15
    F.      Missteps by the Previous Management Team ........................................15
    G.      The Turnaround Plan .............................................................................16
    H.      Corporate and Capital Structure ...........................................................16
    I.      Board of Directors and Management .....................................................19

ARTICLE IV. EVENTS LEADING TO THE CHAPTER 11 CASES....................................20

    A.      The Debtors Need Immediate Access to Additional Liquidity ............20
    B.      Mattress Firm Must Optimize Its Retail Store Network ......................20
    C.      The Debtors' Plan of Reorganization and Path to Exiting Bankruptcy ..............21
    D.      The Steinhoff Lockup Agreement and Negotiations with the SEAG Creditors....22

ARTICLE V. OTHER KEY ASPECTS OF THE PLAN .........................................................23

    A.      Distributions ..........................................................................................23
    B.      Exit Facilities.........................................................................................23
    C.      Intra-Group Loan Facilities ...................................................................24
    D.      Corporate Action...................................................................................24
    E.      Continued Legal Existence and Vesting of Assets in the Reorganized Debtors...24
    F.      Preservation of Causes of Action...........................................................24
    G.      Management Incentive Plan ...................................................................25

H.   Workers' Compensation Programs .................................................25
I.   Operations Between the Confirmation Date and the Effective Date ...................25
J.   Treatment of Executory Contracts and Unexpired Leases .................................26
K.   Provisions for Resolving Disputed Claims .................................................27
L.   **Discharges, Releases, Exculpations and Injunctions; Survival of Indemnification and Exculpation Obligations** .................................................28

ARTICLE VI. CONFIRMATION PROCEDURES .................................................33

A.   Combined Hearing on Confirmation and Approval of Disclosure Statement and Solicitation .................................................33
B.   Requirements for Confirmation of the Plan .................................................33
C.   Best Interests of Creditors / Liquidation Analysis .................................................34
D.   Feasibility .................................................35
E.   Acceptance by Impaired Class .................................................36
F.   Conditions to the Effective Date and Waiver .................................................36
G.   Alternatives to Confirmation and Consummation of the Plan .................................................37

ARTICLE VII. RISK FACTORS .................................................37

A.   Business-Related Risks .................................................37
B.   Bankruptcy-Specific Considerations .................................................38

ARTICLE VIII. CERTAIN UNITED STATES FEDERAL INCOME  TAX CONSEQUENCES OF THE PLAN .................................................41

A.   Certain Federal Income Tax Consequences to the Debtors .................................................42
B.   Certain Federal Income Tax Consequences to Holders of Claims and Interests other than Holders of the Intra-Group Loan Guarantee Claims .................................................44
C.   Certain Federal Income Tax Consequences to Holders of Intra-Group Loan Guarantees .................................................44
D.   Holders that are Non-United States Persons .................................................45
E.   Withholding and Reporting .................................................45
F.   FATCA .................................................45
G.   Reservation of Rights .................................................46

ARTICLE IX. CONCLUSION AND RECOMMENDATION .................................................46

## **Table of Exhibits**

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Financial Projections

EXHIBIT C    Plan Support Agreement

# INTRODUCTION

This Disclosure Statement provides information, pursuant to section 1125 of the Bankruptcy Code, regarding the *Joint Prepackaged Chapter 11 Plan of Reorganization for Mattress Firm, Inc. and Its Debtor Affiliates* (as such may be amended, altered, modified or supplemented from time to time, the "Plan"), dated October 4, 2018. A copy of the Plan is attached hereto as **Exhibit A**. The rules of interpretation set forth in Article I of the Plan shall govern the interpretation of this Disclosure Statement.

The Debtors believe the Plan is in the best interests of the Debtors' Estates. The primary features of the Chapter 11 Cases and the Plan are as follows:

- All of the Debtors' prepetition secured debt will be paid in full, including (a) a roll-up of the full outstanding amount under the Prepetition ABL Facility, which was approximately $87 million on the date hereof, and (b) payment in full in Cash of the approximately $83 million in principal amount outstanding under the Prepetition Term Loan.

- No class of claims is impaired under the Plan.

- General Unsecured Claims—other than Intra-Group Loan Claims arising under the Intra-Group Loan Agreement—including all lease rejection claims that are allowed under section 502(b)(6) of the Bankruptcy Code, will be paid in full in cash in accordance with the applicable provisions of the Bankruptcy Code.

- Distributions under the Plan will be funded with the proceeds of a $400 million secured term loan facility (the "Exit Term Loan Facility").

- On the effective date of the Plan, the Debtors anticipate securing access to a $125 million revolving credit facility (the "Exit ABL Facility" and, together with the Exit Term Loan Facility, the "Exit Facilities"), which is expected to be undrawn, and that will provide additional liquidity for their post-bankruptcy operations.

- The equity of reorganized Debtor Mattress Holdco, Inc. ("MF Holdco"), the direct or indirect parent of each of the other Debtors, will continue to be held by Mattress Firm Holding Corp. ("MFHC"), a non-Debtor Affiliate of the Debtors and the current parent company of MF Holdco, after the Effective Date of the Plan. The equity of MFHC will continue to be held by Stripes US Holding, Inc. ("Stripes"), a non-Debtor affiliate of the Debtors and the direct parent company of MFHC.

- The lenders who are providing the Exit Term Loan Facility will receive equity and payment-in-kind debt as additional consideration for their financing commitments. This equity and payment-in-kind debt will be issued by either MF Holdco or Stripes, depending on the outcome of a tax analysis that the Debtors and their advisors are currently performing. Because it is possible that MF Holdco will be issuing the equity, the Interests in MF Holdco are subject to potential dilution and are therefore being treated as Impaired under the Plan. MFHC, as the sole holder of the Interests in MF

Holdco, is entitled to vote to accept or reject the Plan. All other Classes of Claims and Interests are Unimpaired under the Plan.

- The non-Debtor affiliates of Mattress Firm that are parties to the Intra-Group Loan Agreement as lenders, Steinhoff Europe AG ("SEAG") and Steinhoff Möbel Holding Alpha GmbH ("Möbel"), have agreed to receive no distributions under the Plan on account of their unsecured guarantee claims against the Debtors. Moreover, SEAG and Möbel have agreed, and their creditors have consented, to a gratuitous capital contribution of the remaining claims against Stripes and MFHC under the Intra-Group Loan Agreement.

- On the effective date of the Plan, the guarantee obligations of each Debtor and MFHC under the Intra-Group Loan Agreement will be released.

## ARTICLE I.
## OVERVIEW OF THE PLAN

### A.    New Capital Structure

On the Effective Date, the Debtors will effectuate the transactions contemplated by the Plan, and the Reorganized Debtors anticipate that their capital structure will consist of the following:

- the Exit ABL Facility;

- the Exit Term Loan Facility; and

- equity interests in Reorganized Debtor MF Holdco, 100% of which will continue to be held by MFHC (provided, however, that such Interests shall, if the MF Holdco Stock is issued to the Exit Term Loan Lenders pursuant to the Exit Term Loan Lender Election, be subject to dilution by (i) the MF Holdco Stock and (ii) the Interests reserved by MF Holdco for the Management Incentive Plan).

### B.    Sources of Cash Consideration for Plan Distributions

All Cash necessary for the Reorganized Debtors to make payments required by the Plan shall be obtained from (1) Cash on hand, including Cash from operations and the proceeds of the DIP Credit Facilities, and (2) the proceeds of the Exit Facilities.

### C.    Treatment of Unclassified Claims

#### 1.    *Unclassified Claims Summary*

| Claim | Plan Treatment | Projected Plan Recovery |
|-------|----------------|------------------------|
| Administrative Expense Claims | Paid in full in Cash | 100% |
| Professional Fee Claims | Paid in full in Cash | 100% |
| DIP Credit Facilities Claims | Paid in full in Cash | 100% |
| Priority Tax Claims | Paid in full in Cash | 100% |

2.    *Unclassified Claims Details*

a.    **Administrative Expense Claims**

Except to the extent that a Holder of an Allowed Administrative Expense Claim and the applicable Debtor(s) agree to less favorable treatment with respect to such Allowed Administrative Expense Claim, each Holder of an Allowed Administrative Expense Claim shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Administrative Expense Claim, payment of Cash equal to the full unpaid amount of such Allowed Administrative Expense Claim: (i) on the Effective Date or as soon as reasonably practicable thereafter, or, if not then due, when such Allowed Administrative Expense Claim is due or as soon as reasonably practicable thereafter; (ii) if an Administrative Expense Claim is Allowed after the Effective Date, on the date such Administrative Expense Claim is due or as soon as reasonably practicable thereafter; (iii) on such other date and upon such terms as such Holder and the Debtors or the Reorganized Debtors shall have agreed; or (iv) as otherwise ordered by the Bankruptcy Court; provided, however, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' business during the Chapter 11 Cases shall be paid in full in Cash in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations, course of dealing, course of business, or industry practice.

b.    **Professional Fee Claims**

All Professionals or other Entities requesting compensation or reimbursement of expenses pursuant to sections 328, 330, 331, 503(b) and/or section 1103 of the Bankruptcy Code for services rendered before the Effective Date (including, without limitation, any compensation requested by any Professional or any other entity for making a substantial contribution in the Chapter 11 Cases) shall file and serve final requests for allowance and payment of Professional Fee Claims no later than the first Business Day that is forty-five (45) days after the Effective Date.  Objections to any Professional Fee Claim must be filed and served on the Reorganized Debtors and the applicable Professional within thirty (30) days after the filing of the final fee application with respect to the Professional Fee Claim.  Any such objections that are not consensually resolved may be set for hearing on twenty-one (21) days' notice by the Professional asserting such Professional Fee Claim. The Reorganized Debtors shall promptly pay all amounts owed on account of Professional Fee Claims upon entry of an order of the Bankruptcy Court allowing such Claims on a final basis.

c.    **DIP Credit Facilities Claims**

The DIP Credit Facilities Claims shall be Allowed Claims in the full amount outstanding under the DIP Credit Facilities, including principal, interest, fees, and expenses.  Except to the extent that a Holder of an Allowed DIP Credit Facilities Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed DIP Credit Facilities Claim shall receive, on account of and in full and final satisfaction, settlement, release, and discharge of each Allowed DIP Credit Facilities Claim, indefeasible payment in full in Cash.  Upon the payment or satisfaction of the Allowed DIP Credit Facilities Claims in accordance with Article II.B of the Plan, all Liens and security interests granted to secure the Allowed DIP Credit Facilities Claims

3

shall be automatically terminated and of no further force or effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. As used in Article II.B of the Plan, "indefeasible payment in full in Cash" shall mean the indefeasible payment in full in Cash of all Allowed DIP Credit Facilities Claims (including all fees and expenses of the DIP Agents through the Effective Date in accordance with the payoff letter), the cancellation, backing, or cash collateralization of letters of credit under the DIP Credit Facilities in accordance with the terms of the DIP Credit Facilities, the termination of the DIP Agents' and DIP Lenders' commitments to extend credit under the DIP Facility, and the receipt by the DIP Agents of a countersigned payoff letter in form and substance reasonably satisfactory to the DIP Agents.

d.    **Priority Tax Claims**

Except to the extent that each Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, payment in full in Cash in accordance with the terms of any agreement between the applicable Debtor or Reorganized Debtor, as applicable, and such Holder, or as such Allowed Priority Tax Claim may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

e.    **Post-Effective Date Fees and Expenses**

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors will, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the legal, professional, or other fees and expenses related to the implementation and consummation of the Plan incurred by the Reorganized Debtors following the Effective Date. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Reorganized Debtor may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

D.    **Classification of Claims and Interests**

1.    ***Classified Claims and Interests Summary***

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. Except for the Claims addressed in Article II of the Plan, the Debtors have placed all Claims and Interests into Classes for each of the Debtors. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Credit Facilities Claims, or Priority Tax Claims, as described in Article II of the Plan.

The summary of Classes of Claims and Interests set forth below classifies Claims and Interests for all purposes, including, Confirmation and distribution pursuant to the Plan. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and any Claim or Interest shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies

within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid, released, or otherwise settled prior to the Effective Date.

The Plan establishes a comprehensive classification of Claims and Interests. The table below summarizes the classification, treatment, voting rights, and estimated recoveries of the Claims and Interests, by Class, under the Plan.

| Class | Claim or Interest | Voting Rights | Treatment | Plan Recovery |
|-------|-------------------|---------------|-----------|---------------|
| 1 | Other Priority Claims | Not Entitled to Vote / Presumed to Accept | Paid in full/ Unimpaired | 100% |
| 2 | Other Secured Claims | Not Entitled to Vote / Presumed to Accept | Paid in full / Collateral Returned/ Reinstated/ Unimpaired | 100% |
| 3 | Prepetition ABL Claims | Not Entitled to Vote / Presumed to Accept | Paid in full/ Unimpaired | 100% |
| 4 | Prepetition Term Loan Claims | Not Entitled to Vote / Presumed to Accept | Paid in full/ Unimpaired | 100% |
| 5 | General Unsecured Claims | Not Entitled to Vote / Presumed to Accept | Paid in full/ Released/ Unimpaired | 100%[3] |
| 6 | Intercompany Claims | Not Entitled to Vote / Presumed to Accept | Reinstated/ Unimpaired | 100% |
| 7 | Interests in MF Holdco | Entitled to Vote | Reinstated/ potentially subject to dilution/Impaired | <100% |
| 8 | Intercompany Interests | Not Entitled to Vote / Presumed to Accept | Reinstated/ Unimpaired | 100% |

2.    ***Classified Claims and Interests Details***

Except to the extent that a Debtor and a Holder of an Allowed Claim or Interest, as applicable, agree to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest.  Unless otherwise indicated, the Holder

---

[3] As stated above, each Holder of an Allowed General Unsecured Claim that is an Intra-Group Loan Claim has, in accordance with section 1123(a)(4) of the Bankruptcy Code, agreed to less favorable treatment of such Allowed Intra-Group Loan Claim.  Specifically, each Holder of an Allowed Intra-Group Loan Claim against each Debtor has agreed to receive no distributions under the Plan solely on account of such Allowed Intra-Group Loan Claims, and the Intra-Group Loan Guarantees shall be released on the Effective Date.

of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

a.    **Class 1 – Other Priority Claims**

(i)    <u>Classification</u>:  Class 1 consists of all Other Priority Claims.

(ii)    <u>Treatment</u>:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash of such Allowed Other Priority Claim on or as soon as reasonably practicable after the last to occur of (i) the Effective Date, (ii) the date such Other Priority Claim becomes and Allowed Claim, (iii) the date on which such Allowed Other Priority Claim is due to be paid in the ordinary course of business of the Debtors or Reorganized Debtors, if applicable, and (iv) the date on which the Holder of such Allowed Other Priority Claim and the Debtors or Reorganized Debtors shall otherwise agree in writing.

(iii)    <u>Voting</u>:    Allowed Other Priority Claims in Class 1 are Unimpaired.  Each Holder of an Allowed Other Priority Claim shall be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject the Plan.

b.    **Class 2 – Other Secured Claims**

(i)    <u>Classification</u>:  Class 2 consists of all Other Secured Claims.

(ii)    <u>Treatment</u>:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall, in the discretion of the Reorganized Debtors, receive (i) treatment of such Allowed Other Secured Claim in any manner that renders the claim Unimpaired, including Reinstatement, (ii) payment in full in Cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, or (iii) the collateral securing such Allowed Other Secured Claim, in each case on or as soon as reasonably practicable after the Effective Date.

(iii)    <u>Voting</u>:    Allowed Other Secured Claims in Class 2 are Unimpaired.  Each Holder of an Allowed Other Secured Claim shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject the Plan.

c.    **Class 3 – Prepetition ABL Claims**

(i)    <u>Classification</u>:    Class 3 consists of all Prepetition ABL Claims.

(ii)    <u>Allowance</u>:  The Prepetition ABL Claims are Allowed and will be paid in full by being deemed to roll-up into the DIP ABL Credit Facility pursuant to the DIP Orders in the full principal amount plus all accrued and unpaid fees, costs, expenses, interest (at the non-default rate), charges, premiums and other obligations due under the Prepetition ABL Facility and such Prepetition ABL Claims shall not be subject to recharacterization, subordination, avoidance or any other claim or defense.

(iii)    <u>Treatment</u>:  In exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed Prepetition ABL Claim, each Holder of an Allowed Prepetition ABL Claim will receive indefeasible payment in full of such Allowed Prepetition ABL Claim through the consensual roll-up of the Allowed Prepetition ABL Claims into the DIP ABL Credit Facility in accordance with the terms of the DIP Orders and the DIP ABL Credit Facility; <u>provided</u>, <u>however</u>, that all indemnification obligations of the Debtors arising under the Prepetition ABL Documents in favor of the Prepetition ABL Agent or any Prepetition ABL Lender, or any of their directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, shall remain in full force and effect and be assumed by and enforceable against the Reorganized Debtors on and after the Effective Date.

(iv)    <u>Voting</u>:  Allowed Prepetition ABL Claims in Class 3 are Unimpaired.  Each Holder of an Allowed Prepetition ABL Claim shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject the Plan.

d.    **Class 4 – Prepetition Term Loan Claims**

(i)    <u>Classification</u>:  Class 4 consists of all Prepetition Term Loan Claims.

(ii)    <u>Allowance</u>:  The Prepetition Term Loan Claims are Allowed in the full principal amount plus all accrued and unpaid fees, costs, expenses, interest (at the non-default rate), charges, premiums and other obligations due under the Prepetition Term Loan Facility, and such Prepetition Term Loan Claims shall not be subject to recharacterization, subordination, avoidance or any other claim or defense.

(iii)    <u>Treatment</u>:   In exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed Prepetition Term Loan Claim, each Holder of an Allowed Prepetition Term Loan Claim shall receive indefeasible payment in full in Cash of such Allowed Prepetition Term Loan Claim on the Effective Date; <u>provided</u>, <u>however</u>, that all indemnification obligations of the Debtors arising under the Prepetition Term Loan Documents in favor of the Prepetition Term Loan Lender, or its directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, shall remain in full force and effect and be assumed by and enforceable against the Reorganized Debtors on and after the Effective Date.

(iv)    <u>Voting</u>:  Allowed Prepetition Term Loan Claims in Class 4 are Unimpaired.  Each Holder of an Allowed Prepetition Term Loan Claim shall be conclusively

deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject the Plan.

e.    **Class 5 – General Unsecured Claims**

(i)    <u>Classification</u>:  Class 5 consists of all General Unsecured Claims.

(ii)    <u>Allowance</u>:  On the Effective Date, the Intra-Group Loan Claims shall be Allowed.

(iii)    <u>Treatment</u>:

(a)    Subject to <u>Article III.B.5.c(ii)</u> and <u>Article III.B.5.c(iii)</u> of the Plan in respect of Allowed General Unsecured Claims that are Rejection Damages Claims or Intra-Group Loan Claims, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive payment in full of such Allowed General Unsecured Claim in Cash on or as soon as reasonably practicable after the last to occur of (x) the Effective Date, (y) the date on which an Allowed General Unsecured Claim is due to be paid in the ordinary course of business of the Debtors or the Reorganized Debtors, or (z) the date on which the Holder of an Allowed General Unsecured Claim and the Debtors or Reorganized Debtors shall otherwise agree in writing.

(b)    Except to the extent that a Holder of an Allowed General Unsecured Claim that is a Rejection Damages Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Rejection Damages Claim, each Holder of an Allowed Rejection Damages Claim shall receive payment in full of such Allowed Rejection Damages Claim in Cash on or as soon as reasonably practicable after the last to occur of (x) the date such Rejection Damages Claim becomes an Allowed Claim pursuant to <u>Article VII.B.2</u> of the Plan or (y) the date on which the Holder of an Allowed Rejection Damages Claim and the Debtors or Reorganized Debtors shall otherwise agree in writing.

(c)    Each Holder of an Allowed General Unsecured Claim that is an Intra-Group Loan Claim has, in accordance with section 1123(a)(4) of the Bankruptcy Code, agreed to less favorable treatment of such Allowed Intra-Group Loan Claim. Specifically, each Holder of an Allowed Intra-Group Loan Claim against each Debtor has agreed to receive no distributions under the Plan solely on account of such Allowed Intra-Group Loan Claims, and the Intra-Group Loan Guarantees by such Debtors shall be released on the Effective Date.

(iv)    <u>Voting</u>:  Allowed General Unsecured Claims in Class 5 are Unimpaired.  Each Holder of an Allowed General Unsecured Claim shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject the Plan.

f.    **Class 6 – Intercompany Claims**

(i)    <u>Classification</u>:  Class 6 consists of all Intercompany Claims.

(ii)    <u>Treatment</u>:  On the Effective Date, all Intercompany Claims shall be Reinstated.

(iii)    <u>Voting</u>:  Allowed Intercompany Claims in Class 6 are Unimpaired.  Each Holder of an Allowed Intercompany Claim shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject the Plan.

g.    **Class 7 – Interests in MF Holdco**

(i)    <u>Classification</u>:  Class 7 consists of all Interests in MF Holdco.

(ii)    <u>Treatment</u>:  On the Effective Date, all Interests in MF Holdco shall be Reinstated; <u>provided</u>, <u>however</u>, that such Interests shall, if the MF Holdco Stock is issued to the Exit Term Loan Lenders pursuant to the Exit Term Loan Lender Election, be subject to dilution by (i) the MF Holdco Stock and (ii) the Interests reserved by MF Holdco for the Management Incentive Plan.

(iii)    <u>Voting</u>:  Interests in MF Holdco in Class 7 are Impaired. Each Holder of an Interest in MF Holdco shall be entitled to vote to accept or reject the Plan.

h.    **Class 8 – Intercompany Interests**

(i)    <u>Classification</u>:  Class 8 consists of all Intercompany Interests.

(ii)    <u>Treatment</u>:  On the Effective Date, Intercompany Interests shall be Reinstated and the legal, equitable, and contractual rights to which Holders of Intercompany Interests are entitled shall remain unaltered to the extent necessary to implement the Plan.

(iii)    <u>Voting</u>:  Intercompany Interests in Class 8 are Unimpaired. Each Holder of an Intercompany Interest shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject the Plan.

3.    *Special Provisions Regarding Unimpaired Claims*

a.    **Specified Unimpaired Claims**

Notwithstanding anything to the contrary in the Plan, each Holder of an Allowed Other Priority Claim in Class 1, an Allowed Other Secured Claim in Class 2, an Allowed General Unsecured Claim in Class 5 other than a Rejection Damages Claim or an Intra-Group Loan Claim,

or an Allowed Intercompany Claim in Class 6 (each such Allowed Claim, a "Specified Unimpaired Claim") shall be entitled to enforce its rights in respect of such Specified Unimpaired Claim against the Reorganized Debtors until such Specified Unimpaired Claim has been either (a) paid in full in accordance with applicable law, or on terms agreed to between the Holder of such Specified Unimpaired Claim and the Debtors or Reorganized Debtors, or in accordance with the terms and conditions of the applicable documentation or laws giving rise to such Specified Unimpaired Claim or (b) otherwise satisfied or disposed of as determined by a court of competent jurisdiction.

## ARTICLE II.
## ACCEPTANCE OR REJECTION OF THE PLAN

### A.    Class Entitled to Vote on the Plan

Holders of Claims in Classes 1–6 and Holders of Interests in Class 8 are Unimpaired under the Plan and are therefore conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, no Holders of Claims or Interests in such Classes shall be entitled to vote to accept or reject the Plan. The following Class is the only Class entitled to vote to accept or reject the Plan (the "Voting Class"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 7 | Interests in MF Holdco | Impaired |

If your Claim or Interest is not included in the Voting Class, you are not entitled to vote and you will not receive a Solicitation Package, including a Ballot setting forth detailed voting instructions. If your Claim is included in the Voting Class, you should read your Ballot and carefully follow the instructions included in the Ballot. Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors otherwise provided to you.

### B.    Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims in such class that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims in such class that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests in such class that have voted.

### C.    Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all Holders of Interests entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors, which may impact recoveries under the Plan, include the following:

- unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or the occurrence of Effective Date could result in, among other things, increased Administrative Expense Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims or Interests under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Class or necessarily require a re-solicitation of the votes of Holders of Interests in the Voting Class.

For a further discussion of risk factors, please refer to Article VII of the Disclosure Statement, entitled "Risk Factors."

### D.    Classes Not Entitled to Vote on the Plan

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan.  Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Prepetition ABL Claims | Unimpaired | Presumed to Accept |
| 4 | Prepetition Term Loan Claims | Unimpaired | Presumed to Accept |
| 5 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 6 | Intercompany Claims | Unimpaired | Presumed to Accept |
| 8 | Intercompany Interests | Unimpaired | Presumed to Accept |

E.    **Solicitation Procedures**

1.    *Solicitation Package*

The following materials constitute the solicitation package (the "Solicitation Package") distributed to the Voting Class:

- the Ballot and applicable voting instructions; and

- this Disclosure Statement and all exhibits hereto, including the Plan and all exhibits thereto.

2.    *Distribution of the Solicitation Package*

The Debtors distributed the Solicitation Packages to Holders of Interests in the Voting Class via electronic mail before 11:59 p.m. prevailing Eastern Time on October 5, 2018 (the "Voting Deadline").

F.    **Voting Procedures**

October 3, 2018 (the "Voting Record Date") is the date that was used for determining which Holders of Interests are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of an Interest in the Voting Class to have such Holder's Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by electronic mail to tabulation@epiqglobal.com (reference "Mattress Firm" in the subject line) so that such Holder's Ballot is actually received by the Debtors on or before the Voting Deadline, *i.e.* October 5, 2018 at 11:59 p.m. prevailing Eastern Time.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF AN INTEREST IN THE VOTING CLASS BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF AN INTEREST IN THE VOTING CLASS MUST VOTE ALL OF ITS CLAIMS WITHIN SUCH CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF AN INTEREST IN THE VOTING CLASS WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTOR THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE  BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED

THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.  IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE VOTING CLASS AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF AN INTEREST IN THE VOTING CLASS FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.

## ARTICLE III.
## BUSINESS OVERVIEW AND CORPORATE HISTORY

### A.    Overview of the Debtors' Business

Mattress Firm is the largest specialty mattress retailer in the United States by store count (approximately 3,230) and sales (approximately $3.2 billion for the twelve months ended September 30, 2018).  Mattress Firm is a nationally-recognized brand known for its diverse product offerings, strong customer service, compelling value proposition, and highly visible and convenient store locations.

The Debtors' core business model relies upon strong industry fundamentals.  Mattresses are a necessity item with a relatively predictable replacement cycle.  Long-term demographic trends (population growth and household formation) in the United States drive demand while product innovation and health awareness drive consumer interest.  Research and experience indicate that, for mattress purchases, consumers largely continue to prefer brick-and-mortar stores as compared to online retailers.  For that reason, the continuing trend away from brick-and-mortar stores to online retailers has had a less significant impact on the Debtors compared to other retailers.  Industry awareness initiatives have increased consumer demand for larger-size mattresses and more premium, higher quality products, and Mattress Firm has consistently adjusted its mix of product offerings to satisfy consumers' evolving preferences.

### B.    Corporate History

Although the Debtors' founding dates back to 1986, their primary operating entity, Mattress Firm, was formed in 2002.  MFHC, the indirect parent of Mattress Firm, underwent an initial public offering in November 2011 (NASDAQ: MFRM).  Between 2007 and 2016, the Debtors executed a rapid "roll-up" growth strategy and, through more than 25 acquisitions, increased their retail store count to more than 3,500 stores.  During this time period, the Debtors increased their pro forma annual revenues to $3.6 billion and grew their market share.  The Debtors' expansive footprint also increased to include 76 distribution centers, which allow the Debtors to offer consumers same or next day delivery on many products.

The following chart illustrates Mattress Firm's most significant acquisitions during its growth period from 2007 to 2016:

| Years | Target | Stores | Markets |
|-------|--------|--------|---------|
| 2007 | Mattress Pro | 36 | Texas and Nevada |

| 2011-2012 | Mattress Giant | 236 | Texas, Florida, Georgia, and Missouri |
| | Mattress Xpress | 40 | Florida |
| 2014 | Sleep Experts | 55 | Texas |
| | Mattress King and Bedmart | 67 | Colorado and Arizona<br>Illinois (primarily Chicago) and Florida |
| | Back to Bed | 131 | Arizona |
| | Sleep America | 45 | California, Hawaii, Idaho, Nevada, Oregon and |
| | Sleep Train | 314 | Washington |
| 2016 | Sleepy's | 1,066 | Northeast, New England, Mid-Atlantic, and Midwest (primarily Chicago) |
| **Total** | | **1,990** | |

### C.    Retail Store Network

The Debtors have developed a broad geographical footprint predominantly under the *Mattress Firm*® brand name with an established retail store presence across the United States. In addition to their 3,230 company-owned store locations, the Debtors' operations also include approximately 125 franchisee-operated stores in Alaska, Montana, New Mexico, North Dakota, South Dakota and West Virginia, as well as certain franchised markets, including in Georgia, Iowa, Mississippi, New York, Oklahoma, South Carolina and Texas, all under the *Mattress Firm*® brand name. Including these franchisee-operated stores, the Company has a retail presence in 49 states. The Debtors rely on their network of 76 nationwide distribution centers to make deliveries to customers.

The Debtors are collectively a party to approximately 3,200 retail store leases with approximately 2,500 different landlords, with (a) Mattress Firm being the tenant party to approximately 60% of the Debtors' store leases; (b) Sleepy's, LLC or The Sleep Train, Inc. being the tenant party to approximately 36% of the Debtors' store leases; and (c) seven Debtor subsidiaries of Mattress Firm being the tenant parties to the remaining 4% of store leases.[4]

A typical *Mattress Firm*® location is a freestanding or "end-cap" (corner) location in a high-traffic shopping center in a major retail trade area. The Debtors' stores create a consultative environment, educating customers on various comfort options before directing them towards the premium specialty sleep gallery, Value Zone (promotional) or Clearance Center (special buys and blemished products) sections of the stores.

### D.    Retail Operations and Employees

The Debtors' stores carry both a broad assortment of leading national mattress brands, including *Simmons*®, *Beautyrest*®, *Chattam & Wells*®, *Purple*™, *James & Owen*™, *Intellibed*, *Serta*®, and the Debtors' exclusive in-house brands, including *Sleepy's*™ and *Tulo*™. The Debtors

---

[4] The seven Debtor subsidiaries of Mattress Firm that are counterparties to store leases are: (1) Mattress Giant Corporation; (2) Maggie's Enterprises, LLC; (3) Mattress Firm – Arizona LLC; (4) ST San Diego, LLC; (5) Sleep Country USA, LLC; (6) Mattress Discounters Operations LLC; and (7) Mattress Discounters Group LLC.

also sell other bedding-related products and accessories, including adjustable bases, bed frames, mattress toppers, mattress protectors, pillows and bed sheets.

Concurrently with its rapid expansion, Mattress Firm has allocated resources to improving the retail experience for its customers and continuing commission-based compensation programs for its employees. The Debtors invest a significant amount of time and resources in training— more than 260 hours for a first-year employee—and in culture and career development, which supports the success of their sales associates and decreases turnover. The Debtors seek to incentivize and align the goals of their sales associates with those of their own through a commission-based compensation structure. Through these programs (among others), the Debtors strive to hire and retain highly motivated, career-oriented employees.

As of the date hereof, the Debtors had approximately 9,600 full-time employees and approximately 285 part-time employees (collectively, the "Employees"), all of whom are based in the United States. The Employees serve in numerous capacities, including, without limitation, as sales representatives, store managers, district and regional managers, warehouse staff, warehouse managers, and corporate managers, and they perform various administrative functions for the Debtors.

### E.    Steinhoff's Acquisition of Mattress Firm

In August 2016, approximately five months after Mattress Firm completed its acquisition of Sleepy's, the Debtors entered into an Agreement and Plan of Merger (the "Steinhoff Merger Agreement") with Steinhoff International Holdings N.V. ("Steinhoff"), a global retailer with more than 40 brands in 30 countries. Pursuant to the Steinhoff Merger Agreement, Steinhoff acquired Mattress Firm through the successful completion of a cash tender offer for MFHC's then-publicly traded common stock. Steinhoff completed its acquisition of Mattress Firm in September 2016 for a purchase price of approximately $3.8 billion (including assumption of debt), or $64.00 per share, through Stripes, a newly-formed U.S. subsidiary of Steinhoff. Shortly thereafter, the Debtors began to accelerate the transition of all of the Debtors' acquired stores to the *Mattress Firm*® brand name.

### F.    Missteps by the Previous Leadership

Beginning in early 2016, Mattress Firm management pursued an aggressive plan to rebrand the recently acquired Sleepy's and Sleep Train stores to the Mattress Firm banner to capture the longer-term benefits of a national chain. While rapidly rebranding these over 1,300 recently-acquired stores over a six month period, the Debtors' previous management team made several miscalculations, including failing to properly integrate the Debtors' marketing, merchandising, and sales teams. This led to inefficiencies throughout the Debtors' operations that negatively impacted their bottom line. Moreover, the Debtors' eCommerce sales were disrupted in 2017 due to the effect of the accelerated store rebranding on the Sleepy's and Sleep Train legacy websites. In addition, the Debtors made the long-term strategic decision to terminate the supply arrangement with its then largest supplier, causing additional business disruption. The management team also pursued several well-intentioned, but ill-advised, marketing and sales promotions that contributed to significant losses for the Debtors in 2017 and early 2018. Against this backdrop, the Debtors'

15

adjusted EBITDA declined from positive $251 million in fiscal year ("FY") 2016 to negative $81 million in FY 2017.  The Debtors are projected to lose approximately $150 million in FY 2018.[5]

### G.    The Turnaround Plan

On March 1, 2018, Mattress Firm's former CEO, Steve Stagner, who had been serving as Executive Chairman and previously served as CEO from February 2010 to March 2016, assumed the additional responsibilities of President and CEO.  Mr. Stagner guided Mattress Firm through the "Great Recession" in 2008 and 2009, oversaw its successful initial public offering in 2011, and led Mattress Firm through periods of rapid growth (growing from $400 million in sales to over $3 billion today).  Together with a team of experienced senior executives, Mr. Stagner immediately embarked on implementing a turnaround plan that has demonstrated positive early results, including positive same store sales growth and improving profitability.

The turnaround plan is designed to take full advantage of the recently-implemented divisional operating structure that increases responsiveness to local market conditions.  In addition, the turnaround plan includes five key initiatives: (1) employing clear, concise and competitive advertising; (2) emphasizing financial accountability with a focus on return on investment, including improved product sourcing, promotional and store optimization programs; (3) creating a rewarding in-store customer experience through improved training and execution under the direction of the divisional leadership structure; (4) improving merchandising productivity with better product offerings; and (5) enhancing and growing the Debtors' eCommerce offerings.  These initiatives are already demonstrating results.  For example, the Debtors' 2018 advertising initiatives are driving units and sales with fewer advertising dollars spent than in 2017, and eCommerce sales are up more than 15%.  The Debtors have also taken steps to begin optimizing their retail footprint by buying out more than 40 leases in 2018, thus eliminating approximately $30 million in long-term lease obligations.

Much more remains to be done, but the turnaround plan and Mr. Stagner's leadership have positioned the Debtors to return to profitability once the two structural challenges that are the primary reasons for these Chapter 11 Cases have been addressed.

### H.    Corporate and Capital Structure

Mattress Firm is the Debtors' principal operating entity.  Stripes, a non-Debtor entity that is owned by SEAG, is the direct parent of MFHC, the direct parent of MF Holdco, which, in turn, indirectly owns all of the equity of Mattress Firm.  The Debtor subsidiaries of Mattress Firm are largely inactive entities without any material assets.

As of the date hereof, the Debtors owed approximately $87 million under the Prepetition ABL Facility, in addition to approximately $13 million in outstanding letters of credit (the "LOC"), and approximately $83 million under the Prepetition Term Loan Facility.  In addition, most of the Debtors are guarantors of approximately $3.1 billion (principal amount) of unsecured debt owed

---

[5] All references are to Mattress Firm's fiscal years which run from October to September.

by Stripes to affiliate lenders under the Intra-Group Loan Agreement. Each of these facilities is summarized here in approximate principal amounts and described in greater detail below:

| Secured Debt | Maturity | Interest Rate | Principal Outstanding |
|---|---|---|---|
| Prepetition ABL Facility | June 2019 | Libor + 1.75-2.25% | $87 million $13 million LOC |
| Prepetition Term Loan Facility | September 2019 | 7.5% PIK | $83 million |
| **TOTAL** | | | **$183 million** |

| Intra-Group Loan | Maturity | Interest Rate | Amount Outstanding |
|---|---|---|---|
| Facility A | September 2026 | 6.5% | $916 million |
| Facility B | September 2026 | 6.3% | $2.1 billion |
| Facility C | September 2021 | Libor + 1.25% | $200 million |
| **TOTAL** | | | **$3.2 billion** |

### 1. *Prepetition ABL Facility*

Pursuant to that certain ABL Credit Agreement dated as of December 22, 2017 (as amended by that certain Amendment No. 1 dated as of January 31, 2018, that certain Amendment No. 2 dated as of February 2, 2018, and that certain Amendment No. 3 dated as of March 26, 2018 (the "Prepetition ABL Facility")) by and among Mattress Firm as Borrower, Mattress Holding Corp. and certain subsidiaries of Mattress Firm as Guarantors, Barclays Bank PLC as Administrative Agent and Collateral Agent, Citizens Bank, N.A. as Co-Collateral Agent, and the lenders from time to time party thereto (collectively, the "Prepetition ABL Lenders"), pursuant to which, the Prepetition ABL Lenders provided Mattress Firm with a revolving credit loan in the aggregate principal amount of up to $150 million, subject to compliance with a borrowing base.

The obligations of the Debtors under the Prepetition ABL Facility are secured by a first priority security interest on substantially all of the Debtors' assets. The Prepetition ABL Facility matures in June 2019. As of the date hereof, the available borrowings under the Prepetition ABL Facility were almost fully drawn, with an aggregate principal amount outstanding of approximately $87 million. The Debtors are unable to access the remaining availability under the Prepetition ABL Facility due to borrowing base limitations and inventory reserves. Additionally, as of the date hereof, there are approximately $13 million in issued and undrawn letters of credit under the Prepetition ABL Facility, which further reduce the Debtors' borrowing availability.

### 2. *Prepetition Term Loan Facility*

Pursuant to that certain Term Loan Agreement dated as of March 26, 2018 (as amended, restated, modified or supplemented from time to time (the "Prepetition Term Loan Facility")) by and among Mattress Firm as Borrower, Mattress Holding Corp. and certain subsidiaries of Mattress Firm as Guarantors, and Steinhoff, as lender (in that capacity, the "Prepetition Term Loan

Lender"), Steinhoff agreed to provide Mattress Firm with a multi-draw term secured loan in the principal amount of $80 million.

The obligations under the Prepetition Term Loan Facility are secured by a second priority security interest on substantially all of the Debtors' assets. The Prepetition Term Loan Facility matures in September 2019. As of the date hereof, approximately $83 million of obligations, including accrued and unpaid interest, are outstanding under the Prepetition Term Loan Facility.

3.    ***Prepetition Intercreditor Agreement***

The relative lien priorities and contractual rights of the Prepetition ABL Lenders, on the one hand, and the Prepetition Term Loan Lender, on the other hand, are governed by that certain Intercreditor Agreement, dated as of March 26, 2018 (as amended, restated, modified or supplemented from time to time, the "Prepetition Intercreditor Agreement"). The Prepetition Intercreditor Agreement provides, among other things, that the liens securing the Prepetition ABL Facility are senior in priority to the liens securing the Prepetition Term Loan Facility.

4.    ***Intra-Group Loan Agreement***

Pursuant to that certain affiliate Intra-Group Loan Agreement dated as of September 16, 2016 (as amended, restated, modified or supplemented from time to time, including by that certain Amendment Agreement dated as of December 22, 2017, the "Intra-Group Loan Agreement") by and among Stripes as Borrower and Möbel and Steinhoff Finance Holding GmbH ("Steinhoff Finance") as Lenders, Möbel and Steinhoff Finance agreed to lend $3.05 million to Stripes under three loan facilities: (i) Steinhoff Finance made an unsecured term loan to Stripes in the aggregate principal amount of $850 million (the "Facility A Loan"); (ii) Möbel made an unsecured term loan to Stripes in the aggregate principal amount of $2 billion (the "Facility B Loan"); and (iii) Möbel made unsecured revolving loans to Stripes in the aggregate principal amount of up to $275 million (the "Facility C Loan"), which was subsequently reduced by $75 million and converted into a term loan. On September 30, 2017, Steinhoff Finance assigned the Facility A Loan to SEAG. MFHC, MF Holdco, Mattress Firm, and certain of their Debtor subsidiaries guarantee the obligations of Stripes under the Intra-Group Loan Agreement.

5.    ***RCF Loan to Stripes***

Pursuant to that certain Acquisition Facilities Agreement dated as of August 5, 2016 (as amended, restated, modified or supplemented from time to time, the "Acquisition Facility Agreement"), by and among Stripes, SEAG, Möbel and Steinhoff Finance as Borrowers, Steinhoff as a Guarantor, J.P. Morgan Europe Limited as Agent, and the lenders party thereto from time to time (collectively the "RCF Lenders"), the RCF Lenders provided unsecured revolving loans to Stripes in the aggregate principal amount of up to $200 million (the "RCF Loan"). Although none of the Debtors are borrowers or guarantors under the RCF Loan, the Acquisition Facility Agreement includes negative covenants that severely limit the Debtors' ability to incur additional indebtedness (even on a junior secured or unsecured basis) as long as the RCF Loan remains outstanding.

6.    *Unsecured Trade Debt*

As of the date hereof, the Debtors estimate that their unsecured trade debt totals approximately $160 million.  The Debtors are generally current on their trade debt and intend to remain current on their payments to vendors throughout the Chapter 11 Cases. Contemporaneously with this Declaration, the Debtors have filed a "First Day Pleading" seeking the authority to pay all trade creditors in the ordinary course of business during the pendency of these Chapter 11 Cases.  Because Mattress Firm is the Debtors' main operating entity, most, if not all, of the trade debt is owed by Mattress Firm.

7.    *General Unsecured Claims*

General Unsecured Claims consist of any Claim against the Debtors that is not an Administrative Expense Claim, a DIP Credit Facilities Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, a Prepetition ABL Claim, a Prepetition Term Loan Claim, or an Intercompany Claim, that are neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.

Certain of the General Unsecured Claims are also Intra-Group Loan Claims, which include any Claims derived from, based upon, or relating to the Intra-Group Loan Guarantees, pursuant to which certain of the Debtors provided unsecured guarantees of Stripes's obligations under the Intra-Group Loan Facilities.

The Debtors' landlords may also have Rejection Damages Claims in connection with certain real property leases that may be rejected by the Debtors pursuant to section 365 of the Bankruptcy Code.  Pursuant to the Plan, the Debtors will pay such rejection damages in full, up to the maximum amounts permitted by section 502(b)(6) of the Bankruptcy Code.  Pursuant to the Bankruptcy Code, such treatment renders Rejection Damages Claims Unimpaired.

**I.    Board of Directors and Management**

Mr. Steve Stagner and Mr. Hendré Ackermann are the directors for Debtor MF Holdco, and are the directors for each of the other Debtors.

The following table sets forth the identities of the Debtors' management team:

| Name | Position |
| --- | --- |
| Steve Stagner | Executive Chairman, President and Chief Executive Officer |
| Hendré Ackermann | Vice President, Treasurer, Chief Operating Officer and Chief Financial Officer |
| Scott McKinney | Deputy Chief Financial Officer |
| Scott Thaler | Chief Marketing Officer |
| Nathan Bruno | Chief of Staff and Executive Vice President of Business Development |
| Randy Carlin | Chief Real Estate Officer |
| Kindel Elam | Secretary, Executive Vice President and General Counsel |
| Larry Fultz | Chief Human Capital Officer |
| Jonathan Sider | Chief Information Officer |

Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent that there are anticipated changes in the Reorganized Debtors' directors and officers under the terms of the Exit Term Loan Facility or otherwise, the Debtors will identify those changes in their brief in support of Confirmation of the Plan to be filed in these Chapter 11 Cases.  After the Effective Date, the Reorganized Debtors' organizational documents, as each may be amended thereafter from time to time, shall govern the designation and election of directors of the Reorganized Debtors.

## ARTICLE IV.
## EVENTS LEADING TO THE CHAPTER 11 CASES

### A.    The Debtors Need Immediate Access to Additional Liquidity

As described above, the Debtors are nearly fully drawn on the Prepetition ABL Facility and the Prepetition Term Loan Facility, and negative covenants under the RCF Loan to Stripes severely restrict the Debtors' ability to incur additional indebtedness (even on a junior secured or unsecured basis) outside of bankruptcy.  Moreover, based on the negotiations that led to the formulation of the Plan (discussed below), it would not be possible for the Debtors to refinance their existing credit facilities and obtain sufficient additional capital for their future operating needs without first right-sizing their real estate portfolio.

The Debtors sorely need additional funding in order to continue their operations without interruption.  As previously indicated, however, the Debtors' existing sources of financing have been exhausted.  The Debtors have determined that they would only be able to obtain incremental financing for their near term operations if potential lenders were able to avail themselves of the protections afforded by the Bankruptcy Code for debtor in possession financing.  And the only way the Debtors have been able to secure a commitment for a long-term financing facility is in the context of, and is contingent upon, the comprehensive restructuring, including the real estate optimization, contemplated by the Plan.

### B.    Mattress Firm Must Optimize Its Retail Store Network

As discussed above, Mattress Firm's three largest and most impactful acquisitions occurred in 2014 and 2016 (Back to Bed, Sleep Train and Sleepy's, respectively).  With the Back to Bed, Sleep Train and Sleepy's acquisitions, Mattress Firm added an additional 1,531 stores in the Northeast/Chicago/Mid-Atlantic (Sleepy's), Chicago/Florida (Back to Bed) and West Coast (Sleep Train) markets to its real estate portfolio.  While these acquisitions allowed the Debtors to achieve immediate scale and presence in markets where they previously had little to no presence, they also led to the "cannibalization" of sales amongst stores in close proximity to each other.  This problem was compounded in late 2016 and early 2017, when the Sleep Train and Sleepy's stores were re-branded as Mattress Firm stores.  As a result, many Mattress Firm stores are in direct competition with other Mattress Firm stores, resulting in disappointing sales performance by many stores in Mattress Firm's retail network.  These under-productive stores are burdening the Debtors with excessive fixed costs on long term leases and are diverting sales away from other, more profitable locations.

In 2016, the Debtors announced a plan to cull underperforming and competing stores from their real estate portfolio.  The Debtors, in consultation with their advisors, analyzed store-level

20

earnings, occupancy costs, and other data and identified certain stores that are underperforming or directly competing with other Mattress Firm stores. The Debtors achieved some cost savings through their initial closures of ninety stores in 2016 and 2017, along with forty additional store closures in 2018, not including store closures through natural lease expirations. In connection with these store closures, the Debtors discovered that nearby stores recaptured a meaningful portion of sales from the recently closed locations. The Debtors need to close significantly more stores in order to reduce their fixed costs, maximize the profitability of their remaining locations, and stem their significant operating losses and they simply cannot afford to wait until the leases for all of their underperforming stores expire by their terms. Moreover, the Debtors have learned that potential lenders are not willing to provide additional financing until the Debtors right-size their real estate portfolio and reduce their fixed costs. Although the Debtors continued to negotiate consensual buyouts of leases throughout the last ten months, by the summer of 2018 the Debtors determined that an in-court restructuring was the only viable solution that would allow the Debtors to quickly and efficiently optimize their retail store portfolio, provide the Debtors with access to much needed liquidity, and return the Debtors to profitability in the near term.

### C.    The Debtors' Plan of Reorganization and Path to Exiting Bankruptcy

Shortly after securing the Prepetition Term Loan Facility in March 2018, the Debtors began to evaluate their strategic options in light of continuing liquidity pressures, the anticipated need for additional funding in the near future, the upcoming maturities of their credit facilities in 2019, and the requirements associated with executing on management's turnaround plan. As a result of this analysis, the Debtors concluded that a pre-packaged Chapter 11 filing would allow the Debtors to obtain immediate access to much-needed additional liquidity, quickly and efficiently rationalize their real estate portfolio, and make themselves more attractive to new sources of capital.

The Debtors estimate that they will require up to $100 million of additional liquidity in order to support their day-to-day operations and administrative costs throughout the pendency of these Chapter 11 Cases. In order to secure this necessary funding, the Debtors have sought and obtained, and will be seeking interim and final approval of (i) a $150 million Senior Secured Superpriority Debtor-in-Possession Revolving ABL Credit Facility (the "DIP ABL Credit Facility"), and (ii) a $100 million Senior Secured Superpriority Debtor-in-Possession Term Loan Credit Facility (the "DIP Term Loan Credit Facility" and collectively, the "DIP Credit Facilities"). Subject to Court approval, the Debtors plan to use the DIP ABL Credit Facility to roll-up the Prepetition ABL Facility, and to use the proceeds of the DIP Term Loan Credit Facility to fund the administration of these Chapter 11 Cases.

At emergence, the Debtors estimate that they will need up to $400 million to fully repay outstanding amounts under the DIP Credit Facilities and the Prepetition Term Loan, pay all administrative expenses, and provide sufficient liquidity for their operations post-emergence. The Debtors anticipate that, upon their emergence from these Chapter 11 Cases, their capital structure will consist of the up to $125 million Exit ABL Facility, which may be initially undrawn, and the $400 million Exit Term Loan Facility. The Debtors have obtained commitment letters for the Exit Term Loan Facility and intend to finalize the definitive documentation for those facilities prior to the Confirmation Hearing.

### D.    The Steinhoff Lockup Agreement and Negotiations with the SEAG Creditors

Following the disclosure of certain accounting irregularities at Steinhoff in late 2017, Steinhoff engaged in restructuring discussions with the creditors of SEAG and Steinhoff Finance, the two principal finance companies within Steinhoff's European business.  These companies were historically used to raise funds to support Steinhoff's European and U.S. businesses and accordingly had large primary debt obligations.    Those discussions culminated in the announcement, on July 11, 2018, that Steinhoff had launched a consent process for a lockup agreement (the "Steinhoff Lockup Agreement") in connection with the restructuring of the financial indebtedness of Steinhoff, SEAG, Steinhoff Finance and Stripes. The Steinhoff Lockup Agreement, which became effective on July 20, 2018, imposes agreed limited recourse and standstill obligations on the consenting creditors in order to facilitate the implementation of a global restructuring that, among other things, will modify the terms of the external debts of Steinhoff, SEAG, Steinhoff Finance and Stripes and extend all relevant maturities by three years.

The Steinhoff Lockup Agreement contemplates a restructuring of Steinhoff, SEAG, Steinhoff Finance and Stripes through consent agreements, a company voluntary arrangement in the United Kingdom, and a potential scheme of arrangement in the United Kingdom (collectively, the "Steinhoff Global Restructuring").  Pursuant to the Steinhoff Global Restructuring, the RCF Loan to Stripes will be converted into new debt instruments to be issued by SEAG.  This aspect of the Steinhoff Global Restructuring will be implemented either with the consent of the RCF Lenders or pursuant to a scheme of arrangement for Stripes in the United Kingdom (the "Stripes Restructuring").

Pursuant to the terms of the commitment letter for the Exit Term Loan Facility, the conditions to the effectiveness of the Plan include that either (i) the Stripes Restructuring shall have been consummated (in which case the equity and the payment-in-kind debt will be issued by Stripes to the lenders under the Exit Term Loan Facility), or (ii) if the Stripes Restructuring has not been consummated, the results of the diligence into the U.S. tax impacts of the Plan and the transactions contemplated in the Plan are complete and satisfactory as required by the Exit Term Loan Facility (in which case the equity and the payment-in-kind debt will be issued by MF Holdco to the lenders under the Exit Term Loan Facility).

As of August 17, 2018, 92.12% of the financial creditors of SEAG and 90.87% of the financial creditors of Stripes had signed on to the Steinhoff Lockup Agreement.

Beginning in August 2018, the Debtors engaged in productive discussions with Steinhoff and certain creditors of SEAG (collectively, the "SEAG Creditors") regarding the terms of the Plan, the Debtors' need for DIP and exit financing, and various other aspects of these Chapter 11 Cases.    The complex and intense restructuring negotiations among the Debtors, the SEAG Creditors and Steinhoff were driven by the Debtors' liquidity needs and ultimately concluded with the provision of necessary, backstopped debtor-in-possession to exit financing in the form of the DIP Credit Facilities and the Exit Facilities.  The provision of backstopped financing is the cornerstone of the Debtors' restructuring efforts.  Without immediate access to capital, and the assurance of liquidity on exit, the Debtors' would have a significantly more difficult path to successfully emerging from these Chapter 11 Cases.

The agreements among the parties to the restructuring negotiations are reflected in the Plan Support Agreement entered into by Steinhoff, Steinhoff Finance, Möbel, SEAG, Stripes, MFHC, MF Holdco, Mattress Holding Corp., and Mattress Firm, Inc., a copy of which is attached hereto as Exhibit C, and the financing agreements and commitments attached thereto. Pursuant to the Plan Support Agreement the parties thereto agreed to and have taken certain actions prior to the date hereof, and agreed to the filing of the Chapter 11 Cases and to the terms of and to support the Plan. Under the terms of the Plan Support Agreement, (i) Steinhoff has agreed to contribute to Steinhoff Finance, and Steinhoff Finance has agreed to contribute to Möbel, and Möbel then transferred to SEAG, 100% of the common stock of Stripes, (ii) Steinhoff agreed to the priming of its liens under the Prepetition Term Loan Facility, (iii) SEAG and Möbel consented to the release of all claims against the Debtors under the Intra-Group Loan Agreement on the effective date of the Plan, and (iv) Steinhoff, Möbel, SEAG, Stripes, MFHC, and MF Holdco consented to the reservation and issuance of the equity and the issuance of payment-in-kind debt to be issued in Stripes or MF Holdco immediately after the Effective Date for the benefit of the management of the Reorganized Debtors pursuant to a management incentive plan, as described in the Plan.

## ARTICLE V.
## OTHER KEY ASPECTS OF THE PLAN

### A.    Distributions

One of the key concepts under the Bankruptcy Code is that only claims and interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an Allowed Claim or Interest means that the Debtors agree, or if there is a dispute, the Bankruptcy Court determines, that the Claim or Interest, and the amount thereof, is in fact a valid obligation of the Debtors. A detailed discussion of the treatment and anticipated means of satisfaction for each Class of Allowed Claims or Interests is set forth in Article I.C and Article I.D above.

### B.    Exit Facilities

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities and provide any related guarantees, and the Exit Facilities shall be made available to the Reorganized Debtors pursuant and subject to the terms and conditions set forth in the Exit Facility Documents. Pursuant to the terms of the Exit Term Loan Facility the Exit Term Loan Lenders shall make the Exit Term Loan Lender Election on or prior to the Effective Date and shall receive either the (1) the Stripes Stock and the Stripes PIK Debt or (2) the MF Holdco Stock and the MF Holdco PIK Debt on the Effective Date.

The Confirmation Order shall constitute approval of the Exit Facilities (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith), and authorization for the Reorganized Debtors to enter into and perform under the Exit Facility Documents and such other documents as may be required or appropriate.

### C.    Intra-Group Loan Facilities

For the avoidance of doubt, except as provided in Article III.B.5.c.iii of the Plan with respect to the release of the Intra-Group Loan Guarantees, no provision of the Plan including the releases granted under Article X.D.2 of the Plan, shall constitute a discharge, release, or other modification of the Intra-Group Loan Facilities or the obligations of Stripes or its non-Debtor Affiliates thereunder.  Pursuant to the Plan Support Agreement, SEAG and Möbel have agreed to contribute the Intra-Group Loan Claims (other than the Intra-Group Loan Guarantees, which are released under the Plan) to the share capital of Stripes, and to release the guarantee by MFHC in respect of the Intra-Group Loan Facilities, provided that the conditions to such contribution and release specified in the Plan Support Agreement are met.

### D.    Corporate Action

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors, the Reorganized Debtors, or any other Entity.

### E.    Continued Legal Existence and Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan, each of the Debtors shall continue to exist on and after the Effective Date as a separate corporation, limited liability company, or other form of Entity, as the case may be, with all of the powers of such Entity under applicable law in the jurisdiction in which each Debtor is organized, incorporated, or otherwise formed and pursuant to such Debtor's articles of incorporation or formation, operating agreement, by-laws (or other analogous formation and governance documents) in effect immediately prior to the Effective Date (provided that such organizational documents shall be amended to prohibit the Reorganized Debtor from issuing non-voting equity securities, to the extent necessary to comply with section 1123(a) of the Bankruptcy Code), without prejudice to any right of the Reorganized Debtors to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.  In accordance with Article X.B of the Plan, and except as explicitly provided in the Plan, on the Effective Date, all property comprising the Estates shall vest in the Reorganized Debtors.

### F.    Preservation of Causes of Action

In accordance with section 1123(b)(3) of the Bankruptcy Code, but subject to the releases set forth in Article X.D.1 of the Plan, all Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor on the Effective Date.  Thereafter, the Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  **No Entity may rely on the absence of a specific reference in the Plan or this Disclosure Statement to any specific Cause of Action as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action.  The Debtors or Reorganized Debtors, as**

**applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan**, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to any Cause of Action upon, after, or as a consequence of the Confirmation or the occurrence of the Effective Date.

### G.    Management Incentive Plan

In accordance with the terms of the Plan Support Agreement and the Exit Term Loan Facility, certain of the Reorganized Debtors' senior management shall be entitled to participate in the Management Incentive Plan, the terms of which shall become effective only after the Effective Date.  The Management Incentive Plan is a post-bankruptcy incentive plan and provides no awards for actions taken by any of the Debtors' employees during the Chapter 11 Cases.  Pursuant to the terms of the Plan Support Agreement, Steinhoff Holdings, Steinhoff Finance, Möbel, SEAG, Stripes, and MFHC consent to (A) the issuance of 10% (on a fully-diluted basis) of the stock in either (1) Stripes, if the Stripes Stock is issued pursuant to the Exit Term Loan Lender Election, or (2) MF Holdco, if the MF Holdco Stock is issued pursuant to the Exit Term Loan Lender Election to members of senior management of the Reorganized Debtors following the Effective Date, with all matters relating to vesting of such stock based on time and performance to be determined by a majority vote of the board of directors of Stripes or MF Holdco, as applicable, following the Effective Date, and (B) the issuance of 10% of the principal amount of (1) the Stripes PIK Debt if the Stripes PIK Debt is issued pursuant to the Exit Term Loan Lender Election, or (2) the MF Holdco PIK Debt, if the MF Holdco PIK Debt is issued pursuant to the Exit Term Loan Lender Election, to members of senior management of the Reorganized Debtors following the Effective Date, with the allocations thereof to be determined by a majority vote of the board of directors of Stripes or MF Holdco, as applicable, with respect to which each of the directors is provided an opportunity to vote following the Effective Date of the Plan in a way that avoids triggering adverse tax consequences for such members of senior management or, in the alternative, compensation of comparable value in a form to be reasonably agreed upon ((A) and (B) collectively, the "Management Incentive Plan").

### H.    Workers' Compensation Programs

As of the Effective Date, the Reorganized Debtors will continue to honor their obligations under (1) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (2) the Debtors' (a) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation, (b) self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance.

### I.    Operations Between the Confirmation Date and the Effective Date

During the period from the Confirmation Date to and including the Effective Date, the Debtors may continue to operate their business as debtors in possession in the ordinary course, subject to all applicable orders of the Bankruptcy Court and the provisions of the Bankruptcy Code.

**J.      Treatment of Executory Contracts and Unexpired Leases**

1.   *Assumption of Executory Contracts and Unexpired Leases*

On the Effective Date, all Executory Contracts or Unexpired Leases, including the Plan Support Agreement, shall be deemed assumed by the applicable Reorganized Debtor under the Plan in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code (each an "Assumed Contract" or "Assumed Lease"), unless any such Executory Contract or Unexpired Lease:

a.      has previously been rejected by a Final Order of the Bankruptcy Court;

b.      has previously been rejected by an order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date;

c.      is the subject of a Rejection Motion or Lease Rejection Notice pending as of the Effective Date and is subsequently rejected by a Final Order of the Bankruptcy Court; or

d.      is identified on the Schedule of Post-Effective Date Negotiated Leases as an Unexpired Lease as to which the counterparty has consented in writing to the Debtors' deferral of their decision to assume or reject for a period of up to ninety (90) days immediately following the Effective Date; provided, however, that the Debtors or the Reorganized Debtors, as applicable, may assume any Unexpired Lease identified on the Schedule of Post-Effective Date Negotiated Leases at any time before termination of the Post-Effective Date Lease Negotiation Period on such terms as may be agreed with the relevant counterparty thereto.

The Debtors will not assign any Executory Contracts or Unexpired Leases pursuant to the Plan.

Entry of the Confirmation Order will constitute findings by the Bankruptcy Court that (a) the Reorganized Debtors have properly provided for the cure of any defaults that might have existed consistent with the requirements of section 365(b)(1) of the Bankruptcy Code; (b) each assumption is in the best interest of the Reorganized Debtors, their Estates, and all parties in interest in the Chapter 11 Cases; and (c) the requirements for assumption of any Executory Contract or Unexpired Lease to be assumed have been satisfied.  Except as otherwise provided in the following sentence, defaults under Assumed Contracts and Assumed Leases will be cured by being Reinstated, and all Claims under any Assumed Contract or Assumed Lease will be paid by the Reorganized Debtors on the Effective Date or as soon as reasonably practicable thereafter.  In the event of a dispute as to the amount necessary to satisfy any Claim under section 365(b)(1) of the Bankruptcy Code, such Claim shall be paid upon the later of (i) a settlement of such dispute between the Reorganized Debtors and the relevant Holder and (ii) entry of a Final Order resolving such dispute; provided, however, that if a counterparty's objection to the amount necessary to satisfy a Claim under section 365(b)(1) of the Bankruptcy Code is sustained, the Reorganized Debtors may elect, in their discretion, to reject such Executory Contract or Unexpired Lease in lieu of assuming such Executory Contract or Unexpired Lease.

26

2.      *Rejection of Executory Contracts and Unexpired Leases*

Executory Contracts and Unexpired Leases that are the subject of a Rejection Motion or a Lease Rejection Notice will be deemed rejected on the date specified in the Final Order authorizing such rejection.  The Debtors reserve the right, at any time prior to the Effective Date (subject to the following paragraph in respect of the Schedule of Post-Effective Date Negotiated Leases), to file one or more motions requesting authorization to reject any Executory Contract or Unexpired Lease and/or file one or more Lease Rejection Notices, and to remove any Executory Contract or Unexpired Lease from any such Rejection Motion or Lease Rejection Notice.  The Debtors are authorized to abandon any Remaining Property at or on the leased premises subject to an Unexpired Lease rejected by a Final Order, and the counterparties to the rejected Unexpired Leases may dispose of any such Remaining Property at or on the subject premises on the applicable lease rejection effective date in accordance with the terms and provisions of the Lease Rejection Procedures Order or any Final Order authorizing such rejection.

Notwithstanding anything to the contrary in the Plan, the Debtors and Reorganized Debtors will be entitled to file one or more Lease Rejection Notices after the Effective Date within three (3) Business Days after the termination of the Post-Effective Date Lease Negotiation Period to reflect their decision, if any, to reject Unexpired Leases of nonresidential real property listed on the Schedule of Post-Effective Date Negotiated Leases.

**K.      Provisions for Resolving Disputed Claims**

On and after the Effective Date of the Plan, the Debtors or the Reorganized Debtors will retain any and all of their rights and defenses such Debtor had with respect to any Claim that existed immediately before the Effective Date.

1.      *Claims Other than Rejection Damages Claims*

Subject to <u>Article VII.B</u> of the Plan in respect of Rejection Damages Claims, the Debtors and the Reorganized Debtors may contest the amount and validity of any disputed, contingent, or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved, or adjudicated if the Chapter 11 Cases had not been commenced.  **No Proofs of Claim need be filed for any Claims other than Rejection Damages Claims**.

2.      *Rejection Damages Claims*

a.      **Proofs of Claim for Rejection Damages Claims**

If the rejection of an Executory Contract or Unexpired Lease results in a Rejection Damages Claim, then such Claim shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors or their properties, or any of their interests in properties as agent, successor or assign, unless a Proof of Claim is filed with the Claims and Noticing Agent and served upon counsel to the Reorganized Debtors no later than the Rejection Damages Claims Bar Date.  The Debtors shall give notice of the Rejection Damages Claims Bar Date established by <u>Article VI.B</u> of the Plan and provide a Proof of Claim form (i) to the counterparties to rejected Executory Contracts or Unexpired Leases as of the Effective Date by service of the Notice of

Effective Date, and (ii) to the counterparties to the Unexpired Leases of nonresidential real property listed on the Schedule of Post-Effective Date Negotiated Leases that are subject to Rejection Notices after the Effective Date by service of such Rejection Date.

### b.    Allowance of Rejection Damages Claims

No Rejection Damages Claim will become an Allowed Claim unless and until (i) a Proof of Claim is timely filed on account of such Claim and (ii) such Claim is (x) Allowed pursuant to a Final Order or (y) settled or compromised between the applicable Debtor and the counterparty to the applicable Executory Contract or Unexpired Lease.

### c.    Administration of Rejection Damages Claims

Except as otherwise provided in the Plan and notwithstanding any requirements that may be imposed by Bankruptcy Rule 9019, after the Effective Date the Reorganized Debtors will have the authority to: (a) file, withdraw, or litigate to judgment objections to Rejection Damages Claims; (b) settle or compromise any disputed Rejection Damages Claim that has not yet been Allowed or Disallowed without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without further notice to or action, order, or approval by the Bankruptcy Court.

### d.    Time to File Objections to Rejection Damages Claims

Any objection to a Rejection Damages Claim must be filed on or before the Claims Objection Deadline, which shall be on the date that is 180 days after the applicable Rejection Damages Bar Date, subject to extension by order of the Bankruptcy Court.

### e.    Adjustment to Claims Register Without Objection

The Debtors or the Reorganized Debtors may adjust and expunge any duplicate Claim, any Claim that has been paid or satisfied, or any claim that has been amended or superseded, upon stipulation between the parties without the need for a Claims objection to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### L.    Discharges, Releases, Exculpations and Injunctions; Survival of Indemnification and Exculpation Obligations

#### 1.    *Discharge*

##### a.    Discharge of the Debtors

**Except as otherwise provided in the Plan or in the Confirmation Order (including to the extent any Claims are Reinstated under the Plan), all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties and, regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims, upon the Effective Date, each of the Debtors shall be deemed discharged and released**

28

under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (c) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (d) the Holder of a Claim based upon such debt is deemed to have accepted the Plan.

b.    **Discharge Injunction**

As of the Effective Date, except as explicitly provided in the Plan or the Confirmation Order, all Entities shall be precluded from asserting against the Debtors or the Reorganized Debtors any Claims, debts, rights, causes of action, claims for relief, liabilities, or equity interests relating to the Debtors that have been released, discharged, or exculpated pursuant to the Plan and which are based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as explicitly provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all Claims and other debts and liabilities against the Debtors pursuant to section 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time to the extent such judgment relates to a discharged Claim.

2.    *Releases*

a.    **Releases by the Debtors**

As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents or an assumed contract that remains in effect or becomes effective after the Effective Date or (ii) as expressly provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate and implement the reorganization of the Debtors, as an integral component of the Plan, as of the Effective Date, the Debtors, the Reorganized Debtors, and each of their respective current and former Affiliates (with respect to non-Debtors, to the extent permitted by applicable law), on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to the Bankruptcy Code, shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, void, extinguish, and discharge, each and all of the Released Parties of and from any and all Causes of Action (including, without limitation, Avoidance Actions), any and all other Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever (including any derivative claims or Causes of Action asserted or that may be asserted on behalf of the Debtors, the Reorganized Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other

29

circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors, the Reorganized Debtors, their respective assets and properties, and the Estates, the Chapter 11 Cases, the Plan Support Agreement, the DIP Credit Facilities, the Intra-Group Loan Guarantees, the Prepetition Debt Documents, the Plan, the Disclosure Statement, and any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the distribution of property under the Plan, the execution and delivery of the Exit Facilities, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth in **Article X.D.1** of the Plan shall not be construed as (a) releasing any Released Party from Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, or (b) releasing any post-Effective Date obligations of any Entity under the Plan or any document, instrument, or agreement executed to implement the Plan or Reinstated under the Plan.

b.    **Releases by Certain Holders of Claims**

Except as expressly provided in the Plan or the Confirmation Order, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors, as an integral component of the Plan, each Releasing Party shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, void, extinguish, and discharge each Debtor, Reorganized Debtor, and other Released Party from any and all Claims, Interests, obligations, rights, demands, suits, judgments, Causes of Action, damages, debts, remedies, losses and liabilities of any nature whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors, the Reorganized Debtors, or their Estates, that such Releasing Party would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors, the Reorganized Debtors, their respective assets and properties, and the Estates, the Chapter 11 Cases, the Plan Support Agreement, the DIP Credit Facilities, the Intra-Group Loan Guarantees, the Prepetition Debt Documents, the Plan, or this Disclosure Statement, the Exit Facilities, and any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Cases the pursuit of Confirmation, the administration and implementation of the Plan, including the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; **provided**, **however**, that the releases set forth in **Article X.D.2** of the Plan shall not constitute a release of any

30

claims held by the Intra-Group Lenders other than with respect to the Intra-Group Loan Guarantees.  Notwithstanding the foregoing, the releases set forth in <u>Article X.D.2</u> of the Plan shall not be granted or be deemed to have been granted by any Entity who returns the Opt-Out Election Form, within thirty (30) days after entry of the Effective Date, to the address specified on the Opt-Out Election Form, specifying that such Entity elects not to grant the releases contained in <u>Article X.D.2</u> of the Plan.

3.    *Exculpation*

From and after the Effective Date, the Exculpated Fiduciaries and, solely to the extent provided by section 1125(e) of the Bankruptcy Code, the Section 1125(e) Parties, shall neither have nor incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective Affiliates, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or any of their successors or assigns, for any act, omission, transaction, event, or other circumstance in connection with or related to the Debtors, the Reorganized Debtors, their respective assets and properties, and the Estates, the Chapter 11 Cases, the Plan Support Agreement, the DIP Credit Facilities, the Intra-Group Loan Guarantees, the Exit Facilities, the Prepetition Debt Documents, the Plan, or the Disclosure Statement, the pursuit of Confirmation, the administration and implementation of the Plan, including the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to the foregoing; <u>provided</u>, <u>however</u>, that <u>Article X.D</u> of the Plan shall not apply to release (1) obligations under the Plan and the contracts, instruments, releases, agreements, and documents delivered, Reinstated or assumed under the Plan or (2) any Claims or Causes of Action arising out of fraud, willful misconduct or gross negligence as determined by a Final Order.

Each of the Exculpated Parties shall be entitled to rely, in all respects, upon the reasonable and informed advice of counsel with respect to their duties and responsibilities under the Plan.

4.    *Injunctions*

a.    **Injunction Related to Releases**

Except as expressly provided in the Plan or the Confirmation Order, as of the Effective Date, all Entities that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, Cause of Action or liability of any nature whatsoever, of the types described in <u>Section X.D.2</u> of the Plan and relating to the Debtors, the Reorganized Debtors or any of their respective assets and property and/or the Estates, the Chapter 11 Cases, the Plan Support Agreement, the DIP Credit Facilities, the Intra-Group Loan Guarantees, the Exit Facilities, the Plan, and/or the Disclosure Statement are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Released Party or its property on account of such released liabilities, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities:

31

**(a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under <u>Article X.C</u> of the Plan; and/or (e) commencing or continuing in any manner any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.**

### b.    Injunction Related to Exculpation

**Except as expressly provided in the Plan or the Confirmation Order, as of the Effective Date, all Entities that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, Cause of Action or liability of any nature whatsoever, of the types described in <u>Article X.E</u> of the Plan and relating to the Debtors, the Reorganized Debtors or any of their respective assets and property and/or the Estates, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Exculpated Party or its property on account of such released liabilities, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under <u>Article X.C</u> of the Plan; and/or (e) commencing or continuing in any manner any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.**

### 5.    *Term of Bankruptcy Injunction or Stays*

All injunctions or stays provided for in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

## ARTICLE VI.
## CONFIRMATION PROCEDURES

**A.      Combined Hearing on Confirmation and Approval of Disclosure Statement and Solicitation**

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization.  The Debtors anticipate filing a motion on the Petition Date requesting that the Bankruptcy Court set a hearing for November 15, 2018 to consider approval of this Disclosure Statement and confirmation of the Plan.  The Confirmation Hearing, once set, may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the entities who have filed an objection to the Plan, if any, without further notice to parties in interest.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.  The Debtors, in the same motion requesting a date for the Confirmation Hearing, are requesting that the Bankruptcy Court set a date and time for parties in interest to file Plan objections.  All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that they are received on or before the deadline to file such objections as set forth therein.

**B.      Requirements for Confirmation of the Plan**

Among the requirements for Confirmation are that the Plan is accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, is feasible, and is in the "best interests" of Holders of Claims and Interests that are Impaired under the Plan.  The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan of reorganization.  The Plan fully complies with the statutory requirements for Confirmation listed below.

1.      The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

2.      The Plan has been proposed in good faith and not by any means forbidden by law.

3.      Any payment made or to be made by the Debtors (or any other proponent of the Plan) or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases is subject to the approval of the Bankruptcy Court as reasonable.

4.      The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation, as a director or officer of the Reorganized Debtors, any Affiliate of the Debtors reorganized under the Plan, or any successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and Holders of Interests and with public policies.

5.      The Debtors have disclosed the identity of any Insider that will be employed or retained by the Reorganized Debtors and the nature of any compensation for such Insider.

6.      With respect to each Holder within an Impaired Class of Claims or Interests, each such Holder has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such Holder would so receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

7.      With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan or is Unimpaired under the Plan (subject to the "cram-down" provisions discussed below).

8.      The Plan provides for treatment of Claims, as applicable, in accordance with the provisions of section 507(a) of the Bankruptcy Code.

9.      If a Class of Claims or Interests is Impaired under the Plan, at least one Class of Claims or Interests that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider.

10.     Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors, or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

11.     All fees payable under 28 U.S.C. § 1930 have been paid or the Plan provides for the payment of all such fees on the Effective Date.

**C.      Best Interests of Creditors / Liquidation Analysis**

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. One Class of Interests, Interests in MF Holdco (Class 7), is Impaired under the Plan. The Holders of MF Holdco Interests, as the only Voting Class under the Plan, must accept the Plan in order for the Plan to be confirmed, thereby satisfying clause (a) above.

To calculate the probable distribution to holders of each impaired class of claims and interests if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' assets if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a sale of the Debtors' assets by a chapter 7 trustee.

34

The amount of liquidation value available to unsecured creditors and interest holders would be reduced by the claims of any secured creditors to the extent of the value of their collateral, by the costs and expenses of liquidation, and by other administrative expenses and costs of both the chapter 7 cases and the Chapter 11 Cases.  Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in the Chapter 11 Cases (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 cases, litigation costs, and any claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

Once the Bankruptcy Court ascertains the recoveries in liquidation of secured creditors and priority claimants, if any, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation.  If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

One Class of Interests is Impaired under the Plan: Interests in MF Holdco (Class 7).  The Holders of Interests in MF Holdco, as the only Voting Class under the Plan, must accept the Plan in order for the Plan to be confirmed, thereby satisfying clause (a) above.  The Holders of Interests in MF Holdco would receive no distribution if the Debtor were liquidated under chapter 7 of the Bankruptcy Code for the reasons explained below.

Here, the Plan is in the best interests of claimants and interest holders and meets the requirements of section 1129(a)(7) of the Bankruptcy Code.  The parties to the Plan Support Agreement expect that there will be substantially more assets available to pay Holders of Claims and Interests under the Plan than would be the case if there were no Plan because of, among other reasons, the release of approximately $3.1 billion of the Intra-Group Loan Guarantees by non-Debtor affiliates SEAG and Möbel as the Holders of the Intra-Group Loan Claims.  Such claims would otherwise share pro rata in the recoveries of all unsecured creditors in a liquidation under chapter 7 or chapter 11.  The Plan is the result of an extensively negotiated settlement, which avoids costly and time-consuming litigation that would deplete the funds available for creditors. The parties to the Plan Support Agreement conducted extensive diligence prior to the date hereof, vetted and negotiated the settlement, and support Confirmation of the Plan.  All of these factors demonstrate that the Plan provides greater recoveries to creditors and interest holders than would be realized in a chapter 7 or chapter 11 liquidation, the costs of which would deplete much of the recoveries from the liquidation of the Debtors' assets.

### D.    Feasibility

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan of reorganization is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet obligations under the Plan.  The Debtors, with the assistance of their advisors, have prepared projections for the calendar years 2019 through 2023, including management's assumptions related thereto, which are attached hereto as **Exhibit B** (the "Financial Projections").  The Financial Projections assume that the Plan will be implemented in accordance

with its stated terms. The Debtors are unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the Financial Projections due to a material change in the Debtors' prospects. As reflected in the Financial Projections, the Debtors anticipate that they will timely meet all of their collective obligations and will be financially viable after Confirmation of the Plan. Accordingly, the Debtors believe that Confirmation is not likely to be followed by liquidation or the need for further reorganization.

### E.    Acceptance by Impaired Class

The Bankruptcy Code requires, as a condition to confirmation, that each class of claims or interests that is impaired under a plan of reorganization, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. As stated above, the Voting Class is the sole Impaired Class and is comprised of the Holders of Interests in MF Holdco. Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that actually voted to accept or to reject the plan. Thus, the Voting Class described herein will have voted to accept the Plan only if the Holders of two-thirds in amount of Allowed Interests of Holders that actually vote on the Plan vote to accept.

### F.    Conditions to the Effective Date and Waiver

The Effective Date of the Plan shall not occur unless and until the following conditions have been satisfied or waived in accordance with Article IX of the Plan:

1.    The Confirmation Order, in form and substance reasonably satisfactory to the Debtors, the Exit Term Loan Lenders, and the Plan Support Parties shall have become a Final Order and shall, among other things, provide that the Debtors and the Reorganized Debtors are authorized to take all actions necessary or appropriate to enter into, implement, and consummate the Exit Facilities and other agreements or documents contemplated by the Plan.

2.    The Exit Term Loan Documents shall have been executed and delivered, and all conditions precedent thereto shall have been satisfied (other than the occurrence of the Effective Date), including that either:

- The Stripes Restructuring shall have been consummated (in which case the Stripes Stock and the Stripes PIK Debt shall be issued to the Exit Term Loan Lenders; or

- If the Stripes Restructuring has not been consummated, the Exit Term Loan Lenders shall be satisfied, in their sole and absolute discretion, with the results of their diligence into the potential U.S. tax impacts of the Plan and the transactions contemplated hereby (in which case the MF Holdco Stock and the MF Holdco PIK Debt shall be issued to the Exit Term Loan Lenders pursuant to the Exit Term Loan Lender Election).

3.     Any and all authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement the Plan on the Effective Date shall have been obtained or shall have occurred.

4.     The Confirmation Order shall provide that all Claims for damages resulting from the rejection or termination of an Unexpired Lease of nonresidential real property shall be Allowed only to the extent provided under section 502(b)(6) of the Bankruptcy Code.

Each of the conditions to the occurrence of the Effective Date set forth above may be waived in whole or in part by the Debtors with the written approval of the Exit Term Loan Lenders and the Plan Support Parties, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan.  The failure to satisfy or waive any condition to the Effective Date may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied.

## G.     Alternatives to Confirmation and Consummation of the Plan

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the preferred approach to effectuating the Company's restructuring and maximizing the prospects of a successful turnaround and value for all stakeholders and, therefore, is in the best interests of all constituencies.  If the Plan is not confirmed, the Debtors' ability to continue operating as a going concern could be severely jeopardized.  The realistic alternatives likely will be (1) the preparation and presentation of an alternative plan of reorganization, (2) an out-of-court restructuring involving a dismissal of the proceedings, or (3) a liquidation under chapter 7 of the Bankruptcy Code.

## ARTICLE VII.
## RISK FACTORS

The following provides a summary of various important considerations and other risk factors associated with the Plan; however, it is not exhaustive.  There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement.

## A.     Business-Related Risks

The Financial Projections annexed as **Exhibit B** to this Disclosure Statement are dependent upon the successful implementation of the business plan and the validity of the other assumptions contained therein.  These projections reflect numerous assumptions, including Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, certain assumptions with respect to competitors of the Debtors, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors.  In addition, unanticipated events and circumstances occurring subsequent to the preparation of the projections may affect the actual financial results of the Debtors. Although the Debtors believe that the projections are reasonably attainable, variations between the actual financial results and those projected may occur and be material.

### B.    Bankruptcy-Specific Considerations

#### 1.    *General*

Although the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to the Company's business, the Debtors cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings could have a material adverse effect on the Debtors' business.  A delay in the bankruptcy proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

#### 2.    *Objections to the Plan's Classification or Amounts of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims or Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that parties in interest will not object to the classification or amounts of Claims and Interests under the Plan, or that the Bankruptcy Court will approve such classification or amounts.

#### 3.    *The Conditions Precedent to the Effective Date of the Plan May Not Occur*

As more fully set forth in <u>Article IX</u> of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not satisfied or waived, the Effective Date will not occur.

#### 4.    *Non-Confirmation or Delay of Confirmation of the Plan*

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, findings by a bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under Chapter 7 of the Bankruptcy Code.

The Bankruptcy Court may determine that this Disclosure Statement and/or the solicitation procedures did not satisfy the requirements of the Bankruptcy Code or the Bankruptcy Rules or may decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, or the Plan contains other terms disapproved of by the Bankruptcy Court. If the Debtors fail to achieve Confirmation, the Chapter 11 Cases would likely continue for a protracted period without indication of how or when the Chapter 11 Cases may be completed. Some of the risks that the Debtors face in a bankruptcy proceeding would become more acute in such a scenario, including certain risks that are beyond their control, such as deterioration or other changes in economic conditions, changes in the industry in which the Debtors operate, and potential revaluing of their assets due to chapter 11 proceedings.

Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court is not obligated to confirm the Plan as proposed. A dissenting Holder of a Claim or Interest against the Debtors could challenge the solicitation procedures as not being in compliance with the Bankruptcy Code, which could mean that the results of the Solicitation may be invalid. If the Bankruptcy Court determined that the solicitation procedures were appropriate and the results were valid, the Bankruptcy Court could still decline to confirm the Plan if the Bankruptcy Court found that any of the statutory requirements for confirmation had not been met.

If the Plan is not confirmed by the Bankruptcy Court, (a) the Debtors may not be able to successfully reorganize; (b) the distributions that Holders of Claims or Interests ultimately would receive, if any, with respect to their Claims or Interests would be uncertain, and (c) there may be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims or Interests.

5.    ***Amendment of Plan Prior to Confirmation by the Debtors***

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan or waive any conditions thereto if and to the extent necessary or desirable for Confirmation, in each case, with the prior written consent of the Plan Support Parties. The potential impact of any such amendment or waiver on Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.

6.    ***Failure to Obtain Approval of Releases, Injunctions and Exculpation***

As set forth in <u>Article V.L</u> of this Disclosure Statement, the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, the Reorganized Debtors, the other Released Parties and their respective Related Parties, as applicable. The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain parties may not be considered Released Parties or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

7.    ***U.S. Federal Income Tax Risks***

For U.S. federal income tax purposes, a corporation undergoing a debt restructuring generally recognizes taxable income equal to the difference between the amount of any debt cancelled or extinguished in the restructuring and any value given by the corporation in consideration for such cancellation ("COD Income").  COD Income is not required to be included in a debtor's taxable income in certain circumstances, however, including in situations where the debtor is in a bankruptcy proceeding under Title 11 of the United States Code (the "Bankruptcy Exception") or is insolvent (the "Insolvency Exception").  If the Bankruptcy Exception or the Insolvency Exception applies, the debtor is instead required to reduce the amount of its net operating losses ("NOLs") and certain other tax attributes (including the tax basis of its assets).

The Debtors currently intend to take the position that the transactions contemplated by the Plan will not result in COD Income for the Debtors.  It is possible, however, that the transactions contemplated by the Steinhoff Global Restructuring (including the conversion of the RCF Loan and the elimination of the Intra-Group Loan Agreement may cause the consolidated group of which the Debtors are a part to realize substantial COD Income, which, although likely to be excluded from taxable income by reason of the Bankruptcy Exception or the Insolvency Exception, as applicable, would result in a significant reduction and the possible complete elimination of the Debtors' NOLs and certain of its other tax attributes (including, in certain circumstances, its "built-in losses").

In addition, the Debtors expect to undergo an "ownership change" (within the meaning of Section 382 of the IRC) as a result of the transactions contemplated by the Plan.  As a result, the Debtors expect that any NOLs remaining after the consummation of the transactions contemplated by the Plan and any "built-in losses" (including amortization and depreciation deductions attributable to such built-in losses) will be subject to significant limitations on their use following the Effective Date.

For a more detailed discussion of certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and Holders of certain Claims and Interests, see Article VIII of this Disclosure Statement.

8.    ***Plan Based on Assumptions***

The Plan affects both the Debtors' capital structure and the ownership, structure, and operation of their business and reflects assumptions and analyses based on the Debtors' experience and perception of historical trends, current conditions, and expected future developments, as well as other factors that the Debtors consider appropriate under the circumstances.  Whether actual future results and developments will be consistent with the Debtors' expectations and assumptions depends on a number of factors, including but not limited to the Debtors' (a) ability to obtain adequate liquidity and financing sources; (b) ability to maintain the public's confidence in the Debtors' and Company's viability as a continuing entity and enterprise and to attract and retain sufficient business; and (c) ability to retain key employees, as well as the overall strength and stability of general economic conditions of industries in which the Debtors operate.  The failure of any of these factors could materially adversely affect the successful reorganization of the Debtors' business.

In addition, the Plan relies upon the Financial Projections, including with respect to revenues, EBITDA, debt service, and cash flow. Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate. Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization implemented will occur or, even if they do occur, that they will have the anticipated effects on the Debtors and their subsidiaries or their businesses or operations. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful implementation of the Plan.

## ARTICLE VIII.
## CERTAIN UNITED STATES FEDERAL INCOME
## TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan and is for general information purposes only. This summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences of the Plan.

Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No ruling has been requested or obtained from the IRS with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto. The discussion below is not binding upon the IRS or any court. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein. No representations or assurances are being made to the Holders of Claims or Interests with respect to the U.S. federal income tax consequences described herein.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

### A.    Certain Federal Income Tax Consequences to the Debtors

#### 1.    *Cancellation of Debt Income and Reduction of Tax Attributes*

For U.S. federal income tax purposes, a corporation undergoing a debt restructuring generally recognizes COD Income which, as discussed above, is taxable income equal to the difference between the amount of any debt cancelled or extinguished in the restructuring and any value given by the debtor in consideration for such cancellation.  COD Income is not required to be included in a debtor's taxable income in certain circumstances, however, including in situations where the debtor is in a bankruptcy proceeding under Title 11 of the United States Code or is insolvent.  As discussed above, these exceptions are referred to as the Bankruptcy Exception and the Insolvency Exception, respectively.

If the Bankruptcy Exception or the Insolvency Exception applies, the debtor is instead required to reduce the amount of its NOLs and certain other tax attributes.  In general, tax attributes will be reduced in the following order: (a) NOLs; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets; (e) passive activity loss and credit carryovers; and (f) foreign tax credits.  A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC.  Absent such election, a debtor's tax basis in its assets cannot be reduced below the total amount of its liabilities outstanding immediately after the discharge.  In the context of a group of corporations filing a consolidated federal income tax return, special rules apply to determine how the tax attributes of the group are reduced.

The amount of COD Income that will result from the transactions contemplated by the Plan, and, accordingly, the amount of the Debtors' NOLs and other tax attributes required to be reduced, is currently uncertain.  It is possible that the Debtors' NOLs could be completely eliminated and that its other tax attributes (including tax basis in its assets) could be substantially reduced.  In any case, however, the Debtors do not expect, as a result of the transactions contemplated by the Plan, to be required to include COD Income in taxable income for the taxable year in which the Effective Date occurs.

If the Exit Term Loan Lender Election is made, the Debtors may be required to recognize taxable income for the taxable year that includes the Effective Date.  Such taxable income could result if there were any excess loss accounts or other deferred intercompany items of the Debtors that are required to be recognized by the Debtors in connection with the deconsolidation of MF Holdco and its subsidiaries from its former U.S. federal consolidated group (that currently includes MFHC and Stripes) as a result of the Exit Term Loan Lender Election.  It is expected, however, that any such taxable income would be offset, in whole or in part, by the Debtors' existing NOLs.

#### 2.    *Limitation on Use of Remaining NOLs and Other Tax Attributes*

Under Sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs, capital loss carryovers, tax credit carryovers and certain other tax attributes allocable to periods before the date on which the ownership change occurred ("Pre-Change Losses") that may be utilized to offset future taxable income is subject to annual limitation.

The Debtors anticipate that the transactions contemplated by the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes (whether or not the Exit Term

Loan Lender Election is made). Thus, the Debtors' use of any Pre-Change Losses is expected to be subject to significant limitation. This limitation is independent of, and in addition to, any reduction of NOLs or other tax attributes described in the preceding Section VIII.A.1 resulting from the exclusion of COD Income.

For this purpose, if a corporation has a "net unrealized built-in loss" (generally, an aggregate amount of tax basis in excess of fair market value) at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization and depreciation deductions attributable to such built-in losses) recognized during the following five-years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change. The Debtors may have a net unrealized built-in loss as of the date on which an ownership change occurs and thus, its built-in losses recognized during the five years following the Effective Date may also be subject to annual limitation.

In general, the annual limitation determined under Section 382 of the IRC (the "Section 382 Limitation") on the use of Pre-Change Losses in any "post-change year" is equal to the product of (1) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (2) the "long term tax exempt rate" (which is currently 2.29%). The Section 382 Limitation may be increased during the five-year period following the ownership change to the extent that the Debtors have a "net unrealized built-in gain" rather than a net unrealized built-in loss as of the Effective Date. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. However, if a corporation that has undergone an ownership change does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the Section 382 Limitation is generally reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to net unrealized built-in gain discussed above). As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

Certain exceptions to the foregoing annual limitation rules may apply when a corporation which is under the jurisdiction of the court in a Title 11 or similar case undergoes an ownership change. These exceptions are contained in Sections 382(l)(5) and 382(l)(6) of the IRC. The Debtors do not expect to qualify for the exception described in Section 382(l)(5) of the IRC, but may qualify for the exception described in Section 382(l)(6) of the IRC (the "Section 382(l)(6) Exception"). Under the Section 382(l)(6) Exception, the debtor corporation that undergoes an ownership change is generally permitted to determine the fair market value of its stock for purposes of the Section 382 Limitation after taking into account the increase in value, if any, resulting from any surrender or cancellation of creditor claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before events giving rise to the change. It is unclear whether the Section 382(l)(6) exception, even if applicable, would provide any benefit to the Debtors.

As described above, whether or not the Section 382(l)(6) Exception applies, as a result of the transactions contemplated the Plan, the Debtors expect that their NOLs and other Pre-Change Losses (including, if the Debtors have a "net unrealized built in loss" as of the Effective Date, any built-in losses recognized during the five years following the Effective Date) will be subject to signification limitations on use following the Effective Date.

**B.      Certain Federal Income Tax Consequences to Holders of Claims and Interests other than Holders of the Intra-Group Loan Guarantee Claims**

Holders of Claims and Interests, except for Interests in MF Holdco, will either be paid in full or remain in the same position after consummation of the Plan as they were before.  On the Effective Date, all Interests in MF Holdco shall be Reinstated; provided, however, that such Interests shall, if the MF Holdco Warrants are issued to the Exit Term Loan Lenders pursuant to the Exit Term Loan Lender Election, be subject to dilution by (i) the MF Holdco Warrants and (ii) the Interests reserved by MF Holdco for the Management Incentive Plan.  In general, a Holder whose Claim or Interest is paid may have income or loss equal to the amount by which the Cash and fair market value of other property it receives is greater or less than its tax basis for the Claim or Interest, respectively.  A Holder of a Claim or Interest which is unaffected by the Plan will realize neither gain nor loss as a result of the consummation of the Plan.

**C.      Certain Federal Income Tax Consequences to Holders of Intra-Group Loan Guarantees**

Pursuant to the Plan, the Intra-Group Loan Guarantees of each Debtor under the Intra-Group Loan Agreement will be released (the "Release of Guarantees").

Assuming the Release of Guarantees occurs as part of the gratuitous capital contribution of the Intra-Group Loan Agreement, the Debtors intend on taking the position that the capital contribution is described in Section 108(e)(6) of the IRC.  Under such provision, the holders of the Intra-Group Loan Agreement will be treated as if the Intra-Group Loan Agreement were satisfied for an amount of money equal to their adjusted basis in the Intra-Group Loan Agreement and their adjusted basis in the stock of Stripes will be increased by a like amount.

If instead, the Release of Guarantees occurs before the gratuitous capital contribution of the Intra-Group Loan Agreement (which is expected to be the case if the Exit Term Loan Lender Election is made), the Debtors intend on taking the position that the Release of Guarantees will not be a "significant modification" of the Intra-Group Loan Facilities for U.S. federal income tax purposes.  The U.S. federal income tax treatment of the Release of Guarantees, however, is uncertain.  If the Release of Guarantees is not treated as a "significant modification" of the Intra-Group Loan Facilities for U.S. federal income tax purposes, then no particular U.S. federal income tax consequences result.  If, however, the Release of Guarantees is treated as a "significant modification" of the Intra-Group Loan Facilities for U.S. federal income tax purposes, then the Intra-Group Loan Facilities will be deemed retired and new instruments will be deemed issued by the obligor under the Intra-Group Loan Facilities for U.S. federal income tax purposes.  Any such deemed transaction could result in the recognition of taxable income to Holders of the Intra-Group Loan Facilities.  Holders of the Intra-Group Loan Facilities should consult their own tax advisors with respect to the potential U.S. federal income tax impacts on them of the Release of Guarantees.

### D.    Holders that are Non-United States Persons

Holders of Claims and Interests that are not "United States persons" (within the meaning of Section 7701(a)(30) of the IRC) generally will not be subject to U.S. federal income tax with respect to property (including Cash) received in exchange for such Claims and/or Interests, unless (i) such Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, or (ii) if such Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

### E.    Withholding and Reporting

The Debtors will comply with all applicable reporting requirements of the IRC.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim or Interest.  Additionally, backup withholding, currently at a rate of twenty-four percent (24%), will generally apply to such payments if a Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a credit against such Holder's U.S. federal income tax liability and may entitle such Holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

### F.    FATCA

Pursuant to sections 1471 through 1474 of the IRC (commonly referred to as "FATCA"), foreign financial institutions (which term includes most foreign hedge funds, private equity funds, mutual funds, and other investment vehicles) and certain other foreign entities who do not comply with certain information reporting rules with respect to their U.S. account holders investors or owners may be subject to a withholding tax on U.S.-source payments made to them (whether received as a beneficial owner or as an intermediary for another party). A foreign financial institution or such other foreign entity that does not comply with the FATCA reporting requirements generally will be subject to a 30% withholding tax with respect to any "withholdable payments." For this purpose, "withholdable payments" are any U.S.-source payments of fixed or determinable, annual or periodical income  and also include the entire gross proceeds from the sale or other disposition of any type which can produce U.S.-source interest or dividends. Under the Treasury Regulations, withholding under FATCA will generally apply to payments of U.S.-source dividends on shares of stock in MF Holdco or Stripes, as applicable, although withholding will not apply to gross proceeds from dispositions of such shares of stock occurring prior to January 1,

2019. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Holders are urged to consult with their own tax advisors regarding the effect, if any, of the FATCA provisions to them based on their particular circumstance.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

### G.     Reservation of Rights

The foregoing discussion is subject to change (possibly substantially) based on, among other things, subsequent changes to the Plan and events that may subsequently occur that may impact the timeline for the transactions contemplated by the Plan. The Debtors and their advisors reserve the right to further modify, revise or supplement this Article VIII and the other tax related sections of the Plan and Disclosure Statement in accordance with the terms of the Plan and the Bankruptcy Code.

### ARTICLE IX.
### CONCLUSION AND RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result from any other scenario. Any alternative to Confirmation of the Plan, moreover, could result in extensive delays and increased administrative expenses. Accordingly, the Debtors believe that the Plan provides the best available recovery to their stakeholders and should be confirmed.

Respectfully submitted as of
October 4, 2018

Mattress Firm, Inc.
(on behalf of itself and its Affiliated Debtors)

*/s/ Hendré Ackermann*
Hendré Ackermann
Chief Operating Officer and
Chief Financial Officer

## Exhibit A

**Plan of Reorganization**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MATTRESS FIRM, INC., *et al.*,[1] | Case No. 18-_____ (___) |
| Debtors. | (Joint Administration Requested) |

## JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION
## FOR MATTRESS FIRM, INC. AND ITS DEBTOR AFFILIATES

SIDLEY AUSTIN LLP
Bojan Guzina
Matthew E. Linder
Blair M. Warner
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

-and-

SIDLEY AUSTIN LLP
Gabriel R. MacConaill (No. 4734)
Michael Fishel
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Ashley E. Jacobs (No. 5635)
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

*Proposed Attorneys for the Debtors and Debtors in Possession*

**Dated:  October 4, 2018**

---

[1] The last four digits of Mattress Firm, Inc.'s federal tax identification number are 6008.  The Debtors' mailing address is 10201 S. Main Street, Houston, Texas 77025.  Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  This information may be obtained on the website of the Debtors' noticing and claims agent at http://dm.epiq.com/MattressFirm or by contacting counsel for the Debtors.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARTICLE I.  DEFINED TERMS AND RULES OF INTERPRETATION...................................1

    A.    Defined Terms ...........................................................................1
    B.    Rules of Interpretation.............................................................14
    C.    Computation of Time ..............................................................14
    D.    Deemed Acts...........................................................................14

ARTICLE II.  ADMINISTRATIVE EXPENSE CLAIMS, DIP CREDIT FACILITIES
    CLAIMS, PRIORITY TAX CLAIMS, AND QUARTERLY FEES..............................15

    A.    Administrative Expense Claims ...............................................15
    B.    DIP Credit Facilities Claims....................................................16
    C.    Priority Tax Claims .................................................................16
    D.    Post-Effective Date Fees and Expenses ....................................16

ARTICLE III.  CLASSIFICATION AND TREATMENT  OF CLASSIFIED CLAIMS AND
    INTERESTS...............................................................................17

    A.    Classification of Claims and Interests.......................................17
    B.    Treatment of Claims and Interests ...........................................18
    C.    Special Provisions Regarding Unimpaired Claims.......................21
    D.    Alternative Treatment .............................................................22

ARTICLE IV.  ACCEPTANCE OR REJECTION OF PLAN ..................................................22

ARTICLE V.  MEANS FOR IMPLEMENTATION OF PLAN ...............................................22

    A.    Sources of Cash Consideration for Plan Distributions..................22
    B.    Exit Facilities.........................................................................23
    C.    Intra-Group Loan Facilities .....................................................23
    D.    Corporate Action....................................................................23
    E.    Reorganized Debtors' Directors and Officers ............................23
    F.    Continued Legal Existence and Vesting of Assets in the Reorganized Debtors...24
    G.    Cancellation of Liens ..............................................................24
    H.    Preservation of Causes of Action..............................................24
    I.    Exemption from Certain Transfer Taxes and Recording Fees ...........25
    J.    Management Incentive Plan .....................................................25
    K.    Workers' Compensation Programs ...........................................26
    L.    Operations Between the Confirmation Date and the Effective Date ...................26
    M.    Dissolution of Creditors' Committee.........................................26

ARTICLE VI.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ............................................................................................26

    A.    Assumption of Executory Contracts and Unexpired Leases ................................26
    B.    Rejection of Executory Contracts and Unexpired Leases ....................................27
    C.    Compensation and Benefits Programs ..................................................................28
    D.    Indemnification Obligations ................................................................................28
    E.    Modifications, Amendments, Supplements, Restatements, or Other
        Agreements ..........................................................................................................28
    F.    Reservation of Rights ..........................................................................................28

ARTICLE VII.  PROVISIONS FOR RESOLVING DISPUTED CLAIMS ...............................29

    A.    Claims Other than Rejection Damages Claims ....................................................29
    B.    Rejection Damages Claims...................................................................................29

ARTICLE VIII.  PROVISIONS GOVERNING DISTRIBUTIONS .........................................30

    A.    Allowed Claims and Interests..............................................................................30
    B.    Interest and Penalties on Claims .........................................................................30
    C.    Means of Cash Payment ......................................................................................30
    D.    Withholding and Reporting Requirements ...........................................................31
    E.    Setoff and Recoupment .......................................................................................31
    F.    Undeliverable or Non-Negotiated Distributions...................................................31
    G.    Claims Paid by Third Parties ...............................................................................31

ARTICLE IX.  CONFIRMATION AND CONSUMMATION OF PLAN ................................31

    A.    Conditions to the Effective Date..........................................................................31
    B.    Waiver of Conditions ..........................................................................................32
    C.    Vacatur of Confirmation Order; Non-Occurrence of Effective Date ...................32

ARTICLE X.  EFFECT OF PLAN CONFIRMATION .............................................................33

    A.    Binding Effect......................................................................................................33
    B.    Vesting of Assets in the Reorganized Debtors .....................................................33
    C.    Discharge.............................................................................................................33
    D.    Releases ...............................................................................................................34
    E.    Exculpation .........................................................................................................36
    F.    Injunctions ..........................................................................................................36
    G.    Term of Bankruptcy Injunction or Stays..............................................................37

ARTICLE XI.  RETENTION OF JURISDICTION ....................................................................38

ARTICLE XII.  MISCELLANEOUS PROVISIONS .................................................................39

    A.    Amendment or Modification of this Plan.............................................................39
    B.    Effectuating Documents and Further Transactions ..............................................40

C.      Successors and Assigns ................................................................................40
D.      Revocation, Withdrawal or Non-Consummation ...........................................40
E.      Notice ............................................................................................................40
F.      Nonseverability of Plan Provisions ...............................................................41
G.      Governing Law ..............................................................................................41
H.      Tax Reporting and Compliance .....................................................................42
I.      Closing of Chapter 11 Cases; Caption Change ..............................................42

## INTRODUCTION

Mattress Firm, Inc. and its Affiliated debtors and debtors in possession (collectively, the "Debtors"), hereby propose the following joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code for the resolution of the outstanding Claims against and Interests in the Debtors. Capitalized terms used but not defined in this paragraph have the meanings assigned to such terms in Article I. The classification and treatment of Claims against and Interests in the Debtors are set forth in Article II and Article III. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement, distributed contemporaneously herewith, for a discussion of the Debtors' history, business, results of operations, projections for those operations, risk factors, a summary and analysis of this Plan, and certain related matters.

## ARTICLE I.

## DEFINED TERMS AND RULES OF INTERPRETATION

A.    Defined Terms.

1.    "Administrative Expense Claim" means a Claim (other than a DIP Credit Facilities Claim) for costs and expenses of administration of the Estates arising on or after the Petition Date and prior to the Effective Date under sections 327, 328, 330, 365, 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the business of the Debtors; (b) Professional Fee Claims, to the extent Allowed by the Bankruptcy Court; and (c) any Quarterly Fees.

2.    "Affiliate" has the meaning ascribed to such term in section 101(2) of the Bankruptcy Code. "Affiliated" shall have a correlative meaning.

3.    "Allowed" means any Claim or Interest or any portion thereof (a) that the Debtors have not disputed, either formally or informally, or (b) that has been (i) allowed by a Final Order of the Bankruptcy Court, (ii) allowed pursuant to the terms of this Plan, or (iii) allowed by agreement between the Holder of such Claim or Interest, on one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand; provided, however, that notwithstanding anything in this Plan to the contrary, by treating a Claim as an "Allowed Claim" for purposes of the Plan, the Debtors do not waive, and shall not be deemed to have waived, their rights to contest the amount and/or validity of any disputed, contingent, or unliquidated Claim in the manner and venue in which such Claim would have been determined, resolved, or adjudicated if the Chapter 11 Cases had not been commenced; provided further, that the amount of any "Allowed Claim" for purposes of the Plan shall be determined in accordance with the Bankruptcy Code, including sections 502(b)(6), 503(b), and 506 of the Bankruptcy Code.

4.    "Assumed Contract" has the meaning ascribed to such term in Article VI.A.

5.    "Assumed Lease" has the meaning ascribed to such term in Article VI.A.

1

6.     "Avoidance Actions" means any and all actual or potential claims or causes of action to avoid a transfer of property or an obligation incurred by the Debtors arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 552 or 553(b) of the Bankruptcy Code, or under similar or related state or federal statutes or common law, including preference and fraudulent transfer and conveyance laws, in each case whether or not litigation to prosecute such claim(s) or cause(s) of action was commenced prior to the Effective Date.

7.     "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as in effect on the Petition Date, together with any amendments and modifications thereto that may subsequently be made applicable to the Chapter 11 Cases.

8.     "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases.

9.     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

10.     "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

11.     "Cash" means the legal tender of the United States of America.

12.     "Cause of Action" means any claims, interests, damages, remedies, causes of action, demands, rights, actions (including, without limitation, any Avoidance Actions), suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims that may be pursued under sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any fraudulent transfer or similar claims arising under any state or foreign law.

13.     "Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the chapter 11 case filed for such Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases of all of the Debtors.

14.     "Claim" means any "claim," as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

2

15. "<u>Claims and Noticing Agent</u>" means Epiq Corporate Restructuring, LLC, in its capacity as claims and noticing agent for the Debtors.

16. "<u>Claims Objection Deadline</u>" means the deadline for objecting to a Rejection Damages Claim, which shall be the date that is 180 days after the applicable Rejection Damages Bar Date, subject to extension by order of the Bankruptcy Court.

17. "<u>Claims Register</u>" means the official register of Claims and Interests maintained by the Claims and Noticing Agent.

18. "<u>Class</u>" means each category of Holders of Claims or Interests as set forth in <u>Article III</u> pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

19. "<u>Compensation and Benefits Programs</u>" means all compensation and benefit plans, policies, and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, and incentive plans, deferred compensation plans and life, accidental death and dismemberment insurance plans.

20. "<u>Confirmation</u>" means the entry of the Confirmation Order by the Bankruptcy Court.

21. "<u>Confirmation Date</u>" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

22. "<u>Confirmation Hearing</u>" means the hearing held by the Bankruptcy Court on confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

23. "<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

24. "<u>Creditors Committee</u>" means the statutory committee of unsecured creditors, if any, appointed by the Office of the United States Trustee pursuant to section 1102 of the Bankruptcy Code.

25. "<u>DIP ABL Agent</u>" means Barclays Bank PLC as administrative agent and co-collateral agent, issuer, joint book runner, joint lead arranger, and Citizens Bank, N.A. as co-collateral agent under the DIP ABL Credit Facility.

26. "<u>DIP ABL Credit Facility</u>" means that certain $150 million first priority Senior Secured Superpriority Debtor-in-Possession Asset-Based Revolving Credit Facility, by and among the Debtors, the DIP ABL Agent and various lenders as approved by the DIP Orders.

27. "<u>DIP Agents</u>" means collectively, the DIP ABL Agent and the DIP Term Loan Agent.

28.    "DIP Credit Facilities" means the DIP ABL Credit Facility and the DIP Term Loan Credit Facility as approved by the DIP Orders.

29.    "DIP Credit Facilities Claims" means any Claim derived from, arising under, based upon, or secured by the DIP Credit Facilities or the DIP Orders, including claims for all principal amounts outstanding and all interest, fees, expenses, costs and other charges arising under or in connection with the DIP Credit Facilities.

30.    "DIP Lenders" means the DIP Agents and those lenders in any lender capacity from time to time party to the DIP Credit Facilities.

31.    "DIP Orders" means the Interim DIP Order and the Final DIP Order, collectively.

32.    "DIP Term Loan Agent" means Barclays Bank PLC as administrative agent and collateral agent, book runner and lead arranger under the DIP Term Loan Credit Facility.

33.    "DIP Term Loan Credit Facility" means that certain $100 million second priority Senior Secured Superpriority Debtor-in-Possession Term Loan Credit Facility, by and among the Debtors, the DIP Term Loan Agent and various lenders, as approved by the DIP Orders.

34.    "Disallowed" means any Claim, or any portion thereof, that (a) has been disallowed by Final Order or pursuant to a settlement among the Debtors and the holder thereof; or (b) as to which, in respect of a Rejection Damages Claim, no Proof of Claim has been filed by the Rejection Damages Bar Date or has been deemed timely filed pursuant to a Final Order of the Bankruptcy Court.  "Disallow" and "Disallowance" shall have correlative meanings.

35.    "Disclosure Statement" means the disclosure statement that relates to this Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

36.    "Disputed" means, with respect to a Claim, a Claim that is not yet Allowed or Disallowed.

37.    "Effective Date" means, and shall occur on, the Business Day on which each of the conditions precedent to the effectiveness of the Plan as set forth in Article IX has been satisfied or waived in accordance with the terms thereof.

38.    "Entity" means an entity as defined in section 101(15) of the Bankruptcy Code.

39.    "Estate" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code.

40.    "Exculpated Fiduciaries" means each of the following solely in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; and (c) with respect to each of (a) and (b), to the extent employed in such capacities on or after the Petition Date, each of their respective directors, officers, partners, managers, trustees, assigns, employees, agents, advisory board members, attorneys, financial advisors, investment bankers, accountants, consultants and other professionals or representatives.

41.    "Exculpated Parties" means, collectively, the Exculpated Fiduciaries and the Section 1125(e) Parties.

42.    "Executory Contract" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

43.    "Exit ABL Agent" means Barclays Bank, PLC as administrative agent and collateral agent, issuer and sole lead arranger.

44.    "Exit ABL Documents" means the Exit ABL Facility and such other financing documents to be entered into in connection with the Exit ABL Facility, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements and other security documents.

45.    "Exit ABL Facility" means a senior secured credit facility in a principal amount of up to $125 million to be entered into between the Reorganized Debtors and the Exit ABL Lenders on the Effective Date.

46.    "Exit ABL Lender" means any lender in any lender capacity under the Exit ABL Facility.

47.    "Exit Agents" means, collectively, the Exit ABL Agent and the Exit Term Loan Agent under each of (a) the Exit ABL Facility and (b) the Exit Term Loan Facility, including any successors thereto.

48.    "Exit Facilities" means, collectively, the Exit ABL Facility and the Exit Term Loan Facility.

49.    "Exit Facility Documents" means, collectively, the Exit ABL Documents and the Exit Term Loan Documents.

50.    "Exit Lenders" means, collectively, in their respective capacities as such, the Exit ABL Lenders and the Exit Term Loan Lenders.

51.    "Exit Term Loan Agent" means Barclays Bank PLC as administrative agent, collateral agent and sole lead arranger.

52.    "Exit Term Loan Lender" means any lender under the Exit Term Loan Facility.

53.    "Exit Term Loan Lender Election" means the election available to the Exit Term Loan Lenders pursuant to the Exit Term Loan Documents to receive either (i) the Stripes Stock and the Stripes PIK Debt or (ii) the MF Holdco Stock and the MF Holdco PIK Debt on the Effective Date; provided, however, that if the Stripes Restructuring shall have been consummated on or before the Effective Date, the Exit Term Loan Lenders shall receive the Stripes Stock and the Stripes PIK Debt.

54.    "Exit Term Loan Documents" means the Exit Term Loan Facility and such other financing documents to be entered into in connection with the Exit Term Loan Facility, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements and other security documents.

55.    "Exit Term Loan Facility" means the senior secured term loan facility in the principal amount of $400 million to be entered into between the Reorganized Debtors and the Exit Term Loan Lenders on the Effective Date.

56.    "Final DIP Order" means the order of the Bankruptcy Court authorizing the Debtors to enter into the DIP Credit Facilities on a final basis.

57.    "Final Order" means an order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, new writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order to not be a Final Order.

58.    "General Unsecured Claim" means a Claim against the Debtors that is not an Administrative Expense Claim, a DIP Credit Facilities Claim, Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, a Prepetition ABL Claim, a Prepetition Term Loan Claim, or an Intercompany Claim.

59.    "Governmental Unit" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

60.    "Holder" means an Entity holding a Claim against, or Interest in, one or more of the Debtors.

61.    "Impaired" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.  "Impair" shall have a correlative meaning.

62.    "Indemnification Obligations" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, or other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, or otherwise, for the past and present directors, officers, employees, attorneys, accountants, investment bankers, and other professionals and agents who provided services to the Debtors before or after the Petition Date.

63.    "Intercompany Claim" means any Claim held by a Debtor against another Debtor.

64.    "Intercompany Interest" means an Interest in a Debtor held by another Debtor.

65.    "Interest" means any equity security within the meaning of section 101(16) of the Bankruptcy Code, including any issued and outstanding common stock, preferred stock, limited liability company interest, partnership interest, or any other instrument evidencing an ownership interest in a Debtor that existed immediately before the Effective Date, whether or not transferable, and any restricted stock units, calls, rights, puts, awards, commitments, repurchase rights, unvested or unexercised options, rights of conversion, warrants, unvested common interests, unvested preferred interests or any other agreements of any character related to the common or preferred interests of a Debtor, obligating such Debtor to issue, transfer, purchase, redeem, or sell any equity interests or other equity securities, and any rights under any equity incentive plans, voting agreements and registration rights agreements regarding equity securities of the Debtor.

66.    "Interim DIP Order" means the order of the Bankruptcy Court authorizing the Debtors to enter into the DIP Credit Facilities on an interim basis.

67.    "Intra-Group Lenders" means, collectively, SEAG, Steinhoff Finance, and Möbel in their capacities as lenders under the Intra-Group Loan Agreement.

68.    "Intra-Group Loan Agreement" means that certain Intra-Group Loan Agreement, dated as of September 16, 2016, between Stripes, as Borrower, certain of the Debtors, as Guarantors, and SEAG, Möbel, and Steinhoff Finance, as Lenders (as amended, restated, modified, supplemented, or assigned from time to time, including by that certain Amendment Agreement dated as of December 22, 2017), and all related amendments, supplements, ancillary agreements, notes and other documents and instruments executed or delivered in connection with the Intra-Group Loan Facilities, in each case as amended, amended and restated, supplemented or otherwise modified prior to the date hereof.

69.    "Intra-Group Loan Claims" means any Claims derived from, based upon, or relating to the Intra-Group Loan Guarantees.

70.    "Intra-Group Loan Facilities" means, collectively: (a) that certain senior unsecured Facility A Loan from Steinhoff Finance to Stripes in the original aggregate principal amount of up to $850,000,000, as such Facility A Loan was subsequently assigned by Steinhoff Finance to SEAG pursuant to the terms of that certain Assignment Agreement dated as of September 16, 2016; (b) that certain senior unsecured Facility B Loan from Möbel to Stripes in the original aggregate principal amount of up to $2,000,000,000; and (c) that certain senior unsecured Facility C Loan from Möbel and SEAG to Stripes in the original aggregate principal amount of up to $275,000,000, in each case as available or outstanding from time to time in accordance with the terms of the Intra-Group Loan Agreement.

71.    "Intra-Group Loan Guarantees" means the unsecured guarantees by certain of the Debtors of Stripes' obligations under the Intra-Group Loan Facilities.

72.    "Lease Rejection Notice" means any notice of rejection of one or more Unexpired Leases of nonresidential real property pursuant to section 365 of the Bankruptcy Code that the Debtors file and serve in accordance with the Lease Rejection Procedures.

73.    "Lease Rejection Procedures" means the procedures for the rejection of Unexpired Leases as approved by the Bankruptcy Court pursuant to the Lease Rejection Procedures Order.

74.    "Lease Rejection Procedures Order" means the *Order (I) Approving Procedures for Rejecting Unexpired Leases of Nonresidential Real Property, (II) Authorizing the Debtors to Enter Into Amendments to Certain Unexpired Leases of Nonresidential Real Property, and (III) Granting Related Relief*, entered by the Bankruptcy Court.

75.    "Lien" means, with respect to any interest in property, any mortgage, "lien" as defined in section 101(37) of the Bankruptcy Code, pledge, charge, security interest, easement or encumbrance of any kind whatsoever affecting such interest in property.

76.    "Management Incentive Plan" means the post-Effective Date management incentive plan to be implemented by the Reorganized Debtors as defined in Article V.J.

77.    "MFHC" means Mattress Firm Holding Corp., a non-Debtor Affiliate of the Debtors and the direct parent company of MF Holdco.

78.    "MF Holdco" means Mattress Holdco, Inc., a Delaware corporation and a Debtor herein, and the direct or indirect parent of each of the other Debtors.

79.    "MF Holdco PIK Debt" means the $150 million face amount payment-in-kind debt, which may be issued by MF Holdco to the Exit Term Loan Lenders on the Effective Date pursuant to the terms of the Exit Term Loan Documents.

8

80. "MF Holdco Stock" means 49.9% of the common stock of MF Holdco on a fully-diluted basis, which may be issued to the Exit Term Loan Lenders on the Effective Date pursuant to the terms of the Exit Term Loan Documents.

81. "Möbel" means Steinhoff Möbel Holding Alpha GmbH, the direct parent of SEAG.

82. "Notice of Effective Date" means the notice that all conditions to the Effective Date have been satisfied or waived in accordance with Article IX.

83. "Opt-Out Election Form" means that certain form by which a Releasing Party may "opt out" of the release set forth in Article X.D.2, in substantially the form approved by the Bankruptcy Court, to be served on all Holders of Claims and Interests with the Notice of Effective Date.

84. "Other Priority Claim" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

85. "Other Secured Claim" means any Secured Claim against the Debtors other than a DIP Credit Facilities Claim, a Prepetition ABL Claim, or a Prepetition Term Loan Claim.

86. "Petition Date" means October 4, 2018.

87. "Plan" means this joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules.

88. "Plan Support Agreement" means the Plan Support Agreement entered into by Steinhoff Holdings, Steinhoff Finance, Möbel, SEAG, Stripes, MFHC, MF Holdco, Mattress Holding Corp., and Mattress Firm, Inc. (collectively with each subsidiary of Mattress Firm, Inc. that is a guarantor under the Intra-Group Loan Agreement) prior to the Petition Date, and consented to by the requisite majority of Participants to the Steinhoff Lockup Agreement.

89. "Plan Support Parties" means Steinhoff Holdings, Steinhoff Finance, Möbel, SEAG and Stripes.

90. "Post-Effective Date Lease Negotiation Period" means the ninety (90) day period immediately following the Effective Date, during which time the Debtors shall be entitled to file one or more Lease Rejection Notices with respect to the Unexpired Leases of nonresidential real property listed on the Schedule of Post-Effective Date Negotiated Leases.

91. "Prepetition ABL Agent" means, collectively, Barclays Bank PLC as Administrative Agent and Co-Collateral Agent, Issuer, Book Runner and Lead Arranger and Citizens Bank, N.A. as Co-Collateral Agent, under the Prepetition ABL Facility.

92.    "Prepetition ABL Agreement" means that certain ABL Credit Agreement dated as of December 22, 2017, as amended by that certain Amendment No. 1 dated as of January 31, 2018, that certain Amendment No. 2 dated as of February 2, 2018, and that certain Amendment No. 3 dated as of March 26, 2018, among Mattress Firm, Inc. as Borrower, certain of the other Debtors as Guarantors, the Prepetition ABL Agent, and the Prepetition ABL Lenders.

93.    "Prepetition ABL Claim" means any Claim derived from, based upon, or relating to the Prepetition ABL Documents.

94.    "Prepetition ABL Documents" means the Prepetition ABL Agreement and any other agreements or documents executed in connection therewith or related thereto.

95.    "Prepetition ABL Facility" means the prepetition senior secured revolving financing in the aggregate principal amount of up to $150,000,000 provided by the Prepetition ABL Lenders pursuant to the Prepetition ABL Documents.

96.    "Prepetition ABL Lenders" means the Prepetition ABL Agent and the other lenders in any lender capacity from time to time party to the Prepetition ABL Facility.

97.    "Prepetition Debt Documents" means, collectively, the Prepetition ABL Documents and the Prepetition Term Loan Documents.

98.    "Prepetition Term Loan Agreement" means that certain Term Loan Agreement, dated as of March 26, 2018 (as amended, restated, modified or supplemented from time to time) among Mattress Firm, Inc., as Borrower, certain of the other Debtors, as guarantors, and the Prepetition Term Loan Lender.

99.    "Prepetition Term Loan Claim" means any Claim held by the Prepetition Term Loan Lender that arises under, is derived from, based upon, or related to the Prepetition Term Loan Facility.

100.    "Prepetition Term Loan Documents" means the Prepetition Term Loan Agreement and any other agreements or documents executed in connection therewith or related thereto.

101.    "Prepetition Term Loan Facility" means the prepetition senior secured term loan credit facility in the original aggregate principal amount of up to $80,000,000 provided by the Prepetition Term Loan Lender pursuant to the Prepetition Term Loan Documents.

102.    "Prepetition Term Loan Lender" means Steinhoff International Holdings N.V. in its capacity as the lender under the Prepetition Term Loan Facility.

103.    "Priority Tax Claim" means any Claim of a Governmental Unit entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

104.    "<u>Professional</u>" means any Entity retained by the Debtors or a statutory committee, if any, pursuant to a Final Order of the Bankruptcy Court entered pursuant to sections 327, 328 and/or 1103 of the Bankruptcy Code.

105.    "<u>Professional Fee Claim</u>" means any Claim of a Professional for allowance and award by the Bankruptcy Court of compensation for services rendered and/or reimbursement of costs or expenses incurred in the Chapter 11 Cases on or before the Effective Date under sections 328, 330, 331, 363, or 503(b) of the Bankruptcy Code.

106.    "<u>Proof of Claim</u>" means a proof of Claim filed against any Debtor in the Chapter 11 Cases.

107.    "<u>Quarterly Fees</u>" means all fees due and payable pursuant to section 1930(a)(6) of title 28 of the United States Code.

108.    "<u>Reinstate</u>," "<u>Reinstated</u>" or "<u>Reinstatement</u>" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest, or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate under a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Interest (other than the Debtors or an "insider" of the Debtors within the meaning of section 101(31) of the Bankruptcy Code) for any actual pecuniary loss incurred by such Holder as the result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim or Interest entitles the Holder thereof.

109.    "<u>Rejection Damages Bar Date</u>" means, with respect to each applicable Executory Contract or Unexpired Lease, 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after the Effective Date; <u>provided</u>, <u>however</u>, that, solely in respect of Unexpired Leases included on the Schedule of Post-Effective Date Negotiated Leases that are rejected by an order of the Bankruptcy Court after the Effective Date, the Rejection Damages Bar Date shall be the latest to occur of (a) 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after entry of the order approving the rejection of such Unexpired Lease, and (b) 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after the effective date of the rejection of such Unexpired Lease.

110.    "<u>Rejection Damages Claim</u>" means a Claim resulting from the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

111.    "Rejection Motion" means any motion requesting authorization to reject one or more Executory Contracts or Unexpired Leases pursuant to section 365 of the Bankruptcy Code.

112.    "Related Parties" means, with respect to any Entity, such Entity's predecessors, successors and assigns (whether by operation of law or otherwise) and their respective present Affiliates and subsidiaries and each of their respective current members, partners, equity holders, controlling persons, officers, directors, employees, managers, shareholders, partners, financial advisors, attorneys, accountants, investment bankers, consultants, agents and professionals each acting in such capacity (solely in their capacity as such), and any Entity claiming by or through any of them (including their respective officers, directors, managers, shareholders, partners, employees, equity holders, members, and professionals).

113.    "Released Parties" means, collectively, the following Entities, solely in their capacities as such:  (a) the Debtors, (b) the Reorganized Debtors, (c) the Prepetition ABL Agent, (d) the Prepetition ABL Lenders, (e) the Prepetition Term Loan Lender, (f) the Intra-Group Lenders, (g) the DIP Agents, (h) the DIP Lenders, (i) the Exit Agents, (j) the Exit Lenders, (k) the Plan Support Parties, and (l) MFHC, and, with respect to each of the foregoing Entities specified in clauses (a) through (l), such Entities' Related Parties; provided, however, that any Holder of a Claim or Interest that validly "opts out" by timely returning an Opt-Out Election Form shall not be a "Released Party".

114.    "Releasing Parties" means, collectively, the following Entities, solely in their capacities as such:  (a) the Debtors, (b) the Reorganized Debtors, (c) the Prepetition ABL Agent, (d) the Prepetition ABL Lenders, (e) the Prepetition Term Loan Lender, (f) the Intra-Group Lenders, (g) the DIP Agents, (h) the DIP Lenders, (i) the Exit Agents, (j) the Exit Lenders, (k) the Plan Support Parties, (l) MFHC, and (m) all Holders of Claims or Interests that are presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, with respect to each of the foregoing Entities specified in clauses (a) through (m), such Entities' Related Parties; provided, however, that any Holder of a Claim or Interest that validly "opts out" by timely returning an Opt-Out Election Form shall not be a "Releasing Party."

115.    "Remaining Property" shall have the meaning set forth in the Lease Rejection Procedures Order.

116.    "Reorganized Debtors" means the Debtors, as reorganized pursuant to and under this Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Effective Date, after giving effect to the transactions implementing this Plan.

117.    "Schedule of Post-Effective Date Negotiated Leases" means the schedule of all Unexpired Leases, including any amendments or modifications thereto, as to which the applicable counterparty has consented in writing to the Debtors' deferral of their decision on assumption or rejection during the Post-Effective Date Lease Negotiation Period, as such schedule may be amended from time to time until the occurrence of the Effective Date.

118.    "SEAG" means Steinhoff Europe AG, the direct parent company of Stripes.

12

119.    "Section 1125(e) Parties" means each of the following, solely in their respective capacities as such: (a) the Prepetition ABL Agent, (b) the Prepetition ABL Lenders, (c) the Prepetition Term Loan Lender, (d) the Intra-Group Lenders, (e) the DIP Agents, (f) the DIP Lenders, (g) the Exit Agents, (h) the Exit Lenders, and (i) the Plan Support Parties, and, with respect to each of the foregoing parties under (a) through (i), such Entities' Related Parties, directors, officers, and professionals.

120.    "Specified Unimpaired Claim" has the meaning ascribed to such term in Article III.C.1.

121.    "Steinhoff Finance" means Steinhoff Finance Holding GmbH, the direct parent company of Möbel.

122.    "Steinhoff Global Restructuring" means the restructuring transactions contemplated by the Steinhoff Lockup Agreement.

123.    "Steinhoff Holdings" means Steinhoff International Holdings N.V.

124.    "Steinhoff Lockup Agreement" means that certain Lock-Up Agreement dated July 11, 2018 between Steinhoff International Holdings N.V. and certain direct and indirect subsidiaries thereof as the Obligors and certain lenders to such Obligors as the Participants.

125.    "Stripes" means Stripes US Holding, Inc., a non-Debtor Affiliate of the Debtors and the direct parent company of MFHC.

126.    "Stripes PIK Debt" means the $150 million face amount payment-in-kind debt, which may be issued by Stripes to the Exit Term Loan Lenders on the Effective Date pursuant to the terms of the Exit Term Loan Documents.

127.    "Stripes Restructuring" means the restructuring of Stripes pursuant to the Steinhoff Lockup Agreement, that will be implemented with the consent of the lenders under a revolving loan facility in the original aggregate principal amount of $200,000,000 under the $4 billion acquisition facilities agreement dated August 5, 2016 (as amended or restated from time to time) between, among others, Stripes, Steinhoff Finance, Möbel, SEAG, Steinhoff Holdings and J.P. Morgan Europe Limited (as Agent) or pursuant to a scheme of arrangement for Stripes in the United Kingdom.

128.    "Stripes Stock" means 49.9% of the common stock of Stripes on a fully-diluted basis, which may be issued to the Exit Term Loan Lenders on the Effective Date pursuant to the terms of the Exit Term Loan Documents.

129.    "Unexpired Lease" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

130.    "Unimpaired" means any Claim or Interest that is not Impaired, including any Claim or Interest that is Reinstated.

131.    "United States Trustee" means the Office of the United States Trustee for the District of Delaware.

B.    Rules of Interpretation.

For purposes of this Plan, unless otherwise provided herein:  (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (2) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (3) any reference in this Plan to an existing document, schedule or exhibit filed or to be filed means such document, schedule or exhibit, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (4) any reference to an entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) all references in this Plan to Articles are references to Articles of this Plan, as the same may be amended, waived or modified from time to time; (6) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular Article, paragraph, or clause contained in this Plan; (7)  the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation and shall be deemed to be followed by the words "without limitation;" (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (9) the rules of construction set forth in section 102 of the Bankruptcy Code (other than section 102(5) of the Bankruptcy Code) will apply; and (10) any reference to an Entity's "subsidiaries" means its direct and indirect subsidiaries

C.    Computation of Time.

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.  In the event that any payment, distribution, act or deadline under this Plan is required to be made or performed or occurs on a day that is not a Business Day, then such payment, distribution, act or deadline shall be deemed to occur on the next succeeding Business Day, but if so made, performed or completed by such next succeeding Business Day, shall be deemed to have been completed or to have occurred as of the required date.

D.    Deemed Acts.

Whenever an act or event is expressed under this Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred by virtue of this Plan and/or Confirmation Order without any further act by any party.

## ARTICLE II.

### ADMINISTRATIVE EXPENSE CLAIMS, DIP CREDIT FACILITIES CLAIMS, PRIORITY TAX CLAIMS, AND QUARTERLY FEES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Credit Facilities Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in <u>Article III</u>.

A.    <u>Administrative Expense Claims</u>.

1.    *General*.

Subject to the terms of the Confirmation Order and <u>Article II.A.2</u> and <u>Article II.A.3</u>, except to the extent that a Holder of an Allowed Administrative Expense Claim and the applicable Debtor(s) agree to less favorable treatment with respect to such Allowed Administrative Expense Claim, each Holder of an Allowed Administrative Expense Claim shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Administrative Expense Claim, payment of Cash equal to the full unpaid amount of such Allowed Administrative Expense Claim: (a) on the Effective Date or as soon as reasonably practicable thereafter, or, if not then due, when such Allowed Administrative Expense Claim is due or as soon as reasonably practicable thereafter; (b) if an Administrative Expense Claim is Allowed after the Effective Date, on the date such Administrative Expense Claim is due or as soon as reasonably practicable thereafter; (c) on such other date and upon such terms as such Holder and the Debtors or the Reorganized Debtors shall have agreed; or (d) as otherwise ordered by the Bankruptcy Court; <u>provided</u>, <u>however</u>, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' business during the Chapter 11 Cases shall be paid in full in Cash in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations, course of dealing, course of business, or industry practice.

2.    *Professional Fee Claims*.

All Professionals or other Entities requesting compensation or reimbursement of expenses pursuant to sections 328, 330, 331, 503(b) and/or section 1103 of the Bankruptcy Code for services rendered before the Effective Date (including, without limitation, any compensation requested by any Professional or any other entity for making a substantial contribution in the Chapter 11 Cases) shall file and serve final requests for allowance and payment of Professional Fee Claims no later than the first Business Day that is forty-five (45) days after the Effective Date.  Objections to any Professional Fee Claim must be filed and served on the Reorganized Debtors and the applicable Professional within thirty (30) days after the filing of the final fee application with respect to the Professional Fee Claim.  Any such objections that are not consensually resolved may be set for hearing on twenty-one (21) days' notice by the Professional asserting such Professional Fee Claim. The Reorganized Debtors shall promptly pay all amounts owed on account of Professional Fee Claims upon entry of an order of the Bankruptcy Court allowing such Claims on a final basis.

3.      *Payment of Quarterly Fees.*

The Debtors shall pay on the Effective Date all Quarterly Fees due and payable prior to the Effective Date.  On and after the Effective Date, the Reorganized Debtors shall pay any and all Quarterly Fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee.  Each Debtor shall remain obligated to pay Quarterly Fees to the United States Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  The United States Trustee shall not be required to file a Proof of Claim or any other request for payment of Quarterly Fees.

B.      <u>DIP Credit Facilities Claims</u>.

The DIP Credit Facilities Claims shall be Allowed Claims in the full amount outstanding under the DIP Credit Facilities, including principal, interest, fees, and expenses.  Except to the extent that a Holder of an Allowed DIP Credit Facilities Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed DIP Credit Facilities Claim shall receive, on account of and in full and final satisfaction, settlement, release, and discharge of each Allowed DIP Credit Facilities Claim, indefeasible payment in full in Cash.  Upon the payment or satisfaction of the Allowed DIP Credit Facilities Claims in accordance with this Article II.B, all Liens and security interests granted to secure the Allowed DIP Credit Facilities Claims shall be automatically terminated and of no further force or effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  As used in this Article II.B, "indefeasible payment in full in Cash" shall mean the indefeasible payment in full in Cash of all Allowed DIP Credit Facilities Claims (including all fees and expenses of the DIP Agents through the Effective Date in accordance with the payoff letter), the cancellation, backing, or cash collateralization of letters of credit under the DIP Credit Facilities in accordance with terms of the DIP Credit Facilities, the termination of the DIP Agents' and DIP Lenders' commitments to extend credit under the DIP Facility, and the receipt by the DIP Agents of a countersigned payoff letter in form and substance reasonably satisfactory to the DIP Agents.

C.      <u>Priority Tax Claims</u>.

Except to the extent that each Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, payment in full in Cash in accordance with the terms of any agreement between the applicable Debtor or Reorganized Debtor, as applicable, and such Holder, or as such Allowed Priority Tax Claim may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

D.      <u>Post-Effective Date Fees and Expenses</u>.

Except as otherwise specifically provided in this Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the legal, professional, or

other fees and expenses related to the implementation and consummation of this Plan incurred by the Reorganized Debtors following the Effective Date.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Reorganized Debtor may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND INTERESTS

A.    Classification of Claims and Interests.

1.    *General*.

This Plan constitutes a separate chapter 11 plan of reorganization for each Debtor.  Except for the Claims addressed in Article II (or as otherwise set forth herein), the Debtors have placed all Claims and Interests into Classes for each of the Debtors.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Credit Facilities Claims, or Priority Tax Claims, as described in Article II.

The Classes of Claims and Interests set forth below classify Claims and Interests for all purposes, including Confirmation and distribution pursuant to this Plan, as set forth herein.  This Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and any Claim or Interest shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid, released, or otherwise settled prior to the Effective Date.

2.    *Summary of Classification and Treatment of Claims and Interests*.

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 3 | Prepetition ABL Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 4 | Prepetition Term Loan Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 7 | Interests in MF Holdco | Impaired | Entitled to Vote |
| 8 | Intercompany Interests | Unimpaired | Presumed to Accept; Not Entitled to Vote |

B.      Treatment of Claims and Interests.

1.      *Class 1 – Other Priority Claims.*

a.      Classification:  Class 1 consists of all Other Priority Claims.

b.      Treatment:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash of such Allowed Other Priority Claim on or as soon as reasonably practicable after the last to occur of (i) the Effective Date, (ii) the date such Other Priority Claim becomes and Allowed Claim, (iii) the date on which such Allowed Other Priority Claim is due to be paid in the ordinary course of business of the Debtors or Reorganized Debtors, if applicable, and (iv) the date on which the Holder of such Allowed Other Priority Claim and the Debtors or Reorganized Debtors shall otherwise agree in writing.

c.      Voting:  Allowed Other Priority Claims in Class 1 are Unimpaired. Each Holder of an Allowed Other Priority Claim shall be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

2.      *Class 2 – Other Secured Claims.*

a.      Classification:  Class 2 consists of all Other Secured Claims.

b.      Treatment:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall, in the discretion of the Reorganized Debtors, receive (i) treatment of such Allowed Other Secured Claim in any manner that renders the claim Unimpaired, including Reinstatement, (ii) payment in full in Cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, or (iii) the collateral securing such Allowed Other Secured Claim, in each case on or as soon as reasonably practicable after the Effective Date.

c.      Voting:  Allowed Other Secured Claims in Class 2 are Unimpaired. Each Holder of an Allowed Other Secured Claim shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

3.    *Class 3 – Prepetition ABL Claims*.

a.    <u>Classification</u>:  Class 3 consists of all Prepetition ABL Claims.

b.    <u>Allowance</u>:  The Prepetition ABL Claims are Allowed and will be paid in full by being deemed to roll-up into the DIP ABL Credit Facility pursuant to the DIP Orders in the full principal amount plus all accrued and unpaid fees, costs, expenses, interest (at the non-default rate), charges, premiums and other obligations due under the Prepetition ABL Facility and such Prepetition ABL Claims shall not be subject to recharacterization, subordination, avoidance or any other claim or defense.

c.    <u>Treatment</u>:  In exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed Prepetition ABL Claim, each Holder of an Allowed Prepetition ABL Claim will receive indefeasible payment in full of such Allowed Prepetition ABL Claim through the consensual roll-up of the Allowed Prepetition ABL Claims into the DIP ABL Credit Facility in accordance with the terms of the DIP Orders and the DIP ABL Credit Facility; <u>provided</u>, <u>however</u>, that all indemnification obligations of the Debtors arising under the Prepetition ABL Documents in favor of the Prepetition ABL Agent or any Prepetition ABL Lender, or any of their directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, shall remain in full force and effect and be assumed by and enforceable against the Reorganized Debtors on and after the Effective Date.

d.    <u>Voting</u>:    Allowed Prepetition ABL Claims in Class 3 are Unimpaired.  Each Holder of an Allowed Prepetition ABL Claim shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

4.    *Class 4 – Prepetition Term Loan Claims*.

a.    <u>Classification</u>:    Class 4 consists of all Prepetition Term Loan Claims.

b.    <u>Allowance</u>:  The Prepetition Term Loan Claims are Allowed in the full principal amount plus all accrued and unpaid fees, costs, expenses, interest (at the non-default rate), charges, premiums and other obligations due under the Prepetition Term Loan Facility, and such Prepetition Term Loan Claims shall not be subject to recharacterization, subordination, avoidance or any other claim or defense.

c.    <u>Treatment</u>:  In exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed Prepetition Term Loan Claim, each Holder of an Allowed Prepetition Term Loan Claim shall receive indefeasible payment in full in Cash of such Allowed Prepetition Term Loan Claim on the Effective Date; <u>provided</u>, <u>however</u>, that all indemnification obligations of the Debtors arising under the Prepetition Term Loan Documents in favor of the Prepetition Term Loan Lender, or its directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, shall remain in

19

full force and effect and be assumed by and enforceable against the Reorganized Debtors on and after the Effective Date.

        d.    <u>Voting</u>:  Allowed Prepetition Term Loan Claims in Class 4 are Unimpaired.  Each Holder of an Allowed Prepetition Term Loan Claim shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

       5.    *Class 5 – General Unsecured Claims.*

        a.    <u>Classification</u>:  Class 5 consists of all General Unsecured Claims.

        b.    <u>Allowance</u>:  On the Effective Date, the Intra-Group Loan Claims shall be Allowed.

        c.    <u>Treatment</u>:

        (i)    Subject to <u>Article III.B.5.c(ii)</u> and <u>Article III.B.5.c(iii)</u> in respect of Allowed General Unsecured Claims that are Rejection Damages Claims or Intra-Group Loan Claims, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive payment in full of such Allowed General Unsecured Claim in Cash on or as soon as reasonably practicable after the last to occur of (x) the Effective Date, (y) the date on which an Allowed General Unsecured Claim is due to be paid in the ordinary course of business of the Debtors or the Reorganized Debtors, or (z) the date on which the Holder of an Allowed General Unsecured Claim and the Debtors or Reorganized Debtors shall otherwise agree in writing.

        (ii)    Except to the extent that a Holder of an Allowed General Unsecured Claim that is a Rejection Damages Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Rejection Damages Claim, each Holder of an Allowed Rejection Damages Claim shall receive payment in full of such Allowed Rejection Damages Claim in Cash on or as soon as reasonably practicable after the last to occur of (x) the date such Rejection Damages Claim becomes an Allowed Claim pursuant to <u>Article VII.B.2</u> or (y) the date on which the Holder of an Allowed Rejection Damages Claim and the Debtors or Reorganized Debtors shall otherwise agree in writing.

        (iii)    Each Holder of an Allowed General Unsecured Claim that is an Intra-Group Loan Claim has, in accordance with section 1123(a)(4) of the Bankruptcy Code, agreed to less favorable treatment of such Allowed Intra-Group Loan Claim.  Specifically, each Holder of an Allowed Intra-Group Loan Claim against each Debtor has agreed to receive no distributions under the Plan solely on account of such Allowed Intra-Group Loan Claims, and the Intra-Group Loan Guarantees by such Debtors shall be released on the Effective Date.

d.    <u>Voting</u>:    Allowed General Unsecured Claims in Class 5 are Unimpaired.  Each Holder of an Allowed General Unsecured Claim shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

6.    *Class 6 – Intercompany Claims.*

a.    <u>Classification</u>:  Class 6 consists of all Intercompany Claims.

b.    <u>Treatment</u>:  On the Effective Date, all Intercompany Claims shall be Reinstated.

c.    <u>Voting</u>:  Allowed Intercompany Claims in Class 6 are Unimpaired. Each Holder of an Allowed Intercompany Claim shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

7.    *Class 7 – Interests in MF Holdco.*

a.    <u>Classification</u>:  Class 7 consists of all Interests in MF Holdco.

b.    <u>Treatment</u>:  On the Effective Date, all Interests in MF Holdco shall be Reinstated; <u>provided</u>, <u>however</u>, that such Interests shall, if the MF Holdco Stock is issued to the Exit Term Loan Lenders pursuant to the Exit Term Loan Lender Election, be subject to dilution by (i) the MF Holdco Stock and (ii) the Interests reserved by MF Holdco for the Management Incentive Plan.

c.    <u>Voting</u>:  Interests in MF Holdco in Class 7 are Impaired.  Each Holder of an Interest in MF Holdco shall be entitled to vote to accept or reject this Plan.

8.    *Class 8 – Intercompany Interests.*

a.    <u>Classification</u>:  Class 8 consists of all Intercompany Interests.

b.    <u>Treatment</u>:  On the Effective Date, Intercompany Interests shall be Reinstated, and the legal, equitable, and contractual rights to which Holders of Intercompany Interests are entitled shall remain unaltered to the extent necessary to implement this Plan.

c.    <u>Voting</u>:  Intercompany Interests in Class 8 are Unimpaired.  Each Holder of an Intercompany Interest shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

C.    <u>Special Provisions Regarding Unimpaired Claims.</u>

1.     *Specified Unimpaired Claims.*

Notwithstanding anything to the contrary in this Plan, each Holder of an Allowed Other Priority Claim in Class 1, an Allowed Other Secured Claim in Class 2, an Allowed General Unsecured Claim in Class 5 other than a Rejection Damages Claim or an Intra-Group Loan Claim, or an Allowed Intercompany Claim in Class 6 (each such Allowed Claim, a "Specified Unimpaired Claim") shall be entitled to enforce its rights in respect of such Specified Unimpaired Claim against the Reorganized Debtors until such Specified Unimpaired Claim has been either (a) paid in full in accordance with applicable law, or on terms agreed to between the Holder of such Specified Unimpaired Claim and the Debtors or Reorganized Debtors, or in accordance with the terms and conditions of the applicable documentation or laws giving rise to such Specified Unimpaired Claim or (b) otherwise satisfied or disposed of as determined by a court of competent jurisdiction.

2.     *Rights and Defenses of the Debtors and the Reorganized Debtors.*

Except as otherwise provided in this Plan, the Debtors and the Reorganized Debtors shall retain all rights and defenses, both legal and equitable, under the Bankruptcy Code or other applicable bankruptcy and non-bankruptcy law with respect to any Unimpaired Claim (other than the power to Impair an Unimpaired Claim within the meaning of section 1124 of the Bankruptcy Code), including, but not limited to, legal and equitable rights of setoff and/or recoupment with respect to the Unimpaired Claims.

D.     <u>Alternative Treatment</u>.

Notwithstanding any provision herein to the contrary, any Holder of an Allowed Claim may receive, in lieu of the distribution or treatment to which it is entitled hereunder, any other distribution or treatment to which such Holder and the Debtors or Reorganized Debtors may agree in writing prior to or during the Chapter 11 Cases, including the Plan Support Agreement.

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF PLAN

Holders of Claims or Interests in Classes 1–6 and Holders of Interests in Class 8 are Unimpaired under this Plan and are therefore conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, no Holders of Claims or Interests in such Classes shall be entitled to vote to accept or reject this Plan. Class 7 is Impaired under this Plan, and the Holders of Interests in Class 7 are entitled to vote to accept or reject this Plan.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF PLAN

A.     <u>Sources of Cash Consideration for Plan Distributions</u>.

All Cash necessary for the Reorganized Debtors to make payments required by this Plan shall be obtained from (1) Cash on hand, including Cash from operations and the proceeds of the DIP Credit Facilities, and (2) the proceeds of the Exit Facilities.

B.    Exit Facilities.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities and provide any related guarantees, and the Exit Facilities shall be made available to the Reorganized Debtors pursuant and subject to the terms and conditions set forth in the Exit Facility Documents. Pursuant to the terms of the Exit Term Loan Facility the Exit Term Loan Lenders shall make the Exit Term Loan Lender Election on or prior to the Effective Date and shall receive either the (1) the Stripes Stock and the Stripes PIK Debt or (2) the MF Holdco Stock and the MF Holdco PIK Debt on the Effective Date.

The Confirmation Order shall constitute approval of the Exit Facilities (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith), and authorization for the Reorganized Debtors to enter into and perform under the Exit Facility Documents and such other documents as may be required or appropriate.

C.    Intra-Group Loan Facilities.

For the avoidance of doubt, except as provided in Article III.B.5.c.iii with respect to the release of the Intra-Group Loan Guarantees, no provision of this Plan including the releases granted under Article X.D.2 of this Plan, shall constitute a discharge, release, or other modification of the Intra-Group Loan Facilities or the obligations of Stripes or its non-Debtor Affiliates thereunder.  Pursuant to the Plan Support Agreement, SEAG and Möbel have agreed to contribute the Intra-Group Loan Claims (other than the Intra-Group Loan Guarantees, which are released hereby) to the share capital of Stripes, and to release the guarantee by MFHC in respect of the Intra-Group Loan Facilities, provided that the conditions to such contribution and release specified in the Plan Support Agreement are met.

D.    Corporate Action.

Upon the Effective Date, all actions contemplated by this Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors, the Reorganized Debtors, or any other Entity.

E.    Reorganized Debtors' Directors and Officers.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent that there are anticipated changes in the Reorganized Debtors' Directors and Officers under the terms of the Exit Term Loan Facility or otherwise, the Debtors will identify those changes in their brief in support of Confirmation of the Plan to be filed in these Chapter 11 Cases.  After the Effective Date, the

Reorganized Debtors' organizational documents, as each may be amended thereafter from time to time, shall govern the designation and election of directors of the Reorganized Debtors.

F.     Continued Legal Existence and Vesting of Assets in the Reorganized Debtors.

Except as otherwise provided in this Plan, each of the Debtors shall continue to exist on and after the Effective Date as a separate corporation, limited liability company, or other form of Entity, as the case may be, with all of the powers of such Entity under applicable law in the jurisdiction in which each Debtor is organized, incorporated, or otherwise formed and pursuant to such Debtor's articles of incorporation or formation, operating agreement, by-laws (or other analogous formation and governance documents) in effect immediately prior to the Effective Date (provided that such organizational documents shall be amended to prohibit the Reorganized Debtor from issuing non-voting equity securities, to the extent necessary to comply with section 1123(a) of the Bankruptcy Code), without prejudice to any right of the Reorganized Debtors to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date. In accordance with Article X.B, and except as explicitly provided in this Plan, on the Effective Date, all property comprising the Estates shall vest in the Reorganized Debtors.

G.     Cancellation of Liens.

Except as otherwise provided in this Plan, or in any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, on the Effective Date, in consideration for the distributions to be made on the Effective Date pursuant to this Plan, all Liens, charges, and encumbrances related to any Claim (other than any Lien securing an Other Secured Claim, solely to the extent such Claim is not Reinstated pursuant to this Plan), shall be terminated, null and void and of no force or effect. Each Holder of an Allowed Other Secured Claim (to the extent such Claim is not Reinstated pursuant to this Plan), an Allowed Prepetition ABL Claim, and/or an Allowed Prepetition Term Loan Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such Holder and to take such actions as may be requested by the Debtors (or the Reorganized Debtors as the case may be) to evidence the release of any Liens, including the execution, delivery, and filing or recording of such release documents as may be requested by the Debtors (or the Reorganized Debtors, as the case may be). The Debtors (or the Reorganized Debtors as the case may be) and any of their respective agents, attorneys or designees, shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements, intellectual property assignments, mortgage or deed of trust releases or such other forms or release documents as may be necessary or appropriate to implement the provisions of this section.

H.     Preservation of Causes of Action.

In accordance with section 1123(b)(3) of the Bankruptcy Code, but subject to the releases set forth in Article X.D.1, all Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the

foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. **No Entity may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any specific Cause of Action as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in this Plan**, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to any Cause of Action upon, after, or as a consequence of the Confirmation or the occurrence of the Effective Date.

I.    Exemption from Certain Transfer Taxes and Recording Fees.

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to this Plan (including, without limitation, the execution and delivery of the Exit Facilities) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and, upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and are allowed to accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

J.    Management Incentive Plan.

In accordance with the terms of the Plan Support Agreement and the Exit Term Loan Facility, certain of the Reorganized Debtors' senior management shall be entitled to participate in the Management Incentive Plan, the terms of which shall become effective only after the Effective Date. The Management Incentive Plan is a post-bankruptcy incentive plan and provides no awards for actions taken by any of the Debtors' employees during the Chapter 11 Cases. Pursuant to the terms of the Plan Support Agreement, Steinhoff Holdings, Steinhoff Finance, Möbel, SEAG, Stripes, and MFHC consent to (A) the issuance of 10% (on a fully-diluted basis) of the stock in either (1) Stripes, if the Stripes Stock is issued pursuant to the Exit Term Loan Lender Election, or (2) MF Holdco, if the MF Holdco Stock is issued pursuant to the Exit Term Loan Lender Election to members of senior management of the Reorganized Debtors following the Effective Date, with all matters relating to vesting of such stock based on time and performance to be determined by a majority vote of the board of directors of Stripes or MF Holdco, as applicable, with respect to which each of the directors is provided an opportunity to vote following the Effective Date, and (B) the issuance of 10% of the principal amount of (1) the Stripes PIK Debt if the Stripes PIK Debt is issued pursuant to the Exit Term Loan Lender Election, or (2) the MF Holdco PIK Debt, if the MF Holdco PIK Debt is issued pursuant to the Exit Term Loan Lender Election, to members of senior management of the Reorganized Debtors following the Effective Date, with the allocations thereof to be determined by a majority vote of the board of directors of Stripes or MF Holdco, as applicable, with respect to which each of the directors is provided an opportunity to vote following the Effective Date of the Plan in a way that avoids triggering adverse tax consequences for such

members of senior management or, in the alternative, compensation of comparable value in a form to be reasonably agreed upon ((A) and (B) collectively, the "Management Incentive Plan").

K.      Workers' Compensation Programs.

As of the Effective Date, the Reorganized Debtors shall continue to honor their obligations under (1) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (2) the Debtors' (a) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation, (b) self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance.

L.      Operations Between the Confirmation Date and the Effective Date.

During the period from the Confirmation Date to and including the Effective Date, the Debtors may continue to operate their business as debtors in possession in the ordinary course, subject to all applicable orders of the Bankruptcy Court and the provisions of the Bankruptcy Code.

M.      Dissolution of Creditors' Committee.

The Debtors do not anticipate that a Creditors' Committee will be formed in the Chapter 11 Cases because all Holders of Allowed General Unsecured Claims are Unimpaired under this Plan. Notwithstanding the foregoing, a Creditors' Committee, if appointed, shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and shall perform such other duties as it may be assigned by the Bankruptcy Court prior to the Effective Date. On the Effective Date, the Creditors' Committee, if appointed, shall be dissolved and the Creditors' Committee members shall be deemed released of all of their duties, responsibilities, and obligations in connection with the Chapter 11 Cases or this Plan and its implementation, and the retention and employment of the Creditors' Committee's attorneys, accountants, professionals and other agents shall terminate.

**ARTICLE VI.**

**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.      Assumption of Executory Contracts and Unexpired Leases.

On the Effective Date, all Executory Contracts or Unexpired Leases, including the Plan Support Agreement, shall be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code (each an "Assumed Contract" or "Assumed Lease"), unless any such Executory Contract or Unexpired Lease:

(1)      has previously been rejected by a Final Order of the Bankruptcy Court;

(2)      has previously been rejected by an order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date;

(3)    is the subject of a Rejection Motion or Lease Rejection Notice pending as of the Effective Date and is subsequently rejected by a Final Order of the Bankruptcy Court; or

(4)    is identified on the Schedule of Post-Effective Date Negotiated Leases as an Unexpired Lease as to which the counterparty has consented in writing to the Debtors' deferral of their decision to assume or reject for a period of up to ninety (90) days after the Effective Date; provided, however, that the Debtors or the Reorganized Debtors, as applicable, may assume any Unexpired Lease identified on the Schedule of Post-Effective Date Negotiated Leases at any time before termination of the Post-Effective Date Lease Negotiation Period on such terms as may be agreed with the relevant counterparty thereto.

The Debtors will not assign any Executory Contracts or Unexpired Leases pursuant to this Plan.

Entry of the Confirmation Order shall constitute findings by the Bankruptcy Court that (a) the Reorganized Debtors have properly provided for the cure of any defaults that might have existed consistent with the requirements of section 365(b)(1) of the Bankruptcy Code; (b) each assumption is in the best interest of the Reorganized Debtors, their Estates, and all parties in interest in the Chapter 11 Cases; and (c) the requirements for assumption of any Executory Contract or Unexpired Lease to be assumed have been satisfied. Except as otherwise provided in the following sentence, defaults under Assumed Contracts and Assumed Leases will be cured by being Reinstated, and all Claims under any Assumed Contract or Assumed Lease shall be paid by the Reorganized Debtors on the Effective Date or as soon as reasonably practicable thereafter. In the event of a dispute as to the amount necessary to satisfy any Claim under section 365(b)(1) of the Bankruptcy Code, such Claim shall be paid upon the later of (i) a settlement of such dispute between the Reorganized Debtors and the relevant Holder and (ii) entry of a Final Order resolving such dispute; provided, however, that if a counterparty's objection to the amount necessary to satisfy a Claim under section 365(b)(1) of the Bankruptcy Code is sustained, the Reorganized Debtors may elect, in their discretion, to reject such Executory Contract or Unexpired Lease in lieu of assuming such Executory Contract or Unexpired Lease.

B.    Rejection of Executory Contracts and Unexpired Leases.

Executory Contracts and Unexpired Leases that are the subject of a Rejection Motion or a Lease Rejection Notice shall be deemed rejected on the date specified in the Final Order authorizing such rejection. The Debtors reserve the right, at any time prior to the Effective Date (subject to the following paragraph in respect of the Schedule of Post-Effective Date Negotiated Leases), to file one or more motions requesting authorization to reject any Executory Contract or Unexpired Lease and/or file one or more Lease Rejection Notices, and to remove any Executory Contract or Unexpired Lease from any such Rejection Motion or Lease Rejection Notice. The Debtors are authorized to abandon any Remaining Property at or on the leased premises subject to an Unexpired Lease rejected by a Final Order, and the counterparties to the rejected Unexpired Leases may dispose of any such Remaining Property at or on the subject premises on the applicable lease rejection effective date in accordance with the terms and provisions of the Lease Rejection Procedures Order or any Final Order authorizing such rejection.

27

Notwithstanding anything to the contrary in this Plan, the Debtors and Reorganized Debtors shall be entitled to file one or more Lease Rejection Notices after the Effective Date up to and including the third Business Day after the termination of the Post-Effective Date Lease Negotiation Period to reflect their decision, if any, to reject Unexpired Leases of nonresidential real property listed on the Schedule of Post-Effective Date Negotiated Leases.

C.    Compensation and Benefits Programs.

All of the Compensation and Benefits Programs entered into before the Petition Date and not since terminated shall be deemed to be, and shall be treated as though they are, Assumed Contracts under Article VI.A, and the Debtors' and Reorganized Debtors' obligations under the Compensation and Benefits Programs will survive Confirmation of this Plan and be fulfilled in the ordinary course of business.

D.    Indemnification Obligations.

Notwithstanding anything in this Plan to the contrary, each Indemnification Obligation shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 356 and 1123 of the Bankruptcy Code or otherwise. Each Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose. For the avoidance of doubt, this Article VI.D affects only the obligations of the Debtors and Reorganized Debtors with respect to any Indemnification Obligations owed to or for the benefit of past and present directors, officers, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors, and shall have no effect on nor in any way discharge or reduce, in whole or in part, any obligation of any other Entity owed to or for the benefit of such directors, officers, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors.

E.    Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided in this Plan, each Assumed Contract or Assumed Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Assumed Contract or Assumed Lease, and Executory Contracts and Unexpired Leases related thereto, if any, unless the Debtors reject or repudiate any of the foregoing agreements. Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.    Reservation of Rights.

Neither the inclusion of any Executory Contract or Unexpired Lease in a Rejection Motion or a Lease Rejection Notice, nor anything contained in this Plan, shall constitute an admission by

the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE VII.

## PROVISIONS FOR RESOLVING DISPUTED CLAIMS

On and after the Effective Date, the Debtors or the Reorganized Debtors shall retain any and all of their rights and defenses such Debtor had with respect to any Claim that existed immediately before the Effective Date.

A.    <u>Claims Other than Rejection Damages Claims</u>.

Subject to <u>Article VII.B</u> in respect of Rejection Damages Claims, the Debtors and the Reorganized Debtors may contest the amount and validity of any disputed, contingent, or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved, or adjudicated if the Chapter 11 Cases had not been commenced.  **No Proofs of Claim need be filed for any Claims other than Rejection Damages Claims**.

B.    <u>Rejection Damages Claims</u>.

1.    *Proofs of Claim for Rejection Damages Claims*.

If the rejection of an Executory Contract or Unexpired Lease results in a Rejection Damages Claim, then such Claim shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors or their properties, or any of their interests in properties as agent, successor or assign, unless a Proof of Claim is filed with the Claims and Noticing Agent and served upon counsel to the Reorganized Debtors no later than the Rejection Damages Claims Bar Date.  The Debtors shall give notice of the Rejection Damages Claims Bar Date established by this <u>Article VI.B</u> and provide a Proof of Claim form (i) to the counterparties to rejected Executory Contracts or Unexpired Leases as of the Effective Date by service of the Notice of Effective Date, and (ii) to the counterparties to the Unexpired Leases of nonresidential real property listed on the Schedule of Post-Effective Date Negotiated Leases that are subject to Rejection Notices after the Effective Date by service of such Rejection Notice.

2.    *Allowance of Rejection Damages Claims*.

No Rejection Damages Claim shall become an Allowed Claim unless and until (i) a Proof of Claim is timely filed on account of such Claim and (ii) such Claim is (x) Allowed pursuant to a Final Order or (y) settled or compromised between the applicable Debtor and the counterparty to the applicable Executory Contract or Unexpired Lease.

3.      *Administration of Rejection Damages Claims.*

Except as otherwise provided in this Plan and notwithstanding any requirements that may be imposed by Bankruptcy Rule 9019, after the Effective Date the Reorganized Debtors shall have the authority to: (a) file, withdraw, or litigate to judgment objections to Rejection Damages Claims; (b) settle or compromise any Disputed Rejection Damages Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without further notice to or action, order, or approval by the Bankruptcy Court.

4.      *Time to File Objections to Rejection Damages Claims.*

Any objection to a Rejection Damages Claim shall be filed on or before the Claims Objection Deadline, as such deadline may be extended from time to time.

5.      *Adjustment to Claims Register without Objection.*

The Debtors or the Reorganized Debtors may adjust and expunge any duplicate Claim, any Claim that has been paid or satisfied, or any claim that has been amended or superseded, upon stipulation between the parties without the need for a Claims objection to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

# ARTICLE VIII.

# PROVISIONS GOVERNING DISTRIBUTIONS

A.      <u>Allowed Claims and Interests</u>.

Notwithstanding any provision herein to the contrary, the Debtors or the Reorganized Debtors shall make distributions only to Holders of Allowed Claims.  A Holder of a Disputed Claim shall receive only a distribution on account thereof when and to the extent that such Holder's Disputed Claim becomes an Allowed Claim.

B.      <u>Interest and Penalties on Claims</u>.

Unless otherwise specifically provided for in this Plan or the Confirmation Order, required by applicable bankruptcy law, or necessary to render a Claim Unimpaired, post-petition interest and penalties shall not accrue or be paid on any Claims, including Priority Tax Claims, Other Priority Claims, and General Unsecured Claims, and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the petition Date through the date such Claim is satisfied in accordance with the terms of this Plan.

C.      <u>Means of Cash Payment</u>.

Payments of Cash made pursuant to this Plan shall be made, at the option and in the sole discretion of the Reorganized Debtors, by checks drawn on or wire transfers from a bank selected by the Reorganized Debtors.

D.      Withholding and Reporting Requirements.

In connection with this Plan and all distributions hereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

E.      Setoff and Recoupment.

The Reorganized Debtors may, pursuant to sections 553 and/or 558 of the Bankruptcy Code or applicable non-bankruptcy laws, but shall not be required to, set off and/or recoup against any Claim the payments or other distributions to be made pursuant to this Plan in respect of such Claim, or claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim; provided, however, that neither the failure to assert such rights of setoff and/or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any claim that the Debtors or the Reorganized Debtors may assert against any Holder of an Allowed Claim, and all setoff and/or recoupment claims of the Debtors and/or the Reorganized Debtors are hereby preserved.

F.      Undeliverable or Non-Negotiated Distributions.

All undeliverable distributions under this Plan that remain unclaimed for one year after attempted distribution shall indefeasibly revert to the Reorganized Debtors.  Upon such reversion, the relevant Allowed Claim shall be automatically discharged and forever barred, notwithstanding any federal or state escheatment laws to the contrary.

G.      Claims Paid by Third Parties.

To the extent a Holder receives a distribution on account of a Claim and also receives payment from a party other than the Debtors or the Reorganized Debtors on account of such Claim, such Holder shall, within thirty (30) days of receipt thereof, repay or return the distribution to the Reorganized Debtors, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of the Claim as of the date of any such distribution under this Plan.

## ARTICLE IX.

## CONFIRMATION AND CONSUMMATION OF PLAN

A.      Conditions to the Effective Date.

The Effective Date shall not occur unless and until the following conditions shall have been satisfied or waived in accordance with Article IX.B:

31

1.      The Confirmation Order, in form and substance reasonably satisfactory to the Debtors, the Exit Term Loan Lenders, and the Plan Support Parties shall have become a Final Order and shall, among other things, provide that the Debtors and the Reorganized Debtors are authorized to take all actions necessary or appropriate to enter into, implement, and consummate the Exit Facilities and other agreements or documents contemplated by this Plan.

2.      The Exit Term Loan Documents shall have been executed and delivered, and all conditions precedent thereto shall have been satisfied (other than the occurrence of the Effective Date), including that either:

> a.      The Stripes Restructuring shall have been consummated (in which case the Stripes Stock and the Stripes PIK Debt shall be issued to the Exit Term Loan Lenders pursuant to the Exit Term Loan Lender Election); or

> b.      If the Stripes Restructuring has not been consummated, the Exit Term Loan Lenders shall be satisfied, in their sole and absolute discretion, with the results of their diligence into the potential U.S. tax impacts of the Plan and the transactions contemplated hereby (in which case the MF Holdco Stock and the MF Holdco PIK Debt shall be issued to the Exit Term Loan Lenders pursuant to the Exit Term Loan Lender Election).

3.      Any and all authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement this Plan on the Effective Date shall have been obtained or shall have occurred.

4.      The Confirmation Order shall provide that all Claims for damages resulting from the rejection or termination of an Unexpired Lease of nonresidential real property shall be Allowed only to the extent provided under section 502(b)(6) of the Bankruptcy Code.

B.      Waiver of Conditions.

Each of the conditions to the occurrence of the Effective Date set forth in Article IX.A may be waived in whole or in part by the Debtors with the prior written approval of the Exit Term Loan Lenders and the Plan Support Parties, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan.  The failure to satisfy or waive any condition to the Effective Date may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied.

C.      *Vacatur* of Confirmation Order; Non-Occurrence of Effective Date.

If the Confirmation Order is vacated or the Effective Date does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall (1) constitute a waiver or release of any Causes of Action by or Claims against or Interests in the

Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest or any other Entity; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect; or (4) be used by the Debtors or any other Entity as evidence (or in any other way) in any litigation, including with respect to the strengths and weaknesses of positions, arguments or claims of any of the parties to such litigation.

## ARTICLE X.

## EFFECT OF PLAN CONFIRMATION

A.    Binding Effect.

On the Effective Date of this Plan, all provisions of this Plan, including all agreements, instruments and other documents filed in connection with this Plan by the Debtors or the Reorganized Debtors, shall be binding upon the Debtors, the Estates, the Reorganized Debtors, all Holders of Claims against and Interests in the Debtors and each such Holder's respective successors and assigns, and all other parties that are affected in any manner by this Plan. Except as expressly provided otherwise in this Plan, all agreements, instruments and other documents filed in connection with this Plan shall be given full force and effect, and shall bind all parties referred to therein as of the Effective Date, whether or not such agreements are actually issued, delivered or recorded on the Effective Date or thereafter and whether or not a party has actually executed such agreement.

B.    Vesting of Assets in the Reorganized Debtors.

Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estates—including, without limitation, all Causes of Action not released in Article X.D.1, all Executory Contracts and Unexpired Leases assumed by any of the Debtors, and any property acquired by any of the Debtors, but excluding all Remaining Property that has been abandoned pursuant to an order of the Bankruptcy Court (including without limitation, the Lease Rejection Procedures Order)—shall vest in each respective Reorganized Debtor free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided by this Plan or the Confirmation Order. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

C.    **Discharge**.

1.    ***Discharge of the Debtors***.

**Except as expressly provided in this Plan or the Confirmation Order (including to the extent any Claims are Reinstated under this Plan), all consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties and, regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to this Plan on account of such**

Claims, upon the Effective Date, each of the Debtors shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (c) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (d) the Holder of a Claim based upon such debt is deemed to have accepted this Plan.

2.    *Discharge Injunction*.

As of the Effective Date, except as expressly provided in this Plan or the Confirmation Order, all Entities shall be precluded from asserting against the Debtors or the Reorganized Debtors any Claims, debts, rights, causes of action, claims for relief, liabilities, or equity interests relating to the Debtors that have been released, discharged, or exculpated pursuant to the Plan and which are based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as explicitly provided in this Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all Claims and other debts and liabilities against the Debtors pursuant to section 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time to the extent such judgment relates to a discharged Claim.

D.    **Releases**.

1.    *Releases by the Debtors*.

As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents or an assumed contract that remains in effect or becomes effective after the Effective Date or (ii) as expressly provided in this Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate and implement the reorganization of the Debtors, as an integral component of the Plan, as of the Effective Date, the Debtors, the Reorganized Debtors, and each of their respective current and former Affiliates (with respect to non-Debtors, to the extent permitted by applicable law), on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to the Bankruptcy Code, shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, void, extinguish, and discharge, each and all of the Released Parties of and from any and all Causes of Action (including, without limitation, Avoidance Actions), any and all other Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever (including any derivative claims or Causes of Action asserted or that may be asserted on behalf of the Debtors, the Reorganized Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or

hereinafter arising, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors, the Reorganized Debtors, their respective assets and properties, and the Estates, the Chapter 11 Cases, the Plan Support Agreement, the DIP Credit Facilities, Intra-Group Loan Guarantees, the Prepetition Debt Documents, this Plan, the Disclosure Statement, and any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of this Plan, including the distribution of property under this Plan, the execution and delivery of the Exit Facilities, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in this **Article X.D.1** shall not be construed as (a) releasing any Released Party from Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, or (b) releasing any post-Effective Date obligations of any Entity under this Plan or any document, instrument, or agreement executed to implement this Plan or Reinstated under this Plan.

2.    *Releases by Certain Holders of Claims*.

Except as expressly provided in this Plan or the Confirmation Order, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors, as an integral component of the Plan, each Releasing Party shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, void, extinguish, and discharge each Debtor, Reorganized Debtor, and other Released Party from any and all Claims, Interests, obligations, rights, demands, suits, judgments, Causes of Action, damages, debts, remedies, losses and liabilities of any nature whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors, the Reorganized Debtors, or their Estates, that such Releasing Party would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors, the Reorganized Debtors, their respective assets and properties, and the Estates, the Chapter 11 Cases, the Plan Support Agreement, the DIP Credit Facilities, the Intra-Group Loan Guarantees, the Prepetition Debt Documents, this Plan, the Disclosure Statement, the Exit Facilities, and any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Cases the pursuit of Confirmation, the administration and implementation of this Plan, including the distribution of property under this Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before

the Effective Date related or relating to the foregoing; **provided**, **however**, that the releases set forth in this **Article X.D.2** shall not constitute a release of any claims held by the Intra-Group Lenders other than with respect to the Intra-Group Loan Guarantees. Notwithstanding the foregoing, the releases set forth in this **Article X.D.2** shall not be granted or be deemed to have been granted by any Entity who returns the Opt-Out Election Form, within thirty (30) days after entry of the Effective Date, to the address specified on the Opt-Out Election Form, specifying that such Entity elects not to grant the releases contained in this **Article X.D.2**.

E.    **Exculpation**.

From and after the Effective Date, the Exculpated Fiduciaries and, solely to the extent provided by section 1125(e) of the Bankruptcy Code, the Section 1125(e) Parties, shall neither have nor incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective Affiliates, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or any of their successors or assigns, for any act, omission, transaction, event, or other circumstance in connection with or related to the Debtors, the Reorganized Debtors, their respective assets and properties, and the Estates, the Chapter 11 Cases, the Plan Support Agreement, the DIP Credit Facilities, the Intra-Group Loan Guarantees, the Exit Facilities, the Prepetition Debt Documents, this Plan, or the Disclosure Statement, the pursuit of Confirmation, the administration and implementation of this Plan, including the distribution of property under this Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to the foregoing; **provided**, **however**, that this **Article X.D** shall not apply to release (1) obligations under this Plan and the contracts, instruments, releases, agreements, and documents delivered, Reinstated or assumed under this Plan or (2) any Claims or Causes of Action arising out of fraud, willful misconduct or gross negligence as determined by a Final Order.

Each of the Exculpated Parties shall be entitled to rely, in all respects, upon the reasonable and informed advice of counsel with respect to their duties and responsibilities under this Plan.

F.    **Injunctions**.

1.    *Injunction Related to Releases*.

Except as expressly provided in this Plan or the Confirmation Order, as of the Effective Date, all Entities that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, Cause of Action or liability of any nature whatsoever, of the types described in **Article X.D.2** and relating to the Debtors, the Reorganized Debtors or any of their respective assets and property and/or the Estates, the Chapter 11 Cases, the Plan Support Agreement, the DIP Credit Facilities, the Intra-Group Loan Guarantees, the Exit Facilities, this Plan and/or the Disclosure Statement are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Released Party or its property on

36

account of such released liabilities, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under **Article X.C**; and/or (e) commencing or continuing in any manner any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order.

2. *Injunction Related to Exculpation.*

Except as expressly provided in this Plan or the Confirmation Order, as of the Effective Date, all Entities that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, Cause of Action or liability of any nature whatsoever, of the types described in **Article X.E** and relating to the Debtors, the Reorganized Debtors or any of their respective assets and property and/or the Estates, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Exculpated Party or its property on account of such released liabilities, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under **Article X.C**; and/or (e) commencing or continuing in any manner any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order.

G.    Term of Bankruptcy Injunction or Stays.

All injunctions or stays provided for in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and this Plan pursuant to sections 105(c) and 1142 of the Bankruptcy Code and to the fullest extent permitted by law, including, among other things, jurisdiction to:

1. resolve any matters related to the assumption or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine the Allowed amount of, and, if necessary, liquidate any Claims (including Rejection Damages Claims) arising therefrom.

2. ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and adjudicate any and all disputes relating to distributions under this Plan.

3. decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date (which jurisdiction shall be non-exclusive as to any such non-core matters);

4. enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases and other agreements or documents created in connection with this Plan, the Disclosure Statement, or the Confirmation Order, and issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of this Plan or the Confirmation Order;

5. resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or any contract, instrument, release or other agreement or document that is executed or created pursuant to this Plan, or any Entity's rights arising from or obligations incurred in connection with this Plan or such documents;

6. approve any modification of this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or approve any modification of the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan, the Disclosure

38

Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

        7.    hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge;

        8.    hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under sections 330, 331, 503(b), 1103 and 1129(a)(9) of the Bankruptcy Code, which shall be payable by the Debtors only upon allowance thereof pursuant to an order of the Bankruptcy Court.

        9.    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

        10.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if distributions pursuant to this Plan are enjoined or stayed;

        11.    determine any other matter that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order;

        12.    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

        13.    hear and determine all matters related to the property of the Estates from and after the Confirmation Date;

        14.    enter a Final Order or decree concluding or closing the Chapter 11 Cases; and

        15.    hear any other matter related hereto that are not inconsistent with the Bankruptcy Code or title 28 of the United States Code.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

A.    <u>Amendment or Modification of this Plan</u>.

Subject to section 1127 of the Bankruptcy Code, the Debtors may alter, amend or modify this Plan at any time prior to or after the Confirmation Date but prior to the Effective Date. Each Holder of a Claims or Interest shall be presumed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

B.    Effectuating Documents and Further Transactions.

The Debtors and the Reorganized Debtors are authorized to execute, deliver, file or record such contracts, instruments, certificates, notes, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of this Plan (including, without limitation, the Exit Facility Documents).

C.    Successors and Assigns.

The rights, benefits and obligations of any Entity named or referred to in this Plan or the Confirmation Order shall be binding on, and inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiary, or guardian, if any of each such Entity.

D.    Revocation, Withdrawal or Non-Consummation.

This Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. Accordingly, this Plan may be confirmed and consummated for any Debtor, and the fact that this Plan is confirmed or consummated for any particular Debtor shall have no impact on the ability or right of any other Debtor to confirm or consummate this Plan as to that Debtor.

The Debtors reserve the right to revoke or withdraw this Plan at any time prior to the Confirmation Hearing and to file other plans of reorganization.  If the Debtors revoke or withdraw this Plan, or if Confirmation or consummation of this Plan fails to occur, then (1) this Plan shall be null and void in all respects, (2) any settlement or compromise embodied in this Plan (including the fixing of the amount of any Claim or Class of Claim), assumption of Executory Contracts or Unexpired Leases under this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (3) nothing contained in this Plan, and no acts taken in preparation for consummation of this Plan, shall (a) constitute or be deemed to constitute a waiver or release of any Claims or Causes of Action, (b) prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors, or (c) constitute an admission by the Debtors or any other Entity.

E.    Notice.

All notices, requests, and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered, addressed as follows:

Debtors:              Mattress Firm Holding Corp.
                      10201 S. Main Street
                      Houston, Texas 77025
                      Attn: Kindel Elam
                      kindel.elam@mfrm.com

                      with copies to:

40

| Attorneys for the Debtors: | Sidley Austin LLP |
|---|---|
| | One South Dearborn Street |
| | Chicago, Illinois 60603 |
| | Attn: Bojan Guzina and Matthew E. Linder |

-and-

Sidley Austin LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Attn: Gabriel R. MacConaill and
Michael Fishel

-and-

Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, Delaware 19801
Attn: Edmon L. Morton and Ashley E. Jacobs

F.    <u>Nonseverability of Plan Provisions</u>.

If, prior to Confirmation, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted; <u>provided</u>, that any such alteration or interpretation shall be reasonably satisfactory to (1) the Debtors, (2) the Exit Term Loan Lenders, (3) the Plan Support Parties and (4) the DIP Agents solely to the extent the provisions therein affect the legal and/or economic rights of the DIP Agents. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

G.    <u>Governing Law</u>.

Subject to the provisions of any contract, certificates or articles of incorporation, by-laws, instruments, releases, or other agreements or documents entered into in connection with this Plan, and subject further to <u>Article XI</u>, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with (1) the Bankruptcy Code, the Bankruptcy Rules or other federal law to the extent applicable and (2) if none of such law is

applicable, the laws of the State of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

H.    Tax Reporting and Compliance.

The Reorganized Debtors are hereby authorized, on behalf of each of the Debtors, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date to and including the Effective Date.

I.    Closing of Chapter 11 Cases; Caption Change

On or after the occurrence of the Effective Date, the Reorganized Debtors may submit a proposed final decree order (the "Final Decree Order") to the Bankruptcy Court under certification of counsel closing the Chapter 11 Cases of all of the Debtors except one remaining Debtor to be identified in the Final Decree Order (the "Remaining Debtor"). All contested matters relating to each of the Debtors, including objections to Rejection Damages Claims, shall be administered and heard in the Chapter 11 Case of the Remaining Debtor. Further, for the avoidance of doubt, the Remaining Debtor shall make payments of Quarterly Fees. In addition, the Reorganized Debtors shall submit, under certification of counsel, a proposed order amending the case caption as of the Effective Date, subject to the entry of the Final Decree Order.

*[Remainder of Page Intentionally Left Blank]*

Respectfully submitted as of
October 4, 2018

Mattress Firm, Inc.
(on behalf of itself and its Affiliated Debtors)

*/s/ Hendré Ackermann*

Hendré Ackermann
Chief Operating Officer and
Chief Financial Officer

## Exhibit B

**Financial Projections**

**FINANCIAL PROJECTIONS**

The Debtors, with the assistance of their advisors, developed a set of financial projections for the period of October 4, 2018 through October 1, 2019 (fiscal year-end 2019) and for fiscal years 2020, 2021, 2022, and 2023 (such projections, the "<u>Financial Projections</u>" and, such period, the "Projection Period") for the purpose of demonstrating feasibility of the Plan.

The Financial Projections present, to the best of the Debtors' knowledge, the Reorganized Debtors' projected financial position, results of operations, and cash flows during the Projection Period. Although management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, the Debtors can provide no assurance that such assumptions will be realized.  As described in detail in the Disclosure Statement, a variety of risk factors could affect the Company's financial results and must be considered. Accordingly, the Financial Projections should be reviewed in conjunction with a review of the risk factors set forth in the Disclosure Statement and the assumptions described herein, including all relevant qualifications and footnotes.

The Financial Projections are based upon management's internal view of projected financial performance conducted before the filing of these Financial Projections and may differ methodologically from historical public reporting by the Debtors.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, and that Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan.  In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such Plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

Under Accounting Standards Codification "ASC" 852, "Reorganizations" ("<u>ASC 852</u>"), the Debtors note that the Financial Projections reflect the operational emergence from chapter 11 but not the impact of fresh start accounting that will likely be required upon emergence. Fresh start accounting requires all assets, liabilities, and equity instruments to be valued at "fair value."  The Financial Projections account for the reorganization and related transactions pursuant to the Plan. While the Debtors expect that they will be required to implement fresh start accounting upon emergence, they have not yet completed the work required to quantify the impact to the Financial Projections. When the Debtors fully implement fresh start accounting, differences are anticipated and such differences could be material.

<u>General Assumptions</u>

1. **Reorganized Footprint**. The Financial Projections assume a reorganized footprint of 2,674 stores (i.e., approximately 18% reduction in fleet size). Store closures are assumed to take place during the pendency of the bankruptcy case and expenses from store closures are reflected in preemergence assumptions.

2. **Post-emergence Capital Structure.** The Financial Projections assume the Company secures a new $150 million DIP ABL Credit Facility and $100 million DIP Term Loan Credit Facility, and assumes the Company utilizes the full commitment of the $400 million Exit Term Loan Facility.  The actual size of the ABL Term Loan Replacement Facility will be determined prior to the Confirmation Hearing.

3. **Macroeconomic Factors.** The Financial Projections assume that general economic conditions will not change significantly during the time period in question.

**Operating Assumptions**

4. **Sales.** The Company realizes revenue through the following channels:
   a. **Retail Stores:** Sales from the Company's reorganized footprint of retail stores accounts for ~92% of annual revenues over the Projection Period.
   b. **eCommerce:** The Company hosts an online media platform/marketplace for the sale and distribution of its products, accounting for ~4% of annual revenues over the Projection Period.
   c. **Multi-channel sales ("MCS"):** The Company operates at certain events (state fairs, other events, and expositions) that accounts for ~4% of annual revenues over the Projection Period.

5. **Growth Assumptions.** Same-store-sales growth rates for retail stores and web are projected based on historical performance and recent trends. Growth rates for eCommerce and MCS are based on new initiatives and management expectations.

6. **Gross Margin.** Projected gross margin is based on historical performance, adjusted upward to reflect various initiatives that management has begun to implement.

7. **Other Variable Expenses.** Incorporates salesman expenses, delivery expenses, and financing fees. Other variable expenses are forecasted based on historical needs and adjusted for assumed cost-savings from a reorganized commission program that will also shift consumers towards cheaper financing, and the introduction of part-time employees.

8. **Store Fixed Expenses.** Projected store fixed expenses are based on lease contracts of the reorganized footprint.

9. **Advertising.** The Financial Projections assume advertising expenses at 9% of revenues, based on management targets.

10. **Overhead and Other SG&A Expenses.** Incorporates store and corporate overhead, and warehouse expenses. Overhead and Other SG&A expenses are forecasted based on historical needs and adjusted for the reorganized footprint and inflationary adjustments.

11. **EBITDA.** For purposes of the Financial Projections, EBITDA is defined as earnings before interest expense, income tax provision, depreciation and amortization.

12. **Other Non-Cash Items.** Straightline rent adjustments are based on rate risers associated with lease contracts of the reorganized footprint.

13. **Business Disruption.** Business disruption includes the impact of these chapter 11 cases on sales, as competitors are expected to be aggressive in obtaining market-share during the pendency of the bankruptcy case.

14. **Cash Interest.** Post-reorganization interest expense reflects cash interest payments on the post-emergence debt.

15. **Capital Expenditures.** Capital expenditures include enhancements to the eCommerce platform, expected costs for new stores, remodels and relocation of existing stores, and IT projects, among other items. Capital expenditures in the Financial Projections are generally consistent with historical trends adjusted for the Company's reorganized store footprint.

16. **Change in Net Working Capital.** Projections of changes in certain balance sheet accounts such as accounts receivable and accounts payable are based on historical ratios, adjusted for the Company's reorganized store footprint.

17. **Other.** Other includes the expected receipt of a 2015 tax refund from the United States IRS and disbursements for expected legal settlements and retention payments.

18. **Net Borrowings/(Repayment) of Exit Financing.** Post-reorganization borrowings / (repayment) reflect amortization on the post-emergence term loan and borrows / (repayments) as necessary on the post-emergence asset-based loan.

*Financial Projections*

The Financial Projections prepared by the Debtors are summarized in the following tables.

The Company does not publish projections of its anticipated financial position or results of operations. Unless otherwise required by securities law, the Company will not:

- furnish updated projections, or
- make updated information concerning the Financial Projections publicly available.

The Company believes that the Financial Projections represent the most probable range of operating results and financial position and that the estimates and assumptions underlying the projections are reasonable. The estimates and assumptions may not be realized, however and are inherently subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond its control. Some assumptions inevitably will not materialize, and events and circumstances occurring subsequent to the date on which the Financial Projections were prepared may be different from those assumed or may be unanticipated, and therefore may affect financial results in a material and possibly adverse manner. The Financial Projections, therefore, may not be relied upon as a guarantee or other assurance of the actual results that will occur. Further, various operational or strategy inputs are subject to change at any time,

including during the course of these chapter 11 cases. In addition, negotiations with landlords remain ongoing, therefore, the number of store closures may differ from the projections subject to those negotiations.

The Company's board of directors was not asked to and did not approve the Financial Projections or evaluate or endorse the projections or the assumptions underlying the Financial Projections. Moreover, the Financial Projections were not prepared with a view toward compliance with published guidelines of the United States Securities and Exchange Commission or guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. The Debtors' independent auditor has not examined, compiled or performed any procedures with respect to the Financial Projections contained in this exhibit and, accordingly, it does not express an opinion or any other form of assurance on such information or its achievability. The Debtors' independent auditor assumes no responsibility for, and denies any association with, the prospective financial information.

The Company does not intend to and disclaims any obligation to: (1) furnish updated Financial Projections to holders of Claims or Interests before the Effective Date or to any other party after the Effective Date; (2) include any such updated information in any documents that may be required to be filed with the Securities and Exchange Commission; or (3) otherwise make such updated information publicly available.

**Mattress Firm - Financial Projections**
*($ millions)*

| | FINANCIAL PROJECTIONS | | | | |
|---|---|---|---|---|---|
| | FY2019 | FY2020 | FY2021 | FY2022 | FY2023 |
| Total Revenues................................................................ | 3,206 | 3,420 | 3,591 | 3,761 | 3,926 |
| *YoY Change %* | | *6.7%* | *5.0%* | *4.7%* | *4.4%* |
| | | | | | |
| Cost of Goods Sold........................................................ | (1,253) | (1,318) | (1,377) | (1,443) | (1,507) |
| Product Gross Margin, net............................................ | 1,953 | 2,102 | 2,214 | 2,317 | 2,419 |
| *GM %* | *60.9%* | *61.5%* | *61.6%* | *61.6%* | *61.6%* |
| | | | | | |
| Other Variable Expenses............................................... | (683) | (716) | (760) | (803) | (847) |
| Store Fixed Expenses..................................................... | (569) | (582) | (606) | (619) | (630) |
| Advertising...................................................................... | (289) | (308) | (323) | (338) | (353) |
| Overhead and Other SG&A Expenses............................ | (297) | (297) | (303) | (309) | (315) |
| **EBITDA**............................................................................ | **116** | **200** | **222** | **248** | **274** |
| *EBITDA %* | *3.6%* | *5.9%* | *6.2%* | *6.6%* | *7.0%* |
| | | | | | |
| Other Non-Cash Items................................................... | 2 | 4 | (1) | (5) | (7) |
| Business Disruption........................................................ | (50) | - | - | - | - |
| Cash Interest................................................................... | (39) | (50) | (49) | (49) | (48) |
| Capex............................................................................... | (86) | (83) | (90) | (90) | (90) |
| Change in Working Capital............................................. | (11) | 6 | 9 | 10 | 11 |
| Other................................................................................ | 20 | - | - | - | - |
| Net Borrowing/(Repayment) of Exit Financing............ | (1) | (6) | (4) | (4) | (4) |
| **FCF before reorganization transaction**......................... | **(49)** | **73** | **86** | **111** | **136** |
| | | | | | |
| Exit Term Loan................................................................ | 400 | - | - | - | - |
| Payoff of Loan from Steinhoff N.V. | (80) | - | - | - | - |
| Payoff of Interest from Steinhoff N.V. | (4) | - | - | - | - |
| Claims Resulting from Store Closures............................ | (97) | - | - | - | - |
| Transaction/Professional Fees....................................... | (57) | - | - | - | - |
| Payoff of Existing ABL.................................................... | (82) | - | - | - | - |
| **FCF after reorganization transaction**............................ | **31** | **73** | **86** | **111** | **136** |
| | | | | | |
| Net Increase in Cash and Cash Equivalents.................. | 31 | 73 | 86 | 111 | 136 |
| Cash and cash equivalents at beginning of the period.......... | (31) | - | 73 | 159 | 269 |
| **Cash and cash equivalents at end of the period**.............. | **-** | **73** | **159** | **269** | **405** |

**<u>Exhibit C</u>**

**Plan Support Agreement**

*EXECUTION VERSION*

## PLAN SUPPORT AGREEMENT

This Plan Support Agreement (including the exhibits attached hereto, as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof, this "**Agreement**"), dated as of October 4, 2018, is entered into by and among: Steinhoff International Holdings N.V. ("**NV**"); Steinhoff Finance Holding GmbH ("**Steinhoff Finance**"); Steinhoff Möbel Holding Alpha GmbH ("**Alpha**"); Steinhoff Europe AG ("**SEAG**" and together with NV, Steinhoff Finance and Alpha, the "**Steinhoff Parties**"); Stripes US Holding, Inc. ("**Stripes**"); Mattress Firm Holding Corp. ("**MFHC**"); Mattress Holdco, Inc. ("**MHI**"); Mattress Holding Corp. ("**MHC**") and Mattress Firm, Inc. (collectively with each subsidiary thereof that has guaranteed the Intra-Group Loan, "**Mattress Firm**" and together with MHI, and MHC, the "**Mattress Firm Parties**"). Each of the Steinhoff Parties, Stripes, MFHC and the Mattress Firm Parties is referred to herein individually as a "**Party**," and collectively as the "**Parties**." The Backstop Group (as defined below) is an intended third-party beneficiary of this Agreement.

RECITALS

WHEREAS, NV, Mattress Firm, and MHC are parties to that certain $80,000,000 Term Loan Agreement dated as of March 26, 2018 (as amended, restated, modified, supplemented, or replaced from time to time, the "**NV Term Loan**");

WHEREAS, the NV Term Loan is secured by a lien on substantially all of the assets of Mattress Firm, which lien is junior in priority to the liens securing certain senior secured indebtedness of Mattress Firm, pursuant to that certain Intercreditor Agreement (the "**Intercreditor Agreement**") dated as of March 26, 2018, among Mattress Firm, Barclays Bank PLC as First Lien Administrative Agent, NV as Second Lien Representative, and the other Representatives from time to time party thereto;

WHEREAS, Stripes, Alpha, and SEAG (by assignment from Steinhoff Finance) are parties to that certain Intra-Group Loan Agreement dated as of September 16, 2016 (as amended, restated, modified or supplemented from time to time, the "**Intra-Group Loan**") pursuant to which Alpha and SEAG hold claims in the amount of approximately $3.1 billion (the "**Intra-Group Claims**") against Stripes that are guaranteed (the "**Intra-Group Guarantees**") by MFHC and each of the Mattress Firm Parties, among other guarantors;

WHEREAS, the Parties have agreed that the Mattress Firm Parties and certain of their domestic affiliates (collectively, the "**Debtors**") will commence voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (as amended from time to time, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") to reorganize the Debtors' businesses pursuant to a prepackaged chapter 11 plan of reorganization substantially in the form attached hereto as Exhibit A (as amended from time to time, the "**Plan**"); and

WHEREAS, certain creditors of SEAG (the "**Backstop Group**") together with Barclays Bank PLC have agreed to backstop in full, on a several and not joint basis, an exit term loan in the principal amount of $400 million (the "**Exit Financing**") to finance the consummation

of the Plan in accordance with the letter setting forth the terms of the exit lender's or lenders' commitment to provide the Exit Financing (and all exhibits and schedules thereto) (the "**Exit Commitment Letter**") attached hereto as <u>Exhibit B</u>;

WHEREAS, certain creditors of the Mattress Firm Parties and the Backstop Group have agreed to provide debtor-in-possession financing consisting of a senior secured revolving loan of up to $150 million in principal amount and a senior secured term loan of $100 million in principal amount (the "**DIP Financing**") to finance the Chapter 11 Cases in accordance with the terms of the DIP credit agreements (and all exhibits and schedules thereto) in respect of the DIP Financing (the "**DIP Credit Agreements**") substantially in the form attached hereto as <u>Exhibit C</u>;

NOW, THEREFORE, in consideration of the premises and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    <u>Definitions</u>.  The following terms shall have the following definitions:

"**Alpha**" has the meaning set forth in the preamble hereof.

"**Agreement**" has the meaning set forth in the preamble hereof.

"**Agreement Effective Date**" has the meaning set forth in Section 3 hereto.

"**Backstop Group**" has the meaning set forth in the recitals hereto.

"**Bankruptcy Code**" has the meaning set forth in the recitals hereto.

"**Bankruptcy Court**" has the meaning set forth in the recitals hereto.

"**Chapter 11 Cases**" has the meaning set forth in the recitals hereto.

"**Confirmation Order**" means an order of the Bankruptcy Court confirming the Plan.

"**Debtors**" has the meaning set forth in the recitals hereto.

"**Definitive Documents**" has the meaning set forth in Section 2.a hereof.

"**DIP Credit Agreements**" has the meaning set forth in the recitals hereto.

"**DIP Financing**" has the meaning set forth in the recitals hereto;

"**DIP Orders**" means the interim and final orders of the Bankruptcy Court, in each case in form and substance reasonably acceptable to NV, approving the Debtors' entry into and performance under the DIP Credit Agreements, use of cash collateral and adequate protection in favor of NV.

"**Disclosure Statement**" means the disclosure statement (and all exhibits thereto) with respect to the Plan.

2

"**Exit Commitment Letter**" has the meaning set forth in the recitals hereto.

"**Exit Financing**" has the meaning set forth in the recitals hereto.

"**Exit Facility Agreement**" means the credit agreement (and all exhibits and schedules thereto) with respect to the Exit Financing.

"**Intercreditor Agreement**" has the meaning set forth in the recitals hereto.

"**Intra-Group Claim**" has the meaning set forth in the recitals hereto.

"**Intra-Group Guarantees**" has the meaning set forth in the recitals hereto.

"**Intra-Group Loan**" has the meaning set forth in the recitals hereto.

"**Lock-Up Agreement**" means the lock-up agreement dated 11 July 2018 (as amended, modified, or supplemented from time to time) entered into by, among others, the Steinhoff Parties and certain creditors of Stripes, SEAG and Steinhoff Finance Holdings GmbH, in connection with the financial restructuring of the European business of the Steinhoff group.

"**LUA Consent Requirements**" means such consents, waivers and/or approvals as may be necessary for implementation of the Plan and any other transactions contemplated in connection thereto pursuant to the terms of the Lock-Up Agreement.

"**Management Incentive Plan**" has the meaning set forth in Section 2.f hereto.

"**Mattress Firm**" has the meaning set forth in the preamble hereof.

"**Mattress Firm Parties**" has the meaning set forth in the preamble hereof.

"**MFHC**" has the meaning set forth in the preamble hereof.

"**MHI**" has the meaning set forth in the preamble hereof.

"**MHC**" has the meaning set forth in the preamble hereof.

"**NV**" has the meaning set forth in the preamble hereof.

"**NV Term Loan**" has the meaning set forth in the recitals hereto.

"**Parties**" has the meaning set forth in the preamble hereof.

"**Petition Date**" means the date on which the Mattress Firm Parties commence their Chapter 11 Cases.

"**Plan**" has the meaning set forth in the recitals hereto.

"**Process Requirement**" has the meaning set forth in section 4.c.3 hereof.

"**Process Requirement Date**" has the meaning set forth in section 4.c.3 hereof.

"**SEAG**" has the meaning set forth in the preamble hereof.

"**Steinhoff Finance**" has the meaning set forth in the preamble hereof.

"**Steinhoff Parties**" has the meaning set forth in the preamble hereof.

"**Stripes**" has the meaning set forth in the preamble hereof.

2. <u>Obligations of the Parties</u>.

a. <u>In General</u>.  Each of the Parties hereto agrees:

(1)  to promptly negotiate in good faith and execute (as applicable) the definitive documents to which it is intended it will be a party relating to the implementation and effectuation of the Plan, including, but not limited to (i) the Disclosure Statement, (ii) the DIP Credit Agreements and the DIP Orders, (iii) the Plan, (iv) the Exit Commitment Letter and the Exit Facility Agreement, (v) the Confirmation Order, and (vi) all other agreements, documents, exhibits, annexes, schedules and any orders of the Bankruptcy Court, as applicable, that are necessary or appropriate for the prompt consummation of the Plan (all of the foregoing, collectively with this Agreement, in each case as amended, modified or supplemented from time to time in accordance with the terms hereof, the "**Definitive Documents**");

(2)  to not object to, delay, impede, commence any proceeding, or take any other action to interfere, directly or indirectly, in any material respect with the prompt approval, effectiveness of, and consummation of the transactions contemplated by, the Definitive Documents; <u>provided</u>, <u>however</u>, that each of the Definitive Documents is in form and substance reasonably acceptable to the Steinhoff Parties and the Mattress Firm Parties; and

(3)  to not object to, delay, impede, commence any proceeding, or take any other action to interfere, directly or indirectly, in any material respect with the prompt recognition of any English scheme of arrangement in any case commenced by Stripes and/or SEAG under chapter 15 of the Bankruptcy Code in the Bankruptcy Court or other court of competent jurisdiction.

b. <u>Precedent Transaction</u>.  Prior to the commencement of the Chapter 11 Cases, NV will contribute to Steinhoff Finance, and Steinhoff Finance will then contribute to Alpha, and Alpha will then transfer to SEAG, 100% of the common stock of Stripes.

c. <u>Priming</u>.  NV shall be deemed to have consented to priming of its existing prepetition liens securing the NV Term Loan by liens securing the DIP Credit Agreements solely on the terms set forth in the DIP Orders.

      d.      <u>Treatment of Intra-Group Claims and Guarantees</u>.  SEAG and Alpha shall be deemed to have consented to the treatment of the Intra-Group Guarantees under the Plan and agreed to the subsequent release of the Intra-Group Guarantee by MFHC and contribution of the Intra-Group Claims to the share capital of Stripes in accordance with, and subject to, the terms of the Plan and further agreed to execute and deliver all documents necessary to evidence such release and contribution to capital; <u>provided, however</u>, that neither SEAG nor Alpha shall be deemed to have provided the consents set forth in this subsection d, including that neither SEAG nor Alpha shall have agreed to the release of the Intra-Group Guarantee or the contribution of the Intra-Group Claims to the share capital of Stripes in the event that any person other than Barclays, the Backstop Group, and any other Relevant Participant (as defined in the Lock-up Agreement) is or will be an Exit Term Loan Lender, as defined in the Plan.

      e.      <u>Treatment of NV Term Loan</u>.  The Mattress Firm Parties shall have agreed to pay in full in cash the NV Term Loan plus all accrued and unpaid fees, costs, expenses, non-default interest, charges, premiums and other obligations in accordance with, and subject to, the terms of the Plan.

      f.      <u>Management Incentive Plan</u>.  The Steinhoff Parties, Stripes and MFHC consent to (i) the issuance of 10% (on a fully-diluted basis) of the equity in Stripes or MHI, as applicable in accordance with the terms of the Plan and the Exit Commitment Letter, to members of senior management of Mattress Firm following the Effective Date (as defined in the Plan), with all matters relating to the vesting of such equity based on time and performance to be determined by a majority vote of the board of directors of Stripes or MHI, as applicable, with respect to which each of the directors is provided an opportunity to vote following the Effective Date, and (ii) the issuance of 10% in principal amount of the Stripes PIK Debt or the MF Holdco PIK Debt (each term as defined in the Plan), as applicable, to members of senior management of Mattress Firm following the Effective Date, with the allocations thereof to be determined by a majority vote of the board of directors of Stripes or MHI, as applicable, with respect to which each of the directors is provided an opportunity to vote following the Effective Date in a way that avoids triggering adverse tax consequences for such members of senior management or, in the alternative, compensation of comparable value in a form to be reasonably agreed upon ((i) and (ii) collectively, the "**Management Incentive Plan**").

      g.      <u>MFHC Plan Support</u>.  MFHC, in its capacity as holder of impaired interests in MHI, shall vote to accept the Plan.

      3.      <u>Agreement Effective Date</u>. This Agreement, and the rights and obligations of the Parties hereunder, shall be effective on the date on which the following conditions have been satisfied (the "**Agreement Effective Date**"):

      a.      The Steinhoff Parties have provided written confirmation to the Mattress Firm Parties that (i) the LUA Consent Requirements have been duly satisfied in accordance with the terms of the Lock-Up Agreement and (ii) 100% of the common stock of Stripes has been transferred to SEAG.

      b.      Commitment letters with respect to the DIP Credit Agreements and the Exit Commitment Letter have been executed and delivered to the Parties hereto.

c.    Each Party hereto shall have executed and delivered to the other Parties its signature page to this Agreement.

d.    All representations and warranties of the Parties contained herein shall be true and correct in all material respects as of the Agreement Effective Date.

4.    <u>Termination</u>

a.    This Agreement shall terminate immediately and all of the obligations of the Parties hereunder shall be of no further force or effect in the event that (i) the Plan is consummated; (ii) the Plan is not consummated in accordance with this Agreement by the date on which the DIP Financing terminates, provided that the Parties hereto, in their respective sole discretion, may extend the effectiveness of this Agreement notwithstanding the termination of the DIP Financing; (iii) each of the Parties and the Backstop Group mutually agree to such termination in writing; or (iv) this Agreement is terminated pursuant to paragraph (b) or (c) of this <u>Section 4</u>.

b.    The Mattress Firm Parties may terminate this Agreement by written notice to the other Parties hereto upon the occurrence of any of the following events:

(1)    upon a material breach by any Steinhoff Party of its obligations hereunder, where such breach is not cured within five (5) business days after the giving of written notice of such breach;

(2)    the Bankruptcy Court or other governmental authority with jurisdiction shall have issued any order, injunction or other decree or shall have taken any other action, in each case which has become final and non-appealable and which restrains, enjoins or otherwise prohibits the implementation of the Plan or the other transactions contemplated hereby; or

(3)    upon a determination of the board of directors or similar controlling body of any Mattress Firm Party, based upon advice of counsel, that proceeding with the Plan or any of the other transactions contemplated hereby would be inconsistent with the exercise of its fiduciary or other duties under applicable law to its applicable stakeholders; <u>provided</u>, that the Mattress Firm Party provides notice of such determination to the Steinhoff Parties and Stripes within five (5) business days after the date thereof.

c.    The Steinhoff Parties and Stripes, in their respective sole and absolute discretion, may terminate this Agreement by written notice to the Mattress Firm Parties upon the occurrence of any of the following events:

(1)    upon a material breach by any Mattress Firm Party of its obligations hereunder, where such breach is not cured within five (5) business days after the giving of written notice of such breach;

(2)    upon the filing by the Debtors of any Definitive Document that provides for treatment of the NV Term Loan or the indebtedness or equity interests of Stripes or any of its direct or indirect subsidiaries that is materially adverse to, or materially inconsistent

with this Agreement with respect to, any of the Steinhoff Parties or their direct and indirect affiliates or subsidiaries, without the Steinhoff Parties' prior written consent;

(3)     Upon each of the dates (each a "Process Requirement Date") set forth below if the condition applicable to such date (a "Process Requirement") has not occurred; provided, however, that each Process Requirement Date for each Process Requirement shall be automatically extended to the date set for the matching "Milestone" in the DIP Credit Agreements, including if the date for such "Milestone" is extended by agreement of the required parties under the DIP Credit Agreements:

(a)     at 11:59 p.m. (ET) three (3) calendar days after the Petition Date, unless the Mattress Firm Parties have filed the Plan and Disclosure Statement;

(b)     at 11:59 p.m. (ET) five (5) calendar days after the Petition Date, unless the Bankruptcy Court shall have entered the interim DIP Order;

(c)     at 11:59 p.m. (ET) thirty-five (35) calendar days after the Petition Date, unless the Bankruptcy Court shall have entered the final DIP Order;

(d)     at 11:59 p.m. (ET) sixty (60) calendar days after the Petition Date, unless the Mattress Firm Parties have obtained approval of the Disclosure Statement and the Bankruptcy Court shall have entered the Confirmation Order;

(4)     in the event the Debtors (i) withdraw the Plan, Disclosure Statement, or motion to approve the DIP Financing, in each case, without the prior written consent of the Steinhoff Parties or Stripes, as applicable, (ii) move to dismiss any of the Chapter 11 Cases, (iii) move for conversion of any of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code, (iv) move for appointment of an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code or a trustee in any of the Chapter 11 Cases or (v) file any motion or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement;

(5)     in the event (i) a trustee or an examiner with expanded powers is appointed in any of the Chapter 11 Cases, (ii) any of the Chapter 11 Cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or (iii) the Debtors' exclusive right to file a Chapter 11 plan pursuant to section 1121 of the Bankruptcy Code shall have terminated;

(6)     the Bankruptcy Court grants relief that is (i) materially inconsistent with this Agreement or (ii) would, or would reasonably be expected to, frustrate the purposes of this Agreement or the Lock-Up Agreement, including by preventing the consummation of the transactions contemplated in the Plan;

(7)     either of the DIP Orders is reversed, stayed, dismissed, vacated, modified, terminated or amended in any respect without the consent of NV;

(8)     any Mattress Firm Party files, propounds, or otherwise supports or fails to timely file with the Bankruptcy Court a statement that it does not support, any plan of reorganization that is inconsistent with this Agreement or the Lock-Up Agreement;

7

(9)     any Mattress Firm Party files, propounds, or otherwise supports or fails to timely file with the Bankruptcy Court a statement that it does not support, any motion, application or adversary proceeding filed by any party challenging the amount, validity, enforceability, priority, extent or perfection or seeks the avoidance or subordination of, any claims or liens of the Steinhoff Parties or Stripes, including the NV Term Loan;

(10)    the Bankruptcy Court or other governmental authority with jurisdiction shall have issued any order, injunction or other decree or shall have taken any other action, in each case which has become final and non-appealable and which restrains, enjoins or otherwise prohibits or is materially inconsistent with the implementation of the Plan, the terms of the Lock-Up Agreement or the other transactions contemplated hereby; and

(11)    upon a determination of the board of directors or similar controlling body of any Steinhoff Party or Stripes, based upon advice of counsel, that proceeding with the Plan or any of the other transactions contemplated hereby would be inconsistent with the exercise of its fiduciary or other duties under applicable law to its applicable stakeholders; provided, that the Steinhoff Party provides notice of such determination to the Mattress Firm Parties within five (5) business days after the date thereof.

d.     If this Agreement is terminated pursuant to this Section 4, any and all further obligations of the Parties hereunder shall be terminated without further liability.

e.     To the fullest extent permitted under applicable law, no Party hereto shall assert, and each such Party hereby waives, any claim against any other Party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of any breach of this Agreement.

5.     Representations of the Parties

Each Party hereto represents and warrants to the other Parties that the following statements are true and correct as of the date hereof:

a.     Power and Authority.  It has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement.

b.     Authorization.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

c.     No Conflicts.  The execution and delivery of this Agreement and the performance of its obligations hereunder do not and shall not (i) violate any provision of law, rule, or regulation applicable to it or its organizational documents or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both and exclusive of defaults relating to solvency and bankruptcy) a default under any material contractual obligation to which it is a party or under its organizational documents, subject to satisfaction of the LUA Consent Requirements in the case of the Steinhoff Parties.

d.    Governmental Consents.    The execution and delivery of this Agreement and the performance of its obligations hereunder do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, other than such filings as may be necessary or required in connection with the Chapter 11 Cases.

6.    Binding Obligation.    Subject to entry of an order of the Bankruptcy Court approving this Agreement, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms and the terms of such order of the Bankruptcy Court.

7.    Prior Negotiations

This Agreement sets forth in full the terms of agreement between the Parties with respect to the subject matter hereof and thereof and is intended as the full, complete and exclusive contract governing the relationship between the Parties with respect to the subject matter hereof, superseding all other discussions, promises, representations, warranties, agreements and understandings, whether written or oral, between or among the Parties with respect thereto.

8.    Amendment or Waiver

No waiver, modification or amendment of the terms or provisions of this Agreement shall be valid unless such waiver, modification or amendment is in writing and has been signed by the each of the Parties hereto and the Backstop Group.  No waiver of any of the provisions of this Agreement shall be deemed or constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver unless expressly stated otherwise in writing.

9.    **WAIVER OF JURY TRIAL**

**EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE EXHIBITS ATTACHED HERETO.**

10.    Governing Law and Consent to Jurisdiction and Venue

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Bankruptcy Court and, only to the extent such court lacks jurisdiction, in a federal or state court sitting in New York, New York, and by execution and delivery of this Agreement, each of the Parties hereby irrevocably accepts and submits itself to the jurisdiction of such courts solely with respect to any such action, suit or proceeding arising under, arising out of, or in connection with this Agreement.

11.    <u>Notice</u>

Any notices or other communications required or permitted under, or otherwise in connection with, this Agreement shall be in writing and shall be deemed to have been duly given when delivered in person, by electronic mail (email), or upon confirmation of receipt when transmitted by facsimile transmission (but only if followed by transmittal by national overnight courier or hand for delivery on the next business day) or on receipt after dispatch by registered or certified mail, postage prepaid, or on the next business day if transmitted by national overnight courier, addressed in each case as follows (provided that all such notices shall be simultaneously provided to the Backstop Group):

<u>If to the Steinhoff Parties</u>:

Linklaters LLP
One Silk Street
London EC2Y 8HQ
richard.bussell@linklaters.com
amy.edgy@linklaters.com
robert.trust@linklaters.com

<u>If to Stripes or MFHC</u>:

Linklaters LLP
One Silk Street
London EC2Y 8HQ
richard.bussell@linklaters.com
amy.edgy@linklaters.com
robert.trust@linklaters.com

<u>If to the Mattress Firm Parties</u>:

Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
bguzina@sidley.com
gmacconaill@sidley.com

<u>If to the Backstop Group</u>:

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Attn: Adam J. Goldberg
adam.goldberg@lw.com
T: +1 (212) 906-1828
F: +1.212.751.4864

12.    Successors and Assigns, Several Obligations

Neither this Agreement nor any of the rights or obligations hereunder may be assigned by any Party hereto, without the prior written consent of the other Parties hereto, and then only to a Person who has agreed to be bound by the provisions of this Agreement.  This Agreement is intended to and shall bind and inure to the benefit of the Parties and the Backstop Group and their respective successors, permitted assigns, executors, administrators and representatives.

13.    Fees

The Mattress Firm Parties shall pay $3,650,000 in respect of all documented prepetition and postpetition fees, expenses and costs (the "Reimbursement Amount") of the Steinhoff Parties in respect of this Agreement, the Plan and the transactions contemplated by the Plan incurred on or prior to the date of termination of this Agreement, including, without limitation, the reasonable and documented professional fees and expenses of Linklaters LLP, Moelis & Company, Fellner Wratzfeld & Partner and any other professionals or advisors retained by or on behalf of the Steinhoff Parties in connection therewith; provided, however, that the Steinhoff Parties have agreed that the Reimbursement Amount shall be paid by the Mattress Firm Parties in equal monthly installments starting on May 31, 2019 with the final payment due on September 30, 2019.

14.    Third-Party Beneficiaries

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties hereto and no other person or entity shall be a third-party beneficiary hereof or shall otherwise be entitled to enforce any provision hereof.

Notwithstanding the foregoing, as a material inducement for the Backstop Group to backstop the DIP Credit Agreement and Exit Commitment Letter and in consideration of the agreement of the Backstop Group to backstop the DIP Credit Agreement and Exit Commitment Letter, the Backstop Group are intended third-party beneficiaries of this Agreement and shall be entitled to enforce any and all provisions hereof as if the Backstop Group were a party hereto.

15.    Counterparts

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Any Party hereto may execute and deliver a counterpart of this Agreement by delivery by facsimile transmission or electronic mail of a signature page of this Agreement signed by such Party, and any such facsimile or electronic mail signature shall be treated in all respects as having the same effect as having an original signature.

16.    Acknowledgement; Not a Solicitation

This Agreement does not constitute, and shall not be deemed to constitute (i) an offer for the purchase, sale, exchange, hypothecation, or other transfer of securities for purposes of the Securities Act of 1933 and the Securities Exchange Act of 1934 (or any other federal or state

11

law or regulation), (ii) a solicitation for consents to the Plan or (iii) a solicitation of votes on the Plan for purposes of the Bankruptcy Code.

17.    No Strict Construction

Each Party acknowledges that it has received adequate information to enter into this Agreement, and that this Agreement has been prepared through the joint efforts of all of the Parties, each of which is sophisticated and represented by counsel in connection with this Agreement and the transactions contemplated hereby. Neither the provisions of this Agreement nor any of the Definitive Documents nor any alleged ambiguity herein or therein shall be interpreted or resolved against any Party on the ground that such Party's counsel drafted such document, or based on any other rule of strict construction.

18.    Remedies Cumulative; No Waiver

All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party or Backstop Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or Backstop Party. The failure of any Party or Backstop Party hereto to exercise any right, power, or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon strict compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the parties at variance with the terms hereof, shall not constitute a waiver by such Party or Backstop Party of its right to exercise any such or other right, power, or remedy or to demand such strict compliance.

19.    Severability

If any portion of this Agreement shall be held to be invalid, unenforceable, void or voidable, or violative of applicable law, the remaining portions of this Agreement so far as they may practicably be performed shall remain in full force and effect and binding on the Parties hereto, provided that, this provision shall not operate to waive any condition precedent to any event set forth herein.

20.    Rules of Interpretation

For purposes of this Agreement, unless otherwise specified: (a) each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) all references herein to "Articles", "Sections", and "Exhibits" are references to Articles, Sections, and Exhibits of this Agreement; and (c) the words ''herein,'' "hereof," "hereunder" and ''hereto'' refer to this Agreement in its entirety rather than to a particular portion of this Agreement.

*[Signature pages follow]*

12

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**STEINHOFF INTERNATIONAL HOLDINGS N.V.**

By:_____
Name:  Philip  Dieperink
Title:  CFO

**STEINHOFF FINANCE HOLDING GMBH**

By:_____
Name:
Title:

**STEINHOFF MÖBEL HOLDING ALPHA GMBH**

By:_____
Name:
Title:

**STEINHOFF EUROPE AG**

By:_____
Name:
Title:

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**STEINHOFF INTERNATIONAL HOLDINGS N.V.**

By:_____
Name:
Title:

**STEINHOFF FINANCE HOLDING GMBH**

By:_____
Name: DAVID FRANKEL
Title: DIRECTOR.

**STEINHOFF MÖBEL HOLDING ALPHA GMBH**

By:_____
Name: DAVID FRANKEL
Title: DIRECTOR.

**STEINHOFF EUROPE AG**

By:_____
Name: DAVID FRANKEL
Title: DIRECTOR

**STRIPES US HOLDING, INC.**

By:
Name: Philip Dieperink
Title: Director

**MATTRESS FIRM HOLDING CORP.**

By: _____

Name: Hendre Ackermann

Title: VP Treasurer


**MATTRESS HOLDCO, INC.**

By: _____

Name: Hendre Ackermann

Title: VP + Treasurer


**MATTRESS HOLDING CORP.**

By: _____

Name: Hendre Ackermann

Title: VP + Treasurer


**MATTRESS FIRM, INC.**

By: _____

Name: Hendre Ackermann

Title: CFO + COO

**Exhibit A**

**PLAN**

**Exhibit B**

**EXIT COMMITMENT LETTER**

Execution Version

BARCLAYS
745 Seventh Avenue
New York, NY 10019

**CONFIDENTIAL**

October 4, 2018

Mattress Firm, Inc.
10201 S. Main St.
Houston, Texas 77025
Attention: Hendre Ackermann and Kindel Elam

Exit Facilities Commitment Letter

Ladies and Gentlemen:

Mattress Firm, Inc. ("***you***" or the "***Company***") has advised Barclays Bank PLC ("***Barclays***", the "***Arranger***", "***we***" or "***us***") that it desires to obtain commitments from us for (i) a new senior secured asset-based revolving credit facility in an aggregate principal amount of $125,000,000 (the "***ABL Facility***") and (ii) a new first lien senior secured term loan credit facility in the aggregate principal amount of, subject to paragraph (y) of Annex I to Exhibit B hereto, $400,000,000 (the "***Term Facility***" and, together with the ABL Facility, the "***Senior Secured Facilities***") to (a) refinance and replace the asset-based revolving debtor-in-possession financing consummated in accordance with that certain DIP Financing Commitment Letter by and among Barclays, Citizens Bank, N.A. and Mattress Firm, Inc. (the "***Borrower***"), dated as of the date hereof (the "***DIP Financing Commitment Letter***", and the definitive credit agreement with respect to such asset-based revolving debtor-in-possession financing executed in accordance therewith, the  "***ABL DIP Credit Agreement***"), (b) refinance and replace the term loan debtor-in-possession financing consummated in accordance with the DIP Financing Commitment Letter and the definitive credit agreement with respect to such term loan debtor-in-possession financing executed in accordance therewith (the "***Term Loan DIP Credit Agreement***" and, together with the ABL DIP Credit Agreement, the "***Existing Credit Agreements***") (c) repay in full all outstanding obligations under that certain term loan agreement dated as of March 26, 2018 by and among you, Mattress Firm, Inc. and Steinhoff International Holdings, N.V. as lender, (d) for working capital needs and other general corporate purposes of the Company and its subsidiaries and (e) to pay fees and expenses in connection with the effectiveness of the Senior Secured Facilities (collectively, the "***Transactions***"). Capitalized terms used but not defined herein shall have the meanings assigned to them in the Term Sheets (as defined below).

1.    Commitments.

Based upon the foregoing, (i) Barclays (in such capacity, the "***Initial Lender***") hereby commits to provide to the Borrower 100% of the ABL Facility upon the terms set forth herein and in the ABL Facility Summary of Terms and Conditions attached hereto as Exhibit A (the "***ABL Term Sheet***"), the terms set forth in the Exit Facilities Fee Letter among us and you dated as of the date hereof (the "***Exit Facilities Fee Letter***") and subject only to the conditions set forth in Annex II to the ABL Term Sheet and (ii) the Initial Lender hereby commits to provide to the Borrower 100% of the Term Facility upon the terms set forth herein and in the Term Facility Summary of Terms and Conditions attached hereto as Exhibit B (the "***Term Loan Term Sheet***" and, together with the ABL Term Sheet, the "***Term Sheets***"), the terms set forth in the Exit Facilities Fee Letter, and subject only to the conditions set forth in Annex I of the Term Loan Term Sheet.

2.      <u>Titles and Roles</u>.

You hereby appoint the Arranger to act, and the Arranger hereby agrees to act, as sole lead arranger and sole bookrunner for the Senior Secured Facilities, upon the terms and subject to the conditions set forth or referred to in this commitment letter (the "***Exit Facilities Commitment Letter***"). You agree that (i) Barclays will have "left" placement (and hold the leading role and responsibilities conventionally associated with such placement) and (ii) Barclays will act as administrative agent and collateral agent for the Senior Secured Facilities.  The Arranger will perform the duties and exercise the authority customarily performed and exercised by it in such role.  The Arranger hereby agrees to use its commercially reasonable efforts to arrange a syndicate of banks, financial institutions and other institutional lenders (the "***Lenders***") that will participate in the Senior Secured Facilities (the "***Syndication***").  You agree that no other agents, co-agents, arrangers or bookrunners will be appointed and no other titles will be awarded and no compensation (other than as expressly contemplated by this Exit Facilities Commitment Letter or the Exit Facilities Fee Letter, as the case may be) will be paid in connection with the Senior Secured Facilities.

3.      <u>Syndication</u>.

You agree to assist us in completing a Syndication of the ABL Facility that is reasonably satisfactory to us and you.  Such assistance shall include (a) ensuring that the Syndication benefits from your existing lending and investment banking relationships, (b) direct contact between appropriate members of your senior management, certain representatives and certain non-legal advisors, on the one hand, and the proposed ABL Lenders, on the other hand, at mutually agreed upon times and locations, (c) assisting in the preparation of Information Materials (as defined below), prior to launch of syndication of the ABL Facility, to be used in connection with such Syndication and (d) hosting, with the Arranger, a reasonable number of meetings (or, if you and we shall agree, conference calls in lieu of any such meeting) of existing and prospective ABL Lenders (limited to one "bank meeting", unless otherwise deemed necessary in the reasonable judgment of the Arranger) at times and locations to be mutually agreed upon. It is understood and agreed that the Arranger shall be afforded a Marketing Period as defined and described further in <u>Annex II</u> of <u>Exhibit A</u>.

To ensure an orderly and effective syndication of the ABL Facility, you agree that, until the earlier of (a) sixty (60) days following the Closing Date and (b) the termination of the syndication as determined by Barclays (such earlier date, the "***Syndication Date***"), you will ensure that there will be no competing issues of bank or other syndicated credit facilities or debt securities of Parent (as defined below), you or any of your or its subsidiaries, in each case being offered, placed or arranged that would materially impair the primary syndication of the ABL Facility without the prior written consent of Barclays (it being understood that any short-term working capital facilities, letters of credit, capital leases, purchase money indebtedness and equipment financings, in each case in the ordinary course of business, shall, in each case, not be limited pursuant to this sentence).

You hereby acknowledge that (a) we will make available Information (as defined below), Projections (as defined below) and other customary offering and marketing materials and presentations, including confidential information memoranda to be used in connection with the Syndication (the "***Information Memorandum***" and, together with all of the foregoing, the "***Information Materials***"), on a confidential basis to the proposed syndicate of ABL Lenders by posting the Information Materials on Intralinks, Debt X, SyndTrak Online or by similar electronic means and (b) certain of the ABL Lenders may be "public side" ABL Lenders (i.e., ABL Lenders that do not wish to receive material non-public information and who may be engaged in investment and other market-related activities with respect to you or any of your subsidiaries, or any of your or their respective securities) (each, a "***Public Sider***" and each ABL Lender that is not a Public Sider, a "***Private Sider***").

At the reasonable request of the Arranger, you agree to assist us in preparing an additional version of the Information Materials to be used in connection with the Syndication of the ABL Facility that consists exclusively of information of a type that is either (i) publicly available or (ii) not material with respect to you, Mattress Holdco, Inc. ("**Parent**") or any of your subsidiaries or any of your or their respective securities for the purpose of United States federal and state securities laws (all such information being "**Public Information**") to be used by Public Siders.  It is understood that in connection with your assistance described above, you shall provide us with customary authorization letters for inclusion in any Information Materials that authorize the distribution thereof to prospective ABL Lenders, represent that the additional version of the Information Materials only contains Public Information and exculpate us with respect to any liability related to the use or misuse of the contents, and exculpate you with respect to any liability related to the misuse of the contents, of the Information Materials or related offering and marketing materials by the recipients thereof.  Before distribution of any Information Materials, you agree, at our reasonable request, to identify that portion of the Information Materials that may be distributed to the Public Siders as containing solely "Public Information" (it being understood that you shall not otherwise be under any obligation to mark the Information Materials "PUBLIC").  By marking Information Materials as "PUBLIC," you shall be deemed to have authorized us and the proposed ABL Lenders to treat such Information Materials as containing solely Public Information.

You acknowledge and agree that, subject to the confidentiality and other provisions of this Exit Facilities Commitment Letter, the following documents may be distributed to both Private Siders and Public Siders, unless you advise the Arranger in writing (including by email) within a reasonable time prior (*provided* that such materials have been provided to you and your counsel for review a reasonable period of time prior thereto) to their intended distribution that such materials should only be distributed to Private Siders: (a) administrative materials prepared by the Arranger for the ABL Lenders and prospective ABL Lenders (such as a lender meeting invitation, bank allocation, if any, and funding and closing memoranda), (b) any term sheets and notification of changes in the terms and conditions of the ABL Facility and (c) drafts and final versions of the definitive documentation related to the ABL Facility.  If you advise us in writing (including by email) that any of the foregoing should be distributed only to Private Siders, then Public Siders will not receive such materials without your consent.  Each of the Arranger and each prospective ABL Lender shall be entitled to use and rely upon the information contained therein without responsibility for independent verification thereof.

We will manage, in consultation with you, all aspects of the Syndication, including decisions as to the selection of institutions reasonably acceptable to you and us (in each case such consent not to be unreasonably withheld or delayed) to be approached and when they will be approached, when their commitments will be accepted, which institutions will participate, the allocation of the commitments among the Lenders and the amount and distribution of fees and other amounts payable pursuant to the Exit Facilities Fee Letter among the Lenders.  Notwithstanding the foregoing, the Arranger will not syndicate, participate to or otherwise assign any portion of the ABL Facility to those persons that are (a) identified in writing on or prior to the date of this Exit Facilities Commitment Letter by you to us, (b) competitors of you or your subsidiaries (other than bona fide fixed income investors or debt funds) that are identified in writing by you to us from time to time or (c) affiliates of such persons set forth in clauses (a) and (b) above (in the case of affiliates of such persons set forth in clause (b) above, other than bona fide fixed income investors or debt funds) that are either (i) identified in writing by you from time to time or (ii) clearly identifiable on the basis of such affiliate's name (the persons described in clauses (a) through (c), collectively, the "**Disqualified Institutions**"); *provided*, that, to the extent persons are identified as Disqualified Institutions in writing by you to us after the date hereof pursuant to clauses (b) or (c)(i), the inclusion of such persons as Disqualified Institutions shall not retroactively apply to prior assignments or participations and for the avoidance of doubt, no Backstop Commitment Party (as such term is defined in Annex I to <u>Exhibit B</u> hereto) shall be considered to be a Disqualified Institution.  To assist us in the Syndication, you agree to promptly prepare and provide to us all customary and reasonably

available information with respect to you and each of your subsidiaries and the Transactions, including customary financial information and projections prepared by you and reasonably available to you (including financial estimates, forecasts and other forward-looking information, the "***Projections***"), as we may reasonably request in connection with the Syndication.  For the avoidance of doubt, you will not be required to provide any information to the extent that the provision thereof would violate any law, rule or regulation, or any obligation of confidentiality binding upon, or waive any privilege that may be asserted by, you or any of your affiliates; *provided* that in the event that you do not provide information in reliance on this sentence, you shall provide notice to the Arranger that such information is being withheld and you shall use your commercially reasonable efforts to communicate, to the extent feasible, the applicable information in a way that would not violate the applicable obligation or risk waiver of such privilege.

Subject to the provisions of clause (y) on Annex I to Exhibit B, notwithstanding any other provision of this Commitment Letter to the contrary and notwithstanding any syndication, assignment or other transfer by the Initial Lender, (a) no Initial Lender shall be relieved, released or novated from its obligations hereunder (including its obligation to fund the ABL Facility on the Closing Date) in connection with any syndication, assignment or other transfer until after the initial funding of the ABL Facility on the Closing Date and (b) no such syndication, assignment or other transfer shall become effective with respect to any portion of its commitment in respect of the ABL Facility until the initial funding of the ABL Facility on the Closing Date.

Notwithstanding anything to the contrary contained in this Commitment Letter, neither (a) the commencement nor completion of the syndications nor (b) the compliance with any of the paragraphs of this Section 3 shall be a condition to the closing and funding of the ABL Facility on the Closing Date.

4.    Information.

You hereby represent and warrant that (a) all written information and written data (other than the Projections, other forward looking information and information of a general economic or industry-specific nature, the "***Information***"), that has been or will be made available to us by you or by any of your representatives on your behalf in connection with the transactions contemplated hereby, when taken as a whole, does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (giving effect to all supplements and updates provided thereto) and (b) the Projections that have been or will be made available to us by you or by any of your representatives on your behalf in connection with the transactions contemplated hereby have been, or will be, prepared in good faith based upon assumptions that are believed by you to be reasonable when furnished to the Arranger; it being understood that the Projections are as to future events and are not to be viewed as facts, the Projections (i) are subject to significant uncertainties and contingencies, many of which are beyond your control, that no assurance can be given that any particular Projections will be realized and that actual results during the period or periods covered by any such Projections may differ significantly from the projected results and such differences may be material and (ii) are not a guarantee of performance.  You agree that, if at any time prior to the Syndication Date, you become aware that any of the representations and warranties in the preceding sentence would be incorrect in any material respect if the Information and the Projections were being furnished, and such representations were being made, at such time, then you will promptly supplement the Information and the Projections such that such representations and warranties are correct in all material respects under those circumstances, it being understood in each case that such supplementation shall cure any breach of such representation.  In arranging the Syndication, we will be entitled to use and rely primarily on the Information and the Projections without responsibility for independent verification thereof.

5.      <u>Conditions Precedent</u>.

Notwithstanding anything in this Commitment Letter, the Fee Letter, the Financing Documentation (as defined in each of <u>Exhibit A</u> and <u>Exhibit B</u> hereto) or any other letter agreement or other undertaking concerning the financing of the transactions contemplated hereby to the contrary:

(a)      the terms of the Financing Documentation and any closing deliverables shall be in a form such that (i) they do not impair the availability of the ABL Facility on the Closing Date if the conditions set forth on <u>Annex II to Exhibit A</u> hereto are satisfied and (ii) they do not impair the availability of the Term Facility on the Closing Date if the conditions set forth on <u>Annex I to Exhibit B</u> hereto are satisfied; it being understood that, to the extent any closing deliverables or Collateral (including the creation or perfection of any security interest) is not or cannot be provided on the Closing Date (other than, to the extent required under each Term Sheet,  a lien on Collateral that may be perfected solely by the filing of a financing statement under the UCC, the filing of an intellectual property security agreement in the US Patent and Trademark Office or US Copyright Office, as applicable, or delivery of certificated equity interests and accompanying transfer powers endorsed in blank) after your use of commercially reasonable efforts to do so without undue burden or expense, then the provision of any such closing deliverables and/or the provision and/or perfection of such Collateral shall not constitute a condition precedent to the availability and initial funding of the ABL Facility or the Term Facility on the Closing Date but may instead be delivered and/or perfected within 90 days, or, in the case of account control agreements with respect to any deposit accounts or securities accounts, 30 days (or, in each case, such longer period as the Agent may reasonably agree in its discretion) after the Closing Date pursuant to arrangements to be mutually agreed by the parties hereto acting reasonably, and

(b)      there are no conditions (implied or otherwise) to the commitments hereunder or the availability of the Senior Secured Facilities on the Closing Date, including compliance with the terms of this Commitment Letter, the Fee Letter or the Financing Documentation, except those expressly set forth on <u>Annex II to Exhibit A</u> and <u>Annex I to Exhibit B</u> hereto, and such conditions shall be subject in all respects to the provisions of this <u>Section 5</u>.

Upon the satisfaction (or waiver by us) of the conditions set forth on <u>Annex II Exhibit A</u> hereto, the Lenders will execute and deliver the Financing Documentation to which they are parties and the initial funding of the ABL Facility shall occur.

Upon the satisfaction (or waiver by us) of the conditions set forth on <u>Annex I to Exhibit B</u> hereto, the Lenders will execute and deliver the Financing Documentation to which they are parties and the initial funding of the Term Facility shall occur.

This <u>Section 5</u>, and the provisions contained herein, shall be referred to as the "<u>Certain Funds Provision</u>".

6.      <u>Fees</u>.

As consideration for and a condition precedent to our commitments hereunder and our undertakings to arrange, manage, structure and syndicate the Senior Secured Facilities, you agree to pay (or cause to be paid) to us the fees and other amounts and fulfill the other obligations set forth in the Term Sheets and in the Exit Facilities Fee Letter.  The terms of the Exit Facilities Fee Letter are an integral part of our commitment hereunder and constitute a part of this Exit Facilities Commitment Letter for all purposes hereof.

7.     Indemnification; Expenses.

You agree (a) to indemnify and hold harmless Barclays, the Backstop Commitment Parties, and their respective affiliates and the respective officers, directors, employees, agents, advisors, controlling persons and other representatives of each of the foregoing (each, an "***Indemnified Person***"), from and against any and all losses, claims, damages and liabilities of any kind or nature reasonably incurred and documented or invoiced out-of-pocket fees and expenses, joint or several, to which any such Indemnified Person may become subject to the extent arising out of, resulting from or in connection with any claim, litigation, investigation or proceeding resulting from this Exit Facilities Commitment Letter, the Exit Facilities Fee Letter, the Backstop Commitment Letter, the Transactions, the Senior Secured Facilities or any of the proceeds thereof (each, a "***Proceeding***"), regardless of whether any such Indemnified Person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other third person, and to reimburse each such Indemnified Person upon demand for any incurred and documented or invoiced out-of-pocket legal expenses of one firm of counsel for all such Indemnified Persons, taken as a whole, and, if necessary, of a single local counsel in each relevant jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all such Indemnified Persons, taken as a whole (and, in the case of a conflict of interest, of another firm of counsel to the affected Indemnified Persons similarly situated taken as a whole), and other incurred and documented or invoiced out-of-pocket fees and expenses incurred in connection with investigating, preparing, pursuing or defending any of the foregoing; *provided* that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent that they have resulted from (i) the willful misconduct, bad faith or gross negligence of such Indemnified Person or any of its Related Indemnified Persons (as defined below) (as determined by a court of competent jurisdiction in a final and non-appealable decision), (ii) a material breach of the obligations of such Indemnified Person or any of its Related Indemnified Persons under this Exit Facilities Commitment Letter, the Exit Facilities Fee Letter, the Backstop Commitment Letter, or the Senior Secured Facilities (as determined by a court of competent jurisdiction in a final and non-appealable decision) or (iii) any Proceeding that does not involve an act or omission by you or any of your affiliates and that is brought by an Indemnified Person or its Related Indemnified Persons against any other Indemnified Person or its Related Indemnified Persons (other than any claims against us in our capacity or in fulfilling our role as an administrative agent or Arranger or any similar role in connection with any of the Transactions) and (b) whether or not the Closing Date occurs, to reimburse us from time to time, within 10 days of presentation of a summary statement, for all incurred and documented or invoiced out-of-pocket expenses, due diligence expenses, syndication expenses, travel expenses, costs and expenses incurred in connection with inventory appraisals and field exams in respect of the Senior Secured Facilities and reasonable fees, disbursements and other charges of Paul Hastings LLP, Latham & Watkins LLP, PJT Partners and also appropriate local counsel (including Delaware bankruptcy counsel and Ashby & Geddes P.A.) in applicable local jurisdictions, but limited to one local counsel to the Arranger in each such jurisdiction (which may include a single special counsel acting in multiple jurisdictions), in each case incurred in connection with the Senior Secured Facilities and the preparation and negotiation of this Exit Facilities Commitment Letter and the Exit Facilities Fee Letter, the Backstop Commitment Letter, the definitive documentation related to the Senior Secured Facilities and any ancillary documents and security arrangements in connection therewith (collectively, the "***Expenses***").  The foregoing provisions in this paragraph shall be superseded in each case, to the extent covered thereby, by the applicable provisions contained in the definitive documentation related to the Senior Secured Facilities upon execution thereof.

You shall not, without the prior written consent of any affected Indemnified Person (which consent shall not be unreasonably withheld or delayed), effect any settlement of any pending or threatened proceedings in respect of which indemnity could have been sought hereunder by such Indemnified Person unless such settlement (i) includes an unconditional release of such Indemnified

Person in form and substance reasonably satisfactory to such Indemnified Person from all liability or claims that are the subject matter of such proceeding and (ii) does not include any statement as to or any admission of fault, culpability, wrongdoing or a failure to act by or on behalf of any Indemnified Person; *provided*, that any Indemnified Person may reasonably withhold its consent to any settlement if such settlement does not comply with clauses (i) and (ii) above.

The expense reimbursements and indemnification provisions of this Exit Facilities Commitment Letter shall constitute administrative expenses under Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code (as defined below) in the chapter 11 cases (the "***Chapter 11 Cases***") with respect to the Loan Parties as debtors-in-possession, which commenced in the Bankruptcy Court (as defined below) on October 4, 2018 (the "***Petition Date***") without the need to file any motion (other than any motion as may be necessary to obtain the approvals of the Exit Facilities Commitment Letter and the Exit Facilities Fee Letter), application or proof of claim and notwithstanding any administrative claims bar date, and shall be immediately payable in accordance with the terms hereof without further notice or order of the Bankruptcy Court.

Notwithstanding any other provision of this Exit Facilities Commitment Letter or the Exit Facilities Fee Letter, (i) no Indemnified Person shall be liable for any damages arising from the use by others of information or other materials obtained through internet, electronic, telecommunications or other information transmission systems, except to the extent that such damages have resulted from the willful misconduct, bad faith or gross negligence of such Indemnified Person or any of its Related Indemnified Persons (as determined by a court of competent jurisdiction in a final and non-appealable decision) and (ii) none of we, you, any Indemnified Person or any of its Related Indemnified Persons shall be liable for any indirect, special, punitive or consequential damages in connection with this Exit Facilities Commitment Letter, the Exit Facilities Fee Letter, the Transactions (including the Senior Secured Facilities and the use of proceeds thereunder), or with respect to any activities related to the Senior Secured Facilities, including the preparation of this Exit Facilities Commitment Letter, the Exit Facilities Fee Letter and the definitive documentation related to the Senior Secured Facilities; *provided* that nothing contained in this paragraph shall limit your indemnity and reimbursement obligations to the extent set forth in the second immediately preceding paragraph.

For purposes hereof, a "***Related Indemnified Person***" of an Indemnified Person means (1) any controlling person or controlled affiliate of such Indemnified Person, (2) the respective directors, officers, or employees of such Indemnified Person or any of its controlling persons or controlled affiliates and (3) the respective agents or representatives of such Indemnified Person or any of its controlling persons or controlled affiliates, in the case of this clause (3), acting on behalf of or at the instructions of such Indemnified Person, controlling person or such controlled affiliate; *provided* that each reference to a controlled affiliate, director, officer or employee in this sentence pertains to a controlled affiliate, director, officer or employee involved in the negotiation or syndication of this Exit Facilities Commitment Letter, the Exit Facilities Fee Letter and the Senior Secured Facilities.

8.    Sharing Information; Absence of Fiduciary Relationship; Affiliate Activities; Financial Advisor.

You acknowledge that Barclays and its affiliates may be providing debt financing, equity capital or other services (including, without limitation, financial advisory services) to other persons in respect of which you or your affiliates may have conflicting interests.  Neither Barclays nor its affiliates will use confidential information obtained from you by virtue of the transactions contemplated by this Exit Facilities Commitment Letter in connection with the performance of services for other persons, and none of us or our affiliates will furnish any such information to other persons, except to the extent permitted below.  You also acknowledge that neither Barclays nor its affiliates has any obligation to use

7

in connection with the transactions contemplated by this Exit Facilities Commitment Letter, or to furnish to you, confidential information obtained from other persons.

As you know, Barclays is a full service securities firm engaged, either directly or through our affiliates, in various activities, including securities trading, commodities trading, investment management, financing and brokerage activities and financial planning and benefits counseling for both companies and individuals.  In the ordinary course of these activities, we and our affiliates actively engage in commodities trading or trade the debt and equity securities (or related derivative securities) and financial instruments (including bank loans and other obligations) of the Company and other companies for each of our own account and for the accounts of our customers and may at any time hold long and short positions in such securities.  We and our affiliates also co-invest with, make direct investments in, and invest or co-invest client monies in or with funds or other investment vehicles managed by other parties, and such funds or other investment vehicles may trade or make investments in securities of the Company or other companies or engage in commodities trading with any thereof.

We and our affiliates may have economic interests that conflict with those of the Company.  You agree that we will act under this Exit Facilities Commitment Letter as independent contractors and that nothing in this Exit Facilities Commitment Letter will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between us and you and your equity holders or your and their respective affiliates.  You acknowledge and agree that (i) the transactions contemplated by this Exit Facilities Commitment Letter are arm's-length commercial transactions between us and our affiliates, on the one hand, and you, on the other, (ii) in connection therewith and with the process leading to such transaction us and our applicable affiliates (as the case may be) are acting solely as a principal and not as agents or fiduciaries of you, your management, equityholders, creditors, affiliates or any other person, (iii) Barclays and our applicable affiliates (as the case may be) have not assumed an advisory or fiduciary responsibility or any other obligation in favor of you or your affiliates with respect to the transactions contemplated hereby or the process leading thereto (irrespective of whether we or any of our affiliates have advised or are currently advising you on other matters) except the obligations expressly set forth in this Exit Facilities Commitment Letter and (iv) you have consulted your own legal and financial advisors to the extent you deemed appropriate.  You further acknowledge and agree that neither Barclays nor our affiliates is advising you as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction and you are responsible for making your own independent judgment with respect to the transactions contemplated hereby and the process leading thereto.  You agree that you will not claim that we or any of our applicable affiliates, as the case may be, have rendered advisory services in connection with the services provided pursuant to this Exit Facilities Commitment Letter, or owe a fiduciary or similar duty to you or your affiliates, in connection with such transaction or the process leading thereto.  You waive, to the fullest extent permitted by law, any claims you may have against us or our affiliates for breach of fiduciary duty or alleged breach of fiduciary duty arising out of this Exit Facilities Commitment Letter and agree that we and our affiliates shall have no liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of you, including your equityholders, employees or creditors.

9.      Confidentiality.

You agree that this Exit Facilities Commitment Letter (including the exhibits hereto) and the contents hereof are confidential and that neither its existence, nor the terms hereof, will be disclosed by you to any person other than your principals, managers, officers, directors, employees, accountants, attorneys, and other advisors, and then only on a "need-to-know" basis in connection with the transactions contemplated hereby and on a confidential basis; provided, however, that this Exit Facilities Commitment Letter may be shared with the Backstop Commitment Parties and their advisors on a "need-to-know" basis in connection with the transactions contemplated hereby and on a confidential basis.  The foregoing

8

notwithstanding, you may (i) (A) following your acceptance of this Exit Facilities Commitment Letter in accordance herewith and your return of an executed counterpart of this Exit Facilities Commitment Letter to us, file or make such other public disclosures of the terms and conditions hereof (including the exhibits hereto, but not including Annex I to Exhibit A and the Addendum to Exhibit B of the Exit Facilities Commitment Letter or the Exit Facilities Fee Letter) as you are required by law, in the opinion of your counsel, to make; *provided that*, after this Exit Facilities Commitment Letter has been accepted by you, and after the commencement of cases under title 11 of the United States Code (the "***Bankruptcy Code***") by the Company (or any portion thereof), you may disclose this Exit Facilities Commitment Letter and Annex I to Exhibit A and the Addendum to Exhibit B of the Exit Facilities Commitment Letter (but not the Exit Facilities Fee Letter) to the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"), to the extent required to obtain court approval in connection with any acts or obligations to be taken pursuant to this Exit Facilities Commitment Letter or the transactions contemplated hereby, (B) make disclosures as may be required by regulatory authorities so long as such authorities are informed of the confidential nature of such information, (C) make disclosures as may be required by statute, decision, or judicial or administrative order, rule, or regulation; provided, that prior to any disclosure under this clause (C), the disclosing party agrees to provide Arranger with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to Arranger pursuant to the terms of the applicable statute, decision, or judicial or administrative order, rule or regulation, (D) make disclosures as may be agreed to in advance in writing by Arranger, (E) make disclosures to your shareholders and their respective attorneys and other advisors, but only on a "need-to-know" basis in connection with the transactions contemplated hereby and on a confidential basis and (F) make disclosures as requested or as required by any governmental authority pursuant to any subpoena or other legal process; provided, that prior to any disclosure under this clause (F) the disclosing party agrees to provide Arranger with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to Arranger pursuant to the terms of the subpoena or other legal process, (ii) make disclosures as to any such information that is or becomes generally available to the public (other than as a result of prohibited disclosure by the Company, any Loan Party or any of their respective affiliates), and (iii) make disclosures in connection with any litigation or other adverse proceeding involving parties to this Exit Facilities Commitment Letter; *provided*, that prior to any disclosure to a party other than the Company, Arranger, their respective affiliates and their respective counsel under this clause (iii) with respect to litigation involving a party other than the Company, Arranger and their respective affiliates, the disclosing party agrees to provide Arranger with prior notice thereof.

Notwithstanding anything to the contrary in the foregoing, you agree that if the Exit Facilities Fee Letter is required to be filed with the Bankruptcy Court for purposes of obtaining approval to pay any fees or other amounts provided for therein or otherwise, then you shall promptly notify us and take all actions necessary to prevent the Exit Facilities Fee Letter from becoming publicly available, including, without limitation, filing of a motion or an *ex parte* request pursuant to Sections 105(a) and 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018 seeking an order of the Bankruptcy Court authorizing the debtors to file the Exit Facilities Fee Letter under seal, and you  shall file the Exit Facilities Fee Letter with the Bankruptcy Court under seal in form and substance reasonably satisfactory to the Arranger and, in connection therewith, you may provide an unredacted copy of the Exit Facilities Fee Letter to the Bankruptcy Court, the Office of the United States Trustee and advisors to any statutory committees appointed; *provided*, in each case, that the disclosure to such advisors is on a confidential, "professional eyes only" basis.

The Arranger and its affiliates will use all confidential information provided to them or such affiliates by or on behalf of you hereunder or in connection with the Transactions solely for the purpose of providing the services which are the subject of this Exit Facilities Commitment Letter or other services to you and shall treat confidentially all such information and shall not publish, disclose or

otherwise divulge, such information; *provided*, that nothing herein shall prevent the Arranger and its affiliates from disclosing any such information (a) pursuant to the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law or compulsory legal process or to the extent requested or required by governmental and/or regulatory authorities (in which case the Arranger agrees (except with respect to any audit or examination conducted by bank accountants or any governmental bank or other regulatory authority exercising examination or regulatory authority, including self-regulatory organizations, or internal auditors), to the extent practicable and not prohibited by applicable law, to inform you promptly thereof prior to disclosure), (b) to the extent that such information becomes publicly available other than by reason of disclosure by the Arranger or any of its affiliates or any related parties thereto in violation of any confidentiality obligations owing to you or any of your affiliates (including those set forth in this paragraph), (c) to the extent that such information is received by the Arranger from a third party that is not, to the Arranger's knowledge, subject to contractual or fiduciary confidentiality obligations owing to you or any of your affiliates, (d) to the extent that such information is independently developed by the Arranger, (e) to the Arranger's affiliates and to the Arranger's and its affiliates' respective employees, service providers, legal counsel, independent auditors, professionals and other experts or agents (collectively, the "*Representatives*") who need to know such information in connection with the Transactions and who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential (provided, that the Arranger shall be responsible for the compliance of its affiliates and Representatives with this paragraph), (f) to potential or prospective Lenders, participants or assignees and to any direct or indirect contractual counterparty to any swap or derivative transaction relating to the Company or any of its subsidiaries, subject to the proviso below (including the Backstop Commitment Parties), (g) for purposes of establishing a "due diligence" defense in connection with any proceeding or (h) to the extent you shall have consented to such disclosure in writing; *provided* that the disclosure of any such information to any Lenders or prospective Lenders or participants or prospective participants referred to above shall be made subject to the acknowledgment and acceptance by such Lender or prospective Lender or participant or prospective participant that such information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as is otherwise reasonably acceptable to you and the Arranger, including, without limitation, as agreed in any Information Materials or other marketing materials) in accordance with the standard syndication processes of the Arranger or customary market standards for dissemination of such type of information.  The Arranger shall be principally liable to the extent any confidentiality restrictions set forth herein are violated by any of its affiliates or any of its or their Representatives.  The Arranger's and their respective affiliates', if any, obligations under this paragraph shall terminate automatically and be superseded by the confidentiality provisions in the definitive documentation relating to the Senior Secured Facilities upon the initial funding thereunder.  Notwithstanding anything to the contrary, the confidentiality obligations of the Arranger and its affiliates under this paragraph shall automatically terminate on the first anniversary hereof.

10.     <u>Assignments, Amendments, Governing Law, Etc.</u>

        This Exit Facilities Commitment Letter and the Exit Facilities Fee Letter shall not be assignable by you or by us without the prior written consent of the other party hereto (and any attempted assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto (and, with respect to the provisions provided in <u>Section 7</u>, Indemnified Persons), and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto (and, with respect to the provisions provided in <u>Section 7</u>, Indemnified Persons).  Any and all services to be provided by us may be performed and any and all of our rights hereunder and under the Exit Facilities Fee Letter may be exercised by or through any of our affiliates or branches, provided such affiliates or branches agree to be bound by the terms hereof, and to the extent so employed, such affiliates and branches shall be entitled to the benefits afforded to the Arranger hereunder.  This Exit Facilities

Commitment Letter and the Exit Facilities Fee Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by us and you. This Exit Facilities Commitment Letter and the Exit Facilities Fee Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Exit Facilities Commitment Letter or the Exit Facilities Fee Letter by facsimile transmission or electronic photocopy (*e.g.*, "pdf") shall be effective as delivery of an originally executed counterpart hereof. Section headings used herein are for convenience of reference only, are not part of this Exit Facilities Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Exit Facilities Commitment Letter. You acknowledge that information and documents relating to the Transactions may be transmitted through SyndTrak, Intralinks, the internet, e-mail or similar electronic transmission systems and that we shall not be liable for any damages arising from the unauthorized use by others of information or documents transmitted in such manner. Notwithstanding anything in <u>Section 9</u> to the contrary, we may place advertisements in financial and other newspapers and periodicals or on a home page or similar place for dissemination of information on the Internet or worldwide web as we may choose, and circulate similar promotional materials, after the closing of the Transactions in the form of a "tombstone" or otherwise describing the names of the Company and its affiliates (or any of them), and the amount, type and closing date of such Transactions, all at such party's own expense. This Exit Facilities Commitment Letter and the Exit Facilities Fee Letter supersede all prior understandings, whether written or oral, between us with respect to the Transactions. Your obligations under or in connection with this Exit Facilities Commitment Letter and the Exit Facilities Fee Letter shall be joint and several. THIS COMMITMENT LETTER AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS COMMITMENT LETTER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

11.    <u>Jurisdiction</u>.

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction of any New York state court or Federal court of the United States of America sitting in the Borough of Manhattan, and any appellate court from any thereof, in any suit, action or proceeding arising out of or relating to this Exit Facilities Commitment Letter or the transactions contemplated hereby, and agrees that all claims in respect of any such suit, action or proceeding may be heard and determined only in such New York State court or, to the extent permitted by law, in such Federal court or, prior to the Closing Date, the Bankruptcy Court and the federal appeals court therefrom, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Exit Facilities Commitment Letter or the transactions contemplated hereby in any such New York state court or in any such Federal court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. To the extent permitted by law, service of any process, summons, notice or document by registered mail addressed to you at the address above shall be effective service of process against you for any suit, action or proceeding brought in any such court.

12.    <u>Waiver of Jury Trial</u>.

EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY

11

OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS COMMITMENT LETTER, THE FEE LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THEREUNDER.

13.     Surviving Provisions.

The indemnification, fee, payment, expense, confidentiality, assignments, jurisdiction, information, governing law, and waiver of jury trial provisions contained herein and in the Exit Facilities Fee Letter, and the provisions contained in the foregoing Section 8, shall remain in full force and effect regardless of whether definitive documentation related to the Senior Secured Facilities shall be executed and delivered and notwithstanding the termination of this Exit Facilities Commitment Letter and the Exit Facilities Fee Letter or our agreements hereunder or thereunder; *provided* that your obligations under this Exit Facilities Commitment Letter (other than your obligations with respect to the confidentiality of this Exit Facilities Commitment Letter and the contents hereof) shall automatically terminate and be superseded by the provisions of the definitive documentation for the Senior Secured Facilities to the extent substantively addressed thereby upon the effectiveness thereof and the initial funding thereunder, and you shall automatically be released from all liability in connection therewith at such time.

14.     PATRIOT Act Notification.

We hereby notify you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "***PATRIOT Act***"), we may be and each Lender is required to obtain, verify and record information that identifies the Company, the borrower and the guarantors under the Senior Secured Facilities, which information includes the name, address, tax identification number and other information regarding the Company, the borrower and such guarantors that will allow us or such Lender to identify the Company, the borrower and such guarantors in accordance with the PATRIOT Act.  This notice is given in accordance with the requirements of the PATRIOT Act and is effective as to us and each Lender.  You hereby acknowledge and agree that we shall be permitted to share any or all such information with the Lenders.

15.     Acceptance and Termination.

If the foregoing correctly sets forth our agreement with you, please indicate your acceptance of the terms of this Exit Facilities Commitment Letter and of the Exit Facilities Fee Letter by returning to us executed counterparts hereof and of the Exit Facilities Fee Letter not later than 11:59 p.m., New York City time, on October 5, 2018.  Our offer hereunder, and our respective agreements to perform the services described herein, will expire automatically and without further action or notice and without further obligation to you at such time in the event that we have not received such executed counterparts in accordance with the immediately preceding sentence.  Thereafter, this Exit Facilities Commitment Letter, except as expressly provided herein, shall automatically terminate on the earliest of (a) the Closing Date, (b) the completion of the reorganization without the closing of the Senior Secured Facilities, (c) the dismissal or conversion of the Chapter 11 Cases to proceedings under Chapter 7 of the Bankruptcy Code (other than any dismissal or conversion in respect of a de minimis subsidiary of the Company or subsidiary that would not be a subsidiary guarantor in accordance with the terms of the Commitment Letter) or the appointment of a trustee or examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), except to the extent contemplated by or provided for under the Chapter 11 Plan (as defined in Exhibit A hereto), (d) 11:59 p.m. New York City time, on (x) so long as the Closing Date (as such term is defined in the ABL DIP Credit Agreement) occurs on or prior to October 12, 2018, the date that is three (3) months following the Closing Date or (y) otherwise, the date that is three (3) months following the date hereof, if the definitive documentation for the Senior Secured Facilities has not been entered into on or prior to such

12

date and (e) you or any of your affiliates obtain an asset-based revolving debtor-in-possession financing or a term loan debtor-in-possession financing other than pursuant to the DIP Financing Commitment Letter.  This Exit Facilities Commitment Letter and the Exit Facilities Fee Letter shall be of no force and effect unless (i) executed by you and delivered to us within the time frame required by the initial sentence of this Section 15, and (ii) the Bankruptcy Court shall have approved the payment of all fees, payments, expenses, indemnities and other obligations set forth in this Exit Facilities Commitment Letter and in the Exit Facilities Fee Letter.

16.    Enforceable Obligation.

        Each of the parties hereto agrees that each of this Commitment Letter and the Fee Letter is a binding and enforceable agreement with respect to the subject matter contained herein or therein (including an obligation to negotiate in good faith); it being acknowledged and agreed that the funding of (i) the ABL Facility is subject only to the conditions specified in Annex II to Exhibit A hereto and (ii) the Term Facility is subject only to the conditions specified in Annex I to Exhibit B, including the execution and delivery of the Financing Documentation by the parties hereto in a manner consistent with this Commitment Letter.

17.    No Shop.

        Notwithstanding anything herein to the contrary, each of the Debtors (as defined in Exhibit B), agrees that, from the date hereof until the date of entry of an order by the Bankruptcy Court in form and substance acceptable to the Arranger and Backstop Parties authorizing the Debtors to be bound by this Commitment Letter and providing for all obligations of the Debtors hereunder to constitute super-priority administrative expenses, each Debtor shall not, and shall not authorize or permit any of their officers, directors, employees, advisors, attorneys, investment bankers, financial advisors, or other professionals (collectively, "***Debtor Representatives***") to, directly or indirectly in any manner: (i) solicit, initiate or take any action to facilitate, encourage, or respond to any inquiries or the making of any proposal that may constitute, or could reasonably be expected to lead to, any debt or equity financing, asset sales, or any merger, consolidation, liquidation, dissolution or similar transaction, or chapter 11 plan transaction, involving any of the Debtors (an "***Alternative Transaction***"); (ii) initiate or engage in any discussion or negotiation regarding an Alternative Transaction; (iii) enter into any agreements or other instruments (whether or not binding) regarding an Alternative Transaction; or (iv) furnish any information relating to the Debtors or any of their respective assets or businesses, or afford access to the assets, business, properties, books or records of any of the Debtors to any entity or person, in all cases, for the purpose of assisting with or facilitating an Alternative Transaction. Each of the Debtors shall immediately cease and cause to be terminated, and shall cause its Debtor Representatives to immediately cease and cause to be terminated, all existing discussions or negotiations with any persons conducted prior to the date hereof with respect to, or that could lead to, an Alternative Transaction.  The Debtors hereby represent that they are not now engaged in discussions or negotiations with any party other than the Arranger and Backstop Parties with respect to any Alternative Transaction.

        The Debtors shall notify the Arranger and Backstop Parties promptly in writing if any written offer, or any inquiry or contact with any person with respect to any Alternative Transaction, is made and shall provide the Arranger and Backstop Parties with a copy of such offer and shall keep the Arranger and Backstop Parties informed on the status of any negotiations regarding such offer.  The Debtors shall immediately notify the Arranger and Backstop Parties if any discussions or negotiations are sought to be initiated, any inquiry or proposal is made, or any information is requested with respect to any Alternative Transaction and notify the Arranger and Backstop Parties of the terms of any proposal which it may receive in respect of any such Alternative Transaction, including without limitation the identity of the prospective financing parties, purchaser, or other soliciting party.  The Debtors agree not to release

13

any third party from, or waive any provision of, any confidentiality or standstill agreement to which the Debtors are a party.

[Remainder of this page intentionally left blank]

LEGAL_US_E # 137469018.27

We are pleased to have been given the opportunity to assist you in connection with the financing contemplated hereby.

Very truly yours,

BARCLAYS BANK PLC

By_____
    Name:
    Title:

MATTRESS FIRM, INC.

By_____
    Name:
    Title:

[ALL GUARANTORS]

By_____
    Name:
    Title:

[Signature Page to Exit Facilities Commitment Letter]

**ABL Facility**
**Summary of Terms and Conditions**

[To be attached.]

**PRIVILEGED AND CONFIDENTIAL**

Mattress Firm, Inc.
$125,000,000 Senior Secured Asset-Based Revolving Facility
Summary of Principal Terms and Conditions

The following summary outlines the indicative economic and other terms of a proposed chapter 11 exit financing for Mattress Firm, Inc. and certain of its affiliates. Capitalized terms not otherwise defined herein shall have the meaning ascribed to such term in the Pre-Petition ABL Credit Agreement (as defined below) and subject to the ABL Documentation Principles.

| | |
|---|---|
| Borrower: | Mattress Firm, Inc., a corporation organized under the laws of the State of Delaware (the "***Borrower***"). |
| ABL Administrative Agent: | Barclays Bank PLC will act as sole and exclusive administrative agent (in such capacity, the "***ABL Administrative Agent***") for a syndicate of banks, financial institutions and institutional lenders reasonably acceptable to the Borrower excluding any Disqualified Institution (the "***ABL Lenders***"), and will perform the duties customarily associated with such roles. |
| ABL Collateral Agent: | Barclays Bank PLC will act as collateral agent for the ABL Lenders (the "***ABL Collateral Agent***"). The ABL Collateral Agent reserves the right to retain other co-collateral agents at no additional cost to the Borrower. |
| ABL Arranger: | Barclays Bank PLC, will act as sole lead arranger for the ABL Facility (as defined below) (the "***ABL Arranger***") and as sole bookrunner, and will perform the duties customarily associated with such roles. |
| Pre-Petition Credit Agreements: | The ABL Credit Agreement, dated as of December 22, 2017 (as amended, restated, supplemented or otherwise modified prior to the commencement of the Chapter 11 Cases, the "***Pre-Petition ABL Credit Agreement***") by and among the Borrower, Mattress Holding Corp. ("***Holdings***"), Barclays Bank PLC, as the administrative agent, and the lenders and other parties party thereto. |
| | The Term Loan Credit Agreement, dated as of March 26, 2018 (as amended, restated, supplemented or otherwise modified prior to the commencement of the Chapter 11 Cases, the "***Pre-Petition Second Lien Term Loan Credit Agreement***"), between the Borrower, Holdings and Steinhoff International Holdings N.V., as lender thereunder. |
| ABL Facility: | A first priority senior secured asset-based credit facility (the "***ABL Facility***"), consisting of up to $125 million in revolving credit commitments, the commitments thereunder, the "***Revolving Commitments***" and the loans thereunder, the "***Revolving Loans***"). |
| | Swing Line Loans: |

As a subfacility of the ABL Facility, the ABL Administrative Agent, in its capacity as swing line lender ("***ABL Swing Line Lender***"), shall make available to the Borrower a swingline facility under which the Borrower may make short-term borrowings of up to $20,000,000. Except for purposes of calculating the Commitment Fee (as defined below), any such swing line borrowings will reduce availability under the ABL Facility on a dollar-for-dollar basis. Each ABL Lender under the ABL Facility shall, promptly upon request by the ABL Swing Line Lender, fund to the ABL Swing Line Lender its pro rata share of any swingline borrowings.

<u>Letters of Credit</u>:

Up to $30,000,000 of the ABL Facility will be available in the form of standby letters of credit (including to roll existing letters of credit under the ABL DIP Credit Agreement on the Closing Date. Letters of credit under the ABL Facility will be issued by Barclays Bank PLC or any other ABL Lender who becomes an issuing bank on or after the Closing Date ("***L/C Issuers***"). Each letter of credit shall expire not later than the earlier of (a) (i) 12 months after its date of issuance and (b) unless arrangements reasonably satisfactory to the relevant L/C Issuer have been entered into, the fifth Business Day prior to the final maturity of the ABL Facility; *provided* that any letter of credit may provide for renewal thereof for additional periods of up to 12 months (which in no event shall extend beyond the date referred to in clause (b) above).

Drawings under any letter of credit shall be reimbursed by the Borrower on the next Business Day. To the extent that the Borrower does not reimburse the applicable Issuer when required, the ABL Lenders shall be irrevocably obligated to reimburse such Issuer pro rata based upon their respective Revolving Commitments.

The ABL Facility will include defaulting lender provisions substantially consistent with the Pre-Petition ABL Credit Agreement.

Incremental ABL Facilities:

The ABL Facility will permit the Borrower to increase commitments under the ABL Facility (any such increase, an "***Incremental ABL Facility***") from time to time in an aggregate principal amount not to exceed $50,000,000 (the "***Incremental ABL Capacity***") after the Closing Date and, in the case of any such increase, in a minimum amount of $10,000,000 (unless a lesser amount remains); *provided* that any Incremental ABL Facility shall be on terms and pursuant to the ABL Facility.

The Borrower may (but shall not be required to) seek commitments in respect of the Incremental ABL Facility from existing ABL Lenders (each of which shall be entitled to agree or decline to participate in its sole discretion) and additional banks, financial institutions and other institutional lenders who will become ABL Lenders in connection therewith.

For avoidance of doubt, the fixed dollar amount set forth in connection with

A-2

the Excess Availability tests described herein shall automatically increase proportionately by an amount equal to the proportionate increase to the Revolving Commitments in connection with any Incremental ABL Facility.

Maturity Date:

The earlier of the date that is (a) 36 months from the Closing Date and (b) 91 days prior to the latest maturity of the Term Facility (as defined in the Term Loan Term Sheet (such earlier date, the "***Maturity Date***").

Purpose:

The proceeds of the ABL Facility, together with proceeds of the Term Loans, will be used by the Borrower for funding the amounts payable under the Chapter 11 Plan and for working capital and general corporate purposes.

"***Chapter 11 Plan***" shall mean the Joint Prepackaged Chapter 11 Plan of Reorganization for Mattress Firm, Inc. and its debtor affiliates  filed with the Bankruptcy Court on or about October 5, 2018, as amended, supplemented or otherwise modified from time to time..

Availability and Amounts:

Subject to the terms and express conditions set forth herein, Revolving Loans and Letters of Credit under the ABL Facility will be available, subject to availability under the then-applicable Maximum Credit, at any time prior to the final maturity of the ABL Facility, in minimum incremental principal amounts to be agreed.  Amounts repaid under the ABL Facility may be reborrowed, subject to the then-applicable Borrowing Base.

Borrowing Base:

The borrowing base (the "***Borrowing Base***") at any time shall equal the sum of:

(a) 90% of the appraised net orderly liquidation value (with respect to any month, using the applicable monthly net orderly liquidation value for such month set forth in the most recent Hilco appraisal received by the ABL Administrative Agent) of eligible inventory of the Borrower and the ABL Guarantors (as defined below) (other than Parent and Holdings), *plus*

(b) 90% of the appraised net orderly liquidation value (with respect to any month, using the applicable monthly net orderly liquidation value for such month set forth in the most recent Hilco appraisal received by the ABL Administrative Agent) of eligible in-transit inventory of the Borrower and the ABL Guarantors (other than Parent and Holdings); *provided*, that the amounts under this clause (b) shall not exceed 10% of eligible inventory, *plus*

(c)   90% of eligible accounts receivable of the Borrower and the ABL Guarantors (other than Parent and Holdings), *plus*

(d) 90% of eligible credit card receivables of the Borrower and the ABL Guarantors (other than Parent and Holdings), *minus*

(d) reserves as described below.

Eligibility criteria for eligible inventory, eligible accounts receivable, eligible credit card receivables and eligible in-transit inventory included in the

A-3

Borrowing Base will be consistent with the Pre-Petition ABL Credit Agreement (with adjustments in accordance with the ABL Documentation Principles (as defined below)).

The Borrowing Base will be computed by the Borrower on a monthly basis (or more frequently as the Borrower may elect; *provided* that if such election is exercised, it must be continued until the date that is 60 days after the date of such election), and a certificate (the "***Borrowing Base Certificate***") presenting the Borrower's computation of the Borrowing Base will be delivered to the ABL Administrative Agent promptly, but in no event later than the fifteenth Business Day following the end of each fiscal month; *provided, however*, that during a Cash Dominion Period, the Borrower will be required to compute the Borrowing Base and deliver a Borrowing Base Certificate on a weekly basis, which weekly Borrowing Base Certificate shall be delivered in no event later than the third (3rd) Business Day after the end of such fiscal week.

"***Maximum Credit***" means, at any time, the lesser of (i) the Revolving Commitments in effect at such time and (ii) the Borrowing Base at such time.

"***Permitted Discretion***" means a determination made by the ABL Administrative Agent or the ABL Collateral Agent in good faith in the exercise of its reasonable (from the perspective of an asset-based lender) business judgment.

The ABL Administrative Agent will have the right to establish and modify reserves (including customary reserves for customer deposits) against the Borrowing Base assets in its Permitted Discretion.

|  |  |
|---|---|
| <u>Interest Rates and Fees</u>: | As set forth on <u>Annex I</u> hereto. |
| <u>Default Rate</u>: | Any principal payable under or in respect of the ABL Facility not paid when due shall bear interest at the applicable interest rate plus 2% per annum.  Other overdue amounts (including overdue interest) shall bear interest at the interest rate applicable to ABR loans plus 2% per annum. |
| <u>Guarantees</u>: | All obligations of the Borrower (the "***Borrower Obligations***") under the ABL Facility and under any interest rate protection or other hedging arrangements entered into with an ABL Lender or any affiliate of an ABL Lender at the time of the entering into of such arrangements and designated by the Borrower as "ABL Hedging Obligations" ("***Hedging Obligations***") and under any cash management arrangements entered into with an ABL Lender or any affiliate of an ABL Lender at the time of the entering into of such arrangements and designated by the Borrower as "ABL Cash Management Obligations" ("***Cash Management Obligations***") will be unconditionally guaranteed jointly and severally on a senior secured basis (the "***Guarantees***") by (i) to the extent it guarantees the Term Facility, Stripes US Holdings, Inc., a Delaware corporation ("***Parent***"), and the indirect parent of the Borrower, (ii) Holdings and (iii) subject to customary exceptions to be agreed, each existing and |

A-4

subsequently acquired or organized direct or indirect wholly-owned U.S. restricted subsidiary of Borrower with exceptions to be agreed (the "*ABL Subsidiary Guarantors*" and, together with Holdings, the "*ABL Guarantors*" and, collectively with the Borrower and Holdings, the "*Loan Parties*"). Hedging Obligations and Cash Management Obligations shall not be permitted to be secured under both the ABL Facility and the Term Facility. The Guarantors under the ABL Facility and the Term Facility shall be the same.

Security/Collateral:    The Borrower Obligations, the Guarantees, any Hedging Obligations and any Cash Management Obligations will be secured by:

(a)    a first-priority perfected security interest (subject to certain permitted liens and other customary exceptions to be agreed) in all accounts, credit card receivables, payment intangibles, accounts receivable, chattel paper, and other rights to payment (except to the extent constituting identifiable proceeds of Term Loan Collateral (as defined below) (it being understood that any such accounts receivable that are identifiable proceeds of Term Loan Collateral shall be deemed ineligible)), inventory, cash, deposit accounts, securities accounts and commodities accounts (other than any deposit account, securities account or commodity account (or amount on deposit therein) established solely to hold (and solely holding) identifiable proceeds of Term Loan Collateral), intercompany indebtedness, instruments, general intangibles, contracts, documents, supporting obligations, letter of credit rights, letters of credit, commercial tort claims related to the foregoing assets, and certain other assets and books and records related to the foregoing and, in each case, proceeds (including insurance policies and proceeds) thereof (all of the foregoing, the "*ABL Collateral*"), in each case, subject to exceptions to be agreed; and

(b)    a second-priority perfected security interest (subject to certain permitted liens and other customary exceptions to be agreed) in (i) the capital stock of the Borrowers and their respective subsidiaries, all equipment and intellectual property of the Borrowers and the Guarantors and all other personal property and material fee-owned real property (as described below) of the Borrower and the Guarantors to the extent not constituting ABL Collateral, including, without limitation, proceeds of the foregoing and (ii) in the event that the Common Equity and PIK Debt are issued by Parent, a non-recourse pledge of 100% of the equity interests of Parent, Holdings, and each wholly-owned restricted subsidiary of SUSHI (other than the Borrower and each Guarantor); (all of the foregoing, the "*Term Loan Collateral*" and, together with the ABL Collateral, the "*Collateral*"), in each case, subject to the exceptions to be agreed. The Collateral will be at least as expansive as the Collateral as defined in the Term Facility.

All the above-described pledges, security interests and mortgages shall be created on terms, and pursuant to documentation reasonably satisfactory to the ABL Administrative Agent and the Borrower and otherwise consistent with the ABL Documentation Principles, and none of the ABL Collateral shall be

subject to any other liens (except for the liens securing the Term Loan Facility and other permitted liens consistent with the ABL Documentation Principles).

| | |
|---|---|
| Intercreditor Agreement: | The lien priority, relative rights and other creditors' rights issues between and among the ABL Agent, the ABL Lenders, the lenders under the Term Loan Facility and the agent under the Term Loan Facility will be set forth in a customary intercreditor agreement satisfactory to the aforementioned parties, and the Borrower (the "**ABL/Term Intercreditor**"). |
| ABL Documentation Principles: | The definitive documentation with respect to the ABL Facility (the " **ABL Financing Documentation**") will contain mandatory prepayments, representations, warranties, conditions to borrowing, affirmative, negative and financial covenants and events of default set forth or referred to below in this Term Sheet, in each case applicable to Holdings, the Borrower and their restricted subsidiaries with materiality thresholds, qualifications, exceptions, "baskets" and grace and cure periods to be mutually agreed and which will be consistent with those in the Pre-Petition ABL Credit Agreement with changes and modifications (w) that reflect the terms of this Term Sheet, (x) to reflect changes in law or accounting standards and requirements of local law (including customary EU bail-in provisions) or to cure mistakes or defects, (y) other changes and modifications to be agreed and (z) that are necessitated by the effectiveness of the Chapter 11 Plan (as defined below) (collectively, the "**ABL Documentation Principles**"). |
| Cash Management/Cash Dominion: | The Loan Parties shall obtain account control agreements in favor of the ABL Administrative Agent on the domestic deposit and securities accounts (subject to exceptions set forth in the ABL Facility, which exceptions shall, for the avoidance of doubt, be no less favorable to the Borrower than those set forth in the Pre-Petition ABL Credit Agreement, subject to the ABL Documentation Principles) of the Loan Parties as soon as possible after the Closing Date but not to exceed 30 days after the Closing Date (subject, if requested by the Borrower, to extensions agreed to by the ABL Administrative Agent in its reasonable discretion). If such arrangements are not obtained within such period, the Borrower shall be required to move its bank accounts to the ABL Administrative Agent or another bank reasonably acceptable to the ABL Administrative Agent that will provide such control agreements. During a Cash Dominion Period (as defined below), all amounts in controlled accounts (or in any other material deposit account which are not swept on a regular basis into a concentration account) will be swept into a collection account maintained with the ABL Administrative Agent and used to repay borrowings under the ABL Facility, subject to customary exceptions and thresholds. |
| | "**Cash Dominion Period**" means each period beginning (a) on the date that Excess Availability shall have been less than the greater of (x) 12.5% of the Maximum Credit and (y) $12,500,000, in either case, for five (5) consecutive Business Days, and ending on the date Excess Availability shall have been equal to or greater than the greater of (x) 12.5% of the Maximum Credit and (y) $12,500,000, in each case, for thirty (30) consecutive calendar days, or (b) upon the occurrence of an event of default, the period that such event of default |

A-6

shall be continuing.

"***Excess Availability***" means, at any time, (a) the Maximum Credit at such time *minus* (b) sum of (i) the principal amount of the Revolving Loans outstanding at such time, (ii) the letter of credit obligations outstanding under the ABL Facility at such time and (iii) the principal amount of the swing loans under the ABL Facility outstanding at such time.

| | |
|---|---|
| <u>Mandatory Prepayments</u>: | If at any time, the aggregate amount of outstanding loans, unreimbursed letter of credit drawings and undrawn letters of credit under the ABL Facility exceeds the Maximum Credit, then the Borrower will immediately repay outstanding loans and cash collateralize outstanding letters of credit in an aggregate amount equal to such excess, with no reduction of the ABL Facility commitments. |

In addition, if at any time during a Cash Dominion Period or in the event such disposition would result in the occurrence of a Cash Dominion Period, the Parent, Holdings, Borrower or any of its restricted subsidiaries disposes of any Collateral outside of the ordinary course of business, then the Borrower will immediately repay outstanding loans and cash collateralize outstanding letters of credit in an aggregate amount equal to such excess, with no reduction of the ABL Facility commitments.

In addition, Borrower shall be required to prepay the ABL Facility in full (and terminate any commitments and cash collateralize outstanding letters of credit) upon the occurrence of a Change of Control

| | |
|---|---|
| <u>Voluntary Prepayments and Reductions in Commitments</u>: | Voluntary reductions of the unutilized portion of the ABL Facility commitments and prepayments of borrowings will be permitted at any time (subject to customary notice requirements) in minimum principal amounts of $1,000,000, without premium or penalty, subject to reimbursement of the ABL Lenders' redeployment costs in the case of a prepayment of Eurocurrency Rate borrowings prior to the last day of the relevant interest period. |
| <u>Representations and Warranties</u>: | To be substantially the same as the Pre-Petition ABL Credit Agreement (subject to the ABL Documentation Principles), except applicable to Holdings, Parent, Borrower, and their restricted subsidiaries and also to include additional representations to the extent included in the Term Facility. |
| <u>Conditions Precedent to Closing Date</u>: | The conditions precedent to the Closing Date shall consist of the conditions set forth on <u>Annex I to Exhibit A</u>.  The first date on which all of the conditions set forth on <u>Annex I to Exhibit A</u> have been satisfied shall be referred to herein as the "***Closing Date***." |
| <u>Conditions Precedent to Borrowings after the Closing Date</u>: | Conditions precedent to each drawing under the ABL Facility after the Closing Date shall consist of the following: (a) delivery of a customary notice of borrowing to the ABL Administrative Agent, (b) all representations and warranties are true and correct in all material respects (except to the extent such representation or warranty is qualified by materiality or Material Adverse Effect, it shall be true and correct in all respects), (c) no default or events of default shall have occurred or be continuing and (d) after giving effect to the |

A-7

relevant credit extension, the revolving credit outstandings shall not exceed the Maximum Credit.

<u>Affirmative Covenants</u>:   The ABL Financing Documentation will contain reporting covenants and affirmative covenants of the types contained in the Pre-Petition ABL Credit Agreement (subject to adjustments in accordance with the ABL Documentation Principles), but application to Parent (if it is a Guarantor), Holdings, Borrower and their restricted subsidiaries, including the following:  maintenance of existence; compliance with laws; designation of subsidiaries; payment of taxes; maintenance of insurance; inspection rights; books and records; maintenance of properties; use of proceeds; compliance with environmental laws; covenant to guarantee obligations and give security; cash receipts; further assurances, including as to security (including after-acquired property); periodic updates of field examinations and inventory appraisals; delivery of monthly, quarterly and annual financial statements; monthly (and weekly during a Cash Dominion Period) Borrowing Base Certificates; updated Borrowing Base Certificates in connection with dispositions of ABL Collateral (other than inventory sold in the ordinary course of business) having a fair market value of $5 million or more since the delivery of the most recent Borrowing Base Certificate; delivery of Compliance Certificates; quarterly lender calls; annual budgets and notices of default and other material events. To also include any additional categories of representations and warranties included in the Term Facility.

The ABL Administrative Agent may conduct up to two (2) field examinations and up to two (2) inventory appraisals (each at the expense of the Borrower) during any period of 12 consecutive months; *provided* that (A) at the ABL Lenders' expense, the ABL Administrative Agent may conduct one (1) additional field examination and one (1) additional inventory appraisal, in each case, during any period of 12 consecutive months and (B) at any time during the continuation of an Event Default, field examinations and inventory appraisals may be conducted (at the expense of the Borrower) as frequently as determined by the ABL Administrative Agent in its reasonable discretion.

<u>Negative Covenants</u>:   The ABL Financing Documentation will contain negative covenants of the types contained in the Pre-Petition ABL Credit Agreement, but applicable to Parent (if it is a Guarantor), Holdings, Borrower and their restricted subsidiaries (subject to adjustments in accordance with the ABL Documentation Principles), including the following:  liens; investments; debt; fundamental changes; dispositions; restricted payments; material changes in nature of business; transactions with affiliates; burdensome agreements; accounting changes; prepayments of subordinated, junior or unsecured debt (and amendments to documentation related thereto); Holdings to remain a passive holding company and, if Parent is a Guarantor, Parent to remain a passive holding company. Parent will be treated like a non-Loan Party with respect to covenants that would otherwise permit Parent, as a Loan Party, to receive assets in dispositions from a Loan Party, to receive restricted payments from a Loan Party, to receive investments from a Loan Party, to merge or consolidate with another Loan Party, and or other permissive transactions that would allow leakage from the other Loan Parties to Parent it is were treated as Loan Party. To be updated to also include any additional type of negative covenant included in the Term Facility (subject to adjustment for the ABL

A-8

nature of the ABL Facility).

Limitation on Liens

Exceptions include, but are not limited to (a) liens securing the Term Loan Facility; (b) liens securing the ABL Facility, (c) liens securing permitted indebtedness assumed in connection with (but not in contemplation of) a Permitted Acquisition (to be defined in a manner to be agreed); *provided* that such liens shall be limited to assets acquired in connection with such Permitted Acquisition and shall not extend to any other asset or property, (d) a general lien basket of $25,000,000; *provided* that such liens shall not extend to ABL Collateral or shall be junior to liens securing the ABL Facility (and subject to an intercreditor agreement reasonably satisfactory in form and substance to the ABL Administrative Agent) and (e) a basket of $50,000,000 for liens securing debt (senior to the Term Facility but junior with respect to the ABL Facility on ABL Collateral pursuant to an intercreditor agreement in form and substance satisfactory to the ABL Administrative Agent). Notwithstanding the foregoing, no liens are permitted in respect of the Stripes Facilities Agreement (as defined in the Pre-Petition ABL Credit Agreement).

Limitation on Investments

Exceptions include, but are not limited to (a) Permitted Acquisitions not to exceed $25,000,000, subject to a sublimit for investments in Persons that do not become Loan Parties of the greater of $15,000,000 and 5% of Adjusted EBITDA ("***Non-Loan Party Investment Sublimit***"), (b) intercompany investments, subject to the Non-Loan Party Investment Sublimit, (c) investments funded with qualified equity interests of Holdings (or any direct or indirect parent thereof) and (d) subject to no event of default, a general investment basket of $15,000,000. Notwithstanding the foregoing, no investments are permitted in respect of the Stripes Facilities Agreement.

Limitation on Indebtedness

Exceptions include but are not limited to (a) indebtedness under the Term Loan Facility; *provided* that the aggregate principal amounts at any time outstanding pursuant to this clause (a) shall not exceed $400,000,000 plus fees and interest paid in kind thereon, subject to the ABL/Term Intercreditor, (b) indebtedness under the ABL Facility, (c) indebtedness acquired in connection with Permitted Acquisitions in an aggregate principal amount at any time outstanding not to exceed $25,000,000, subject to a sublimit for indebtedness of non- Loan Parties not to exceed $12,500,000 ("***Non-Loan Party Debt Sublimit***"), (d) unsecured indebtedness consisting of earn-out and other contingent consideration obligations and deferred purchase price obligations up to $5,000,000, (e) a capital lease and purchase money debt basket in an amount not to exceed the greater of $25,000,000 and 10% of Adjusted EBITDA, (f) a general debt basket in an amount not to exceed $30,000,000, subject to the Non-Loan Party Debt Sublimit and (g) a basket of $50,000,000 for securing debt (senior to the Term Facility but junior with respect to the ABL Facility on ABL Collateral pursuant to an intercreditor agreement in form and substance satisfactory to the ABL Administrative Agent). Notwithstanding the foregoing,

no indebtedness is permitted in respect of the Stripes Facilities Agreement.

<u>Limitation on Dispositions</u>

Exceptions include but are not limited to (a) sales of inventory in the ordinary course of business, (b) customary asset swaps, (c) dispositions of non-core assets acquired in connection with a Permitted Acquisition or other permitted investments, provided that on a pro forma basis, Excess Availability on the date thereof and for the 30 day period immediately prior to the consummation of such sale or disposition, is not less than $20,000,000, (d) sales of obsolete, worn out, uneconomical, negligible or surplus assets or assets no longer used or useful in the business, and (e) dispositions (other than of material Intellectual Property) in an amount not to exceed $5,000,000, so long as in the case of a sale of ABL Collateral, Excess Availability is not less than $15,000,000 after giving effect thereto.

In addition, the Borrower and any Subsidiary Guarantor will be permitted to make asset sales or other dispositions of property (other than material intellectual property) on an unlimited basis for fair market value so long as (w) no event of default has occurred and is continuing or would result from such sale or disposition, (x) for dispositions with a purchase price in excess of $10,000,000 or with respect to any disposition of ABL Collateral, at least 75% of the consideration therefore consists of cash or cash equivalents (subject to a basket of $5,000,000 for customary non-cash consideration that may be designated as cash consideration), (y) Excess Availability is not less than $15,000,000 after giving effect thereto, and (z) delivery of an updated delivery of a Borrowing Base Certificate for dispositions of Current Asset Collateral in excess of $5,000,000.

<u>Limitation on Restricted Payments</u>

Exceptions include but are not limited to (a) redemptions of equity or options issued by the Borrower or any direct or indirect parent company thereof to directors, officers, employees, and consultants in an annual amount not to exceed $7,500,000 per annum, with ability to carry-forward unused amounts, (b) dividends, repurchases, redemptions and distributions funded with equity or equity proceeds (other than disqualified equity interests) and (c) so long as (i) no default or event of default has occurred and is continuing or would result from such payment, (ii) Excess Availability is not less than $30,000,000 after giving effect thereto and (iii) the Borrower is in compliance with a minimum Fixed Charge Coverage Ratio of at least 1.00 to 1.00, a general basket of $5,000,000 ("***General RP Basket***").

<u>Limitation on Payments of Unsecured Debt, Junior Lien or Subordinated Debt</u>

Exceptions include but are not limited to prepayments, redemptions and repurchases made, in respect of subordinated debt, junior lien debt, or unsecured debt, so long as (a)(i) no default or event of default has occurred and is continuing or would result from such payment, (ii) Excess Availability is not less than $30,000,000 after giving effect thereto and (iii) the Borrower is in compliance with a minimum Fixed Charge Coverage Ratio of at least 1.00 to

A-10

1.00, from the General RP Basket or (b) the Payment Conditions (to be defined in a manner consistent with the Pre-Petition ABL Credit Agreement; *provided* that (1) references in that definition to Intra-Group Debt Restricted Payment will be replaced with references to payments of subordinated debt, junior lien debt or secured debt and (2) there will be an additional requirement in the definition that Excess Availability is not less than $50,000,00 after giving effect thereto) are satisfied before and after giving effect thereto. Notwithstanding the foregoing, payments in respect of indebtedness that is subordinated in right of payment to the Loans shall not be permitted, unless pursuant to the terms of a subordination agreement

Financial Covenants:    The ABL Financing Documentation will contain the following financial covenants:

**1. Fixed Charge Coverage Ratio**

The Borrower shall comply on a quarterly basis with a minimum Fixed Charge Coverage Ratio of at least 1.00 to 1.00 on a trailing four quarter basis during any Testing Period.

"**Testing Period**" means the period commencing on the last day of the most recently ended fiscal quarter of the Borrower for which financial statements have been delivered prior to the occurrence of a Trigger Event and continuing until Borrower has had Excess Availability, for 30 consecutive calendar days thereafter, of greater than or equal to the greater of (A) $10,000,000 and (B) 12.5% of the Maximum Credit.

"**Trigger Event**" means if Excess Availability shall at any time be less than the greater of (A) $10,000,000 and (B) 12.5% of the Maximum Credit.

**2. Minimum Liquidity**

Maintain Excess Availability of at least $10,000,000 at all times.

**3. Maximum Capital Expenditures**

Capital expenditures, in any fiscal year, in an aggregate amount for the Borrower and its restricted subsidiaries shall not be in excess of $60,000,000, plus, commencing with the fiscal quarter ended April 2, 2019, the then applicable CAPEX Builder Amount.

"**CAPEX Builder**" a quarterly builder amount to be defined in definitive documents, which builds each quarter by the amount by which actual Adjusted EBITDA for such fiscal quarter exceeds 90% of budgeted Adjusted EBITDA for such fiscal quarter, which amounts may be carried forward for one (1) year from the date added to the CAPEX Builder if not utilized.

Events of Default:    To be substantially the same as the Pre-Petition ABL Credit Agreement (subject to the ABL Documentation Principles) but applicable to Parent, Holdings, Borrower and their restricted subsidiaries, with adjustments to be

A-11

agreed to reflect the post-bankruptcy capital structure of the Loan Parties and to also include any additional events of default included in the Term Facility.

Voting:                          To be substantially the same as the Pre-Petition ABL Credit Agreement (subject to the ABL Documentation Principles).

Cost and Yield                   To be substantially the same as the Pre-Petition ABL Credit Agreement
Protection:                      (subject to the ABL Documentation Principles).

Assignments and                  To be substantially the same as the Pre-Petition ABL Credit Agreement
Participations:                  (subject to the ABL Documentation Principles).

Expenses and                     To be substantially the same as the ABL DIP Credit Agreement (subject to the
Indemnification:                 ABL Documentation Principles).

Governing Law and                New York.
Forum:

Counsel to the ABL               Paul Hastings LLP.
Arranger:

A-12

| Interest Rates: | The interest rates under the ABL Facility are as follows: |
|---|---|

A percentage per annum equal to (a) until the end of the first full Fiscal Quarter ending after the Closing Date, (i) for Eurocurrency Rate Loans, 2.50%, (ii) for Base Rate Loans, 1.50%, and (b) thereafter, the following percentages per annum, based upon Average Historical Excess Availability as of the most recent date of determination:

| Average Historical Excess Availability as a % of Maximum Credit | Applicable Rate for Eurocurrency Loans | Applicable Rate for Base Rate Loans |
|---|---|---|
| Greater than or equal to 66.7% | 2.00% | 1.00% |
| Less than 66.7% and greater than or equal to 33.3% | 2.25% | 1.25% |
| Less than 33.3% | 2.50% | 1.50% |

"*Average Historical Excess Availability*" means, at any date of determination, the average daily Excess Availability for the three month period immediately preceding such date of determination (or, in the case of the first Adjustment Date, the period from and including the Closing Date through the date immediately preceding such first date of determination).

| Letter of Credit Fees: | A per annum fee equal to the spread over Eurocurrency Rate under the ABL Facility will accrue on the aggregate face amount of outstanding letters of credit under the ABL Facility, payable in arrears at the end of each quarter and upon the termination of the ABL Facility, in each case for the actual number of days elapsed over a 360-day year.  Such fees shall be distributed to the ABL Lenders pro rata in accordance with the amount of each such ABL Lender's commitment.  In addition, the Borrower shall pay to the Issuing Bank, for its own account, (a) a fronting fee equal to 0.125% of the aggregate face amount of outstanding letters of credit, payable in arrears on the first Business Day following the end of each fiscal quarter and upon the termination of the ABL Facility, calculated based upon the actual number of days elapsed over a 360-day year, and (b) customary issuance and administration fees. |
|---|---|

| Commitment Fees: | A percentage per annum equal to (a) until the end of the first full Fiscal Quarter ending after the Closing Date, 0.375% and (b) thereafter, the following percentages per annum, based upon Average Revolving Loan Utilization determined as of the most recent date of determination: |
|---|---|

| Average Revolving Loan | Applicable Unused |
|---|---|

| Utilization as a % of Maximum Credit | Commitment Fee Rate |
|---|---|
| Greater than or equal to 50.0% | 0.25% |
| Less than 50.0% | 0.375% |

**ABL Facility**

**Summary of Additional Conditions Precedent**

The closing and initial funding of the ABL Facility shall be subject solely to the following conditions precedent, which shall be subject to the satisfaction (or waiver by the ABL Administrative Agent and, in each case, subject to the Certain Funds Provision):

(a)    **Documentation**. Definitive documentation for the ABL Facility consistent with the ABL Term Sheet and the Exit Facilities Commitment Letter (including, without limitation, the Intercreditor Agreements, and the Guarantees and Collateral to the extent required by the Exit Facilities Commitment Letter and ABL Term Sheet) and acceptable to the Arranger shall have been executed by each of the parties thereto and delivered to the ABL Administrative Agent, and the borrowings under the ABL Facility have been funded, or shall be funded, substantially concurrently with the ABL Facility.

(b)    **Term Facility:**

(i)    **Documentation**. Definitive documentation for the Term Facility with terms and conditions consistent with <u>Exhibit B</u> hereto and acceptable to the Arranger shall have been executed by each of the parties thereto and delivered to the ABL Administrative Agent, and each of the conditions precedent set forth therein shall have been satisfied to the satisfaction of the Term Administrative Agent and the borrowings under the Term Facility are to be funded substantially concurrently with the ABL Facility.  All conditions precedent to the closing of the ABL Facility shall have been satisfied and the Term Facility shall have closed with gross proceeds of  $400.0 million, on terms and conditions satisfactory to the Lenders

(ii)    **Proceeds**.   The gross proceeds of the Term Facility shall not be less than $400,000,000.

(c)    **Refinancing of Existing Credit Agreements and Other Indebtedness**. The Arranger shall have received evidence satisfactory to it of the repayment in full of obligations outstanding under the DIP ABL Credit Agreement and the DIP Term Loan Agreement (and of any other indebtedness for borrowed money outstanding (or commitments with respect thereto) except any indebtedness to be mutually agreed in the Financing Documentation), termination of the commitments thereunder and release of all liens granted thereunder (with such repayment in full, termination and release being evidenced by one or more payoff letters reasonably acceptable to the Arranger); provided, that, certain letters of credit issued under the DIP ABL Credit Agreement shall remain outstanding provided, that, the aggregate amount of such letters of credit does not exceed a maximum amount to be determined and such letters of credit are cash collateralized to the satisfaction of the Commitment Parties.

(d)    **Fees and Expenses**. All accrued fees and other payments under the Exit Facilities Fee Letter and all accrued reasonable and documented out-of-pocket costs and expenses under the Exit Facilities Commitment Letter (including legal fees and expenses), in each case required to be paid on the Closing Date pursuant to the Exit Facilities Fee Letter or the Exit Facilities Commitment Letter, as applicable, shall, upon the initial funding under the ABL Facility, have been paid (which amounts may be offset against the proceeds of the ABL Facility).

(e)    **Financial Statements**. The Arranger shall have received copies of (i) the audited annual financial statements required to be delivered by the Borrower under the Existing Credit Agreements (as in

effect on the date of the Exit Facilities Commitment Letter) for each of the three fiscal years immediately preceding the Closing Date ended at least 120 days prior to the Closing Date (ii) the unaudited quarterly financial statements required to be delivered by the Borrower under the Existing Credit Agreements (as in effect on the date of the Exit Facilities Commitment Letter) for the fiscal quarters of fiscal year 2018 ended at least 45 days prior to the Closing Date and (iii) the monthly financial statements required to be delivered by the Borrower under the Existing Credit Agreements (as in effect on the date of the Exit Facilities Commitment Letter) for the calendar months of year 2018 ended at least 30 days prior to the Closing Date.

(f)    **Projections**.  The Arranger shall have received quarterly projections of the operating results of the Company and its subsidiaries for a period ending on the projected maturity date of the ABL Facility ("***Projections***").

(g)    **Patriot Act**.  The Borrower shall have provided to the ABL Administrative Agent at least three business days prior to the Closing Date, such documentation and other information regarding the Company, the Borrower and their respective subsidiaries as required by regulatory authorities under applicable "know-your-customer" rules and regulations, including the Patriot Act and a certification regarding beneficial ownership required by 31 C.F.R. § 1010.230, to the extent reasonably requested by any ABL Lender to the applicable ABL Administrative Agent and conveyed by the applicable ABL Administrative Agent to the Borrower in writing at least 10 days prior to the Closing Date.

(h)    **Miscellaneous Closing Conditions**.  The ABL Administrative Agent shall have received (i) customary legal opinions, customary evidence of authorization, customary officer's certificates, good standing certificates (to the extent applicable) and customary UCC searches with respect to the Company and its subsidiaries, (ii) copies of any insurance certificates then in effect to the extent previously furnished to the collateral agent under and pursuant to the Existing Credit Agreements, (iii) a Borrowing Base Certificate from the Company's chief financial officer or treasurer completed as of the calendar month ended at least 20 days prior to the Closing Date, (iv) a solvency certificate from the Company's chief financial officer or treasurer, in the form attached as <u>Annex III</u> to <u>Exhibit A</u> hereto, certifying that the Company and its restricted subsidiaries, on a consolidated basis are solvent and (v) all governmental consents and approvals necessary in connection with the Transactions shall have been obtained and be effective, other than those which the failure to obtain, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect .  To the extent applicable, the ABL Administrative Agent shall have received a customary notice of borrowing no less than two business days prior to the Closing Date.  Notwithstanding anything in the foregoing, no control agreements shall be required to be delivered until the later of (a) 30 days from the Closing Date and (b) 30 days from the opening of the relevant account.

As used herein, "***Material Adverse Effect***" shall mean any event, facts, or circumstances, which, after the Closing Date, has a material adverse effect on (a) the business, assets, operations, financial condition or income of the Loan Parties taken as a whole, or (b) the validity or enforceability of the Financing Documentation or any of the rights or remedies of the ABL Administrative Agent, the ABL Collateral Agent, or the lenders thereunder (it being understood that Material Adverse Effect shall exclude (i) any matters publicly disclosed prior to the commencement of the Chapter 11 Cases and (ii) matters resulting from the Chapter 11 Cases and the events and conditions related and/or leading up to the Chapter 11 Cases and the effects thereof).

(i)    **Collateral**.  All documents and instruments (if any) required to create and perfect the ABL Collateral Agent's security interest in the Collateral with the priorities contemplated by the ABL Term Sheet shall have been executed (if applicable) and delivered and, if applicable, be in proper form for filing, and the Arranger shall have received:  (i) UCC-1 financing statements naming the applicable Loan

Parties, as debtor, in form appropriate for filing in the relevant jurisdictions covering the collateral described in the relevant Financing Documentation and (ii) to the extent constituting securities, equity interest certificates representing the pledged collateral described in the relevant Financing Documentation, accompanied by undated transfer powers executed in blank.

(j)     **Representations and Warranties and No Default**.  Each representation and warranty in the Financing Documentation shall be true and correct in all material respects (except to the extent any such representation and warranty is qualified by a "Material Adverse Effect," or a "materiality" qualifier, in which case, such representation and warranty shall be true and correct in all respects after giving effect to such qualification) as of the Closing Date.  No default or events of default shall have occurred or be continuing as of the Closing Date.

(k)     **Marketing Period**.  The Arranger shall have been afforded a period of not less than 20 consecutive calendar days after the later of (x) October 19, 2018 and (y) receipt of the financial statements and projections referenced in paragraphs (e) and (f) above and other information customarily provided by borrowers for inclusion in a confidential information memorandum (the "***Required Bank Information***") (the "***Marketing Period***"); *provided* that (a) the Marketing Period will exclude November 12, 2018, November 21, 2018, November 22, 2018 and November 23, 2018 as consecutive calendar days (but such dates shall not restart such Marketing Period) and (b) if the Marketing Period has not ended by December 18, 2018, it shall not begin before January 3, 2018.  If the Borrower reasonably believe that it has delivered the Required Bank Information, the Borrower may deliver to the Arranger a written notice to that effect (stating when it believes such delivery was completed), in which case the marketing period shall be deemed to have commenced on the date specified in such notice, unless the Arranger in good faith reasonably believes the Borrower has not completed delivery of the Required Bank Information and, within three business days after the delivery of such notice by the Borrower, deliver a written notice to the Borrower to that effect (stating with specificity which Required Bank Information the Arranger reasonably believes the Borrower has not delivered to the Arranger).

(l)     **Loans under the ABL Facility**.  Excess Availability under the ABL Facility shall not be less than $75,000,000 as of the Closing Date after giving effect to all extensions of credit on the Closing Date.

(m)     **Bankruptcy Court Order**.  Entry by the Bankruptcy Court of an order (which order may be the confirmation order) approving the ABL Facility, the Term Facility and all related documentation (including, for the absence of doubt, this Exit Facilities Commitment Letter and the Exit Facilities Fee Letter), in form and substance satisfactory to the Arranger, which order shall (i) specifically provide that the right to receive all amounts due and owing, including indemnification obligations, the fees and other payments as set forth herein and in the Exit Facilities Fee Letter, and reimbursement of all reasonable costs and expenses incurred in connection with the transactions contemplated herein and as set forth herein and in the Exit Facilities Fee Letter, shall be entitled to priority as administrative expense claims under Sections 503(b) and 507(a)(1) of the Bankruptcy Code, regardless of whether the Closing Date occurs and (ii) be in full force and effect, unstayed, final and non-appealable, and shall not have been amended, supplemented or otherwise modified without the written consent of the Arranger.

(n)     **Disclosure Statement**.  The Disclosure Statement shall be satisfactory to the Arranger and shall have been approved by the US Bankruptcy Court.

As used herein, "***Disclosure Statement***" shall mean that certain Disclosure Statement of the debtors under the Chapter 11 Plan filed with the Bankruptcy Court on October 4, 2018, as may be amended, supplemented or otherwise modified from time to time.

(o)    **No Material Adverse Effect**.  Except as disclosed in the Disclosure Statement, other than the filing and pendency of the Chapter 11 Cases and the consequences thereof, since the Petition Date, there has not been any event, occurrence, development or state of circumstances or facts that has had or would reasonably be expected to have, individually or in the aggregate a Material Adverse Effect.

(p)    **Chapter 11 Plan**.  The Chapter 11 Plan and all other related documentation (a) shall be satisfactory to the Arranger with respect to any portions of such Chapter 11 Plan that directly relate to the ABL Facility, and reasonably satisfactory to the Arranger in all other respects (b) shall have been confirmed by an order of the Bankruptcy Court on or before the date that is 75 days after the Petition Date, which order shall be satisfactory to the Arranger with respect to any portions of such order that directly relate to the ABL Facility, and reasonably satisfactory to the Arranger in all other respects, which order shall be in full force and effect, unstayed, final and non-appealable, and shall not have been modified or amended without the written consent of the Arranger reversed or vacated, (c) all conditions precedent to the effectiveness of the Chapter 11 Plan as set forth therein shall have been satisfied or waived (the waiver thereof having been approved by the Arranger), and the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of the Chapter 11 Plan in accordance with its terms shall have occurred contemporaneously with the closing of the ABL Facility, and (d) the Chapter 11 Plan shall have become effective in accordance with its terms, and all conditions precedent to the effectiveness of the Chapter 11 Plan shall have been satisfied or waived with the prior written consent of the ABL Administrative Agent and Lenders, and (iv) the transactions contemplated by the Chapter 11 Plan to occur on the effective date of the Chapter 11 Plan shall have been substantially consummated (as defined in Section 1101 of the Bankruptcy Code) on the Closing Date and substantially contemporaneously with the initial funding hereunder in accordance with the terms of the Chapter 11 Plan and in compliance with applicable law and Bankruptcy Court and regulatory approvals.

(q)    **Release of Intercompany Obligations**. ABL Administrative Agent shall have received fully executed release letters or other documentation reasonably satisfactory to ABL Administrative Agent confirming that, or otherwise be reasonably satisfied that, all obligations owing by any Loan Party to the lenders of the Intra-Group Loan Agreement dated as of September 16, 2016 (as amended or supplemented on or prior to the Closing Date, the "Stripes Intercompany Facility") between SUSHI as borrower and Steinhoff Finance Holding GMBH and Steinhoff Mobel Holding Alpha GMBH as lenders and the other parties from time to time party thereto, to the extent not contributed into SUSHI under the Approved Plan, will be released and all liens upon any of the assets of the Loan Parties in favor of the lenders under the Stripes Intercompany Facility shall be released.

(r)    **Corporate Documents**.  The corporate structure, capital structure, other debt instruments and governing documents of the Borrower and its subsidiaries, and the tax effects resulting from the Chapter 11 Plan and the Transactions shall be reasonably satisfactory to the ABL Administrative Agent.

(s)    **Overadvance**.  No overadvance shall result from any borrowings.

(t)    **Lease Rejections**.  The Loan Parties shall have rejected the leases with respect to not less than 500 stores on or before the date that is 60 days after the Petition Date in accordance with a Bankruptcy Court order in form and substance satisfactory to the ABL Administrative Agent

(u)    **Rent Reduction**.  The Loan Parties shall have secured rent reductions from landlords of the non-closed stores in an aggregate amount of at least $35,000,000.

(v)    **Pre-Petition Second Lien Term Loan Credit Agreement**.  The Pre-Petition Second Lien Term Loan Credit Agreement shall be repaid in full with the proceeds of the Term Facility.

(w)    **Budget**.  The Arranger and Lenders shall have received satisfactory evidence that the Borrower is in compliance with the approved budget most recently delivered to the Lenders under the ABL DIP Facility (as defined in the Term Loan DIP Credit Agreement) and the DIP Term Loans (as defined in the DIP ABL Credit Agreement) immediately prior to the Closing Date during the Chapter 11 Cases with 20% headroom to the items set forth therein.

(x)    **Compliance with DIP Facility and PSA**.  No event of default or other defaults shall have occurred and be continuing under the Existing Credit Agreements or the PSA (as defined in the Term Facility).

(y)    **SUSHI Preferred Stock**. The existing Series A Preferred Stock of SUSHI shall be extinguished in form and substance acceptable to the Lenders in their sole and absolute discretion.

Form of Solvency Certificate

[●][●], 20[●]

This Solvency Certificate is being executed and delivered pursuant to Section [●] of that certain [●][1] (the "Credit Agreement"; the terms defined therein being used herein as therein defined).

I, [●], the **[Chief Financial Officer/equivalent officer]** of the Borrower, in such capacity and not in an individual capacity, hereby certify as follows:

1.     I am generally familiar with the businesses and assets of the Borrower and its Restricted Subsidiaries, taken as a whole, and am duly authorized to execute this Solvency Certificate on behalf of the Borrower pursuant to the Credit Agreement.  I have reviewed the [Loan Documents] and such other documentation and information and have made such investigation and inquiries as I have deemed necessary and prudent therefor.  I have also reviewed the consolidated financial statements of the Borrower and its Restricted Subsidiaries, including projected financial statements and forecasts relating to income statements and cash flow statements of the Borrower and its Restricted Subsidiaries; and

2.     As of the date hereof and after giving effect to the Transactions and the incurrence of the indebtedness and obligations being incurred in connection with the Credit Agreement and the Transactions, that, (i) the fair value of the assets of the Borrower and its Restricted Subsidiaries, on a consolidated basis, exceeds, on a consolidated basis, their debts and liabilities, subordinated, contingent or otherwise, (ii) the present fair value of the property of the Borrower and its Restricted Subsidiaries, on a consolidated basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured, (iii) the Borrower and its Restricted Subsidiaries, on a consolidated basis, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured and (iv) the Borrower and its Restricted Subsidiaries, on a consolidated basis, are not engaged in, and are not about to engage in, business for which they have unreasonably small capital.  For the purposes hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

[Remainder of page intentionally left blank]

---

[1] Describe Credit Agreement.

**Term Loan Facility**
**Summary of Terms and Conditions**

[To be attached.]

**SUMMARY OF TERMS AND CONDITIONS**

**MATTRESS FIRM, INC.**
**$400.0 MILLION SENIOR SECURED TERM LOAN FACILITY**

*This Summary of Terms and Conditions (this "Term Sheet") is intended as an outline of certain of the material terms of the Term Facility (as defined below). It does not include descriptions of all of the terms, conditions and other provisions that are to be contained in the documentation relating to the Term Facility and it is not intended to limit the scope of discussion and negotiation of any matters that do not conflict with the specific matters set forth herein. This Term Sheet is for discussion purposes only and is not a commitment.*

**Transactions:**  Mattress Holdco Inc. and certain of its subsidiaries (the "Debtors") intend to file voluntary petitions under chapter 11 of title 11 ("Chapter 11") of the United States Code (11 U.S.C. § 101, et seq.) (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on [October __], 2018 (the "Petition Date"), and expect their cases to be jointly administered under the caption [*In re Mattress Firm, Inc., et al.*], Case No. 18-[_____] (the "Chapter 11 Cases"). The commencement of the Chapter 11 Cases is for the purpose of seeking confirmation and consummation of a joint prepackaged Chapter 11 plan of reorganization [as contemplated in [Plan Support Agreement, dated as of [____], 2018 (the "PSA"), among [_____] (together with all exhibits, schedules, annexes, supplements or other attachments thereto, the "Plan").

Pursuant to the Plan, the cash payments required to fund the Debtors' emergence from Chapter 11 would be funded by, *inter alia*, the proceeds raised from the term loan facility described herein in the aggregate amount not to exceed $400.0 million plus capitalized fees and interest described herein (collectively, the "Transactions").

**Borrower:**  Mattress Firm, Inc., a Delaware corporation (the "Borrower").

**Guarantors:**  All obligations under the Term Facility (as defined below) and, at the Borrower's option, under certain hedging arrangements and cash management obligations shall be fully and unconditionally guaranteed by the issuer of Common Equity and PIK Debt (each as described herein) which shall either be Mattress Holdco Inc., a Delaware corporation, or at the election of the Lenders in their sole and absolute discretion prior to the Closing Date, Stripes US Holding Inc., a Delaware corporation (the entity subject to such election, "Holdings") that is the indirect parent of the Borrower, and each of the Holdings' existing and future direct or indirect wholly-owned U.S. subsidiaries (the "Subsidiary Guarantors", together with Holdings, the "Guarantors"; and the Borrower and the Guarantors collectively, the "Loan Parties") on a senior secured basis, subject to customary limited exceptions consistent with facilities of this type to be agreed.  Notwithstanding the foregoing, subsidiaries may be excluded from the guarantee requirements in circumstances where the Borrower and the Lenders reasonably agree that the cost or other consequence of providing such a guarantee is excessive in relation to the value afforded thereby.  The Guarantors under the ABL Facility and the Term Loan Facility

1

shall be the same.

| | |
|---|---|
| **Administrative and Collateral Agent:** | Barclays Bank PLC (in such capacities, the "<u>Agent</u>"). |

| | |
|---|---|
| **Sole Lead Arranger and Bookrunner:** | Barclays Bank PLC  (the "<u>Arranger</u>"). |

| | |
|---|---|
| **Lenders:** | A syndicate of financial institutions (collectively, the "<u>Lenders</u>"). |

| | |
|---|---|
| **Closing Date:** | The date on which all conditions precedent set forth below are satisfied or waived (the "<u>Closing Date</u>"). |

| | |
|---|---|
| **Term Facility:** | A term loan facility in an aggregate principal amount of $400.0 million (the "<u>Term Facility</u>" and the loans under the Term Facility, the "<u>Term Loans</u>"). The Term Facility shall be comprised of U.S. dollar denominated loans. |

| | |
|---|---|
| **Maturity:** | The Term Facility shall mature on and be payable on the 4th year anniversary of the Closing Date (the "<u>Term Loan Maturity Date</u>") with no amortization. |

| | |
|---|---|
| **Availability:** | The Term Loans shall be drawn in full on the Closing Date. Once repaid, the Term Loans may not be reborrowed. |

| | |
|---|---|
| **Use of Proceeds:** | The proceeds of the Term Loans shall be used to (i) repay in full the existing debtor-in-possession term and ABL facilities other than letters of credit rolled over into the ABL Facility (collectively, the "<u>DIP Facility</u>") of the Borrower; (ii) repay in full the $80.0 million facility of the Borrower from Steinhoff International Holdings N.V. plus accrued interest with respect thereto (the "<u>NV Facility</u>", together with the DIP Facility, the "<u>Existing Facilities</u>"); (iii) repay certain prepetition debt and make a distribution to certain claimholders in accordance with the terms of the Plan; (iv) to pay fees and expenses incurred in connection with the Transactions; (v) fund in part other cash payments required to fund the Debtors' emergence from Chapter 11 pursuant to the Plan in an aggregate amount to be agreed; and (vi) finance the working capital, other general corporate purposes, and any other purpose not prohibited by the Loan Agreement. |

| | |
|---|---|
| **Interest Rates and Fees:** | As set forth in the Addendum to this Term Sheet. |

| | |
|---|---|
| **Voluntary Prepayments and Commitment Reductions:** | Term Loans may be prepaid and commitments may be reduced, in whole or in part without premium or penalty (subject to the Prepayment Fee (to the extent applicable)), in minimum amounts to be agreed, at the option of the Borrower upon customary notice requirements, subject to reimbursement of the actually incurred Lenders' breakage costs in the case of a prepayment of LIBOR Loans prior to the last day of the relevant interest period. |

| | |
|---|---|
| **Prepayment Fee:** | In the event all or any portion of the Term Loans are repaid (or prepaid) prior to maturity for any reason other than mandatory prepayment of the type described in clause (a) or (c) under the heading "Mandatory Prepayments" below (including, without limitation, upon acceleration for any reason including automatic acceleration in the event of a bankruptcy default or upon |

2

any redemptions or buybacks), such repayments shall be made at (i) the amount due, plus a customary T+50 make-whole, if such repayment occurs prior to the second anniversary of the Closing Date, (ii) 110% of the amount repaid if such repayment occurs on or after the second anniversary of the Closing Date but prior to the third anniversary of the Closing Date, and (iii) 105% of the amount repaid if such repayment occurs on or after the third anniversary of the Closing Date but prior to the date that is 3 months prior to the Term Loan Maturity Date and (iv) 100% of the amount repaid if such repayment occurs on or after the date that is 3 months prior to the Term Loan Maturity Date. For the avoidance of doubt, the Prepayment Fee shall be due and payable upon acceleration, including upon automatic acceleration upon a bankruptcy event of default.

|  |  |
|---|---|
| **Mandatory Prepayments:** | The Borrower will be required to prepay the Term Loans upon the occurrence of a Change of Control (to be defined in the Loan Documents but in any event shall include any bankruptcy filing or restructuring event and to provide for a carve-out for transfers of shares in SUSHI (defined below) to Steinhoff Europe AG ("<u>SEAG</u>")) at 100% of the principal amount thereof, together with accrued and unpaid interest and the applicable Prepayment Fee. |

In addition, the following amounts shall be applied to prepay the Term Loans:

(a) 100% of the net cash proceeds of certain non-ordinary course asset sales or other dispositions of Term Priority Collateral by Holdings or any of its subsidiaries (including insurance and condemnation proceeds) after the Closing Date (but with exceptions for sales of inventory and other ordinary course dispositions, dispositions of obsolete or worn-out property, property no longer useful in the business, and other to be agreed upon exceptions) in excess of an amount to be agreed, subject to the right of the Borrower to reinvest up to an amount to be agreed of such proceeds if reinvested within 90 days;

(b) 100% of the net cash proceeds received by Holdings or any of its restricted subsidiaries from the issuance of debt after the Closing Date (other than permitted debt, but including the proceeds of any refinancing facilities); and

(c) in each fiscal year commencing with the fiscal year of the Borrower ended October 1, 2019, 50% of excess cash flow for the prior fiscal year (or such period as applicable) (to be defined in a manner to be agreed, but in any event (i) the principal amount of the Term Loans voluntarily prepaid (including pursuant to discounted prepayments with credit given to the cash used to make such purchase) during such fiscal year or (at the option of the Borrower and without duplication) after year-end and prior to the time such excess cash flow prepayment is due, will reduce the amount of excess cash flow prepayments required for such fiscal year on a dollar-for-dollar basis and (ii) excess cash flow shall be reduced for, among other things, cash used for capital expenditures, certain permitted investments, permitted acquisitions and certain restricted payments to be agreed, in each case, other than to the extent financed with long term indebtedness (other than revolving indebtedness), subject to reductions to 25% if the Total Net Leverage Ratio as of the last day of such

US-DOCS\103394457.23

fiscal year was less than levels to be agreed.

All mandatory prepayments shall be applied to the principal amount of the Term Loans.

**Collateral**:    Subject to the limitations set forth in this section, the Term Facility and, at the Borrower's option, certain hedging arrangements entered into with, or cash management obligations owing to, any Lender or any affiliate of a Lender (provided Borrower shall elect whether to have hedging arrangements and cash management arrangements secured by either the ABL Facility or the Term Loan Facility) will be secured by (i) a valid and perfected first priority lien (subject to permitted liens) on substantially all assets of the Borrower and each Guarantor (other than ABL Priority Collateral, as defined below),  including: (a) a perfected first priority (subject to permitted liens) pledge of 100% of the equity interests of the Borrower and each direct or indirect wholly-owned subsidiary of the Borrower and of each Subsidiary Guarantor (which pledge is limited to 65% of the issued and outstanding voting equity interests and 100% of the issued and outstanding non-voting equity interests, if any, of each first-tier subsidiary that is a "controlled foreign corporation" for US federal income tax purposes or a foreign-subsidiary holding company); (b) in the event that the Common Equity and PIK Debt are issued by Stripes US Holding, Inc. ("SUSHI"), a perfected first priority (subject to permitted liens) non-recourse pledge of 100% of the equity interests of SUSHI, Holdings and each wholly-owned restricted subsidiary of SUSHI (other than the Borrower and each Subsidiary Guarantor); and (c) perfected first priority (subject to permitted liens) security interests in, and mortgages on, substantially all tangible and intangible personal and real property of the Borrower and each Guarantor (including but not limited to equipment, general intangibles (including contract rights), investment property, U.S. intellectual property, owned and leased real property, instruments, chattel paper and documents, letter of credit rights, commercial tort claims, all other property not constituting ABL Priority Collateral and proceeds of the foregoing collectively, the "Term Priority Collateral"); and (ii) a valid and perfected second priority security interest in the ABL Priority Collateral (other than, in the case of (i) and (ii) above, Excluded Assets (as defined below), whether owned on the Closing Date or thereafter acquired (collectively, the "Collateral").

"ABL Priority Collateral" means all accounts, credit card receivables, payment intangibles, accounts receivable, chattel paper, and other rights to payment (except to the extent constituting identifiable proceeds of Term Loan Collateral (as defined below), inventory, cash, deposit accounts, securities accounts and commodities accounts (other than any deposit account, securities account or commodity account (or amount on deposit therein) established solely to hold (and solely holding) identifiable proceeds of Term Loan Collateral) (other than identifiable cash proceeds of Term Priority Collateral and the accounts in which net cash proceeds from the sale of Term Priority Collateral are deposited pending reinvestment), intercompany indebtedness, instruments, general intangibles, contracts, documents, supporting obligations, letter of credit rights, letters of credit, commercial tort claims related to the foregoing assets, and certain other assets and books and records related to the foregoing and, in each case, proceeds (including insurance policies and proceeds)

thereof. For the avoidance of doubt, ABL Priority Collateral shall not include intellectual property and certain other related assets evidencing, governing, securing or otherwise relating thereto.

Subject to the limitations set forth in this section, all pledges, security interests and mortgages covering the Collateral shall be created on terms and pursuant to documentation consistent with facilities of this type.

Notwithstanding the foregoing, the following assets will be excluded from Collateral (collectively, the "Excluded Assets"): (i) letter of credit rights with a value of less than an amount to be agreed (except to the extent perfected by the filing of UCC financing statements) and commercial tort claims with a value of less than an amount to be agreed, (ii) any assets to the extent the grant of a security interest therein is prohibited or restricted by applicable law, rule or regulation (including any requirement to obtain the consent of any governmental authority) or contract (to the extent such contract existed on the Closing Date, or if after the Closing Date, at the time the relevant subsidiary is acquired but not entered in contemplation of such acquisition), in each case except to the extent such prohibition or restriction is ineffective or unenforceable under the applicable Uniform Commercial Code (other than proceeds thereof) or under the Bankruptcy Code or the Confirmation Order (as defined below) and only so long as such prohibition or restriction exists, (iii) all personal property leases, contracts, agreements, licenses, franchises and permits to the extent the grant of a security interest therein is prohibited or restricted by law or by the terms thereof, in each case (a) except to the extent such prohibition or restriction is ineffective or unenforceable under the applicable Uniform Commercial Code (other than proceeds thereof) or under the Bankruptcy Code or the Confirmation Order, (b) only to the extent such prohibition or restriction is not created in anticipation of such grant and (c) only so long as such prohibition or restriction exists, (iv) equipment and assets that are subject to a lien securing a purchase money or capital lease obligation permitted to be incurred under the Loan Documents, if the underlying contract or other agreement prohibits or restricts the creation of any other lien on such equipment, except to the extent such prohibition or restriction is ineffective under the applicable Uniform Commercial Code (other than proceeds thereof), (v) equity interests in any non-wholly owned subsidiary to the extent that the organizational documents or other agreements with other equity holders do not permit or restrict the pledge of such equity interests, (vi) any "intent to use" trademark applications, (vii) payroll, petty cash, withholding and trust, and other deposit and securities accounts with a de minimis average balance (including zero balance accounts) and other accounts to be agreed upon, (viii) margin stock and (ix) other exceptions consistent with facilities of this type to be agreed. In no event will the collateral securing the Term Facility be less broad than the collateral securing the ABL Facility (as defined below).

**Intercreditor Matters:**

The relative rights and priorities in the Collateral for the secured parties in respect of that certain $125.0 million asset based revolving credit facility as set out in the Plan (the "ABL Facility") and the secured parties in respect of the Term Facility will be set forth in a customary intercreditor agreement as between the collateral agent for the Term Facility, and the collateral agent for the ABL Facility (the "ABL Intercreditor Agreement") which shall include,

without limitation, buyout rights by the Lenders of the ABL Facility at par at any time and a waiting period to be agreed (subject to a caveat for exigent circumstances) for ABL to exercise remedies to enable Lenders to exercise buyout right.

| | |
|---|---|
| **Conditions Precedent to Initial Borrowings:** | The effectiveness of the Term Facility and the funding of the initial Term Loans on the Closing Date shall be subject to the conditions set forth on <u>Annex I</u> hereto. |
| **Representations and Warranties:** | Applicable to Holdings, the Borrower and their respective subsidiaries (subject to thresholds and/or exceptions to be agreed and to be no less restrictive than the representations and warranties in the Existing Facilities and with appropriate changes for holding companies) and including, without, limitation: organization and existence; corporate separateness; power and authority; authorization; execution, delivery and enforceability of the Loan Documents; no conflicts with law, organizational documents or material contractual obligations; material governmental authorizations; accuracy and completeness of financial and other information (including pro forma financial information); no material adverse change; compliance with applicable laws and regulations, including margin regulations, anti-bribery laws, anti-terrorism laws (including PATRIOT Act), export controls and economic sanctions laws, anti-money laundering laws, anti-fraud laws, laws requiring the maintenance of accurate books and records and effective systems of internal controls; accuracy and completeness of disclosure at closing; material consents and approvals; ownership of property; intellectual property; capitalization; insurance; accuracy of the Beneficial Ownership Certification; environmental laws; ERISA and labor matters; no material litigation; inapplicability of the Investment Company Act of 1940; solvency on a consolidated basis at closing after giving effect to the Transactions; use of proceeds; payment of taxes; no default or event of default; validity, priority and perfection of liens and security interests in the Collateral; and Confirmation Order upon exit from Chapter 11 Cases and Plan. |
| **Affirmative Covenants:** | Applicable to Holdings, the Borrower and their respective subsidiaries (subject to exceptions to be agreed and to be no less restrictive than the corresponding terms and conditions of the Existing Facilities and with appropriate changes for holding companies) and including, without limitation: delivery of annual audited financial statements of Holdings within 120 days after the end of the fiscal year ended October 2, 2018 and 90 days after the fiscal year end for each fiscal year thereafter (accompanied by an audit opinion from nationally recognized auditors that is not subject to qualification as to "going concern" or the scope of such audit), quarterly unaudited financial statements within 45 days after the end of the first three fiscal quarters in any fiscal year and annual financial projections with delivery of the prior year's audit; customary narrative report with delivery of quarterly financial statements; forecasts of the Borrower's six-month liquidity (calculated based on normalized vendor payment terms) certified by management; quarterly lender calls; monthly trading updates, delivery of certificates, notices and other material information (including notices of default, litigation, ERISA events and material adverse change); compliance with applicable laws and regulations including ERISA and environmental laws, anti-bribery laws, anti-terrorism laws (including |

PATRIOT Act), export controls and economic sanctions laws, anti-money laundering laws, anti-fraud laws, laws requiring the maintenance of accurate books and records and effective systems of internal controls, and Beneficial Ownership Regulation; maintenance of effective policies and procedures to ensure compliance with applicable laws and regulations; commitment to disclose to Lenders evidence or allegations of non-compliance with applicable laws and regulations, or investigations regarding the foregoing; payment of taxes; use of proceeds; preservation of existence, permits, licenses and approvals; audit, visitation and inspection rights; access by Lenders to information and personnel sufficient to monitor effectiveness of compliance program; removal (at the option of the Lenders) of any Board members or senior managers of Borrower or its subsidiaries who are found guilty or liable for fraud or corruption-related offenses; keeping of books and records; maintenance of properties and insurance coverage; covenants to guarantee obligations and give security; and further assurances.

**Negative Covenants:**    Applicable to Holdings, the Borrower and their respective subsidiaries (subject to exceptions and baskets to be agreed and to be no less restrictive than the corresponding terms and conditions of the Existing Facilities and with appropriate changes for holding companies), including, without limitation:

(a)    Limitations on debt, guarantees and hedging arrangements, which shall provide for a basket of $50.0 million for secured debt (which will be senior to the Term Facility but junior with respect to the ABL Facility on ABL Priority Collateral) with a right of first refusal to the Lenders.

(b)    Limitations on liens and further negative pledges.

(c)    Limitations on voluntary prepayments and redemptions or repurchases of junior debt (other than permitted refinancings).

(d)    Limitations on mergers, consolidations and other fundamental changes.

(e)    Limitations on sales, transfers and other dispositions of assets.

(f)    Limitations on loans, investments and capital expenditures.

(g)    Limitations on dividends and other distributions, stock repurchases and redemptions and other restricted payments other than payments made pursuant to the Management Incentive Plan.

(h)    Limitations on transactions with affiliates.

(i)    Limitations on change in (i) nature of business and (ii) fiscal year.

(j)    No modification or waiver of charter documents or any material subordinated debt documents in a manner materially adverse to the Lenders.

(k)    Limitations on sales and leasebacks.

**Financial Covenant:** (a) Minimum liquidity (i.e. amounts available to be drawn under the ABL Facility plus cash to be agreed) of US$25.0 million at all times, to be tested quarterly, on a consolidated basis, beginning on the last day of the first full fiscal quarter following the Closing Date, with a 6 month look forward based on a liquidity forecast certified by management and calculated based on normalized vendor payment terms.

(b) A maximum Total Net Leverage Ratio set at levels in a grid to be agreed[1] , to be tested quarterly, beginning on the last day of the fiscal quarter ending on December 31, 2019.

As used herein, the "Total Net Leverage Ratio" will be measured for Borrower and its subsidiaries and be defined as the ratio of (i) consolidated debt (comprised of debt for borrowed money including the ABL Facility, purchase money indebtedness and capital leases and unreimbursed obligations with respect to standby letters of credit of the Borrower and its restricted subsidiaries ("Consolidated Total Debt")), net of (x) unrestricted cash and cash equivalents of Borrower and its subsidiaries whether or not held in a pledged account and (y) cash and cash equivalents of Borrower and its subsidiaries restricted in favor of the Term Facility (which may also include cash and cash equivalents securing other indebtedness secured by a lien on the Collateral along with the Term Facility), in each case, such unrestricted cash and restricted cash and cash equivalents to be determined in accordance with generally accepted accounting principles (the amounts in clause (x) and (y), collectively, "Unrestricted Cash") to (ii) trailing 4-quarter consolidated "EBITDA". "EBITDA" shall be defined in the Loan Documents in a manner to be agreed, but to include, in any event, as net income *plus* to the extent deducted in determining net income, the sum of (i) interest expense, (ii) income tax expense, and (iii) all amounts attributable to depreciation and amortization expense, subject to such modifications as Lenders may approve.

(c) A minimum of EBITDA at levels to be agreed[2], to be tested quarterly, on a consolidated basis beginning on the last day of the first full fiscal quarter following the Closing Date. In the event EBITDA falls below such threshold, the Lenders shall have the right to appoint (but, for the avoidance of doubt, not replace) an additional executive officer of the Borrower but failure to satisfy such EBITDA levels shall not result in an Event of Default.

**Events of Default:** Applicable to Holdings and its subsidiaries (subject to grace periods, thresholds and exceptions to be agreed and to be no less restrictive than the corresponding terms and conditions of the Existing Facilities), including, without limitation: failure to pay principal when due; failure to pay interest or other amounts within five days when due; inaccuracy of representations or warranties in any material respect when made; breach of covenants (subject, in the case of affirmative covenants (other than notices of default, use of proceeds, and the covenant to maintain existence ) to a grace period of 30 days); cross-default and cross-acceleration to material debt of the loan parties

---

[1] FTI/Alix Partners to provide leverage grid. Total Net Leverage Ratios will have 35% headroom.
[2] EBITDA levels will have 20% headroom.

US-DOCS\103394457.23

(provided, that any cross default to the ABL Facility shall be limited to payment defaults, acceleration, enforcement of remedies and other uncured or unwaived defaults that continue for 30 days); bankruptcy and insolvency events of any direct or indirect parent of the Borrower (other than the company voluntary arrangement or scheme of arrangement contemplated by the Global Lock Up Agreement, Permitted Closures (as defined in the Global Lock Up Agreement), and other insolvency events that do not constitute Insolvency Events (as defined in the Global Lock Up Agreement), and provided that such events of default shall cease to apply upon consummation of the restructuring contemplated by the Global Lock Up Agreement), the Borrower or any significant subsidiary thereof; material monetary judgment defaults; actual or asserted invalidity or impairment of any material guarantees or security documents (including the ABL Intercreditor Agreement) or collateral; a change of control consistent with facilities of this type; customary ERISA defaults (subject to a material adverse effect qualifier).  Agents and Lenders shall be entitled to cumulative remedies to the maximum extent permitted by law.

**Amendments:**  Amendments and waivers of the provisions of the Loan Documents shall require the approval of Lenders holding more than 50% of the aggregate principal amount of the Term Loans and unused commitments under the Term Facility (the "Required Lenders"); *provided* that (a) the consent of each directly and adversely affected Lender shall be required for (i) increases in the commitment of such Lender; (ii) reductions of principal, interest or fees of such Lender; (iii) extensions of the final maturity date of the Term Loans or commitments of such Lender; (iv) releases of all or substantially all of the Collateral or all or substantially all of the value of the guarantees; (v) modifications to any of the voting requirements (or any applicable related definitions); and (vi) modifications to pro rata treatment; (b) consent of the Lenders holding not less than 50% of any class of Term Loans under the Term Facility shall be required for, among other things, any amendment or waiver that by its terms adversely affects the rights of such class in respect of payments or Collateral in a manner different than such amendment or waiver affects another class and (c) the Loan Documents will include customary protections for the Agent. The Loan Documents shall contain customary provisions for replacing of (i) non-consenting Lenders in connection with amendments and waivers requiring the consent of all (or all affected) Lenders, so long as Lenders holding more than 50% of the aggregate amount of the Term Loans and unused commitments have consented thereto and (ii) Lenders in connection with increased costs or taxes or the inability to provide LIBOR Loans.

Notwithstanding the foregoing, modifications to customary provisions in connection with "amend and extend" shall be permitted on customary terms.

**Assignments and Participations:**  Each Lender may assign all or part (subject to minimum amounts to be agreed) of its Term Loans and commitments with the consent of the Agent (each such consent not to be unreasonably withheld or delayed).  A Lender's Term Loans, commitments and equity holdings shall not be stapled or otherwise tied in connection with assignments of any such interests.

Each Lender may sell participations in all or part of its Term Loans and commitments under the Term Facility; *provided* that no participant shall have direct or indirect voting rights except for certain unanimous/all affected Lender voting issues. Participants shall have the same benefits as the Lenders (but no greater than its assigning Lender) and mitigation obligations with respect to yield protection and increased cost provisions.

Assignments to Holdings, the Borrower and certain of Holdings' affiliates, together with related rights of such assignees, shall be subject to limitations to be agreed.

**Expenses and Indemnification:**   The Borrower shall pay (a) all reasonable and documented out-of-pocket expenses of the Agent, the Arranger and the Lenders incurred in connection with the syndication of the Term Facility and the preparation, execution, delivery, administration, amendment or waiver of the Loan Documents (including the reasonable out-of-pocket fees, disbursements and other charges of the counsel and financial advisor to the Agent and the Lenders identified below and, if necessary, of one local counsel in each relevant jurisdiction); and (b) all reasonable out-of-pocket expenses of the Agent, the Arranger and the Lenders (including the fees, disbursements and other charges of one counsel and financial advisor to each of (i) the Agent and (ii) the Lenders taken as a whole and, if necessary, of one local counsel in each relevant jurisdiction, and, solely in the case of a conflict of interest, one additional counsel to the Lenders taken as a whole) in connection with the enforcement of the Loan Documents, including in connection with workouts or restructurings, in each case including the fees and expenses of Latham & Watkins, Paul Hastings and PJT Partners.

The Borrower will indemnify and hold harmless the Agent, the Arranger and the Lenders (and their affiliates and their respective officers, directors, employees, advisors, agents and representatives including Latham & Watkins, Paul Hastings and PJT Partners (collectively with the Agent, Arranger and Lender, the "<u>indemnified persons</u>")) against any loss, liability, cost or expense incurred in connection with or arising out of the Transactions, Loan Documents and financing contemplated hereby, any action contemplated by the Transactions or Loan Documents contemplated hereby or the use of proceeds of the Term Facility, except (a) to the extent resulting from such indemnified person's or any of its affiliates and their respective officers, directors, employees, advisors and agents' gross negligence, bad faith or willful misconduct, in each case, as determined by a final, non-appealable judgment of a court of competent jurisdiction and (b) in the case of a dispute solely among the indemnified persons (other than any claims against the Agent or Arranger each in its capacity as such under the Term Facility and other than any claims arising out of any act or omission of the Borrower or any of its affiliates), *provided* that no indemnified person, nor the Borrower and its subsidiaries shall be liable for any indirect, special, punitive or consequential damages (other than with respect to the Borrower and its subsidiaries in respect of any such damages incurred or paid by an indemnified person to a third party).

**Taxes, Yield Protection and**   The Loan Documents will contain customary provisions for facilities of this kind, including, without limitation, in respect of tax gross-ups (excluding tax

| | |
|---|---|
| **Increased Costs:** | gross-ups with respect to recharacterization risk), breakage and redeployment costs, increased costs, funding losses, capital adequacy liquidity and illegality. There will be customary exceptions to gross-up obligations, yield protection and increased costs. |
| **Tax Treatment:** | The Term Loans are intended to be treated as indebtedness for all relevant tax and financial accounting purposes, including for U.S. federal and state income tax purposes.  The Borrower and each Lender agrees to, and cause its Affiliates to, (i) file all tax returns and prepare all financial statements consistently with such intended treatment and (ii) not take any actions inconsistent with treating the Term Loans as indebtedness for all relevant tax and financial accounting purposes, except to the extent required by (x) a final determination by an applicable taxing authority or a court of competent jurisdiction or (y) a change in applicable accounting standards.  The Borrower and each Lender further agree, for U.S. federal and other applicable income tax purposes, not to treat the Term Loans as "contingent payment debt instruments" under Treasury Regulation Section 1.1275-4 (or any corresponding provision of state income tax law), and to file all tax returns consistently with this intended tax treatment, except to the extent required by a final determination by an applicable taxing authority or a court of competent jurisdiction. |
| **Bail-In Provisions:** | The definitive documentation for the Term Facility shall include European Union bail-in provisions (including in "Defaulting Lenders" provisions) substantially in the form of the Loan Syndication and Trading Association proposed standard form. |
| **Governing Law and Forum:** | State of New York. |
| **Miscellaneous:** | Each of the parties shall (i) waive its right to a trial by jury and (ii) submit to New York jurisdiction. |
| **Counsel to the Agent:** | Paul Hastings LLP |
| **Counsel to the Lenders:** | Latham & Watkins LLP |

US-DOCS\103394457.23

## ADDENDUM

### INTEREST RATES AND FEES

Capitalized terms not otherwise defined herein have the same meanings as specified therefor in the Term Sheet to which this Addendum is attached.

**Interest Rates:**  U.S. dollar denominated loans will bear interest based on the Base Rate ("<u>Base Rate Loans</u>") or LIBOR ("<u>LIBOR Loans</u>"), at the Borrower's option (subject to certain customary exceptions).

**Base Rate Loans**:  Interest on Base Rate Loans will accrue at the Base Rate plus the applicable Interest Margin referred to below.  Such interest will be calculated on the basis of the actual number of days elapsed in a 360-day year (or with respect to interest payable based on the prime rate, a 365-day year (or a 366-day year in a leap year)) and payable quarterly in arrears.

"<u>Base Rate</u>" means a per annum rate equal to the greatest of (i) the Federal Funds Effective Rate plus ½ of 1.00%, (ii) the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Agent) or any similar release by the Federal Reserve Board (as determined by the Agent) and (iii) one-month LIBOR <u>plus</u> 1.00%. Base Rate Loan borrowings will require one business day's prior notice and will be minimum amounts to be agreed.

**LIBOR Loans**: Interest on LIBOR Loans will be determined for interest periods of three months and accrue at a rate equal to the greater of (x) an annual rate equal to the London Interbank Offered Rate determined by reference to a customary source to be agreed ("<u>LIBOR</u>") and (y) 1.00%, <u>plus</u> the applicable Interest Margin referred to below.

LIBOR borrowings will require three business days' prior notice and will be in minimum amounts to be agreed.   Interest will be payable quarterly in arrears and will be calculated on the basis of the actual number of days elapsed in a 360-day year.

**Interest Margins**: The applicable interest margin (the "<u>Interest Margin</u>") will be the following percentages:

| Term Facility | Base Rate Loans | LIBOR Loans |
|---|---|---|
| | 9.00% | 10.00% |

**PIK Option**: If on any interest payment date, (i) the Total Net Leverage Ratio exceeds 4.00x, (ii) the minimum cash liquidity is less than $100.0 million or (iii) the trailing 4 quarter consolidated EBITDA is less than zero, in each case after giving pro forma effect to such interest payment, the Borrower shall have the option to elect, so long as no event of default has occurred and is continuing, to pay all or a portion of the interest due and payable on the outstanding principal of the Term

1

Loans on such interest payment date in-kind.  If the Borrower so elects, such interest shall be payable at a rate per annum equal to LIBOR plus 12.00% (the "PIK Interest Rate").

**Default Rate:**    Upon the occurrence of an event of default, overdue amounts of principal under the Term Facility shall bear interest at 2.00% above the otherwise applicable rate and, after giving effect to the applicable grace periods, overdue interest, fees and other amounts shall bear interest at 2.00% above the rate applicable to Base Rate Loans, which interest shall be payable on demand.

**Fees:**    To be set forth in the Fee Letter

US-DOCS\103394457.23

## ANNEX I

## SUMMARY OF CONDITIONS PRECEDENT TO THE TERM FACILITY

*This Summary of Conditions Precedent outlines certain of the conditions precedent to the Term Facility referred to in the Term Sheet.  Certain capitalized terms used herein are defined in the Term Sheet.*

(a)    <u>Loan Documents</u>.  Agent shall have received on or before the Closing Date executed originals of all of the definitive documentation for the Term Facility (the "<u>Loan Documents</u>") required to be executed as of the Closing Date each in form and substance reasonably satisfactory to Agent.

(b)    <u>ABL Facility and Liquidity</u>. All conditions precedent to the closing of the ABL Facility shall have been satisfied and the ABL Facility shall have closed with aggregate commitments available of at least $125.0 million, on terms and conditions satisfactory to the Lenders.  Agent shall be reasonably satisfied that after giving effect to the consummation of the Transactions, payment of all costs and expenses in connection therewith, funding of the initial Revolving Loans (to be defined in the definitive documentation evidencing the ABL Facility) and issuance of the initial Letters of Credit (to be defined in the definitive documentation evidencing the ABL Facility), liquidity (inclusive of excess availability under the ABL Facility) shall be not less than (x) $75.0 million on the Closing Date and (y) $50.0 million on a normalized  look forward basis for the six month period ending after the Closing Date.

(c)    <u>Budget</u>. The Arranger and Lenders shall have received satisfactory evidence that the Borrower is in compliance with the approved budget during the Chapter 11 Cases with 20% headroom to the items set forth therein.

(d)    <u>Financial Statements</u>.   The Arranger shall have received (i) audited consolidated balance sheets and related statements of income and cash flows for Borrower and its subsidiaries for the fiscal year ended October 3, 2017 and (ii) unaudited consolidated balance sheets and related statements of income and cash flows for Borrower and its subsidiaries for each fiscal quarter subsequent to October 3, 2017 and ended at least 45 days prior to the Closing Date.

(e)    <u>Customary Closing Documents</u>.  All documents required to be delivered under the definitive financing documents, including notices of borrowing, customary legal opinions, corporate records and documents from public officials and officers' certificates shall have been delivered.

(f)    <u>Representations and Warranties</u>.  The representations and warranties of the Loan Parties in the Loan Documents shall be true and correct in all material respects as of the Closing Date (provided that such materiality qualifier shall not apply to representations and warranties that are already qualified or modified by materiality or material adverse effect).

(g)    <u>Solvency</u>.  After giving effect to the Transactions, Agent shall have received a solvency certificate, executed by a responsible officer of the Borrower in form substantially similar to that provided under the ABL Facility.

(h)    <u>Transactions</u>. The Transactions shall have closed and been substantially consummated in the manner contemplated by the Approved Plan (as defined below), including without limitation, the issuance of the Common Equity as described on Exhibit B-1 hereto (the "<u>Common Equity</u>") and the US$150.0 million unsecured term loan facility (the "<u>PIK Debt</u>") as described on Exhibit B-2 hereto, shall have been consummated, and the other applicable documents (as set out in the Approved

A-1

Plan) and shall otherwise be in form and substance satisfactory to Agent, the Lenders SEAG and Steinhoff International Holdings N.V. in each case in their respective sole discretion.

(i)     Repayment of Obligations.  (i) Agent shall have received fully executed pay-off letters reasonably satisfactory to Agent confirming that, or otherwise be reasonably satisfied that, all obligations owing by any Loan Party to any lender of the Existing Facilities, to the extent not contributed into SUSHI under the Approved Plan, will be paid in full from the proceeds of the initial Term Loans and other proceeds from the consummation of the Transactions and all liens upon any of the assets of the Loan Parties in favor of the lenders under the Existing Facilities shall be terminated immediately upon such payment; and (ii) all letters of credit issued under such pre-petition or debtor-in-possession facilities shall have been cash collateralized or rolled over into the ABL Facility.

(j)     Release of Intercompany Obligations. Agent shall have received fully executed release letters or other documentation reasonably satisfactory to Agent confirming that, or otherwise be reasonably satisfied that, all obligations owing by any Loan Party to the lenders of the Intra-Group Loan Agreement dated as of September 16, 2016 (as amended or supplemented on or prior to the Closing Date, the "Stripes Intercompany Facility") between SUSHI as borrower and Steinhoff Finance Holding GMBH and Steinhoff Mobel Holding Alpha GMBH as lenders and the other parties from time to time party thereto, to the extent not contributed into SUSHI under the Approved Plan, will be released and all liens upon any of the assets of the Loan Parties in favor of the lenders under the Stripes Intercompany Facility shall be released.

(k)     Approval of Commitment Letter and Payment of Fees. (i)  The Debtors shall have filed on the Petition Date a motion to approve the Commitment Letter and the Commitment Fee on expedited notice and shall have used their best efforts to obtain the approval by the Bankruptcy Court of the Commitment Fee as a super-priority administrative expense of each of the Debtors pursuant to an order in form and substance acceptable to the Agent and Lenders upon expedited notice at the earliest practicable date, and such order shall have become a final order of the Bankruptcy Court, for which the time for taking of any appeal or petition for writ of certiorari shall have passed, and shall not have been stayed, reversed, vacated, amended, supplemented or modified without the prior written consent of the Agent and the Lenders.  (ii)  The Commitment Letter, the Commitment Fee, and all fees required to be paid on the Closing Date to Agent, the Arranger and the Lenders shall have been approved as super-priority administrative expenses of each of the Debtors by the Bankruptcy Court pursuant to an order in form and substance acceptable to the Agent and Lenders within 25 days of the Petition Date, which order shall have become a final order of the Bankruptcy Court, for which the time for taking of any appeal or petition for writ of certiorari shall have passed, and shall not have been stayed, reversed, vacated, amended, supplemented or modified without the prior written consent of the Agent and the Lenders. (iii) The Borrower shall have paid all fees required to be paid on the Closing Date to Agent, the Arranger and the Lenders and shall have reimbursed Agent, the Arranger and the Lenders for all fees, costs and expenses of closing presented as of the Closing Date.

(l)     Material Adverse Effect.  Except as set forth in the disclosure statement of the Debtors filed in the Chapter 11 Cases, since the Petition Date, there shall not have been a material adverse change, individually or in the aggregate, in the business, operations, property, assets, or condition, financial or otherwise, of the Debtors taken as a whole, or their assets taken as a whole, other than the filing and pendency of the Chapter 11 Cases and the consequences thereof.

(m)     Collateral.  Each UCC financing statement and each document required by any security document or any applicable requirements of law to be filed, registered or recorded in order to create in favor of Agent, for the benefit of the Secured Parties (to be defined in the Loan Documents), a perfected first priority lien and, as to the ABL Priority Collateral, a perfected second priority lien, on the

Collateral (subject to Permitted Liens (to be defined in the Loan Documents)) required to be delivered pursuant to each security document, shall be in proper form for filing, registration or recording.

(n)     Leases. Agent shall have received reasonably satisfactory evidence that no less than 500 leases to which any Debtor is a party shall have been rejected in accordance with the Plan and pursuant to an order of the Bankruptcy Court in form and substance acceptable to the Agent and Lenders.

(o)     Plan of Reorganization and Confirmation Order. (i) The Plan, the Confirmation Order (defined below) and all documents to be executed and/or delivered in connection with implementation of the Plan shall be on terms and conditions acceptable to Agent and the Lenders (such acceptable Plan, the "Approved Plan"), and, without the prior written consent of the Agent and the Lenders, no amendment, modification, supplement or waiver shall have been made to the Approved Plan, the Confirmation Order or any document to be executed and/or delivered in connection with the implementation of the Plan, (ii) the Bankruptcy Court shall have entered an order, in form and substance satisfactory to Agent, confirming the Approved Plan, which order shall have become a final order of the Bankruptcy Court, for which the time for taking of any appeal or petition for writ of certiorari shall have passed, and shall not have been stayed, reversed, vacated, amended, supplemented or modified without the prior written consent of the Agent and the Lenders (the "Confirmation Order"), and which shall authorize the Loan Parties and their subsidiaries to execute, deliver and perform all of their obligations under all documents contemplated hereunder and thereunder, (iii) the Approved Plan shall have become effective in accordance with its terms, and all conditions precedent to the effectiveness of the Approved Plan shall have been satisfied or waived with the prior written consent of the Agent and Lenders, and (iv) the transactions contemplated by the Approved Plan to occur on the effective date of the Plan shall have been substantially consummated (as defined in Section 1101 of the Bankruptcy Code) on the Closing Date and substantially contemporaneously with the initial funding hereunder in accordance with the terms of the Approved Plan and in compliance with applicable law and Bankruptcy Court and regulatory approvals.

(p)     Compliance with DIP Facility and PSA. No event of default or other defaults shall have occurred and be continuing under the DIP Facility or the PSA.

(q)     PATRIOT Act, etc. Agent shall have received, no later than 3 business days in advance of the Closing Date, all documentation and other information with respect to the Borrower and the Guarantors required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act and 31 C.F.R. §1010.230 (the "Beneficial Ownership Regulation"), that has been reasonably requested by any Lender or Agent in writing at least 10 days in advance of the Closing Date. No later than 3 business days prior to the Closing Date, if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, then the Borrower shall have delivered to Agent a Beneficial Ownership Certification in relation to the Borrower. "Beneficial Ownership Certification" means a certification regarding individual beneficial ownership solely to the extent expressly required by 31 C.F.R. §1010.230.

(r)     Tax Restructuring.

(i)     SUSHI shall not be a "Facility C Borrower" under that certain Acquisition Facilities Agreement dated August 5, 2016 between Steinhoff Finance Holding GMBH Steinhoff Mobel Holding Alpha GMBH, Steinhoff Europe AG and SUSHI as borrowers, JPMorgan Europe Limited as Agent, and certain lenders (as amended or supplemented on or prior to the Closing Date, the "Acquisition Facilities Agreement"), whether as a result of consent of each of the lenders under Facility C (as defined in the Acquisition Facilities Agreement)  or an English Scheme of Arrangement, and the Common Equity and PIK Debt shall have been issued by SUSHI, or

(ii)    if SUSHI remains a Facility C Borrower under the Acquisition Facilities Agreement, the Agent and each of the Lenders shall be satisfied with the results of tax diligence and transaction structuring in their sole and absolute discretion, the Borrower and Steinhoff are satisfied with the results of tax diligence and transaction structuring in their reasonable discretion, the Common Equity and PIK Debt shall have been issued by Mattress Holdco Inc.

(s)    <u>Tax Opinions</u>.  In addition, SUSHI shall have received a written opinion from Crowe LLP or another tax advisor reasonably acceptable to the Agent and each of the Lenders, at a level which is at least "more likely than not," that the contribution of the Stripes Intercompany Facility to SUSHI as contemplated by the Approved Plan will not result in any cancellation of debt income by SUSHI or any of its subsidiaries.

(t)    <u>Projections</u>.  The Arranger and Lenders shall have received quarterly projections of the operating results of the Borrower  and its subsidiaries for a period commencing ending on the projected maturity date of the Term Facility.

(u)    <u>Rent Reduction</u>.  The Debtors shall have secured rent reductions from landlords of the non-closed stores in an aggregate amount of at least $35,000,000.

(v)    <u>PIK Debt</u>.  The PIK Debt shall be treated and structured as debt for US tax purposes, or in the alternative, the Borrower and Lenders shall agree on alternative terms and structuring for the Transactions in form and substance acceptable to the Lenders in their sole and absolute discretion.

(w)    <u>Affiliate</u> Releases.  SUSHI and Mattress Firm Holdco Corp. shall have granted releases in favor of the Debtors for any and all claims arising in whole or in part from facts arising prior to the effective date of the Plan.

(x)    <u>SUSHI Preferred Stock</u>. The existing Series A Preferred Stock of SUSHI shall be extinguished in form and substance acceptable to the Lenders in their sole and absolute discretion.

(y)    <u>Back Stop Commitment Letter</u>.  The Arranger shall have received an executed commitment letter, in form and substance and with respect to matters satisfactory to it, in respect of backstopped commitments from the commitment parties party thereto (the "***Backstop Commitment Parties***") for the Term Loans (together with any amendments or modifications thereto satisfactory to the Arranger, the "***Back Stop Commitment Letter***") and such Back Stop Commitment Letter shall be in full force and effect immediately prior to the Closing Date. The Arranger shall have received cash proceeds in escrow from the Backstop Commitment Parties in an aggregate amount of not less than $380,000,000 pursuant to the terms of the Backstop Commitment Letter;  provided that the Initial Lender shall have no obligation to fund any amounts in excess of the amounts funded to the Initial Lender in escrow pursuant to the terms and conditions of the Back-Stop Commitment Letter and the amount of the Term Loan Facility shall be reduced by the amount equal to any such deficiency not received by the Initial Lender as of such date.  Barclays shall have the right to participate in up to 5% of the aggregate amount of the Term Facility on identical terms to those applicable to the other lenders under such Term Facility, except for the right to designate or vote on the initial board of directors.

### PRINCIPLE TERMS AND CONDITIONS

### EQUITY INVESTMENT - STOCKHOLDERS AGREEMENT

**October 4, 2018**

*Corporation*
Stripes US Holding, Inc. ("SUSHI") (unless the Agent, each of the "Lenders" (being a syndicate of financial institutions), Mattress Firm, Inc. (the "Borrower") and Steinhoff International Holding N.V. ("Steinhoff") agrees prior to the closing of the exit financing (the "Closing") that Mattress Holdco, Inc. should issue the Issued Shares (the elected entity, the "Issuer").

*Securities to be Issued at Closing*
At the Closing, the Lenders will be issued such number of newly-issued shares of common stock of the Issuer (the "Common Stock") constituting 49.9% of the issued and outstanding shares of Common Stock of the Issuer as of the Closing (the "Issued Shares"). A capitalization table of the Issuer as of the Closing is attached as Schedule I hereto.

*Representative*
[●], or such other person or entity appointed by the Lender Stockholders from time to time (the "Representative").

*Stockholders*
- The Lenders (or their respective transferees) (the "Lender Stockholders").

- If the Issuer is SUSHI, Steinhoff Europe AG ("SEAG"), or if the Issuer is Mattress Holdco, Inc., Mattress Firm Holding Corp. (such entity, "SEAG Stockholder", and, together with the Lender Stockholders, the "Stockholders").

- Members of the management team of Mattress Firm, Inc. who received awards of Common Stock in accordance with the terms of an equity-based management incentive plan ("Management Stockholders"). As a condition to receiving such equity awards, the Management Stockholders shall enter into a separate stockholders agreement with respect to their equity holding in the Issuer, covering such matters customarily addressed in management stockholders agreement (including, without limitation, transfer restrictions, call right, bring-

along right, etc.).

| | |
|---|---|
| *Agreement* | Stockholders Agreement of the Issuer (the "<u>SHA</u>"), to be entered into as of the Closing by SEAG Stockholder, the Issuer and the Lender Stockholders. |

*Equity Securities*

Common Stock, and any other equity securities of the Issuer (whether issued in lieu of Common Stock or in addition thereto (collectively, "<u>Securities</u>").

*Final Documentation; Organizational Documents of the Issuer*

The SHA and the other transaction documentation (as applicable) shall include, among other things, customary representations and warranties by the Issuer, including authority, no conflicts, capitalization, compliance with applicable laws, implementation of adequate compliance procedures and accounting controls and "not a USRPHC" status, and covenants of the Issuer reflecting the provisions contained in this Terms Sheet.

Effective as of the Closing, the organizational documents of the Issuer will be amended and restated to reflect the transactions contemplated by this Term Sheet, as well as such other terms agreed to by the Representative and the SEAG Stockholder.

*Governance; Board of Directors*

The Issuer's board of directors (the "<u>Board</u>") will have full power to manage and control the business and affairs of the Issuer.

The Board shall be comprised of five (5) members (each, a "<u>Director</u>"), nominated and appointed as follows:

- The Lender Stockholders, acting through the Representative, shall have the right to nominate three (3) Directors (each, a "<u>Lender Director</u>"). The Representative shall propose each Lender Director nominee to SEAG Stockholder, and SEAG Stockholder, within fifteen (15) business days of such proposal, shall have a right to reasonably reject the appointment of a Lender Director nominee and request that the Representative propose another individual to serve as such Lender Director in lieu of the nominee so rejected; <u>provided</u> that, notwithstanding anything to the contrary, SEAG Stockholder shall not reject any Lender Director nominee unless such nominee was convicted of a crime involving a moral turpitude, has a material personal interest in a direct competitor of the Issuer or its subsidiaries or is in a material conflict of interests with the

Issuer or its subsidiaries;

- For so long as SEAG Stockholder beneficially owns at least 20% of the issued and outstanding Securities entitled to vote in the election of directors, SEAG Stockholder shall have the right to nominate one (1) Director (the "SEAG Director"); provided that the SEAG Director nominee has not been convicted of a crime involving a moral turpitude, shall not have a material personal interest in a direct competitor of the Issuer or its subsidiaries and shall not be in a material conflict of interests with the Issuer or its subsidiaries; and

- The Chief Executive Officer of Mattress Firm, Inc.

SEAG Stockholder and the Lender Stockholders shall take all actions reasonably necessary to cause the individuals nominated in accordance with the foregoing to be appointed as directors, including voting all their Securities in favor of such nominees.

Each Director shall have one (1) vote.  All actions of the Board must be approved by a majority of the votes.

For so long as SEAG Stockholder beneficially owns at least 20% of the issued and outstanding Securities entitled to vote in the election of directors, SEAG Stockholder shall have the right to designate one (1) observer to the Board (who shall, at its election, be a Steinhoff nominee to the SEAG Stockholder board) who shall be entitled to attend all meetings of the Board and all committees thereof in a nonvoting observer capacity and to receive copies of all materials provided to the Board and any committee thereof, including notices, minutes, consents and any other materials provided to the Directors at the same time and in the same manner as provided to such Directors; provided, however, that such observer shall agree to hold such materials and information in confidence and trust, and, provided, further, that such observer has not been convicted of a crime involving a moral turpitude, shall not have a material personal interest in a direct competitor of the Issuer or its subsidiaries and shall not be in a material conflict of interests with the Issuer or its subsidiaries.

The Issuer's and each of its subsidiaries' organizational documents will include a waiver of corporate opportunities or similar doctrines to the maximum

EU-DOCS\22267702

extent permitted under applicable law.

The SHA will include the Issuer's director and officer slates as of the Closing.

*Transfer Restrictions*

Without the consent of: (i) where SEAG Stockholder proposes a Transfer, the Representative (acting on instructions of the Lender Stockholders given on a consensual (not unanimous) basis); or (ii) where Lender Stockholders propose a Transfer, SEAG Stockholder, prior to an IPO (and other than in a Bring-Along Transaction), no Stockholder shall be permitted to, directly or indirectly, sell, assign, transfer, convey, pledge in favor of or otherwise dispose of (including, without limitation, through the use of derivative securities or other instruments) (collectively, "Transfer") any of its Securities to any person or entity that is or has (directly or indirectly) a material ownership stake in: (a) a material competitor of the Issuer or its subsidiaries; and/or (b) any of the Issuer's or its subsidiaries' actual or past material suppliers or vendors (other than a passive investment of not more than 1% of the securities of a publicly-traded company, so long as the transferee does not have, and does not exercise, any rights with respect to such company (including, without limitation, any rights to manage, advise, consult with or operate the business of such company)).

Without limiting the foregoing, if SEAG Stockholder proposes to Transfer all or any portion of its Securities, the Lender Stockholders will have a right of first offer with respect to such Securities.

Subject to compliance with the tag-along right described below, Issued Shares will be freely transferable subject to applicable securities laws.  For the avoidance of doubt (and without limiting the foregoing), the Issued Shares are not stapled to, and issued separately from, the PIK Loans and the Term Loans, and may be transferred separately without regard to such other instruments.

*Bring-Along Rights*

If the Lender Stockholders determine to sell Securities representing 75% or more of all of the Securities held by all the Lender Stockholders as of the Closing to, or merge the Issuer with or sell substantially all of the Issuer's assets to, or otherwise cause the Issuer or substantially all of its subsidiaries to enter into a business combination with one or more unaffiliated third party purchasers (a "Bring-Along Transaction"), SEAG Stockholder shall be required to take all reasonable actions reasonably requested by the Representative in connection with such Bring-Along Transaction, including voting all its equity

interests in favor of such transaction, and, in the event of a sale of equity interests, the Representative shall have the right, but not the obligation, to require SEAG Stockholder to sell, for cash consideration, to such unaffiliated third party purchaser(s) that number of its Securities that equal the lesser of (a) the number derived by multiplying (i) the total number of Securities of an applicable class held by SEAG Stockholder, *by* (ii) a fraction, the numerator of which is the total number of Securities of such class to be sold by the Lender Stockholders in connection with the transaction or series of related transactions and the denominator of which is the total number of the then outstanding Securities of such class held by the Lender Stockholders, or (b) the number of Securities as the Representative shall designate in its notice of intent to exercise the bring-along right; <u>provided</u> that SEAG Stockholder shall participate in the sale on terms not less favorable than those of the Lender Stockholders (subject to customary limitations), including consideration per Security and assumption of expense reimbursement and indemnification (and other post-closing liabilities) *pro rata*; <u>provided</u>, <u>further</u>, that only if the Bring-Along Transaction is not conducted through a customary competitive U.S. marketing process reasonably acceptable to the SEAG Stockholder, the consideration payable to SEAG Stockholder for the Securities it is required to sell in a Bring-Along Transaction pursuant to the Lender Stockholders bring-along right shall be not less than the "fair market value" (a reasonable detailed definition of which to be agreed between the parties and included in the SHA) of such Securities.

*Tag-Along Rights*

Subject to customary exceptions, if Stockholder(s) (whether individually or together) (the "<u>Proposing Stockholders</u>") determine to sell Securities of a class, representing 20% or more of the issued and outstanding Securities, to one or more unaffiliated third-party purchasers in a single transaction or a series of related transactions, then the other Stockholders shall have the right (the "<u>Tag-Along Right</u>") to require that the proposed purchaser purchase from such Stockholders, on no less favorable terms and conditions as apply to the Proposing Stockholders, up to the number of Securities of the applicable class equal to the number derived by multiplying (a) the total number of Securities of such class that the proposed purchaser has agreed or committed to purchase, by (b) a fraction, the numerator of which is the total number of Securities of such class owned by the tagging Stockholders, and the denominator of which is the aggregate number of Securities of such

class owned by the Proposing Stockholders, the tagging Stockholders and all other holders of such class of Securities who have exercised a tag-along right similar to such rights granted to the tagging Stockholders hereunder.

This Tag-Along Right shall terminate immediately prior to effectiveness of the registration statement in connection with an IPO.

*Initial Public Offering; Registration Rights*

The Lender Stockholders shall have the right to cause an initial public offering of equity interests of the Issuer (or a successor entity or affiliate thereof) (an "IPO").

If an IPO is undertaken, SEAG Stockholder shall agree, if requested in connection with the IPO, to convert or exchange its Securities into other equity securities of the Issuer  or equity securities of any other entity upon the same terms and conditions as the Lender Stockholders and take such other actions and enter into and modify such agreements reasonably necessary in order to facilitate the IPO; provided that the SEAG Stockholder shall not be required to sell any of its Securities in an IPO.

Following an initial public offering, the Lender Stockholders and the SEAG Stockholder (for so long as SEAG Stockholder beneficially owns at least 20% of the issued and outstanding Securities) shall be permitted to exercise unlimited demand registration rights.

Each of SEAG Stockholder and the Lender Stockholders shall have customary piggyback registration rights (with pro rata cutbacks) following an IPO.

At the request of the Lender Stockholders or the SEAG Stockholder (for so long as SEAG Stockholder beneficially owns at least 20% of the issued and outstanding Securities), each other Stockholder shall enter into a customary coordination agreement related to the sale of equity securities following an IPO.

In connection with an IPO or a demand registration, the SEAG Stockholder, the Lender Stockholders and the Management Stockholders (pursuant to the management incentive plan) shall enter into customary lock-up agreements with the managing underwriters of the offering.  In addition, the Issuer shall use its reasonable best efforts to cause its directors and executive officers to enter into similar lock-up agreements.

The Issuer shall bear the registration expenses of all

6

piggyback and demand registrations, and shall reimburse the holders of registrable securities included in each registration (including registrations pursuant to an initial public offering) for the reasonable fees and disbursements of one counsel.    Any underwriting discounts and selling commissions with respect to registrable securities shall be paid by the holders of such securities.

| | |
|---|---|
| *Expenses* | The Issuer will pay all reasonable costs and expenses of the Lender Stockholders associated with due diligence and the preparation, negotiation and closing of all definitive documentation relating to the equity investment contemplated by this Term Sheet, including, without limitation, the legal fees of counsel and third party advisors to the Representative, regardless of whether or not the Closing occurs. |
| | The Issuer will pay all reasonable costs and expenses of the SEAG Stockholder associated with the preparation, negotiation and closing of all definitive documentation relating to the equity investment contemplated by this Term Sheet, the PIK Loans, the Term Loans and the other transactions contemplated thereby, up to a maximum aggregate amount of $3,650,000 (the "SEAG Fees"); provided that the SEAG Fees (or any portion thereof) shall be payable in five equal monthly installments commencing in May, 2019. |
| *Governing Law; Jurisdiction* | Delaware. |

**Schedule I**

**Capitalization of the Issuer as of the Closing**

EU-DOCS\22267702

# SUMMARY OF TERMS AND CONDITIONS

## STRIPES US HOLDING, INC.
## $150.0 MILLION SENIOR UNSECURED TERM LOAN FACILITY

*This Summary of Terms and Conditions (this "Term Sheet") is intended as an outline of certain of the material terms of the PIK Facility (as defined below). It does not include descriptions of all of the terms, conditions and other provisions that are to be contained in the documentation relating to the PIK Facility and it is not intended to limit the scope of discussion and negotiation of any matters that do not conflict with the specific matters set forth herein. The "Term Facility Term Sheet" means the term sheet entitled "Summary of Terms and Conditions Mattress Firm, Inc. $400 million Senior Secured Term Loan Facility" which sets forth a summary of certain material terms of the senior secured term loan credit facility (the "Term Facility") described therein. Capitalized terms used herein without definition shall have the meanings assigned to such terms in the Term Facility Term Sheet. This Term Sheet is for discussion purposes only and is not a commitment.*

| | |
|---|---|
| **PIK Facility:** | A senior unsecured term facility of the Borrower in an initial aggregate principal amount of $150,000,000 (the "PIK Facility" and the loans under the PIK Facility, the "PIK Loans"). |
| **Borrower:** | Either of (a) Stripes US Holding, Inc., a Delaware corporation ("Stripes") or (b) Mattress Holdco, Inc., a Delaware corporation ("MF Holdco"), which such entity as shall be chosen at the election of the Lenders pursuant to the terms and conditions set forth in the Term Facility Credit Agreement (as defined below) and shall be hereinafter referred to as the "Borrower" and being the same entity as the issuer of the Common Equity (as defined below). |
| **Transactions:** | MF Holdco and certain of its subsidiaries (the "Debtors") intend to file voluntary petitions under chapter 11 of title 11 ("Chapter 11") of the United States Code (11 U.S.C. § 101, et seq.) (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on October 4, 2018 (the "Petition Date"), and expect their cases to be jointly administered under the caption [*In re Mattress Firm, Inc., et al.*, Case No. 18-[_____] (the "Chapter 11 Cases"). The commencement of the Chapter 11 Cases is for the purpose of seeking confirmation and consummation of a joint prepackaged Chapter 11 plan of reorganization [as contemplated in [Plan Support Agreement, dated as of [_____], 2018 (the "PSA"), among [_____] (together with all exhibits, schedules, annexes, supplements or other attachments thereto, the "Plan"). |
| | Pursuant to the Plan, the cash payments required to fund the Debtors' emergence from Chapter 11 would be funded by, *inter alia*, the proceeds raised from the Term Facility in the aggregate amount not to exceed $400.0 million and in connection therewith the lenders under the Term Facility will be issued the PIK Loans and the common equity as further described on Exhibit B-1 (the "Common Equity") (collectively, the "Transactions"). |

| | |
|---|---|
| **Administrative Agent:** | An institution selected by the Required Lenders (in such capacity, the "<u>Agent</u>"). |
| **Guarantors:** | None. |
| **Collateral:** | None. |
| **Lenders:** | Initially, the same lenders as under the Term Facility along with members of the management team of Mattress Firm, Inc., a Delaware corporation who receive awards of Common Stock in accordance with the terms of an equity-based management incentive plan. |
| **Maturity:** | 5 years after the funding of the PIK Loans (the "<u>Closing Date</u>"). |
| **Availability:** | The PIK Loans shall be issued in full on the Closing Date. |
| **Amortization:** | None. |
| **Interest Rate:** | Interest on the PIK Loans shall accrue from the Closing Date at a rate equal to 15.00% per annum all of which shall be payable semi-annually, in-kind by increasing the aggregate principal amount of the PIK Loans (any interest payable in kind being referred to herein as "<u>PIK Interest</u>"). The principal amount of the PIK Loans will increase in an amount equal to such PIK Interest for the applicable interest period on the last day of such interest period (the "<u>Interest Payment Date</u>"). The PIK Loans will bear interest on the increased amount thereof from and after the applicable Interest Payment Date on which a payment of PIK Interest is made.  Interest will be computed on the basis of a 360 day year comprised of twelve 30-day months. |
| **Default Rate:** | Upon the occurrence of a payment or bankruptcy event of default, all overdue amounts under the PIK Facility shall bear interest at 2.00% above the otherwise applicable rate, which interest shall be payable in additional PIK Interest. |
| **Voluntary Prepayments and Commitment Reductions:** | PIK Loans may be prepaid and commitments may be reduced, in whole or in part without premium or penalty (subject to the Prepayment Fee (to the extent applicable)), in minimum amounts to be agreed, at the option of the Borrower upon customary notice requirements. |
| **Prepayment Fee:** | In the event all or any portion of the PIK Loans are repaid (or prepaid) other than at maturity for any reason (including, without limitation, upon acceleration or as a result of a mandatory prepayment), such repayments shall be made (i) subject to a customary T+50 make-whole premium, if such repayment occurs prior to the second anniversary of the Closing Date; (ii) at 110% of the amount repaid if such repayment occurs on or after the second anniversary of the Closing Date but prior to the third anniversary of the Closing Date; and (iii) at 105.0% of the amount repaid if such repayment occurs on or after the third |

anniversary of the Closing Date, in each case, plus accrued, but unpaid interest.

**Mandatory Prepayments:**   The Borrower will be required to prepay the entire amount of the then outstanding PIK Loans upon the occurrence of a Change of Control or a Qualified IPO (in each case, to be defined consistent with the PIK Documentation Principles in the PIK Facility Documentation) at 100% of the principal amount thereof, together with the applicable Prepayment Fee, plus accrued and unpaid interest.

**Ranking:**   The PIK Loans will be the senior unsecured obligations of the Borrower.

**Representations and Warranties:**   Consistent with the PIK Documentation Principles (as defined below), the PIK Facility Documentation will contain certain limited representations and warranties by the Borrower, which for the avoidance of doubt, will include, organization and existence; corporate separateness; power and authority; authorization; execution, delivery and enforceability of the PIK Facility Documentation; no conflicts with law, organizational documents or material contractual obligations; material governmental authorizations, compliance with applicable laws and regulations, including margin regulations, anti-bribery laws, anti-terrorism laws (including Patriot Act), export controls and economic sanctions laws, anti-money laundering laws, anti-fraud laws, Investment Company Act, accuracy of the Beneficial Ownership Certification and solvency).

**Documentation:**   The definitive documentation for the PIK Facility (the "PIK Facility Documentation") will consist of a credit agreement, among the Borrower, the Lenders and the Administrative Agent, together with certain associated documentation, which will be consistent with this Term Sheet and otherwise, will be consistent with the materiality thresholds, qualifications, exceptions, "baskets" and grace and cure periods to be mutually agreed and which, will be consistent, where applicable, with those in the definitive documentation governing the Term Facility (the "Term Facility Credit Agreement") with changes and modifications that reflect the terms of this Term Sheet, reflect that the PIK Facility is unsecured holding company indebtedness, reflect changes in law or accounting standards and requirements of local law or to cure mistakes or defects, other changes and modifications to be agreed and that are necessitated by the effectiveness of the Plan (collectively, the "PIK Documentation Principles").

**Affirmative Covenants:**   Consistent with the PIK Documentation Principles, the same as the Term Facility, as modified to be applicable only to the Holding Companies (as defined below) and to reflect the status of the PIK Facility as unsecured holding company indebtedness.

| **Negative Covenants:** | Applicable only to the Borrower and its subsidiaries (other than Mattress Holding Corp. (the "<u>Company</u>") and its subsidiaries) (the "<u>Holding Companies</u>"): |
|---|---|
| | - A passive holding company covenant, including prohibitions on the incurrence of any debt, liens or preferred stock (other than, in the case of preferred stock, by the Borrower) or the making of any direct or indirect (including restricted payments in respect of direct or indirect equity holders of the Borrower made by subsidiaries of the Borrower) restricted payments prior to the repayment of the PIK Loans and including a requirement that Borrower at all times directly or indirectly own 100% of the equity interests of Mattress Firm, Inc. |
| | - Limitations on mergers, consolidations and other fundamental changes. |
| | - No modification or waiver of charter documents in a manner materially adverse to the Lenders. |
| **Financial Covenant:** | None |
| **Events of Default and Remedies:** | Consistent with the PIK Documentation Principles, including breach of representations and warranties, breach of covenants, non-payment, certain bankruptcy and insolvency events of the Holding Companies, judgment defaults of the Holding Companies, actual or asserted invalidity or impairment of the PIK Facility Documentation. |
| | In the event of an acceleration, any applicable premium that would be payable in a voluntary prepayment made on such date will be required to be paid, in addition to the principal amount and accrued and unpaid interest. |
| **Amendments:** | Consistent with the PIK Documentation Principles, the same as the Term Facility, as modified to reflect the status of the PIK Facility as unsecured indebtedness. |
| **Assignments and Participations:** | Consistent with the PIK Documentation Principles, the same as the Term Facility.  For the avoidance of doubt, the non-management PIK Loans will not be stapled to either the Term Loans or the Common Equity and may be assigned separately without regard to such other instruments. |
| **Indemnity/Expense Reimbursement:** | Consistent with the PIK Documentation Principles, as to be mutually agreed. |
| **Taxes, Yield Protection and Increased Costs:** | Consistent with the PIK Documentation Principles, as to be mutually agreed. |
| **Bail-In Provisions:** | Consistent with the PIK Documentation Principles, the same as the Term Facility. |

| | |
|---|---|
| **Governing Law and Jurisdiction:** | State of New York. |
| **Miscellaneous:** | Each of the parties shall (i) waive its right to a trial by jury and (ii) submit to New York jurisdiction, with language in the PIK Facility Documentation consistent with the PIK Documentation Principles. |
| **Tax Treatment:** | The PIK Loans are intended to be treated as indebtedness for all relevant tax and financial accounting purposes, including for U.S. federal and state income tax purposes.  The Borrower and each Lender agrees to, and cause its Affiliates to, (i) file all tax returns and prepare all financial statements consistently with such intended treatment and (ii) not take any actions inconsistent with treating the PIK Loans as indebtedness for all relevant tax and financial accounting purposes, except to the extent required by (x) a final determination by an applicable taxing authority or a court of competent jurisdiction or (y) a change in applicable accounting standards.  The Borrower and each Lender further agree, for U.S. federal and other applicable income tax purposes, not to treat the Loans as "contingent payment debt instruments" under Treasury Regulation Section 1.1275-4 (or any corresponding provision of state income tax law), and to file all tax returns consistently with this intended tax treatment, except to the extent required by a final determination by an applicable taxing authority or a court of competent jurisdiction. |
| **Counsel to the Agent:** | To be selected by the Agent. |
| **Counsel to the Lenders:** | Latham & Watkins LLP |

**Exhibit C**

**DIP CREDIT AGREEMENTS**

$150,000,000
SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
ABL CREDIT AGREEMENT


Dated as of [  ], 2018

among

MATTRESS FIRM, INC.,
as the Borrower,


MATTRESS HOLDING CORP.,
as Holdings,


BARCLAYS BANK PLC,
as Administrative Agent, Collateral Agent and Issuer,

and

THE OTHER LENDERS AND ISSUERS PARTY HERETO

———————————

CITIZENS BANK, N.A.,
as a Co-Collateral Agent

BARCLAYS BANK PLC
AND
CITIZENS BANK, N.A.,
as Joint Book Runners and Joint Lead Arrangers

**ARTICLE I** DEFINITIONS, INTERPRETATION AND ACCOUNTING TERMS ..................1
    SECTION 1.1    Defined Terms................................................................................2
    SECTION 1.2    Other Interpretive Provisions. ...................................................60
    SECTION 1.3    Accounting Terms.......................................................................61
    SECTION 1.4    Rounding.....................................................................................61
    SECTION 1.5    **[Reserved]**. ...............................................................................61
    SECTION 1.6    References to Agreements, Laws, Etc..........................................62
    SECTION 1.7    Times of Day...............................................................................62
    SECTION 1.8    Timing of Payment of Performance. ...........................................62
    SECTION 1.9    Pro Forma Calculations. .............................................................62
    SECTION 1.10    Currency Equivalents Generally. ................................................63
    SECTION 1.11    Schedules. ...................................................................................63

**ARTICLE II** THE FACILITY .......................................................................................64
    SECTION 2.1    The Revolving Credit Commitments. ..........................................64
    SECTION 2.2    Borrowing Procedure. .................................................................65
    SECTION 2.3    Swing Loans................................................................................66
    SECTION 2.4    Letters of Credit. .........................................................................68
    SECTION 2.5    Reduction and Termination of the Revolving Credit Commitments. ...73
    SECTION 2.6    Repayment of Loans. ..................................................................74
    SECTION 2.7    Evidence of Indebtedness............................................................74
    SECTION 2.8    Optional Prepayments. ................................................................75
    SECTION 2.9    Mandatory Prepayments..............................................................75
    SECTION 2.10    Interest.........................................................................................76
    SECTION 2.11    Conversion/Continuation Option. ...............................................77
    SECTION 2.12    Fees. ............................................................................................77
    SECTION 2.13    Payments and Computations. ......................................................79
    SECTION 2.14    Special Provisions Governing Eurocurrency Rate Loans. ....................80
    SECTION 2.15    **[Reserved]**. ...............................................................................81
    SECTION 2.16    Defaulting Lenders......................................................................81
    SECTION 2.17    Certain Bankruptcy Matters. .......................................................83

**ARTICLE III** TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY ...............85
    SECTION 3.1    Taxes. ..........................................................................................85
    SECTION 3.2    Illegality. ....................................................................................90
    SECTION 3.3    Inability to Determine Rates. ......................................................91
    SECTION 3.4    Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurocurrency Rate Loans................................................................92
    SECTION 3.5    Funding Losses. ..........................................................................93
    SECTION 3.6    Matters Applicable to All Requests for Compensation. .......................94
    SECTION 3.7    Replacement of Lenders under Certain Circumstances. ......................94
    SECTION 3.8    Survival. ......................................................................................96

**ARTICLE IV** CONDITIONS PRECEDENT .................................................................96
    SECTION 4.1    Conditions Precedent to Closing Date. .......................................96
    SECTION 4.2    Conditions Precedent to Each Loan and Letter of Credit. ...................99

**ARTICLE V** REPRESENTATIONS AND WARRANTIES ................................................100
    SECTION 5.1    Existence, Qualification and Power; Compliance with Laws. ...........100
    SECTION 5.2    Authorization; No Contravention. ......................................................101
    SECTION 5.3    Governmental Authorization. ............................................................101
    SECTION 5.4    Binding Effect. .................................................................................101
    SECTION 5.5    No Material Adverse Effect. .............................................................101
    SECTION 5.6    Litigation. .........................................................................................102
    SECTION 5.7    Labor Matters. ..................................................................................102
    SECTION 5.8    Ownership of Property; Liens. ..........................................................102
    SECTION 5.9    Environmental Matters. .....................................................................102
    SECTION 5.10    Taxes. ................................................................................................102
    SECTION 5.11    ERISA Compliance. ..........................................................................103
    SECTION 5.12    Subsidiaries. ......................................................................................103
    SECTION 5.13    Margin Regulations; Investment Company Act. ................................103
    SECTION 5.14    Disclosure. ........................................................................................103
    SECTION 5.15    Intellectual Property; Licenses, Etc. .................................................104
    SECTION 5.16    Budget. ..............................................................................................104
    SECTION 5.17    Subordination of Junior Financing. ..................................................104
    SECTION 5.18    USA PATRIOT Act; OFAC; FCPA. ................................................104
    SECTION 5.19    Collateral Documents. ......................................................................105
    SECTION 5.20    Orders. ..............................................................................................105

**ARTICLE VI** FINANCIAL COVENANTS ..........................................................................106
    SECTION 6.1    Minimum Excess Availability. ..........................................................106

**ARTICLE VII** REPORTING COVENANTS..........................................................................106
    SECTION 7.1    Financial Statements, Etc. .................................................................106
    SECTION 7.2    Certificates; Other Information. ........................................................109
    SECTION 7.3    Notices. ..............................................................................................111
    SECTION 7.4    Borrowing Base Certificate. ..............................................................111

**ARTICLE VIII** AFFIRMATIVE COVENANTS......................................................................112
    SECTION 8.1    Preservation of Existence, Etc..........................................................113
    SECTION 8.2    Compliance with Laws, Etc. .............................................................113
    SECTION 8.3    [**Reserved**]. ........................................................................................113
    SECTION 8.4    Payment of Taxes, Etc......................................................................113
    SECTION 8.5    Maintenance of Insurance. ................................................................113
    SECTION 8.6    Inspection Rights...............................................................................114
    SECTION 8.7    Books and Records............................................................................114
    SECTION 8.8    Maintenance of Properties.................................................................114
    SECTION 8.9    Use of Proceeds.................................................................................115
    SECTION 8.10    Compliance with Environmental Laws. .............................................115
    SECTION 8.11    Covenant to Guarantee Obligations and Give Security. ....................115
    SECTION 8.12    Cash Receipts. ...................................................................................117
    SECTION 8.13    Further Assurances and Post-Closing Covenants. .............................119
    SECTION 8.14    [**Reserved**]. ........................................................................................119
    SECTION 8.15    Additional Information and Bankruptcy-Related Obligations............119

2

SECTION 8.16    Milestones. ...................................................................................120
SECTION 8.17    Performance Within Budget. ..........................................................121

**ARTICLE IX** NEGATIVE COVENANTS ...........................................................122
SECTION 9.1    Liens. ...............................................................................................122
SECTION 9.2    Investments. .....................................................................................126
SECTION 9.3    Indebtedness. ....................................................................................128
SECTION 9.4    Fundamental Changes. ......................................................................131
SECTION 9.5    Dispositions.  Make any Disposition, except: ...................................131
SECTION 9.6    Restricted Payments. ........................................................................133
SECTION 9.7    Change in Nature of Business. ..........................................................135
SECTION 9.8    Transactions with Affiliates. .............................................................135
SECTION 9.9    Burdensome Agreements. .................................................................137
SECTION 9.10    **[Reserved]**. ...................................................................................138
SECTION 9.11    Accounting Changes. .....................................................................138
SECTION 9.12    Prepayments, Etc. of Indebtedness. ...............................................138
SECTION 9.13    Holdings. ........................................................................................138
SECTION 9.14    Intra-Group Debt Restricted Payments. ..........................................139
SECTION 9.15    New Stores. .....................................................................................139
SECTION 9.16    Chapter 11 Claims. .........................................................................139
SECTION 9.17    Compliance with Budget. ...............................................................139
SECTION 9.18    Use of Collateral.   .........................................................................140
SECTION 9.19    Bankruptcy Related Negative Covenants. .......................................141

**ARTICLE X** EVENTS OF DEFAULT AND REMEDIES ....................................142
SECTION 10.1    Events of Default. ...........................................................................142
SECTION 10.2    Remedies upon Event of Default. ...................................................147
SECTION 10.3    Application of Funds. .....................................................................148
SECTION 10.4    **[Reserved]**. ...................................................................................150
SECTION 10.5    Actions in Respect of Letters of Credit; Cash Collateral. ...............150

**ARTICLE XI** THE ADMINISTRATIVE AGENT AND OTHER AGENTS ..........................151
SECTION 11.1    Appointment and Authority of the Administrative Agent and Collateral
                 Agent. ...............................................................................................151
SECTION 11.2    Rights as a Lender. ..........................................................................152
SECTION 11.3    Exculpatory Provisions. ..................................................................152
SECTION 11.4    Reliance by the Agents. ...................................................................153
SECTION 11.5    Delegation of Duties. ......................................................................154
SECTION 11.6    Resignation of Administrative Agent or Collateral Agent. ...............154
SECTION 11.7    Non-Reliance on Administrative Agent and Other Lenders; Disclosure
                 of Information by Agents. ..................................................................156
SECTION 11.8    No Other Duties; Other Agents, Arrangers, Etc. ..............................156
SECTION 11.9    Appointment and Authority of Co-Collateral Agents. .....................157
SECTION 11.10    Administrative Agent May File Proofs of Claim. ............................159
SECTION 11.11    Collateral and Guaranty Matters. ..................................................159
SECTION 11.12    Appointment of Supplemental Administrative Agents. ....................161

3

SECTION 11.13 Secured Cash Management Agreements and Secured Hedge
Agreements. ...................................................................................162
SECTION 11.14 Indemnification of Agents....................................................163

**ARTICLE XII** MISCELLANEOUS .................................................................163
SECTION 12.1    Amendments, Etc. .................................................................163
SECTION 12.2    Successors and Assigns..........................................................167
SECTION 12.3    Attorney Costs and Expenses.................................................172
SECTION 12.4    Indemnification by the Borrower. ..........................................174
SECTION 12.5    **[Reserved]**. .......................................................................175
SECTION 12.6    Right of Setoff.......................................................................175
SECTION 12.7    Sharing of Payments. ............................................................176
SECTION 12.8    Notices and Other Communications; Facsimile Copies.....................177
SECTION 12.9    No Waiver; Cumulative Remedies. .........................................179
SECTION 12.10  Judgment Currency. ..............................................................179
SECTION 12.11  Binding Effect. ......................................................................180
SECTION 12.12  **[Reserved]**. .......................................................................180
SECTION 12.13  Governing Law; Submission to Jurisdiction; Service of Process. ......180
SECTION 12.14  Waiver of Jury Trial. .............................................................181
SECTION 12.15  Marshaling; Payments Set Aside. ...........................................181
SECTION 12.16  **[Reserved]**. .......................................................................182
SECTION 12.17  Counterparts; Integration; Effectiveness............................182
SECTION 12.18  Electronic Execution of Assignments and Certain Other Documents.182
SECTION 12.19  Confidentiality. .....................................................................182
SECTION 12.20  Use of Name, Logo, Etc. .......................................................183
SECTION 12.21  USA PATRIOT Act Notice. ...................................................183
SECTION 12.22  [Reserved]. ..........................................................................184
SECTION 12.23  No Advisory or Fiduciary Responsibility. .........................184
SECTION 12.24  Severability. ..........................................................................184
SECTION 12.25  Survival of Representations and Warranties. ....................185
SECTION 12.26  Lender Action........................................................................185
SECTION 12.27  Interest Rate Limitation.......................................................185
SECTION 12.28  **[Reserved]**. .......................................................................185
SECTION 12.29  Contractual Recognition of Bail-In.....................................185

4

### SCHEDULES

| | | |
|---|---|---|
| Schedule I | - | Revolving Credit Commitments |
| Schedule II | - | Guarantors |
| Schedule 1.1E | - | Credit Card Agreements |
| Schedule 2.4 | - | Pre-Petition Letters of Credit |
| Schedule 5.16 | - | Budget |
| Schedule 8.12 | - | Deposit Accounts |
| Schedule 8.13 (b) | - | Post-Closing Matters |
| Schedule 12.8 | - | Administrative Agent's Office, Certain Addresses for Notices |

## EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Form of Assignment and Assumption |
| Exhibit B | - | Form of Revolving Credit Note |
| Exhibit C | - | Form of Notice of Borrowing |
| Exhibit D | - | Form of Swing Loan Request |
| Exhibit E | - | Form of Letter of Credit Request |
| Exhibit F | - | Form of Notice of Conversion or Continuation |
| Exhibit G | - | Form of Guaranty |
| Exhibit H | - | Form of Security Agreement |
| Exhibit I | - | Form of Borrowing Base Certificate |
| Exhibit J | - | [Reserved] |
| Exhibit K | - | Intercompany Subordination Agreement |
| Exhibit L | - | [Reserved] |
| Exhibit M | - | [Reserved] |
| Exhibit N | - | Forms of Non-Bank Certificates |
| Exhibit O | - | Form of Compliance Certificate |
| Exhibit P | - | Credit Card Notification |
| Exhibit Q | - | Form of Customs Broker Agreement |
| Exhibit R | - | Form of Interim Order |

2

This SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION ABL CREDIT AGREEMENT ("**Agreement**") is entered into as of [  ], 2018, among MATTRESS FIRM, INC., a Delaware corporation (the "**Borrower**"), MATTRESS HOLDING CORP., a Delaware corporation ("**Holdings**"), BARCLAYS BANK PLC, as administrative agent (in such capacity, including any successor thereto, the "**Administrative Agent**") and as collateral agent (in such capacity, including any successor thereto, the "**Collateral Agent**") under the Loan Documents, Citizens Bank, N.A. (as a "**Co-Collateral Agent**") and each lender from time to time party hereto (collectively, the "**Lenders**" and individually, a "**Lender**").

PRELIMINARY STATEMENTS

The Borrower has entered into an ABL Credit Agreement, dated as of December 22, 2017 (as amended and in effect prior to the date hereof, the "**Pre-Petition Credit Agreement**"), among the Borrower, Holdings, Barclays Bank PLC, as administrative agent and as collateral agent, Citizens Bank, N.A., as co-collateral agent, and each lender from time to time party thereto.

On October [  ], 2018, (the "**Petition Date**"), each of the Loan Parties (collectively, the "**Debtors**") filed a voluntary petition for relief (collectively, the "**Cases**") under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). The Debtors are continuing in the possession of their assets and continuing to operate their respective businesses and manage their respective properties as debtors and debtors in possession under Section 1107(a) and 1108 of the Bankruptcy Code;

On the Petition Date, the Loan Parties filed a Disclosure Statement (as defined below) and the Chapter 11 Plan (as defined below) with the Bankruptcy Court; and

The Debtors have requested that the Lenders make available to the Borrower, from and after the date of entry of the Interim Order, a senior secured super-priority debtor-in-possession asset-based revolving credit facility on the terms and conditions set forth in this Agreement to, among other things, fund the working capital requirements and other financial needs of the Debtors during the pendency of the Cases, including a "roll-up" of all the existing outstanding obligations under Pre-Petition Credit Agreement, which shall be secured by a first priority lien on the Collateral. Concurrently therewith, the Debtors will also obtain a new $100,000,000 senior secured debtor-in-possession term loan facility secured by a second priority lien on the Collateral pursuant to the DIP Term Loan Agreement (as defined below).

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

**ARTICLE I**

**DEFINITIONS, INTERPRETATION AND ACCOUNTING TERMS**

SECTION 1.1      Defined Terms.

As used in this Agreement, the following terms have the following meanings:

"*Account*" has the meaning given to such term in Article 9 of the UCC.

"*Account Debtor*" has the meaning given to such term in Article 9 of the UCC.

"*ACH*" means automated clearing house transfers.

"*Acquired Indebtedness*" means, with respect to any specified Person: (a) Indebtedness of any other Person existing at the time such other Person is merged, consolidated or amalgamated with or into or became a Restricted Subsidiary of such specified Person, (but excluding Indebtedness incurred in connection with, or in contemplation of, such other Person merging, amalgamating or consolidating with or into, or becoming a Restricted Subsidiary of, such specified Person), and (b) Indebtedness secured by a Lien encumbering any asset acquired by such specified Person; provided, however, that any Lien securing Acquired Indebtedness (other than any purchase money Indebtedness with respect to real estate, equipment or other fixed assets or any Capitalized Lease) shall be junior to the Liens on the Collateral securing the Obligations and subject to a Customary Intercreditor Agreement.

"*Actual Cash Receipts*" means the sum of all cash collections received by the Loan Parties from operations (excluding any borrowings or other cash receipts not constituting trade receipts) during the relevant period of determination, as determined in a manner consistent with the Budget.

"*Actual Disbursements*" means the sum of all operating disbursements, expenses and payments made by the Loan Parties (other than transaction-related payments and professional fees and expenses, in each case, to the extent paid on the Closing Date, and professional fees and expenses of Gordon Brothers Retail Partners LLC (and their subcontractors)) during the relevant period of determination, as determined in a manner consistent with the Budget.

"*Actual Inventory Levels*" means the actual aggregate inventory levels of the Loan Parties as of the relevant date of determination which corresponds to the budgeted aggregate inventory levels of the Loan Parties contained in the Budget under "forecast ending inventory", as determined in a manner consistent with the Budget.

"*Adjusted Eurocurrency Rate*" means, as to any Eurocurrency Rate Loan for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the Eurocurrency Rate for such Interest Period divided by (b) one minus the Eurocurrency Reserve Percentage.

"*Adjustment Date*" [means the first day of each calendar month, as applicable.]

"*Administrative Agent*" has the meaning specified in the introductory paragraph to this Agreement.

"*Administrative Agent's Office*" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 12.8, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"*Administrative Questionnaire*" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"*Affiliate*" means, with respect to any Person, another Person that directly or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "*Controlling*" and "*Controlled*" have meanings correlative thereto. For the avoidance of doubt, none of the Arrangers, nor the Agents, nor their respective lending affiliates nor any entity acting as an Issuer hereunder shall be deemed to be an Affiliate of Holdings, the Borrower or any of their respective Subsidiaries.

"*Agent Parties*" has the meaning specified in Section 12.8(d).

"*Agent-Related Distress Event*" means, with respect to the Administrative Agent, Collateral Agent, any Co-Collateral Agent, or any Person that directly or indirectly Controls the Administrative Agent, Collateral Agent, or any Co-Collateral Agent (each, a "*Distressed Agent-Related Person*"), a voluntary or involuntary case with respect to such Distressed Agent-Related Person under any Debtor Relief Law, or a custodian, conservator, receiver or similar official is appointed for such Distressed Agent-Related Person or any substantial part of such Distressed Agent-Related Person's assets, or such Distressed Agent-Related Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Agent-Related Person to be, insolvent or bankrupt; provided that an Agent-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any Equity Interests in the Administrative Agent, Collateral Agent, Co-Collateral Agent or any Person that directly or indirectly Controls the Administrative Agent, Collateral Agent, or any Co-Collateral Agent by a Governmental Authority or an instrumentality thereof.

"*Agent-Related Persons*" means the Agents, together with their respective Affiliates, and the officers, directors, employees, agents, attorney-in-fact, partners, trustees and advisors of such Persons and of such Persons' Affiliates.

"*Agents*" means, collectively, the Administrative Agent, the Collateral Agent, any Co-Collateral Agent, the Supplemental Administrative Agents (if any), and the Arrangers.

"*Aggregate Commitments*" means the Revolving Credit Commitments of all the Lenders.

"*Aggregate Letter of Credit Sublimit*" means the lesser of (a) $30,000,000 and (b) the aggregate principal amount of the Revolving Credit Commitments.

"*Agreement*" means this Credit Agreement, as amended, restated, modified or supplemented from time to time in accordance with the terms hereof.

3

"*Agreement Currency*" has the meaning specified in Section 12.10.

"*Applicable Rate*" means a percentage per annum equal to (i) for Eurocurrency Rate Loans, 2.75%, (ii) for Base Rate Loans, 1.75% and (iii) for Letter of Credit fees, 2.75%.

"*Applicable Percentage*" means with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Commitments represented by such Lender's Revolving Credit Commitment at such time, subject to adjustment as provided in Section 2.16. If the commitment of each Lender to make Loans and the obligation of the Issuers to make L/C Credit Extensions have been terminated pursuant to Section 10.2 or if the Aggregate Commitments have expired, then the Applicable Percentage of each Lender shall be determined based on the Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule I or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"*Applicable Unused Commitment Fee Rate*" means a percentage per annum equal to (a) until the end of October 2018, 0.375% and (b) thereafter, the following percentages per annum, based upon Average Revolving Loan Utilization determined as of the most recent Adjustment Date:

| Average Revolving Loan Utilization as a percentage of Maximum Credit | Applicable Unused Commitment Fee Rate |
|---|---|
| Greater than or equal to 50.0% | 0.25% |
| Less than 50.0% | 0.375% |

The Applicable Unused Commitment Fee Rate shall be adjusted monthly in accordance with the table above on each Adjustment Date for the period beginning on such Adjustment Date based upon the Average Revolving Loan Utilization as the Administrative Agent shall determine in good faith within ten (10) Business Days after such Adjustment Date. Any increase or decrease in the Applicable Unused Commitment Fee Rate resulting from a change in the Average Revolving Loan Utilization shall become effective as of the Adjustment Date for the period beginning on such Adjustment Date.

"*Appropriate Lender*" means, at any time, with respect to Loans of any Class, the Lenders of such Class.

"*Approved Account Bank*" means a financial institution at which the Borrower or a Guarantor maintains an Approved Deposit Account.

"*Approved Bank*" means any commercial bank that is organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development or is the principal banking Subsidiary of a bank holding company organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and

4

Development, is a member of the Federal Reserve System and has combined capital and surplus of not less than $500,000,000 in the case of U.S. domestic banks and $100,000,000 (or the Dollar equivalent as of the date of determination) in the case of non-U.S. banks.

"*Approved Deposit Account*" means each Deposit Account that is subject to the control of the Administrative Agent pursuant to the Cash Management Order or Orders, as applicable, and that is maintained by any Loan Party with a financial institution approved by the Administrative Agent, the Collateral Agent and the Co-Collateral Agent.

"*Approved Fund*" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"*Approved Securities Account*" means each Securities Account that is subject to the control of the Administrative Agent pursuant to the Cash Management Order or Orders, as applicable, and that is maintained by the Borrower or any Subsidiary Guarantor with a securities intermediary or commodity intermediary approved by the Administrative Agent, the Collateral Agent and the Co-Collateral Agent.

"*Approved Securities Intermediary*" means a securities intermediary at which the Borrower or a Subsidiary Guarantor maintains an Approved Securities Account.

"*Arrangers*" means Barclays Bank PLC and Citizens Bank, N.A., each in its capacity as a joint bookrunner and a joint lead arranger under this Agreement.

"*Assignee Group*" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"*Assignment and Assumption*" means an Assignment and Assumption substantially in the form of Exhibit A or any other form approved by the Administrative Agent.

"*Attorney Costs*" means all reasonable and documented or invoiced, fees, costs, expenses and disbursements of any law firm or other external legal counsel.

"*Attributable Indebtedness*" means, subject to the second paragraph of Section 1.3, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with IFRS.

"*Availability Rent*" means the lesser of (1) rent for two months and (2) rent for the projected "going out of business sale" period for Inventory at leased locations as set forth in the most recent appraisal of Inventory received by the Administrative Agent, the Co-Collateral Agent and the Collateral Agent.

"*Availability Reserves*" means the Carve Out Reserve and, without duplication of any other reserves or items that are otherwise addressed or excluded through eligibility criteria, such other reserves as the Administrative Agent, the Collateral Agent and any Co-Collateral Agent from time to time determines in its Permitted Discretion as being appropriate (a) to reflect the

5

impediments to the Agents' ability to realize upon the Collateral, (b) to reflect claims and liabilities that the Administrative Agent, the Collateral Agent and any Co-Collateral Agent determines will need to be satisfied in connection with the realization upon the Collateral, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, the Collateral or the validity or enforceability of this Agreement or the other Loan Documents or any material remedies of the Secured Parties hereunder or thereunder, (d) to reflect any Lien, choate or inchoate, which could reasonably be expected to rank in priority to or pari passu with the Agents' Lien or (e) to reflect the amount of any priority claims that, in the Administrative Agent's reasonable determination, ranks equal or senior in priority to the Obligations, or require payment prior to the payment of the Obligations, in the Cases. Without limiting the generality of the foregoing, Availability Reserves may include reserves based on: (i) rent; *provided* that such Availability Reserves shall be limited to an amount not to exceed the sum of (x) past due rent for all of the Borrower's and the Subsidiary Guarantors' leased locations plus (y) (A) Availability Rent for all of the Borrower's and the Subsidiary Guarantors' leased locations located in the states of Washington, Virginia, Pennsylvania and all other Landlord Lien States and (B) Availability Rent for all of the Borrower's and the Subsidiary Guarantors' leased locations located in any other state that are distribution centers and warehouses, in each case, with respect to which the Administrative Agent has not received a Collateral Access Agreement in form and substance reasonably satisfactory to the Administrative Agent, the Co-Collateral Agent and the Collateral Agent (it being understood that any Collateral Access Agreements obtained in respect of the Pre-Petition Credit Agreement shall be deemed to be delivered in respect of this Agreement pursuant to the Cash Management Order or Orders, as applicable); (ii) customs duties, and other costs to release Inventory which is being imported into the United States; (iii) outstanding Taxes and other governmental charges, including, ad valorem, real estate, personal property, sales, and other Taxes which have priority over the interests of the Collateral Agent in the Collateral; (iv) salaries, wages and benefits due to employees of the Borrower which have priority over the interests of the Collateral Agent in the Collateral, (v) Customer Credit Liabilities; (vi) warehousemen's or bailee's charges and other Liens permitted under Section 9.1 which have priority over the interests of the Collateral Agent in the Collateral; (vii) reserves in respect of Cash Management Obligations, provided that reserves of the type described in this clause (vii) in respect of such Cash Management Obligations shall require the consent of the Borrower; (viii) reserves in respect of Obligations in respect of Secured Hedge Agreements, provided that, if such Obligations in respect of Secured Hedge Agreements shall constitute Specified Secured Hedge Obligations, then reserves of the type described in this clause (viii) shall require the consent of the Borrower; (ix) subject to the limitations set forth above, customer deposit and similar reserves and (x) additional reserves in the Administrative Agent's Permitted Discretion, the Collateral Agent's Permitted Discretion and the Co-Collateral Agent's Permitted Discretion.

"*Avoidance Action*" means any cause of action under chapter 5 of the Bankruptcy Code.

"*Average Revolving Loan Utilization*" means the fraction, expressed as a percentage as of the most recent Adjustment Date, (a) the numerator of which is the average daily aggregate Revolving Credit Exposure (excluding any Revolving Credit Exposure resulting from any outstanding Swing Loans) for the three month period immediately preceding such Adjustment Date (or, in the case of the first Adjustment Date, the period from and including the Closing Date

through the date immediately preceding such first Adjustment Date), and (b) the denominator of which is the Aggregate Commitments at such time.

"*Bail-In Action*" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"*Bail-In Legislation*" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"*Bankruptcy Code*" means Title 11, U.S.C., as now or hereafter in effect, or any successor thereto.

"*Bankruptcy Court*" has the meaning specified in the recitals hereto.

"*Barclays*" means Barclays Bank PLC, acting in its individual capacity, and its successors and assigns.

"*Base Rate*" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent).

"*Base Rate Loan*" means a Loan that bears interest based on the Base Rate.

"*Basel III*" means, collectively, those certain agreements on capital requirements, leverage ratios and liquidity standards contained in "Basel III: A Global Regulatory Framework for More Resilient Banks and Banking Systems," "Basel III: International Framework for Liquidity Risk Measurement, Standards and Monitoring," and "Guidance for National Authorities Operating the Countercyclical Capital Buffer," each as published by the Basel Committee on Banking Supervision in December 2010 (as revised from time to time).

"*Board of Directors*" means, for any Person, the board of directors or other governing body of such Person or, if such Person does not have such a board of directors or other governing body and is owned or managed by a single entity, the Board of Directors of such entity, or, in either case, any committee thereof duly authorized to act on behalf of such Board of Directors. Unless otherwise provided, "Board of Directors" means the Board of Directors of the Borrower.

"*Borrower*" has the meaning specified in the introductory paragraph to this Agreement.

"*Borrower Materials*" has the meaning specified in Section 7.2.

"*Borrowing*" means a borrowing consisting of Loans of the same Class and Type made, converted or continued on the same date and, in the case of Eurocurrency Rate Loans, having the same Interest Period.

"*Borrowing Base*" means, at any time of calculation, an amount equal to:

      (a)    the face amount of Eligible Credit Card Receivables multiplied by the Credit Card Advance Rate; plus

      (b)    the face amount of Eligible Accounts multiplied by the Eligible Accounts Advance Rate; plus

      (c)    the Net Recovery Percentage of Eligible Inventory, multiplied by the Inventory Advance Rate multiplied by the Cost of Eligible Inventory, net of Inventory Reserves attributable to Eligible Inventory; plus

      (d)    the Net Recovery Percentage of Eligible In-Transit Inventory multiplied by the In-Transit Advance Rate, multiplied by the Cost of Eligible In-Transit Inventory, net of Inventory Reserves attributable to Eligible In-Transit Inventory, provided that such amount shall not exceed 10% of Eligible Inventory; minus

      (e)    the then amount of all Availability Reserves (including, for the avoidance of doubt and without duplication, the Carve Out Reserve).

The Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base Certificate delivered to the Administrative Agent, the Co-Collateral Agent and the Collateral Agent pursuant to Section 7.4, as adjusted to give effect to Reserves following such delivery; provided, that Administrative Agent, the Co-Collateral Agent and the Collateral Agent shall be available to discuss any Reserve or change with the Borrower and the Borrower may take such action as may be required so that the event, condition or matter that is the basis for such Reserve or change no longer exists, in a manner and to the extent reasonably satisfactory to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent.  The amount of any Reserve established by the Administrative Agent, the Co-Collateral Agent and the Collateral Agent and any change in the amount of any Reserve, shall have a reasonable relationship to the event, condition or other matter that is the basis for such Reserve or such change (including for the avoidance of doubt, reasonable efforts by the Administrative Agent, the Co-Collateral Agent and the Collateral Agent to reduce or eliminate any Reserve for which the related event, condition or other matter giving rise to such established or increased Reserve no longer exists or is continuing).  Notwithstanding anything herein to the contrary, Reserves shall not duplicate eligibility criteria contained in the definition of Eligible Account, Eligible Credit Card Receivables, Eligible In-Transit Inventory, Eligible Inventory or any other Reserve then established.

"*Borrowing Base Certificate*" means a certificate of the Borrower substantially in the form of Exhibit I.

"*Budget*" means the financial projections for the Loan Parties covering the thirteen-week period on a weekly basis (i.e., Saturday to Friday) (but with the first period therein commencing

on the Petition Date through October 5, 2018 and weekly thereafter), substantially in the form of the initial Budget annexed hereto as Schedule 5.16. Such Budget may be amended, modified or otherwise updated from time to time by the Borrower, including pursuant to the requirements of Section 7.1(g), as approved by the Administrative Agent, the Collateral Agent and the Co-Collateral Agent in their sole and absolute discretion; provided, that upon the receipt of any such proposed updates, the Administrative Agent, the Collateral Agent and Co-Collateral Agent shall notify the Borrower in writing within 3 Business Days of receipt thereof if such updates are unacceptable and if no such written notice is provided, then the updated budget so delivered shall thereafter constitute the Budget for all purposes hereunder.

"*Budgeted Cash Receipts*" means the sum of the line items contained in the Budget labeled "operating receipts: trading receipts" during the relevant period of determination.

"*Budgeted Disbursements*" means the sum of the line items contained in the Budget labeled "total operating disbursements" and "professional fees" during the relevant period of determination.

"*Budgeted Inventory Levels*" means the budgeted aggregate inventory levels of the Loan Parties contained in the "forecast ending inventory" portion of the Budget opposite the heading "Ending Inventory" as of the relevant date of determination.

"*Business Day*" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, in New York City, New York and if such day relates to any interest rate settings as to a Eurocurrency Rate Loan, any fundings, disbursements, settlements and payments in respect of any such Eurocurrency Rate Loan, or any other dealings to be carried out pursuant to this Agreement in respect of any such Eurocurrency Rate Loan, means any such day on which dealings in deposits in Dollars are conducted by and between banks in the London interbank eurocurrency market.

"*Canadian Dollars*" means Canadian dollars, the lawful currency of Canada.

"*Capitalized Lease Obligation*" means, subject to the second paragraph of Section 1.3, at the time any determination thereof is to be made, the amount of the liability in respect of a Capitalized Lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with IFRS.

"*Capitalized Leases*" means, subject to the second paragraph of Section 1.3, all leases that have been or are required to be, in accordance with IFRS, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with IFRS.

"*Carve Out*" has the meaning assigned to such term in the Interim Order or the Final Order, as applicable.

"*Carve Out Reserve*" means an Availability Reserve established by the Administrative Agent in an amount equal to the sum of (i) the maximum amount of the Carve Out Reserve (as defined in any Order), but in any event not less than $7,000,000 at any time plus (ii) all fees payable (or projected to be payable) to the Clerk of the Court and to the United States Trustee

under section 1930(a) of title 28 of the United States Code or otherwise during the Cases, plus interest at the statutory rate.

"*Cases*" has the meaning specified in the recitals hereto.

"*Cash Collateralize*" means to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the Administrative Agent, an Issuer or the Swing Loan Lender (as applicable) and the Lenders, as collateral for Letter of Credit Obligations, Obligations in respect of Swing Loans, or obligations of Lenders to fund participations in respect of either thereof (as the context may require), cash (which the applicable Issuer may require to be in the same currency as the relevant Letter of Credit) or deposit account balances or, if the applicable Issuer or Swing Loan Lender benefitting from such collateral shall agree in its sole discretion, other credit support, in each case in an amount (taking into account potential currency fluctuations) and pursuant to documentation in form and substance reasonably satisfactory to (a) the Administrative Agent and (b) the applicable Issuer or the Swing Loan Lender (as applicable). "*Cash Collateral*" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

"*Cash Dominion Period*" means each period beginning (a) on the date that Excess Availability shall have been less than $30,000,000 (or, if the Interim Order has approved DIP Term Loans on the Closing Date in an aggregate principal amount under the DIP Term Loan Agreement of $60,000,000 or less, $17,500,000 until such time the Final Order is entered and then, $30,000,000) for five (5) consecutive Business Days, and ending on the date Excess Availability shall have been equal to or greater than $30,000,000 (or, if the Interim Order has approved DIP Term Loans on the Closing Date in an aggregate principal amount under the DIP Term Loan Agreement of $60,000,000 or less, $17,500,000 until such time the Final Order is entered and then, $30,000,000) for thirty (30) consecutive calendar days, or (b) upon the occurrence of an Event of Default, the period that such Event of Default shall be continuing.

"*Cash Equivalents*" means any of the following types of Investments, to the extent owned by the Borrower or any Restricted Subsidiary:

(a)    Dollars, pounds sterling, yen, Euros or Canadian Dollars;

(b)    in the case of any Foreign Subsidiary that is a Restricted Subsidiary or any jurisdiction in which the Borrower or its Restricted Subsidiaries conducts business, such local currencies held by it from time to time in the Ordinary Course of Business and not for speculation;

(c)    readily marketable direct obligations issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 12 months or less from the date of acquisition;

(d)    certificates of deposit, time deposits and eurocurrency time deposits with maturities of 12 months or less from the date of acquisition, demand deposits, bankers'

10

acceptances with maturities not exceeding 24 months and overnight bank deposits, in each case with any Approved Bank;

(e)      repurchase obligations for underlying securities of the types described in clauses (c) and (d) above or clause (g) below entered into with any Approved Bank;

(f)      commercial paper rated at least P-2 by Moody's or at least A-2 by S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) and in each case maturing within 12 months after the date of acquisition thereof;

(g)      marketable short-term money market and similar highly liquid funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency);

(h)      readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof, in each case having an Investment Grade Rating from either Moody's or S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) with maturities of 12 months or less from the date of acquisition;

(i)      Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency);

(j)      Investments, classified in accordance with IFRS as Consolidated Current Assets of the Borrower or any Restricted Subsidiary, in money market investment programs which are registered under the Investment Company Act of 1940 or which are administered by an Approved Bank, and, in either case, the portfolios of which are limited such that substantially all of such Investments are of the character, quality and maturity described in clauses (a) through (i) of this definition; and

(k)      investment funds investing substantially all of their assets in securities of the types described in clauses (a) through (j) above.

In the case of Investments by any Foreign Subsidiary that is a Restricted Subsidiary or Investments made in a country outside the United States, Cash Equivalents shall also include (i) investments of the type and maturity described in clauses (a) through (k) above of foreign obligors, which Investments or obligors (or the parents of such obligors) have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (ii) other short-term investments utilized by Foreign Subsidiaries that are Restricted Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments in clauses (a) through (k) and in this paragraph.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clause (a) above, provided that such amounts are converted into Dollars as promptly as practicable and in any event within ten (10) Business Days following the receipt of such amounts.

"*Cash Management Bank*" means any Person that is a Lender or an Affiliate of a Lender at the time it provides any Cash Management Services, whether or not such Person subsequently ceases to be a Lender or an Affiliate of a Lender.

"*Cash Management Obligations*" means obligations owed by the Borrower or any Restricted Subsidiary to any Cash Management Bank in respect of or in connection with any Cash Management Services and designated by the Cash Management Bank and the Borrower in writing to the Administrative Agent as "Cash Management Obligations".

"*Cash Management Order*" means an order of the Bankruptcy Court, in form and substance satisfactory to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent, among other things, (i) approving and authorizing the Debtors to use existing cash management systems, (ii) authorizing and directing banks and financial institutions to honor and process checks and transfers, (iii) authorizing continued use of intercompany transactions, (iv) waiving requirements of Section 345(b) of the Bankruptcy Code and (v) authorizing the Debtors to use existing bank accounts and existing business forms.

"*Cash Management Services*" means any agreement or arrangement to provide cash management services, including treasury, depository, overdraft, credit card processing, credit or debit card, purchase card, electronic funds transfer and other cash management arrangements.

"*Cash Receipts*" shall have the meaning specified in Section 8.12.

"*Cash Taxes*" means, with respect to any Test Period, all taxes paid or payable in cash by the Borrower and its Restricted Subsidiaries during such period.

"*CFC*" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"*CFC Holdco*" means any Domestic Subsidiary that has no material assets other than, directly or indirectly, equity interests (or equity interests and indebtedness) of one or more Foreign Subsidiaries that are CFCs or any other Domestic Subsidiary that itself is a CFC Holdco.

"*Change in Law*" means the occurrence after the date of this Agreement (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rules, guideline, requirement or directive (whether or not having the force of law) by any Governmental Authority; provided however, that notwithstanding anything herein to the contrary (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority)

12

or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case arising under clauses (i) or (ii) be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"*Change of Control*" means the earliest to occur of:

(a)     Steinhoff Parent ceases to own and control, directly or indirectly, more than 50.1% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Parent;

(b)     Holdings ceases to be an indirect wholly owned Subsidiary of Parent; or

(c)     the Borrower ceases to be a direct wholly owned Subsidiary of Holdings; or

(d)     the occurrence of a Change of Control (as defined in the DIP Term Loan Agreement) shall have occurred.

"*Chapter 11 Plan*" shall have the meaning specified in Section 8.16(b), which Chapter 11 Plan shall not be modified or amended without the consent of the Administrative Agent, the Collateral Agent and the Co-Collateral Agent in their sole discretion.

"*Citizens*" means Citizens Bank, N.A.

"*Class*" means (i) with respect to Commitments or Loans, those of such Commitments or Loans that have the same terms and conditions (without regard to differences in the Type of Loan, Interest Period, upfront fees, OID or similar fees paid or payable in connection with such Commitments or Loans, or differences in tax treatment (e.g., "fungibility")) and (ii) with respect to Lenders, those of such Lenders that have Commitments or Loans of a particular Class.

"*Closing Date*" means the first date on which all the conditions precedent in Section 4.1 are satisfied or waived in accordance with Section 12.1, which date is [  ], 2018.

"*Co-Collateral Agent*" means Citizens Bank, N.A. and any other Co-Collateral Agent appointed in accordance with the terms of Section 11.9.

"*Code*" means the U.S. Internal Revenue Code of 1986, as amended from time to time.

"*Collateral*" means substantially all property and assets of the Loan Parties, including (a) all the "Collateral" (or equivalent term or words of similar intent) as defined in any Collateral Document and shall include the Mortgaged Properties and (b) the ["DIP Collateral"] referred to in any Orders, it being understood that "Collateral" shall include all such "DIP Collateral" irrespective of whether any such property was excluded pursuant to the Pre-Petition Loan Documents.

"*Collateral Agent*" has the meaning specified in the introductory paragraph to this Agreement.

"*Collateral Access Agreement*" means an agreement reasonably satisfactory in form and substance to the Administrative Agent, the Co-Collateral Agent and the Collateral Agent executed by, as the case may be, (a) a bailee or other Person in possession of Collateral, and (b) any landlord of any premises leased by any Loan Party, pursuant to which such Person (i) acknowledges the Collateral Agent's Lien on the Collateral, (ii) releases or subordinates such Person's Liens in the Collateral held by such Person or located on such premises, (iii) agrees to provide the Collateral Agent with access to the Collateral held by such bailee or other Person or located in or on such premises for the purpose of conducting field examinations, appraisals or Liquidation and (iv) makes such other agreements with the Collateral Agent as the Administrative Agent and the Co-Collateral Agent may reasonably require.

"*Collateral and Guarantee Requirement*" means, at any time, the requirement that:

(l)    the Collateral Agent shall have received each Collateral Document required to be delivered on the Closing Date pursuant to Section 4.1(a)(iii) or pursuant to Section 8.11, Section 8.12 or Section 8.13 at such time, subject, in each case, to the limitations and exceptions of this Agreement and the Collateral Documents and any Order, duly executed by each Loan Party thereto;

(m)    the Bankruptcy Court shall have entered an Order granting the super-priority claim and the liens  in the Collateral and other rights and protections contemplated hereby and customary for debtor in possession financings and authorizing the Loans, which order (i) shall be in full force and effect and shall not have been, in whole or in part, vacated, reversed, stayed, or set aside and (ii) shall not have been modified or amended without the consent of the Administrative Agent, the Collateral Agent and the Co-Collateral Agent, such consent not to be unreasonably withheld, delayed, denied or conditioned;

(n)    all Obligations (other than, with respect to any Guarantor, any Excluded Swap Obligations of such Guarantor) shall have been unconditionally guaranteed by (i) Holdings and each Restricted Subsidiary of the Borrower that is a wholly owned Material Domestic Subsidiary and not an Excluded Subsidiary including those Subsidiaries that are listed on Schedule II hereto (each, a "*Guarantor*") and (ii) any Subsidiary of the Borrower that Guarantees any Indebtedness incurred by the Borrower pursuant to any Junior Financing shall be a Guarantor hereunder;

(o)    the Obligations and the Guaranty shall have been secured by a first-priority security interest (subject to Liens permitted by Section 9.1) in (i) all the Equity Interests of the Borrower, (ii) all Equity Interests of each Restricted Subsidiary that is a Domestic Subsidiary (other than a Restricted Subsidiary described in the following clause (iii)(A)) that is directly owned by the Borrower or any Subsidiary Guarantor and (iii) 65% of the issued and outstanding Equity Interests directly owned by the Borrower or by any Subsidiary Guarantor of (A) each Restricted Subsidiary that is a CFC Holdco and (B) each Restricted Subsidiary that is a CFC; and

(p)    except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 9.1, or under any Collateral Document or any Order, the

14

Obligations and the Guaranty shall have been secured by a perfected first-priority security interest in substantially all tangible and intangible property of the Borrower and each Guarantor (including accounts, deposit accounts, Inventory, equipment, investment property, contract rights, applications and registrations of intellectual property filed in the United States, other general intangibles, and proceeds of the foregoing), in each case, with the priority required by the Collateral Documents or any Order, in each case subject to exceptions and limitations otherwise set forth in this Agreement and the Collateral Documents or any Order; and

      (q)    **[reserved]**.

The foregoing definition and/or any other provision of this Agreement shall not require (i) the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, surveys, abstracts or appraisals or taking other actions with respect to any Excluded Assets, (ii) any Loan Party to provide Mortgages, obtain title insurance, surveys, abstracts or appraisals or take any other action with respect to any fee-owned or leased real property of any Loan Party, and/or (iii) any Loan Party to obtain a Lien Acknowledgement Agreement or deliver a Credit Card Notification.

The Collateral Agent and the Co-Collateral Agent may grant extensions of time for the perfection of security interests in or the obtaining of title insurance and surveys with respect to particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) where it reasonably determines, in consultation with the Borrower, that perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

No actions in any non-U.S. jurisdiction or required by the Laws of any non-U.S. jurisdiction shall be required in order to create any security interests in assets located or titled outside of the U.S. or to perfect such security interests, including any intellectual property registered in any non-U.S. jurisdiction (it being understood that there shall be no security agreements or pledge agreements governed under the Laws of any non-U.S. jurisdiction).

"*Collateral Documents*" means, collectively, the Security Agreement, the Intellectual Property Security Agreements, each of the collateral assignments, Security Agreement Supplements, security agreements, pledge agreements or other similar agreements delivered to the Agents and the Lenders pursuant to Section 4.1(a)(iv), Section 8.11, Section 8.12 or Section 8.13, the Guaranty, each Lien Acknowledgment Agreement and each of the other agreements, instruments or documents that creates or purports to create a Lien or Guarantee in favor of the Collateral Agent for the benefit of the Secured Parties.

"*Commitment Letter*" means the Commitment Letter dated as of October 4, 2018, among Barclays Bank PLC, Citizens Bank, N.A. and Borrower.

"*Committee Professionals*" has the meaning specified in the definition of "Carve Out".

"*Commodity Exchange Act*" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"*Compliance Certificate*" means a certificate substantially in the form of Exhibit O and which certificate shall in any event be a certificate of the chief financial officer, chief accounting officer or other Responsible Officer of the Borrower with equivalent duties with financial reporting responsibilities (a) certifying as to whether a Default has occurred and is continuing and, if applicable, specifying the details thereof and any action taken or proposed to be taken with respect thereto, and (b) setting forth a reasonably detailed calculation of Excess Availability as of the last day of the most recently completed Test Period.

"*Concentration Account*" has the meaning specified in Section 8.12(d).

"*Consolidated Total Debt*" means, as of any date of determination, the aggregate principal amount of Indebtedness of the Borrower and the Restricted Subsidiaries outstanding on such date, in an amount that would be reflected on a balance sheet prepared as of such date on a consolidated basis in accordance with IFRS (but excluding the effects of any discounting of Indebtedness resulting from the application of acquisition accounting in connection with the Transaction, any Permitted Acquisition or any other Investment permitted hereunder), consisting of Indebtedness for borrowed money, Attributable Indebtedness, and all Guarantees of Indebtedness of such type that is owed by a Person that is not the Borrower or a Restricted Subsidiary; provided that Consolidated Total Debt shall not include Indebtedness in respect of (i) any letter of credit, except to the extent of unreimbursed obligations in respect of drawn letters of credit (provided that any unreimbursed amount under commercial letters of credit shall not be counted as Consolidated Total Debt until three (3) Business Days after such amount is drawn (it being understood that any borrowing, whether automatic or otherwise, to fund such reimbursement shall be counted)) and (ii) obligations under Swap Contracts.

"*Contractual Obligation*" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"*Cost*" means the cost of purchases of Inventory determined according to the accounting policies used in the preparation of the Borrower's financial statements.

"*Credit Card Advance Rate*" means 90%.

"*Credit Card Agreements*" means all agreements now or hereafter entered into by the Borrower or any Guarantor for the benefit of the Borrower or a Subsidiary Guarantor, in each case with any Credit Card Issuer or any Credit Card Processor, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, including, but not limited to, the agreements set forth on Schedule 1.1E hereto.

"*Credit Card Issuer*" means any Person (other than the Borrower or a Guarantor) who issues or whose members issue credit cards, including MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non bank credit or debit cards, including credit or debit cards issued by or through American Express Travel Related Services Company, Inc., Novus Services, Inc. and the Mattress Firm Card.

16

"*Credit Card Notification*" means, collectively, the notices to Credit Card Issuers or Credit Card Processors who are parties to Credit Card Agreements in substantially the form of Exhibit P and which Credit Card Notifications shall require the ACH or wire transfer no less frequently than each Business Day (and whether or not there are then any outstanding Obligations) to an Approved Deposit Account of all payments due from Credit Card Processors; it being understood that pursuant to the Cash Management Order or the Orders, as applicable, any Credit Card Notification delivered under the Pre-Petition Credit Agreement shall be deemed to have been delivered in respect of this Agreement.

"*Credit Card Processor*" means any servicing or processing agent or any factor or financial intermediary, in each case, other than a Credit Card Issuer, who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to the Borrower's or any Guarantor's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"*Credit Card Receivables*" means, collectively, but without duplication, (a) all present and future rights of the Borrower or any Guarantor to payment from any Credit Card Issuer (other than the issuer of the Mattress Firm Card), Credit Card Processor or other third party arising from sales of goods or rendition of services to customers who have purchased such goods or services using a credit or debit card and (b) all present and future rights of the Borrower or any Guarantor to payment from any Credit Card Issuer (other than the issuer of the Mattress Firm Card), Credit Card Processor or other third party in connection with the sale or transfer of Accounts arising pursuant to the sale of goods or rendition of services to customers who have purchased such goods or services using a credit card or a debit card, including, but not limited to, all amounts at any time due or to become due from any Credit Card Issuer (other than the issuer of the Mattress Firm Card) or Credit Card Processor under the Credit Card Agreements or otherwise, in each case above calculated net of prevailing interchange charges.

"*Credit Extension*" means each of the following: (a) a Borrowing and (b) a L/C Credit Extension.

"*Cure Amount*" has the meaning specified in Section 10.4(b).

"*Current Assets Collateral*" means all Collateral other than Collateral consisting of:

<blockquote>

(B)     Equipment;

(C)     Fixtures;

(D)     Intellectual Property (as defined in the Security Agreement);

(E)     real estate; and/or

(F)     Equity Interests.

</blockquote>

For purposes of this definition of "Current Assets Collateral", capitalized terms not otherwise defined in this Agreement shall have the meanings ascribed to them in the UCC.

17

"*Customary Intercreditor Agreement*" means an intercreditor agreement executed in connection with the incurrence of Indebtedness secured by Liens on the Collateral which are intended to rank junior to the Liens on the Collateral securing the Obligations, in form and substance reasonably acceptable to the Administrative Agent, the Co-Collateral Agent and the Collateral Agent which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank junior to the Liens on the Collateral securing the Obligations.

"*Customer Credit Liabilities*" means, at any time, the aggregate remaining balance at such time of (a) outstanding gift certificates and gift cards of the Borrower entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory and (b) outstanding merchandise credits of the Borrower, in each case, net of any dormancy reserves maintained by the Borrower on its books and records in the Ordinary Course of Business consistent with past practices.

"*Customs Broker Agreement*" means an agreement in substantially the form attached hereto as Exhibit Q (or such other form as may be reasonably satisfactory to the Administrative Agent, the Co-Collateral Agent and the Collateral Agent) among a Loan Party, a customs broker, freight forwarder or other carrier, and the Collateral Agent, in which the customs broker, freight forwarder or other carrier acknowledges that it has control over and holds the documents evidencing ownership of, or other shipping documents relating to, the subject Inventory or other property for the benefit of the Collateral Agent, and agrees, upon notice from the Collateral Agent (which notice shall be delivered only upon the occurrence and during the continuance of an Event of Default), to hold and dispose of the subject Inventory and other property solely as directed by the Collateral Agent.

"*Debtor Professionals*" has the meaning specified in the definition of "Carve Out".

"*Debtor Relief Laws*" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"*Debtors*" has the meaning specified in the recitals hereto.

"*Default*" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"*Default Rate*" means an interest rate equal to (a) the Base Rate plus (b) the Applicable Rate applicable to Base Rate Loans plus (c) 2.0% per annum; *provided* that with respect to the outstanding principal amount of any Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan (giving effect to Section 2.11) plus 2.0% per annum; *provided further* that with respect to Letter of Credit Fee amounts due and payable, the Default Rate shall be the rate equal to the rate otherwise applicable to such Letter of Credit plus 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws.

"*Defaulting Lender*" means, subject to Section 2.16(b), any Lender that, as determined by the Administrative Agent, (a) has failed to perform any of its funding obligations hereunder, including in respect of its Loans or participations in respect of Letters of Credit or Swing Loans, within three (3) Business Days of the date required to be funded by it hereunder, (b) has notified the Borrower or the Administrative Agent that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations hereunder or under other agreements in which it commits to extend credit, (c) has failed, within three Business Days after request by the Administrative Agent, to confirm in a manner satisfactory to the Administrative Agent that it will comply with its funding obligations (provided that any Lender that has failed to give such timely confirmation shall cease to be a Defaulting Lender under this clause (c) upon receipt of such confirmation by the Administrative Agent), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it, (iii) become the subject of a Bail-in Action or (iv) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority.

"*Deposit Account*" means any checking or other demand deposit account maintained by the Loan Parties, including any "deposit accounts" under Article 9 of the UCC. All funds in such Deposit Accounts shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in the Deposit Accounts, subject to the Security Agreement.

"*Designated Cash Equivalents*" means funds maintained in a Deposit Account and items specified in clauses (d) and (i) of the definition of "Cash Equivalents".

"*Designated Non-Cash Consideration*" means the fair market value of non-cash consideration received by the Borrower or a Restricted Subsidiary in connection with a Disposition pursuant to Section 9.5(j) that is designated as Designated Non-Cash Consideration pursuant to a certificate of a Responsible Officer, setting forth the basis of such valuation (which amount will be reduced by the fair market value of the portion of the non-cash consideration converted to cash within one-hundred eighty (180) days following the consummation of the applicable Disposition).

"*DIP Intercreditor Agreement*" means that certain DIP Intercreditor Agreement dated as of [ ], 2018 by and between the Administrative Agent and Barclays, as administrative agent for the holders of the DIP Term Loan, as amended and in effect from time to time.

"*DIP Superpriority Claim*" means the allowed superpriority administrative expense claim granted to the Loan Parties in the Cases and any Successor Cases pursuant to Section 364(c)(1) of the Bankruptcy Code for all of the Obligations with priority over any and all Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b) (except as set forth in the Orders), 546(c), 546(d),

726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative; *provided*, *however*, that the DIP Superpriority Claim shall not have recourse to any Avoidance Actions or the proceeds thereof subject to entry of the Final Order; *provided*, *further*, that the DIP Superpriority Claim shall be subject to the Carve Out.

"*DIP Term Loan Agreement*" means that certain [Senior Secured Super-Priority Debtor-In-Possession Term Loan Credit Agreement] dated as of October [•], 2018 among the Borrower, the lenders party thereto, Barclays Bank PLC, as administrative agent and collateral agent, and the other parties thereto, as amended and in effect from time to time in accordance with the terms of the DIP Intercreditor Agreement or any Order and any refinancing or replacement thereof in whole or in part (in accordance with the terms of the DIP Intercreditor Agreement and the Orders).

"*DIP Term Loans*" means the "Term Loans" as defined in the DIP Term Loan Agreement as of the date hereof.

"*Disclosure Statement*" shall have the meaning specified in Section 8.16(b), which Disclosure Statement shall not be modified or amended without the consent of the Administrative Agent, the Collateral Agent and the Co-Collateral Agent in their sole discretion.

"*Disposition*" or "*Dispose*" means the sale, transfer, license, lease or other disposition (including any Sale-Leaseback and any sale or issuance of Equity Interests in a Restricted Subsidiary) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"*Disqualified Equity Interests*" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Cash Management Obligations or obligations under Secured Hedge Agreements) that are accrued and payable and the termination of the Revolving Credit Commitments and the termination of all outstanding Letters of Credit (unless the Outstanding Amount of the Letter of Credit Obligations related thereto has been Cash Collateralized, back-stopped by a letter of credit reasonably satisfactory to the applicable Issuer or deemed reissued under another agreement reasonably acceptable to the applicable Issuer)), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests and other than as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Cash Management Obligations or obligations under Secured Hedge Agreements) that are accrued and payable and the termination of the Revolving Credit

20

Commitments and the termination of all outstanding Letters of Credit (unless the Outstanding Amount of the Letter of Credit Obligations related thereto has been Cash Collateralized, back-stopped by a letter of credit reasonably satisfactory to the applicable Issuer or deemed reissued under another agreement reasonably acceptable to the applicable Issuer)), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Latest Maturity Date at the time of issuance of such Equity Interests; provided, that if such Equity Interests are issued pursuant to a plan for the benefit of future, current or former employees, directors, officers, members of management or consultants of Holdings (or any direct or indirect parent thereof), the Borrower or the Restricted Subsidiaries or by any such plan to such employees, directors, officers, members of management or consultants, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be permitted to be repurchased by the Borrower or its Restricted Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's, officer's, management member's or consultant's termination of employment or service, as applicable, death or disability.

"*Disqualified Institutions*" means those Persons (the list of all such Persons, the "Disqualified Institutions List") that are (i) identified in writing by the Borrower to the Arrangers prior to the Closing Date, (ii) competitors of the Borrower and its Subsidiaries (other than bona fide fixed income investors or debt funds) that are identified in writing by the Borrower to the Arrangers from time to time or (iii) Affiliates of such Persons set forth in clauses (i) and (ii) above (in the case of Affiliates of such Persons set forth in clause (ii) above, other than bona fide fixed income investors or debt funds) that are either (a) identified in writing by the Borrower to the Administrative Agent from time to time or (b) clearly identifiable on the basis of such Affiliate's name; provided, that, to the extent Persons are identified as Disqualified Institutions in writing by the Borrower to the Administrative Agent after the Closing Date pursuant to clauses (ii) or (iii)(a), the inclusion of such Persons as Disqualified Institutions shall not retroactively apply to prior assignments or participations in respect of any Loan under this Agreement.  Until the disclosure of the identity of a Disqualified Institution to the Lenders generally by the Administrative Agent, such Person shall not constitute a Disqualified Institution for purposes of a sale of a participation in a Loan (as opposed to an assignment of a Loan) by a Lender.  Notwithstanding the foregoing, the Borrower, by written notice to the Administrative Agent, may from time to time in its sole discretion remove any entity from the Disqualified Institutions List (or otherwise modify such list to exclude any particular entity), and such entity removed or excluded from the Disqualified Institutions List shall no longer be a Disqualified Institution for any purpose under this Agreement or any other Loan Document.

"*Disqualified Institutions List*" has the meaning specified in the definition of "Disqualified Institutions".

"*Document*" has the meaning set forth in Article 9 of the UCC.

"*Documentary Letter of Credit*" means any Letter of Credit that is drawable upon presentation of documents evidencing the sale or shipment of goods purchased by the Borrower or a Guarantor in the ordinary course of its business.

"*Dollars*" and "*$*" mean lawful money of the United States.

"*Domestic Subsidiary*" means any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"*EEA Financial Institution*" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"*EEA Member Country*" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"*EEA Resolution Authority*" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"*Eligible Accounts*" means, as of any date of determination thereof, the aggregate amount of all Accounts (which, for the avoidance of doubt, shall include the Mattress Firm Card Receivables) due to the Borrower and each Subsidiary Guarantor, except in each case to the extent that (determined without duplication):

(a)     such Account (i) does not arise from the sale of goods or the performance of services by the Borrower or any Subsidiary Guarantor in the ordinary course of its business or (ii) arises out of arrangements with franchisees; provided that up to $4 million in Accounts owed to the Borrower or any Subsidiary Guarantor by franchisees, so long as any such Account satisfies clauses (b) through (z) of this definition of "*Eligible Accounts*", shall be deemed Eligible Accounts notwithstanding this clause (a);

(b)     (i) the Borrower's or Subsidiary Guarantor's right to receive payment is not absolute or is contingent upon the fulfillment of any condition whatsoever (other than the preparation and delivery of an invoice) or (ii) as to which such Person is not able to bring suit or otherwise enforce its remedies against the Account Debtor through judicial process;

(c)     any defense, counterclaim, set-off or dispute exists as to such Account, but only to the extent of such defense, counterclaim, set-off or dispute;

(d)     such Account is not a true and correct statement of bona fide indebtedness incurred in the amount of the Account for merchandise sold to or services rendered and accepted by the applicable Account Debtor;

(e)     an invoice, reasonably acceptable to the Administrative Agent, the Co-Collateral Agent and the Collateral Agent, in form and substance or otherwise in the form otherwise required by any Account Debtor, has not been sent to the applicable Account Debtor in respect of such Account on or before the date as of which such Account is first

included in the Borrowing Base Certificate or otherwise reported to the Administrative Agent, the Co-Collateral Agent and the Collateral Agent as Collateral;

(f)    such Account (i) is not owned by the Borrower or Subsidiary Guarantor or (ii) is not subject to the first priority, valid and perfected security interest and Lien of Collateral Agent, for and on behalf of itself and the Lenders (subject to Liens permitted under Section 9.1 having priority by operation of applicable Law over the Liens of the Collateral Agent) or (iii) is subject to any other Lien (other than Liens permitted hereunder pursuant to clauses (a), (c), (d), (h) and (dd) of Section 9.1) (the foregoing clauses (ii) and (iii) (other than in respect of the immediately foregoing clause (y)) not being intended to limit the ability of the Administrative Agent, the Co-Collateral Agent and the Collateral Agent to change, establish or eliminate any Reserves in its Permitted Discretion on account of any such permitted Liens);

(g)    such Account is the obligation of an Account Debtor that is (i) a director, officer, other employee or Affiliate of the Borrower or Subsidiary Guarantor or (ii) a natural person;

(h)    such Account is the obligation of an Account Debtor that is any Governmental Authority;

(i)    Accounts subject to a partial payment plan;

(j)    the Borrower or Subsidiary Guarantor is liable for goods sold or services rendered by the applicable Account Debtor to the Borrower but only to the extent of the potential offset;

(k)    (i) if such Account constitutes third-party financing receivables or Mattress Firm Card Receivables, such Account is unpaid for more than fifteen (15) days after the date of sale of Inventory giving rise to such third-party financing receivables or such Mattress Firm Card Receivables or (ii) if such Account does not constitute third-party financing receivables or Mattress Firm Card Receivables, the Account is not paid on or prior to (x) ninety (90) days following the original invoice date or (y) sixty (60) days following the date on which such Account was due;

(l)    **[reserved]**;

(m)    such Account is the obligation of an Account Debtor from whom 50% or more of the amount of all Accounts owing by that Account Debtor are ineligible under the criteria set forth in this definition;

(n)    any of the representations or warranties in the Loan Documents with respect to such Account are untrue in any material respect with respect to such Account (or, with respect to representations or warranties that are qualified by materiality, any of such representations and warranties are untrue);

(o)    such Account is evidenced by chattel paper or an instrument of any kind, or has been reduced to judgment;

23

(p)    such Account, together with all other Accounts owing by such Account Debtor and its Affiliates as of any date of determination, exceeds the greater of (i) 15% of all Eligible Accounts and (ii) 10% of the Borrowing Base (but, in each case, only to the extent of such excess) (the "*Account Concentration Limits*"); provided, that for purposes of this clause (p), Accounts owing by any third-party financing source that has an Investment Grade Rating shall not be subject to the Account Concentration Limits;

(q)    such Account is payable in any currency other than Dollars;

(r)    such Account has been redated, extended, compromised, settled or otherwise modified or discounted, except discounts or modifications that are granted by the Borrower or Subsidiary Guarantor in the Ordinary Course of Business and that are reflected in the calculation of the Borrowing Base;

(s)    such Account is of an Account Debtor that is located in a state requiring the filing of a notice of business activities report or similar report in order to permit the Borrower or Subsidiary Guarantor to seek judicial enforcement in such state of payment of such Account, unless the Borrower or Subsidiary Guarantor has qualified to do business in such state or has filed a notice of business activities report or equivalent report for the then-current year or if such failure to file and inability to seek judicial enforcement is capable of being remedied without any material delay or material cost;

(t)    such Account was acquired or originated by a Person acquired in a Permitted Acquisition (until such time as the Administrative Agent, the Co-Collateral Agent and the Collateral Agent have completed a customary due diligence investigation as to such Accounts and such Person, which investigation may, at the sole discretion of the Administrative Agent, the Co-Collateral Agent and the Collateral Agent, include a field examination, and the Administrative Agent, the Co-Collateral Agent and the Collateral Agent are satisfied with the results thereof in its Permitted Discretion);

(u)    Account Debtor is subject to an event of the type described in Section 10.1(f);

(v)    such Account represents a sale on a bill-and-hold, guaranteed sale, sale and return, sale on approval, consignment or other repurchase or return basis;

(w)    the Account Debtor is organized or has its principal offices or assets outside the United States, unless such Account is backed by a letter of credit reasonably acceptable to the Administrative Agent, the Co-Collateral Agent and the Collateral Agent (which is issued by a bank reasonably acceptable to the Administrative Agent, the Co-Collateral Agent and the Collateral Agent) and such letter of credit is subject to a first priority perfected Lien in favor of the Collateral Agent;

(x)    Accounts that are subject to any factoring or receivables finance program or constitute proceeds thereof;

(y)    the portion, if any, of any Account that includes a billing for interest, fees or late charges; or

24

(z)    such Account constitutes a Credit Card Receivable.

"*Eligible Accounts Advance Rate*" means 90%.

"*Eligible Assignee*" means any Person that meets the requirements to be an assignee under Section 12.2(b)(iii) and (v) (subject to such consents, if any, as may be required under Section 12.2(b)(ii)).

"*Eligible Credit Card Receivables*" means, as to the Borrower and each Subsidiary Guarantor, Credit Card Receivables of such Person which satisfy the criteria set forth below:

(aa)    such Credit Card Receivables arise from the actual and bona fide sale and delivery of goods or rendition of services by such Person in the ordinary course of the business of such Person;

(bb)    such Credit Card Receivables are not past due (beyond any stated applicable grace period, if any, therefor) pursuant to the terms set forth in the Credit Card Agreements with the Credit Card Issuer or Credit Card Processor of the credit card or debit card used in the purchase which gave rise to such Credit Card Receivables;

(cc)    such Credit Card Receivables are not unpaid more than five (5) Business Days after the date of the sale of Inventory giving rise to such Credit Card Receivables;

(dd)    the Credit Card Issuer or Credit Card Processor obligated in respect of such Credit Card Receivable has not failed to remit any monthly payment in respect of any Credit Card Receivable owing to a Loan Party;

(ee)    the Credit Card Issuer or Credit Card Processor with respect to such Credit Card Receivables has not asserted a counterclaim, defense or dispute against such Credit Card Receivables (other than customary set-offs to fees and chargebacks consistent with the practices of such Credit Card Issuer or Credit Card Processor with such Person from time to time), but the portion of the Credit Card Receivables owing by such Credit Card Issuer or Credit Card Processor in excess of the amount owing by such Person to such Credit Card Issuer or Credit Card Processor pursuant to such fees and chargebacks shall be deemed Eligible Credit Card Receivables;

(ff)    the Credit Card Issuer or Credit Card Processor with respect to such Credit Card Receivables has not set off against amounts otherwise payable by such Credit Card Issuer or Credit Card Processor to such Person for the purpose of establishing a reserve or collateral for obligations of such Person to such Credit Card Issuer or Credit Card Processor (other than customary set-offs and chargebacks consistent with the practices of such Credit Card Issuer or Credit Card Processor from time to time) but the portion of the Credit Card Receivables owing by such Credit Card Issuer or Credit Card Processor in excess of the set-off amounts shall be deemed Eligible Credit Card Receivables;

(gg)    such Credit Card Receivables (x) are owned by the Borrower or a Subsidiary Guarantor and such Person has a good title to such Credit Card Receivables, (y) are subject to the first priority, valid and perfected security interest and Lien of

25

Collateral Agent (subject only to Liens permitted under Section 9.1 having priority by operation of applicable Law over the Liens of the Collateral Agent), for and on behalf of itself and Lenders, as to such Credit Card Receivables of such Person and (z) are not subject to any other Lien (other than Liens permitted hereunder pursuant to clauses (a), (c), (d), (h) and (dd) of Section 9.1) (the foregoing clauses (y) and (z) (other than in respect of the immediately foregoing clause (2)) not being intended to limit the ability of the Administrative Agent, the Co-Collateral Agent and the Collateral Agent to change, establish or eliminate any Reserves in its Permitted Discretion on account of any such permitted Liens);

(hh)    the Credit Card Issuer or Credit Card Processor with respect to such Credit Card Receivables is not subject to an event of the type described in Section 10.1(f);

(ii)    no event of default has occurred under the Credit Card Agreement of such Person with the Credit Card Issuer or Credit Card Processor who has issued the credit card or debit card or handles payments under the credit card or debit card used in the sale which gave rise to such Credit Card Receivables which event of default gives such Credit Card Issuer or Credit Card Processor the right to cease or suspend payments to such Person;

(jj)    the customer using the credit card or debit card giving rise to such Credit Card Receivable shall not have returned the merchandise purchased giving rise to such Credit Card Receivable;

(kk)    to the extent required by Section 8.12(c), the Credit Card Receivables are subject to Credit Card Notifications;

(ll)    the Credit Card Processor is organized and has its principal offices or assets within the United States or is otherwise acceptable to the Administrative Agent, the Co-Collateral Agent and the Collateral Agent in each of their Permitted Discretion;

(mm)    such Credit Card Receivables are not evidenced by chattel paper or an instrument of any kind, and have not been reduced to judgment;

(nn)    the portion of such Credit Card Receivables that does not include a billing for interest, fees or late charges; and

(oo)    in the case of a Credit Card Receivable due from a Credit Card Processor (other than an Agent, Paymentech, LLC, First Data, Alliance Data or any of their respective Affiliates), none of the Administrative Agent, the Co-Collateral Agent and the Collateral Agent, have notified the Borrower that the Administrative Agent, the Co-Collateral Agent and the Collateral Agent have determined in their respective Permitted Discretion that such Credit Card Receivable is unlikely to be collected.

Credit Card Receivables which would otherwise constitute Eligible Credit Card Receivables pursuant to this Section will not be deemed ineligible solely by virtue of the Credit Card Agreements with respect thereto having been entered into by any Guarantor, for the benefit of

Borrower.  Any Credit Card Receivables which are not Eligible Credit Card Receivables shall, to the extent not constituting Excluded Assets, nevertheless be part of the Collateral.

"*Eligible In-Transit Inventory*" means, as of any date of determination, without duplication of other Eligible Inventory, Inventory of the Borrower or a Subsidiary Guarantor which meets the following criteria:

(pp)    such Inventory has been shipped from any foreign location to a United States location for receipt by the Borrower or a Subsidiary Guarantor within sixty (60) days of the date of determination and has not yet been received by the Borrower or a Subsidiary Guarantor,

(qq)    the purchase order for such Inventory is in the name of the Borrower or a Subsidiary Guarantor and title has passed to the Borrower or a Subsidiary Guarantor,

(rr)    either (i) such Inventory is subject to a negotiable document of title, in form reasonably satisfactory to the Administrative Agent, the Co-Collateral Agent and the Collateral Agent, which shall, except as otherwise agreed by the Administrative Agent, the Co-Collateral Agent and the Collateral Agent, each in their respective Permitted Discretion, have been endorsed to the Collateral Agent or an agent acting on its behalf or (ii) such Inventory is evidenced by a non-negotiable document of title in form reasonably acceptable to the Administrative Agent, the Co-Collateral Agent and the Collateral Agent, or other shipping document reasonably acceptable to the Administrative Agent, the Co-Collateral Agent and the Collateral Agent, which names the Borrower or a Subsidiary Guarantor as consignee,

(ss)    during the continuation of any In-Transit Trigger Period, (i) each relevant freight carrier, freight forwarder, customs broker, shipping company or other Person in possession of such Inventory and/or the documents relating to such Inventory, in each case, as reasonably requested by Administrative Agent, the Co-Collateral Agent and the Collateral Agent, shall have entered into a Customs Broker Agreement and (ii) as reasonably requested by the Administrative Agent, the Co-Collateral Agent and the Collateral Agent, the documents relating to such Inventory shall be in the possession of the Administrative Agent or an agent (or sub-agent) acting on its behalf,

(tt)    such Inventory is insured in accordance with the provisions of this Agreement and the other Loan Documents, including marine cargo insurance,

(uu)    such Inventory is subject, to the reasonable satisfaction of the Administrative Agent, the Co-Collateral Agent and the Collateral Agent, to a first priority perfected security interest in and lien upon such Inventory in favor of the Collateral Agent (except for any possessory lien upon such goods in the possession of a freight carrier or shipping company securing only the freight charges for the transportation of such goods to the Borrower or Subsidiary Guarantor), and

(vv)    such Inventory is not excluded from the definition of Eligible Inventory (except solely pursuant to clauses (f), (j), (o), (p), (x) and (y) thereof); provided that the Administrative Agent, the Co-Collateral Agent and the Collateral Agent may, in their

27

respective Permitted Discretion and upon notice to the Borrower, exclude any particular Inventory from the definition of "Eligible In-Transit Inventory" in the event that the Administrative Agent, the Co-Collateral Agent or the Collateral Agent determines in its respective Permitted Discretion and upon notice to the Borrower that such Inventory is subject to any Person's right or claim which is (or is capable of being) senior to, or pari passu with, the Lien of the Collateral Agent (such as, without limitation, a right of reclamation or stoppage in transit), as applicable, or may otherwise adversely impact the ability of the Collateral Agent to realize upon such Inventory.

Eligible In-Transit Inventory shall not include Inventory accounted for as "in transit" by the Borrower by virtue of such Inventory's being in transit between the Loan Parties' locations or in storage trailers at Loan Parties' locations; rather such Inventory shall be treated as "Eligible Inventory" if it satisfies the conditions therefor.

"*Eligible Inventory*" means, as to the Borrower and each Subsidiary Guarantor, Inventory consisting of finished goods merchantable and readily saleable to the public in the ordinary course of the business of such Person but shall not include:

(ww)   work-in-process;

(xx)   raw materials;

(yy)   spare parts for equipment;

(zz)   packaging and shipping materials;

(aaa)   supplies used or consumed in such Person's business;

(bbb)   Inventory (other than In-Transit Inventory as described in clause (x) below) located at premises owned and operated by a Person other than, and not leased by, the Borrower or any Subsidiary Guarantor, if the Administrative Agent shall not have received a Collateral Access Agreement from the owner and operator with respect to such location, duly authorized, executed and delivered by such owner and operator (or the Administrative Agent, the Co-Collateral Agent and the Collateral Agent shall determine to accept a Collateral Access Agreement that does not include all required provisions or provisions in the form otherwise required by the Administrative Agent, the Co-Collateral Agent and the Collateral Agent), unless the Administrative Agent, the Co-Collateral Agent and the Collateral Agent have, at their option, established such Availability Reserves in respect of amounts at any time due or to become due to the owner and operator thereof as the Administrative Agent, the Co-Collateral Agent and the Collateral Agent shall determine in their respective Permitted Discretion;

(ccc)   35% of all Inventory located at any Store designated by the Debtors to be closed,

(ddd)   bill and hold goods;

(eee)    obsolete, unmerchantable, "seconds", used, unfit for sale or slow moving Inventory;

(fff)    Inventory (i) which is not subject to the first priority, valid and perfected security interest of the Collateral Agent (subject only to Liens permitted under Section 9.1 having priority by operation of applicable Law over the Liens of the Collateral Agent) or (ii) which is subject to any other Lien (other than Liens permitted hereunder pursuant to clauses (a), (c), (d), (h), (q) and (dd) of Section 9.1) (the foregoing clauses (i) and (ii) (other than in respect of the immediately foregoing clause (y)) not being intended to limit the ability of the Administrative Agent, the Co-Collateral Agent and the Collateral Agent to change, establish or eliminate any Reserves in its Permitted Discretion on account of any such permitted Liens);

(ggg)    damaged and/or defective Inventory;

(hhh)    returned Inventory which is not held for sale in the Ordinary Course of Business;

(iii)    Inventory purchased or sold on consignment;

(jjj)    Inventory acquired in a Permitted Acquisition, unless (i) such Inventory otherwise meets the requirements of Eligible Inventory and (ii) either (x) such Inventory does not exceed 15% of all Eligible Inventory or (y) the Administrative Agent, the Co-Collateral Agent and the Collateral Agent have completed or received (A) an appraisal of such Inventory from appraisers reasonably satisfactory to the Administrative Agent, the Co-Collateral Agent and the Collateral Agent, and established Inventory Reserves (if applicable) therefor and (B) such other due diligence as the Administrative Agent, the Co-Collateral Agent and the Collateral Agent may require in their respective Permitted Discretion, all of the results of the foregoing to be satisfactory to the Administrative Agent, the Co-Collateral Agent and the Collateral Agent in their respective Permitted Discretion;

(kkk)    Inventory that is not solely owned by the applicable Loan Party or the applicable Loan Party does not have good and valid title thereto;

(lll)    Inventory that is not located in the United States (excluding territories or possessions of the United States);

(mmm) custom items;

(nnn)    spare parts, promotional, marketing, packaging and shipping materials or supplies used or consumed in a Loan Party's business;

(ooo)    samples, labels, bags, packaging, and other similar non-merchandise categories;

(ppp)    are not in material compliance with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale;

(qqq)    Inventory that is not insured in compliance with this Agreement;

(rrr)    Inventory that has been sold but not yet delivered or as to which the Borrower has accepted a deposit;

(sss)    Inventory that is subject to any licensing, patent, royalty, trademark, trade name or copyright agreement with any third party from which the Borrower or any of its Subsidiaries has received notice of a dispute in respect of any such agreement (but ineligibility shall be limited to the amount of such dispute);

(ttt)    In-Transit Inventory; and

(uuu)    Except as otherwise agreed by the Administrative Agent, the Co-Collateral Agent and the Collateral Agent in their respective Permitted Discretion, Inventory that represents goods that do not conform in all material respects to the representations and warranties contained in this Agreement or any of the Collateral Documents.

Any Inventory which is not Eligible Inventory shall, to the extent not constituting Excluded Assets, nevertheless be part of the Collateral.

"*EMU*" means the economic and monetary union as contemplated in the Treaty on European Union.

"*EMU Legislation*" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"*Entitlement Holder*" has the meaning given to such term in Article 8 of the UCC.

"*Entitlement Order*" has the meaning given to such term in Article 8 of the UCC.

"*Environmental Claim*" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, investigations (other than internal reports prepared by any Loan Party or any of its Subsidiaries (a) in the Ordinary Course of Business of such Person or (b) as required in connection with a financing transaction or an acquisition or disposition of real estate) or proceedings with respect to any Environmental Liability (hereinafter "*Claims*"), including (i) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any Environmental Law and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief pursuant to any Environmental Law.

"*Environmental Laws*" means any and all Laws relating to the protection of the environment or, to the extent relating to exposure to Hazardous Materials, human health.

"*Environmental Liability*" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) of any Loan Party or any of its Restricted Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation,

30

storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"*Environmental Permit*" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"*Equity Interests*" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"*ERISA Affiliate*" means any trade or business (whether or not incorporated) that together with any Loan Party is under common control with or treated as a single employer within the meaning of Sections 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"*ERISA Event*" means  (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as a termination under Section 4062(e) of ERISA; (c) a written notification to any Loan Party or any of their respective ERISA Affiliates concerning the imposition of Withdrawal Liability, a complete or partial withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Multiemployer Plan (within the meaning of Sections 4203 and 4205 of ERISA), or written notification that a Multiemployer Plan is insolvent or is in reorganization, within the meaning of Title IV of ERISA; (d) the filing under Section 4041(c) of ERISA of a notice of intent to terminate a Pension Plan, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA; (e) the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan or to appoint a trustee to administer a Pension Plan; (f) the imposition of any liability under Title IV of ERISA with respect to the termination of any Pension Plan or Multiemployer Plan, other than for the payment of plan contributions or PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any of their respective ERISA Affiliates; (g) the application for a minimum funding waiver under Section 302(c) of ERISA or Section 412(c) of the Code with respect to a Pension Plan; (h) the imposition of a lien under Section 303(k) of ERISA or Section 430(k) of the Code with respect to any Pension Plan; or (i) the imposition of liability on any of the Loan Parties or any of their respective ERISA Affiliates pursuant to Sections 4069 or 4212(c) of ERISA.

"*EU Bail-In Legislation Schedule*" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"*Eurocurrency Rate*" means for any Interest Period as to any Eurocurrency Rate Loan, (i) the rate per annum determined by the Administrative Agent to be the offered rate which appears on the page of the Reuters Screen which displays the London interbank offered rate administered by ICE Benchmark Administration Limited (such page currently being the LIBOR01 page) (the "LIBO Rate") for deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period in Dollars, determined as of approximately 11:00 a.m. (London, England time), two Business Days prior to the commencement of such Interest Period, or (ii) in the event the rate referenced in the preceding clause (i) does not appear on such page or service or if such page or service shall cease to be available, the rate determined by the Administrative Agent to be the offered rate on such other page or other service which displays the LIBO Rate for deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period in Dollars, determined as of approximately 11:00 a.m. (London, England time) two Business Days prior to the commencement of such Interest Period; provided that if LIBO Rates are quoted under either of the preceding clauses (i) or (ii), but there is no such quotation for the Interest Period elected, the LIBO Rate shall be equal to the Interpolated Rate; and provided, further, that if any such rate determined pursuant to the preceding clauses (i) or (ii) is less than zero, the Eurocurrency Rate will be deemed to be zero.

"*Eurocurrency Rate Loan*" means a Loan that bears interest at a rate determined by reference to the Eurocurrency Rate.

"*Eurocurrency Reserve Percentage*" means, for any day during any Interest Period, the reserve percentage in effect on such day applicable to the Administrative Agent under regulations issued from time to time by the Federal Reserve Board for determining the maximum reserve requirement (including any emergency, special, supplemental or other marginal reserve requirement) with respect to eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D).    The Adjusted Eurocurrency Rate for each outstanding Eurocurrency Rate Loan shall be adjusted automatically as of the effective date of any change in the Eurocurrency Reserve Percentage.

"*Euros*" means the lawful currency of the Participating Member States introduced in accordance with the EMU Legislation.

"*Event of Default*" has the meaning specified in Section 10.1.

"*Excess Availability*" means, at any time, (a) the Maximum Credit at such time minus (b) the aggregate Revolving Credit Outstandings at such time.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Excluded Assets*" means (i) governmental licenses or state or local franchises, charters and authorizations and any other property and assets to the extent that the Collateral Agent may not validly possess a security interest therein under applicable Laws (including, without limitation, rules and regulations of any Governmental Authority or agency) or the pledge or creation of a security interest in which would require governmental consent, approval, license or authorization, other than to the extent such prohibition or limitation is rendered ineffective under the UCC or other applicable Law notwithstanding such prohibition and other than proceeds and

receivable thereof, (ii) any particular asset or right under contract, if the pledge thereof or the security interest therein is prohibited or restricted by applicable Law (including, without limitation, rules and regulations of any Governmental Authority or agency) or any third party (so long as any agreement with such third party that provides for such prohibition or restriction was not entered into in contemplation of the acquisition of such assets or entering into of such contract or for the purpose of creating such prohibition or restriction), other than to the extent such prohibition or restriction is rendered ineffective under the UCC or other applicable Law, notwithstanding such prohibition, and other than proceeds and receivable thereof, (iii) any written agreement, license or lease or any property subject to a purchase money security interest, capital lease obligations or similar arrangement permitted hereunder, in each case, to the extent the grant of a security interest therein would violate or invalidate such lease, license or agreement or purchase money or similar arrangement or would give rise to a termination right in favor of any other party thereto (other than Holdings or any of its Subsidiaries) after giving effect to the applicable anti-assignment provisions of the UCC or other applicable Laws, in each case, only to the extent that such limitation on such pledge or security interest is otherwise permitted under Section 9.9, other than proceeds and receivable thereof, the assignment of which is expressly deemed effective under the UCC or other applicable Laws, notwithstanding such prohibition, (iv) Equity Interests in any non-wholly owned Subsidiaries and any entities which do not constitute Subsidiaries, but only to the extent that (x) the Organization Documents or other agreements with equity holders of such non-wholly owned Restricted Subsidiaries or other entities do not permit or restrict the pledge of such Equity Interests, or (y) the pledge of such Equity Interests (including any exercise of remedies) would result in a change of control, repurchase obligation or other adverse consequence to any of the Loan Parties or such non-wholly owned Restricted Subsidiary or other entity), (v) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable federal law and (vi) assets in circumstances where the cost of obtaining a security interest in such assets, including, without limitation, the cost of title insurance, surveys or flood insurance (if necessary) would be excessive in light of the practical benefit to the Lenders afforded thereby as reasonably determined by the Borrower, the Administrative Agent, the Collateral Agent and the Co-Collateral Agent; provided, however, that Excluded Assets shall not include any proceeds, substitutions or replacements of any Excluded Assets referred to in clause (i) through (vi) (unless such proceeds, substitutions or replacements would independently constitute Excluded Assets referred to in clauses (i) through (vi)).

"*Excluded Accounts*" means (a) any Deposit Account specifically, solely and exclusively used for escrow arrangements, fiduciary arrangements, or trust arrangements, in each case, for the benefit of unaffiliated third parties or for making payments in respect of payroll, employee wage and benefit payments or taxes, and (b) any Deposit Account so long as the balance in each such account, individually, does not exceed $3,000,000 at any time and the aggregate balance of all such Deposit Accounts under this clause (b) does not at any time exceed $3,000,000.

"*Excluded Subsidiary*" means (a) any Subsidiary that is not a wholly owned Subsidiary of the Borrower or a Guarantor, (b) any CFC, (c) any CFC Holdco, (d) any Domestic Subsidiary that is a direct or indirect Subsidiary of a CFC, (e) any Subsidiary that is prohibited or restricted by applicable Law or by Contractual Obligations existing on the Closing Date (or, in the case of

33

any newly acquired Subsidiary, in existence at the time of acquisition but not entered into in contemplation thereof) from providing a Guaranty or if such Guaranty would require governmental (including regulatory) consent, approval, license or authorization, (f) **[reserved]**, (g) any Subsidiary that is a not-for-profit organization, (h) any Subsidiary, the obtaining of a Guarantee with respect to which would result in material adverse tax consequences as reasonably determined by the Borrower in good faith consultation with the Administrative Agent, the Co-Collateral Agent and the Collateral Agent (including as a result of the operation of Section 956 of the Code), (i) [reserved], (j) each Unrestricted Subsidiary, (k) any Captive Insurance Subsidiary, and (l) any other Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent, the Co-Collateral Agent, the Collateral Agent and the Borrower, the cost or other consequences (including any adverse tax consequences) of providing the Guaranty outweighs the benefits to be obtained by the Lenders therefrom.

"*Excluded Swap Obligation*" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, as applicable, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) (a) by virtue of such Guarantor's failure to constitute an "eligible contract participant," as defined in the Commodity Exchange Act and the regulations thereunder, at the time the guarantee of (or grant of such security interest by, as applicable) such Guarantor becomes or would become effective with respect to such Swap Obligation or (b) in the case of a Swap Obligation that is subject to a clearing requirement pursuant to section 2(h) of the Commodity Exchange Act, because such Guarantor is a "financial entity," as defined in section 2(h)(7)(C) of the Commodity Exchange Act, at the time the guarantee of (or grant of such security interest by, as applicable) such Guarantor becomes or would become effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one Swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swaps for which such guarantee or security interest is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof).

"*fair market value*" means, with respect to any asset or liability, the fair market value of such asset or liability as determined by the Borrower in good faith.

"*FATCA*" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof,  any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"*Federal Funds Rate*" means, for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public

website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate; provided, that if the Federal Funds Effective Rate for any day is less than zero, the Federal Funds Effective Rate for such day will be deemed to be zero.

"*Federal Reserve Board*" means the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"*Fee Letter*" means that certain Fee Letter entered into on October 4, 2018 between Barclays Bank PLC, Citizens Bank, N.A. and the Borrower.

"*Field Examination*" has the meaning specified in Section 7.4(d).

"*Final Order*" means an order or judgment as entered on the docket of the Bankruptcy Court with respect to the Cases substantially in the form of the Interim Order, with only such modifications as are satisfactory in form and substance to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent, which order shall have been entered on such prior notice to such parties as may be satisfactory to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent, which order shall not have been vacated, reversed, modified, amended or stayed without the consent of the Administrative Agent, the Collateral Agent and the Co-Collateral Agent in their sole discretion.

"*Financial Asset*" has the meaning given to such term in Article 8 of the UCC.

"*Financial Covenants*" shall mean the covenants set forth in Section 6.1 and Section 6.2.

"*First Day Orders*" has the meaning specified in Section 8.15(f).

"*Fiscal Quarter*" means a fiscal quarter of any Fiscal Year.

"*Fiscal Year*" means the fiscal year of the Borrower and its Subsidiaries ending on the Tuesday closest to September 30 in the following calendar year.

"*Flood Insurance Laws*" shall mean, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (v) Biggert- Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"*Foreign Lender*" has the meaning specified in Section 3.1(b).

"*Foreign Subsidiary*" means any direct or indirect Subsidiary of the Borrower that is not a Domestic Subsidiary.

"*Fronting Exposure*" means, at any time there is a Defaulting Lender, (a) with respect to an Issuer, such Defaulting Lender's Applicable Percentage of the outstanding Letter of Credit

Obligations to the extent that such Defaulting Lender's Applicable Percentage of such outstanding Letter of Credit Obligations has not been reallocated pursuant to Section 2.16(a)(iv) or Cash Collateralized pursuant to Section 2.16(c), and (b) with respect to the Swing Loan Lender, such Defaulting Lender's Applicable Percentage of Swing Loans to the extent that such Defaulting Lender's Applicable Percentage of Swing Loans has not been reallocated pursuant to Section 2.16(a)(iv) or Cash Collateralized pursuant to Section 2.16(c).

"*Fund*" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"*GAAP*" means generally accepted accounting principles in the United States, as in effect from time to time; *provided*, *however*, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Requisite Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"*Governmental Authority*" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"*Granting Lender*" has the meaning specified in Section 12.2(g).

"*Guarantee*" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or other monetary obligation is assumed by such Person (or

36

any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); provided that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the Ordinary Course of Business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"*Guarantors*" has the meaning specified in the definition of "Collateral and Guarantee Requirement". For avoidance of doubt, the Borrower may cause any Restricted Subsidiary that is not an Excluded Subsidiary to Guarantee the Obligations by causing such Restricted Subsidiary to execute a supplement to the Guaranty in substantially the form attached thereto, and thereafter any such Restricted Subsidiary shall be a Guarantor hereunder and thereunder for all purposes.

"*Guaranty*" means (a) the guaranty made by Holdings and the other Guarantors in favor of the Administrative Agent on behalf of the Secured Parties pursuant to clause (b) of the definition of "Collateral and Guarantee Requirement," substantially in the form of Exhibit G, and (b) each other guaranty and guaranty supplement delivered pursuant to Section 8.11.

"*Hazardous Materials*" means all explosive or radioactive substances or wastes, all hazardous or toxic substances, and all wastes or pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas and infectious or medical wastes regulated pursuant to any Environmental Law.

"*Hedge Bank*" means, with respect to any Swap Contract, as of any date of determination, (a) any Person that is a Lender or an Affiliate of a Lender on such date or (b) any Person who (i) was a Lender or an Affiliate of a Lender at the time such Swap Contract was entered into and who is no longer a Lender or an Affiliate of a Lender, (ii) is, and at all times remains, in compliance with the provisions of Section 11.13(b)(i) and (iii) agrees in writing that the Agents and the other Secured Parties shall have no duty to such Person (other than the payment of any amounts to which such Person may be entitled under Section 10.3) and acknowledges that the Agents and the other Secured Parties may deal with the Loan Parties and the Collateral as they deem appropriate (including the release of any Loan Party or all or any portion of the Collateral) without notice or consent from such Person, whether or not such action impairs the ability of such Person to be repaid Obligations owing to it in respect of the Secured Hedge Agreements to which it is a party) and agrees to be bound by Section 11.13(b)(ii).

"*Holdings*" has the meaning specified in the introductory paragraph to this Agreement.

"*IFRS*" means international accounting standards within the meaning of the IAS Regulation 1606/2002 to the extent applicable to the relevant financial statements; provided, however, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the

Closing Date in IFRS or in the application thereof (including through the adoption of GAAP) on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Requisite Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in IFRS or in the application thereof (including through the adoption of GAAP), then such provision shall be interpreted on the basis of IFRS as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith

"*Initial Orders*" has the meaning specified in Section 8.15(f)

"*In-Transit Advance Rate*" means 90%.

"*In-Transit Inventory*" means Inventory located outside of the United States or in transit within or outside of the United States to the Borrower or any Subsidiary Guarantor from vendors and suppliers that has not yet been received into a distribution center or store of such Person.

"*In-Transit Trigger Period*" means the period beginning on the date on which the Borrower has failed to maintain Excess Availability at least equal to the greater of (a) 20% of the Maximum Credit or (b) $12,500,000 in either case, for five (5) consecutive Business Days, and ending on the date Excess Availability shall have been equal to or greater than the greater of (x) 20% of the Maximum Credit and (y) $12,500,000, in each case, for thirty (30) consecutive calendar days.

"*Indebtedness*" means, as to any Person at a particular time, without duplication, all of the following:

(vvv)   all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(www)  the maximum amount (after giving effect to any prior drawings or reductions that may have been reimbursed) of all outstanding letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(xxx)   net obligations of such Person under any Swap Contract;

(yyy)   all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts and accrued expenses payable in the Ordinary Course of Business, (ii) any earn-out obligation until such obligation is not paid within 30 days after becoming due and payable and becomes a liability on the balance sheet of such Person in accordance with IFRS and (iii) accruals for payroll and other liabilities accrued in the Ordinary Course of Business);

(zzz)   indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue

bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(aaaa)  all Attributable Indebtedness;

(bbbb) all obligations of such Person in respect of Disqualified Equity Interests if and to the extent that the foregoing would constitute indebtedness or a liability in accordance with IFRS; and

(cccc)  to the extent not otherwise included above, all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall (A) include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of Consolidated Total Debt and (B) in the case of the Borrower and its Subsidiaries, exclude all intercompany Indebtedness having a term not exceeding 364 days (inclusive of any roll over or extensions of terms) and made in the Ordinary Course of Business.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of Indebtedness of any Person for purposes of clause (e) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value (as determined by such Person in good faith) of the property encumbered thereby as determined by such Person in good faith.

"*Indemnified Liabilities*" has the meaning specified in Section 12.4(a).

"*Indemnitees*" has the meaning specified in Section 12.4(a).

"*Independent Financial Advisor*" means an accounting, appraisal, investment banking firm or consultant of nationally recognized standing that is, in the good faith judgment of the Borrower, qualified to perform the task for which it has been engaged and that is independent of the Borrower and its Affiliates.

"*Information*" has the meaning specified in Section 12.19.

"*Initial Field Examination*" means that certain initial field examination to be prepared by Hilco Global for the Administrative Agent in form and detail reasonably satisfactory to the Administrative Agent.

"*Initial Inventory Appraisal*" means that certain initial inventory appraisal report to be prepared by Hilco Global for the Administrative Agent in form and detail reasonably satisfactory to the Administrative Agent.

"*Intellectual Property Security Agreements*" has the meaning specified in the Security Agreement.

"*Intercompany Subordination Agreement*" means an agreement executed by each Restricted Subsidiary of the Borrower, in substantially the form of Exhibit K, as amended, restated, supplemented or otherwise modified from time to time.

"*Interest Period*" means, as to each Eurocurrency Rate Loan, the period commencing on the date such Eurocurrency Rate Loan is disbursed or converted to or continued as a Eurocurrency Rate Loan and ending on the date one, two, three or six months thereafter, or to the extent consented to by each applicable Lender, twelve months (or such period of less than one month as may be consented to by each applicable Lender), as selected by the Borrower in its Notice of Borrowing or Notice of Conversion or Continuation; provided that:

(dddd) any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the immediately preceding Business Day;

(eeee) any Interest Period (other than an Interest Period having a duration of less than one month) that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(ffff) no Interest Period shall extend beyond the applicable Scheduled Termination Date of the Class of Loans of which the Eurocurrency Rate Loan is a part.

"*Interim Order*" means the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court with respect to the Cases substantially in the form of Exhibit R and otherwise acceptable to the Co-Collateral Agent, the Collateral Agent and the Administrative Agent, approving, inter alia, this Agreement and the other Loan Documents, and (a) authorizing the incurrence by the Borrower of interim secured indebtedness in accordance with this Agreement, (b) providing for the lifting of the automatic stay (to the extent applicable) arising under section 362 of the Bankruptcy Code to enable the Administrative Agent, the Collateral Agent, a Co-Collateral Agent or any Lender effectuate, among other things, their respective rights and remedies under Section 10.2 and 10.3 and the Loan Documents), and (c) subject to the terms thereof, approving the payment by the Borrower of the fees and other amounts contemplated by this Agreement, which order shall not have been vacated, reversed, modified, amended or stayed without the consent of the Administrative Agent, the Collateral Agent and the Co-Collateral Agent in their sole discretion.

"*Interim Order Period*" means the period of time from the time at which the Bankruptcy Court enters the Interim Order until the time at which the Bankruptcy Court enters the Final Order.

"*Interpolated Rate*" means, in relation to the LIBO Rate, the rate which results from interpolating on a linear basis between:

(gggg) the applicable LIBO Rate for the longest period (for which that LIBO Rate is available) which is less than the Interest Period of that Loan; and

(hhhh) the applicable LIBO Rate for the shortest period (for which that LIBO Rate is available) which exceeds the Interest Period of that Loan,

each as of approximately 11:00 a.m. (London, England time) two Business Days prior to the commencement of such Interest Period of that Loan.

"*Intra-Group Debt Restricted Payment*" has the meaning set forth in Section 9.14.

"*Inventory*" has the meaning given to such term in Article 9 of the UCC.

"*Inventory Advance Rate*" means 90%.

"*Inventory Reserves*" means (a) such reserves as may be established from time to time by the Administrative Agent, the Co-Collateral Agent and the Collateral Agent, in their respective Permitted Discretion, with respect to changes in the determination of the saleability, at retail, of the Eligible Inventory or which reflect such other factors as negatively affect the market value of the Eligible Inventory, including the closing of any store (including, without limitation, transportation and refurbishment costs and expenses), the rejection of any store lease or a proposed going out of business sale at any store and (b) Shrink Reserves.

"*Investment*" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition (including without limitation by merger or otherwise) of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution (excluding accounts receivable, credit card and debit card receivables, trade credit, advances to customers, commission, travel and similar advances to employees, directors, officers, members of management, manufacturers and consultants, in each case made in the Ordinary Course of Business) to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person or (c) the purchase or other acquisition (in one transaction or a series of transactions, including without limitation by merger or otherwise) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  For purposes of the definition of "Unrestricted Subsidiary":

(1)     "Investments" shall include the portion (proportionate to the Borrower's Equity Interest in such Subsidiary) of the fair market value of the net assets of a Subsidiary of the Borrower at the time that such Subsidiary is designated an Unrestricted Subsidiary; provided, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Borrower shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to:

(iiii)     the Borrower's "Investment" in such Subsidiary at the time of such redesignation; less

(jjjj)     the portion (proportionate to the Borrower's Equity Interest in such Subsidiary) of the fair market value of the net assets of such Subsidiary at the time of such redesignation; and

41

(2)      any property transferred to or from an Unrestricted Subsidiary shall be valued at its fair market value at the time of such transfer.

The amount of any Investment outstanding at any time (including for purposes of calculating the amount of any Investment outstanding at any time under any provision of the covenant described Section 9.2 and otherwise determining compliance with such covenant) shall be the original cost of such Investment (determined, in the case of any Investment made with assets of the Borrower or any Restricted Subsidiary, based on the fair market value of the assets invested and without taking into account subsequent increases or decreases in value), reduced (but not in excess of the original amount of such Investment) by any dividend, distribution, interest payment, return of capital, repayment or other amount received in cash by the Borrower or a Restricted Subsidiary in respect of such Investment.  Any Investment in the form of a loan or an advance shall be the principal amount thereof outstanding on such date, minus any cash payments actually received by such investor representing interest in respect of such Investment (to the extent any such payment to be deducted does not exceed the remaining principal amount of such Investment), but without any adjustment for write-downs or write-offs (including as a result of forgiveness of any portion thereof) with respect to such loan or advance after the date thereof.  Any Investment in the form of a Guarantee shall be equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof.

"*Investment Grade Rating*" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other nationally recognized statistical rating agency selected by the Borrower.

"*IP Rights*" has the meaning specified in Section 5.15.

"*IRS*" means the Internal Revenue Service of the United States.

"*ISP*" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance).

"*Issue*" means, with respect to any Letter of Credit, to issue, extend the expiry of, amend, renew or increase the maximum face amount (including by deleting or reducing any scheduled decrease in such maximum face amount) of, such Letter of Credit.  The terms "Issued", "Issuing" and "Issuance" shall have a corresponding meaning.

"*Issuer*" means Barclays and each other Lender or Affiliate of a Lender that (a) is listed on the signature pages hereof as an "Issuer" and (b) hereafter becomes an Issuer with the approval of the Administrative Agent and the Borrower by agreeing pursuant to an agreement with and in form and substance satisfactory to the Administrative Agent and the Borrower to be bound by the terms hereof applicable to Issuers (and in the case of any resignation, subject to and in accordance with Section 12.2(h)).  Notwithstanding anything herein to the contrary, neither Barclays nor any of its branches or Affiliates shall be required to issue any commercial or documentary letters of credit hereunder.

"*Issuer Documents*" means, with respect to any Letter of Credit, the Letter of Credit Request, and any other document, agreement and instrument entered into by an Issuer and the Borrower (or any of its Subsidiaries) or in favor of such Issuer and relating to such Letter of Credit.

"*Joint Venture*" means (a) any Person which would constitute an "equity method investee" of the Borrower or any of the Restricted Subsidiaries and (b) any Person in whom the Borrower or any of the Restricted Subsidiaries beneficially owns any Equity Interest that is not a Restricted Subsidiary (other than an Unrestricted Subsidiary).

"*Judgment Currency*" has the meaning specified in Section 12.10.

"*Junior Financing*" has the meaning specified in Section 9.12(a)(i).  For the avoidance of doubt, the Stripes Intra-Group Loan Agreement, the DIP Term Loan Credit Agreement and the Second Lien Credit Agreement constitute Junior Financing.

"*Junior Financing Documentation*" means any documentation governing any Junior Financing.

"*L/C Credit Extension*" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the renewal or increase of the amount thereof.

"*Landlord Lien State*" means any state in which, at any time, a landlord's claim for rent has priority notwithstanding any contractual provision to the contrary by operation of applicable Law over the lien of the Collateral Agent in any of the Collateral.

"*Laws*" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities and executive orders, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"*Lender*" means the Swing Loan Lender, Revolving Credit Lender and each other financial institution or other entity that (a) is listed on the signature pages hereof as a "Lender" or (b) from time to time becomes a party hereto by execution of an Assignment and Assumption.

"*Lending Office*" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"*Letter of Credit*" means any letter of credit Issued (or deemed Issued) pursuant to Section 2.4.  A Letter of Credit may be a Documentary Letter of Credit or a Standby Letter of Credit.  The Pre-Petition Letters of Credit shall constitute Letters of Credit hereunder.

"*Letter of Credit Borrowing*" means an extension of credit resulting from a drawing under any Letter of Credit that has not been reimbursed on the applicable Reimbursement Date or refinanced as a Revolving Loan.

"*Letter of Credit Fee*" has the meaning specified in Section 2.12(b).

"*Letter of Credit Obligations*" means, at any time, the aggregate of all liabilities at such time of any Loan Party to all Issuers with respect to Letters of Credit, whether or not any such liability is contingent, including, without duplication, the sum of (a) the Reimbursement Obligations at such time and (b) the Letter of Credit Undrawn Amounts at such time.

"*Letter of Credit Reimbursement Agreement*" has the meaning specified in clause (v) of the proviso to clause (a) of Section 2.4.

"*Letter of Credit Request*" has the meaning specified in Section 2.4(c).

"*Letter of Credit Sublimit*" means the lesser of (i) $30,000,000 and (ii) the principal amount of Barclays' Revolving Credit Commitment.  The Letter of Credit Sublimit is part of, and not in addition to, the Revolving Credit Commitments.

"*Letter of Credit Undrawn Amounts*" means, at any time, the aggregate undrawn face amount of all Letters of Credit outstanding at such time.

"*LIBO Rate*" has the meaning specified in the definition of "Eurocurrency Rate".

"*Lien*" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing); provided, that in no event shall an operating lease in and of itself be deemed a Lien.

"*Lien Acknowledgment Agreement*" means each Collateral Access Agreement and Customs Broker Agreement.

 "*Liquidation*" means the exercise by the Collateral Agent or the Administrative Agent of those rights and remedies accorded to the Collateral Agent or the Administrative Agent under the Loan Documents and applicable Law as a creditor of the Loan Parties with respect to the realization on the Collateral, including (after the occurrence and continuation of an Event of Default) the conduct by the Loan Parties acting with the consent of the Collateral Agent or the Administrative Agent, of any public, private or "going out of business" sale or other disposition of the Collateral for the purpose of liquidating the Collateral.  Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"*Loan*" means any loan made by any Lender pursuant to this Agreement, including Swing Loans.

"*Loan Documents*" means, collectively, (a) this Agreement, (b) the Revolving Credit Notes, (c) the Guaranty, (d) the Commitment Letter, (e) each Letter of Credit Reimbursement Agreement, (f) the Collateral Documents, (g) the Issuer Documents, (h) any Customary Intercreditor Agreement, (i) the Fee Letter, (j) the Borrowing Base Certificates and (k) the DIP Intercreditor Agreement.

"*Loan Parties*" means, collectively, (a) Holdings, (b) the Borrower and (c) each other Guarantor.

"*Margin Stock*" has the meaning set forth in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"*Master Agreement*" has the meaning specified in the definition of "Swap Contract".

"*Material Adverse Effect*" means any event, facts, or circumstances, which, after the Closing Date, has a material adverse effect on (a) the business, assets, operations, financial condition or income of the Loan Parties taken as a whole, or (b) the validity or enforceability of the Loan Documents or any of the rights or remedies of the Administrative Agent, the Co-Collateral Agent, the Collateral Agent or the Lenders thereunder (it being understood that Material Adverse Effect shall exclude (i) any matters publicly disclosed prior to the Petition Date and (ii) matters resulting from the Cases and the events and conditions related and/or leading up to the Cases and the effects thereof).

"*Material Domestic Subsidiary*" means, at any date of determination, each of the Borrower's Domestic Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with IFRS; *provided* that if, at any time and from time to time after the Closing Date, Domestic Subsidiaries that are not Guarantors solely because they do not meet the thresholds set forth in clauses (a) or (b) comprise in the aggregate more than 5.0% of Total Assets as of the end of the most recently ended Fiscal Quarter of the Borrower for which financial statements have been delivered pursuant to Section 7.1 or more than 5.0% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries for the period of four consecutive Fiscal Quarters ending as of the last day of such Fiscal Quarter, then the Borrower shall, not later than forty-five (45) days after the date by which financial statements for such quarter are required to be delivered pursuant to this Agreement (or such longer period as may be agreed by the Administrative Agent in its reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Domestic Subsidiaries as "Material Domestic Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of Sections 8.11, 8.12 and 8.13 applicable to such Subsidiary.

"*Material Foreign Subsidiary*" means, at any date of determination, each of the Borrower's Foreign Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with IFRS.

"*Material Subsidiary*" means any Material Domestic Subsidiary or any Material Foreign Subsidiary.

"*Mattress Firm Card*" means the private label credit card issued by Synchrony Bank pursuant to the Credit Card Agreement of the Borrower or any Subsidiary Guarantor with such bank (or any subsequent Credit Card Issuer with respect to such private label credit card) to customers or prospective customers of the Borrower or a Subsidiary Guarantor.

"*Mattress Firm Card Receivables*" means, collectively, but without duplication, (a) all present and future rights of the Borrower or any Guarantor to payment from the issuer of the Mattress Firm Card arising from sales of goods or rendition of services to customers who have purchased such goods or services using the Mattress Firm Card and (b) all present and future rights of the Borrower or any Guarantor to payment from the issuer of the Mattress Firm Card in connection with the sale or transfer of Accounts arising pursuant to the sale of goods or rendition of services to customers who have purchased such goods or services using the Mattress Firm Card, including, but not limited to, all amounts at any time due or to become due from the issuer of the Mattress Firm Card under the Credit Card Agreement of the Borrower or any Subsidiary Guarantor with such issuer or otherwise, in each case above calculated net of prevailing interchange charges.

"*Maximum Credit*" means, at any time, the lesser of (i) the Revolving Credit Commitments in effect at such time less the Carve Out Reserve and (ii) the Borrowing Base at such time.

"*Maximum Rate*" has the meaning specified in Section 12.27.

"*Moody's*" means Moody's Investors Service, Inc. and any successor thereto.

"*Mortgage Policies*" has the meaning specified in paragraph (e) of the definition of "Collateral and Guarantee Requirement".

"*Mortgaged Properties*" has the meaning specified in paragraph (e) of the definition of "Collateral and Guarantee Requirement".

"*Mortgages*" means, collectively, the deeds of trust, trust deeds, hypothecs and mortgages made by the Loan Parties in favor or for the benefit of the Collateral Agent on behalf of the Lenders in form and substance reasonably satisfactory to the Collateral Agent (taking account of relevant local Law matters), and any other mortgages executed and delivered pursuant to Sections 8.11or 8.13.

"*Multiemployer Plan*" means any multiemployer plan as defined in Section 4001(a)(3) of ERISA and subject to Title IV of ERISA, to which any Loan Party or any of their respective ERISA Affiliates makes or is obligated to make contributions, or during the preceding five plan years has made or been obligated to make contributions.

"*Net Cash Proceeds*" means:

(kkkk) with respect to (x) the Disposition of any asset by the Borrower or any of the Restricted Subsidiaries or (y) with respect to any casualty or condemnation event, (i) insurance proceeds paid on account of any loss of or damage to or (ii) awards of compensation arising from the taking by eminent domain or condemnation of, in each

case, any assets of the Borrower or any of the Restricted Subsidiaries (any such event in this clause (y), a "C&C Event"), the excess, if any, of (i) the sum of cash and Cash Equivalents received by the Borrower or any of the Restricted Subsidiaries in connection with such Disposition (including any cash and Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) or C&C Event, as applicable, over (ii) the sum of (A) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness that is secured by the asset subject to such Disposition or C&C Event and that is required to be repaid in connection with such Disposition or C&C Event (other than Indebtedness under the Loan Documents), (B) the out-of-pocket fees and expenses (including attorneys' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees) actually incurred by the Borrower or such Restricted Subsidiary in connection with such Disposition or C&C Event, (C) taxes or distributions made pursuant to Section 9.6(g)(A) or (g)(C) paid or reasonably estimated to be payable, directly or indirectly, in connection therewith (including taxes imposed on the distribution or repatriation of any such Net Cash Proceeds), (D) in the case of any Disposition or C&C Event by a non-wholly owned Restricted Subsidiary, the pro-rata portion of the Net Cash Proceeds thereof (calculated without regard to this clause (D)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a wholly owned Restricted Subsidiary as a result thereof, and (E) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with IFRS and (y) any liabilities associated with such asset or assets and retained by the Borrower or any Restricted Subsidiary after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction, it being understood that "Net Cash Proceeds" shall include the amount of any reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in this clause (E) as of the date of such reversal; and

(llll)    (i) with respect to the incurrence or issuance of any Indebtedness by the Borrower or any Restricted Subsidiary or any Permitted Equity Issuance by the Borrower or any direct or indirect parent of the Borrower, the excess, if any, of (A) the sum of the cash and Cash Equivalents received in connection with such incurrence or issuance over (B) the investment banking fees, underwriting discounts, commissions, costs and other out-of-pocket expenses and other customary expenses, incurred by the Borrower or such Restricted Subsidiary in connection with such incurrence or issuance and (ii) with respect to any Permitted Equity Issuance by any direct or indirect parent of the Borrower, the amount of cash from such Permitted Equity Issuance contributed to the capital of the Borrower.

"*Net Income*" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with IFRS and before any reduction in respect of preferred stock dividends.

"*Net Recovery Percentage*" means the fraction, expressed as a percentage, (a) the numerator of which is the amount equal to the recovery on the aggregate amount of the Inventory at such time on a "going out of business sale" basis as set forth in the most recent appraisal of Inventory received by the Administrative Agent, the Co-Collateral Agent and the Collateral Agent in accordance with Section 7.4, net of operating expenses, liquidation expenses and commissions, and (b) the denominator of which is the applicable original cost of the aggregate amount of the Inventory subject to appraisal.  The Net Recovery Percentage for any category of Inventory used in determining the Borrowing Base shall be based on the applicable percentage in the most recent appraisal conducted as set forth in Section 7.4.  The foregoing to the contrary notwithstanding, until such time as Administrative Agent, the Co-Collateral Agent and the Collateral Agent shall have received the results of any Updated Inventory Appraisal after the Closing Date, the Net Recovery Percentage shall be (i) for October 2018, 62.4%, (ii) for November 2018, 64.7% and (iii) for December 2018, 64.1%, and (iv) for any months thereafter, the percentage set forth for any such applicable month in the Hilco Inventory Appraisal of Mattress Firm, Inc. dated August 4, 2018.

"*Non-Bank Certificate*" has the meaning specified in Section 3.1(b).

"*Non-Consenting Lender*" has the meaning specified in Section 3.7.

"*Non-Loan Party*" means any Subsidiary of the Borrower that is not a Loan Party.

"*Notice of Borrowing*" has the meaning specified in Section 2.2.

"*Notice of Conversion or Continuation*" has the meaning specified in Section 2.11(a).

"*Notice of Intent to Cure*" has the meaning specified in Section 7.2.

"*Obligations*" means all (a) advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, (b) obligations of any Loan Party arising under any Secured Hedge Agreement and (c) obligations of any Loan Party arising under any Cash Management Obligations, other than, in each case, Excluded Swap Obligations.  Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and any of their Restricted Subsidiaries to the extent they have obligations under the Loan Documents) include the obligation (including guarantee obligations) to pay principal, interest, Letter of Credit, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document.

"*OFAC*" has the meaning specified in Section 5.18.

"*OID*" means original issue discount.

48

"*Orders*" means, together, the Interim Order and the Final Order.

"*Ordinary Course of Business*" shall mean, with respect to any Person, any ordinary course business practices engaged in by such Person or other business practice reasonably related thereto or that is a reasonable extension, development or expansion thereof.

"*Organization Documents*" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"*Other Taxes*" has the meaning specified in Section 3.1.

"*Outstanding Amount*" means (a) with respect to the Revolving Loans and Swing Loans on any date, the amount thereof after giving effect to any borrowings and prepayments or repayments of Revolving Loans (including any refinancing of Letter of Credit Obligations as a Revolving Loan) and Swing Loans, as the case may be, occurring on such date; and (b) with respect to any Letter of Credit Obligations on any date, the amount thereof on such date after giving effect to any related extension of any Letter of Credit occurring on such date and any other changes thereto as of such date, including as a result of any reimbursements of outstanding Letter of Credit Obligations (including any refinancing of outstanding Letter of Credit Obligations under related Letters of Credit or related extensions of any Letters of Credit as a Revolving Loan) or any reductions in the maximum amount available for drawing under related Letters of Credit taking effect on such date.

"*Overnight Rate*" means, for any day, the greater of (a) the Federal Funds Rate and (b) an overnight rate determined by the Administrative Agent, an Issuer, or the Swing Loan Lender, as applicable, in accordance with banking industry rules on interbank compensation.

"*Parent*" means Stripes US Holding, Inc.

"*Participant*" has the meaning specified in Section 12.2(d).

"*Participant Register*" has the meaning specified in Section 12.2(e).

"*Participating Member State*" means each state so described in any EMU Legislation.

"*Payroll Account*" shall mean any Deposit Account used by the Loan Parties solely and exclusively for the purpose of making payroll, other employee wage and benefit payments to employees and withholding tax payments on behalf of employees.

"*PBGC*" means the Pension Benefit Guaranty Corporation.

"*Pension Plan*" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or any of their respective ERISA Affiliates or to which any Loan Party or any of their respective ERISA Affiliates contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time in the preceding five plan years.

"*Permitted Acquisition*" means the purchase or other acquisition, in each case, prior to the Petition Date by Borrower or any of its Restricted Subsidiaries of property and assets or businesses of any Person or of assets constituting a business unit, a line of business or division of such Person, a Store or Equity Interests in a Person that, upon the consummation thereof, will be a wholly owned Restricted Subsidiary of the Borrower (including as a result of a merger or consolidation).

"*Permitted Discretion*" means a determination made by the Administrative Agent, the Collateral Agent, or any Co-Collateral Agent (as applicable) in good faith in the exercise of its reasonable (from the perspective of an asset-based lender) business judgment.

"*Permitted Equity Issuance*" means any sale or issuance of any Qualified Equity Interests of the Borrower or any direct or indirect parent of the Borrower (in which case the Net Cash Proceeds have been received by the Borrower as cash common equity), in each case to the extent permitted hereunder.

"*Permitted Variances*" has the meaning set forth in Section 8.17.

"*Petition Date*" has the meaning specified in the recitals hereto.

"*Person*" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"*Plan*" means any material "employee benefit plan" (as such term is defined in Section 3(3) of ERISA, whether or not such plan is subject to ERISA) established or contributed to by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any of their respective ERISA Affiliates.

"*Platform*" has the meaning specified in Section 7.2.

"*Pledged Debt*" has the meaning specified in the Security Agreement.

"*Pledged Equity*" has the meaning specified in the Security Agreement.

"*Post-Petition Credit Card Notifications*" has the meaning specified in Section 8.12(j).

"*Post-Petition Deposit Account*" has the meaning specified in Section 8.12(i).

"*Post-Petition Securities Account*" has the meaning specified in Section 8.12(i).

"*Pre-Petition*" means the time period ending immediately prior to the filing of the Cases.

"*Pre-Petition Credit Agreement*" has the meaning specified in the recitals hereto.

"*Pre-Petition Letter of Credit*" has the meaning specified in Section 2.4(l).

"*Pre-Petition Letter of Credit Borrowings*" means Pre-Petition Obligations in respect of "Letter of Credit Borrowings" under, and as defined in, the Pre-Petition Credit Agreement and all interest, expenses, fees and other amounts payable in respect thereof under the Pre-Petition Credit Agreement.

"*Pre-Petition Loan Documents*" means the "*Loan Documents*" as set forth in the Pre-Petition Credit Agreement.

"*Pre-Petition Obligations*" means all of the "Obligations" as set forth in the Pre-Petition Credit Agreement.

"*Pre-Petition Revolving Loans*" has the meaning specified in Section 2.1(a).

"*Pro Forma Basis*" and "Pro Forma Effect" mean, with respect to compliance with any test or covenant or calculation hereunder, the determination or calculation of such test, covenant or ratio (including in connection with Specified Transactions) in accordance with Section 1.9.

"*Proceeds*" has the meaning given to such term in Article 9 of the UCC.

"*Professional Persons*" has the meaning specified in the definition of "Carve Out".

"*Projections*" shall have the meaning specified in Section 7.1(d).

"*Protective Advances*" means an overadvance made or deemed to exist by the Administrative Agent, in its discretion, which:

> (mmmm)    is made to maintain, protect or preserve the Collateral and/or the Loan Parties' rights under the Loan Documents or which is otherwise for the benefit of the Loan Parties; or

> (nnnn) is made to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation; or

> (oooo) is made to pay any other amount chargeable to any Loan Party hereunder; and

> (pppp) together with all other Protective Advances then outstanding, shall not (i) exceed five percent (5%) of the Borrowing Base at any time or (ii) unless a Liquidation is taking place, remain outstanding for more than forty-five (45) consecutive Business Days, unless in each case, the Requisite Lenders otherwise agree.

"*Public Lender*" has the meaning specified in Section 7.2. "*Qualified Equity Interests*" means any Equity Interests that are not Disqualified Equity Interests.

"*Ratable Portion*", "*Pro Rata Share*", "*ratable share*" or (other than in the expression "equally and ratably") "*ratably*" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Revolving Credit Commitments and, if applicable and without duplication, Loans of such Lender under the applicable Class or Classes at such time and the denominator of which is the amount of the Aggregate Commitments and, if applicable and without duplication, Loans under the applicable Class or Classes at such time.

"*Register*" has the meaning specified in Section 12.2(c).

"*Reimbursement Date*" has the meaning specified in Section 2.4(h).

"*Reimbursement Obligations*" means, as and when matured, the obligation of any Loan Party to pay, on the date payment is made or scheduled to be made to the beneficiary under each such Letter of Credit (or at such other date as may be specified in the applicable Letter of Credit Reimbursement Agreement) and in the currency drawn (or in such other currency as may be specified in the applicable Letter of Credit Reimbursement Agreement), all amounts of each drafts and other requests for payments drawn under Letters of Credit, and all other matured reimbursement or repayment obligations of any Loan Party to any Issuer with respect to amounts drawn under Letters of Credit.

"*Related Indemnified Person*" of an Indemnitee means (a) any controlling person or controlled affiliate of such Indemnitee, (b) the respective directors, officers, or employees of such Indemnitee or any of its controlling persons or controlled affiliates and (c) the respective agents of such Indemnitee or any of its controlling persons or controlled affiliates, in the case of this clause (c), acting at the instructions of such Indemnitee, controlling person or such controlled affiliate; provided that each reference to a controlled affiliate or controlling person in this definition shall pertain to a controlled affiliate or controlling person involved in the negotiation or syndication of the Revolving Credit Commitments.

"*Relevant Participant*" has the meaning specified in the lock-up agreement dated July 11, 2018 in respect of Steinhoff International Holdings N.V., Steinhoff Finance Holding GmbH and Steinhoff Europe AG, as amended from time to time.

"*Reportable Event*" means, with respect to any Pension Plan, any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived under applicable regulation or guidance.

"*Requisite Lenders*" means, collectively, Lenders having more than fifty percent (50%) of the aggregate outstanding amount of the Revolving Credit Commitments or, after the Revolving Credit Termination Date, more than fifty percent (50%) of the aggregate Revolving Credit Outstandings; *provided* that the unused Revolving Credit Commitment of, and the portion of the Loans and outstanding Letters of Credit held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Requisite Lenders; provided, however, that, (x) at any time that there are at least two, but not more than three, Lenders that are not Affiliates or Approved Funds of one another, "Requisite Lenders" shall include at least two (2) Lenders that are not Affiliates or Approved Funds of one another and (y) at any time that any

52

Lender (together with its Affiliates) holds Revolving Credit Commitments in excess of 33 and 1/3% of the Aggregate Commitments (or, after the Revolving Credit Termination Date, Revolving Credit Exposure in excess of 33 and 1/3% of the Revolving Credit Outstandings), "Requisite Lenders" shall include such Lender so long as such Lender is not a Defaulting Lender.

"*Reserves*" means any Inventory Reserves, Availability Reserves and, without duplication, the Carve Out Reserve.

"*Responsible Officer*" means the chief executive officer, president, vice president, chief financial officer, chief operating officer, chief administrative officer, secretary or assistant secretary, treasurer or assistant treasurer or other similar officer or Person performing similar functions of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.  Unless otherwise specified, all references herein to a "Responsible Officer" shall refer to a Responsible Officer of the Borrower.

"*Restricted Payment*" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of Holdings, the Borrower or any Restricted Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to Holdings or the Borrower's stockholders, partners or members (or the equivalent Persons thereof).

"*Restricted Subsidiary*" means any Subsidiary of the Borrower other than an Unrestricted Subsidiary.

"*Revolving Credit Commitment*" means, with respect to each Lender, the commitment of such Lender to make Loans and acquire interests in other Revolving Credit Outstandings expressed as an amount representing the maximum principal amount of the Loans to be made by such Lender under this Agreement, as such commitment may be (a) reduced from time to time pursuant to this Agreement and (b) reduced from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption. The initial amount of each Lender's Revolving Credit Commitment is set forth on Schedule I under the caption "Revolving Credit Commitment," as amended to reflect each Assignment and Assumption executed by such Lender.  The aggregate amount of the Revolving Credit Commitment on and after the Closing Date is $150,000,000.

"*Revolving Credit Exposure*" means, as to each Lender, the sum of the Outstanding Amount of such Lender's Revolving Loans, its Pro Rata Share of the Letter of Credit Obligations and its Pro Rata Share of the Swing Loan Obligations at such time.

"*Revolving Credit Lender*" means each Lender that (a) has a Revolving Credit Commitment, (b) holds a Revolving Loan or (c) participates in any Letter of Credit.

"*Revolving Credit Note*" means a promissory note of the Borrower payable to any Revolving Credit Lender in a principal amount equal to the amount of such Lender's Revolving Credit Commitment evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the Loans of a given Class owing to such Lender.

"*Revolving Credit Outstandings*" means, at any particular time, the sum of (a) the principal amount of the Loans outstanding at such time, (b) the Letter of Credit Obligations outstanding at such time and (c) the principal amount of the Swing Loans outstanding at such time.

"*Revolving Credit Termination Date*" means the earliest of (a) the Scheduled Termination Date, (b) the date of termination of the Revolving Credit Commitments during the continuance of an Event of Default, (c) the closing date of a sale pursuant to Section 363 of the Bankruptcy Code of all or substantially all of the Loan Parties' assets, (d) the effective date of a confirmed Chapter 11 Plan of reorganization for the Loan Parties, (e) the date of conversion of the Cases to Successor Cases, (f) five (5) Business Days following the Petition Date if the Interim Order has not been entered by the Bankruptcy Court by such date, (g) 30 days following the Petition Date if the Final Order has not been entered by the Bankruptcy Court by such date and (h) the date on which all Obligations are paid in full (including, without limitation, Cash Collateralization of Letters of Credit but excluding contingent obligations not due and owing) and the Revolving Credit Commitments have terminated.

"*Revolving Loan*" has the meaning specified in Section 2.1(a).

"*S&P*" means Standard & Poor's Ratings Services, a division of S&P Global, Inc., and any successor thereto.

"*Sale-Leaseback*" means any transaction or series of related transactions pursuant to which the Borrower or any of the Restricted Subsidiaries (a) sells, transfers or otherwise Disposes of any property, real or personal, whether now owned or hereafter acquired, and (b) as part of such transaction, thereafter rents or leases such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold, transferred or otherwise Disposed.

"*Same Day Funds*" means disbursements and payments in immediately available funds.

"*Sanctions*" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State.

"*Sanctioned Country*" means, at any time, a country or territory which is the subject or target of any Sanctions (as of the date of this Agreement, Cuba, Iran, North Korea, Sudan and Syria).

"*Sanctioned Person*" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State and (b) any other Person operating

or organized in a Sanctioned Country or controlled (as determined by applicable law) by any Person that is a Sanctioned Person.

"*Scheduled Termination Date*" means [_____][1] after the Closing Date.

"*SEC*" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"*Second Day Orders*" has the meaning specified in Section 8.15(f).

"*Second Lien Credit Agreement*" means that certain Term Loan Agreement, dated as of March 26, 2018 by and among the Borrower, Holdings and Steinhoff Parent, as lender thereunder.

"*Second Lien Intercreditor Agreement*" means the Intercreditor Agreement, dated as of March 26, 2018 between Barclays Bank PLC, as first lien agent, and Steinhoff Parent, as second lien lender, and the Loan Parties party thereto.

"*Second Lien Loan Documents*" means the Loan Documents as defined in the Second Lien Credit Agreement.

"*Secured Cash Management Agreement*" means any Cash Management Agreement that is entered into by and between the Borrower or any Subsidiary and any Cash Management Bank.

"*Secured Hedge Agreement*" means any Swap Contract permitted under Section 9.3(f) that is entered into by and between the Borrower or any Restricted Subsidiary and any Hedge Bank; and designated in writing by the Hedge Bank and the Borrower to the Administrative Agent as a "Secured Hedge Agreement".

"*Secured Obligations*" means, in the case of the Borrower, the Obligations and, in the case of any other Loan Party, the "Guaranteed Obligations" under the Guaranty and any of such Loan Party's other obligations under the other Loan Documents to which it is a party.

"*Secured Parties*" means, collectively, the Lenders, the Issuers, the Administrative Agent, the Collateral Agent, each Co-Collateral Agent, each Hedge Bank, each Cash Management Bank, the Supplemental Administrative Agent and each co-agent or sub-agent (if any) appointed by the Administrative Agent from time to time pursuant to Section 11.5.

"*Securities Account*" means all securities accounts of any Loan Party, including "securities accounts" within the meaning given to such term in Article 8 of the UCC.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Security*" means any Equity Interest, voting trust certificate, bond, debenture, note or other evidence of Indebtedness, whether secured, unsecured, convertible or subordinated, or any certificate of interest, share or participation in, any temporary or interim certificate for the

---

[1] To be the date that is 3 months after the closing date

purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing, but shall not include any evidence of the Obligations.

"*Security Agreement*" means, collectively, the Security Agreement executed by the Loan Parties, substantially in the form of Exhibit H, as amended, restated, supplemented or otherwise modified from time to time, together with each other Security Agreement Supplement executed and delivered pursuant to Section 8.11.

"*Security Agreement Supplement*" has the meaning specified in the Security Agreement.

"*Shrink Reserve*" means an amount reasonably estimated by the Administrative Agent, the Co-Collateral Agent and the Collateral Agent to be equal to that amount which is required in order that the shrink reflected in current books and records of the Borrower and its Subsidiaries would be reasonably equivalent to the shrink calculated as part of the Borrower's most recent physical Inventory (it being understood and agreed that no Shrink Reserve established by the Administrative Agent, the Co-Collateral Agent and the Collateral Agent shall be duplicative of any shrink as so reflected in the current books and records of the Borrower and its Subsidiaries or estimated by the Borrower for purposes of computing the Borrowing Base).

"*SPC*" has the meaning specified in Section 12.2(g).

"*Specified Secured Hedge Obligations*" means Obligations under any Secured Hedge Agreement which provides by its terms that such Obligations shall only be payable pursuant to Section 10.3 pursuant to clause "Ninth" thereof.  Any applicable Hedge Bank may, with the consent of the Borrower, designate or cancel such designation of Obligations under any applicable Secured Hedge Agreement as "Specified Secured Hedge Obligations" by delivering notice in writing to the Administrative Agent of such designation or cancellation of designation.

"*Specified Transaction*" means (u) the Transaction, (v) any Investment that results in a Person becoming a Restricted Subsidiary, (w) any designation of a Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary, (x) any Permitted Acquisition and any Investment constituting an acquisition of assets constituting a business unit, line of business or division of another Person or a Store, (y) any Disposition that results in a Restricted Subsidiary ceasing to be a Subsidiary of the Borrower, and any Disposition of a business unit, line of business or division or a Store of the Borrower or a Restricted Subsidiary, in each case whether by merger, consolidation, amalgamation or otherwise or (z) any incurrence or repayment of Indebtedness (other than Indebtedness incurred or repaid under any revolving credit facility or line of credit), Restricted Payment, that by the terms of this Agreement requires a financial ratio or test to be calculated on a "Pro Forma Basis" or after giving "Pro Forma Effect."

"*Standby Letter of Credit*" means any Letter of Credit that is not a Documentary Letter of Credit.

"*Steinhoff Parent*" means Steinhoff International Holdings, N.V.

"*Store*" means any retail store (which includes any real property, fixtures, equipment, Inventory and other property related thereto) operated, or to be operated, by the Borrower or any Restricted Subsidiary.

"*Stripes Facilities Agreement*" means the U.S. $4,000,000,000 Acquisition Facilities Agreement, dated August 5, 2016 (as amended or supplemented prior to the Closing Date) between Steinhoff Finance Holding GMBH and Steinhoff Mobel Holding Alpha GMBH, Stripes US Holding, Inc., Bank of America Merrill Lynch International Limited, Bank of America N.A. and J.P. Morgan Limited, as arrangers, J.P. Morgan Europe Limited as agent, and the other parties from time to time party thereto.

"*Stripes Intra-Group Loan Agreement*" means the Intra-Group Loan Agreement dated September 16, 2016 (as amended or supplemented on or prior to the Closing Date) between Stripes US Holding, Inc. as borrower and Steinhoff Finance Holding GMBH and Steinhoff Mobel Holding Alpha GMBH as lenders and the other parties from time to time party thereto.

"*Subsidiary*" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (excluding, for the avoidance of doubt, charitable foundations and any other Person that meets the requirements of Section 501(c)(3) of the Code) (i) of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned by such Person, or (ii) the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, by such Person, to the extent such entity's financial results are required to be included in such Person's consolidated financial statements under IFRS. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"*Subsidiary Guarantor*" means any Guarantor other than Holdings.

"*Successor Cases*" means any case under Chapter 7 of the Bankruptcy Code commenced upon the conversion of any Cases.

"*Supermajority Lenders*" means, as of any date of determination, Lenders having 66.67% or more of the sum of the (a) Revolving Credit Outstandings (with the aggregate principal amount of each Lender's risk participation and funded participation in Letter of Credit Obligations and Swing Loans being deemed "held" by such Lender for purposes of this definition) and (b) aggregate unused Revolving Credit Commitments; provided that the unused Revolving Credit Commitment of, and the portion of the Loans and outstanding Letters of Credit held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Supermajority Lenders; provided, however, that, (x) at any time that there are at least two, but not more than three, Lenders that are not Affiliates or Approved Funds of one another, "Supermajority Lenders" shall include at least two (2) Lenders that are not Affiliates or Approved Funds of one another and (y) at any time that any Lender (together with its Affiliates) holds Revolving Credit Commitments in excess of 33 and 1/3% of the Aggregate Commitments (or, after the Revolving Credit Termination Date, Revolving Credit Exposure in excess of 33 and 1/3% of the Revolving Credit Outstandings), "Supermajority Lenders" shall include such Lender so long as such Lender is not a Defaulting Lender.

"*Supplemental Administrative Agent*" and "Supplemental Administrative Agents" have the meanings specified in Section 11.12(a).

"*Swap*" means any agreement, contract, or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"*Swap Contract*" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"*Swap Obligation*" means, with respect to any person, any obligation to pay or perform under any Swap.

"*Swap Termination Value*" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark to-market value(s) for such Swap Contracts, as determined based upon one or more mid market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"*Swing Loan*" has the meaning specified in Section 2.3(a).

"*Swing Loan Lender*" means Barclays in its capacity as the Swing Loan Lender hereunder.

"*Swing Loan Obligations*" means, as at any date of determination, the aggregate Outstanding Amount of all Swing Loans.

"*Swing Loan Request*" has the meaning specified in Section 2.3(b).

"*Swing Loan Sublimit*" means the lesser of (a) $15,000,000 and (b) the aggregate principal amount of the Revolving Credit Commitments.  The Swing Loan Sublimit is part of, and not in addition to, the Revolving Credit Commitments.

"*Taxes*" has the meaning specified in Section 3.1(a).

"*Test Period*" in effect at any time means the most recent period of four consecutive Fiscal Quarters of the Borrower ended on or prior to such time (taken as one accounting period); *provided* that, prior to the first date that financial statements have been or are required to be delivered pursuant to Section 7.1(a) or (b), the Test Period in effect shall be the period of four consecutive Fiscal Quarters of the Borrower ended [  ], 2018.  A Test Period may be designated by reference to the last day thereof (i.e., the "[  ], 2018 Test Period" refers to the period of four consecutive Fiscal Quarters of the Borrower ended [  ], 2018), and a Test Period shall be deemed to end on the last day thereof.

"*Threshold Amount*" means $18,500,000.

"*Total Assets*" means the total assets of the Borrower and the Restricted Subsidiaries on a consolidated basis in accordance with IFRS, as shown on the most recent balance sheet of the Borrower delivered pursuant to Sections 7.1(a) or 7.1(b) or, for the period prior to the time any such statements are so delivered pursuant to Sections 7.1(a) or 7.1(b), the Pro Forma Financial Statements.

"*Transaction*" means, collectively, (a) the funding of the Loans on the Closing Date, if any, (b) the consummation of any other transactions in connection with the foregoing, including the funding of DIP Term Loans under the DIP Term Loan Agreement and the prepayment of any Pre-Petition Revolving Loans outstanding under the Pre-Petition Credit Agreement, and (c) the payment of the fees and expenses incurred in connection with any of the foregoing.

"*Transaction Expenses*" means any fees or expenses incurred or paid by any direct or indirect parent of the Borrower, the Borrower or any of its (or their) Subsidiaries in connection with the Transactions (including expenses in connection with close-out fees in connection with the termination of hedging transactions, if any, and payments to officers, employees and directors as change of control payments, severance payments, special or retention bonuses and charges for repurchase or rollover of, or modifications to, stock options and/or restricted stock), this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby.

"*Type*" means, with respect to a Loan, its character as a Base Rate Loan or a Eurocurrency Rate Loan.

"*Uniform Commercial Code*" or "*UCC*" means the Uniform Commercial Code or any successor provision thereof as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code or any successor provision thereof (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"*United States*" and "*U.S.*" mean the United States of America.

"*Unrestricted Subsidiary*" means any Subsidiary of the Borrower designated by the Board of Directors of the Borrower as an Unrestricted Subsidiary prior to the Closing Date. There are no Unrestricted Subsidiaries as of the Closing Date.

"*Unused Commitment Fee*" has the meaning specified in Section 2.12(a).

"*Updated Inventory Appraisal*" has the meaning specified in Section 7.4.

"*U.S. Lender*" has the meaning specified in Section 3.1.

"*U.S. Trustee*" means the United States Trustee applicable in the Cases.

"*USA PATRIOT Act*" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"*Variance Report*" has the meaning provided in Section 7.1(g).

"*wholly owned*" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) nominal shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

"*Write-down and Conversion Powers*" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

"*Withdrawal Liability*" means the liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.2    Other Interpretive Provisions.

With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    (i) The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)    References in this Agreement to an Exhibit, Schedule, Article, Section, clause or sub-clause refer (A) to the appropriate Exhibit or Schedule to, or Article, Section, clause or sub-clause in this Agreement or (B) to the extent such references are not present in this Agreement, to the Loan Document in which such reference appears,

(iii)    The term "including" is by way of example and not limitation,

(iv)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form, and

(v)     Unless otherwise expressly indicated herein, the words "above" and "below", when following a reference to a clause or a sub-clause of any Loan Document, refer to a clause or sub-clause within, respectively, the same Section or clause.

(c)     The terms "Lender," "Issuer" and "Administrative Agent" include, without limitation, their respective successors.

(d)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including", the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including."

(e)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(f)     For purposes of determining compliance with any Section of Article IX at any time, except as otherwise expressly set forth herein, in the event that any Lien, Investment, Indebtedness (whether at the time of incurrence or upon application of all or a portion of the proceeds thereof), Disposition, Restricted Payment, Affiliate transaction, Contractual Obligation, or prepayment of Indebtedness meets the criteria of one or more than one of the categories of transactions permitted pursuant to any clause of such Sections, such transaction (or portion thereof) at any time, shall be permitted under one or more of such clauses as determined by the Borrower in its sole discretion at such time.

SECTION 1.3     Accounting Terms.

All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, IFRS (or, if the Borrower has elected to report under GAAP, GAAP), except as otherwise specifically prescribed herein.

Notwithstanding any changes in GAAP or IFRS after the Closing Date, any lease of the Loan Parties and their Subsidiaries that would be characterized as an operating lease under GAAP or IFRS in effect on the Closing Date (whether such lease is entered into before or after the Closing Date) shall not constitute Indebtedness, Attributable Indebtedness or a Capitalized Lease Obligation under this Agreement or any other Loan Document as a result of such changes in GAAP or IFRS.

SECTION 1.4     Rounding.

Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number)

SECTION 1.5     **[Reserved]**.

SECTION 1.6    References to Agreements, Laws, Etc. Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all appendices, exhibits and schedules thereto and all subsequent amendments, restatements, extensions, supplements and other modifications thereto (but only to the extent that such amendments, restatements, extensions, supplements and other modifications are permitted by any Loan Document); and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

SECTION 1.7    Times of Day. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

SECTION 1.8    Timing of Payment of Performance. When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day.

SECTION 1.9    Pro Forma Calculations.

(a)    Notwithstanding anything to the contrary herein, financial ratios and tests shall be calculated in the manner prescribed by this Section 1.9; provided that, notwithstanding anything to the contrary in clauses (b), (c), (d), (e) or (f) of this Section 1.9, when calculating any such ratio or test for purposes of the incurrence of any Indebtedness, cash and Cash Equivalents resulting from the incurrence of any such Indebtedness shall be excluded from the pro forma calculation of any applicable ratio or test. In addition, whenever a financial ratio or test is to be calculated on a pro forma basis, the reference to the "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which financial statements have been delivered pursuant to Section 7.1(a) or (b), as applicable, for the relevant Test Period.

(b)    For purposes of calculating any financial ratio or test or compliance with any covenant determined by reference to Total Assets, Specified Transactions (with any incurrence or repayment of any Indebtedness in connection therewith to be subject to clause (d) of this Section 1.9) that have been made (i) during the applicable Test Period or (ii) if applicable as described in clause (a) above, subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made shall be calculated on a pro forma basis assuming that all such Specified Transactions (and any increase or decrease in Total Assets and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period (or, in the case of Total Assets, on the last day of the applicable Test Period). If since the beginning of any applicable Test Period any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Restricted Subsidiaries since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.9, then such financial ratio or test (or Total Assets) shall be calculated to give pro forma effect thereto in accordance with this Section 1.9.

62

(c)    In the event that the Borrower or any Restricted Subsidiary incurs (including by assumption or guarantees) or repays (including by redemption, repayment, retirement or extinguishment) any Indebtedness (other than Indebtedness incurred or repaid under any revolving credit facility unless such Indebtedness has been permanently repaid and not replaced), (i) during the applicable Test Period or (ii) subject to paragraph (a), subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then such financial ratio or test shall be calculated giving pro forma effect to such incurrence or repayment of Indebtedness, in each case to the extent required, as if the same had occurred on the last day of the applicable Test Period.

(d)    Whenever pro forma effect is to be given to a Specified Transaction, the pro forma calculations shall be made in good faith by a responsible financial or accounting officer of the Borrower.

(e)    [**reserved**].

(f)    If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of the event for which the calculation is made had been the applicable rate for the entire period (taking into account any interest hedging arrangements applicable to such Indebtedness); provided, in the case of repayment of any Indebtedness, to the extent actual interest related thereto was included during all or any portion of the applicable Test Period, the actual interest may be used for the applicable portion of such Test Period.  Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a Responsible Officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with IFRS.  Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a London interbank offered rate, or other rate, shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Borrower or Restricted Subsidiary may designate.

SECTION 1.10    Currency Equivalents Generally.

For purposes of determining compliance with Sections 9.1, 9.2 and 9.3 with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness or Investment is incurred (so long as such Indebtedness or Investment, at the time incurred, made or acquired, was permitted hereunder).

SECTION 1.11    Schedules.

All schedules attached hereto or to any other Loan Documents shall be deemed to incorporate by reference all information disclosed in the Orders, the Chapter 11 Plan and the Disclosure Statement, in each case as of the Petition Date, in the form delivered to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent prior to date of the Commitment Letters, which Orders, the Chapter 11 Plan and the Disclosure Statement, shall have been modified or amended without the consent of the Administrative Agent, the Collateral Agent and the Co-Collateral Agent in their sole discretion.

63

# ARTICLE II

# THE FACILITY

SECTION 2.1    The Revolving Credit Commitments.

(a)    On the terms and subject to the conditions contained in this Agreement, each Lender severally agrees to make loans in Dollars (each, a "*Revolving Loan*") to the Borrower from time to time on any Business Day during the period from the Closing Date until the Revolving Credit Termination Date in an aggregate principal amount at any time outstanding for all such loans by such Lender not to exceed such Lender's Revolving Credit Commitment; *provided, however*, that at no time shall any Lender be obligated to make a Revolving Loan in excess of such Lender's Ratable Portion of the Maximum Credit.    Within the limits of the Revolving Credit Commitment of each Lender, amounts of Loans repaid may be reborrowed under this Section 2.1.    Notwithstanding anything to the contrary contained in this subsection 2.1(a), the Loan Parties hereby, acknowledge, confirm and agree that immediately prior to the Closing Date, the outstanding principal amount of loans under the Pre-Petition Credit Agreement was not less than $86,781,250.00 (such Indebtedness being hereinafter referred to as the "*Pre-Petition Revolving Loans*"), (ii) such Pre-Petition Revolving Loans shall either be repaid on the Closing Date with the proceeds of the DIP Term Loans, or re-evidenced by this Agreement as a portion of the Revolving Loans outstanding hereunder, (iii) for all purposes of this Agreement and the other Loan Documents, the sum of the Pre-Petition Revolving Loans and any other Revolving Loans made on the Closing Date shall constitute all of the Revolving Loans outstanding on the Closing Date, and (iv) the revolving credit commitments under the Pre-Petition Credit Agreement shall hereinafter be deemed to be assigned or re-allocated among the Revolving Credit Commitments hereunder and after giving effect hereto, the Revolving Credit Commitments as of the Closing Date shall be as set forth on Schedule I.

(b)    Subject to the limitations set forth below (and notwithstanding anything to the contrary in Section 4.2), the Administrative Agent is authorized by the Borrower and the Lenders, from time to time in the Administrative Agent's sole discretion (but shall have absolutely no obligation), to make Revolving Loans to the Borrower, on behalf of all Lenders at any time that any condition precedent set forth in Section 4.2 has not been satisfied or waived, which the Administrative Agent, in its Permitted Discretion, deems necessary or desirable for the purposes specified in the definition of "Protective Advances".    Any Protective Advance may be made in a principal amount that would cause the aggregate Revolving Credit Exposure to exceed the Borrowing Base; provided that the aggregate amount of outstanding Protective Advances plus the aggregate of all other Revolving Credit Exposure shall not exceed the Aggregate Commitments.    Protective Advances may be made even if the conditions precedent set forth in Section 4.2 have not been satisfied or waived.    Each Protective Advance shall be secured by the Liens in favor of the Collateral Agent in and to the Collateral and shall constitute Obligations hereunder.    The Administrative Agent's authorization to make Protective Advances may be revoked at any time by the Requisite Lenders.    Any such revocation must be in writing and shall become effective prospectively upon the Administrative Agent's receipt thereof.    The making of a Protective Advance on any one occasion shall not obligate the Administrative Agent to make any Protective Advance on any other occasion.    At any time that the conditions precedent set forth in Section 4.2 have been satisfied or waived, the Administrative Agent may request the

Lenders to make a Revolving Loan to repay a Protective Advance. At any other time, the Administrative Agent may require the Lenders to fund their risk participations described in Section 2.1(c).

(c)    Upon the making of a Protective Advance by the Administrative Agent (whether before or after the occurrence of a Default), each Lender shall be deemed, without further action by any party hereto, unconditionally and irrevocably to have purchased from the Administrative Agent without recourse or warranty, an undivided interest and participation in such Protective Advance in proportion to its Applicable Percentage. From and after the date, if any, on which any Lender is required to fund its participation in any Protective Advance purchased hereunder, the Administrative Agent shall promptly distribute to such Lender, such Lender's Applicable Percentage of all payments of principal and interest and all proceeds of Collateral received by the Administrative Agent in respect of such Protective Advance.

(d)    Each Borrowing shall be comprised entirely of Base Rate Loans or Eurocurrency Rate Loans as the Borrower may request in accordance herewith.

SECTION 2.2    Borrowing Procedure.

(a)    Each Borrowing shall be made on notice given by the Borrower to the Administrative Agent (i) not later than 9:00 a.m. (New York, New York time) on the requested date of such Borrowing, in the case of a Borrowing of Base Rate Loans or (ii) not later than 12:00 noon (New York, New York time) three (3) Business Days prior to the requested date of such Borrowing, in the case of a Borrowing of Eurocurrency Rate Loans; *provided* that the notice referred to in this subclause (ii) may be delivered no later than one (1) Business Day prior to the Closing Date in the case of any Borrowing of Eurocurrency Rate Loans on the Closing Date. Each such notice shall be in substantially the form of Exhibit C (a "*Notice of Borrowing*"), specifying (A) the date of such proposed Borrowing, which shall be a Business Day, (B) the aggregate amount of such proposed Borrowing, (C) whether any portion of the proposed Borrowing will be of Base Rate Loans or Eurocurrency Rate Loans, (D) the initial Interest Period or Interest Periods for any Eurocurrency Rate Loans and (E) the Class of such proposed Borrowing. The Loans shall be made as Base Rate Loans, unless, subject to Section 2.14, the Notice of Borrowing specifies that all or a portion thereof shall be Eurocurrency Rate Loans. Each Borrowing shall be in an aggregate amount of not less than $500,000 or an integral multiple of $100,000 in excess thereof.

(b)    The Administrative Agent shall give to each Appropriate Lender prompt notice of the Administrative Agent's receipt of a Notice of Borrowing and, if Eurocurrency Rate Loans are properly requested in such Notice of Borrowing, the applicable interest rate determined pursuant to Section 2.14(a). Each Lender shall, before 2:00 p.m. on the date of the proposed Borrowing, make available to the Administrative Agent at its address referred to in Section 12.8, in Same Day Funds in the applicable currency, such Lender's Ratable Portion of such proposed Borrowing. Upon fulfillment (or due waiver in accordance with Section 12.1) (i) on the Closing Date, of the applicable conditions set forth in Section 4.1 and (ii) at any time (including the Closing Date), of the applicable conditions set forth in Section 4.2, and, subject to clause (c) below, after the Administrative Agent's receipt of such funds, the Administrative Agent shall make such funds available to the Borrower as promptly as reasonably practicable.

65

(c)      Unless the Administrative Agent shall have received notice from a Lender prior to the date of any proposed Borrowing that such Lender will not make available to the Administrative Agent such Lender's Ratable Portion of such Borrowing (or any portion thereof), the Administrative Agent may assume that such Lender has made such Ratable Portion available to the Administrative Agent on the date of such Borrowing in accordance with this Section 2.2 and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount.  If and to the extent that such Lender shall not have so made such Ratable Portion available to the Administrative Agent, such Lender and the Borrower severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent, at (i) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, the Federal Funds Rate for the first Business Day and thereafter at the interest rate applicable at the time to the Loans comprising such Borrowing.  If such Lender shall repay to the Administrative Agent such corresponding amount, such corresponding amount so repaid shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement.  If the Borrower shall repay to the Administrative Agent such corresponding amount, such payment shall not relieve such Lender of any obligation it may have hereunder to the Borrower.

(d)      The failure of any Defaulting Lender to make on the date specified any Loan or any payment required by it, including any payment in respect of its participation in Swing Loans and Letter of Credit Obligations, shall not relieve any other Lender of its obligations to make such Loan or payment on such date but, except to the extent otherwise provided herein, no such other Lender shall be responsible for the failure of any Defaulting Lender to make a Loan or payment required under this Agreement.

(e)      After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than ten (10) Interest Periods in effect unless otherwise agreed between the Borrower and the Administrative Agent.

SECTION 2.3      Swing Loans.

(a)      On the terms and subject to the conditions contained in this Agreement, the Swing Loan Lender shall make, in Dollars, loans (each, a "*Swing Loan*") otherwise available to the Borrower under the Revolving Credit Commitments from time to time on any Business Day during the period from the Closing Date until the Revolving Credit Termination Date in an aggregate principal amount at any time outstanding (together with the aggregate outstanding principal amount of any other Loan made by the Swing Loan Lender hereunder in its capacity as the Swing Loan Lender) not to exceed the Swing Loan Sublimit; provided, however, that at no time shall the Swing Loan Lender make any Swing Loan to the extent that, after giving effect to such Swing Loan, the aggregate Revolving Credit Outstandings would exceed the Maximum Credit; provided further that in the event that the Swing Loan Lender and the Administrative Agent are not the same Person, then the Swing Loan Lender shall only make a Swing Loan after having given prior notice thereof to the Administrative Agent; provided further that the Swing Loan Lender shall not be required to make any Swing Loan to the extent that such Swing Loan

66

Lender reasonably believes that any Lender is a Defaulting Lender, unless after giving effect to the requested Swing Loans, there would exist no Fronting Exposure (in the good faith determination of the Swing Loan Lender).  Each Swing Loan shall be a Base Rate Loan and must be repaid in full in Dollars within seven (7) days after its making or, if sooner, upon any Borrowing hereunder and shall in any event mature no later than the Revolving Credit Termination Date.  Within the limits set forth in the first sentence of this clause (a), amounts of Swing Loans repaid may be reborrowed under this clause (a).

(b)    In order to request a Swing Loan, the Borrower shall telecopy (or forward by electronic mail or similar means) to the Administrative Agent a duly completed request in substantially the form of Exhibit D, setting forth the requested amount and date of such Swing Loan (a "*Swing Loan Request*"), to be received by the Administrative Agent not later than 1:00 p.m. on the day of the proposed borrowing.  The Administrative Agent shall promptly notify the Swing Loan Lender of the details of the requested Swing Loan.  Subject to the terms of this Agreement, the Swing Loan Lender shall make a Swing Loan available to the Administrative Agent and, in turn, the Administrative Agent shall make such amounts available to the Borrower as promptly as reasonably practicable on the date set forth in the relevant Swing Loan Request. The Swing Loan Lender shall not make any Swing Loan (other than a Protective Advance) in the period commencing on the first Business Day after it receives written notice from the Administrative Agent or any Lender that one or more of the conditions precedent contained in Section 4.2 shall not on such date be satisfied, and ending when such conditions are satisfied. The Swing Loan Lender shall not otherwise be required to determine that, or take notice whether, the conditions precedent set forth in Section 4.2 have been satisfied in connection with the making of any Swing Loan.

(c)    The Swing Loan Lender may demand at any time, and shall demand on a least a weekly basis, that each Lender pay to the Administrative Agent, for the account of the Swing Loan Lender, in the manner provided in clause (d) below, such Lender's Ratable Portion of all or a portion of the outstanding Swing Loans, which demand shall be made through the Administrative Agent, shall be in writing and shall specify the outstanding principal amount of Swing Loans demanded to be paid.

(d)    The Administrative Agent shall forward each demand referred to in clause (c) above to each Lender on the day such notice or such demand is received by the Administrative Agent (except that any such notice or demand received by the Administrative Agent after 2:00 p.m. on any Business Day or any such notice or demand received on a day that is not a Business Day shall not be required to be forwarded to the Lenders by the Administrative Agent until the next succeeding Business Day), together with a statement prepared by the Administrative Agent specifying the amount of each Lender's Ratable Portion of the aggregate principal amount of the Swing Loans stated to be outstanding in such notice or demanded to be paid pursuant to such demand, and, notwithstanding whether or not the conditions precedent set forth in Sections 4.2 and 2.1 shall have been satisfied (which conditions precedent the Lenders hereby irrevocably waive), each Lender shall, before 11:00 a.m. on the Business Day next succeeding the date of such Lender's receipt of such notice or demand, make available to the Administrative Agent, in Same Day Funds in Dollars, for the account of the Swing Loan Lender, the amount specified in such statement.  Upon such payment by a Lender, such Lender shall, except as provided in clause (e) below, be deemed to have made a Revolving Loan to the Borrower in the amount of

such payment.  The Administrative Agent shall use such funds to repay the Swing Loans to the Swing Loan Lender.

(e)    From and after the date on which any Lender is deemed to have made a Revolving Loan pursuant to clause (d) above with respect to any Swing Loan, the Swing Loan Lender shall promptly distribute to such Lender such Lender's Ratable Portion of all payments of principal and interest received by the Swing Loan Lender on account of such Swing Loan other than those received from a Lender pursuant to clause (d) above.

SECTION 2.4    Letters of Credit.

(a)    Subject to the terms and subject to the conditions contained in this Agreement, each Issuer agrees to Issue at the request of the Borrower, for the account of the Borrower or a Restricted Subsidiary (provided that any Letter of Credit issued for the benefit of any Restricted Subsidiary that is not the Borrower shall be issued naming the Borrower as the account party on any such Letter of Credit but such Letter of Credit may contain a statement that it is being issued for the benefit of such Restricted Subsidiary), one or more Letters of Credit from time to time on any Business Day during the period commencing on the Closing Date and ending on the earlier of the Revolving Credit Termination Date and five (5) Business Days prior to the Scheduled Termination Date (or, if such day is not a Business Day, the next preceding Business Day), or such later date as agreed to by the Administrative Agent in its sole discretion; provided, however, that no Issuer shall be under any obligation to Issue (and, upon the occurrence of any of the events described in clauses (ii), (iii), (iv) and (v)(A) below, shall not Issue) any Letter of Credit upon the occurrence of any of the following:

(i)    any order, judgment or decree of any Governmental Authority or arbitrator having binding powers shall purport by its terms to enjoin or restrain such Issuer from Issuing such Letter of Credit or any Law applicable to such Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such Issuer shall prohibit, or request that such Issuer refrain from, the Issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such Issuer with respect to such Letter of Credit any restriction or reserve or capital requirement (for which such Issuer is not otherwise compensated) not in effect on the Closing Date or result in any unreimbursed loss, cost or expense that was not applicable, in effect or known to such Issuer as of the Closing Date and that such Issuer in good faith deems material to it (for which such Issuer is not otherwise compensated);

(ii)    such Issuer shall have received any written notice of the type described in clause (d) below;

(iii)    after giving effect to the Issuance of such Letter of Credit, (A) the aggregate Revolving Credit Outstandings would exceed the Maximum Credit at such time, (B) the Revolving Credit Outstandings of any Lender would exceed such Lender's Revolving Credit Commitment, (C) the Outstanding Amount of the Letter of Credit Obligations would exceed the Aggregate Letter of Credit Sublimit or (D) with respect to the Issuer of such Letter of Credit, the Outstanding Amount of the Letter of Credit

LEGAL_US_W # 95739072.21

Obligations with respect to such Issuer would exceed the Letter of Credit Sublimit for such Issuer;

(iv)    such Letter of Credit is requested to be denominated in any currency other than Dollars, except as may be approved by the Administrative Agent and such Issuer, each in their sole discretion;

(v)    (A) any fees due in connection with a requested Issuance have not been paid, (B) such Letter of Credit is requested to be Issued in a form that is not acceptable to such Issuer or (C) the Issuer for such Letter of Credit shall not have received, in form and substance reasonably acceptable to it and, if applicable, duly executed by the Borrower, applications, agreements and other documentation (collectively, a "*Letter of Credit Reimbursement Agreement*") such Issuer generally employs in the ordinary course of its business for the Issuance of letters of credit of the type of such Letter of Credit; or

(vi)    any Lender is at that time a Defaulting Lender, unless (i) after giving effect to the requested Issuance, there would exist no Fronting Exposure (in the good faith determination of the applicable Issuer) or (ii) the applicable Issuer has entered into arrangements, including the delivery of Cash Collateral, satisfactory to the applicable Issuer (in its good faith determination) with the Borrower or such Lender to eliminate such Issuer's actual or potential Fronting Exposure (after giving effect to Section 2.16(a)(iv)) with respect to the Defaulting Lender arising from either the Letter of Credit then proposed to be issued or any other Letter of Credit Obligations as to which such Issuer has actual or potential Fronting Exposure, as it may elect in its sole discretion.

(vii)    None of the Lenders (other than the Issuers in their capacity as such) shall have any obligation to Issue any Letter of Credit.  Any Letter of Credit which has been or deemed Issued hereunder may be amended at any time to reduce the amount outstanding thereunder.

(b)    In no event shall the expiration date of any Letter of Credit (other than the Pre-Petition Letters of Credit) be more than one (1) year after the date of issuance thereof unless the Administrative Agent and the applicable Issuer have approved such later expiry date; provided, however, that any Letter of Credit with a term less than or equal to one (1) year may provide for the renewal thereof for additional periods less than or equal to one (1) year, as long as, on or before the expiration of each such term and each such period, the Borrower and the Issuer of such Letter of Credit shall have the option to prevent such renewal; provided further, that, for any Letter of Credit having an expiration date after the Scheduled Termination Date (other than the Pre-Petition Letters of Credit), the Borrower agrees to deliver to the applicable Issuer on or prior to the date that occurs five (5) Business Days prior to the Scheduled Termination Date a letter of credit or letters of credit in form and substance reasonably acceptable to the Administrative Agent and the applicable Issuer issued by a bank acceptable to the Administrative Agent and the applicable Issuer, in each case in their sole discretion, and/or cash collateral in an amount equal to 101% of the maximum drawable amount of any such Letter of Credit.

(c)    In connection with the Issuance of each Letter of Credit, the Borrower shall give the relevant Issuer and the Administrative Agent at least three (3) Business Days' (or such

69

shorter period as may be agreed by the relevant Issuer) prior written notice for Letters of Credit denominated in Dollars (and at least five (5) Business Days' prior written notice for Letters of Credit denominated in currencies other than Dollars), in substantially the form of Exhibit E (or in such other written or electronic form as is acceptable to such Issuer), of the requested Issuance of such Letter of Credit (a "*Letter of Credit Request*").  Such notice shall specify the Issuer of such Letter of Credit, the face amount and currency of the Letter of Credit requested, the date on which such Letter of Credit is to expire (which date shall be a Business Day) and, in the case of an issuance, the Person for whose benefit the requested Letter of Credit is to be issued.  Such notice, to be effective, must be received by the relevant Issuer and the Administrative Agent not later than 11:00 a.m. on the last Business Day on which such notice can be given under the first sentence of this clause (c); provided that the relevant Issuer and the Administrative Agent may agree in a particular instance in their sole discretion to a later time and date.

(d)     Subject to the satisfaction of the conditions set forth in this Section 2.4, the relevant Issuer shall, on the requested date, Issue a Letter of Credit on behalf of the Borrower in accordance with such Issuer's usual and customary business practices.  No Issuer shall Issue any Letter of Credit in the period commencing on the first Business Day after it receives written notice from any Lender that one or more of the conditions precedent contained in Section 4.2 or clause (a) above (other than those conditions set forth in clauses (a)(i), (a)(v)(B) and (C) above and, to the extent such clause relates to fees owing to the Issuer of such Letter of Credit and its Affiliates, clause (a)(v)(A) above) are not on such date satisfied or duly waived and ending when such conditions are satisfied or duly waived.  No Issuer shall otherwise be required to determine that, or take notice whether, the conditions precedent set forth in Section 4.2 have been satisfied in connection with the Issuance of any Letter of Credit.

(e)     The Borrower agrees that, if requested by the Issuer of any Letter of Credit prior to the issuance of a Letter of Credit, it shall execute a Letter of Credit Reimbursement Agreement in respect to any Letter of Credit Issued hereunder.  In the event of any conflict between the terms of any Letter of Credit Reimbursement Agreement and this Agreement, the terms of this Agreement shall govern.

(f)     Each Issuer shall comply with the following:

(i)     give the Administrative Agent written notice (or telephonic notice confirmed promptly thereafter in writing), which writing may be a telecopy or electronic mail, of the Issuance of any Letter of Credit Issued by it (including the applicable currency), all drawings under any Letter of Credit Issued by it and of the payment (or the failure to pay when due) by the Borrower of any Reimbursement Obligation when due (which notice the Administrative Agent shall promptly transmit by telecopy, electronic mail or similar transmission to each Lender);

(ii)     upon the request of any Lender, furnish to such Lender copies of any Letter of Credit Reimbursement Agreement to which such Issuer is a party and such other documentation as may reasonably be requested by such Lender; and

(iii)     on the first Business Day of each calendar week, provide to the Administrative Agent (and the Administrative Agent shall provide a copy to each Lender

70

requesting the same) and the Borrower separate schedules for Documentary Letters of Credit and Standby Letters of Credit issued by it, in form and substance reasonably satisfactory to the Administrative Agent, setting forth the aggregate Letter of Credit Obligations and applicable currencies, in each case outstanding at the end of each month, and any information requested by the Borrower or the Administrative Agent relating thereto.

(g)    Immediately upon the issuance by an Issuer of a Letter of Credit in accordance with the terms and conditions of this Agreement, such Issuer shall be deemed to have sold and transferred to each Lender, and each Lender shall be deemed irrevocably and unconditionally to have purchased and received from such Issuer, without recourse or warranty, an undivided interest and participation, to the extent of such Lender's Ratable Portion, in such Letter of Credit and the obligations of the Borrower with respect thereto (including all Letter of Credit Obligations with respect thereto) and any security therefor and guaranty pertaining thereto.

(h)    The Borrower agrees to pay to the Issuer of any Letter of Credit, in each case in the same currency and in an equivalent amount, and, to the extent so financed, all Reimbursement Obligations owing to such Issuer under any Letter of Credit issued for its account no later than (x) on the same Business Day that the Borrower receives written notice from such Issuer that payment has been made under such Letter of Credit in accordance with its terms if such notice is received by the Borrower by 11:00 a.m. and (y) on the next succeeding Business Day after which the Borrower receives written notice from such Issuer that payment has been made under such Letter of Credit in accordance with its terms if such notice is received by the Borrower after 11:00 a.m. (such date described in clause (x) or (y) above, the "*Reimbursement Date*"), irrespective of any claim, set off, defense or other right that the Borrower may have at any time against such Issuer or any other Person. In the event that any Issuer makes any payment under any Letter of Credit in accordance with its terms and the Borrower shall not have repaid such amount to such Issuer pursuant to this clause (h) (directly or by application of the deemed Loans described below in this clause (h) or by virtue of the penultimate sentence of this clause (h)) or any such payment by the Borrower is rescinded or set aside for any reason, such Reimbursement Obligation shall be payable on demand with interest thereon computed (i) from the date on which such Reimbursement Obligation arose to the Reimbursement Date, at the rate of interest applicable during such period to Loans that are Base Rate Loans and (ii) from the Reimbursement Date until the date of repayment in full, at the rate of interest applicable during such period to past due Loans that are Base Rate Loans, and such Issuer shall promptly notify the Administrative Agent, which shall promptly notify each Lender of such failure, and each Lender shall promptly and unconditionally pay to the Administrative Agent for the account of such Issuer the amount of such Lender's Ratable Portion of such payment in Same Day Funds. If the Administrative Agent so notifies such Lender prior to 11:00 a.m. on any Business Day, such Lender shall make available to the Administrative Agent for the account of such Issuer its Ratable Portion of the amount of such payment on such Business Day in Same Day Funds. Upon such payment by a Lender, such Lender shall, notwithstanding whether or not the conditions precedent set forth in Section 4.2 shall have been satisfied (which conditions precedent the Lenders hereby irrevocably waive), be deemed to have made a Revolving Loan to the Borrower in the principal amount of such payment. Whenever any Issuer receives from the Borrower a payment of a Reimbursement Obligation as to which the Administrative Agent has received for the account of such Issuer any payment from a Lender

71

pursuant to this clause (h), such Issuer shall pay over to the Administrative Agent any amount received in excess of such Reimbursement Obligation and, upon receipt of such amount, the Administrative Agent shall promptly pay over to each Lender, in Same Day Funds in the applicable currency, an amount equal to such Lender's Ratable Portion of the amount of such payment adjusted, if necessary, to reflect the respective amounts the Lenders have paid in respect of such Reimbursement Obligation. (A) In the absence of written notice to the contrary from the Borrower, and subject to the other provisions of this Agreement (but without regard to the conditions to borrowing set forth in Section 4.2), Reimbursement Obligations shall be financed when due with Swing Loans or Base Rate Loans, in each case to the Borrower in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting Base Rate Loan or Swing Loan, as the case may be, and (B) in the event that the Borrower has notified the Administrative Agent that it will not so finance any such payments, the Borrower will make payment directly to the applicable Issuer when due. The Administrative Agent shall promptly remit the proceeds from any Loans made pursuant to clause (A) above in reimbursement of a draw under a Letter of Credit to the applicable Issuer.

(i)       Each Defaulting Lender agrees to pay to the Administrative Agent for the account of such Issuer forthwith on demand any such unpaid amount together with interest thereon, for the first Business Day after payment was first due at the Federal Funds Rate and, thereafter, until such amount is repaid to the Administrative Agent for the account of such Issuer, at a rate per annum equal to the rate applicable to Base Rate Loans.

(j)       The Borrower's obligations to pay each Reimbursement Obligation and the obligations of the Lenders to make payments to the Administrative Agent for the account of the Issuers with respect to Letters of Credit shall be absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement, under any and all circumstances whatsoever, including the occurrence of any Default or Event of Default, and irrespective of any of the following:

(i)       any lack of validity or enforceability of any Letter of Credit or any Loan Document, or any term or provision therein;

(ii)      any amendment or waiver of or any consent to departure from all or any of the provisions of any Letter of Credit or any Loan Document;

(iii)     the existence of any claim, set-off, defense or other right that the Borrower, any other party guaranteeing, or otherwise obligated with, the Borrower, any Subsidiary or other Affiliate thereof or any other Person may at any time have against the beneficiary under any Letter of Credit, any Issuer, the Administrative Agent or any Lender or any other Person, whether in connection with this Agreement, any other Loan Document or any other related or unrelated agreement or transaction;

(iv)      any draft or other document presented under a Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

LEGAL_US_W # 95739072.21

(v)    payment by the Issuer under a Letter of Credit against presentation of a draft or other document that does not strictly comply, but that does substantially comply, with the terms of such Letter of Credit; and

(vi)    any other act or omission to act or delay of any kind of any Issuer, the Lenders, the Administrative Agent or any other Person or any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.4, constitute a legal or equitable discharge of the Borrower's obligations hereunder.

Any action taken or omitted to be taken by the relevant Issuer under or in connection with any Letter of Credit, if taken or omitted in the absence of gross negligence or willful misconduct, shall not result in any liability of such Issuer to the Borrower or any Lender.  In determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof, the Issuers may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary and, in making any payment under any Letter of Credit, the Issuers may rely exclusively on the documents presented to it under such Letter of Credit as to any and all matters set forth therein, including reliance on the amount of any draft presented under such Letter of Credit, whether or not the amount due to the beneficiary thereunder equals the amount of such draft and whether or not any document presented pursuant to such Letter of Credit proves to be insufficient in any respect, if such document on its face appears to be in order, and whether or not any other statement or any other document presented pursuant to such Letter of Credit proves to be forged or invalid or any statement therein proves to be inaccurate or untrue in any respect whatsoever, and any noncompliance in any immaterial respect of the documents presented under such Letter of Credit with the terms thereof shall, in each case, be deemed not to constitute willful misconduct or gross negligence of the applicable Issuer.

(k)    Applicability of ISP and UCP.  Unless otherwise expressly agreed by the relevant Issuer and the Borrower when a Letter of Credit is issued, (i) the rules of the ISP shall apply to each Standby Letter of Credit, and (ii) the rules of the Uniform Customs and Practice for Documentary Credits, as most recently published by the International Chamber of Commerce at the time of issuance, shall apply to each Documentary Letter of Credit.

(l)    Notwithstanding anything to the contrary contained in this Section 2.4, it is hereby acknowledged and agreed that each of the letters of credit described in Schedule 2.4 (each a "*Pre-Petition Letter of Credit*") shall constitute a "Letter of Credit" for all purposes of this Agreement and shall be deemed issued under this Agreement on the Closing Date and all Pre-Petition Letter of Credit Borrowings outstanding on the Closing Date shall constitute "Letter of Credit Borrowings" for all purposes of this Agreement.

SECTION 2.5    Reduction and Termination of the Revolving Credit Commitments.

The Borrower may, upon at least three (3) Business Days' prior notice to the Administrative Agent, terminate in whole or reduce in part ratably the unused portions of any Class of Revolving Credit Commitments of the Lenders without premium or penalty other than any amount required to be paid by the Borrower pursuant to Section 3.5; provided, however, that

each partial reduction shall be in an aggregate amount of not less than $1,000,000 or an integral multiple of $500,000 in excess thereof; provided, further, that no reduction or termination of Commitments having a later maturity shall be permitted on a greater than pro rata basis with commitments having an earlier maturity.  Notwithstanding the foregoing, the Borrower may rescind or postpone any notice of termination of the Revolving Credit Commitments if such termination would have resulted from a refinancing of all of the applicable Class, which refinancing shall not be consummated or otherwise shall be delayed.

SECTION 2.6    Repayment of Loans.

The Borrower promises to repay to the Administrative Agent for the ratable account of the Lenders the aggregate unpaid principal amount of the Loans (including any Letter of Credit Borrowings) and the Swing Loans on the Revolving Credit Termination Date or earlier, if otherwise required by the terms hereof.

SECTION 2.7    Evidence of Indebtedness.

(a)    The Loans made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for purposes of Treasury Regulation Section 5f.103-1(c), as agent for the Borrower, in each case in the Ordinary Course of Business. Subject to Section 12.2(c), accounts or records maintained by the Administrative Agent and each Lender shall be prima facie evidence absent manifest error of the amount of the Loans made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

(b)    (i) Subject to Section 12.2(c), entries made in good faith by the Administrative Agent in the Register pursuant to Sections 2.7(a) and by each Lender in its account or accounts pursuant to Section 2.7a) shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; provided that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

(ii)    Notwithstanding anything to the contrary contained in this Agreement, the Loans (including the Revolving Credit Notes evidencing such Loans) and the drawn Letters of Credit are registered obligations and the right, title, and interest of the Lenders and the Issuers and their assignees in and to such Loans or drawn Letters of Credit, as the case may be, shall be transferable only upon notation of such transfer in the Register.  A Revolving Credit Note shall only evidence the Lender's or a registered assignee's right, title and interest in and to the related Loan, and in no event is any such Revolving Credit

74

Note to be considered a bearer instrument or obligation. This Section 2.7(b) and Section 12.2 shall be construed so that the Loans and drawn Letters of Credit are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related regulations (or any successor provisions of the Code or such regulations).

(c)     Notwithstanding any other provision of the Agreement, in the event that any Lender requests that the Borrower execute and deliver a promissory note or notes payable to such Lender in order to evidence the Indebtedness owing to such Lender by the Borrower hereunder, the Borrower shall promptly execute and deliver a Revolving Credit Note or Revolving Credit Notes to such Lender evidencing the Loans of such Lender, substantially in the form of Exhibit B. Each Lender may attach schedules to its Revolving Credit Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto; provided that the failure to do so shall in no way affect the obligations of the Borrower or any other Loan Party under any Loan Document.

SECTION 2.8     Optional Prepayments.

The Borrower may prepay, in the applicable currency, the outstanding principal amount of the Loans and Swing Loans in whole or in part at any time; provided, however, that if any prepayment of any Eurocurrency Rate Loan is made by the Borrower other than on the last day of an Interest Period for such Loan, the Borrower shall also pay any amount owing pursuant to Section 3.5.

SECTION 2.9     Mandatory Prepayments.

(a)     If at any time, the aggregate principal amount of Revolving Credit Outstandings exceeds the aggregate Maximum Credit at such time (including as a result of any currency fluctuation), the Borrower shall within one (1) Business Day from the date of such occurrence, in each case, prepay, in the applicable currency, the Swing Loans first and then the other Loans then outstanding in an amount equal to such excess. If any such excess remains after repayment in full of the aggregate outstanding Swing Loans and the other Loans, the Borrower shall Cash Collateralize the Letter of Credit Obligations in the manner set forth in Section 10.5 in an amount equal to 101% of such excess.

(b)     If (x) at any time during a Cash Dominion Period or (y) in respect of any Disposition that would result in the occurrence of a Cash Dominion Period, any Loan Party or any of its Subsidiaries receives any Net Cash Proceeds arising from any Disposition in respect of any Collateral outside of the Ordinary Course of Business, the Borrower shall promptly (but in any event within five (5) Business Days of such receipt) prepay the Loans in an amount equal to 100% of such Net Cash Proceeds (and, to the extent such Net Cash Proceeds exceed the aggregate principal amount of Loans outstanding, Cash Collateralize Letters of Credit in an amount equal to up to 101% of the aggregate maximum drawable amount of such Letters of Credit).

(c)     Subject to Section 3.5 hereof, all such payments in respect of the Loans pursuant to this Section 2.9 shall be without premium or penalty. All interest accrued on the principal

amount of the Loans paid pursuant to this Section 2.9 shall be paid, or may be charged by the Administrative Agent to any loan account(s) of the Borrower, at the Administrative Agent's option, on the date of such payment.  Interest shall accrue and be due, until the next Business Day, if the amount so paid by the Borrower to the bank account designated by the Administrative Agent for such purpose is received in such bank account after 3:00 p.m.

(d)      At all times after the occurrence and during the continuance of Cash Dominion Period and notification thereof by the Administrative Agent to the Borrower (subject to the provisions of Section 10.3 and to the terms of the Security Agreement), on each Business Day, at or before 1:00 p.m., the Agent shall apply all Same Day Funds credited to the Concentration Account and all amounts received pursuant to Section 2.9(b), first to pay any fees or expense reimbursements then due to the Administrative Agent, the Issuers and the Lenders (other than in connection with Cash Management Obligations, Obligations in respect of Secured Hedge Agreements), pro rata, second to pay interest due and payable in respect of any Loans (including Swing Loans) and any Protective Advances that may be outstanding, pro rata, third to prepay the principal of any Protective Advances that may be outstanding, pro rata, and fourth to prepay the principal of the Loans (including Swing Loans) and to Cash Collateralize outstanding Letter of Credit Obligations, pro rata.

(e)      Substantially concurrently with receipt by the Borrower of proceeds of the DIP Term Loans, the Borrower shall prepay all Loans then outstanding in an amount not less than (i) the aggregate amount of such proceeds *less* (ii) fees and expenses paid on such funding date.

SECTION 2.10      Interest.

(a)      Rate of Interest.  All Loans and the outstanding amount of all other Obligations owing under the Loan Documents shall bear interest, in the case of any Class of Loans, on the unpaid principal amount thereof from the date such Loans are made and, in the case of such other Obligations, from the date such other Obligations are due and payable until, in all cases, paid in full, except as otherwise provided in clause (c) below, as follows:

(i)      if a Base Rate Loan or such other Obligation (except as otherwise provided in this Section 2.10(a)), at a rate per annum equal to the sum of (A) the Base Rate as in effect from time to time and (B) the Applicable Rate for Base Rate Loans; and

(ii)      if a Eurocurrency Rate Loan, at a rate per annum equal to the sum of (A) the Adjusted Eurocurrency Rate determined for the applicable Interest Period and (B) the Applicable Rate applicable to Eurocurrency Rate Loans in effect from time to time during such Interest Period.

(b)      Interest Payments.  (i) Interest accrued on each Base Rate Loan (other than Swing Loans) shall be payable in arrears (A) on the first Business Day of each month, commencing on the first such day following the making of such Base Rate Loan and (B) if not previously paid in full, at maturity (whether by acceleration or otherwise) of such Base Rate Loan, (ii) interest accrued on Swing Loans shall be payable in arrears on the first Business Day of the immediately succeeding calendar month, (iii) interest accrued on each Eurocurrency Rate Loan shall be payable in arrears (A) on the last day of each Interest Period applicable to such Loan and, if such

Interest Period has a duration of more than one (1) month, on each date during such Interest Period occurring every one (1) month from the first day of such Interest Period, (B) upon the payment or prepayment thereof in full or in part and (C) if not previously paid in full, at maturity (whether by acceleration or otherwise) of such Eurocurrency Rate Loan and (iv) interest accrued on the amount of all other Obligations shall be payable on demand from and after the time such Obligation becomes due and payable (whether by acceleration or otherwise).

(c)    Default Interest.  The Borrower shall pay interest on past due amounts hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.   Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

SECTION 2.11    Conversion/Continuation Option.

(a)    The Borrower may elect (i) at any time on any Business Day, to convert Base Rate Loans (other than Swing Loans) or any portion thereof to Eurocurrency Rate Loans and (ii) at the end of any applicable Interest Period, to convert Eurocurrency Rate Loans or any portion thereof into Base Rate Loans, or to continue such Eurocurrency Rate Loans or any portion thereof for an additional Interest Period; provided, however, that the aggregate amount of the Eurocurrency Rate Loans for each Interest Period must be in the amount of at least $500,000 or an integral multiple of $100,000 in excess thereof.  Each conversion or continuation shall be allocated among the Loans of each Lender in accordance with such Lender's Ratable Portion. Each such election shall be in substantially the form of Exhibit F (a "*Notice of Conversion or Continuation*") and shall be made by giving the Administrative Agent at least three (3) Business Days' prior written notice specifying (A) the amount and type of Loan being converted or continued, (B) in the case of a conversion to or a continuation of Eurocurrency Rate Loans, the applicable Interest Period and (C) in the case of a conversion, the date of such conversion.

(b)    The Administrative Agent shall promptly notify each Lender of its receipt of a Notice of Conversion or Continuation and of the options selected therein.  Notwithstanding the foregoing, the Administrative Agent or the Requisite Lenders may require by notice to the Borrower that no conversion in whole or in part of Base Rate Loans to Eurocurrency Rate Loans and no continuation in whole or in part of Eurocurrency Rate Loans upon the expiration of any applicable Interest Period shall be permitted at any time at which (A) an Event of Default shall have occurred and be continuing or (B) the continuation of, or conversion into, a Eurocurrency Rate Loan would violate any provision of Section 2.14.  If, within the time period required under the terms of this Section 2.11, the Administrative Agent does not receive a Notice of Conversion or Continuation from the Borrower containing a permitted election to continue any Eurocurrency Rate Loans for an additional Interest Period or to convert any such Loans, then, upon the expiration of the applicable Interest Period, such Loans shall be automatically converted to Base Rate Loans.  Each Notice of Conversion or Continuation shall be irrevocable.

SECTION 2.12    Fees.

(a)    Unused Commitment Fee.  The Borrower agrees to pay in Same Day Funds in Dollars to the Administrative Agent for the account of each Lender a commitment fee (the "*Unused Commitment Fee*") on the average daily amount by which the Revolving Credit

Commitment of such Lender exceeds such Lender's Ratable Portion of the sum of (i) the aggregate outstanding principal amount of Loans for the applicable Class and (ii) the outstanding amount of the aggregate Letter of Credit Undrawn Amounts from the Closing Date through the Revolving Credit Termination Date at the Applicable Unused Commitment Fee Rate, payable in arrears (x) on the first Business Day of each month, commencing on the first such Business Day following the Closing Date and (y) on the Revolving Credit Termination Date.   For the avoidance of doubt, any Swing Loans outstanding shall reduce the Revolving Credit Commitment of the Swing Loan Lender in its capacity as a Lender.

(b)    Letter of Credit Fees.  The Borrower agrees to pay the following amounts with respect to Letters of Credit issued by any Issuer:

(i)    to the Administrative Agent for the account of each Issuer of a Letter of Credit, with respect to each Letter of Credit issued by such Issuer, an issuance fee equal to 0.125% per annum of the average daily maximum undrawn face amount of such Letter of Credit (whether or not such maximum amount is then in effect under such Letter of Credit if such maximum amount increases periodically pursuant to the terms of such Letter of Credit) for the immediately preceding month (or portion thereof), payable in arrears (A) on the first Business Day of each month, commencing on the first such Business Day following the issuance of such Letter of Credit and (B) on the Revolving Credit Termination Date;

(ii)    to the Administrative Agent for the ratable benefit of the Lenders, with respect to each Letter of Credit, a fee accruing in Dollars at a rate per annum equal to the Applicable Rate for Eurocurrency Rate Loans (each such fee, a "*Letter of Credit Fee*"), in each case multiplied by the average daily maximum undrawn face amount of such Letter of Credit (whether or not such maximum amount is then in effect under such Letter of Credit if such maximum amount increases periodically pursuant to the terms of such Letter of Credit) for the immediately preceding month (or portion thereof), payable in arrears (A) on the first Business Day of each month, commencing on the first such Business Day following the issuance of such Letter of Credit and (B) on the Revolving Credit Termination Date; provided, however, that any Letter of Credit Fees otherwise payable for the account of a Defaulting Lender with respect to any Letter of Credit as to which such Defaulting Lender has not provided Cash Collateral satisfactory to the applicable Issuer pursuant to Section 2.4 shall be payable, to the maximum extent permitted by applicable Law, to the other Lenders in accordance with the upward adjustments in their respective Applicable Percentages allocable to such Letter of Credit pursuant to Section 2.16(a)(iv), with the balance of such fee, if any, payable to the applicable Issuer for its own account; and

(iii)    to the Issuer of any Letter of Credit, with respect to the issuance, amendment or transfer of each Letter of Credit and each drawing made thereunder, customary documentary and processing charges in accordance with such Issuer's standard schedule for such charges in effect at the time of issuance, amendment, transfer or drawing, as the case may be.

(c)      Additional Fees.  The Borrower has agreed to pay to the Administrative Agent and the Arrangers additional fees, the amount and dates of payment of which are embodied in the Fee Letter.

SECTION 2.13      Payments and Computations.

(a)      All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  The Borrower shall make each payment and prepayment hereunder (including fees and expenses) not later than 2:00 p.m. on the day when due, (i) in the case of Loans, in the currency in which such Loan is denominated, (ii) in the case of Reimbursement Obligations, in the currency of the applicable Letter of Credit, (iii) in the case of any accrued interest payable on a Loan or Reimbursement Obligation, in the currency of such Loan or Reimbursement Obligation, as applicable, and (iv) in the case of all other payments under each Loan Document, in Dollars except as otherwise expressly provided herein or therein, in each case to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office for payment and in Same Day Funds without condition or deduction for any defense, recoupment, set-off or counterclaim.  The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Administrative Agent after 2:00 p.m. shall, in each case be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)      All computations of interest for Base Rate Loans shall be made on the basis of a year of 365 days or 366 days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365 day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; provided that any Loan that is repaid on the same day on which it is made shall bear interest for one (1) day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(c)      **[reserved]**

(d)      Whenever any payment hereunder shall be stated to be due on a day other than a Business Day, the due date for such payment shall be extended to the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or fees, as the case may be; provided, however, that if such extension would cause payment of interest on or principal of any Eurocurrency Rate Loan to be made in the next calendar month, such payment shall be made on the immediately preceding Business Day.  All repayments of any Loans shall be applied as follows:  first, to repay any such Loans outstanding as Base Rate Loans and then, to repay any such Loans outstanding as Eurocurrency Rate Loans, with those Eurocurrency Rate Loans having earlier expiring Interest Periods being repaid prior to those having later expiring Interest Periods.

(e)     Unless the Administrative Agent shall have received notice from the Borrower to the Lenders prior to the date on which any payment is due hereunder that the Borrower will not make such payment in full, the Administrative Agent may assume that the Borrower has made such payment in full to the Administrative Agent on such date and the Administrative Agent may (but shall not be so required to), in reliance upon such assumption, cause to be distributed to each Lender on such due date an amount equal to the amount then due such Lender.  If and to the extent that the Borrower shall not have made such payment to the Administrative Agent in Same Day Funds in the applicable currency, then each Lender shall repay to the Administrative Agent forthwith on demand the portion of such assumed payment that was made available to such Lender in Same Day Funds in the applicable currency, together with interest thereon in respect of each day from and including the date such amount was made available to such Lender to the date such amount is repaid to the Administrative Agent in Same Day Funds in the applicable currency at the applicable Overnight Rate from time to time in effect.

(f)     Except for payments and other amounts received by the Administrative Agent and applied in accordance with the provisions of Section 10.2(b) below (or required to be applied in accordance with Section 2.9), all payments and any other amounts received by the Administrative Agent from or for the benefit of the Borrower shall be applied as follows: first, to pay principal of, and interest on, any portion of the Loans the Administrative Agent may have advanced pursuant to the express provisions of this Agreement on behalf of any Lender, for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower, second, to pay all other Obligations then due and payable and third, as the Borrower so designates.  Payments in respect of Swing Loans received by the Administrative Agent shall be distributed to the Swing Loan Lender; payments in respect of Loans received by the Administrative Agent shall be distributed to each Lender in accordance with such Lender's Ratable Portion; and all payments of fees and all other payments in respect of any other Obligation shall be allocated among such of the Lenders and Issuers as are entitled thereto and, for such payments allocated to the Lenders, in proportion to their respective Ratable Portions.

(g)     At the option of the Administrative Agent, principal on the Swing Loans, Reimbursement Obligations, interest, fees, expenses and other sums due and payable in respect of the Loans and Protective Advances may be paid from the proceeds of Swing Loans or the Revolving Loans unless the Borrower makes such payments on the next succeeding Business Day after the Borrower receives written notice from the Administrative Agent requesting such payments.  The Borrower hereby authorizes the Swing Loan Lender to make such Swing Loans pursuant to Section 2.3(a) and the Lenders to make such Loans pursuant to Section 2.2(a) from time to time in the amounts of any and all principal payable with respect to the Swing Loans, Reimbursement Obligations, interest, fees, expenses and other sums payable in respect of the Loans and Protective Advances, and further authorizes the Administrative Agent to give the Lenders notice of any Borrowing with respect to such Swing Loans and the Revolving Loans and to distribute the proceeds of such Swing Loans and the Revolving Loans to pay such amounts. The Borrower agrees that all such Swing Loans and the Revolving Loans so made shall be deemed to have been requested by it (irrespective of the satisfaction of the conditions in Section 4.2, which conditions the Lenders irrevocably waive) and directs that all proceeds thereof shall be used to pay such amounts.

SECTION 2.14     <u>Special Provisions Governing Eurocurrency Rate Loans</u>.

80

(a)      Determination of Interest Rate.  The Adjusted Eurocurrency Rate for each Interest Period for Eurocurrency Rate Loans shall be determined by the Administrative Agent pursuant to the procedures set forth in the definition of "Eurocurrency Rate".  The Administrative Agent's determination shall be presumed to be correct and binding on the Loan Parties, absent manifest error.

(b)      Interest Rate Unascertainable, Inadequate or Unfair.   In the event that (i) the Administrative Agent reasonably determines that adequate and fair means do not exist for ascertaining the applicable interest rates by reference to which the Eurocurrency Rate then being determined is to be fixed or (ii) the Requisite Lenders reasonably determine and notify the Administrative Agent that the Eurocurrency Rate for any Interest Period will not adequately reflect the cost to the Lenders of making or maintaining such Loans for such Interest Period, the Administrative Agent shall forthwith so notify the Borrower and the Lenders, whereupon each Eurocurrency Rate Loan shall automatically, on the last day of the current Interest Period for such Loan, convert into a Base Rate Loan, and the obligations of the Lenders to make Eurocurrency Rate Loans or to convert Base Rate Loans into Eurocurrency Rate Loans shall be suspended until the Administrative Agent shall notify the Borrower that the Requisite Lenders have determined that the circumstances causing such suspension no longer exist.

SECTION 2.15      **[Reserved]**.

SECTION 2.16      Defaulting Lenders.

(a)      Adjustments.   Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)      Waivers and Amendments.  That Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 12.1.

(ii)      Reallocation of Payments.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article X or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to Section 12.6), shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; second, to the payment on a pro rata basis of any amounts owing by that Defaulting Lender to any Issuer or the Swing Loan Lender hereunder; third, if so determined by the Administrative Agent or requested by any Issuer or the Swing Loan Lender, to be held as cash collateral for future funding obligations of that Defaulting Lender of any participation in any Swing Loan or Letter of Credit; fourth, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; fifth, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released in order to

81

satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; sixth, to the payment of any amounts owing to the Lenders, any Issuer or the Swing Loan Lender as a result of any judgment of a court of competent jurisdiction obtained by any Lender, any Issuer or the Swing Loan Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; seventh, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and eighth, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans or Letter of Credit Borrowings in respect of which that Defaulting Lender has not fully funded its appropriate share and (y) such Loans or Letter of Credit Borrowings were made at a time when the conditions set forth in Section 4.2 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and Letter of Credit Borrowings owed to, all non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or Letter of Credit Borrowings owed to, that Defaulting Lender.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash collateral pursuant to this Section 2.16(a)(ii) shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    Certain Fees.  That Defaulting Lender (x) shall not be entitled to receive any commitment fee pursuant to Section 2.12(a) for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender for such period) and (y) shall be limited in its right to receive Letter of Credit Fees as provided in Section 2.12(b).

(iv)    Reallocation of Applicable Percentages to Reduce Fronting Exposure. During any period in which there is a Defaulting Lender, for purposes of computing the amount of the obligation of each non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit or Swing Loans pursuant to Sections 2.3 and 2.4, the "Applicable Percentage" of each non-Defaulting Lender shall be computed without giving effect to the Revolving Credit Commitment of that Defaulting Lender; provided that (i) each such reallocation shall be given effect only if, at the date the applicable Lender becomes a Defaulting Lender, no Default or Event of Default exists; and (ii) the aggregate obligation of each non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit and Swing Loans shall not exceed the positive difference, if any, of (1) the Revolving Credit Commitment of that non Defaulting Lender minus (2) the aggregate Outstanding Amount of the Revolving Loans of that Lender.

(b)    Defaulting Lender Cure.  If the Borrower, the Administrative Agent, Swing Loan Lender and the Issuers agree in writing in their reasonable discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash

Collateral), that Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Revolving Loans and funded and unfunded participations in Letters of Credit and Swing Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages (without giving effect to Section 2.16(a)(iv)), whereupon that Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower for the period that such Lender was a Defaulting Lender; and provided further that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(c)    Cash Collateral.    At any time that there shall exist a Defaulting Lender, immediately upon the request of the Administrative Agent, the applicable Issuer or the Swing Loan Lender, the Borrower shall deliver to the Administrative Agent Cash Collateral in an amount sufficient to cover all Fronting Exposure (after giving effect to Section 2.16(a)(iv) and any Cash Collateral provided by the Defaulting Lender).

SECTION 2.17    Certain Bankruptcy Matters.

(a)    Except to the extent expressly provided otherwise in an Order, the Loan Parties hereby agree that, subject only to the Carve Out and the DIP Intercreditor Agreement, the Obligations shall be deemed to (i) constitute DIP Superpriority Claims over all administrative expense claims and claims against the Borrower or the other Loan Parties now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order) (and all rights to charge the Collateral and all collateral securing the Pre-Petition Obligations under Section 506(c) shall be waived), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provisions of the Bankruptcy Code and all superpriority administrative expense claims granted to any other Person the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court, (ii) pursuant to Bankruptcy Code Section 364(c)(2), be secured by a perfected first-priority security interest in the Collateral, and any proceeds and products thereof in whatever form received, provided, further that the Collateral shall exclude the Debtors' claims and causes of action under Chapter 5 of the Bankruptcy Code, or other Avoidance Actions, but subject only to, and effective upon, entry of the Final Order, shall include any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise, in each case, to the extent that such Collateral is not subject to valid, perfected and non-avoidable liens as of the commencement of the Cases, (iii) pursuant to Bankruptcy Code section 364(c)(3), be secured by a perfected lien on all Collateral, to the extent that such Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code and (iv) pursuant to Bankruptcy Code section 364(d), be secured by a perfected priming first priority lien on all Collateral, to the extent that such Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties as of the

83

commencement of the Cases that secure the obligations of the Loan Parties under or in connection with the Pre-Petition Credit Agreement.

(b)    In the event of a conflict between, or inconsistency among, the Orders, on the one hand, and any Loan Document, on the other hand, the Orders shall control.

(c)    Notwithstanding anything to the contrary contained herein or elsewhere (except as specifically described below):

(i)    the parties hereto agree, and the Orders shall provide, that the Loan Parties shall not be required to prepare, file, register or publish any financing statements, mortgages, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on the Collateral granted by or pursuant to this Agreement, the Orders or any other Loan Document. Subject to the limitations set forth in the definition of "Guarantee and Collateral Requirement" and in Sections 8.11 and 8.13, if the Administrative Agent (in its sole discretion), from time to time elects to prepare, file, register or publish any such financing statements, mortgages, account control agreements, notices of Lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Collateral Agent's Liens on the Collateral, (A) all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that the Interim Order is entered, and (B) shall not negate or impair the validity or effectiveness of this Section 2.17(c) or of the perfection of any other Liens in favor of the Collateral Agent, for the benefit of the Lenders and the other Loan Parties, on the Collateral; and

(ii)    except as otherwise agreed to by the Lenders (including, without limitation, in the DIP Intercreditor Agreement) or as otherwise permitted or contemplated by this Agreement, the Orders or the other Loan Documents, the Liens, Lien priorities, DIP Superpriority Claims and other rights and remedies granted to the Loan Parties pursuant to this Agreement, the Orders or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the DIP Superpriority Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by the Borrower or any other Loan Party (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of the Cases, or by any other act or omission whatsoever.

(d)    Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)    subject only to the Carve Out and the Orders, no costs or expenses of administration which have been or may be incurred in the Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of any Lender or the Administrative Agent against the Borrower in respect of any Obligations;

(ii)    other than as provided in the Orders or the Loan Documents, the Collateral Agent's Liens on the Collateral shall constitute valid, enforceable and perfected Liens, and, except with respect to the Carve Out (and as otherwise set forth in the DIP Intercreditor Agreement and in the Orders), shall be prior to all other Liens now existing or hereafter arising, in favor of any other creditor or other Person; and

(iii)    the parties hereto agree, and the Orders shall provide, that the Collateral Agent's Liens on the Collateral shall continue to be valid, enforceable and perfected without the need for the Collateral Agent or any Lender to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect the Collateral Agent's Liens under applicable non-bankruptcy law.

## ARTICLE III

## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

SECTION 3.1    Taxes.

(a)    Except as required by law, any and all payments by the Borrower (the term "Borrower" under this Article III being deemed to include any Subsidiary for whose account a Letter of Credit is issued) or any Guarantor under any Loan Document shall be made free and clear of and without deduction for any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings (including backup withholding) or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto (collectively, "*Taxes*"), excluding, in the case of each Agent and each Lender, (i) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Agent or Lender being organized under the laws of, or having its principal office in or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax, (ii) Taxes imposed on such Agent or Lender as a result of a present or former connection between such Agent or Lender and the jurisdiction imposing such Tax (other than connections arising from such Agent or Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document), (iii) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (A) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 3.7 or (B) such Lender changes its lending office, except in each case to the extent that, pursuant to this Section 3.1, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (iv) any U.S. federal withholding Taxes imposed as a result of the failure of any Agent or Lender to comply with, in the case of any Foreign Lender, as defined below, the provisions of Sections 3.1(b) and 3.1(c) or, in the case of any U.S. Lender, as defined below, the provisions of Section 3.1(d), and (v) any U.S. federal withholding taxes imposed pursuant to FATCA (all Taxes described in this Section 3.1(a)(i)-(v)

being hereinafter referred to as "*Excluded Taxes*"; all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document being hereinafter referred to as "*Indemnified Taxes*"). If the Borrower or a Guarantor is required by Law (as determined in the good faith discretion of the Borrower or Guarantor) to deduct or withhold any Indemnified Taxes or Other Taxes (as defined below) from or in respect of any sum payable under any Loan Document to any Agent or any Lender, (i) the sum payable shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under this Section 3.1(a)), each of such Agent and such Lender receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the Borrower or Guarantor shall make such deductions or withholdings, (iii) the Borrower or Guarantor shall timely pay the full amount deducted or withheld to the relevant taxing authority, and (iv) within thirty (30) days after the date of such payment (or, if receipts or evidence are not available within thirty (30) days, as soon as practicable thereafter), the Borrower or Guarantor shall furnish to such Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof to the extent such a receipt has been made available to the Borrower or Guarantor (or other evidence of payment reasonably satisfactory to the Administrative Agent). If the Borrower or Guarantor fails to pay any Indemnified Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to any Agent or any Lender the required receipts or other required documentary evidence that has been made available to the Borrower or Guarantor, the Borrower or Guarantor shall indemnify such Agent and such Lender for any incremental Indemnified Taxes and Other Taxes that may become payable by such Agent or such Lender arising out of such failure.

(b)     To the extent it is legally able to do so, each Agent or Lender (including an Eligible Assignee to which a Lender assigns its interest in accordance with Section 12.2) that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code (each, a "*Foreign Lender*") agrees to complete and deliver to the Borrower and the Administrative Agent on or prior to the date on which the Agent or Lender (or Eligible Assignee) becomes a party hereto, two (2) accurate, complete and original signed copies of whichever of the following is applicable:  (i) IRS Form W-8BEN or IRS Form W-8BEN-E certifying that it is entitled to benefits under an income tax treaty to which the United States is a party; (ii) IRS Form W-8ECI certifying that the income receivable pursuant to any Loan Document is effectively connected with the conduct of a trade or business in the United States; (iii) if the Foreign Lender is not (A) a bank described in Section 881(c)(3)(A) of the Code, (B) a 10-percent shareholder described in Section 871(h)(3)(B) of the Code, or (C) a controlled foreign corporation related to the Borrower within the meaning of Section 864(d) of the Code, a certificate to that effect in substantially the form attached hereto as Exhibit N (a "*Non-Bank Certificate*") and an IRS Form W-8BEN or IRS Form W-8BEN-E, certifying that the Foreign Lender is not a United States person; (iv) to the extent a Lender is not the beneficial owner for U.S. federal income tax purposes, IRS Form W-8IMY (or any successor forms) of the Lender, accompanied by, as and to the extent applicable, an IRS Form W-8BEN or IRS Form W-8BEN-E, IRS Form W-8ECI, IRS Form W-9, IRS Form W-8IMY (or other successor forms), Non-Bank Certificate and any other required supporting information from each beneficial owner (it being understood that a Lender need not provide certificates or supporting documentation from beneficial owners if (x) the Lender is a "qualified intermediary" or "withholding foreign partnership" for U.S. federal income tax purposes and (y) such Lender is as a result able to establish, and does establish, that payments to such Lender are,

to the extent applicable, entitled to an exemption from or, if an exemption is not available, a reduction in the rate of, U.S. federal withholding taxes without providing such certificates or supporting documentation); or (v) any other form prescribed by applicable requirements of U.S. federal income tax law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable requirements of law to permit the Borrower and the Administrative Agent to determine the withholding or deduction required to be made.

(c)    In addition, each such Lender shall, to the extent it is legally entitled to do so, (i) promptly submit to the Borrower and the Administrative Agent two (2) accurate, complete and original signed copies of such other or additional forms or certificates (or such successor forms or certificates as shall be adopted from time to time by the relevant taxing authorities) as may then be applicable or available to secure an exemption from or reduction in the rate of U.S. federal withholding tax (A) on or before the date that such Lender's most recently delivered form, certificate or other evidence expires or becomes obsolete or inaccurate in any material respect, (B) after the occurrence of a change in the Foreign Lender's circumstances requiring a change in the most recent form, certificate or evidence previously delivered by it to the Borrower and the Administrative Agent, and (C) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent, and (ii) promptly notify the Borrower and the Administrative Agent of any change in the Foreign Lender's circumstances which would modify or render invalid any claimed exemption or reduction.

(d)    Each Agent or Lender that is a "United States person" (within the meaning of Section 7701(a)(30) of the Code) (each a "*U.S. Lender*") agrees to complete and deliver to the Borrower and the Administrative Agent two (2) original copies of accurate, complete and  signed IRS Form W-9 or successor form certifying that such Agent or Lender is not subject to United States backup withholding tax (i) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement), (ii) on or before the date that such form expires or becomes obsolete or inaccurate in any material respect, (iii) after the occurrence of a change in the Agent's or Lender's circumstances requiring a change in the most recent form previously delivered by it to the Borrower and the Administrative Agent, and (iv) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.

(e)    If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Agent as may be necessary for the Borrower and the Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause 3.1(e)(ii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

87

(f)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made hereunder shall deliver to the Borrower and the Agent, at the time or times reasonably requested by the Borrower or the Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Agent as will enable the Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.1(b), (d) and (e) above) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(g)     On or before the date the Administrative Agent becomes a party to this Agreement, the Administrative Agent shall provide to the Borrower, two duly-signed, properly completed copies of the documentation prescribed in clause (i) or (ii) below, as applicable (together with all required attachments thereto):  (i) IRS Form W-9 or any successor thereto, or (ii) (A) IRS Form W-8ECI or any successor thereto, and (B) with respect to payments received on account of any Lender, a U.S. branch withholding certificate on IRS Form W-8IMY or any successor thereto evidencing its agreement with the Borrower to be treated as a U.S. Person for U.S. federal withholding purposes.  At any time thereafter, the Administrative Agent shall provide updated documentation previously provided (or a successor form thereto) when any documentation previously delivered has expired or become obsolete or invalid or otherwise upon the reasonable request of the Borrower.

(h)     The Borrower agrees to pay any and all present or future stamp, court or documentary Taxes and any other similar excise, property, intangible or mortgage recording Taxes or charges or similar levies which arise from any payment made under any Loan Document or from the execution, delivery, performance, from the receipt or perfection of a security interest under, enforcement or registration of, or otherwise with respect to, any Loan Document (including additions to tax, penalties and interest related thereto) excluding, in each case, such Taxes that are described in Section 3.1(a)(ii) imposed with respect to an Assignment and Assumption, except to the extent that any such change is requested in writing by the Borrower (all such non-Excluded Taxes described in this Section 3.1(h) being hereinafter referred to as "*Other Taxes*").

(i)     If any Indemnified Taxes or Other Taxes are directly asserted against any Agent or Lender with respect to any payment received by such Agent or Lender in respect of any Loan Document, such Agent or Lender may pay such Indemnified Taxes or Other Taxes and the Borrower will promptly indemnify and hold harmless such Agent or Lender for the full amount of such Indemnified Taxes and Other Taxes (and any Indemnified Taxes and Other Taxes imposed on amounts payable under this Section 3.1), and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted.  Payments under this Section 3.1(i) shall be made within ten (10) days after the date Borrower receives demand for payment from such Agent or Lender.

A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by an Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(j)       Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (x) any Indemnified Taxes or Other Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes or Other Taxes pursuant to this Agreement and without limiting the obligation of the Borrower to do so), (y) any Indemnified Taxes or Other Taxes attributable to such Lender's failure to comply with the provisions of Section 12.2(e) relating to the maintenance of a Participant Register and (z) any Taxes excluded from Indemnified Taxes or Other Taxes that are attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off an apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (j).

(k)       **[reserved]**.

(l)       **[reserved]**.

(m)      If any Administrative Agent or any Lender determines, in its sole discretion exercised in good faith, that it has received a refund in respect of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrower or Holdings, as the case may be or with respect to which the Borrower or Holdings, as the case may be has paid additional amounts pursuant to this Section 3.1, it shall remit such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower or Holdings, as the case may be under this Section 3.1 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses incurred by the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower or Holdings, as the case may be, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower or Holdings, as the case may be (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph 3.1(m), in no event will the Administrative Agent or any Lender be required to pay any amount to an indemnifying party pursuant to this paragraph 3.1(m) the payment of which would place the Administrative Agent or Lender in a less favorable net after-tax position than such Administrative Agent or Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This subsection shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other

information relating to its Taxes that it deems confidential) to the Borrower, Holdings or any other Person.

(n)     Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 3.1(a) or (i) with respect to such Lender, it will, if requested by the Borrower, use commercially reasonable efforts (subject to legal and regulatory restrictions) to mitigate the effect of any such event, including by designating another Lending Office for any Loan affected by such event and by completing and delivering or filing any tax-related forms which such Lender is legally able to deliver and which would reduce or eliminate any amount of Taxes or Other Taxes required to be deducted or withheld or paid by the Borrower; provided that such efforts are made at the Borrower's expense and on terms that, in the reasonable judgment of such Lender, cause such Lender and its Lending Office(s) to suffer no material economic, legal or regulatory disadvantage, and provided further that nothing in this paragraph 3.1(n) affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.1(a) or (i).

(o)     Notwithstanding any other provision of this Agreement, the Borrower and the Administrative Agent may deduct and withhold any taxes required by any Laws to be deducted and withheld from any payment under any of the Loan Documents, subject to the provisions of this Section 3.1.

(p)     With respect to any Lender's claim for compensation under this Section 3.1, the Borrower shall not be required to compensate such Lender for any amount incurred more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the event that gives rise to such claim; provided that, if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(q)     Each party's obligations under this Section 3.1 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 3.2     Illegality.  If any Lender reasonably determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to the Eurocurrency Rate, or to determine or charge interest rates based upon the Eurocurrency Rate or Adjusted Eurocurrency Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, (i) any obligation of such Lender to make or continue Eurocurrency Rate Loans or to convert Base Rate Loans to Eurocurrency Rate Loans shall be suspended, and (ii) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Adjusted Eurocurrency Rate component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Adjusted Eurocurrency Rate component of the

90

Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (x) the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurocurrency Rate Loans and shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurocurrency Rate Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Adjusted Eurocurrency Rate component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Rate Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such Eurocurrency Rate Loans and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Adjusted Eurocurrency Rate component of the Base Rate with respect to any Base Rate Loans, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Adjusted Eurocurrency Rate component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal  for such Lender to determine or charge interest rates based upon the Eurocurrency Rate.  Each Lender agrees to designate a different Lending Office if such designation will avoid the need for such notice and will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

SECTION 3.3      Inability to Determine Rates.  If the Requisite Lenders reasonably determine that for any reason in connection with any request for a Eurocurrency Rate Loan or a conversion to or continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank eurocurrency market for the applicable amount and Interest Period of such Eurocurrency Rate Loan, (b) adequate and reasonable means do not exist for determining the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan or in connection with an existing or proposed Base Rate Loan; provided that the Administrative Agent and the Borrower shall endeavor to establish an alternate rate of interest to the Eurocurrency Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans in the United States at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable, and notwithstanding anything to the contrary in Section 12.1, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Administrative Agent shall not have received, within five (5) Business Days of the date notice of such alternate rate of interest is provided to the Lenders, a written notice from the Required Lenders stating that such Required Lenders object to such amendment, or (c) the Eurocurrency Rate, for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain Eurocurrency Rate Loans shall be suspended, and (y) in the event of a determination described in the preceding sentence with respect to the Adjusted Eurocurrency Rate component of the Base Rate, the utilization of the Adjusted Eurocurrency Rate component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (upon the instruction of the Requisite Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke

91

any pending request for a Borrowing of, conversion to or continuation of Eurocurrency Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount <u>specified therein.</u>

SECTION 3.4    <u>Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurocurrency Rate Loans</u>.

(a)    Increased Costs Generally.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender or any Issuer;

(ii)    subject any Lender or the Administrative Agent or any Issuer to any Tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any participation in a Letter of Credit or any Eurocurrency Rate Loan made by it, or change the basis of taxation of payments to such Lender or the Administrative Agent or the Issuer in respect thereof (except for Indemnified Taxes, Other Taxes or Excluded Taxes); or

(iii)    impose on any Lender or any Issuer or the London interbank market any other condition, cost or expense affecting this Agreement or Eurocurrency Rate Loans made by such Lender or any Letter of Credit or participation therein, in each case that is not otherwise accounted for in the definition of Adjusted Eurocurrency Rate or this clause (a);

and the result of any of the foregoing shall be to increase the cost to such Lender (or, in the case of clause (ii) above, the Administrative Agent) of making or maintaining any Loan the interest on which is determined by reference to the Eurocurrency Rate (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender (or, in the case of clause (ii) above, the Administrative Agent) or such Issuer of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or Issuer hereunder (or, in the case of clause (ii) above, the Administrative Agent)  (whether of principal, interest or any other amount) then, from time to time within fifteen (15) days after receipt of the certificate referred to in Section 3.4(c) below setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender or Issuer (or, in the case of clause (ii) above, the Administrative Agent), as the case may be, such additional amount or amounts as will compensate such Lender or Issuer (or, in the case of clause (ii) above, the Administrative Agent), as the case may be, for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If any Lender or any Issuer reasonably determines that any Change in Law affecting such Lender or such Issuer or any Lending Office of such Lender or such Lender's or such Issuer's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or such Issuer's capital or on the capital of such Lender's or such Issuer's holding company, if any, as a

consequence of this Agreement, the Revolving Credit Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by such Issuer, to a level below that which such Lender or such Issuer or such Lender's or such Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or such Issuer's policies and the policies of such Lender's or such Issuer's holding company with respect to capital adequacy and liquidity requirements), then from time to time upon demand of such Lender or such Issuer setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender or such Issuer, as the case may be, within fifteen (15) days after receipt of the certificate referred to in Section 3.4(c) below, such additional amount or amounts as will compensate such Lender or such Issuer or such Lender's or such Issuer's holding company for any such reduction suffered.

(c)     Certificates for Reimbursement.    A certificate of a Lender or an Issuer setting forth the amount or amounts necessary to compensate such Lender or such Issuer or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section 3.4 and delivered to the Borrower shall be conclusive absent manifest error.   The Borrower shall pay such Lender or such Issuer, as the case may be, the amount shown as due on any such certificate within fifteen (15) days after receipt thereof.

(d)     Delay in Requests.    Failure or delay on the part of any Lender or any Issuer to demand compensation pursuant to the foregoing provisions of this Section 3.4 shall not constitute a waiver of such Lender's or such Issuer's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender or an Issuer pursuant to the foregoing provisions of this Section 3.4 for any increased costs incurred or reductions suffered more than one hundred and eighty (180) days prior to the date that such Lender or such Issuer, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or such Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

SECTION 3.5     Funding Losses.  Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense actually incurred by it as a result of:

(a)     any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day prior to the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)     any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower; or

93

(c)     any assignment of a Eurocurrency Rate Loan on a day prior to the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 3.7;

(d)     including any loss or expense (excluding loss of anticipated profits or margin) actually incurred by reason of the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained (and, for the avoidance of doubt, excluding the impact of clause (b) of the definition of "Adjusted Eurocurrency Rate").

SECTION 3.6     Matters Applicable to All Requests for Compensation.

(a)     Designation of a Different Lending Office. If any Lender requests compensation under Section 3.4, or the Borrower is required to pay any additional amount to any Lender, any Issuer, or any Governmental Authority for the account of any Lender or any Issuer pursuant to Section 3.1, or if any Lender gives a notice pursuant to Section 3.2, then such Lender or such Issuer shall, as applicable, use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender or such Issuer, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.1 or 3.4, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.2, as applicable, and (ii) in each case, would not subject such Lender or such Issuer, as the case may be, to any material unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender or such Issuer, as the case may be in any material economic, legal or regulatory respect.

(b)     Suspension of Lender Obligations.  If any Lender requests compensation by the Borrower under Section 3.4, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue Eurocurrency Rate Loans from one Interest Period to another Interest Period, or to convert Base Rate Loans into Eurocurrency Rate Loans, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.6(c) shall be applicable); provided that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)     Conversion of Eurocurrency Rate Loans.  If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Sections 3.2, 3.3 or 3.4 hereof that gave rise to the conversion of such Lender's Eurocurrency Rate Loans no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurocurrency Rate Loans made by other Lenders are outstanding, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurocurrency Rate Loans, to the extent necessary so that, after giving effect thereto, all Loans of a given Class held by the Lenders of such Class holding Eurocurrency Rate Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Pro Rata Shares.

SECTION 3.7     Replacement of Lenders under Certain Circumstances.

If (i) any Lender requests compensation under Section 3.4 or ceases to make Eurocurrency Rate Loans as a result of any condition described in Section 3.2 or Section 3.4, (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.1 or 3.4, (iii) any Lender is a Non-Consenting Lender or (iv) any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 12.2), all of its interests, rights and obligations under this Agreement (or, with respect to clause (iii) above, all of its interests, rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related consent, waiver and amendment) and the related Loan Documents to one or more Eligible Assignees that shall assume such obligations (any of which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a)     the Borrower shall have paid to the Administrative Agent the assignment fee specified in Section 12.2(b)(iv);

(b)     such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.5) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower;

(c)     such Lender being replaced pursuant to this Section 3.7 shall (i) execute and deliver an Assignment and Assumption with respect to all, or a portion as applicable, of such Lender's Commitment and outstanding Loans, and (ii) deliver any Revolving Credit Notes evidencing such Loans to the Borrower or Administrative Agent (or a lost or destroyed note indemnity in lieu thereof); provided that the failure of any such Lender to execute an Assignment and Assumption or deliver such Revolving Credit Notes shall not render such sale and purchase (and the corresponding assignment) invalid and such assignment shall be recorded in the Register and the Revolving Credit Notes shall be deemed to be canceled upon such failure;

(d)     the Eligible Assignee shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, Revolving Credit Commitments and participations, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender (and, if such assigning Lender is a Non-Consenting Lender, such Eligible Assignee shall agree to the applicable consent, waiver or amendment to which such Non-Consenting Lender has not agreed);

(e)     in the case of any such assignment resulting from a claim for compensation under Section 3.4 or payments required to be made pursuant to Section 3.1, such assignment will result in a reduction in such compensation or payments thereafter;

(f)     such assignment does not conflict with applicable Laws; and

(g)      the Lender that acts as the Administrative Agent cannot be replaced in its capacity as Administrative Agent other than in accordance with Section 11.6.

In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each Lender, all affected Lenders or all the Lenders or all affected Lenders with respect to a certain Class or Classes of the Loans and/or Revolving Credit Commitments and (iii) the Requisite Lenders have agreed (but solely to the extent required by Section 12.1) to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "Non-Consenting Lender".

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

SECTION 3.8      Survival.  All of the Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder and resignation or removal of the Administrative Agent, the Collateral Agent, the Swing Loan Lender or any Issuer.

# ARTICLE IV

## CONDITIONS PRECEDENT

SECTION 4.1      Conditions Precedent to Closing Date.

The Agreement became effective on the Closing Date upon the satisfaction or due waiver in accordance with Section 12.1 of each of the following conditions precedent, except as otherwise agreed between the Borrower, the Administrative Agent, the Collateral Agent and the Co-Collateral Agent:

(a)      The Administrative Agent's, the Collateral Agent's and Co-Collateral Agent's receipt of the following, each of which shall be originals or pdf copies or other facsimiles (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party each in form and substance reasonably satisfactory to the Administrative Agent and its legal counsel, the Collateral Agent and its legal counsel and the Co-Collateral Agent and its legal counsel:

(i)      a Notice of Borrowing in accordance with the requirements hereof;

(ii)      executed counterparts of this Agreement and the Guaranty;

(iii)      the Security Agreement, duly executed by each Loan Party thereto;

(A)  **[reserved]**;

(B)  **[reserved]**;

(iv)    executed copy of the DIP Term Loan Credit Agreement (on terms and conditions reasonably satisfactory to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent; it being understood and agreed that the credit agreement governing the DIP Term Loans attached as an exhibit to the Commitment Letter is satisfactory) and evidence of the substantially concurrent funding of loans thereunder;

(v)    executed copies of the engagement letters with any financial advisors of the Borrower;

(vi)    executed copies of commitment letters and fee letters providing for commitments for exit financing of the Borrower for (i) an asset-based revolving facility of not less than $125,000,000 and (ii) a term loan facility of not less than $400,000,000, each of which shall be in form and substance acceptable to the Administrative Agent, the Collateral Agent and Co-Collateral Agent, including, without limitation, the conditions to funding and other terms thereof (any such commitment letter, an "***Exit Commitment Letter***"); it being understood that the terms and conditions set forth in the Exit Commitment Letters as of the Petition Date are satisfactory;

(vii)    executed copy of the DIP Intercreditor Agreement (in substantially the form attached as Exhibit C to the Commitment Letter);

(viii)    such certificates of good standing from the applicable secretary of state of the state of organization of each Loan Party, certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent, the Collateral Agent and the Co-Collateral Agent may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date;

(ix)    an opinion from Sidley Austin LLP, New York counsel to the Loan Parties in form and substance satisfactory to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent;

(x)    **[reserved]**;

(xi)    **[reserved]**;

(xii)    a Borrowing Base Certificate, certified as complete and correct in all respects by the chief financial officer of the Borrower, which calculates the Borrowing Base as of the most recent calendar month ended at least 20 days prior to the Closing Date;

(xiii)    Delivery of a Responsible Officer's Certificate, in form and substance reasonably satisfactory to Administrative Agent, the Collateral Agent and the Co-Collateral Agent, certifying as to the conditions set forth in Sections [4.1(e), 4.1(j), 4.2(b) and 4.2 (c).]

(b)　　All fees and expenses required to be paid hereunder or under the Orders and invoiced at least one (1) Business Day before the Closing Date shall have been paid in full in cash.

(c)　　The Arrangers shall have received (i) copies of the most recent unaudited quarterly financial statements required to be delivered by the Borrower under the Pre-Petition Credit Agreement, (ii) copies of the most recent monthly financial statements required to be delivered by the Borrower under the Pre-Petition Credit Agreement for the calendar months of year 2018 ended at least 30 days prior to the Closing Date and (iii) at least two (2) Business Days prior to the Closing Date, the Budget.

(d)　　The Arrangers shall have received at least three (3) Business Days prior to the Closing Date all documentation and other information reasonably requested in writing by them at least ten (10) days prior to the Closing Date in order to allow the Arrangers and the Lenders to comply with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and a certification regarding beneficial ownership required by 31 C.F.R. § 1010.230.

(e)　　After giving effect to the Transactions, Excess Availability on the Closing Date shall be not less than an amount equal to (1) the aggregate amount of DIP Term Loans funded on the Closing Date *less* (2) $25,000,000.

(f)　　The Petition Date shall have occurred.

(g)　　No later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order granting of the super-priority claim and the liens and other rights and protections contemplated hereby and customary for debtor in possession financings and authorizing the Loans (including, for the avoidance of doubt, a roll up in full of the Pre-Petition Revolving Loans as of the Closing Date and repayment of the Loans as required under Section 2.9(e)), order (i) shall be in full force and effect and shall not have been, in whole or in part, vacated, reversed, stayed, or set aside and (ii) shall not have been modified or amended without the consent of the Administrative Agent, the Collateral Agent and the Co-Collateral Agent.

(h)　　The First Day Orders (including the Cash Management Order and approval of the Cash Management System) entered by the Bankruptcy Court, to the extent affecting the rights or obligations of the Administrative Agent, the Collateral Agent, the Co-Collateral Agent, the Lenders, or the agent or the lenders under the Pre-Petition Credit Agreement, or which may give rise to a post-petition claim, administrative in nature or otherwise, shall be in form and substance acceptable to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent.  There shall exist no unstayed order and injunctions challenging this Agreement or any other Loan Documents, the Exit Commitment Letters, the Pre-Petition Credit Agreement or any Pre-Petition Loan Document, the DIP Term Loan Agreement or any Loan Documents (as defined therein), the Pre-Petition Obligations, or any Liens or claims in connection therewith.

(i)　　As of the Petition Date, the Loan Parties shall have filed the Disclosure Statement and the Chapter 11 Plan with the Bankruptcy Court.

(j)      Since the Petition Date there has not been any event, occurrence, development or state of circumstances or facts that has had or would reasonably be expected to have, individually or in the aggregate a Material Adverse Effect.

Without limiting the generality of the provisions of the last paragraph of Section 9.3, for purposes of determining compliance with the conditions specified in this Section 4.1, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

SECTION 4.2      Conditions Precedent to Each Loan and Letter of Credit.

The obligation of each Lender on and after the Closing Date to honor a Notice of Borrowing (but not a Notice of Conversion or Continuation) and of each Issuer on any date to Issue any Letter of Credit is subject to the satisfaction of each of the following conditions precedent:

(a)      Request for Borrowing or Issuance of Letter of Credit.  With respect to any Loan, the Administrative Agent shall have received a duly executed Notice of Borrowing (or, in the case of Swing Loans, a duly executed Swing Loan Request), and, with respect to any Letter of Credit, the Administrative Agent and the applicable Issuer shall have received a duly executed Letter of Credit Request.

(b)      Representations and Warranties; No Defaults.  The following statements shall be true on the date of such Credit Extension, both immediately before and immediately after giving effect thereto and, in the case of any Loan, giving effect to the application of the proceeds thereof:

(i)      The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document shall be true and correct in all material respects on and as of the date of such Borrowing; provided that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided, further that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates;

(ii)      No Default or Event of Default shall have occurred or be continuing, or would result from such proposed Credit Extension or from the application of the proceeds therefrom (including, without limitation, the entry of the Final Order in accordance with Section 8.16(d) hereof);

(c)      Borrowing Base.  After giving effect to the Loans or Letters of Credit requested to be made or Issued on any such date and the use of proceeds thereof, the Revolving Credit Outstandings shall not exceed the Maximum Credit at such time.

99

(d)    Each Credit Extension shall be made in accordance in all material respects with the Budget, including Permitted Variances thereto, and shall have been approved by the Interim Order or the Final Order (as then applicable), which Order shall be in full force and effect and which shall not have been modified or amended without the consent of the Administrative Agent, the Collateral Agent and the Co-Collateral Agent and not have been vacated, reversed, modified, amended or stayed.

(e)    (i) There shall not have been (x) any order granted by the Bankruptcy Court sustaining any objection by any Person, nor (y) any motion, complaint, objection or other pleading filed by any party, challenging, in either case, the validity, priority, perfection, or enforceability of the Loan Documents or any Lien granted pursuant to the Loan Documents, and (ii) no Lien granted pursuant to the Loan Documents shall have been determined to be null and void, invalid or unenforceable by the Bankruptcy Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Cases, including, without limitation, the Committee Professionals.

Each submission by the Borrower to the Administrative Agent of a Notice of Borrowing (but not a Notice of Conversion or Continuation) or a Swing Loan Request and the acceptance by the Borrower of the proceeds of each Loan requested therein, and each submission by the Borrower to an Issuer of a Letter of Credit Request, and the Issuance of each Letter of Credit requested therein, shall be deemed to constitute a representation and warranty by the Borrower that the conditions specified in clause (b) and clause (d) above have been satisfied on and as of the date of the making of such Loan or the Issuance of such Letter of Credit.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Holdings, the Borrower and each of the Subsidiary Guarantors party hereto represent and warrant to the Agents and the Lenders that:

SECTION 5.1    Existence, Qualification and Power; Compliance with Laws. Each Loan Party and each of its Restricted Subsidiaries that is a Material Subsidiary (a) is a Person duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization (to the extent such concept exists in such jurisdiction), (b) subject to the entry of the Interim Order or the Final Order, as applicable, has all requisite power and authority to (i) own or lease its assets and carry on its business as currently conducted and (ii) in the case of the Loan Parties, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (to the extent such concept exists in such jurisdiction) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) subject to the entry of the Interim Order or the Final Order, is in compliance with all applicable Laws, orders, writs and injunctions and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case referred to in clause (c), (d) or (e), to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect.

SECTION 5.2    Authorization; No Contravention.  (a) Subject to the entry of the Interim Order or the Final Order, as applicable, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party have been duly authorized by all necessary corporate or other organizational action.  (b) Subject to the entry of the Interim Order or the Final Order, as applicable, neither the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, the consummation of the Transaction, nor the incurrence of any Obligations or the granting of Lien to secure the Obligations will (i) contravene the terms of any of such Person's Organization Documents, (ii) result in any breach or contravention of, or the creation of any Lien upon any of the property or assets of such Person or any of the Restricted Subsidiaries (other than as permitted by Section 9.1) under (A) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (B) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any applicable Law; except with respect to any breach, contravention or violation (but not creation of Liens) referred to in clauses (ii) and (iii), to the extent that such breach, contravention or violation would not reasonably be expected to have a Material Adverse Effect.

SECTION 5.3    Governmental Authorization.  Subject to the entry of the Interim Order or the Final Order, as applicable, no material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (i) filings necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings that have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or in full force and effect pursuant to the Collateral and Guarantee Requirement) and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

SECTION 5.4    Binding Effect.  This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto.  This Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited by (i) Debtor Relief Laws, including the entry of the Interim Order or the Final Order, as applicable, (ii) the need for filings and registrations necessary to create or perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties and (iii) the effect of foreign Laws, rules and regulations as they relate to pledges of Equity Interests in Foreign Subsidiaries.

SECTION 5.5    No Material Adverse Effect.

Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

LEGAL_US_W # 95739072.21

SECTION 5.6       Litigation.   Except for the Cases, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, overtly threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against Holdings, the Borrower or any of the Restricted Subsidiaries that would reasonably be expected to have a Material Adverse Effect.

SECTION 5.7       Labor Matters.   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:  (a) there are no strikes or other labor disputes against any of the Borrower or its Restricted Subsidiaries pending or, to the knowledge of the Borrower, overtly threatened in writing and (b) hours worked by and payment made based on hours worked to employees of each of the Borrower or its Restricted Subsidiaries have not been in material violation of the Fair Labor Standards Act or any other applicable Laws dealing with wage and hour matters.

SECTION 5.8       Ownership of Property; Liens.   The Borrower and each of its Restricted Subsidiaries has good record title to, or valid leasehold interests in, or easements or other limited property interests in, all real property necessary in the ordinary conduct of its business, free and clear of all Liens except for Pre-Petition Liens and except for minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and except for Liens permitted by Section 9.1 and except where the failure to have such title or other interest would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.9       Environmental Matters.

Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)       (i) each Loan Party and its respective properties and operations are, and for the past three years have been, in compliance with all Environmental Laws in all jurisdictions in which each Loan Party is currently doing business, which includes obtaining and maintaining all applicable Environmental Permits required under such Environmental Laws to carry on the business of the Loan Parties, and (ii) none of the Loan Parties is subject to any pending Environmental Claim or any other Environmental Liability, or to the knowledge of the Borrower, any Environmental Claim or any other Environmental Liability threatened in writing; and

(b)       none of the Loan Parties or any of their respective Subsidiaries has released, treated, stored, transported or disposed of Hazardous Materials at or from any currently or, to the knowledge of the Borrower, formerly operated real estate or facility relating to its business except in compliance with Environmental Laws.

SECTION 5.10      Taxes.   Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, Holdings, the Borrower and its Restricted Subsidiaries have timely filed all Federal and state and other tax returns and reports required to be filed by them, and have timely paid all Federal and state and other Taxes, assessments, fees and other governmental charges (including satisfying its withholding tax obligations) levied or imposed on their properties, income or assets or otherwise due and

102

payable, except those which are being contested in good faith by appropriate actions diligently conducted and for which adequate reserves have been provided in accordance with IFRS.

SECTION 5.11    ERISA Compliance.

(a)    Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA and the Code.

(b)    (i) No ERISA Event has occurred prior to the date on which this representation is made or deemed made;  and (ii) no Pension Plan has failed to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan, except, with respect to each of the foregoing clauses of this Section 5.11(b), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

SECTION 5.12    Subsidiaries.  As of the Closing Date (after giving effect to the Transaction), no Loan Party has any Material Subsidiaries other than those specifically set forth in the Disclosure Statement, and all of the outstanding Equity Interests owned by the Loan Parties in such Material Subsidiaries have been validly issued and are fully paid and (if applicable) nonassessable, and all Equity Interests owned by a Loan Party are owned free and clear of all Liens except (i) those created under the Collateral Documents and (ii) any Lien that is permitted under Section 9.1.  As of the Closing Date, the Disclosure Statement sets forth the name and jurisdiction of each Loan Party, (b) sets forth the ownership interest of Holdings, the Borrower and any other Subsidiary in each Subsidiary, including the percentage of such ownership and (c) identifies each Subsidiary that is a Subsidiary the Equity Interests of which are required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement.

SECTION 5.13    Margin Regulations; Investment Company Act.

(a)    The Borrower is not engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U of the Board of Governors of the United States Federal Reserve System.

(b)    Neither the Borrower nor any Guarantor is registered as an "investment company" under the Investment Company Act of 1940.

SECTION 5.14    Disclosure.  None of the information and data heretofore or contemporaneously furnished in writing by or on behalf of any Loan Party (other than financial estimates, forecasts and other forward-looking information, pro forma financial information and information of a general economic or industry-specific nature) to any Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make such information and data (taken as a whole),

103

in the light of the circumstances under which it was delivered, not materially misleading. With respect to any financial estimates, forecasts and other forward-looking information or any pro forma financial information, the Borrower represents that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation; it being understood that such projections may vary from actual results and that such variances may be material.

SECTION 5.15    Intellectual Property; Licenses, Etc.    The Borrower and the Restricted Subsidiaries have good and marketable title to, or a valid license or right to use, all patents, patent rights, trademarks, servicemarks, trade names, copyrights, technology, software, know-how database rights, rights of privacy and publicity, licenses and other intellectual property rights (collectively, "*IP Rights*") that are reasonably necessary for the operation of their respective businesses as currently conducted and as proposed to be conducted, except where the failure to have any such rights, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. To the knowledge of the Borrower, the operation of the respective businesses of the Borrower or any of its Restricted Subsidiaries as currently conducted does not infringe upon, misuse, misappropriate or violate any rights held by any Person except for such infringements, misuse, misappropriations or violations individually or in the aggregate, that would not reasonably be expected to have a Material Adverse Effect. No claim or litigation regarding any IP Rights is pending or, to the knowledge of the Borrower, threatened in writing against any Loan Party or Restricted Subsidiary, that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

SECTION 5.16    Budget.    A true and complete copy of the initial Budget is attached as Schedule 5.16 hereto.

SECTION 5.17    Subordination of Junior Financing.    The Obligations are "Designated Senior Debt", "Senior Debt", "Senior Indebtedness", "Guarantor Senior Debt" or "Senior Secured Financing" (or any comparable term) under, and as defined in, any indenture or document governing any applicable Junior Financing Documentation in respect of Indebtedness that is subordinated in right of payment to the Obligations.

SECTION 5.18    USA PATRIOT Act; OFAC; FCPA.

(a)    To the extent applicable, each of Holdings and its Subsidiaries is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto and (ii) the USA PATRIOT Act.

(b)    No part of the proceeds of the Loans or Letters of Credit will be used, directly or, to the knowledge of Holdings and its Subsidiaries, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(c)    (i) None of Holdings or its Subsidiaries will directly or, to the knowledge of Holdings or such Subsidiary, indirectly, use the proceeds of the Loans or Letters of Credit in violation of applicable Sanctions or otherwise knowingly make available such proceeds to any Person for the purpose of financing the activities of any Sanctioned Person, except to the extent licensed, exempted or otherwise approved by a competent governmental body responsible for enforcing such Sanctions, (ii) none of Holdings, any Subsidiary or to the knowledge of Holdings or such Subsidiary, their respective directors, officers or employees or, to the knowledge of the Borrower, any controlled Affiliate of Holdings, the Borrower or its Subsidiaries that will act in any capacity in connection with or benefit from any Class, is a Sanctioned Person and (iii) none of Holdings, its Subsidiaries or, to the knowledge of Holdings or such Subsidiary, their respective directors, officers and employees, are in violation of applicable Sanctions in any material respects.

SECTION 5.19    Collateral Documents.    The Collateral Documents, taken together with the Orders, create in favor of the Administrative Agent, for the benefit of the Administrative Agent, the Collateral Agent, the Co-Collateral Agent and the other Secured Parties, legal, valid and enforceable Liens, security or mortgage interests in the Collateral (subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law). Except for the entry of the Orders, no filing or other action will be necessary to perfect or protect such Liens, security or mortgage interests. Upon entry of and to the extent provided in the Orders, the Obligations of the Loan Parties under this Agreement will constitute allowed super-priority administrative expense claims in the Case and first priority liens under Section 364(c) of the Bankruptcy Code as further described in Section 2.17(a)(ii) and (iii), having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person (including, for the avoidance of doubt, Avoidance Actions and the proceeds of thereof), subject only to the Carve Out. Notwithstanding anything to the contrary herein, the Carve Out shall be senior to all Liens and claims (including administrative and superpriority claims) securing the Obligations, adequate protection Liens, and all other Liens or claims (including administrative claims and DIP Superpriority Claims), including all other forms of adequate protection, Liens, or claims (including administrative claims and DIP Superpriority Claims) securing the Obligations granted or recognized as valid, including the Liens, security interests, and claims (including administrative claims and DIP Superpriority Claims) granted to the Agents and the other Loan Parties.

SECTION 5.20    Orders.    The Loan Parties are in compliance with the terms and conditions of the Orders. Each of the Interim Order (to the extent necessary during the Interim Order Period) or the Final Order (from after the date of the entry of the Final Order) is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent, the Collateral Agent, the Co-Collateral Agent and each Lender, no change, amendment or modification or any application or motion for any change, amendment or modification to any of the Orders shall be made, in each case, that is adverse to the interests of the Loan Parties.

## ARTICLE VI

## FINANCIAL COVENANTS

So long as any Lender shall have any Revolving Credit Commitment hereunder, any Loan or other Obligation hereunder (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations under Secured Hedge Agreements and Cash Management Obligations) shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding (unless the Outstanding Amount of the Letter of Credit Obligations related thereto has been Cash Collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the Administrative Agent), Holdings and the Borrower agrees with the Lenders, the Issuers and the Administrative Agent to the following:

SECTION 6.1    Minimum Excess Availability.  Excess Availability shall not be less than the greater of (a) 10% of the Borrowing Base and (b) $15,000,000 at any time.

## ARTICLE VII

## REPORTING COVENANTS

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations under Secured Hedge Agreements and Cash Management Obligations) shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding (unless the Outstanding Amount of the Letter of Credit Obligations related thereto has been Cash Collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the Administrative Agent), Holdings and Borrower shall, and shall (except in the case of the covenants set forth in Sections 7.1, 7.2 and 7.3) cause each of the Restricted Subsidiaries to:

SECTION 7.1    Financial Statements, Etc.  Deliver to the Administrative Agent, the Co-Collateral Agent and the Collateral Agent for prompt further distribution to each Lender each of the following and shall take the following actions:

(a)    commencing with the Fiscal Year ending October 2, 2018, as soon as available, but in any event within one hundred and twenty (120) days after the end of each Fiscal Year of the Borrower, a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such Fiscal Year, and the related consolidated statements of income, stockholders' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail and prepared in accordance with IFRS (or, if the Borrower has then elected to be governed by GAAP, GAAP), audited and accompanied by a report and opinion of Deloitte & Touche LLP or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards, together with management's discussion and analysis ("*MD&A*") describing results of operations for such period (which MD&A shall be

deemed delivered hereunder upon the filing with the SEC (or equivalent) of a Form 10-K (or equivalent) by the Borrower or any direct or indirect parent of the Borrower).

(b)     as soon as available, but in any event within forty-five (45) days after the end of each of the first three (3) Fiscal Quarters of each Fiscal Year of the Borrower (except for the first Fiscal Quarter of Fiscal Year ending October 2, 2018, which shall be within sixty (60) days), a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such Fiscal Quarter, and the related (i) consolidated statements of income for such Fiscal Quarter and for the portion of the Fiscal Year then ended and (ii) consolidated statements of cash flows for such Fiscal Quarter and for the portion of the Fiscal Year then ended, setting forth in each case in comparative form the figures for the corresponding Fiscal Quarter of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with IFRS (or, if the Borrower has then elected to be governed by GAAP, GAAP), subject to normal year-end adjustments and the absence of footnotes, together with an MD&A describing results of operations for such period (which MD&A shall be deemed delivered hereunder upon the filing with the SEC (or equivalent) of a Form 10-Q (or equivalent) by the Borrower or any direct or indirect parent of the Borrower);

(c)     as soon as available, but in any event within thirty (30) days after the end of each month during the Cases (commencing with the first month ending after the Closing Date), a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such month, and the related consolidated statements of income and consolidated statements of cash flows for such month, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with IFRS (or, if the Borrower has then elected to be governed by GAAP, GAAP), subject to normal year-end adjustments and the absence of footnotes;

(d)     within ninety (90) days after the end of each Fiscal Year of the Borrower, a reasonably detailed consolidated budget for the following Fiscal Year (including a projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following Fiscal Year, the related consolidated statements of projected income and projected cash flow and setting forth the material underlying assumptions applicable thereto) (collectively, the "*Projections*"), which Projections shall in each case be accompanied by a certificate of a Responsible Officer stating that such Projections have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time of preparation of such Projections, it being understood that actual results may vary from such Projections and that such variations may be material;

(e)     simultaneously with the delivery of each set of consolidated financial statements referred to in Sections 7.1(a), 7.1(b) and 7.1(c) above, the related unaudited consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) (which may be in footnote form only) from such consolidated financial statements;

(f)      upon request of the Administrative Agent, within ten Business Days after the delivery of each set of financial statements referred to in Section 7.1(a) and (b) above, a conference call (which may be password protected) to discuss such financial statements and operations for the relevant period (with the time and date of such conference call, together with all information necessary to access the call, to be provided to the Administrative Agent no fewer than three Business Days (or such shorter time as to which the Administrative Agent may agree) prior to the date of such conference call, for posting on the Platform); and

(g)      The Borrower will furnish to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent, (i) on or before 5:00 p.m. (New York time) every Wednesday during the Cases (commencing on Wednesday October 17, 2018) a weekly cash flow forecast, calculated as of the Friday of the week previously ended, for the subsequent 13-week period certified by a Responsible Officer of the Borrower, together with a cash report detailing all cash and Cash Equivalents on-hand of the Loan Parties and their subsidiaries (broken out by entity) as of the close of business on such Friday date, each in form, scope and detail reasonably acceptable to the Administrative Agent, the Collateral Agent and Co-Collateral Agent, and (ii) on or before 5:00 p.m. (New York time) every Wednesday during the Cases (commencing on Wednesday October 17, 2018), a variance report certified by a Responsible Officer of the Borrower (the "*Receipts/Disbursements Variance Report*") setting forth Actual Cash Receipts and Actual Disbursements of the Loan Parties for the preceding one calendar week period calculated as of the Friday of the week previously ended (and solely for the Receipts/Disbursements Variance Report delivered on October 17, 2018, calculated for the period from the Petition Date through October 12, 2018) and cumulatively for the preceding four week period (or, prior to the fourth full week after the Petition Date, the period from the Petition Date through the end of such week period) and (iii) on or before 5:00 p.m. (New York time) every Friday during the Cases (commencing on Friday October 19, 2018) a variance report certified by a Responsible Officer of the Borrower (the "*Inventory Variance Report*" and together with the Receipts/Disbursements Variance Report, the "*Variance Report*") setting forth Actual Inventory Levels of the Loan Parties calculated as of the prior Tuesday of the such week and, in each case of clause (ii) and (iii), setting forth all the variances (including, without limitation, variances related to Budgeted Cash Receipts, Budgeted Disbursements and Budgeted Inventory Levels), on a line-item and aggregate basis, from the amount set forth for each such periods or as of such dates as compared to the Budget delivered by the Loan Parties (and each Variance Report shall include reasonably detailed explanations for all material variances (including Permitted Variances), each in form, scope and detail reasonably acceptable to Administrative Agent, the Collateral Agent and Co-Collateral Agent.  Not later than one Business Day after the receipt of Receipts/Disbursements Variance Report, the Borrower and the Administrative Agent, the Collateral Agent and Co-Collateral Agent shall conduct a conference call to discuss the information contained therein at a mutually convenient time.

Notwithstanding the foregoing, the obligations in paragraphs (a) and (b) of this Section 7.1 may be satisfied with respect to financial information of the Borrower and its Restricted Subsidiaries (including the provision of any MD&A) by furnishing (A) the applicable financial statements of any direct or indirect parent of the Borrower that holds all of the Equity Interests of the Borrower or (B) the Borrower's or such entity's Form 10-K or 10-Q (or equivalent), as applicable, filed with the SEC (or equivalent Governmental Authority applicable to such indirect parent company); *provided* that, with respect to each of clauses (A) and (B), (i) to the extent such

108

information relates to a parent of the Borrower, the financial statements are accompanied by unaudited consolidating information that explains in reasonable detail the differences between the information relating to the Borrower (or such parent), on the one hand, and the information relating to the Borrower and the Restricted Subsidiaries on a standalone basis, on the other hand and (ii) to the extent the financial statements are in lieu of financial statements required to be provided under Section 7.1(a), such materials are, to the extent applicable, accompanied by a report and opinion of Deloitte & Touche LLP or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards.

SECTION 7.2    Certificates; Other Information.    Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)    no later than five (5) days after the delivery of the financial statements referred to in Section 7.1(a), Section 7.1(b) and Section 7.1(c), a duly completed Compliance Certificate signed by the chief financial officer of the Borrower;

(b)    promptly after the same are publicly available, copies of all annual, regular, periodic and special reports, proxy statements and registration statements which Holdings or the Borrower or any Restricted Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor or with any national securities exchange, as the case may be (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8), and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this Section 7.2;

(c)    promptly after the furnishing thereof, copies of any material notices (other than notices furnished in the ordinary course) furnished to any holder of any class or series of debt securities of any Loan Party having an aggregate outstanding principal amount greater than the Threshold Amount, so long as the aggregate outstanding principal amount thereunder is greater than the Threshold Amount and not otherwise required to be furnished to the Administrative Agent pursuant to any other clause of this Section 7.2;

(d)    together with the delivery of each Compliance Certificate delivered pursuant to Section 7.2(a), (i) a report setting forth the information required by Section 3.03(c) of the Security Agreement (or confirming that there has been no change in such information since the Closing Date or the date of the last such report), (ii) a description of each event, condition or circumstance during the last Fiscal Quarter covered by such Compliance Certificate requiring a mandatory prepayment under Section 2.9, if any, and (iii) a list of each Subsidiary of the Borrower that identifies each Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary as of the date of delivery of such Compliance Certificate or a confirmation that there is no change in such information since the later of the Closing Date and the date of the last such list;

(e)    promptly, such additional information regarding the business, legal, financial or corporate affairs (including information regarding leases and stores, notwithstanding any limitation under Section 8.6 regarding the ability to exercise inspection rights) of any Loan Party

or any Restricted Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent may from time to time on its own behalf or on behalf of any Lender reasonably request; and

(f)      all information required to be delivered by the Loan Parties pursuant to the Orders regarding the Budget and the Permitted Variances.

Documents required to be delivered pursuant to Section 7.1(a), (b) or (c) or Section 7.2(c) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower (or any direct or indirect parent of the Borrower) posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 12.8; or (ii) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that:   (i) upon written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents (which may be electronic copies delivered via electronic mail) to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent and/or the Arranger will make available to the Lenders and the Issuers materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "*Borrower Materials*") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "*Platform*") and (b) certain of the Lenders (each, a "*Public Lender*") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Subsidiaries, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Arranger, the Issuers and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 12.19); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent and the Arranger shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side

110

Information." Notwithstanding the foregoing, the Borrower shall be under no obligation to mark the Borrower Materials "PUBLIC".

SECTION 7.3    Notices.    Promptly after a Responsible Officer obtains actual knowledge thereof, notify the Administrative Agent:

(a)    of the occurrence of any Default; and

(b)    of (i) any dispute, litigation, investigation or proceeding between any Loan Party and any arbitrator or Governmental Authority, (ii) other than in connection with the Cases, the filing or commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary, including pursuant to any applicable Environmental Laws or in respect of IP Rights, the occurrence of any noncompliance by any Loan Party or any of its Subsidiaries with, or liability under, any Environmental Law or Environmental Permit, or (iii) the occurrence of any ERISA Event that, in any such case referred to in clauses (i), (ii) or (iii), has resulted or would reasonably be expected to result in a Material Adverse Effect.

Each notice pursuant to this Section 7.3 shall be accompanied by a written statement of a Responsible Officer of the Borrower (x) that such notice is being delivered pursuant to Section 7.3(a) or (b) (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

SECTION 7.4    Borrowing Base Certificate.

(a)    Borrower shall provide the Administrative Agent, the Collateral Agent and the Co-Collateral Agent with the following documents in a form and detail reasonably satisfactory to Administrative Agent, the Collateral Agent and the Co-Collateral Agent: not later than the third (3rd) Business Day after the end of each fiscal week, a Borrowing Base Certificate setting forth the calculation of the Borrowing Base and of Excess Availability as of the last Business Day of the immediately preceding fiscal week, duly completed and executed by a Responsible Officer of the Borrower, together with all schedules required pursuant to the terms of the Borrowing Base Certificate duly completed; provided that the Borrower may elect, at its option, to deliver more frequent Borrowing Base Certificates, in which case such Borrowing Base Certificates shall be computed in accordance with the requirements in respect of Borrowing Base Certificates required to be delivered during the continuance of a Cash Dominion Period and the Borrower shall continue to deliver Borrowing Base Certificates on such more frequent basis until the date that is 60 days after the date of such election.

(b)    [**reserved**].

(c)    Holdings and the Borrower shall also cooperate with (and cause its Subsidiaries to cooperate with) the Administrative Agent, the Collateral Agent, and the Co-Collateral Agent in connection with updates to the Initial Inventory Appraisal that shall be in form and detail and from third-party appraisers reasonably acceptable to the Administrative Agent, the Co-Collateral Agent and the Collateral Agent (the "*Updated Inventory Appraisal*"), for the purpose of determining the amount of the Borrowing Base attributable to Inventory and the Administrative Agent, the Co-Collateral Agent and the Collateral Agent, collectively, may carry out, at the Borrower's expense, two (2) Updated Inventory Appraisals in any period of 12 consecutive

111

months; provided, however, (i) the Administrative Agent, the Collateral Agent and the Co-Collateral Agent, collectively, may carry out, at the Lenders' expense, one (1) additional Updated Inventory Appraisal in any period of 12 consecutive months and (ii) at any time during the continuation of an Event of Default, the Administrative Agent, the Co-Collateral Agent and the Collateral Agent, collectively, may carry out, at the Borrower's expense, Updated Inventory Appraisals as frequently as determined by the Administrative Agent, the Co-Collateral Agent and the Collateral Agent, collectively, in their respective reasonable discretion.  The Borrower shall furnish to the Administrative Agent, the Co-Collateral Agent and the Collateral Agent any information that the Administrative Agent, the Collateral Agent or any Co-Collateral Agent may reasonably request regarding the determination and calculation of the Borrowing Base including correct and complete copies of any invoices, underlying agreements, instruments or other documents and the identity of all Account Debtors in respect of Accounts or Inventory referred to therein.

(d)    The Administrative Agent, the Co-Collateral Agent and the Collateral Agent, collectively, may carry out investigations and reviews of each Loan Party's property at the reasonable expense of the Borrower (including field audits conducted by the Administrative Agent) ("*Field Examination*") and the Administrative Agent, the Co-Collateral Agent and the Collateral Agent, collectively, may carry out, at the Borrower's expense, two (2) Field Examinations in any period of 12 consecutive months; provided, however, (i) the Administrative Agent, the Co-Collateral Agent and the Collateral Agent, collectively, may carry out, at the Lenders' expense, one (1) additional Field Examination in any period of 12 consecutive months and (ii) at any time during the continuation of an Event of Default, the Administrative Agent, the Co-Collateral Agent and the Collateral Agent, collectively, may carry out, at the Borrower's expense, Field Examinations as frequently as determined by the Administrative Agent, the Co-Collateral Agent and the Collateral Agent, collectively, in their respective reasonable discretion. The Borrower shall furnish to the Administrative Agent, the Co-Collateral Agent and the Collateral Agent any information that the Administrative Agent, the Collateral Agent or the Co-Collateral Agent may reasonably request regarding the determination and calculation of the Borrowing Base including correct and complete copies of any invoices, underlying agreements, instruments or other documents and the identity of all Account Debtors in respect of Accounts referred to therein.

(e)    The Borrower shall provide the Administrative Agent, the Co-Collateral Agent and the Collateral Agent with an updated Borrowing Base Certificate at the times required under Section 9.5 and at any other time when Current Assets Collateral with a fair market value of $5,000,000 or more has been disposed of outside the Ordinary Course of Business by any Loan Party since the date of the most recently delivered Borrowing Base Certificate

## ARTICLE VIII

## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Revolving Credit Commitment hereunder or any Loan or other Obligation hereunder (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations under Secured Hedge Agreements and Cash Management Obligations) shall remain unpaid or unsatisfied, or any Letter of Credit shall

remain outstanding (unless the Outstanding Amount of the Letter of Credit Obligations related thereto has been Cash Collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the Administrative Agent), Holdings and the Borrower shall, and shall cause each of the Restricted Subsidiaries to:

SECTION 8.1    Preservation of Existence, Etc.

(a)  Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization and (b) take all reasonable action to obtain, preserve, renew and keep in full force and effect its rights, licenses, permits and franchises material to the ordinary conduct of its business, except in the case of clause (a) or (b) to the extent (other than with respect to the preservation of the existence of Holdings and the Borrower) that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or pursuant to any merger, consolidation, liquidation, dissolution or Disposition permitted by Article IX.

SECTION 8.2    Compliance with Laws, Etc.

Comply in all material respects with its Organization Documents and the requirements of all Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or to its business or property, except if the failure to comply therewith would not reasonably be expected individually or in the aggregate to have a Material Adverse Effect.

SECTION 8.3    [**Reserved**].

SECTION 8.4    Payment of Taxes, Etc.

To the extent required or permitted by any Order or the Bankruptcy Code and contemplated by the Budget (subject to Permitted Variances), timely pay, discharge or otherwise satisfy, as the same shall become due and payable in the normal conduct of its business, all of its obligations and liabilities in respect of Taxes imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent (i) any such Tax is being contested in good faith and by appropriate actions for which appropriate reserves have been established in accordance with IFRS or (ii) the failure to pay or discharge the same would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

SECTION 8.5    Maintenance of Insurance.

Maintain with insurance companies that the Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Restricted Subsidiaries) as are customarily carried under similar circumstances by such other Persons, and will furnish to the Lenders, upon written request from the Administrative Agent, the Collateral Agent or the Co-Collateral Agent, information presented in reasonable detail as to the insurance so carried.  Each such policy of insurance shall, as

appropriate, (i) name the Collateral Agent, on behalf of the Lenders, as an additional insured thereunder as its interests may appear and/or (ii) in the case of each casualty insurance policy, contain a lender loss payable clause or endorsement that names the Collateral Agent, on behalf of the Lenders as the lender loss payee thereunder.

SECTION 8.6        Inspection Rights.

In addition to the requirements pursuant to Section 7.4, permit representatives and independent contractors of the Administrative Agent, the Collateral Agent, the Co-Collateral Agent, and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided that, only the Administrative Agent, the Collateral Agent and the Co-Collateral Agent, collectively, on behalf of the Lenders may elect to exercise rights of the Administrative Agent, the Co-Collateral Agent, the Collateral Agent and the Lenders under this Section 8.6 and the Administrative Agent, the Collateral Agent and the Co-Collateral Agent, collectively, shall not exercise such rights more often than two (2) times during any calendar year and only one (1) such time shall be at the Borrower's expense; provided, further, that when an Event of Default exists and is continuing, the Administrative Agent (or any of its respective representatives or independent contractors), the Collateral Agent and the Co-Collateral Agent may, collectively, do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice.  The Administrative Agent, the Collateral Agent, the Co-Collateral Agent, and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.  Notwithstanding anything to the contrary in this Section 8.6, none of the Borrower or any of the Restricted Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes non-financial trade secrets or non-financial proprietary information (other than with respect to any non-financial trade secrets or non-financial proprietary information related to Eligible Accounts, Eligible Credit Card Receivables, Eligible In-Transit Inventory, Eligible Inventory or balances in deposit accounts and securities accounts), (b) in respect of which disclosure to the Administrative Agent, the Collateral Agent, the Co-Collateral Agent, or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (c) is subject to attorney-client or similar privilege or constitutes attorney work product.

SECTION 8.7        Books and Records.

Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with IFRS shall be made of all material financial transactions and matters involving the assets and business of Holdings, the Borrower or such Restricted Subsidiary, as the case may be.

SECTION 8.8        Maintenance of Properties.

114

Except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, maintain, preserve and protect all of its material properties and equipment used in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and fire, casualty or condemnation excepted.

SECTION 8.9    Use of Proceeds.

In accordance with and subject to the Budget (including the Permitted Variance provisions) and the Orders, use the proceeds of Loans and Letters of Credit made and/or issued hereunder to finance: (i) the payment of expenses incurred in connection with the transactions contemplated hereby, (ii) the payment of fees, expenses and costs incurred in connection with the Cases, (iii) the payment of any adequate protection payments approved in the Orders, (iv) working capital, capital expenditures, and other general corporate purposes of the Loan Parties and (v) repayment of all Loans (but not, for the avoidance of doubt, Letters of Credit under the Pre-Petition Credit Agreement, which shall be deemed issued under this Agreement upon entry of the Interim Order) under the Pre-Petition Credit Agreement.

SECTION 8.10    Compliance with Environmental Laws.

Except, in each case, to the extent that the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) comply, and take all reasonable actions to cause any lessees and other Persons operating or occupying its properties to comply with all applicable Environmental Laws and Environmental Permits; (b) obtain and renew all Environmental Permits necessary for its operations and properties; and, (c) in each case to the extent required by applicable Environmental Laws, conduct any investigation, remedial or other corrective action necessary to address all releases of Hazardous Materials on or from any of its properties, in accordance with the requirements of all applicable Environmental Laws.

SECTION 8.11    Covenant to Guarantee Obligations and Give Security.

At the Borrower's expense, subject to the limitations and exceptions of this Agreement, including, without limitation, the provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent, the Collateral Agent, or any Co-Collateral Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(a)    (x) upon the formation or acquisition of any new direct or indirect wholly owned Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary) by any Loan Party or any Subsidiary becoming a wholly owned Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary):

(i)    within sixty (60) days (or such greater number of days specified below) after such formation, acquisition or designation or, in each case, such longer period as the Administrative Agent, the Co-Collateral Agent and the Collateral Agent may agree in their reasonable discretion:

LEGAL_US_W # 95739072.21

(A)    cause each such Material Domestic Subsidiary that is required to become a Guarantor under the Collateral and Guarantee Requirement to furnish to the Collateral Agent a description of the Material Real Properties owned by such Material Domestic Subsidiary in detail reasonably satisfactory to the Collateral Agent;

(B)    within sixty (60) days after such formation, acquisition or designation, cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Collateral Agent, other than with respect to any Excluded Assets, Security Agreement Supplements, Intellectual Property Security Agreements and other security agreements and documents, as reasonably requested by and in form and substance reasonably satisfactory to the Collateral Agent and the Co-Collateral Agent (consistent with the Mortgages, Security Agreement, Intellectual Property Security Agreements and other Collateral Documents in effect on the Closing Date), in each case granting Liens required by the Collateral and Guarantee Requirement;

(C)    cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to deliver any and all certificates representing Equity Interests (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank (or any other documents customary under local law) and instruments evidencing the intercompany Indebtedness held by such Material Domestic Subsidiary and required to be pledged pursuant to the Collateral Documents, indorsed in blank to the Collateral Agent;

(D)    within sixty (60) days (or within ninety (90) days in the case of documents listed in Section 8.13(a)(ii)) after such formation, acquisition or designation, take and cause the applicable Material Domestic Subsidiary and each direct or indirect parent of the applicable Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to take whatever action (including the filing of UCC financing statements and delivery of stock and membership interest certificates to the extent certificated) as may be necessary in the reasonable opinion of the Administrative Agent or any Co-Collateral Agent to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid Liens required by the Collateral and Guarantee Requirement, enforceable against all third parties in accordance with their terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity (regardless of whether enforcement is sought in equity or at law); and

(ii)    within sixty (60) days after the reasonable request therefor by the Administrative Agent, the Co-Collateral Agent or the Collateral Agent (or such longer period as the Administrative Agent, the Co-Collateral Agent and the Collateral Agent may agree in their respective reasonable discretion), deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties reasonably acceptable to the Administrative Agent, the Co-Collateral Agent and the Collateral Agent to such matters set forth in this

116

Section 8.11(a) as the Administrative Agent, the Collateral Agent or any Co-Collateral Agent may reasonably request;

      (iii)    **[reserved]**;

(b)    **[reserved]**.

    SECTION 8.12   <u>Cash Receipts</u>. Each Loan Party shall manage all cash in accordance with the provisions below and as provided in the Orders and/or Cash Management Order, in each case, as entered by the Bankruptcy Court, and:

(a)    The Borrower shall ensure that the Administrative Agent shall have springing control with respect to the Approved Deposit Accounts pursuant to the Cash Management Order or the Orders, as applicable.

(b)    The Borrower shall ensure that the Administrative Agent shall have springing control with respect to the Approved Securities Accounts pursuant to the Cash Management Order or the Orders, as applicable.

(c)    Each Loan Party shall (i) instruct each Account Debtor or other Person obligated to make a payment to any of them under any Account to make payment, or to continue to make payment, to an Approved Deposit Account or Post-Petition Deposit Account that is not an Excluded Account, (ii) deposit in an Approved Deposit Account or Post-Petition Deposit Account promptly upon receipt all Cash Receipts (as defined below) received by any Loan Party from any other Person (provided that, any Cash Receipts may be deposited into an Excluded Account to the extent that such deposit would not cause such Excluded Account to cease to be qualified as an Excluded Account) and (iii) instruct each depository institution for a Deposit Account or Post-Petition Deposit Account to cause all amounts on deposit and available at the close of each Business Day in such Deposit Account or Post-Petition Deposit Account to be swept to one of the Loan Parties' concentration accounts no less frequently than on a daily basis, such instructions to be irrevocable unless otherwise agreed to by the Administrative Agent, the Collateral Agent and the Co-Collateral Agent (other than, in the case of clause (iii), any Excluded Account or any amounts deposited in an Excluded Account).

(d)    For each Pre-Petition Credit Card Notification, Post-Petition Credit Card Notification, Approved Deposit Account and Post-Petition Deposit Account (and, in the case of clause (iii) below, Approved Securities Account and Post-Petition Securities Account) the Loan Parties shall cause, after the occurrence and during the continuance of a Cash Dominion Period, the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to the concentration account maintained by, in the name of and under the sole dominion and control of the Administrative Agent and identified by the Administrative Agent to the Borrower from time to time (the "*Concentration Account*"), of all cash receipts and collections, including the following (collectively, the "*Cash Receipts*"):

      (i)    all available cash receipts from the sale of Inventory and other Collateral or casualty insurance proceeds arising from any of the foregoing;

(ii)    all proceeds of collections of Accounts (including, without limitation, Credit Card Receivables);

(iii)    the then contents of each Approved Deposit Account and each Approved Securities Account and each Post-Petition Securities Account (in each case, net of any minimum balance as may be required to be kept in the subject Deposit Account or Securities Account, as the case may be, by the institution at which such Deposit Account or Securities Account, as applicable, is maintained); and

(iv)    the cash proceeds of all credit card charges.

(e)    The Concentration Account shall at all times be under the sole dominion and control of the Administrative Agent.  The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Concentration Account, (ii) the funds on deposit in the Concentration Account shall at all times be collateral security for all of the Obligations and (iii) subject to the Orders and the obligation to fund the Carve Out, the funds on deposit in the Concentration Account shall be applied as provided in this Agreement.  In the event that, notwithstanding the provisions of this Section, during the continuation of any Cash Dominion Period, any Loan Party receives or otherwise has dominion and control of any such proceeds or collections, such proceeds and collections shall be held in trust by such Loan Party for the Administrative Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Concentration Account or dealt with in such other fashion as such Loan Party may be instructed by the Administrative Agent.

(f)    So long as no Cash Dominion Period is continuing, the Loan Parties may direct, and shall have sole control over, the manner of disposition of funds in the Approved Securities Accounts, Approved Deposit Accounts, Post-Petition Deposit Accounts and Post-Petition Securities Accounts. The Loan Parties shall instruct their Credit Card Issuers and Credit Card Processors to make payments due to any Loan Party to an Approved Deposit Account or Post-Petition Deposit Account that is subject to a control agreement and Collateral Agent agrees not to change such payment instructions unless a Cash Dominion Period is continuing.

(g)    Any amounts received in the Concentration Account at any time when no Cash Dominion Period is continuing or all of the Obligations have been paid in full shall be remitted to the operating account of the Loan Parties maintained with the Administrative Agent or to an operating account otherwise designated by the Borrower.

(h)    Unless otherwise provided for in the Cash Management Order or in the Orders, as applicable, the Administrative Agent shall promptly (but in any event within five (5) Business Days) furnish written notice to each Approved Account Bank and each Approved Securities Intermediary, as applicable, of any termination of a Cash Dominion Period.

(i)    The Borrower and the Loan Parties shall not directly or indirectly, own, or control the use of, any Deposit Account or Securities Accounts (other than Approved Deposit Accounts, Approved Securities Accounts and any Excluded Accounts) without (i) the consent of the Administrative Agent, the Collateral Agent and the Co-Collateral Agent, and (ii) entry into an

effective account control agreement with respect to such Deposit Account (the "*Post-Petition Deposit Accounts*") or Securities Accounts (the "*Post-Petition Securities Accounts*").

(j)      To the extent that the Borrower and the other Loan Parties enter into any new Credit Card Agreements after the Petition Date in accordance with the Cash Management Order or the Orders, as applicable, within (30) Business Days after entering into or acquiring such Credit Card Agreements (or such longer period following such date as the Administrative Agent, the Co-Collateral Agent and the Collateral Agent may agree) the Borrower shall provide evidence that each such Credit Card Issuer and Credit Card Processor has countersigned its respective Credit Card Notification (such Post-Petition Credit Card Notifications, the "*Post-Petition Credit Card Notifications*").

SECTION 8.13      Further Assurances and Post-Closing Covenants.

(a)      Subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitations in any Collateral Document and in each case at the expense of the Loan Parties:

(i)      Promptly upon reasonable request by the Administrative Agent or the Collateral Agent or the Co-Collateral Agent or as may be required by applicable law (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent or Collateral Agent or the Co-Collateral Agent may reasonably request from time to time in order to carry out more effectively the purposes of the Collateral Documents.

(ii)      **[reserved]**.

(b)      Complete and/or deliver to Administrative Agent, or cause to be completed or so delivered, in form and substance reasonably satisfactory to Administrative Agent, the Collateral Agent and Co-Collateral Agent, the actions and items described on Schedule 8.13(b) hereof on or before the dates specified with respect to such actions and items, or such later dates as may be agreed to by Administrative Agent in its sole discretion.

SECTION 8.14      **[Reserved]**.

SECTION 8.15      Additional Information and Bankruptcy-Related Obligations.

(a)      The Borrower will, as soon as practicable in advance of filing with the Bankruptcy Court, of all material documents, motions and pleadings related to the Orders, this Agreement, proposed Store closings, asset sales and the Chapter 11 Plan and the Disclosure Statement, deliver to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent all such documents to be filed and provide the Administrative Agent, the Collateral Agent and the Co-Collateral Agent with a reasonable opportunity to review and comment on all such documents, which documents shall be reasonably satisfactory to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent.

119

(b)    Without limiting the requirements set forth in Section 8.15(a), the Borrower will deliver to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent promptly after the same are available, copies of all pleadings, applications, judicial information, financial information and other documents filed on behalf of the Borrower or any Guarantor with the Bankruptcy Court in the Cases, or distributed by or on behalf of any Loan Party to the Committee Professionals; provided that any publicly filed documents with the Bankruptcy Court shall be deemed to have been delivered to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent.

(c)    The Borrower will deliver to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent promptly after the same are available, copies of all reporting and information related to any proposed Store closings, asset sales or other dispositions that could reasonably be expected to materially affect the Borrowing Base (including, without limitation, detail regarding transportation and refurbishment costs associated with any Store closings, and other information reasonably requested by the Administrative Agent).

(d)    The Borrower will allow the Administrative Agent, the Collateral Agent and the Co-Collateral Agent access to, upon reasonable notice during normal business hours, all financial advisors and advisors engaged by the Loan Parties (which engagement, with respect to any financial professionals and advisors engaged after the Closing Date, shall be on terms and conditions reasonably satisfactory to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent).

(e)    The Borrower will deliver to the legal counsel to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent, at least two Business Days in advance of filing with the Bankruptcy Court, copies of all proposed orders entered by the Bankruptcy Court or any other court having jurisdiction over the insolvency proceeding of any Loan Party pending outside of the Bankruptcy Court in respect of first day motions and applications ("First Day Orders") and second day motions and applications ("Second Day Orders"; together with the First Day Orders, the "Initial Orders") and motions seeking approval of the Initial Orders, which shall be in form and substance reasonably satisfactory to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent.

SECTION 8.16    Milestones.

(a)    On the Petition Date or the next Business Day thereafter, the Debtors shall have filed with the Bankruptcy Court a motion seeking approval of this Agreement and the Loans.

(b)    As of the Petition Date, the Loan Parties shall have (i) filed a disclosure statement ("Disclosure Statement") and the Chapter 11 Plan with the Bankruptcy Court, each in form and substance satisfactory to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent, which plan and (A) provides for payment in full of all Obligations (other than outstanding Letters of Credit, which shall either be "rolled" into the exit ABL credit facility or Cash Collateralized) on the effective date thereof, and (B) either (I) provides that each class of claims or interests therein is not impaired or (II) has been accepted, pursuant to a solicitation (conducted in accordance with applicable law) of votes completed prior to the Petition Date, by each impaired class of claims or interests, without regard to any acceptance by any insider of the Loan

Parties (the "*Chapter 11 Plan*") and (ii) provided evidence, satisfactory to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent, of the agreements by holders of intercompany Indebtedness of any Debtor to support the Chapter 11 Plan.

(c)     On or before three (3) Business Days after the Petition Date, the Interim Order shall have been entered by the Bankruptcy Court.

(d)     On or before 30 days after the Petition Date, the Final Order shall have been entered by the Bankruptcy Court.

(e)     On or before 60 days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance that is satisfactory to the Administrative Agent, the Collateral Agent and Co-Collateral Agent, confirming the Chapter 11 Plan.

(f)     (i) On the Petition Date, the Debtors shall have filed a Motion to Reject Leases with respect to no less than 200 Stores, in form and substance satisfactory to the Administrative Agent, the Collateral Agent and Co-Collateral Agent, and (ii) obtained one or more orders of the Bankruptcy Court on or before the 60th day after the Petition Date to close no less than 500 Stores, such orders to be in form and substance satisfactory to the Administrative Agent, the Collateral Agent and Co-Collateral Agent.

SECTION 8.17     Performance Within Budget.

At all times following the Closing Date, strictly perform in accordance with the Budget, including making all scheduled payments to the Administrative Agent and the Lenders as and when required under this Agreement, subject to the following (the "*Permitted Variances*"):

(a)     The Loan Parties' cumulative Actual Disbursements shall not exceed the Budgeted Disbursements by more than (i) 17.5% solely during the period from the Petition Date through October 12, 2018 calculated on a cumulative basis for such period, (ii) 15% solely during the period from the Petition Date through October 19, 2018 calculated on a cumulative basis for such period, (iii) 12.5% solely during the period from the Petition Date through October 26, 2018 calculated on a cumulative basis for such period, and (iv) at all times thereafter, 10%, in each case on a rolling four week cumulative basis;

(b)     The Loan Parties' Actual Cash Receipts shall not be less than (i) 90% of the Budgeted Cash Receipts, solely during each of the first two weeks ending after the Petition Date, calculated on a cumulative basis for such one or two week period, (ii) 90% of the Budgeted Cash Receipts during the succeeding week, calculated on a cumulative basis for such three week period, and (ii) at all times thereafter, 90% of the Budgeted Cash Receipts, calculated on a rolling four week cumulative basis; and

(c)     The Loan Parties' Actual Inventory Level shall not be less than 85% of the Budgeted Inventory Level at the end of each week ending after the commencement of the Cases commencing on October 19, 2018 calculated as of the Tuesday of such week.

With respect to the Actual Disbursements and Actual Cash Receipts, the foregoing shall be reported in arrears on Wednesday of each week (commencing on Wednesday, October 17 with respect to the period from the Petition Date and ending on October 12, 2018), in each case, pursuant to the Receipts/Disbursements Variance Report delivered by the Borrower to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent in accordance with Section 7.1(g).

With respect to the Actual Inventory, the foregoing shall be reported in arrears on Friday of each week (commencing on Friday, October 19 with respect to Actual Inventory on October 16, 2018), in each case, pursuant to the Inventory Variance Report delivered by the Borrower to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent in accordance with Section 7.1(g).

## ARTICLE IX

## NEGATIVE COVENANTS

So long as any Lender shall have any Revolving Credit Commitment hereunder or any Loan or other Obligation hereunder (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations under Secured Hedge Agreements and Cash Management Obligations) shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding (unless the Outstanding Amount of the Letter of Credit Obligations related thereto has been Cash Collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the Administrative Agent), Holdings and the Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to:

SECTION 9.1    Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens created pursuant to any Loan Document or the Orders;

(b)    Liens existing on the Closing Date;

(c)    Liens for Taxes, assessments or governmental charges arising after the Petition Date that are not overdue for a period of more than thirty (30) days or that are being contested in good faith and by appropriate actions for which appropriate reserves have been established in accordance with IFRS;

(d)    statutory or common law Liens of landlords, sublandlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens, or other customary Liens (other than in respect of Indebtedness) in favor of landlords, so long as, in each case, such Liens secure amounts not overdue for a period of more than thirty (30) days or, if more than thirty (30) days overdue, are unfiled and no other action has been taken to enforce such Lien or that are being contested in good faith and by appropriate actions, if and for which adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with IFRS or the equivalent accounting principles in the relevant local jurisdiction;

LEGAL_US_W # 95739072.21

(e)      (i) pledges or deposits in the Ordinary Course of Business in connection with workers' compensation, health, disability or employee benefits, unemployment insurance and other social security laws or similar legislation or regulation or other insurance-related obligations (including, but not limited to, in respect of deductibles, self-insured retention amounts and premiums and adjustments thereto) and (ii) pledges and deposits in the Ordinary Course of Business securing liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty or liability insurance to Holdings, the Borrower or any Restricted Subsidiaries;

(f)      Liens to secure the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the Ordinary Course of Business or consistent with past practice or industry practice;

(g)      easements, rights-of-way, covenants, conditions, restrictions (including zoning restrictions), encroachments, protrusions and other similar encumbrances and title defects affecting real property that, in the aggregate, do not in any case materially interfere with the ordinary conduct of the business of the Borrower and its Restricted Subsidiaries taken as a whole, or the use of the property for its intended purpose, and any other exceptions to title on the final Mortgage Policies issued to the Collateral Agent in connection with the Mortgaged Properties;

(h)      Liens arising from judgments or orders for the payment of money not constituting an Event of Default under Section 10.1(g);

(i)      Liens securing obligations in respect of Indebtedness permitted under Section 9.3(e); provided that (A) such Liens attach concurrently with or within two hundred and seventy (270) days after completion of the acquisition, construction, repair, replacement or improvement (as applicable) of the property subject to such Liens, (B) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, replacements thereof and additions and accessions to such property and the proceeds and the products thereof and customary security deposits and (C) with respect to Capitalized Leases, such Liens do not at any time extend to or cover any assets (except for replacements, additions and accessions to such assets) other than the assets subject to such Capitalized Leases and the proceeds and products thereof and customary security deposits; provided that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(j)      leases, non-exclusive licenses, cross-licenses, subleases or non-exclusive sublicenses granted to others in the Ordinary Course of Business which (i) do not interfere in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole, (ii) do not secure any Indebtedness or (iii) are permitted by Section 9.5;

(k)      Liens in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods in the Ordinary Course of Business;

(l)     Liens (i) of a collection bank arising under Section 4-208 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the Ordinary Course of Business in connection with the maintenance of such accounts and not for speculative purposes so long as such liens do not secure Indebtedness for borrowed money (other than for overdraft obligations in an aggregate amount not to exceed, taken together with overdrafts permitted under clause (iii) below, $5,000,000), and (iii) in favor of a banking or other financial institution arising as a matter of Law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry or arising pursuant to such banking institution's general terms and conditions, which liens secure obligations related to the maintenance of such accounts and do not secure Indebtedness for borrowed money (other than for overdraft obligations in an aggregate amount not to exceed, taken together with overdrafts permitted under clause (i) above, $5,000,000);

(m)     [**reserved**];

(n)     Liens on property of any Non-Loan Party, which Liens secure Indebtedness of any Non-Loan Party permitted under Section 9.3 or other obligations of any Non-Loan Party not constituting Indebtedness;

(o)     Liens in favor of the Borrower or a Restricted Subsidiary securing Indebtedness permitted under Section 9.3(d);

(p)     Liens (other than on Current Assets Collateral unless the Liens (subject to customary bifurcation to be agreed relative to proceeds of non-Current Assets Collateral) thereon are subordinated to the Lien of the Collateral Agent in a manner consistent with the terms of a Customary Intercreditor Agreement) existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Restricted Subsidiary, in each case after the Closing Date (other than Liens on the Equity Interests of any Person that becomes a Restricted Subsidiary); provided that (i) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property of such acquired Restricted Subsidiary), and (ii) the Indebtedness secured thereby is permitted under Section 9.3(e) or (g);

(q)     any interest or title (and all encumbrances and other matters affecting such interest or title) of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under leases, subleases, licenses, cross-licenses or sublicenses entered into by the Borrower or any of the Restricted Subsidiaries in the Ordinary Course of Business;

(r)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of the Restricted Subsidiaries in the Ordinary Course of Business;

(s)     Liens deemed to exist in connection with Investments in repurchase agreements under Section 9.2 and reasonable customary initial deposits and margin deposits and similar

Liens attaching to commodity trading accounts or other brokerage accounts maintained in the Ordinary Course of Business and not for speculative purposes;

(t)        Liens that are contractual rights of setoff or rights of pledge (i) relating solely to the establishment of depository relations with banks or other deposit-taking financial institutions and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of Holdings, the Borrower or any of the Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the Ordinary Course of Business of Holdings, the Borrower or any of the Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of the Restricted Subsidiaries in the Ordinary Course of Business;

(u)        [**reserved**];

(v)        ground leases in respect of real property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(w)        purported Liens evidenced by the filing of precautionary Uniform Commercial Code financing statements or similar public filings;

(x)        Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(y)        [**reserved**];

(z)        [**reserved**];

(aa)        (i) zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business complies, and (ii) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Restricted Subsidiaries, taken as a whole;

(bb)        [**reserved**];

(cc)        [**reserved**];

(dd)        Liens or rights of setoff arising after the Petition Date against credit balances of the Borrower or any of its Subsidiaries with Credit Card Issuers or Credit Card Processors or amounts owing by such Credit Card Issuers or Credit Card Processors to the Borrower or any of its Subsidiaries in the Ordinary Course of Business, but not Liens on or rights of setoff against any other property or assets of the Borrower or any of its Subsidiaries pursuant to the Credit Card Agreements, as in effect on the Closing Date, to secure the obligations of the Borrower or any of its Subsidiaries to the Credit Card Issuers or Credit Card Processors as a result of fees and chargebacks;

(ee)        Liens on specific items of inventory or other goods and the proceeds thereof of any Person securing such Person's obligations permitted under *Section 9.3(v)* in respect of letters

of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(ff)    deposits of cash with the owner or lessor of premises leased and operated by the Borrower or any of its Subsidiaries to secure the performance of the Borrower's or such Subsidiary's obligations under the terms of the lease for such premises;

(gg)    [**reserved**];

(hh)    To the extent existing as of the Petition Date, Liens on Collateral securing Indebtedness under the Second Lien Credit Agreement;

(ii)    Liens on Collateral securing Indebtedness under the DIP Term Loan Agreement which are subject to the DIP Intercreditor Agreement; and

(jj)    other Liens which are Pre-Petition claims.

The expansion of Liens by virtue of accrual of interest, the accretion of accreted value, the payment of interest or dividends in the form of additional Indebtedness, amortization of original issue discount and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an incurrence of Liens for purposes of this Section 9.1.

Notwithstanding anything to the contrary contained herein, Holdings and the Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, create, incur, assume or suffer to exist any Lien upon any of their property, assets or revenues, whether now owned or hereafter acquired, in respect of obligations in respect of the Stripes Intra-Group Loan Agreement and/or the Stripes Facilities Agreement.

SECTION 9.2    Investments.

Make or hold any Investments, except:

(a)    Investments by Holdings, the Borrower or any of the Restricted Subsidiaries in assets that are Cash Equivalents;

(b)    To the extent provided for in the Budget, loans or advances to officers, directors and employees of Holdings (or any direct or indirect parent thereof), the Borrower or any of the Restricted Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) in connection with such Person's purchase of Equity Interests of Holdings (or any direct or indirect parent thereof; provided that, to the extent such loans or advances are made in cash, the amount of such loans and advances used to acquire such Equity Interests shall be contributed to Holdings in cash) and (iii) for any other purpose, in an aggregate principal amount outstanding at any time not to exceed 5,000,000;

(c)    Investments by the Borrower or any Restricted Subsidiary that is a Loan Party in the Borrower or any Restricted Subsidiary that is a Loan Party.

(d)      Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the Ordinary Course of Business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the Ordinary Course of Business;

(e)      Investments consisting of Liens, Indebtedness, fundamental changes, Dispositions and Restricted Payments permitted under Sections 9.1, 9.3 (other than Sections 9.3(c)(ii) or (d)), 9.4 (other than Sections 9.4(c)(ii)), 9.5 (other than Sections 9.5 (e)) and 9.6 (other than Sections 9.6(d)), respectively;

(f)      Investments existing on the Closing Date or made pursuant to legally binding written contracts in existence on the Closing Date, in each case, set forth in the Disclosure Statement;

(g)      Investments in Swap Contracts permitted under Section 9.3;

(h)      promissory notes and other non-cash consideration that is permitted to be received in connection with Dispositions permitted by Section 9.5;

(i)      **[reserved]**;

(j)      Investments made in accordance with the Orders;

(k)      Investments in the Ordinary Course of Business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers consistent with past practices;

(l)      Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the Ordinary Course of Business or upon the foreclosure with respect to any secured Investment;

(m)      To the extent provided for in the Budget, loans and advances to Holdings (or any direct or indirect parent thereof) in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof), Restricted Payments to the extent permitted to be made to Holdings (or such direct or indirect parent) in accordance with Section 9.6(f) or (g);

(n)      so long as no Event of Default exists or would result therefrom, other Investments that do not exceed in the aggregate at any time outstanding $1,000,000;

(o)      To the extent provided for in the Budget, advances of payroll payments to employees in the Ordinary Course of Business;

(p)      **[reserved]**;

(q)      [**reserved**];

127

(r)    Guarantees by Holdings, the Borrower or any of the Restricted Subsidiaries of leases (other than Capitalized Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the Ordinary Course of Business;

(s)    **[reserved]**; and

(t)    **[reserved]**.

Notwithstanding anything to the contrary contained herein, Holdings and the Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, make or hold any Investments in respect of the Stripes Intra-Group Loan Agreement (other than in existence as of the Petition Date) and/or the Stripes Facilities Agreement.

SECTION 9.3    Indebtedness.

Create, incur, assume or suffer to exist any Indebtedness or issue any Disqualified Equity Interest, other than:

(a)    Indebtedness under the Loan Documents or the Pre-Petition Loan Documents;

(b)    Indebtedness incurred prior to the Petition Date as set forth in the Disclosure Statement;

(c)    (i) Guarantees by Holdings, the Borrower and the Restricted Subsidiaries in respect of Indebtedness of the Borrower or any of the Restricted Subsidiaries otherwise permitted hereunder (except that a Restricted Subsidiary that is not a Loan Party may not, by virtue of this Section 9.3(c), Guarantee Indebtedness that such Restricted Subsidiary could not otherwise incur under this Section 9.3); provided that (A) no Guarantee by any Restricted Subsidiary of any Junior Financing shall be permitted unless such Restricted Subsidiary shall have also provided a Guarantee of the Obligations substantially on the terms set forth in the Guaranty and (B) if the Indebtedness being Guaranteed is subordinated to the Obligations, such Guarantee shall be subordinated to the Guaranty on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness and (ii) any Guaranty by a Loan Party of Indebtedness of a Restricted Subsidiary that would have been permitted as an Investment by such Loan Party in such Restricted Subsidiary under Section 9.2(c);

(d)    Indebtedness of the Borrower or any of the Restricted Subsidiaries owing to the Borrower or any other Restricted Subsidiary (or issued or transferred to any direct or indirect parent of a Loan Party which is substantially contemporaneously transferred to a Loan Party or any Restricted Subsidiary of a Loan Party) to the extent constituting an Investment permitted by Section 9.2; provided that (i) all such Indebtedness of any Loan Party owed to any Person that is not a Loan Party shall be subject to the Intercompany Subordination Agreement and (ii) such Indebtedness shall be duly noted on the books and records of the Loan Parties as being owing in respect of Collateral;

(e)    (i) Attributable Indebtedness and other Indebtedness (including Capitalized Leases) of the Borrower and the Restricted Subsidiaries financing the acquisition, construction, repair, replacement or improvement of fixed or capital assets; provided that such Indebtedness is

128

incurred concurrently with or within two hundred and seventy (270) days after the applicable acquisition, construction, repair, replacement or improvement and (ii) Attributable Indebtedness arising out of Sale-Leasebacks; provided that the aggregate principal amount of Indebtedness at any one time outstanding incurred pursuant to this clause (e) shall not exceed the greater of $5,000,000, in each case determined at the time of incurrence;

(f)     Unless otherwise permitted pursuant to the Budget, to the extent incurred prior to the Petition Date and outstanding as of the Closing Date, Indebtedness in respect of Swap Contracts designed to hedge against Holdings', the Borrower's or any Restricted Subsidiary's exposure to interest rates, foreign exchange rates or commodities pricing risks incurred in the Ordinary Course of Business and not for speculative purposes and Guarantees thereof so long as such Indebtedness to the extent secured does not exceed $5,000,000;

(g)     To the extent incurred prior to the Petition Date and outstanding as of the Closing Date, Acquired Indebtedness of the Borrower or any Restricted Subsidiary assumed in connection with any Permitted Acquisition of any such Indebtedness, in an aggregate principal amount at any time outstanding not to exceed $25,000,000; provided that in no event shall the aggregate amount of Indebtedness incurred by Non-Loan Parties under this clause (g), together with all Indebtedness of Non-Loan Parties incurred under clauses (n) of this Section 9.3, exceed at any time outstanding $12,500,000;

(h)     To the extent incurred prior to the Petition Date and outstanding as of the Closing Date, unsecured Indebtedness of the Loan Parties in their capacities as guarantors of Indebtedness outstanding under the Stripes Intra-Group Loan Agreement on the Closing Date;

(i)     Indebtedness representing deferred compensation to employees of the Borrower (and any direct or indirect parent thereof) and its Subsidiaries incurred in the Ordinary Course of Business;

(j)     Unless otherwise permitted pursuant to the Budget, to the extent incurred prior to the Petition Date and outstanding as of the Closing Date, Indebtedness to current or former officers, directors, managers, consultants and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests or other equity based awards of Holdings (or any direct or indirect parent thereof) permitted by Section 9.6;

(k)     To the extent incurred prior to the Petition Date and outstanding as of the Closing Date, unsecured Indebtedness incurred by Holdings, the Borrower or any of the Restricted Subsidiaries in a Permitted Acquisition, any other Investment expressly permitted hereunder or any Disposition, in each case to the extent constituting indemnification obligations or obligations in respect of purchase price (including earn-outs) or other similar adjustments so long as such Indebtedness in respect of earn-outs or similar adjustments (other than those existing on the Closing Date) does not exceed $5,000,000;

(l)     Unless otherwise permitted pursuant to the Budget, to the extent incurred prior to the Petition Date and outstanding as of the Closing Date, unsecured Indebtedness consisting of obligations of Holdings, the Borrower and the Restricted Subsidiaries under deferred compensation or other similar arrangements with employees incurred by such Person in

connection with Permitted Acquisition or any other Investment expressly permitted hereunder so long as such Indebtedness does not exceed $5,000,000;

(m)    to the extent incurred prior to the Petition Date and outstanding as of the Closing Date, Cash Management Obligations and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the Ordinary Course of Business and any Guarantees thereof;

(n)    Indebtedness of the Borrower and the Restricted Subsidiaries in an aggregate principal amount at any time outstanding not to exceed $1,000,000;

(o)    Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the Ordinary Course of Business;

(p)    Indebtedness incurred by the Borrower or any of the Restricted Subsidiaries in respect of warehouse receipts or similar instruments issued or created in the Ordinary Course of Business in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(q)    contingent obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of the Restricted Subsidiaries, in each case in the Ordinary Course of Business or consistent with past practice;

(r)    To the extent incurred prior to the Petition Date and outstanding as of the Closing Date, Indebtedness of the Borrower and the Restricted Subsidiaries incurred under the Second Lien Credit Agreement in an aggregate original principal committed amount not to exceed $80,000,000, *provided* that such indebtedness is permitted under and subject to the Second Lien Intercreditor Agreement;

(s)    Indebtedness of the Borrower and the Restricted Subsidiaries which are guarantors under the DIP Term Loan Agreement in an aggregate original principal committed amount not to exceed $100,000,000, *provided* that such indebtedness is permitted under and subject to the DIP Intercreditor Agreement;

(t)    **[reserved]**;

(u)    **[reserved]**;

(v)    **[reserved]**;

(w)    **[reserved]**;

(x)    **[reserved]**;

130

(y)    **[reserved]**;

(z)    Indebtedness incurred in accordance with the Orders; and

(aa)    all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (aa) above.

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased, plus the aggregate amount of fees, underwriting discounts, premiums (including tender premiums) and other costs and expenses (including OID) incurred in connection with such refinancing.

The accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 9.3. The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with IFRS.

Notwithstanding anything to the contrary contained herein, Holdings and the Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, create, incur, assume or suffer to exist any Indebtedness or issue any Disqualified Equity Interest in respect of the Stripes Facilities Agreement, or any obligations arising thereunder.

SECTION 9.4    Fundamental Changes. Merge, dissolve, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person other than in accordance with the Orders.

SECTION 9.5    Dispositions. Make any Disposition, except:(w) Dispositions of obsolete, worn out, used or surplus property, whether now owned or hereafter acquired, in the Ordinary Course of Business, (x) Dispositions of property no longer used or useful in the conduct of the business of the Borrower and the Restricted Subsidiaries in the Ordinary Course of Business and (y) Dispositions to landlords of improvements made to leased real property pursuant to customary terms of leases entered into in the Ordinary Course of Business;

(b)        Dispositions of inventory and goods held for sale in the Ordinary Course of Business and immaterial assets in the Ordinary Course of Business;

(c)        Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)        Dispositions of property from a Loan Party to another Loan Party;

(e)        Dispositions permitted by Sections 9.2 (other than Section 9.2(e)), 9.4) and 9.6 (other Section 9.6(d)) and Liens permitted by Section 9.1);

(f)        **[reserved]**;

(g)        Dispositions of Cash Equivalents to the extent not otherwise prohibited by this Agreement;

(h)        (i) leases, subleases, non-exclusive licenses, cross-licenses or non-exclusive sublicenses (including the provision of software under an open source license), in each case in the Ordinary Course of Business and which do not materially interfere with the business of the Borrower and the Restricted Subsidiaries, taken as a whole and (ii) Dispositions of intellectual property that are not material to the business of the Borrower and the Restricted Subsidiaries taken as a whole;

(i)        Dispositions of property (other than Current Assets Collateral) subject to casualty or condemnation events;

(j)        [**reserved**];

(k)        **[reserved]**;

(l)        Dispositions or discounts without recourse of accounts receivable (other than Eligible Accounts and Eligible Credit Card Receivables) in connection with the collection or compromise thereof;

(m)        **[reserved]**;

(n)        **[reserved]**;

(o)        the unwinding of any Swap Contract;

(p)        [**reserved**];

(q)        bulk sales or other Dispositions of the inventory of a Restricted Subsidiary not in the Ordinary Course of Business; provided, however, that (i) if Current Assets Collateral the fair market value of which is in excess of $3,000,000 in the aggregate is Disposed of pursuant to this clause (q) since the most recent Borrowing Base Certificate was delivered to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent, the Borrower shall promptly deliver to

the Administrative Agent, the Collateral Agent and the Co-Collateral Agent an updated Borrowing Base Certificate giving Pro Forma Effect to such Disposition, (ii) no Event of Default has occurred and is continuing and (iii) before and after giving effect thereto Excess Availability is not less than $15,000,000 on a pro forma basis;

(r)    [reserved];

(s)    the lapse or abandonment in the Ordinary Course of Business of any registrations or applications for registration of any immaterial IP Rights;

(t)    [reserved];

(u)    [reserved];

(v)    Dispositions made in accordance with the Orders; and

(w)    [reserved].

*provided* that any Disposition of any property pursuant to this Section 9.5 (except pursuant to Sections 9.5 (a), (e), (h), (l), and (s) and except for Dispositions from the Borrower or a Restricted Subsidiary that is a Loan Party to the Borrower or a Restricted Subsidiary that is a Loan Party), shall be for no less than the fair market value of such property at the time of such Disposition as determined by the Borrower in good faith.  To the extent any Collateral is Disposed of as expressly permitted by this Section 9.5 to any Person other than Holdings, the Borrower or any Restricted Subsidiary, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and the Administrative Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing. If Current Assets Collateral the fair market value of which is in excess of $3,000,000 in the aggregate is Disposed of outside the Ordinary Course of Business at any time since the most recent Borrowing Base Certificate was delivered to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent or, if at the time of or as a result of any Disposition, the Borrower shall promptly deliver to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent an updated Borrowing Base Certificate giving Pro Forma Effect to such Disposition; provided that nothing herein shall be deemed to permit any Disposition that is not otherwise permitted under Section 9.5 or waive any other requirement in respect of the Collateral or the Borrowing Base.

SECTION 9.6    Restricted Payments. Declare or make, directly or indirectly, any Restricted Payment, except, in each case consistent with the Budget (subject to Permitted Variances) and any applicable order of the Bankruptcy Court:

(a)    each Restricted Subsidiary may make Restricted Payments to the Borrower and to its other Restricted Subsidiaries that are Loan Parties (and, in the case of a Restricted Payment by a non-wholly owned Restricted Subsidiary, to the Borrower and any of its other Restricted Subsidiaries that are Loan Parties and to each other owner of Equity Interests of such Restricted Subsidiary that is a Loan Party based on their relative ownership interests of the relevant class of Equity Interests);

(b)    [reserved];

133

(c)    **[reserved]**;

(d)    to the extent constituting Restricted Payments, the Borrower and the Restricted Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 9.2 (other than Section 9.2(e)), 9.8 (other than Sections 9.8(a) or (i)), or Section 9.14;

(e)    **[reserved]**;

(f)    **[reserved]**;

(g)    **[reserved]**:

(h)    **[reserved]**;

(i)    **[reserved]**;

(j)    the Borrower may make Restricted Payments to Holdings or to any direct or indirect parent of Holdings:

(A)    with respect to any taxable period for which the Borrower and and/or its Subsidiaries are members of a consolidated, combined, unitary or affiliated tax group for U.S. federal and/or applicable state or local tax purposes of which a direct or indirect parent of the Borrower is the common parent ("Tax Group"), the proceeds of which will be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof to pay) the Tax liability to each federal, state or local jurisdiction in respect of which such Tax Group return is filed by Holdings (or such direct or indirect parent that is the common parent of such Tax Group) that includes the Borrower and/or any of its Subsidiaries, to the extent such Tax liability does not exceed the lesser of (A) the Taxes that would have been payable by the Borrower and/or its Subsidiaries as a stand-alone group and (B) the actual Tax liability of Holdings' Tax Group (or, if Holdings is not the parent of the Tax Group, the Taxes that would have been paid by Holdings, the Borrower and/or the Borrower's Subsidiaries as a stand-alone group), reduced by any such Taxes paid or to be paid directly by the Borrower or its Subsidiaries; provided that Restricted Payments or other distributions in respect of an Unrestricted Subsidiary shall be permitted only to the extent that cash distributions were made by such Unrestricted Subsidiary to Borrower or any of its Restricted Subsidiaries for such purpose;

(B)    the proceeds of which shall be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof to pay) its operating costs and expenses incurred in the Ordinary Course of Business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the Ordinary Course of Business, attributable to the ownership or operations of the Borrower and its Subsidiaries;

(C)    the proceeds of which shall be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof which does not own other

134

Subsidiaries besides Holdings, its Subsidiaries and the direct or indirect parents of Holdings to pay) (A) franchise Taxes and other fees, similar Taxes and expenses required to maintain its (or any of such direct or indirect parents') corporate existence or (B) costs and expenses incurred by it or any of its direct or indirect parents in connection with such entity being a public company, including costs and expenses relating to ongoing compliance with federal and state securities laws and regulations, SEC rules and regulations and the Sarbanes-Oxley Act of 2002; or

(D) the proceeds of which (A) shall be used to pay salary, commissions, bonus and other benefits payable to and indemnities provided on behalf of officers, employees, directors and members of management of Holdings or any direct or indirect parent company of Holdings and any payroll, social security or similar taxes hereof to the extent such salaries, commissions, bonuses and other benefits are attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries or (B) shall be used to make payments permitted under Sections 9.8(g) and (i) (but only to the extent such payments have not been and are not expected to be made by the Borrower or a Restricted Subsidiary);

(k)     Restricted Payments made in accordance with the Orders;

(l)     **[reserved]**;

(m)     **[reserved]**; and

(n)     **[reserved]**.

Notwithstanding anything to the contrary contained herein, Holdings and the Borrower shall not, nor shall Holdings or the Borrower permit any Restricted Subsidiary to, declare or make, directly or indirectly, Restricted Payments in respect of, or the proceeds of which will be used directly or indirectly to make payments on account of, obligations with respect to the Stripes Intra-Group Loan Agreement, the Second Lien Credit Agreement and/or the Stripes Facilities Agreement.

SECTION 9.7     Change in Nature of Business.

Engage in any material line of business substantially different from those lines of business conducted by the Borrower and the Restricted Subsidiaries on the Closing Date or any business or any other activities reasonably related, complementary, synergistic or ancillary thereto or reasonable extensions thereof.

SECTION 9.8     Transactions with Affiliates.

Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the Ordinary Course of Business, other than:

(a)     transactions between or among the Loan Parties (to the extent otherwise permitted hereunder),

(b)      transactions in the Ordinary Course of Business upon fair and reasonable terms fully disclosed to the Administrative Agent, the Collateral Agent and Co-Collateral Agent and on terms substantially as favorable to the Borrower or such Restricted Subsidiary as would be obtainable by the Borrower or such Restricted Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate,

(c)      [**reserved**],

(d)      [**reserved**],

(e)      To the extent provided for in the Budget (subject to Permitted Variances) and existing as of the Petition Date, employment and severance arrangements between Holdings, the Borrower and the Restricted Subsidiaries and their respective officers and employees in the Ordinary Course of Business and transactions pursuant to stock option plans and employee benefit plans and arrangements,

(f)      To the extent existing as of the Petition Date or if permitted by any applicable order of the Bankruptcy Court, the non-exclusive licensing of trademarks, copyrights or other IP Rights in the Ordinary Course of Business to permit the commercial exploitation of IP Rights between or among Affiliates and Subsidiaries of Holdings or the Borrower,

(g)      the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers and employees of Holdings and the Restricted Subsidiaries or any direct or indirect parent of Holdings in the Ordinary Course of Business to the extent attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries,

(h)      any agreement, instrument or arrangement as in effect and consummated prior to the Closing Date and set forth in the Disclosure Statement,

(i)      Restricted Payments permitted under Section 9.6,

(j)      [**reserved**],

(k)      the issuance or transfer of Equity Interests (other than Disqualified Equity Interests) of Holdings to any former, current or future director, manager, officer, employee or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) of the Borrower, any of its Subsidiaries or any direct or indirect parent thereof to the extent otherwise permitted by this Agreement and to the extent such issuance or transfer would not give rise to a Change of Control,

(l)      [**reserved**],

(m)      payments to or from, and transactions with, Joint Ventures (to the extent any such Joint Venture is only an Affiliate as a result of Investments by Holdings, the Borrower and the Restricted Subsidiaries in such Joint Venture) in the Ordinary Course of Business and consistent with past practices to the extent otherwise permitted under Section 9.2,

136

(n)     any transaction in accordance with the Orders, and

(o)      the DIP Term Loan Agreement.

Notwithstanding anything to the contrary contained herein, Holdings and the Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, enter into any agreement pursuant to which it will become an obligor under the Stripes Facilities Agreement.

SECTION 9.9    <u>Burdensome Agreements</u>.  Other than as set forth in the Orders, enter into or permit to exist any Contractual Obligation (other than this Agreement, any other Loan Document,  the Pre-Petition Credit Agreement or any other Pre-Petition Loan Document) that prohibits, restricts, imposes any condition on or limits the ability of (a) any Restricted Subsidiary that is not a Loan Party to make Restricted Payments to (directly or indirectly) or to make or repay loans or advances to any Loan Party or to Guarantee the Obligations of any Loan Party under the Loan Documents or (b) any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Lenders with respect to the Obligations under the Loan Documents; provided that the foregoing clauses (a) and (b) shall not apply to Contractual Obligations that:

(a)     exist on the Closing Date and set forth in the Disclosure Statements,

(b)     represent Indebtedness of a Restricted Subsidiary that is not a Loan Party that is permitted by Section 9.3,

(c)     are customary restrictions that arise in connection with (x) any Lien permitted by Sections  9.1(a), (l), (s), (t)(i), (t)(ii) and (ee) and relate to the property subject to such Lien or (y) any Disposition permitted by Section 9.5 applicable pending such Disposition solely to the assets subject to such Disposition,

(d)     are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 9.2 and applicable solely to such joint venture,

(e)     are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 9.3 but solely to the extent any negative pledge relates to the property financed by or the subject of such Indebtedness (and excluding in any event any Indebtedness constituting any Junior Financing) and the proceeds and products thereof,

(f)     are customary restrictions on leases, subleases, licenses, cross-licenses, sublicenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the property interest, rights or the assets subject thereto,

(g)     comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Sections 9.3(e), (g), (h), (o)(i) and (w) to the extent that such restrictions apply only to the property or assets securing such Indebtedness,

(h)     are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any Restricted Subsidiary,

137

(i)      are customary provisions restricting assignment of any agreement entered into in the Ordinary Course of Business,

(j)      are restrictions on cash or other deposits imposed by customers under contracts entered into in the Ordinary Course of Business,

(k)      arise in connection with cash or other deposits permitted under Section 9.1 or Section 9.2,

(l)      exist in the DIP Term Loan Agreement and related loan documents, or

(m)      entered into in accordance with the Orders.

SECTION 9.10      **[Reserved]**.

SECTION 9.11      Accounting Changes.

Make any change in Fiscal Year or any material change in accounting treatment or reporting practices, except as required by IFRS.

SECTION 9.12      Prepayments, Etc. of Indebtedness.

(a)      Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any unsecured Indebtedness for borrowed money, any Indebtedness that is secured by Liens that are junior to the Liens securing the Obligations, or any Indebtedness that is subordinated in right of payment to the Obligations expressly by its terms (other than Indebtedness among the Borrower and its Restricted Subsidiaries) (collectively, "*Junior Financing*"), except payments due under the DIP Term Loan Agreement (subject to the DIP Intercreditor Agreement), in accordance with the Orders and the Budget (subject to Permitted Variances).

(b)      [**reserved**].

(c)      [**reserved**].

(d)      [**reserved**].

(e)      [**reserved**].

(f)      Amend, modify or change any term or condition of the DIP Term Loan Agreement or any other document governing any Junior Financing (i) without the consent of the Administrative Agent, the Collateral Agent, the Co-Collateral Agent and the Requisite Lenders unless expressly permitted by the DIP Intercreditor Agreement or (ii) in any manner inconsistent with, or contrary to, the DIP Intercreditor Agreement.

SECTION 9.13      Holdings.  In the case of Holdings, conduct, transact or otherwise engage in any business or operations other than the following (and any activities incidental thereto):  (i) its direct ownership of the Equity Interests of the Borrower and its indirect

ownership of the Equity Interests of the Subsidiaries of the Borrower and activities incidental thereto, including payment of dividends and other amounts in respect of its Equity Interests, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) the performance of its obligations with respect to the Loan Documents, (iv) participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings and the Borrower, (v) holding any cash or property received in connection with Restricted Payments made by the Borrower in accordance with Section 9.6 pending application thereof by Holdings, (vi) providing indemnification to officers and directors and (vii) activities incidental to the businesses or activities described in clauses (i) to (vi) of this Section 9.13 or otherwise in accordance with the Orders.

SECTION 9.14    Intra-Group Debt Restricted Payments.    Holdings and the Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, make, directly or indirectly, any payment, distribution, redemption, purchase, defeasance or other satisfaction of any Indebtedness, liabilities, or other obligations (whether on account of interest, principal, or otherwise), whether now existing or arising hereafter, under or in connection with the Stripes Intra-Group Loan Agreement, the Second Lien Credit Agreement or any Second Lien Loan Document (the "*Intra-Group Debt Restricted Payments*").

SECTION 9.15    New Stores.    Open, acquire or take possession of any newly leased stores except as contemplated by the Budget (subject to Permitted Variances).

SECTION 9.16    Chapter 11 Claims.    No Loan Party shall, until payment in full of the Obligations under this Agreement (other than (i) contingent indemnification obligations as to which no claim has been asserted, (ii) Obligations under Secured Hedge Agreements and Cash Management Obligations or (iii) Letter of Credit Obligations that have been Cash Collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the Administrative Agent), except with respect to the Carve Out, and otherwise to the extent permitted under the Orders, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim or Lien on its property which is *pari passu* with or senior to the claims or Liens, as the case may be, of the Administrative Agent, the Collateral Agent, the Co-Collateral Agent and the Lenders hereunder or under the Orders (other than, in each case, Liens permitted under Section 9.1).

SECTION 9.17    Compliance with Budget.    No Loan Party shall, except as otherwise provided herein or approved by the Administrative Agent, the Co-Collateral Agent and the Collateral Agent, directly or indirectly (i) use any cash or the proceeds of any Loans in a manner or for a purpose other than those consistent with this Agreement, the Orders and the Budget (other than a Permitted Variance), (ii) permit a disbursement causing any variance other than a Permitted Variance without the prior written consent of the Administrative Agent, the Co-Collateral Agent and the Collateral Agent or (iii) make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or Indebtedness arising prior to the Petition Date other than payments consistent with the Budget or any Permitted Variance and authorized by the Bankruptcy Court.

(b)    Prior to the occurrence of an Event of Default, the Borrower shall be permitted to pay compensation and reimbursement of fees and expenses solely to the extent that such fees and

expenses are consistent with the Budget or any Permitted Variance and authorized to be paid under Sections 330 and 331 of the Bankruptcy Code pursuant to an order of the Bankruptcy Court. Upon the occurrence of an Event of Default and delivery of a Carve Out Trigger Notice, the right of the Borrower to pay professional fees of Professional Persons in excess of the Carve Out shall terminate, and the Borrower shall provide immediate notice to all Professional Persons informing them that the Borrower's ability to pay such Professional Persons is subject to and limited by the Carve Out.

SECTION 9.18    Use of Collateral.  Other than as expressly permitted by the Orders, no Loan Party shall use or permit the use of Collateral, proceeds of Loans, portion of the Carve Out or any other amounts directly or indirectly by any of the Loan Parties, the Committee Professionals, if any, or any trustee, interim receiver, receiver, receiver-manager or other estate representative appointed in the Cases (or any Successor Case) or any other Person (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):to seek authorization to obtain Liens or security interests that are senior to, or on a parity with, the Liens granted under the Loan Documents or the DIP Superpriority Claims other than in connection with any replacement debtor-in-possession financing that will discharge the Obligations in "full" in cash (other than (i) contingent indemnification obligations as to which no claim has been asserted, (ii) Obligations under Secured Hedge Agreements and Cash Management Obligations or (iii) Letter of Credit Obligations that have been Cash Collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the Administrative Agent); or

(b)    to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against the Agents, the Lenders, the other Loan Parties, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any Avoidance Actions; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the DIP Superpriority Claims; the Liens granted under the Loan Documents, the Pre-Petition Loan Documents, the liabilities under the Pre-Petition Credit Agreement or the Liens under the Pre-Petition Credit Agreement; (iv) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the Obligations; or (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the Agents or the Lenders hereunder or under any of the other Loan Documents (including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of their assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the Loan Documents and the Orders). Notwithstanding anything to the contrary herein, the Committee Professionals may use up to [$50,000] in the aggregate amount of the Carve Out, any cash-collateral, or proceeds of the Loan to investigate the Pre-Petition Parties (the "*Committee Investigation*

*Budget*"); *provided* that the Borrower's stipulations as to validity, priority and security of the liabilities under the Pre-Petition Credit Agreement shall be binding upon each other party in interest, including the Committee Professionals unless such party in interest commences a challenge by (x) with respect to the Committee Professionals, [60 days after the initial appointment of the Committee, and (y) with respect to any other party in interest, 75 days after the date of entry of the Interim Order].

SECTION 9.19    Bankruptcy Related Negative Covenants.  The Borrower will not seek, consent to, or permit to exist any of the following:

(a)    Any modification or amendment to the Orders to which the Administrative Agent, the Collateral Agent, the Co-Collateral Agent and the Required Lenders have not consented in writing, or any appeal, stay, reversal, or vacatur of any of the Orders;

(b)    (i) Except to the extent provided in the DIP Intercreditor Agreement, a priority claim or administrative expense or unsecured claim against the Loan Parties (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c) (subject to entry of the Final Order) (and all rights to charge the Collateral and all collateral securing the Pre-Petition Obligations under Section 506(c) shall be waived), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Administrative Agent, the Collateral Agent or Co-Collateral Agent in respect of the Obligations or (ii) any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, in each case except with respect to the Carve Out;

(c)    Except as provided for in the Budget, without the prior written consent of the Administrative Agent, the Collateral Agent and the Co-Collateral Agent and pursuant to an order of the Bankruptcy Court (including any Order) after notice and a hearing, any claim or expense with respect to any Lien or Indebtedness incurred or arising prior to the Petition Date that is subject to an automatic stay provision of the Bankruptcy Code whether by way of "adequate protection" under the Bankruptcy Code or otherwise;

(d)    Except as agreed to by the Administrative Agent, the Collateral Agent and Co-Collateral Agent, any order which authorizes the return of any of the Loan Parties' property pursuant to Section 546(h) of the Bankruptcy Code;

(e)    File a plan of reorganization other than the Chapter 11 Plan (except for any plan that contains only non-material amendments of the Chapter 11 Plan), including, without limitation, any plan that provides for treatment of the Obligations or the "Obligations" (as defined in the Pre-Petition Credit Agreement) other than repayment in full in cash on the effective date thereof (other than (i) contingent indemnification obligations as to which no claim has been asserted, (ii) Obligations under Secured Hedge Agreements and Cash Management Obligations or (iii) Letter of Credit Obligations that have been Cash Collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the Administrative Agent);

LEGAL_US_W # 95739072.21

(f)    Re-solicit votes of any class of claims or interests under the Chapter 11 Plan, or seek the entry of an order of the Bankruptcy Court directing any such re-solicitation

(g)    Any actions relating to reclamation claims with respect to material Inventory;Any order which (i) authorizes the payment of any Indebtedness (other than the Indebtedness reflected in the Budget (subject to Permitted Variances), and other Indebtedness approved by the Administrative Agent, the Collateral Agent and the Co-Collateral Agent) incurred prior to the Petition Date, and payment of any Indebtedness owed to the Affiliates of the Debtors (but not the Debtors) or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien (other than as expressly set forth in the Orders or the Budget (subject to Permitted Variances)) or (ii) is any manner contrary to the terms of this Agreement (subject to Permitted Variances); or

(h)    Any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents unless in connection therewith the Obligations will be paid in full in cash (other than (i) contingent indemnification obligations as to which no claim has been asserted, (ii) Obligations under Secured Hedge Agreements and Cash Management Obligations or (iii) Letter of Credit Obligations that have been Cash Collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the Administrative Agent).

## ARTICLE X

## EVENTS OF DEFAULT AND REMEDIES

SECTION 10.1    Events of Default.

Each of the events referred to in clauses (a) through (s) of this Section 10.1 shall constitute an "Event of Default":

(a)    Non-Payment.  The Borrower fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(b)    Specific Covenants.

(i)    The Borrower, any Restricted Subsidiary, or Holdings fails to perform or observe any term, covenant or agreement contained in (A) Article VI, (B) Section 7.1(g), 7.3(a), (C) Section 8.1(a) (solely with respect to the Borrower), (D) Section 8.13(b), (E) Article IX, or (F) Section 8.15, Section 8.16 or Section 8.17;

(ii)    the Borrower or any other Loan Party fails to perform or observe (or to cause to be performed or observed) any covenant or agreement contained in Section 8.12; or

(iii)    The Borrower or any other Loan Party fails to perform or observe (or to cause to be performed or observed) any covenant or agreement contained in Section 7.1(h), Section 7.1(i), Section 7.4(a), Section 7.4(b) or Section 7.4(e), as applicable; or

(c)    Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 10.1(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after receipt by the Borrower of written notice thereof from the Administrative Agent; or

(d)    Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by any Loan Party herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be incorrect in any material respect (or, with respect to any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language, in any respect (after giving effect to any qualification therein)) when made or deemed made; or

(e)    Cross-Default.  Except as a result of commencement of the Cases or unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Bankruptcy Court, any Loan Party or any Restricted Subsidiary (A) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness (other than Indebtedness hereunder) (i) having an aggregate outstanding principal amount (individually or in the aggregate with all other Indebtedness as to which such a failure shall exist) of not less than the Threshold Amount or (ii) under the Second Lien Credit Agreement, the DIP Term Loan Agreement or the Stripes Intra-Group Loan Agreement, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and not as a result of any other default thereunder by any Loan Party), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; provided that this clause (e)(B) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; provided, further, that such failure is unremedied and is not waived by the holders of such Indebtedness prior to any termination of the Aggregate Commitments or acceleration of the Loans pursuant to Section 10.2; or

(f)    Insolvency Proceedings, Etc. Holdings, the Borrower or any Material Subsidiary (in each case, other than the Debtors or in respect of the Cases) institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is

143

appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(g)     Judgments.   Excluding any order fixing the amount of any claim in the Cases, there is entered against any Loan Party or any Restricted Subsidiary a final judgment or order for the payment of money after the Petition Date in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied or failed to acknowledge coverage thereof) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive days; or

(h)     ERISA.   (i)    An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or would reasonably be expected to result in liability of any Loan Party or their respective ERISA Affiliates under Title IV of ERISA in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect or (ii) any Loan Party or any of their respective ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect; or

(i)     Invalidity of Loan Documents.   Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 9.4 or 9.5) or the satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of repayment in full of the Obligations and termination of the Aggregate Commitments), or purports in writing to revoke or rescind any Loan Document; or

(j)     Collateral Documents.   Any Collateral Document after delivery thereof pursuant to Section 4.1 or 8.11 shall for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction permitted under Section 9.4 or 9.5) cease to create, or any Lien purported to be created by any Collateral Document or the Orders shall be asserted in writing by any Loan Party not to be, a valid and perfected lien, with the priority required by the Collateral Documents (or other security purported to be created on the applicable Collateral) on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 9.1, (x) except to the extent that any such perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or the loss of such perfection or priority results from the failure of the Administrative Agent or the Collateral Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Collateral Documents or to file UCC continuation statements and except as to Collateral consisting of real property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage; or

(k)    Junior Financing Documentation.  (i) Any of the Obligations of the Loan Parties under the Loan Documents for any reason shall cease to be "Senior Indebtedness" (or any comparable term) or "Senior Secured Financing" (or any comparable term) under, and as defined in any Junior Financing Documentation governing Junior Financing subordinated in right of payment to the Obligations under the Loan Documents with an aggregate principal amount of not less than the Threshold Amount or (ii) the subordination provisions set forth in any Junior Financing Documentation governing Junior Financing subordinated in right of payment to the Obligations under the Loan Documents with an aggregate principal amount of not less than the Threshold Amount shall, in whole or in part, cease to be effective or cease to be legally valid, binding and enforceable against the holders of any such Junior Financing, if applicable; or

(l)    Change of Control.  There occurs any Change of Control; or

(m)    **[reserved]**; or

(n)    **[reserved]**; or

(o)    **[reserved]**; or

(p)    Except as otherwise permitted herein, the dissolution of any Loan Party; or

(q)    The Loan Parties or any of their subsidiaries, or any person claiming by or through the Loan Parties or any of their subsidiaries, obtain court authorization to commence, or commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the Administrative Agent, the Collateral Agent, the Co-Collateral Agent or the Lenders in each case relating to this Agreements; or

(r)    Any of the following shall occur in any Case:

(i)    the filing by any Loan Party of (A) a plan other than the Chapter 11 Plan, as it may be modified with the consent of the Administrative Agent, the Collateral Agent and Co-Collateral Agent and/or (B) any motion or pleading that is inconsistent with the prosecution of the Chapter 11 Plan;

(ii)    (A) any Order or provision thereof is reversed, vacated, stayed, or otherwise ceases to be in full force and effect, (B) entry of an order without the prior consent of the Administrative Agent, the Collateral Agent, Co-Collateral Agent or the Required Lenders amending, supplementing or otherwise modifying any Order in a manner adverse to the Lenders, the Collateral Agent, the Co-Collateral Agent and/or the Administrative Agent (other than immaterial modifications to correct grammatical or typographical errors) or (C) failure by the Loan Parties to perform under any Order in a material respect;

(iii)    The filing of a motion by any Loan Party seeking entry of, or the entry of any order without the prior consent of the Administrative Agent, the Collateral Agent, Co-Collateral Agent or the Required Lenders that authorizes any of the following:

(A)     except as provided in the DIP Intercreditor Agreement, a priority claim or administrative expense or unsecured claim against the Loan Parties (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c) (subject to entry of the Final Order) (and all rights to charge the Collateral and all collateral securing the Pre-Petition Obligations under Section 506(c) shall be waived), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Administrative Agent, the Collateral Agent, the Co-Collateral Agent and the Lenders in respect of the Obligations, except with respect to the Carve Out, the DIP Term Loan or as may be approved by the Bankruptcy Court for payments to critical vendors, such critical vendor order to be reasonably acceptable to the Administrative Agent, the Collateral Agent and the Co-Collateral Agent;

(B)     except as provided in the DIP Intercreditor Agreement or pursuant to the Orders, any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, except with respect to the Carve Out;

(C)     the consummation of any sale of all or substantially all the working capital assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Cases or otherwise that does not result in payment in full of all of the Obligations in immediately available funds at the closing of such sale or initial payment of the purchase price or effectiveness of such plan, as applicable (other than (i) contingent indemnification obligations as to which no claim has been asserted, (ii) Obligations under Secured Hedge Agreements and Cash Management Obligations or (iii) Letter of Credit Obligations that have been Cash Collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the Administrative Agent);

(D)     except as consented to by the Administrative Agent, the Collateral Agent and Co-Collateral Agent, the return of any of the Loan Parties' property pursuant to section 546(h) of the Bankruptcy Code;

(E)   authorizing or directing payment of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code or requiring the marshaling of assets or any other similar remedy against or with respect to any of the Collateral or from the Administrative Agent, the Collateral Agent, the Co-Collateral Agent or any of Lenders, to the extent not dismissed or denied within 45 days after the filing of such motion;

(F)     granting of (I) relief from the automatic stay in the Cases to permit foreclosure or enforcement on, or any right or remedy with respect to any material asset of the Borrower or (II) any relief that would impair the material rights and interests of the Administrative Agent, the Collateral Agent, Co-Collateral Agent and the Lenders in

146

their capacities as such (regardless of whether such relief was sought by the Debtors or a third party);

(G)    the payment of any Indebtedness (other than Indebtedness reflected in the Budget (subject to Permitted Variances) or as permitted by the Orders; and/or

(H)    payment of or granting adequate protection with respect to Pre-Petition Indebtedness, other than as expressly set forth in the Orders and the Budget.

(iv)    the dismissal of the Cases or conversion of the Cases to a case under Chapter 7 of the Bankruptcy Code, or the filing of any motion to so dismiss or convert brought by any Loan Party;

(v)    appointment of a Chapter 11 trustee or an examiner or any similar insolvency official or administrator, with expanded powers, or the filing of any motion to so appoint brought by any Loan Party;

(vi)    any of the Liens or the DIP Superpriority Claims granted hereunder cease to be valid, perfected and enforceable in any respect;

(vii)    the use of cash collateral by the Debtors are terminated and the Debtors fail to regain the use of cash collateral (consensually or non-consensually) pursuant to an order in form and substance acceptable to Administrative Agent, the Collateral Agent and the Co-Collateral Agent; or

(viii)    the Bankruptcy Court enters an order that is adverse in any material respect, when taken as a whole, to the interests of the Administrative Agent, the Collateral Agent, the Co-Collateral Agent and the Lenders or their respective material rights and remedies in their capacities as such under this Agreement or in any of the Cases; or

(s)    The termination or expiration or unenforceability of any Exit Commitment Letter.

SECTION 10.2    Remedies upon Event of Default. Notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the Orders,

(a)    If any Event of Default occurs and is continuing, the Administrative Agent may with the consent of, and shall at the request of, the Requisite Lenders take any or all of the following actions:

(i)    declare Revolving Credit Commitments of each Lender and any obligation of the Issuers to make L/C Credit Extensions to be terminated, whereupon such Revolving Credit Commitments and obligation shall be terminated;

(ii)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment,

147

demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(iii)    require that the Borrower Cash Collateralize the Letter of Credit Obligations (in an amount equal to the then Outstanding Amount thereof); and

(iv)    exercise (or direct Collateral Agent to exercise) on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

*provided* that with respect to the enforcement of Liens or other remedies with respect to the Collateral of the Loan Parties under the preceding clause (iv), the Administrative Agent shall provide the Borrower with five (5) Business Days' written notice prior to taking the action contemplated thereby

(b)    Without limitation of the rights of the Agents or Secured Parties under Section 8.12, the Borrower hereby irrevocably waives the right to direct the application of any and all payments in respect of the Obligations and any proceeds of Collateral after the occurrence and during the continuance of an Event of Default and agrees that during the continuance of an Event of Default, and notwithstanding Section 2.13(f) above, the Administrative Agent or Collateral Agent may in its sole discretion, and, upon either (A) the written direction of the Requisite Lenders or (B) the acceleration of the Obligations pursuant to Section 10.2(a), deliver a notice to each Approved Account Bank instructing them to cease complying with any instructions from any Loan Party and to transfer all funds therein to the Administrative Agent and the Administrative Agent shall apply all payments in respect of any Obligations and all funds on deposit in the Concentration Account and all other proceeds of Collateral in the order specified in Section 10.3 hereof.

SECTION 10.3    Application of Funds.  After the exercise of remedies provided for in Section 10.2 (or after the Loans have automatically become immediately due and payable and the Letter of Credit Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to Section 10.2), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

*First*, to pay accrued and unpaid professional fees and expenses of the Professional Persons and to fund the [Carve Out Account (as defined in the Interim Order)] up to an aggregate amount not to exceed the [Carve Out Cap (as defined in the Interim Order)];

*Second*, ratably, pay any fees, indemnities, or expense reimbursements then due to the Administrative Agent, the Collateral Agent, any Co-Collateral Agent, or any Issuer from the Borrower (other than in connection with Cash Management Obligations or Obligations in respect of Secured Hedge Agreements);

*Third*, ratably, to pay any fees or expense reimbursements then due to the Revolving Credit Lenders from the Borrower (other than in connection with Cash Management Obligations or Obligations in respect of Secured Hedge Agreements);

148

*Fourth*, to pay interest due and payable in respect of any Loans (including any Swing Loans) and any Protective Advances, ratably;

*Fifth*, to pay the principal of the Protective Advances;

*Sixth*, to pay the principal of Swing Loans;

*Seventh*, to pay principal on the Loans (other than the Protective Advances) and unreimbursed Letter of Credit Borrowings, and to pay any amounts owing with respect to Obligations in respect of Secured Hedge Agreements (other than any Specified Secured Hedge Obligations) to the extent of Availability Reserves established for any such Secured Hedge Agreements prior to payment under this Section 10.3, ratably;

*Eighth*, to pay an amount to the Administrative Agent equal to 101% of the Letter of Credit Obligations on such date, to be held in the Concentration Account as cash collateral for such Obligations;

*Ninth*, to pay any amounts owing with respect to Cash Management Obligations and unpaid Obligations under Secured Hedge Agreements, ratably;

*Tenth*, to pay any amounts owing with respect to any Specified Secured Hedge Obligations, ratably;

*Eleventh*, to the payment of any other Obligation due to the Administrative Agent, Collateral Agent, or the Co-Collateral Agent,  or any Lender by the Borrower;

*Twelfth*, **[reserved]**; and

*Thirteenth*, after all of the Obligations have been paid in full, to the Borrower or as the Borrower shall direct or as otherwise required by Law.

Subject to Sections 2.4, 2.16, 8.12 and 10.5, amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Seventh above shall be applied to satisfy drawings under such Letters of Credit as they occur.  If any amount remains on deposit as cash collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above and, if no Obligations remain outstanding, to the Borrower.

Notwithstanding the foregoing, if sufficient funds are not available to fund all payments to be made in respect of any Secured Obligation described in any specific level of the waterfall in clauses First through Eleventh above, the available funds being applied with respect to any such Secured Obligation (unless otherwise specified in such clause) shall be allocated to the payment of such Secured Obligation ratably, based on the proportion of the Administrative Agent's, Collateral Agent's, Co-Collateral Agent's, and each Lender's or Issuer's interest in the aggregate outstanding Secured Obligations described in such clauses.  Except as may be otherwise provided in Section 12.1, the order of priority set forth in clauses First through Eighth above may at any time and from time to time be changed by the agreement of all Lenders without necessity of notice to or consent of or approval by the Borrower, any Secured Party that

is not a Lender or Issuer or by any other Person that is not a Lender or Issuer.  Except as may be otherwise provided in Section 12.1, the order of priority set forth in clauses First through Eleventh above may be changed only with the prior written consent of the Administrative Agent in addition to that of all Lenders.  Neither the Loan Parties, the Committee Professionals, nor any other party-in-interest shall have the right to contest the enforcement of remedies set forth in the Orders and the Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable Loan Documents. The Loan Parties shall cooperate fully with the Administrative Agent and the Lenders in their exercise of rights and remedies, whether against the Collateral or otherwise. The Loan Parties hereby waive any right to seek relief under the Bankruptcy Code, including under Section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the Administrative Agent and the Lenders set forth in the Orders and in the Loan Documents.

Subject to the Orders, in case any one or more of the covenants and/or agreements set forth in this Agreement or any other Loan Document shall have been breached by any Loan Party, then the Administrative Agent may proceed to protect and enforce the Lenders' rights either by suit in equity and/or by action at law, including an action for damages as a result of any such breach and/or an action for specific performance of any such covenant or agreement contained in this Agreement or such other Loan Document. Without limitation of the foregoing, the Borrower agrees that failure to comply with any of the covenants contained herein will cause irreparable harm and that specific performance shall be available in the event of any breach thereof. The Administrative Agent shall be indemnified by the Borrower against all liability, loss or damage, together with all reasonable costs and expenses related thereto (including reasonable legal and accounting fees and expenses) in accordance with the terms hereof.

SECTION 10.4    [**Reserved**]..

SECTION 10.5    Actions in Respect of Letters of Credit; Cash Collateral.

(a)    At any time (i) upon the Revolving Credit Termination Date, (ii) after the Revolving Credit Termination Date when the aggregate funds on deposit in the Concentration Account to Cash Collateralize Letter of Credit Obligations shall be less than 101% of the Letter of Credit Obligations and (iii) as may be required by Section 2.9 or Section 2.16, the Borrower shall pay to the Administrative Agent in Same Day Funds at the Administrative Agent's office referred to in Section 12.8, for deposit in the Concentration Account, (x) in the case of clauses (i) and (ii) above, the amount required to that, after such payment, the aggregate funds on deposit in the Concentration Account counts equals or exceeds 101% of the sum of all outstanding Letter of Credit Obligations and (y) in the case of clause (iii) above, the amount required by Section 2.9. The Administrative Agent may, from time to time after funds are deposited in the Concentration Account, apply funds then held in the Concentration Account to the payment of any amounts, in accordance with Section 2.9 and Section 10.2(b), as shall have become or shall become due and payable by the Borrower to the Issuers or Lenders in respect of the Letter of Credit Obligations. The Administrative Agent shall promptly give written notice of any such application; provided, however, that the failure to give such written notice shall not invalidate any such application.  If at any time the Administrative Agent determines that Cash Collateral is subject to any right or claim of any Person other than the Administrative Agent as herein provided, or that the total amount of such Cash Collateral is less than the applicable Fronting Exposure and other

150

obligations secured thereby, the Borrower or the relevant Defaulting Lender will, promptly upon demand by the Administrative Agent, pay or provide to the Administrative Agent additional Cash Collateral in an amount sufficient to eliminate such deficiency. The Administrative Agent may, at any time and from time to time after the initial deposit of Cash Collateral, request that additional Cash Collateral be provided in order to protect against the results of exchange rate fluctuations.

(b)     Application.     Notwithstanding anything to the contrary contained in this Agreement, Cash Collateral provided under any of this Section 10.5 or Sections 2.4, 2.9, 2.12, 2.16 or 10.2 in respect of Letters of Credit or Swing Loans shall be held and applied to the satisfaction of the specific Letter of Credit Obligations, Swing Loans, obligations to fund participations therein (including, as to Cash Collateral provided by a Defaulting Lender, any interest accrued on such obligation) and other obligations for which the Cash Collateral was so provided, prior to any other application of such property as may be provided for herein.

(c)     Release.     Cash Collateral (or the appropriate portion thereof) provided to reduce Fronting Exposure or other obligations shall be released promptly following (i) the elimination of the applicable Fronting Exposure or other obligations giving rise thereto (including by the termination of Defaulting Lender status of the applicable Lender or, as appropriate, its assignee following compliance with Section 12.2(b)(vi)) or (ii) the Administrative Agent's good faith determination that there exists excess Cash Collateral; provided, however, (x) that Cash Collateral furnished by or on behalf of a Loan Party shall not be released during the continuance of a Default or Event of Default (and following application as provided in this Section 10.5 may be otherwise applied in accordance with Section 10.3), and (y) the Person providing Cash Collateral and the applicable Issuer or Swing Loan Lender, as applicable, may agree that Cash Collateral shall not be released but instead held to support future anticipated Fronting Exposure or other obligations.

## ARTICLE XI

## THE ADMINISTRATIVE AGENT AND OTHER AGENTS

SECTION 11.1     Appointment and Authority of the Administrative Agent and Collateral Agent.

(a)     Each of the Lenders and the Issuers hereby irrevocably appoints Barclays to act on its behalf as the Administrative Agent and Collateral Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent and Collateral Agent, as applicable, to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent or Collateral Agent, as applicable, by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. Each of the Lenders and the Issuers hereby authorizes the Administrative Agent to enter into (i) any Customary Intercreditor Agreements in connection with Indebtedness permitted under Section 9.1(hh), (ii) the Second Lien Intercreditor Agreement and (iii) the DIP Intercreditor Agreement. The provisions of this Article XI (other than Sections 11.6 and 11.11) are solely for the benefit of the Administrative Agent, the Lenders and the Issuers, and the Borrower shall not have rights as a third party beneficiary of any such provision.

(b)    The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (including in its capacities as a Lender and a potential Hedge Bank and/or Cash Management Bank) and the Issuers hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of (and to hold any security interest created by the Collateral Documents for and on behalf of or in trust for) such Lender and such Issuer for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" (and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent or Collateral Agent pursuant to Section 11.5 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article XI and Article XII (including Sections 11.3, 11.14, 12.3, 12.4 and 12.5, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto. Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent and the Collateral Agent to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents and acknowledge and agree that any such action by any Agent shall bind the Lenders.

SECTION 11.2    Rights as a Lender.

Any Person serving as an Agent (including as Administrative Agent) hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each Person serving as an Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.  The Lenders acknowledge that, pursuant to such activities, any Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them.

SECTION 11.3    Exculpatory Provisions.  Neither the Administrative Agent nor any other Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, an Agent (including the Administrative Agent):

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing and without limiting the generality of the foregoing, the use of the term "agent" herein and in the other Loan Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under

agency doctrine of any applicable Law and instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties;

(b)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Requisite Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)     shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by any Person serving as an Agent or any of its Affiliates in any capacity.

Neither Administrative Agent or any other Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Requisite Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 12.1 and 12.2) or (ii) in the absence of its own gross negligence or willful misconduct as determined by the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Borrower, a Lender or an Issuer.

No Agent-Related Person shall be responsible for or have any duty to ascertain or inquire into (i) any recital statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, the Collateral Agent or any Co-Collateral Agent, or (vii) the inspection of the properties, books or records of any Loan Party or any Affiliate thereof.

SECTION 11.4     Reliance by the Agents.

The Administrative Agent and each other Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent

LEGAL_US_W # 95739072.21

or otherwise authenticated by the proper Person. The Administrative Agent and each other Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the applicable Issuer, the Administrative Agent may presume that such condition is satisfactory to such Lender or such Issuer unless the Administrative Agent shall have received notice to the contrary from such Lender or such Issuer prior to the making of such Loan or the issuance of such Letter of Credit. The Administrative Agent and each other Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Other than in respect of any actions at the direction of the Borrower, the Administrative Agent and each other Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Requisite Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent and each other Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Requisite Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders; provided that neither the Administrative Agent not any other Agent shall be required to take any action that, in its opinion or in the opinion of its counsel, may expose the Administrative Agent or such Agent to liability or that is contrary to any Loan Document or applicable Law.

SECTION 11.5    Delegation of Duties.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Documents by or through any one or more sub agents appointed by the Administrative Agent. The Agents and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Agent-Related Persons. The exculpatory provisions of this Article shall apply to any such sub agent and to the Agent-Related Persons of the Agents and any such sub agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent or any other Agent. No Agent shall be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Agent acted with gross negligence or willful misconduct in the selection of such sub agents.

SECTION 11.6    Resignation of Administrative Agent or Collateral Agent.

(a)    The Administrative Agent or Collateral Agent may resign upon ten (10) days' notice of its resignation to the Lenders and the Borrower; provided that if no successor agent is appointed in accordance with the terms set forth below within such 10-day period, the

154

Administrative Agent and/or the Collateral Agent shall not be permitted to resign until the earlier to occur of (x) the date of the appointment of the successor agent or (y) the date that is twenty (20) days after the last day of such 10-day period. If the Administrative Agent or Collateral Agent, as applicable, is subject to an Agent-Related Distress Event, the Requisite Lenders or the Borrower may remove the Administrative Agent or the Collateral Agent, as applicable, upon ten (10) days' notice. Upon the removal or receipt of any such notice of resignation, the Requisite Lenders shall have the right, with the consent of the Borrower at all times other than during the existence of an Event of Default (which consent of the Borrower shall not be unreasonably withheld or delayed if such successor is a commercial bank with a combined capital and surplus of at least $5,000,000,000 that is a "U.S. person" and a "financial institution" within the meaning of Treasury Regulation Section 1.1441-1, and otherwise may be withheld at the Borrower's sole discretion), to appoint a successor, which shall be a Lender or a bank with an office in the United States, or an Affiliate of any such Lender or bank with an office in the United States. If no such successor shall have been so appointed by the Requisite Lenders and shall have accepted such appointment within twenty (20) days after the last day of such 10-day period, then the retiring or removed Administrative Agent or Collateral Agent, as applicable, may on behalf of the Lenders and the Issuers, appoint a successor Administrative Agent or Collateral Agent, as applicable, meeting the qualifications set forth above; provided that if the Administrative Agent or Collateral Agent, as applicable, shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring or removed Administrative Agent or Collateral Agent, as applicable, shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent or Collateral Agent on behalf of the Lenders or the Issuers under any of the Loan Documents, the retiring or removed Agent shall continue to hold such collateral security until such time as a successor of such Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender and each Issuer directly, until such time as the Requisite Lenders appoint a successor Administrative Agent as provided for above in this Section 11.6. Upon the acceptance of a successor's appointment as Administrative Agent or Collateral Agent, as applicable, hereunder and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Requisite Lenders may request, in order to (i) continue the perfection of the Liens granted or purported to be granted by the Collateral Documents or (ii) otherwise ensure that the Collateral and Guarantee Requirement is satisfied, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) or removed Administrative Agent or Collateral Agent, as applicable, and the retiring or removed Administrative Agent or Collateral Agent, as applicable, shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrower to a successor Administrative Agent or Collateral Agent, as applicable, shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring or removed Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Sections 12.3, 12.4 and 12.5 shall continue in effect for the benefit of such retiring or removed Agent, its sub-agents and their respective Agent-Related Persons in

respect of any actions taken or omitted to be taken by any of them while the retiring or removed Agent was acting as Administrative Agent or Collateral Agent, as applicable.

(b)     Any resignation by Barclays as Administrative Agent pursuant to this Section shall also constitute its resignation as an Issuer and Swing Loan Lender.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (i) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuer and Swing Loan Lender, (ii) the retiring Issuer and Swing Loan Lender shall be discharged from all of their respective duties and obligations hereunder or under the other Loan Documents, and (iii) the successor Issuer shall issue letters of credit in substitution for the Letters of Credit issued by Barclays, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring Issuer to effectively assume the obligations of the retiring Issuer with respect to such Letters of Credit.

SECTION 11.7     Non-Reliance on Administrative Agent and Other Lenders; Disclosure of Information by Agents.

Each Lender and each Issuer acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession.  Each Lender represents to each Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower and the other Loan Parties hereunder.  Each Lender and each Issuer also represents that it will, independently and without reliance upon the Administrative Agent , any other Agent, or any other Lender or any of their Agent-Related Persons and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent herein, such Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

SECTION 11.8     No Other Duties; Other Agents, Arrangers, Etc.

Barclays Bank PLC and Citizens Bank, N.A. are each hereby appointed as an Arranger hereunder on the Closing Date, and each Lender authorizes each of Barclays Bank PLC and

Citizens Bank, N.A. to act as an Arranger in accordance with the terms hereof and the other Loan Documents. Each Agent hereby agrees to act in its capacity as such upon the express conditions contained herein and the other Loan Documents, as applicable. Anything herein to the contrary notwithstanding, none of the Arrangers or Agents shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, the Collateral Agent, Co-Collateral Agent, or a Lender hereunder and such Persons shall have the benefit of this Article XI. Without limiting the foregoing, none of the Lenders or other Persons so identified shall have or be deemed to have any agency or fiduciary or trust relationship with any Lender, Holdings, the Borrower or any of their respective Subsidiaries. Each Lender acknowledges that it has not relied, and will not rely, on any of the Arrangers, Lenders, or other Persons so identified in deciding to enter into this Agreement or in taking or not taking action hereunder. Subject to Section 11.6 and 11.9, any Agent or Arranger may resign from such role at any time, with immediate effect, by giving prior written notice thereof to the Administrative Agent and Borrower.

SECTION 11.9    Appointment and Authority of Co-Collateral Agents.

(a)    Each of the Lenders and the Issuers hereby irrevocably appoints Citizens to act on its behalf as a Co-Collateral Agent hereunder and under the other Loan Documents and authorizes the Co-Collateral Agent to take such actions on its behalf and to exercise such powers as are delegated to the Co-Collateral Agent by the terms of this Agreement and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto.

(b)    Notwithstanding anything in this Agreement or any other Loan Document to the contrary, in addition to the rights specifically set forth in this Agreement, the Co-Collateral Agent shall have rights under the Loan Documents at least as expansive as the rights afforded to the Administrative Agent or the Collateral Agent with respect to (i) the determination of the calculation of "Excess Availability" (other than for purposes of the Applicable Unused Commitment Fee, which shall be calculated solely by Administrative Agent), (ii) the determination and calculation of the "Borrowing Base" (including the component definitions thereof, applicable advance rates, and eligibility criteria), (iii) the determination of whether or not to conduct inspections or otherwise exercise rights pursuant to Section 8.6 (subject to the frequency limitations set forth therein), (iv) the determination of whether or not to conduct field exams, audits, or appraisals pursuant to Section 7.4 (subject to the frequency limitations set forth therein), (v) the approval of any proposed appraiser or third party field examiner after the Closing Date, (vi) the establishment, determination, modification, or release of any reserve established pursuant to the definition of "Reserves", "Availability Reserves", or "Inventory Reserves", (vii) any amendment, consent, waiver, approval or authorization which may be provided or made under or in respect of the DIP Intercreditor Agreement and (viii) any approvals or authorization which may be provided with respect to the Cases; in the case of the foregoing clauses (vii) and (viii), it being understood and agreed that the Administrative Agent shall be permitted to act at the direction of the Required Lenders as required herein (the rights specifically delegated to the Co-Collateral Agent (whether acting alone or together with any other Agent or Agents) in this Agreement, together with the rights described in this Section 11.9(b), hereafter referred to as the "*Credit Facility Issues*").

157

(c)      In the event that the Co-Collateral Agent, on the one hand, and the Collateral Agent and the Administrative Agent, on the other hand, cannot in good faith agree on the resolution of, or course of action with respect to, any Credit Facility Issue, the Administrative Agent, the Collateral Agent, and the Co-Collateral Agent hereby agree that the Credit Facility Issue shall be resolved on behalf of all of them (including under any circumstance which requires approval or consent by both Administrative Agent or Collateral Agent and the Co-Collateral Agent) by the implementation of the course of action that represents the most conservative credit judgment (that is, the determination that would result in the least amount of credit being made available to the Borrower or with respect to a request for an extension, exception, or greater flexibility for the benefit of any Loan Party, a determination to decline to permit the requested action), which credit judgment shall be made in accordance with the standards (if any, such as reasonable discretion, Permitted Discretion, etc.) expressly prescribed in this Agreement for such matter; provided, that, in the event such Credit Facility Issues cannot be resolved by either proceeding with the most conservative credit judgment or declining to permit a requested action, then the position of the Administrative Agent relative such Credit Facility Issues shall be the course of action approved.

(d)      Notwithstanding anything in this Agreement or any of the other Loan Documents to the contrary, the Co-Collateral Agent hereby agrees with Administrative Agent that (i) all rights of the Co-Collateral Agent hereunder and the obligation of Administrative Agent to comply with any request or determination of the Co-Collateral Agent shall be at all times subject to the terms and conditions of and any limitations set forth in the DIP Intercreditor Agreement and the Second Lien Intercreditor Agreement, (ii) Administrative Agent shall select, employ and retain all attorneys, advisors or other professionals retained or to be retained by or on behalf of Administrative Agent, the Collateral Agent, the Co-Collateral Agent and the Lenders, in each case, the expenses of which are required to be reimbursed by any Loan Party under the Loan Documents; provided that such limitation shall not apply in the case of counsel appointed in express compliance with the conflicts provisions set forth in this Agreement, (iii) nothing in this Agreement shall permit the Co-Collateral Agent (in its capacity as such) to undertake to order any appraisals, audits or examinations of any Collateral, but rather this Agreement grants Co-Collateral Agent the right and authority to direct Administrative Agent to do so in accordance with the terms and conditions of this Agreement including Section 11.9(c) and (iv) from and after the Closing Date, Administrative Agent shall coordinate inspections, audits and appraisals under Sections 7.4 and 8.6 with the Co-Collateral Agent and, subject to Section 11.9(c).

(e)      Administrative Agent agrees to provide the Co-Collateral Agent, to the extent not furnished directly to Co-Collateral Agent by the applicable appraisers or auditors, copies of Collateral appraisals and field exam reports relating to the Collateral or any Loan Party which are received by Administrative Agent.  Each Co-Collateral Agent further expressly agrees and acknowledges that the Administrative Agent and Collateral Agent (i) do not make any representation or warranty as to the accuracy of any appraisal, collateral report, field exam, or item or information furnished to the Co-Collateral Agent by Administrative Agent or any Collateral Agent and (ii) shall not be liable for any information contained in any appraisal, collateral report, field exam, or other item referenced above.

(f)      Co-Collateral Agent is not permitted to assign any of its rights, powers, duties and obligations as Co-Collateral Agent (other than to an Affiliate of the Co-Collateral Agent)

hereunder to any Person without the prior written consent of Borrower, the Required Lenders, and the Administrative Agent.

(g)    The Co-Collateral Agent may resign upon ten (10) days' notice of its resignation to the Lenders, Administrative Agent, and the Borrower.  If the Co-Collateral Agent is subject to an Agent Related Distress Event, the Requisite Lenders may remove such Co-Collateral Agent upon ten (10) days' notice. The Co-Collateral Agent that ceases to be a Lender shall cease to be a Co-Collateral Agent. If any rights or duties are expressly delegated to the Co-Collateral Agent at any time when there is no Co-Collateral Agent, such rights and duties shall, until such time as there is a Co-Collateral Agent, reside with the Administrative Agent.

SECTION 11.10    <u>Administrative Agent May File Proofs of Claim.</u>

In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or Letter of Credit Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, Letter of Credit Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Issuers and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Issuers and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the Issuers and the Administrative Agent under Sections 2.12, 12.3 and 12.4) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and each Issuer to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the Issuers, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due the Administrative Agent under Sections 2.12, 12.3 and 12.4.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or any Issuer any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or any Issuer to authorize the Administrative Agent to vote in respect of the claim of any Lender or any Issuer in any such proceeding.

SECTION 11.11    <u>Collateral and Guaranty Matters.</u>

159

Each of the Lenders (including in its capacities as a potential Cash Management Bank and a potential Hedge Bank) and the Issuers irrevocably authorizes the Administrative Agent and the Collateral Agent, and each of the Administrative Agent and the Collateral Agent agrees that it will:

(a)    automatically release any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than (x) obligations and liabilities under Secured Hedge Agreements, (y) Cash Management Obligations and (z) contingent indemnification obligations not yet accrued and payable) and the expiration or termination of all Letters of Credit (other than Letters of Credit as to which other arrangements reasonably satisfactory to the Administrative Agent and each applicable Issuer shall have been made), (ii) at the time the property subject to such Lien is transferred or to be transferred as part of or in connection with any transfer permitted hereunder or under any other Loan Document to any Person other than Holdings, the Borrower or any of its Domestic Subsidiaries that are Guarantors, (iii) subject to Section 12.1, if the release of such Lien is approved, authorized or ratified in writing by the Requisite Lenders, (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to clause (c) below or (v) if such property becomes Excluded Assets;

(b)    release or subordinate any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 9.1(i); and

(c)    release any Guarantor from its obligations under the Guaranty if (i) in the case of any Subsidiary, such Person ceases to be a Restricted Subsidiary as a result of a transaction or designation permitted hereunder or (ii) in the case of Holdings, as a result of a transaction permitted hereunder; provided that no such release shall occur if such Guarantor continues to be a guarantor in respect of any Junior Financing.

(d)    Upon request by the Administrative Agent or Collateral Agent at any time, the Requisite Lenders will confirm in writing the Administrative Agent's  and Collateral Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 11.11. In each case as specified in this Section 11.11, the applicable Agent will (and each Lender irrevocably authorizes the applicable Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 11.11.

Notwithstanding anything contained in any of the Loan Documents to the contrary, the Loan Parties, the Agents and each Lender hereby agree that (1) no Lender shall have any right individually to realize upon any of the Collateral under any Collateral Document or to enforce the Guarantee, it being understood and agreed that all powers, rights and remedies under the Collateral Documents and the Guarantee may be exercised solely by the Administrative Agent

acting as agent for and representative of Lenders in accordance with the terms thereof, and (2) in the event of a foreclosure by the Administrative Agent on any of the Collateral pursuant to a public or private sale or a sale under Section 363 of the Bankruptcy Code, the Administrative Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and the Administrative Agent, as agent for and representative of Lenders (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled (at the direction of the Required Lenders), for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Administrative Agent at such sale.

> SECTION 11.12   Appointment of Supplemental Administrative Agents.

(a)     It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction.  It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent deems that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, the Administrative Agent is hereby authorized to appoint an additional individual or institution selected by the Administrative Agent in its sole discretion as a separate trustee, co-trustee, administrative agent, collateral agent, administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individually as a "*Supplemental Administrative Agent*" and collectively as "*Supplemental Administrative Agents*").

(b)     In the event that the Administrative Agent appoints a Supplemental Administrative Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Administrative Agent to the extent, and only to the extent, necessary to enable such Supplemental Administrative Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Administrative Agent shall run to and be enforceable by either the Administrative Agent or such Supplemental Administrative Agent, and (ii) the provisions of this Article XI and of Sections 12.3 and 12.4 that refer to the Administrative Agent shall inure to the benefit of such Supplemental Administrative Agent and all references therein to the Administrative Agent shall be deemed to be references to the Administrative Agent and/or such Supplemental Administrative Agent, as the context may require.

(c)     Should any instrument in writing from any Loan Party be required by any Supplemental Administrative Agent so appointed by the Administrative Agent for more fully and

certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower or Holdings, as applicable, shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent.  In case any Supplemental Administrative Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Administrative Agent, to the extent permitted by Law, shall vest in and be exercised by the Administrative Agent until the appointment of a new Supplemental Administrative Agent.

SECTION 11.13    <u>Secured Cash Management Agreements and Secured Hedge Agreements</u>.

(a)    Except as otherwise expressly set forth herein or in any Guaranty or any Collateral Document, no Cash Management Bank or Hedge Bank that obtains the benefits of Section 10.3, any Guaranty or any Collateral by virtue of the provisions hereof or of any Guaranty or any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents.  Notwithstanding any other provision of this Article XI to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising under Secured Cash Management Agreements and Secured Hedge Agreements unless the Administrative Agent has received written notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Cash Management Bank or Hedge Bank, as the case may be.

(b)    Each Secured Party hereby agrees (i) that, after the occurrence and during the continuance of a Cash Dominion Period (and thereafter at such frequency as the Administrative Agent may reasonably request in writing), it will provide to the Administrative Agent, promptly upon the written request of the Administrative Agent, a summary of all Obligations owing to it under this Agreement and (ii) that the benefit of the provisions of the Loan Documents directly relating to the Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not an Agent, a Lender or an Issuer party hereto as long as, by accepting such benefits, such Secured Party agrees, as among Agent and all other Secured Parties, that such Secured Party is bound by (and, if requested by Agent, shall confirm such agreement in a writing in form and substance reasonably acceptable to Agent) this Article XI and Sections 3.1, Sections 12.4, 12.6, 12.19, 12.23 and 12.26, and the decisions and actions of any Agent and the Requisite Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders or other parties hereto as required herein) to the same extent a Lender is bound; provided, however, that, notwithstanding the foregoing clause (ii), (x) such Secured Party shall be bound by Sections 12.3, 12.4 and 12.5 only to the extent of liabilities, reimbursement obligations, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements with respect to or otherwise relating to the Liens and Collateral held for the benefit of such Secured Party, in which case the obligations of such Secured Party thereunder shall not be limited by any concept of pro rata share or similar concept, (y) each of Agents, the Lenders and the Issuers party hereto shall be entitled to act at its sole discretion, without regard

to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (z) such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any Loan Document.

SECTION 11.14    Indemnification of Agents.

Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand the Agents and each other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the any Agent) (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata, and hold harmless the Agents and each other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of any Agent) from and against any and all Indemnified Liabilities incurred by it; provided that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final judgment of a court of competent jurisdiction; provided that no action taken in accordance with the directions of the Requisite Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 11.14. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 11.14 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent and Collateral Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Administrative Agent or Collateral Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent or Collateral Agent is not reimbursed for such expenses by or on behalf of the Borrower, provided that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, provided further that the failure of any Lender to indemnify or reimburse the Administrative Agent or Collateral Agent shall not relieve any other Lender of its obligation in respect thereof. The undertaking in this Section 11.14 shall survive termination of the Aggregate Commitments, the payment of all other Obligations and the resignation of the Administrative Agent, the Collateral Agent, the Swing Loan Lender or any Issuer.

## ARTICLE XII

## MISCELLANEOUS

SECTION 12.1    Amendments, Etc.    Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom,

shall be effective unless in writing signed by the Requisite Lenders (other than with respect to any amendment or waiver contemplated in Sections 12.1(a) through (j) below, which shall only require the consent of the Lenders expressly set forth therein and not the Requisite Lenders) (or by the Administrative Agent with the consent of the Requisite Lenders) and the Borrower or the applicable Loan Party, as the case may be and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided that, no such amendment, waiver or consent shall:

(a)     extend or increase the Revolving Credit Commitment of any Lender without the written consent of each Lender directly and adversely affected thereby (it being understood that (i) a waiver of any condition precedent set forth in Section 4.2 and (ii) the waiver of any Default, mandatory prepayment or mandatory reduction of the Revolving Credit Commitments shall not constitute an extension or increase of any Revolving Credit Commitment of any Lender);

(b)     postpone any date scheduled for, or reduce the amount of, any payment of principal or interest under Section 2.6 or 2.10 without the written consent of each Lender directly and adversely affected thereby, it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest, and it further being understood that any change to the definition of "Average Revolving Loan Utilization" or, in each case, the component definitions thereof shall not constitute a reduction in any amount of interest.

(c)     reduce the principal of, or the rate of interest specified herein on, any Loan or Letter of Credit Borrowing, or (subject to clause (iii) of the second proviso to this Section 12.1) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly and adversely affected thereby (it being understood that any change to the definitions of "Excess Availability" or "Average Revolving Loan Utilization" or, in each case, the component definitions thereof shall not constitute a reduction in the rate of interest); provided that only the consent of the Requisite Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(d)     change any provision of this Section 12.1, Section 12.7 (in a manner that would alter the pro rata sharing of payments or setoffs required thereby), the definition of "Requisite Lenders", "Supermajority Lenders" or any other provision specifying the number of Lenders or portion of the Loans or Revolving Credit Commitments required to take any action under the Loan Documents, without the written consent of each Lender affected thereby;

(e)     other than in a transaction permitted under Section 9.4 or 9.5, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(f)     other than in a transaction permitted under Section 9.4 or 9.5, release all or substantially all of the aggregate value of the Guaranty, without the written consent of each Lender;

(g)    change the definition of the term "Borrowing Base" or any component definition thereof, but excluding the definition of "Eligible Accounts Advance Rate," "Credit Card Advance Rate," "In-Transit Advance Rate" or "Inventory Advance Rate", in each case the amendment or modifications of which shall be subject to clause (h) below, if as a result thereof the amounts available to be borrowed by the Borrower would be increased, without the written consent of the Supermajority Lenders, provided that the foregoing shall not limit the discretion of the Administrative Agent, the Co-Collateral Agent and the Collateral Agent to change, establish or eliminate any Availability Reserves, Inventory Reserves or Shrink Reserves without the consent of any Lenders;

(h)    increase the numerical percentage contained in Eligible Accounts Advance Rate, Credit Card Advance Rate, In-Transit Advance Rate or Inventory Advance Rate, without the written consent of each Lender (except as otherwise provided in such definitions as the Closing Date); *provided* that the foregoing shall not limit the discretion of the Administrative Agent, the Co-Collateral Agent and the Collateral Agent to change, establish or eliminate any Availability Reserves, Inventory Reserves or Shrink Reserves without the consent of any Lenders;

(i)    without the prior written consent of all Lenders directly affected thereby, (i) subordinate the Obligations hereunder to any other Indebtedness, or (ii) except as provided by operation of applicable Law, subordinate the Liens granted hereunder or under the other Loan Documents to any other Lien; or

(j)    change the order of the application of funds specified in Section 10.3 without the written consent of each Lender directly affected thereby;

and *provided, further*, that (i) no amendment, waiver or consent shall, unless in writing and signed by each Issuer in addition to the Lenders required above, affect the rights or duties of an Issuer under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it; (ii) no amendment, waiver or consent shall, unless in writing and signed by the Swing Loan Lender in addition to the Lenders required above, affect the rights or duties of the Swing Loan Lender under this Agreement; (iii) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent and Collateral Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent or Collateral Agent under this Agreement or any other Loan Document; (iv) Section 12.2(g) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification; (v) [reserved]; (vi) no amendment, waiver or consent shall, unless in writing and signed by the Collateral Agent and Co-Collateral Agent in addition to the Lenders required above and the Administrative Agent, affect the rights or duties of any Collateral Agent or Co-Collateral Agent under this Agreement; (vii) only the consent of the Borrower, the Administrative Agent, and Citizens shall be required to effect any amendment, waiver or consent under the Fee Letter, and (viii) only the consent of the Borrower, the Administrative Agent, the Co-Collateral Agent and the Collateral Agent shall be required to effect any amendment, waiver or consent under the Commitment Letter. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be

effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Revolving Credit Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

Notwithstanding anything to the contrary contained in this Section 12.1, guarantees, collateral security documents and related documents executed by Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent, the Collateral Agent and each Co-Collateral Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent, the Collateral Agent and each Co-Collateral Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

If the Administrative Agent, the Collateral Agent, each Co-Collateral Agent and the Borrower shall have jointly identified an obvious error (including, but not limited to, an incorrect cross-reference) or any error or omission of a technical or immaterial nature, in each case, in any provision of this Agreement or any other Loan Document (including, for the avoidance of doubt, any exhibit, schedule or other attachment to any Loan Document), then the Administrative Agent, the Collateral Agent and the Co-Collateral Agent (acting in its sole discretion) and the Borrower or any other relevant Loan Party shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Document. Notification of such amendment shall be made by the Administrative Agent to the Lenders promptly upon such amendment becoming effective.

Notwithstanding anything in this Section 12.1 to the contrary, technical and conforming modifications to the Loan Documents may be made with the consent of the Borrower and the Administrative Agent (and no other Person) to the extent necessary to (i) conform to the Orders and/or (ii) modify any other provision hereunder or under any other Loan Document in a manner more favorable to the then-existing Lenders, in each case in connection with the issuance or incurrence of any other Indebtedness permitted hereunder, where the terms of any such other Indebtedness are more favorable to the lenders thereof than the corresponding terms applicable to other Loans or Revolving Credit Commitments then existing hereunder, and it is intended that one or more then-existing Classes of Loans or Revolving Credit Commitments under this Agreement share in the benefit of such more favorable terms in order to comply with the provisions hereof relating to the incurrence of such other Indebtedness.

If any Lender does not consent to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender and that has been approved by the Requisite Lenders, the Borrower may replace such non-consenting Lender in accordance with Section 3.7; provided that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Borrower to be made pursuant to this paragraph).

SECTION 12.2    Successors and Assigns.

(a)    Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither Holdings nor the Borrower may, except as permitted by Section 9.4, assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section, or (iv) to an SPC in accordance with the provisions of subsection (g) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Agent-Related Persons of each of the Administrative Agent, the Issuers and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving Credit Commitment and the Loans (including for purposes of this subsection (b), participations in Letter of Credit Obligations and in Swing Loans) at the time owing to it); provided that any such assignment shall be subject to the following conditions:

     (i)    Minimum Amounts.

          (A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Revolving Credit Commitment and the Loans of any Class at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

          (B)    in any case not described in subsection (b)(i)(A) of this Section, the aggregate unused amount of the Revolving Credit Commitment (plus the principal outstanding balance of the Loans) or, if the Revolving Credit Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000 unless each of the Administrative Agent and, so long as no Event of Default, solely with respect to the Borrower, has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)    Proportionate Amounts.    Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Revolving Credit Commitment assigned, except that this clause (ii) shall not apply to rights in respect of the Swing Loan Lender's rights and obligations in respect of Swing Loans;

(iii)    Required Consents.    No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)    the consent of the Borrower (such consent not to be unreasonably withheld) shall be required unless (1) other than with respect to any proposed assignment to any Person that is a Disqualified Institution, an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender, or an Approved Fund; provided that, other than with respect to any proposed assignment to any Person that is a Disqualified Institution as shown on a list available to the assigning Lender prior to the execution of the Assignment and Assumption, the Borrower shall be deemed to have consented to any such assignment of the Loans unless it shall have objected thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof, or (3) such assignment will become effective 45 days after the Closing Date; and, or (4) in connection with the exercise of purchase rights under Section [5.07] of the DIP Intercreditor Agreement.

(B)    the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender;

(C)    the consent of the Issuers (such consent not to be unreasonably withheld or delayed) shall be required for any assignment that increases the obligation of the assignee to participate in exposure under one or more Letters of Credit (whether or not then outstanding); and

(D)    the consent of the Swing Loan Lender (such consent not to be unreasonably withheld or delayed) shall be required for any assignment;

(iv)    Assignment and Assumption.    The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; provided, however, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.    The Eligible Assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.    All assignments shall be by novation.

(v)    No Assignment to Certain Persons.    No such assignment shall be made (A) to Holdings, the Borrower or any of the Borrower's Affiliates or Subsidiaries, or (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a

Lender hereunder, would constitute any of the foregoing Persons described in this clause (B), (C) to a natural person or (D) to any Disqualified Institution; provided, that the Administrative Agent shall have no duties or responsibilities for monitoring or enforcing prohibitions on participations to Disqualified Institutions.

(vi)    Certain Additional Payments.  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Letters of Credit and Swing Loans in accordance with its Applicable Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to clause (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.1, 3.4, 3.5, 12.3, 12.4 and 12.5 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, and the surrender by the assigning Lender of its Revolving Credit Note, the Borrower (at its expense) shall execute and deliver a Revolving Credit Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

(c)    Register.  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the Administrative Agent's Office  a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Revolving Credit Commitments of, and principal amounts (and related interest amounts) of the Loans and Letter of Credit Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "*Register*").  The entries in the

Register shall be conclusive absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  In addition, the Administrative Agent shall maintain on the Register information regarding the designation, and revocation of designation, of any Lender as a Defaulting Lender.  The Register shall be available for inspection by the Borrower, any Agent or any Lender (but, only in the case of a Lender, at the Administrative Agent's Office and with respect to any entry relating to such Lender's Commitments, Loans and other Obligations), at any reasonable time and from time to time upon reasonable prior notice.  This Section 12.2(c) and Section 2.7 shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations).

(d)      Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person, a Disqualified Institution, a Defaulting Lender or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "*Participant*") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Revolving Credit Commitment and/or the Loans (including such Lender's participations in Letter of Credit Obligations and/or Swing Loans) owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such participation is recorded in the Participant Register and (iv) the Borrower, the Agents, the other Lenders and the Issuers shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any  provision of this Agreement or any other Loan Document; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 12.1 (other than clause (d) thereof) that directly affects such Participant.  Subject to subsection (e) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.1 (subject to the requirements of Sections 3.1(b), (c) or (d), as applicable), Section 3.4 and Section 3.5 (through the applicable Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section.  To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 12.6 as though it were a Lender; provided such Participant agrees to be subject to Section 12.7 as though it were a Lender.

(e)      Limitations upon Participant Rights.  The Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.1, 3.4 and 3.5 (subject to the requirements and limitations therein, including the requirements under Section 3.1(b), (c) or (d), as applicable, (it being understood that the documentation required under to Section 3.1(b), (c) or (d) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such

170

Participant (i) agrees to be subject to the provisions of Sections 3.1, 3.4, 3.5 and 3.7 as if it were an assignee under paragraph (b) of this Section; and (ii) shall not be entitled to receive any greater payment under Section 3.1, 3.4 or 3.5 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation or the sale of the participation to such Participant is made with the Borrower's prior written consent. Each Lender that sells a participation shall (acting solely for this purpose as a non-fiduciary agent of the Borrower) maintain a register complying with the requirements of Sections 163(f), 871(h) and 881(c)(2) of the Code and the Treasury regulations issued thereunder relating to the exemption from withholding for portfolio interest on which is entered the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "*Participant Register*"). A Lender shall not be obligated to disclose the Participant Register to any Person except to the extent such disclosure is necessary to establish that any Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury regulations or is otherwise required thereunder. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. The portion of any Participant Register relating to any Participant or SPC requesting payment from the Borrower or seeking to exercise its rights under Section 12.9 shall be available for inspection by the Borrower upon reasonable request to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations or is otherwise required thereunder.

(f)    Any Lender may, at any time, pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Revolving Credit Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    Notwithstanding anything to the contrary contained herein, any Lender (a "*Granting Lender*") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "*SPC*") the option to provide all or any part of any Revolving Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to fund any Revolving Loan, (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Revolving Loan, the Granting Lender shall be obligated to make such Revolving Loan pursuant to the terms hereof or, if it fails to do so, to make such payment to the Administrative Agent as is required under Section 2.13(e) and (iii) such SPC and the applicable Loan or any applicable part thereof, shall be appropriately reflected in the Participant Register. Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Sections 3.1, 3.4 and 3.5), (ii) no SPC shall be liable

171

for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder.  The making of a Revolving Loan by an SPC hereunder shall utilize the Revolving Credit Commitment of the Granting Lender to the same extent, and as if, such Revolving Loan were made by such Granting Lender.  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior debt of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceeding under the laws of the United States or any State thereof. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500 (which processing fee may be waived by the Administrative Agent in its sole discretion), assign all or any portion of its right to receive payment with respect to any Revolving Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Revolving Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

(h)     Resignation as Issuer or Swing Loan Lender.  Notwithstanding anything to the contrary contained herein, any Issuer may resign as Issuer at any time by giving 30 days' prior notice to the Administrative Agent, the Lenders and the Borrower, and any Swing Loan Lender may resign as Swing Loan Lender at any time by giving 30 days' prior notice to the Administrative Agent, the Lenders and the Borrower.  In the event of any such resignation as Issuer or Swing Loan Lender, the Borrower shall be entitled to appoint from among the Lenders a successor Issuer or Swing Loan Lender hereunder; provided, however, that no failure by the Borrower to appoint any such successor shall affect the resignation of Barclays or the applicable Issuer as Issuer or (as applicable) Swing Loan Lender, as the case may be.  If Barclays or the applicable Issuer resigns as Issuer, it shall retain all the rights, powers, privileges and duties of an Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as Issuer and all Letter of Credit Obligations with respect thereto (including the right to require the Lenders to make Base Rate Loans or fund risk participations in unreimbursed amounts under Letters of Credit pursuant to Section 2.4).  If Barclays resigns as Swing Loan Lender, it shall retain all the rights of the Swing Loan Lender provided for hereunder with respect to Swing Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Lenders to make Base Rate Loans or fund risk participations in outstanding Swing Loans pursuant to Section 2.3.  Upon the appointment of a successor Issuer and/or Swing Loan Lender, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuer or Swing Loan Lender, as the case may be, and (b) the successor Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to Barclays or the applicable Issuer to effectively assume the obligations of Barclays or the applicable Issuer with respect to such Letters of Credit.

SECTION 12.3     <u>Attorney Costs and Expenses</u>.

The Borrower agrees (a) to pay or reimburse the Administrative Agent, the Co-Collateral Agent, the Collateral Agent and the Arrangers for all reasonable and documented or invoiced out-of-pocket costs and expenses (including Attorney Costs subject to the limitations set forth below) incurred in connection with the preparation, negotiation, syndication and execution of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all Attorney Costs of Paul Hastings LLP, all Attorney Costs of Morgan, Lewis & Bockius LLP (subject to a cap of $90,000 for Attorney Costs of Morgan, Lewis & Bockius LLP prior to the Closing Date and a cap of $50,000 for Attorney Costs of Morgan, Lewis & Bockius LLP after the Closing Date unless otherwise agreed in writing by the Borrower) and, if reasonably necessary, one local counsel in each relevant jurisdiction material to the interests of the Lenders taken as a whole, and, solely in the case of a conflict of interest, additional counsel in each relevant jurisdiction for group members who are similarly situated, and (b) to pay or reimburse the Administrative Agent, the Collateral Agent, the Co-Collateral Agent, the Issuers and the Lenders for all of their reasonable and documented or invoiced out-of-pocket costs and expenses   (including Attorney Costs subject to the limitations set forth below) incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including (i) all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all Attorney Costs of Paul Hastings LLP  and Richards, Layton & Finger (and, one local counsel as designated by the Administrative Agent to act in any relevant material jurisdiction and, in the event of any conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Lenders similarly situated taken as a whole) and (ii) all such costs and expenses of Berkeley Research Group, LLC or replacements if conflicted)).  The agreements in this Section 12.3 shall survive the termination of the Aggregate Commitments and repayment of all other Obligations.  All amounts due under this Section 12.3 shall be paid within the later of (x) thirty (30) days following receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail or (y) the approval of the Bankruptcy Court of the fee application for the payment of such expenses; provided that, with respect to the Closing Date, all amounts due under this Section 12.3 shall be paid on the Closing Date solely to the extent invoiced to the Borrower within one (1) Business Day prior to the Closing Date.  If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its sole discretion.  The Borrower and each other Loan Party hereby acknowledge that the Administrative Agent, Collateral Agent, and Co-Collateral Agent, any Issuer and/or any Lender may receive a benefit, including a discount, credit or other accommodation, from any of such counsel based on the fees such counsel may receive on account of their relationship with the Administrative Agent, Collateral Agent, Co-Collateral Agent, such Issuer and/or such Lender, including fees paid pursuant to this Agreement or any other Loan Document.  This Section 12.3 shall not apply to Indemnified Taxes, or amounts excluded from the definition of Indemnified Taxes pursuant to clauses (i) through (v) of the first sentence of Section 3.1(a), that are imposed with respect to payments to or for the account of any Agent or any Lender under any Loan Document, which shall be governed by Section 3.1.  This Section 12.3 also shall not apply to Other Taxes or to taxes covered by Section 3.4.

SECTION 12.4    Indemnification by the Borrower.

The Borrower shall indemnify and hold harmless the Agents, each Lender, each Issuer, each Arranger and their respective Affiliates and such Persons' and their Affiliates' respective directors, officers, employees, agents, partners, trustees or advisors and other representatives (collectively the "*Indemnitees*") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including Attorney Costs) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (but limited, in the case of legal fees and expenses, to the reasonable and documented or invoiced out-of-pocket fees, disbursements and other charges of one counsel to all Indemnitees taken as a whole and, a single local counsel for all Indemnitees taken as a whole in each relevant jurisdiction that is material to the interest of the Lenders, and solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Indemnitees similarly situated taken as a whole) (i) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (ii) any Revolving Credit Commitment, Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by an Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), or (iii) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned or operated by the Borrower, any Subsidiary or any other Loan Party, or any Environmental Liabilities arising out of the activities or operations of the Borrower, any Subsidiary or any other Loan Party, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee or a Loan Party is a party thereto (all the foregoing, collectively, the "*Indemnified Liabilities*"); provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or of any Related Indemnified Person, as determined by a final, non-appealable judgment of a court of competent jurisdiction, (y) a material breach of any obligations under any Loan Document by such Indemnitee or of any Related Indemnified Person, in each case as determined by a final, non-appealable judgment of a court of competent jurisdiction or (z) any dispute solely among Indemnitees other than any claims against an Indemnitee in its capacity or in fulfilling its role as an administrative agent, collateral agent, co-collateral agent, or arranger or any similar role under any Class of Loans and other than any claims arising out of any act or omission of the Borrower or any of its Affiliates.  To the extent that the undertakings to indemnify and hold harmless set forth in this Section 12.4 may be unenforceable in whole or in part because they are violative of any applicable law or public policy, the Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them.  No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection

174

with this Agreement (except for direct (as opposed to indirect, special, punitive or consequential) damages resulting from the gross negligence, bad faith or willful misconduct, as determined by a court of competent jurisdiction in a final and non-appealable judgment, of any such Indemnitee), nor shall any Indemnitee or any Loan Party have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (other than, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party).   In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 12.4 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents is consummated.   All amounts due under this Section 12.4 shall be paid within the later of (x) twenty (20) Business Days after written demand therefor (together with reasonably detailed backup documentation supporting such reimbursement request) and (y) the approval of the payment thereof by the Bankruptcy Court; provided, however, that such Indemnitee shall promptly refund such amount to the extent that it is determined by a final, non-appealable judgment of a court of competent jurisdiction that such Indemnitee was not entitled to indemnification rights with respect to such payment pursuant to the express terms of this Section 12.4.   The agreements in this Section 12.4 shall survive the resignation of the Administrative Agent, the Collateral Agent, any Co-Collateral Agent, the Swing Loan Lender or any Issuer, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.  This Section 12.4 shall not apply to Indemnified Taxes, or amounts excluded from the definition of Indemnified Taxes pursuant to clauses (i) through (v) of the first sentence of Section 3.1(a), that are imposed with respect to payments to or for account of any Agent or any Lender under any Loan Document, which shall be governed by Section 3.1.  This Section 12.5 also shall not apply to Other Taxes or to taxes covered by Section 3.4.

SECTION 12.5       **[Reserved]**.

SECTION 12.6       Right of Setoff.

Notwithstanding anything to the contrary in Section 362 of the Bankruptcy Code but subject to the Orders, if an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent,   to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the obligations of the Borrower or such other Loan Party (other than, with respect to any Guarantor, Excluded Swap Obligations of such Guarantor) now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness;  provided that in the

LEGAL_US_W # 95739072.21

event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.16 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

SECTION 12.7    Sharing of Payments.

If, other than as expressly provided elsewhere herein, any Lender shall obtain payment in respect of any principal of or interest on account of the Loans made by it, or the participations in Letter of Credit Obligations and Swing Loans held by it (in each case, whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them and/or such subparticipations in the participations in Letter of Credit Obligations or Swing Loans held by them, as the case may be, as shall be necessary to cause such purchasing Lender to share the excess payment of principal of or interest on such Loans or such participations, as the case may be, pro rata with each of them; provided that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 12.15 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon.  The provisions of this Section shall not be construed to apply to the application of Cash Collateral provided for in Sections 10.3 and 10.5.  For avoidance of doubt, the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement as in effect from time to time or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant permitted hereunder.  The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of set-off, but subject to Section 12.6) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.  The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 12.7 and will in each case notify the Lenders following any such purchases or repayments.  Each Lender that purchases a participation pursuant to this Section 12.7 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under

this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

SECTION 12.8    Notices and Other Communications; Facsimile Copies.

(a)    General.    Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to Holdings, the Borrower, the Administrative Agent (which address shall also be used for Collateral Agent), Citizens Bank, N.A., as a Co-Collateral Agent, an Issuer or the Swing Loan Lender, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 12.8;

(ii)    if to any other Co-Collateral Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person in the agreement pursuant to which such person is appointed as a Co-Collateral Agent and

(iii)    if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).    Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)    Electronic Communications.    Notices and other communications to the Lenders and the Issuers hereunder may be delivered or furnished by electronic communication (including e mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender or Issuer pursuant to Article II if such Lender or Issuer, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.    The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

(c)    Receipt.    Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the

177

recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(d)    The Platform.    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall any Agent or any of its Agent-Related Persons or any Arranger (collectively, the "*Agent Parties*") have any liability to Holdings, the Borrower, any Lender, any Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to Holdings, the Borrower, any Lender, any Issuer or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(e)    Change of Address.    Each of Holdings, the Borrower, the Administrative Agent, the Collateral Agent, each Co-Collateral Agent, each Issuer and the Swing Loan Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower, the Administrative Agent, each Issuer and the Swing Loan Lender.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

(f)    Reliance by Administrative Agent, Issuers and Lenders.  The Administrative Agent, the Issuers and the Lenders shall be entitled to rely and act upon any notices (including telephonic Notices of Borrowing or Swing Loan Requests) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent, each Issuer, each Lender and the Agent-Related Persons of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in the absence of gross negligence, willful misconduct or bad faith of such Person, as determined by a final non-appealable judgment of a court of competent jurisdiction.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

SECTION 12.9    No Waiver; Cumulative Remedies.

No failure by any Lender, the Administrative Agent, Collateral Agent, or the Co-Collateral Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

SECTION 12.10    Judgment Currency.  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.  The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "*Judgment Currency*") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "*Agreement Currency*"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss.  If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable Law).

179

SECTION 12.11    Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrower, Holdings and the Administrative Agent and the Administrative Agent shall have been notified by each Lender, Swing Loan Lender and each Issuer that each such Lender, Swing Loan Lender and Issuer has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, Holdings, each Agent and each Lender and their respective successors and assigns.

SECTION 12.12    **[Reserved]**.

SECTION 12.13    Governing Law; Submission to Jurisdiction; Service of Process.

(a)    THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND THE BANKRUPTCY CODE, AS APPLICABLE.

(b)    THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT, COLLATERAL AGENT, EACH CO-COLLATERAL AGENT, AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, AND, TO THE EXTENT THE BANKRUPTCY COURT DECLINES OR IS OTHERWISE UNABLE TO EXERCISE JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  EACH PARTY HERETO AGREES THAT THE AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE LOAN DOCUMENTS OR IN THE EXERCISE OF ANY RIGHTS UNDER ANY COLLATERAL DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT. NOTHING CONTAINED HEREIN SHALL BE DEEMED TO CONSTITUTE A LENDER'S CONSENT TO JURISDICTION OF THE BANKRUPTCY COURT FOR ANY PURPOSES OTHER THAN THE ENFORCEMENT OF THIS AGREEMENT AND THE ORDERS. NOTHING CONTAINED HEREIN SHALL BE DEEMED CONSENT TO JURISDICTION BEFORE ANY BANKRUPTCY COURT IN THE CASES.

(c)    THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT, COLLATERAL AGENT, EACH CO-COLLATERAL AGENT, AND EACH LENDER EACH

180

IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (b) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)     EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 12.8.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

SECTION 12.14     Waiver of Jury Trial.

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 12.15     Marshaling; Payments Set Aside.

None of the Administrative Agent, the Collateral Agent, any Lender or any Issuer shall be under any obligation to marshal any assets in favor of the Loan Parties or any other party or against or in payment of any or all of the Obligations.  To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of set-off, and such payment or the proceeds of such set-off or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such set-off had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of

181

such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

SECTION 12.16    **[Reserved]**.

SECTION 12.17    Counterparts; Integration; Effectiveness.

This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. The Credit Agreement became effective on the Closing Date. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 12.18    Electronic Execution of Assignments and Certain Other Documents.

Delivery by telecopier, .pdf, or other electronic imaging means of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 12.19    Confidentiality.

Each of the Administrative Agent, the Collateral Agent, each Co-Collateral Agent, the Lenders and the Issuers agrees to maintain the confidentiality of the Information in accordance with its customary procedures (as set forth below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, advisors, service providers, and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, provided that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (other than at the request of a regulatory authority) unless such notification is prohibited by law, rule or

regulation, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions at least as restrictive as those of this Section 12.19, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement (including any Relevant Participant) or (ii) any actual or prospective direct or indirect counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower; (h) to any rating agency when required by it on a customary basis and after consultation with the Borrower (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Loan Parties received by it from such Lender); or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent, any Issuer, any Lender, or any of their respective Affiliates on a nonconfidential basis from a source other than Holdings, the Borrower or any Subsidiary thereof, and which source is not known by such Agent or Lender to be subject to a confidentiality restriction in respect thereof in favor of the Borrower or any Affiliate of the Borrower.

For purposes of this Section, "Information" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary thereof or their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by any Loan Party or any Subsidiary thereof other than as a result of a breach of this Section 12.19, it being understood that all information received from Holdings, the Borrower or any Subsidiary after the Closing Date shall be deemed confidential unless such information is clearly identified at the time of delivery as not being confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so in accordance with its customary procedures if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent, the Collateral Agent, each Co-Collateral Agent, and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

SECTION 12.20    Use of Name, Logo, Etc.

Except in connection with the Cases, each Loan Party consents to the publication in the ordinary course by Administrative Agent or any Arranger of customary advertising material relating to the financing transactions contemplated by this Agreement using such Loan Party's name, product photographs, logo or trademark.  Such consent shall remain effective until revoked by such Loan Party in writing to the Administrative Agent and the Arranger.

SECTION 12.21    USA PATRIOT Act Notice.

LEGAL_US_W # 95739072.21

Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act.  The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

SECTION 12.22    [**Reserved**].

SECTION 12.23    <u>No Advisory or Fiduciary Responsibility</u>.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Borrower and Holdings  acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Agents and any Arranger are arm's-length commercial transactions between the Borrower, Holdings and their respective Affiliates, on the one hand, and the Agents and any Arranger, on the other hand, (B) each of the Borrower and Holdings has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Borrower and Holdings is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Agents, the Arrangers and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, Holdings or any of their respective Affiliates, or any other Person and (B) none of the Agents, the Arrangers, or any Lender has any obligation to the Borrower, Holdings or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents, the Arrangers, the Lender and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, Holdings their respective Affiliates, and none of the Agents, the Arrangers, or any Lender has any obligation to disclose any of such interests to the Borrower, Holdings or any of their respective Affiliates.  To the fullest extent permitted by law, each of the Borrower and Holdings hereby waives and releases any claims that it may have against the Agents, the Arrangers or any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 12.24    <u>Severability</u>.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Without limiting the

LEGAL_US_W # 95739072.21

foregoing provisions of this Section 12.24, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, the applicable Issuer or the Swing Loan Lender, as applicable, then such provisions shall be deemed to be in effect only to the extent not so limited.

SECTION 12.25    <u>Survival of Representations and Warranties</u>.    All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Agents, each Issuer and each Lender, regardless of any investigation made by the Agents, any Issuer or any Lender or on their behalf and notwithstanding that any Agent, any Issuer or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations under Secured Hedge Agreements and Cash Management Obligations).

SECTION 12.26    <u>Lender Action</u>.    Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under any of the Loan Documents or the Secured Hedge Agreements (including the exercise of any right of set-off, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Administrative Agent (which shall not be withheld in contravention of Section 11.4). The provision of this Section 12.26 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

SECTION 12.27    <u>Interest Rate Limitation</u>.    Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non usurious interest permitted by applicable Law (the "*Maximum Rate*"). If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

SECTION 12.28    **[Reserved]**.

SECTION 12.29    <u>Contractual Recognition of Bail-In</u>.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto

acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; and

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]**

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**MATTRESS FIRM, INC.**, as Borrower


By:_____
　　Name:_____
　　Title:_____


**MATTRESS HOLDING CORP.**, as Holdings,


By:_____
　　Name:_____
　　Title:_____

**BARCLAYS BANK PLC**, as Administrative Agent, Swing Loan Lender, Issuer and a Lender,

By:_____

    Name:_____

    Title:_____

**<u>LENDERS</u>**

[_____]

—————————————

$100,000,000
SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
TERM LOAN CREDIT AGREEMENT

Dated as of [  ], 2018

among

MATTRESS FIRM, INC.,
as the Borrower,


MATTRESS HOLDING CORP.,
as Holdings,


BARCLAYS BANK PLC,
as Administrative Agent and Collateral Agent

and

THE OTHER LENDERS PARTY HERETO

—————————————

BARCLAYS BANK PLC
as Sole Book Runner and Sole Lead Arranger

**ARTICLE I** DEFINITIONS, INTERPRETATION AND ACCOUNTING TERMS ...................1

SECTION 1.1    Defined Terms......................................................................1

SECTION 1.2    Other Interpretive Provisions ................................................39

SECTION 1.3    Accounting Terms ................................................................40

SECTION 1.4    Rounding..............................................................................40

SECTION 1.5    [Reserved] ............................................................................40

SECTION 1.6    References to Agreements, Laws, Etc....................................40

SECTION 1.7    Times of Day........................................................................41

SECTION 1.8    Timing of Payment of Performance ......................................41

SECTION 1.9    Pro Forma Calculations ........................................................41

SECTION 1.10   Currency Equivalents Generally ...........................................42

SECTION 1.11   Schedules .............................................................................42

SECTION 1.12   .  All schedules attached hereto or to any other Loan Documents shall be deemed to incorporate by reference all information disclosed in the Orders, the Chapter 11 Plan and the Disclosure Statement, in each case as of the Petition Date, in the form delivered to the Administrative Agent and the Collateral Agent prior to date of the Commitment Letters, which Orders, the Chapter 11 Plan and the Disclosure Statement, shall have been modified or amended without the consent of the Administrative Agent and the Collateral Agent in their sole discretion. ..............................................................................42

**ARTICLE II** THE FACILITY .......................................................................42

SECTION 2.1    The Loans.............................................................................42

SECTION 2.2    Borrowing Procedure ...........................................................42

SECTION 2.3    [Reserved]. ...........................................................................44

SECTION 2.4    [Reserved]. ...........................................................................44

SECTION 2.5    Termination of the Term Loan Commitments .......................44

SECTION 2.6    Repayment of Loans .............................................................44

SECTION 2.7    Evidence of Indebtedness......................................................44

SECTION 2.8      Optional Prepayments. .......................................................................45

SECTION 2.9      Mandatory Prepayments.......................................................................45

SECTION 2.10     Interest. ................................................................................................45

SECTION 2.11     Conversion/Continuation Option. ........................................................46

SECTION 2.12     Fees ......................................................................................................47

SECTION 2.13     Payments and Computations. ..............................................................47

SECTION 2.14     Special Provisions Governing Eurocurrency Rate Loans. ...................48

SECTION 2.15     [Reserved]. ...........................................................................................49

SECTION 2.16     [Reserved]. ...........................................................................................49

SECTION 2.17     Certain Bankruptcy Matters .................................................................49

**ARTICLE III** TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY ...............51

SECTION 3.1      Taxes. ...................................................................................................51

SECTION 3.2      Illegality ...............................................................................................57

SECTION 3.3      Inability to Determine Rates ................................................................57

SECTION 3.4      Increased Cost and Reduced Return; Capital Adequacy......................58

SECTION 3.5      Funding Losses ....................................................................................59

SECTION 3.6      Matters Applicable to All Requests for Compensation. ......................60

SECTION 3.7      Replacement of Lenders under Certain Circumstances. ......................60

SECTION 3.8      Survival ................................................................................................62

**ARTICLE IV** CONDITIONS PRECEDENT ........................................................................62

SECTION 4.1      Conditions Precedent to Closing Date .................................................62

**ARTICLE V** REPRESENTATIONS AND WARRANTIES ......................................................65

SECTION 5.1      Existence, Qualification and Power; Compliance with Laws ...............65

SECTION 5.2      Authorization; No Contravention..........................................................66

SECTION 5.3      Governmental Authorization.................................................................66

2

SECTION 5.4     Binding Effect ........................................................................66

SECTION 5.5     No Material Adverse Effect ...................................................67

SECTION 5.6     Litigation ...............................................................................67

SECTION 5.7     Labor Matters ........................................................................67

SECTION 5.8     Ownership of Property; Liens ...............................................67

SECTION 5.9     Environmental Matters ..........................................................67

SECTION 5.10    Taxes .....................................................................................67

SECTION 5.11    ERISA Compliance ...............................................................68

SECTION 5.12    Subsidiaries ...........................................................................68

SECTION 5.13    Margin Regulations; Investment Company Act.....................68

SECTION 5.14    Disclosure..............................................................................68

SECTION 5.15    Intellectual Property; Licenses, Etc.......................................69

SECTION 5.16    Budget ...................................................................................69

SECTION 5.17    [Reserved] .............................................................................69

SECTION 5.18    USA PATRIOT Act; OFAC; FCPA ......................................69

SECTION 5.19    Collateral Documents............................................................70

SECTION 5.20    Orders....................................................................................70

**ARTICLE VI** FINANCIAL COVENANTS .......................................................70

SECTION 6.1     Minimum Excess Availability................................................70

**ARTICLE VII** REPORTING COVENANTS.....................................................71

SECTION 7.1     Financial Statements, Etc ......................................................71

SECTION 7.2     Certificates; Other Information ..............................................73

SECTION 7.3     Notices...................................................................................75

**ARTICLE VIII** AFFIRMATIVE COVENANTS................................................75

SECTION 8.1     Preservation of Existence, Etc...............................................76

3

SECTION 8.2    Compliance with Laws, Etc ...................................................76

SECTION 8.3    [Reserved]. ..............................................................................76

SECTION 8.4    Payment of Taxes, Etc............................................................76

SECTION 8.5    Maintenance of Insurance ......................................................76

SECTION 8.6    Inspection Rights.....................................................................76

SECTION 8.7    Books and Records...................................................................77

SECTION 8.8    Maintenance of Properties......................................................77

SECTION 8.9    Use of Proceeds .......................................................................77

SECTION 8.10   Compliance with Environmental Laws ..................................78

SECTION 8.11   Covenant to Guarantee Obligations and Give Security ........78

SECTION 8.12   Cash Receipts ..........................................................................79

SECTION 8.13   Further Assurances and Post-Closing Covenants. ................80

SECTION 8.14   [Reserved]. ..............................................................................80

SECTION 8.15   Additional Information and Bankruptcy-Related Obligations..............80

SECTION 8.16   Milestones. ...............................................................................81

SECTION 8.17   Performance Within Budget....................................................82

**ARTICLE IX** NEGATIVE COVENANTS ...................................................................83

SECTION 9.1    Liens...........................................................................................83

SECTION 9.2    Investments ...............................................................................87

SECTION 9.3    Indebtedness..............................................................................88

SECTION 9.4    Fundamental Changes ..............................................................92

SECTION 9.5    Dispositions...............................................................................92

SECTION 9.6    Restricted Payments .................................................................94

SECTION 9.7    Change in Nature of Business ..................................................95

SECTION 9.8    Transactions with Affiliates ....................................................96

4

SECTION 9.9    Burdensome Agreements ........................................................97

SECTION 9.10    [Reserved]. ..............................................................................98

SECTION 9.11    Accounting Changes ................................................................98

SECTION 9.12    Prepayments, Etc .....................................................................98

SECTION 9.13    Holdings ...................................................................................98

SECTION 9.14    Intra-Group Debt Restricted Payments ...................................99

SECTION 9.15    New Stores ...............................................................................99

SECTION 9.16    Chapter 11 Claims ...................................................................99

SECTION 9.17    Compliance with Budget ..........................................................99

SECTION 9.18    Use of Collateral ...................................................................100

SECTION 9.19    Bankruptcy Related Negative Covenants ..............................101

**ARTICLE X** EVENTS OF DEFAULT AND REMEDIES .....................................102

SECTION 10.1    Events of Default....................................................................102

SECTION 10.2    Remedies upon Event of Default ...........................................107

SECTION 10.3    Application of Funds...............................................................107

**ARTICLE XI** THE ADMINISTRATIVE AGENT AND OTHER AGENTS .........................109

SECTION 11.1    Appointment and Authority of the Administrative Agent and Collateral Agent..................................................................109

SECTION 11.2    Rights as a Lender .................................................................110

SECTION 11.3    Exculpatory Provisions ..........................................................110

SECTION 11.4    Reliance by the Agents...........................................................111

SECTION 11.5    Delegation of Duties ..............................................................112

SECTION 11.6    Resignation of Administrative Agent or Collateral Agent.................112

SECTION 11.7    Non-Reliance on Administrative Agent and Other Lenders; Disclosure of Information by Agents ..................................113

SECTION 11.8    No Other Duties; Other Agents, Arrangers, Etc .................114

5

SECTION 11.9    [Reserved]. ............................................................................114

SECTION 11.10  Administrative Agent May File Proofs of Claim ...............................114

SECTION 11.11  Collateral and Guaranty Matters .........................................................115

SECTION 11.12  Appointment of Supplemental Administrative Agents. ....................116

SECTION 11.13  [Reserved] ...............................................................................117

SECTION 11.14  Indemnification of Agents ..................................................................117

**ARTICLE XII** MISCELLANEOUS ................................................................................118

SECTION 12.1    Amendments, Etc .............................................................................118

SECTION 12.2    Successors and Assigns ....................................................................120

SECTION 12.3    Attorney Costs and Expenses ...........................................................124

SECTION 12.4    Indemnification by the Borrower .......................................................125

SECTION 12.5    [Reserved]. ............................................................................127

SECTION 12.6    Right of Setoff ....................................................................................127

SECTION 12.7    Sharing of Payments .........................................................................127

SECTION 12.8    Notices and Other Communications; Facsimile Copies.....................128

SECTION 12.9    No Waiver; Cumulative Remedies.....................................................130

SECTION 12.10  Judgment Currency ............................................................................130

SECTION 12.11  Binding Effect ....................................................................................131

SECTION 12.12  [Reserved]. ............................................................................131

SECTION 12.13  Governing Law; Submission to Jurisdiction; Service of Process. ......131

SECTION 12.14  Waiver of Jury Trial ...........................................................................132

SECTION 12.15  Marshaling; Payments Set Aside .......................................................132

SECTION 12.16  [Reserved]. ............................................................................133

SECTION 12.17  Counterparts; Integration; Effectiveness ............................................133

SECTION 12.18  Electronic Execution of Assignments and Certain Other Documents 133

LEGAL_US_W # 95883172.13

SECTION 12.19  Confidentiality ............................................................................. 133

SECTION 12.20  Use of Name, Logo, Etc ............................................................... 134

SECTION 12.21  USA PATRIOT Act Notice ........................................................... 135

SECTION 12.22  [Reserved]. .................................................................................. 135

SECTION 12.23  No Advisory or Fiduciary Responsibility ..................................... 135

SECTION 12.24  Severability ................................................................................. 135

SECTION 12.25  Survival of Representations and Warranties ................................. 136

SECTION 12.26  Lender Action .............................................................................. 136

SECTION 12.27  Interest Rate Limitation ............................................................... 136

SECTION 12.28  [Reserved]. .................................................................................. 136

SECTION 12.29  Contractual Recognition of Bail-In ............................................. 136

LEGAL_US_W # 95883172.13

## SCHEDULES

| | | |
|---|---|---|
| Schedule I | - | Term Loan Commitments |
| Schedule II | - | Guarantors |
| Schedule 1.1E | - | Credit Card Agreements |
| Schedule 5.16 | - | Budget |
| Schedule 8.12 | - | Deposit Accounts |
| Schedule 8.13 (b) | - | Post-Closing Matters |
| Schedule 12.8 | - | Administrative Agent's Office, Certain Addresses for Notices |

EXHIBITS

Exhibit A      -      Form of Assignment and Assumption
Exhibit B      -      Form of Note
Exhibit C      -      Form of Notice of Borrowing
Exhibit D      -      [Reserved]
Exhibit E      -      [Reserved]
Exhibit F      -      Form of Notice of Conversion or Continuation
Exhibit G      -      Form of Guaranty
Exhibit H      -      Form of Security Agreement
Exhibit I      -      [Reserved]
Exhibit J      -      [Reserved]
Exhibit K      -      Intercompany Subordination Agreement
Exhibit L      -      [Reserved]
Exhibit M      -      [Reserved]
Exhibit N      -      Forms of Non-Bank Certificates
Exhibit O      -      Form of Compliance Certificate
Exhibit P      -      [Reserved]
Exhibit Q      -      Form of Customs Broker Agreement
Exhibit R      -      Form of Interim Order

This SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT ("***Agreement***") is entered into as of [    ], 2018, among MATTRESS FIRM, INC., a Delaware corporation (the "***Borrower***"), MATTRESS HOLDING CORP., a Delaware corporation ("***Holdings***"), BARCLAYS BANK PLC, as administrative agent (in such capacity, including any successor thereto, the "***Administrative Agent***") and as collateral agent (in such capacity, including any successor thereto, the "***Collateral Agent***") under the Loan Documents and each lender from time to time party hereto (collectively, the "***Lenders***" and individually, a "***Lender***").

## PRELIMINARY STATEMENTS

The Borrower has entered into an ABL DIP Credit Agreement, dated as of December 22, 2017 (as amended and in effect prior to the date hereof, the "***Pre-Petition Credit Agreement***"), among the Borrower, Holdings, Barclays Bank PLC, as administrative agent and as collateral agent, Citizens Bank, N.A., as co-collateral agent, and each lender from time to time party thereto.

On October 4, 2018, (the "***Petition Date***"), each of the Loan Parties (collectively, the "***Debtors***") filed a voluntary petition for relief (collectively, the "***Cases***") under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"). The Debtors are continuing in the possession of their assets and continuing to operate their respective businesses and manage their respective properties as debtors and debtors in possession under Section 1107(a) and 1108 of the Bankruptcy Code;

On the Petition Date, the Loan Parties filed a Disclosure Statement (as defined below) and the Chapter 11 Plan (as defined below) with the Bankruptcy Court; and

The Debtors have requested that the Lenders make available to the Borrower, [on the date] of entry of the Interim Order, a senior secured super-priority debtor-in-possession term loan credit facility in an aggregate principal amount at any time outstanding not to exceed $100,000,000 on the terms and conditions set forth in this Agreement to, among other things, fund financial needs of the Debtors during the pendency of the Cases, which shall be secured by a second priority lien on the Collateral (as defined below). Concurrently therewith, the Debtors will also obtain a new $150,000,000 senior secured debtor-in-possession asset based revolving facility secured by a first priority lien on the Collateral pursuant to the DIP ABL Loan Agreement (as defined below) (the "***ABL DIP Facility***");

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I

## DEFINITIONS, INTERPRETATION AND ACCOUNTING TERMS

SECTION 1.1 <u>Defined Terms</u>.

As used in this Agreement, the following terms have the following meanings:

"*ABL DIP Agent*" means Barclays Bank PLC, in its capacity as administrative agent and collateral agent in respect of the ABL DIP Credit Agreement, together with its successors and assigns in such capacity.

"*ABL DIP Credit Agreement*" means that certain Senior Secured Super-Priority Debtor-In-Possession ABL DIP Credit Agreement dated as of October [•], 2018 among the Borrower, the lenders party thereto, Barclays Bank PLC, as administrative agent and collateral agent, and the other parties thereto, as amended and in effect from time to time in accordance with the terms of the DIP Intercreditor Agreement or any Order and any refinancing or replacement thereof in whole or in part (in accordance with the terms of the DIP Intercreditor Agreement and the Orders).

"*ABL DIP Facility*" has the meaning specified in the recitals to this Agreement.

"*ABL DIP Loan Documents*" means the ABL DIP Credit Agreement and the other "*Loan Documents*" as defined in the ABL DIP Credit Agreement, as each such document may be amended, restated, supplemented or otherwise modified.

"*Account*" has the meaning given to such term in Article 9 of the UCC.

"*Account Debtor*" has the meaning given to such term in Article 9 of the UCC.

"*ACH*" means automated clearing house transfers.

"*Acquired Indebtedness*" means, with respect to any specified Person: (a) Indebtedness of any other Person existing at the time such other Person is merged, consolidated or amalgamated with or into or became a Restricted Subsidiary of such specified Person, (but excluding Indebtedness incurred in connection with, or in contemplation of, such other Person merging, amalgamating or consolidating with or into, or becoming a Restricted Subsidiary of, such specified Person), and (b) Indebtedness secured by a Lien encumbering any asset acquired by such specified Person; provided, however, that any Lien securing Acquired Indebtedness (other than any purchase money Indebtedness with respect to real estate, equipment or other fixed assets or any Capitalized Lease) shall be junior to the Liens on the Collateral securing the Obligations and subject to a Customary Intercreditor Agreement.

"*Actual Cash Receipts*" means the sum of all cash collections received by the Loan Parties from operations (excluding any borrowings or other cash receipts not constituting trade receipts) during the relevant period of determination, as determined in a manner consistent with the Budget.

"*Actual Disbursements*" means the sum of all operating disbursements, expenses and payments made by the Loan Parties (other than transaction-related payments and professional fees and expenses, in each case, to the extent paid on the Closing Date, and professional fees and expenses of Gordon Brothers Retail Partners LLC (and their subcontractors)) during the relevant period of determination, as determined in a manner consistent with the Budget.

"*Actual Inventory Levels*" means the actual aggregate inventory levels of the Loan Parties as of the relevant date of determination which corresponds to the budgeted aggregate inventory levels of the Loan Parties contained in the Budget under "forecast ending inventory", as determined in a manner consistent with the Budget.

"*Adjusted Eurocurrency Rate*" means, as to any Eurocurrency Rate Loan for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the Eurocurrency Rate for such Interest Period divided by (b) one minus the Eurocurrency Reserve Percentage.

"*Administrative Agent*" has the meaning specified in the introductory paragraph to this Agreement.

"*Administrative Agent's Office*" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 12.8, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"*Administrative Questionnaire*" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"*Affiliate*" means, with respect to any Person, another Person that directly or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  "*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "*Controlling*" and "*Controlled*" have meanings correlative thereto.  For the avoidance of doubt, none of the Arrangers, nor the Agents, nor their respective lending affiliates shall be deemed to be an Affiliate of Holdings, the Borrower or any of their respective Subsidiaries.

"*Agent Parties*" has the meaning specified in Section 12.8(d).

"*Agent-Related Distress Event*" means, with respect to the Administrative Agent, Collateral Agent or any Person that directly or indirectly Controls the Administrative Agent or the Collateral Agent (each, a "*Distressed Agent-Related Person*"), a voluntary or involuntary case with respect to such Distressed Agent-Related Person under any Debtor Relief Law, or a custodian, conservator, receiver or similar official is appointed for such Distressed Agent-Related Person or any substantial part of such Distressed Agent-Related Person's assets, or such Distressed Agent-Related Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Agent-Related Person to be, insolvent or bankrupt; provided that an Agent-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any Equity Interests in the Administrative Agent, the Collateral Agent or any Person that directly or indirectly Controls the Administrative Agent or the Collateral Agent by a Governmental Authority or an instrumentality thereof.

"*Agent-Related Persons*" means the Agents, together with their respective Affiliates, and the officers, directors, employees, agents, attorney-in-fact, partners, trustees and advisors of such Persons and of such Persons' Affiliates.

"*Agents*" means, collectively, the Administrative Agent, the Collateral Agent, the Supplemental Administrative Agents (if any), and the Arrangers.

"*Aggregate Commitments*" means the Term Loan Commitments of all the Lenders.

"*Agreement*" means this Credit Agreement, as amended, restated, modified or supplemented from time to time in accordance with the terms hereof.

"*Agreement Currency*" has the meaning specified in Section 12.10.

"*Applicable Rate*" means a percentage per annum equal to (i) for Eurocurrency Rate Loans, 10.00% and (ii) for Base Rate Loans, 9.00%.

"*Applicable Percentage*" means with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Commitments represented by such Lender's Term Loan Commitment at such time, subject to adjustment as provided in Section 2.16. If the commitment of each Lender to make Loans has been terminated pursuant to Section 10.2 or if the Aggregate Commitments have expired, then the Applicable Percentage of each Lender shall be determined based on the Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule I or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"*Appropriate Lender*" means, at any time, with respect to Loans of any Class, the Lenders of such Class.

"*Approved Account Bank*" means a financial institution at which the Borrower or a Guarantor maintains an Approved Deposit Account.

"*Approved Bank*" means any commercial bank that is organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development or is the principal banking Subsidiary of a bank holding company organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development, is a member of the Federal Reserve System and has combined capital and surplus of not less than $500,000,000 in the case of U.S. domestic banks and $100,000,000 (or the Dollar equivalent as of the date of determination) in the case of non-U.S. banks.

"*Approved Deposit Account*" means each Deposit Account that is subject to the control of the Administrative Agent pursuant to the Cash Management Order or Orders, as applicable, and that is maintained by any Loan Party with a financial institution approved by the Administrative Agent and the Collateral Agent.

"*Approved Fund*" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"*Approved Securities Account*" means each Securities Account that is subject to the control of the Administrative Agent pursuant to the Cash Management Order or Orders, as applicable, and that is maintained by the Borrower or any Subsidiary Guarantor with a securities intermediary or commodity intermediary approved by the Administrative Agent and the Collateral Agent.

"*Approved Securities Intermediary*" means a securities intermediary at which the Borrower or a Subsidiary Guarantor maintains an Approved Securities Account.

"*Arranger*" means Barclays Bank PLC, in its capacity as sole bookrunner and sole lead arranger under this Agreement.

"*Assignee Group*" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"*Assignment and Assumption*" means an Assignment and Assumption substantially in the form of Exhibit A or any other form approved by the Administrative Agent.

"*Attorney Costs*" means all reasonable and documented or invoiced, fees, costs, expenses and disbursements of any law firm or other external legal counsel.

"*Attributable Indebtedness*" means, subject to the second paragraph of Section 1.3, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with IFRS.

"*Avoidance Action*" means any cause of action under chapter 5 of the Bankruptcy Code.

"*Bail-In Action*" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"*Bail-In Legislation*" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"*Bankruptcy Code*" means Title 11, U.S.C., as now or hereafter in effect, or any successor thereto.

"*Bankruptcy Court*" has the meaning specified in the recitals hereto.

"*Barclays*" means Barclays Bank PLC, acting in its individual capacity, and its successors and assigns.

"*Base Rate*" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no

5

longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent).

"*Base Rate Loan*" means a Loan that bears interest based on the Base Rate.

"*Basel III*" means, collectively, those certain agreements on capital requirements, leverage ratios and liquidity standards contained in "Basel III: A Global Regulatory Framework for More Resilient Banks and Banking Systems," "Basel III:  International Framework for Liquidity Risk Measurement, Standards and Monitoring," and "Guidance for National Authorities Operating the Countercyclical Capital Buffer," each as published by the Basel Committee on Banking Supervision in December 2010 (as revised from time to time).

"*Board of Directors*" means, for any Person, the board of directors or other governing body of such Person or, if such Person does not have such a board of directors or other governing body and is owned or managed by a single entity, the Board of Directors of such entity, or, in either case, any committee thereof duly authorized to act on behalf of such Board of Directors. Unless otherwise provided, "Board of Directors" means the Board of Directors of the Borrower.

"*Borrower*" has the meaning specified in the introductory paragraph to this Agreement.

"*Borrower Materials*" has the meaning specified in Section 7.2.

"*Borrowing*" means a borrowing consisting of Loans of the same Class and Type made, converted or continued on the same date and, in the case of Eurocurrency Rate Loans, having the same Interest Period.

"*Borrowing Base*" has the meaning assigned to such term in the ABL DIP Credit Agreement.

"*Budget*" means the financial projections for the Loan Parties covering the thirteen-week period on a weekly basis (i.e., Saturday to Friday) (but with the first period therein commencing on the Petition Date through October 5, 2018 and weekly thereafter), substantially in the form of the initial Budget annexed hereto as Schedule 5.16. Such Budget may be amended, modified or otherwise updated from time to time by the Borrower, including pursuant to the requirements of Section 7.1(g), as approved by the Administrative Agent and the Collateral Agent in their sole and absolute discretion; provided, that upon the receipt of any such proposed updates, the Administrative Agent and Collateral Agent shall notify the Borrower in writing within 3 Business Days of receipt thereof if such updates are unacceptable and if no such written notice is provided, then the updated budget so delivered shall thereafter constitute the Budget for all purposes hereunder.

"*Budgeted Cash Receipts*" means the sum of the line items contained in the Budget labeled "total operating receipts: trading receipts" during the relevant period of determination.

"*Budgeted Disbursements*" means the sum of the line items contained in the Budget labeled "total operating disbursements" and "professional fees" during the relevant period of determination.

6

"*Budgeted Inventory Levels*" means the budgeted aggregate inventory levels of the Loan Parties contained in the "forecast ending inventory" portion of the Budget opposite the heading "Ending Inventory" as of the relevant date of determination.

"*Business Day*" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, in New York City, New York and if such day relates to any interest rate settings as to a Eurocurrency Rate Loan, any fundings, disbursements, settlements and payments in respect of any such Eurocurrency Rate Loan, or any other dealings to be carried out pursuant to this Agreement in respect of any such Eurocurrency Rate Loan, means any such day on which dealings in deposits in Dollars are conducted by and between banks in the London interbank eurocurrency market.

"*Canadian Dollars*" means Canadian dollars, the lawful currency of Canada.

"*Capitalized Lease Obligation*" means, subject to the second paragraph of Section 1.3, at the time any determination thereof is to be made, the amount of the liability in respect of a Capitalized Lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with IFRS.

"*Capitalized Leases*" means, subject to the second paragraph of Section 1.3, all leases that have been or are required to be, in accordance with IFRS, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with IFRS.

"*Carve Out*" has the meaning assigned to such term in the Interim Order or the Final Order, as applicable.

"*Cases*" has the meaning specified in the recitals hereto.

"*Cash Equivalents*" means any of the following types of Investments, to the extent owned by the Borrower or any Restricted Subsidiary:

(a)    Dollars, pounds sterling, yen, Euros or Canadian Dollars;

(b)    in the case of any Foreign Subsidiary that is a Restricted Subsidiary or any jurisdiction in which the Borrower or its Restricted Subsidiaries conducts business, such local currencies held by it from time to time in the Ordinary Course of Business and not for speculation;

(c)    readily marketable direct obligations issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 12 months or less from the date of acquisition;

(d)    certificates of deposit, time deposits and eurocurrency time deposits with maturities of 12 months or less from the date of acquisition, demand deposits, bankers'

7

acceptances with maturities not exceeding 24 months and overnight bank deposits, in each case with any Approved Bank;

(e)    repurchase obligations for underlying securities of the types described in clauses (c) and (d) above or clause (g) below entered into with any Approved Bank;

(f)    commercial paper rated at least P-2 by Moody's or at least A-2 by S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) and in each case maturing within 12 months after the date of acquisition thereof;

(g)    marketable short-term money market and similar highly liquid funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency);

(h)    readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof, in each case having an Investment Grade Rating from either Moody's or S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) with maturities of 12 months or less from the date of acquisition;

(i)    Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency);

(j)    Investments, classified in accordance with IFRS as Consolidated Current Assets of the Borrower or any Restricted Subsidiary, in money market investment programs which are registered under the Investment Company Act of 1940 or which are administered by an Approved Bank, and, in either case, the portfolios of which are limited such that substantially all of such Investments are of the character, quality and maturity described in clauses (a) through (i) of this definition; and

(k)    investment funds investing substantially all of their assets in securities of the types described in clauses (a) through (j) above.

In the case of Investments by any Foreign Subsidiary that is a Restricted Subsidiary or Investments made in a country outside the United States, Cash Equivalents shall also include (i) investments of the type and maturity described in clauses (a) through (k) above of foreign obligors, which Investments or obligors (or the parents of such obligors) have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (ii) other short-term investments utilized by Foreign Subsidiaries that are Restricted Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments in clauses (a) through (k) and in this paragraph.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clause (a) above, provided that such amounts are converted into Dollars as promptly as practicable and in any event within ten (10) Business Days following the receipt of such amounts.

"*Cash Management Order*" means an order of the Bankruptcy Court, in form and substance satisfactory to the Administrative Agent and the Collateral Agent, among other things, (i) approving and authorizing the Debtors to use existing cash management systems, (ii) authorizing and directing banks and financial institutions to honor and process checks and transfers, (iii) authorizing continued use of intercompany transactions, (iv) waiving requirements of Section 345(b) of the Bankruptcy Code and (v) authorizing the Debtors to use existing bank accounts and existing business forms.

"*CFC*" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"*CFC Holdco*" means any Domestic Subsidiary that has no material assets other than, directly or indirectly, equity interests (or equity interests and indebtedness) of one or more Foreign Subsidiaries that are CFCs or any other Domestic Subsidiary that itself is a CFC Holdco.

"*Change in Law*" means the occurrence after the date of this Agreement (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rules, guideline, requirement or directive (whether or not having the force of law) by any Governmental Authority; provided however, that notwithstanding anything herein to the contrary (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case arising under clauses (i) or (ii) be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"*Change of Control*" means the earliest to occur of:

(a)     Steinhoff Parent ceases to own and control, directly or indirectly, more than 50.1% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Parent;

(b)     Holdings ceases to be an indirect wholly owned Subsidiary of Parent; or

(c)     the Borrower ceases to be a direct wholly owned Subsidiary of Holdings; or

(d)     the occurrence of a Change of Control (as defined in the DIP ABL Loan Agreement) shall have occurred.

9

"*Chapter 11 Plan*" shall have the meaning specified in Section 8.16(b), which Chapter 11 Plan shall not be modified or amended without the consent of the Administrative Agent and the Collateral Agent in their sole discretion.

"*Citizens*" means Citizens Bank, N.A.

"*Class*" means (i) with respect to Commitments or Loans, those of such Commitments or Loans that have the same terms and conditions (without regard to differences in the Type of Loan, Interest Period, upfront fees, OID or similar fees paid or payable in connection with such Commitments or Loans, or differences in tax treatment (e.g., "fungibility")) and (ii) with respect to Lenders, those of such Lenders that have Commitments or Loans of a particular Class.

"*Closing Date*" means the first date on which all the conditions precedent in Section 4.1 are satisfied or waived in accordance with Section 12.1, which date is [ ], 2018.

"*Code*" means the U.S. Internal Revenue Code of 1986, as amended from time to time.

"*Collateral*" means substantially all property and assets of the Loan Parties, including (a) all the "Collateral" (or equivalent term or words of similar intent) as defined in any Collateral Document and shall include the Mortgaged Properties and (b) the ["DIP Collateral"] referred to in any Orders, it being understood that "Collateral" shall include all such "DIP Collateral" irrespective of whether any such property was excluded pursuant to the Pre-Petition Loan Documents.

"*Collateral Agent*" has the meaning specified in the introductory paragraph to this Agreement.

"*Collateral Access Agreement*" means an agreement reasonably satisfactory in form and substance to the Administrative Agent and the Collateral Agent executed by, as the case may be, (a) a bailee or other Person in possession of Collateral, and (b) any landlord of any premises leased by any Loan Party, pursuant to which such Person (i) acknowledges the Collateral Agent's Lien on the Collateral, (ii) releases or subordinates such Person's Liens in the Collateral held by such Person or located on such premises, (iii) agrees to provide the Collateral Agent with access to the Collateral held by such bailee or other Person or located in or on such premises for the purpose of conducting field examinations, appraisals or Liquidation and (iv) makes such other agreements with the Collateral Agent as the Administrative Agent and the Collateral Agent may reasonably require.

"*Collateral and Guarantee Requirement*" means, at any time, the requirement that:

    (a)    the Collateral Agent shall have received each Collateral Document required to be delivered on the Closing Date pursuant to Section 4.1(a)(iii) or pursuant to Section 8.11, Section 8.12 or Section 8.13 at such time, subject, in each case, to the limitations and exceptions of this Agreement and the Collateral Documents and any Order, duly executed by each Loan Party thereto;

    (b)    the Bankruptcy Court shall have entered an Order granting the super-priority claim and the liens in the Collateral and other rights and protections

contemplated hereby and customary for debtor in possession financings and authorizing the Loans, which order (i) shall be in full force and effect and shall not have been, in whole or in part, vacated, reversed, stayed, or set aside and (ii) shall not have been modified or amended without the consent of the Administrative Agent, such consent not to be unreasonably withheld, delayed, denied or conditioned;

(c)    all Obligations shall have been unconditionally guaranteed by (i) Holdings and each Restricted Subsidiary of the Borrower that is a wholly owned Material Domestic Subsidiary and not an Excluded Subsidiary including those Subsidiaries that are listed on Schedule II hereto (each, a "*Guarantor*") and (ii) any Subsidiary of the Borrower that Guarantees any Indebtedness incurred by the Borrower pursuant to any Junior Financing shall be a Guarantor hereunder;

(d)    subject to the DIP Intercreditor Agreement, the Obligations and the Guaranty shall have been secured by a second-priority security interest (subject to Liens permitted by Section 9.1) in (i) all the Equity Interests of the Borrower, (ii) all Equity Interests of each Restricted Subsidiary that is a Domestic Subsidiary (other than a Restricted Subsidiary described in the following clause (iii)(A)) that is directly owned by the Borrower or any Subsidiary Guarantor and (iii) 65% of the issued and outstanding Equity Interests directly owned by the Borrower or by any Subsidiary Guarantor of (A) each Restricted Subsidiary that is a CFC Holdco and (B) each Restricted Subsidiary that is a CFC;

(e)    except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 9.1, or under any Collateral Document or any Order, the Obligations and the Guaranty shall have been secured by a perfected second-priority security interest in substantially all tangible and intangible property of the Borrower and each Guarantor (including accounts, deposit accounts, Inventory, equipment, investment property, contract rights, applications and registrations of intellectual property filed in the United States, other general intangibles, and proceeds of the foregoing), in each case, with the priority required by the Collateral Documents or any Order, in each case subject to exceptions and limitations otherwise set forth in this Agreement and the Collateral Documents or any Order; and

(f)    [reserved].

The foregoing definition and/or any other provision of this Agreement shall not require (i) the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, surveys, abstracts or appraisals or taking other actions with respect to any Excluded Assets, (ii) any Loan Party to provide Mortgages, obtain title insurance, surveys, abstracts or appraisals or take any other action with respect to any fee-owned or leased real property of any Loan Party, and/or (iii) any Loan Party to obtain a Lien Acknowledgement Agreement.

The Collateral Agent may grant extensions of time for the perfection of security interests in or the obtaining of title insurance and surveys with respect to particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) where it reasonably determines, in consultation with the Borrower,

that perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

No actions in any non-U.S. jurisdiction or required by the Laws of any non-U.S. jurisdiction shall be required in order to create any security interests in assets located or titled outside of the U.S. or to perfect such security interests, including any intellectual property registered in any non-U.S. jurisdiction (it being understood that there shall be no security agreements or pledge agreements governed under the Laws of any non-U.S. jurisdiction).

"*Collateral Documents*" means, collectively, the Security Agreement, the Intellectual Property Security Agreements, each of the collateral assignments, Security Agreement Supplements, security agreements, pledge agreements or other similar agreements delivered to the Agents and the Lenders pursuant to Section 4.1(a)(iv), Section 8.11, Section 8.12 or Section 8.13, the Guaranty, each Lien Acknowledgement Agreement and each of the other agreements, instruments or documents that creates or purports to create a Lien or Guarantee in favor of the Collateral Agent for the benefit of the Secured Parties.

"*Commitment Letter*" means the Commitment Letter dated as of October [4], 2018, among Barclays Bank PLC, Citizens Bank, N.A. and Borrower.

"*Committee Professionals*" has the meaning specified in the definition of "Carve Out".

"*Compliance Certificate*" means a certificate substantially in the form of Exhibit O and which certificate shall in any event be a certificate of the chief financial officer, chief accounting officer or other Responsible Officer of the Borrower with equivalent duties with financial reporting responsibilities (a) certifying as to whether a Default has occurred and is continuing and, if applicable, specifying the details thereof and any action taken or proposed to be taken with respect thereto, and (b) setting forth a reasonably detailed calculation of Excess Availability as of the last day of the most recently completed Test Period.

"*Consolidated Total Debt*" means, as of any date of determination, the aggregate principal amount of Indebtedness of the Borrower and the Restricted Subsidiaries outstanding on such date, in an amount that would be reflected on a balance sheet prepared as of such date on a consolidated basis in accordance with IFRS (but excluding the effects of any discounting of Indebtedness resulting from the application of acquisition accounting in connection with the Transaction, any Permitted Acquisition or any other Investment permitted hereunder), consisting of Indebtedness for borrowed money, Attributable Indebtedness, and all Guarantees of Indebtedness of such type that is owed by a Person that is not the Borrower or a Restricted Subsidiary; provided that Consolidated Total Debt shall not include Indebtedness in respect of (i) any letter of credit, except to the extent of unreimbursed obligations in respect of drawn letters of credit (provided that any unreimbursed amount under commercial letters of credit shall not be counted as Consolidated Total Debt until three (3) Business Days after such amount is drawn (it being understood that any borrowing, whether automatic or otherwise, to fund such reimbursement shall be counted)) and (ii) obligations under Swap Contracts.

"*Contractual Obligation*" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"*Credit Card Agreements*" means all agreements now or hereafter entered into by the Borrower or any Guarantor for the benefit of the Borrower or a Subsidiary Guarantor, in each case with any Credit Card Issuer or any Credit Card Processor, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, including, but not limited to, the agreements set forth on Schedule 1.1E hereto.

"*Credit Card Issuer*" means any Person (other than the Borrower or a Guarantor) who issues or whose members issue credit cards, including MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non bank credit or debit cards, including credit or debit cards issued by or through American Express Travel Related Services Company, Inc., Novus Services, Inc. and the Mattress Firm Card.

"*Credit Card Processor*" means any servicing or processing agent or any factor or financial intermediary, in each case, other than a Credit Card Issuer, who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to the Borrower's or any Guarantor's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"*Cure Amount*" has the meaning specified in Section 10.4(b).

"*Customary Intercreditor Agreement*" means an intercreditor agreement executed in connection with the incurrence of Indebtedness secured by Liens on the Collateral which are intended to rank junior to the Liens on the Collateral securing the Obligations, in form and substance reasonably acceptable to the Administrative Agent and the Collateral Agent which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank junior to the Liens on the Collateral securing the Obligations.

"*Customs Broker Agreement*" means an agreement in substantially the form attached hereto as Exhibit Q (or such other form as may be reasonably satisfactory to the Administrative Agent and the Collateral Agent) among a Loan Party, a customs broker, freight forwarder or other carrier, and the Collateral Agent, in which the customs broker, freight forwarder or other carrier acknowledges that it has control over and holds the documents evidencing ownership of, or other shipping documents relating to, the subject Inventory or other property for the benefit of the Collateral Agent, and agrees, upon notice from the Collateral Agent (which notice shall be delivered only upon the occurrence and during the continuance of an Event of Default), to hold and dispose of the subject Inventory and other property solely as directed by the Collateral Agent.

"*Debtor Professionals*" has the meaning specified in the definition of "Carve Out".

"*Debtor Relief Laws*" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium,

13

rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"*Debtors*" has the meaning specified in the recitals hereto.

"*Default*" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"*Default Rate*" means an interest rate equal to (a) the Base Rate plus (b) the Applicable Rate applicable to Base Rate Loans plus (c) 2.0% per annum; *provided* that with respect to the outstanding principal amount of any Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan (giving effect to Section 2.11) plus 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws.

"*Deposit Account*" means any checking or other demand deposit account maintained by the Loan Parties, including any "deposit accounts" under Article 9 of the UCC. All funds in such Deposit Accounts shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in the Deposit Accounts, subject to the Security Agreement.

"*DIP Intercreditor Agreement*" means that certain DIP Intercreditor Agreement dated as of [ ], 2018 by and between the ABL DIP Agent and the Administrative Agent, as amended and in effect from time to time.

"*DIP Superpriority Claim*" means the allowed superpriority administrative expense claim granted to the Loan Parties in the Cases and any Successor Cases pursuant to Section 364(c)(1) of the Bankruptcy Code for all of the Obligations with priority over any and all Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b) (except as set forth in the Orders), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative; *provided*, *however*, that the DIP Superpriority Claim shall not have recourse to any Avoidance Actions or the proceeds thereof subject to entry of the Final Order *provided, further*, that the DIP Superpriority Claim shall be subject to the Carve Out.

"*Disclosure Statement*" shall have the meaning specified in Section 8.16(b), which Disclosure Statement shall not be modified or amended without the consent of the Administrative Agent and the Collateral Agent in their sole discretion.

"*Disposition*" or "*Dispose*" means the sale, transfer, license, lease or other disposition (including any Sale-Leaseback and any sale or issuance of Equity Interests in a Restricted Subsidiary) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

14

"*Disqualified Equity Interests*" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable at such time (other than contingent indemnification obligations as to which no claim has been asserted), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests and other than as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations (other than contingent indemnification obligations as to which no claim has been asserted), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Latest Maturity Date at the time of issuance of such Equity Interests; provided, that if such Equity Interests are issued pursuant to a plan for the benefit of future, current or former employees, directors, officers, members of management or consultants of Holdings (or any direct or indirect parent thereof), the Borrower or the Restricted Subsidiaries or by any such plan to such employees, directors, officers, members of management or consultants, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be permitted to be repurchased by the Borrower or its Restricted Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's, officer's, management member's or consultant's termination of employment or service, as applicable, death or disability.

"*Disqualified Institutions*" means those Persons (the list of all such Persons, the "Disqualified Institutions List") that are (i) identified in writing by the Borrower to the Arrangers prior to the Closing Date, (ii) competitors of the Borrower and its Subsidiaries (other than bona fide fixed income investors or debt funds) that are identified in writing by the Borrower to the Arranger from time to time or (iii) Affiliates of such Persons set forth in clauses (i) and (ii) above (in the case of Affiliates of such Persons set forth in clause (ii) above, other than bona fide fixed income investors or debt funds) that are either (a) identified in writing by the Borrower to the Administrative Agent from time to time or (b) clearly identifiable on the basis of such Affiliate's name; provided, that, to the extent Persons are identified as Disqualified Institutions in writing by the Borrower to the Administrative Agent after the Closing Date pursuant to clauses (ii) or (iii)(a), the inclusion of such Persons as Disqualified Institutions shall not retroactively apply to prior assignments or participations in respect of any Loan under this Agreement.  Until the disclosure of the identity of a Disqualified Institution to the Lenders generally by the Administrative Agent, such Person shall not constitute a Disqualified Institution for purposes of a sale of a participation in a Loan (as opposed to an assignment of a Loan) by a Lender. Notwithstanding the foregoing, the Borrower, by written notice to the Administrative Agent, may from time to time in its sole discretion remove any entity from the Disqualified Institutions List (or otherwise modify such list to exclude any particular entity), and such entity removed or excluded from the Disqualified Institutions List shall no longer be a Disqualified Institution for any purpose under this Agreement or any other Loan Document.

LEGAL_US_W # 95883172.13

"*Disqualified Institutions List*" has the meaning specified in the definition of "Disqualified Institutions".

"*Document*" has the meaning set forth in Article 9 of the UCC.

"*Dollars*" and "*$*" mean lawful money of the United States.

"*Domestic Subsidiary*" means any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"*EEA Financial Institution*" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"*EEA Member Country*" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"*EEA Resolution Authority*" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"*Eligible Assignee*" means any Person that meets the requirements to be an assignee under Section 12.2(b)(iii) and (v) (subject to such consents, if any, as may be required under Section 12.2(b)(ii)).

"*EMU*" means the economic and monetary union as contemplated in the Treaty on European Union.

"*EMU Legislation*" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"*Environmental Claim*" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, investigations (other than internal reports prepared by any Loan Party or any of its Subsidiaries (a) in the Ordinary Course of Business of such Person or (b) as required in connection with a financing transaction or an acquisition or disposition of real estate) or proceedings with respect to any Environmental Liability (hereinafter "*Claims*"), including (i) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any Environmental Law and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief pursuant to any Environmental Law.

"*Environmental Laws*" means any and all Laws relating to the protection of the environment or, to the extent relating to exposure to Hazardous Materials, human health.

"*Environmental Liability*" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) of any Loan Party or any of its Restricted Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"*Environmental Permit*" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"*Equity Interests*" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"*ERISA Affiliate*" means any trade or business (whether or not incorporated) that together with any Loan Party is under common control with or treated as a single employer within the meaning of Sections 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"*ERISA Event*" means  (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as a termination under Section 4062(e) of ERISA; (c) a written notification to any Loan Party or any of their respective ERISA Affiliates concerning the imposition of Withdrawal Liability, a complete or partial withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Multiemployer Plan (within the meaning of Sections 4203 and 4205 of ERISA), or written notification that a Multiemployer Plan is insolvent or is in reorganization, within the meaning of Title IV of ERISA; (d) the filing under Section 4041(c) of ERISA of a notice of intent to terminate a Pension Plan, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA; (e) the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan or to appoint a trustee to administer a Pension Plan; (f) the imposition of any liability under Title IV of ERISA with respect to the termination of any Pension Plan or Multiemployer Plan, other than for the payment of plan contributions or PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any of their respective ERISA Affiliates; (g) the application for a minimum funding waiver under Section 302(c) of ERISA or Section 412(c) of the Code with respect to a Pension Plan; (h) the imposition of a lien under Section 303(k) of ERISA or Section 430(k) of the Code with respect to any Pension Plan; or (i) the imposition of liability on any of

17

the Loan Parties or any of their respective ERISA Affiliates pursuant to Sections 4069 or 4212(c) of ERISA.

"*EU Bail-In Legislation Schedule*" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"*Eurocurrency Rate*" means for any Interest Period as to any Eurocurrency Rate Loan, (i) the rate per annum determined by the Administrative Agent to be the offered rate which appears on the page of the Reuters Screen which displays the London interbank offered rate administered by ICE Benchmark Administration Limited (such page currently being the LIBOR01 page) (the "*LIBO Rate*") for deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period in Dollars, determined as of approximately 11:00 a.m. (London, England time), two Business Days prior to the commencement of such Interest Period, or (ii) in the event the rate referenced in the preceding clause (i) does not appear on such page or service or if such page or service shall cease to be available, the rate determined by the Administrative Agent to be the offered rate on such other page or other service which displays the LIBO Rate for deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period in Dollars, determined as of approximately 11:00 a.m. (London, England time) two Business Days prior to the commencement of such Interest Period; provided that if LIBO Rates are quoted under either of the preceding clauses (i) or (ii), but there is no such quotation for the Interest Period elected, the LIBO Rate shall be equal to the Interpolated Rate; and provided, further, that if any such rate determined pursuant to the preceding clauses (i) or (ii) is less than 1.00%, the Eurocurrency Rate will be deemed to be 1.00%.

"*Eurocurrency Rate Loan*" means a Loan that bears interest at a rate determined by reference to the Eurocurrency Rate.

"*Eurocurrency Reserve Percentage*" means, for any day during any Interest Period, the reserve percentage in effect on such day applicable to the Administrative Agent under regulations issued from time to time by the Federal Reserve Board for determining the maximum reserve requirement (including any emergency, special, supplemental or other marginal reserve requirement) with respect to eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D). The Adjusted Eurocurrency Rate for each outstanding Eurocurrency Rate Loan shall be adjusted automatically as of the effective date of any change in the Eurocurrency Reserve Percentage.

"*Euros*" means the lawful currency of the Participating Member States introduced in accordance with the EMU Legislation.

"*Event of Default*" has the meaning specified in Section 10.1.

"*Excess Availability*" has the meaning assigned to such term in the ABL DIP Credit Agreement.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Excluded Assets*" means (i) governmental licenses or state or local franchises, charters and authorizations and any other property and assets to the extent that the Collateral Agent may not validly possess a security interest therein under applicable Laws (including, without limitation, rules and regulations of any Governmental Authority or agency) or the pledge or creation of a security interest in which would require governmental consent, approval, license or authorization, other than to the extent such prohibition or limitation is rendered ineffective under the UCC or other applicable Law notwithstanding such prohibition and other than proceeds and receivable thereof, (ii) any particular asset or right under contract, if the pledge thereof or the security interest therein is prohibited or restricted by applicable Law (including, without limitation, rules and regulations of any Governmental Authority or agency) or any third party (so long as any agreement with such third party that provides for such prohibition or restriction was not entered into in contemplation of the acquisition of such assets or entering into of such contract or for the purpose of creating such prohibition or restriction), other than to the extent such prohibition or restriction is rendered ineffective under the UCC or other applicable Law, notwithstanding such prohibition, and other than proceeds and receivable thereof, (iii) any written agreement, license or lease or any property subject to a purchase money security interest, capital lease obligations or similar arrangement permitted hereunder, in each case, to the extent the grant of a security interest therein would violate or invalidate such lease, license or agreement or purchase money or similar arrangement or would give rise to a termination right in favor of any other party thereto (other than Holdings or any of its Subsidiaries) after giving effect to the applicable anti-assignment provisions of the UCC or other applicable Laws, in each case, only to the extent that such limitation on such pledge or security interest is otherwise permitted under Section 9.9, other than proceeds and receivable thereof, the assignment of which is expressly deemed effective under the UCC or other applicable Laws, notwithstanding such prohibition, (iv) Equity Interests in any non-wholly owned Subsidiaries and any entities which do not constitute Subsidiaries, but only to the extent that (x) the Organization Documents or other agreements with equity holders of such non-wholly owned Restricted Subsidiaries or other entities do not permit or restrict the pledge of such Equity Interests, or (y) the pledge of such Equity Interests (including any exercise of remedies) would result in a change of control, repurchase obligation or other adverse consequence to any of the Loan Parties or such non-wholly owned Restricted Subsidiary or other entity, (v) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable federal law and (vi) assets in circumstances where the cost of obtaining a security interest in such assets, including, without limitation, the cost of title insurance, surveys or flood insurance (if necessary) would be excessive in light of the practical benefit to the Lenders afforded thereby as reasonably determined by the Borrower, the Administrative Agent, and the Collateral Agent; provided, however, that Excluded Assets shall not include any proceeds, substitutions or replacements of any Excluded Assets referred to in clause (i) through (vi) (unless such proceeds, substitutions or replacements would independently constitute Excluded Assets referred to in clauses (i) through (vi)).

"*Excluded Subsidiary*" means (a) any Subsidiary that is not a wholly owned Subsidiary of the Borrower or a Guarantor, (b) any CFC, (c) any CFC Holdco, (d) any Domestic Subsidiary that is a direct or indirect Subsidiary of a CFC, (e) any Subsidiary that is prohibited or restricted by applicable Law or by Contractual Obligations existing on the Closing Date (or, in the case of

19

any newly acquired Subsidiary, in existence at the time of acquisition but not entered into in contemplation thereof) from providing a Guaranty or if such Guaranty would require governmental (including regulatory) consent, approval, license or authorization, (f) [reserved], (g) any Subsidiary that is a not-for-profit organization, (h) any Subsidiary, the obtaining of a Guarantee with respect to which would result in material adverse tax consequences as reasonably determined by the Borrower in good faith consultation with the Administrative Agent and the Collateral Agent (including as a result of the operation of Section 956 of the Code), (i) [reserved], (j) each Unrestricted Subsidiary, (k) any Captive Insurance Subsidiary, and (l) any other Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent, the Collateral Agent, and the Borrower, the cost or other consequences (including any adverse tax consequences) of providing the Guaranty outweighs the benefits to be obtained by the Lenders therefrom.

"*fair market value*" means, with respect to any asset or liability, the fair market value of such asset or liability as determined by the Borrower in good faith.

"*FATCA*" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"*Federal Funds Rate*" means, for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate; provided, that if the Federal Funds Effective Rate for any day is less than zero, the Federal Funds Effective Rate for such day will be deemed to be zero.

"*Federal Reserve Board*" means the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"*Fee Letter*" means that certain Fee Letter entered into on October 4, 2018 between Barclays Bank PLC, Citizens Bank, N.A. and the Borrower.

"*Field Examination*" has the meaning specified in Section 7.4(d).

"*Final Order*" means an order or judgment as entered on the docket of the Bankruptcy Court with respect to the Cases substantially in the form of the Interim Order, with only such modifications as are satisfactory in form and substance to the Administrative Agent and the Collateral Agent, which order shall have been entered on such prior notice to such parties as may be satisfactory to the Administrative Agent and the Collateral Agent, which order shall not have been vacated, reversed, modified, amended or stayed without the consent of the Administrative Agent and the Collateral Agent in their sole discretion.

"*Financial Asset*" has the meaning given to such term in Article 8 of the UCC.

"*Financial Covenants*" shall mean the covenants set forth in Section 6.1 and Section 6.2.

"*First Day Orders*" has the meaning specified in Section 8.15(f).

"*Fiscal Quarter*" means a fiscal quarter of any Fiscal Year.

"*Fiscal Year*" means the fiscal year of the Borrower and its Subsidiaries ending on the Tuesday closest to September 30 in the following calendar year.

"*Flood Insurance Laws*" shall mean, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (v) Biggert- Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"*Foreign Lender*" has the meaning specified in Section 3.1(b).

"*Foreign Subsidiary*" means any direct or indirect Subsidiary of the Borrower that is not a Domestic Subsidiary.

"*Fund*" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"*GAAP*" means generally accepted accounting principles in the United States, as in effect from time to time; *provided*, *however*, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Requisite Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"*Governmental Authority*" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"*Granting Lender*" has the meaning specified in Section 12.2(g).

"*Guarantee*" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or other monetary obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); provided that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the Ordinary Course of Business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"*Guarantors*" has the meaning specified in the definition of "Collateral and Guarantee Requirement".  For avoidance of doubt, the Borrower may cause any Restricted Subsidiary that is not an Excluded Subsidiary to Guarantee the Obligations by causing such Restricted Subsidiary to execute a supplement to the Guaranty in substantially the form attached thereto, and thereafter any such Restricted Subsidiary shall be a Guarantor hereunder and thereunder for all purposes.

"*Guaranty*" means (a) the guaranty made by Holdings and the other Guarantors in favor of the Administrative Agent on behalf of the Secured Parties pursuant to clause (b) of the definition of "Collateral and Guarantee Requirement," substantially in the form of Exhibit G, and (b) each other guaranty and guaranty supplement delivered pursuant to Section 8.11.

"*Hazardous Materials*" means all explosive or radioactive substances or wastes, all hazardous or toxic substances, and all wastes or pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas and infectious or medical wastes regulated pursuant to any Environmental Law.

"*Holdings*" has the meaning specified in the introductory paragraph to this Agreement.

"*IFRS*" means international accounting standards within the meaning of the IAS Regulation 1606/2002 to the extent applicable to the relevant financial statements; provided, however, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in IFRS or in the application thereof (including through the adoption of GAAP) on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Requisite Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in IFRS or in the application thereof (including through the adoption of GAAP), then such provision shall be interpreted on the basis of IFRS as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith

"*Initial Orders*" has the meaning specified in Section 8.15(f)

"*Indebtedness*" means, as to any Person at a particular time, without duplication, all of the following:

      (a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

      (b)     the maximum amount (after giving effect to any prior drawings or reductions that may have been reimbursed) of all outstanding letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

      (c)     net obligations of such Person under any Swap Contract;

      (d)     all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts and accrued expenses payable in the Ordinary Course of Business, (ii) any earn-out obligation until such obligation is not paid within 30 days after becoming due and payable and becomes a liability on the balance sheet of such Person in accordance with IFRS and (iii) accruals for payroll and other liabilities accrued in the Ordinary Course of Business);

      (e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

      (f)     all Attributable Indebtedness;

      (g)     all obligations of such Person in respect of Disqualified Equity Interests if and to the extent that the foregoing would constitute indebtedness or a liability in accordance with IFRS; and

(h)    to the extent not otherwise included above, all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall (A) include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of Consolidated Total Debt and (B) in the case of the Borrower and its Subsidiaries, exclude all intercompany Indebtedness having a term not exceeding 364 days (inclusive of any roll over or extensions of terms) and made in the Ordinary Course of Business. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (e) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value (as determined by such Person in good faith) of the property encumbered thereby as determined by such Person in good faith.

"*Indemnified Liabilities*" has the meaning specified in Section 12.4(a).

"*Indemnitees*" has the meaning specified in Section 12.4(a).

"*Independent Financial Advisor*" means an accounting, appraisal, investment banking firm or consultant of nationally recognized standing that is, in the good faith judgment of the Borrower, qualified to perform the task for which it has been engaged and that is independent of the Borrower and its Affiliates.

"*Information*" has the meaning specified in Section 12.19.

"*Initial Lender*" means Barclays.

"*Intellectual Property Security Agreements*" has the meaning specified in the Security Agreement.

"*Intercompany Subordination Agreement*" means an agreement executed by each Restricted Subsidiary of the Borrower, in substantially the form of Exhibit K, as amended, restated, supplemented or otherwise modified from time to time.

"*Interest Period*" means, as to each Eurocurrency Rate Loan, the period commencing on the date such Eurocurrency Rate Loan is disbursed or converted to or continued as a Eurocurrency Rate Loan and ending on the date one, two, three or six months thereafter, or to the extent consented to by each applicable Lender, twelve months (or such period of less than one month as may be consented to by each applicable Lender), as selected by the Borrower in its Notice of Borrowing or Notice of Conversion or Continuation; provided that:

(a)    any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the immediately preceding Business Day;

(b)    any Interest Period (other than an Interest Period having a duration of less than one month) that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)    no Interest Period shall extend beyond the Maturity Date.

"*Interim Order*" means the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court with respect to the Cases substantially in the form of Exhibit R and otherwise acceptable to the Collateral Agent and the Administrative Agent, approving, inter alia, this Agreement and the other Loan Documents, and (a) authorizing the incurrence by the Borrower of interim secured indebtedness in accordance with this Agreement, (b) providing for the lifting of the automatic stay (to the extent applicable) arising under section 362 of the Bankruptcy Code to enable the Administrative Agent, a Collateral Agent or any Lender effectuate, among other things, their respective rights and remedies under Section 10.2 and 10.3 and the Loan Documents), and (c) subject to the terms thereof, approving the payment by the Borrower of the fees and other amounts contemplated by this Agreement, which order shall not have been vacated, reversed, modified, amended or stayed without the consent of the Administrative Agent and the Collateral Agent in their sole discretion.

"*Interim Order Period*" means the period of time from the time at which the Bankruptcy Court enters the Interim Order until the time at which the Bankruptcy Court enters the Final Order.

"*Interpolated Rate*" means, in relation to the LIBO Rate, the rate which results from interpolating on a linear basis between:

(a)    the applicable LIBO Rate for the longest period (for which that LIBO Rate is available) which is less than the Interest Period of that Loan; and

(b)    the applicable LIBO Rate for the shortest period (for which that LIBO Rate is available) which exceeds the Interest Period of that Loan,

each as of approximately 11:00 a.m. (London, England time) two Business Days prior to the commencement of such Interest Period of that Loan.

"*Intra-Group Debt Restricted Payment*" has the meaning set forth in Section 9.14.

"*Inventory*" has the meaning given to such term in Article 9 of the UCC.

"*Investment*" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition (including without limitation by merger or otherwise) of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution (excluding accounts receivable, credit card and debit card receivables, trade credit, advances to customers, commission, travel and similar advances to employees, directors, officers, members of management, manufacturers and consultants, in each case made in the Ordinary Course of Business) to, Guarantee or assumption

25

of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person or (c) the purchase or other acquisition (in one transaction or a series of transactions, including without limitation by merger or otherwise) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  For purposes of the definition of "Unrestricted Subsidiary":

(1)    "Investments" shall include the portion (proportionate to the Borrower's Equity Interest in such Subsidiary) of the fair market value of the net assets of a Subsidiary of the Borrower at the time that such Subsidiary is designated an Unrestricted Subsidiary; provided, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Borrower shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to:

(a)    the Borrower's "Investment" in such Subsidiary at the time of such redesignation; less

(b)    the portion (proportionate to the Borrower's Equity Interest in such Subsidiary) of the fair market value of the net assets of such Subsidiary at the time of such redesignation; and

(2)    any property transferred to or from an Unrestricted Subsidiary shall be valued at its fair market value at the time of such transfer.

The amount of any Investment outstanding at any time (including for purposes of calculating the amount of any Investment outstanding at any time under any provision of the covenant described Section 9.2 and otherwise determining compliance with such covenant) shall be the original cost of such Investment (determined, in the case of any Investment made with assets of the Borrower or any Restricted Subsidiary, based on the fair market value of the assets invested and without taking into account subsequent increases or decreases in value), reduced (but not in excess of the original amount of such Investment) by any dividend, distribution, interest payment, return of capital, repayment or other amount received in cash by the Borrower or a Restricted Subsidiary in respect of such Investment.  Any Investment in the form of a loan or an advance shall be the principal amount thereof outstanding on such date, minus any cash payments actually received by such investor representing interest in respect of such Investment (to the extent any such payment to be deducted does not exceed the remaining principal amount of such Investment), but without any adjustment for write-downs or write-offs (including as a result of forgiveness of any portion thereof) with respect to such loan or advance after the date thereof.  Any Investment in the form of a Guarantee shall be equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof.

"*Investment Grade Rating*" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other nationally recognized statistical rating agency selected by the Borrower.

"*IP Rights*" has the meaning specified in Section 5.15.

"*IRS*" means the Internal Revenue Service of the United States.

"*Joint Venture*" means (a) any Person which would constitute an "equity method investee" of the Borrower or any of the Restricted Subsidiaries and (b) any Person in whom the Borrower or any of the Restricted Subsidiaries beneficially owns any Equity Interest that is not a Restricted Subsidiary (other than an Unrestricted Subsidiary).

"*Judgment Currency*" has the meaning specified in Section 12.10.

"*Junior Financing*" has the meaning specified in Section 9.12(a)(i).  For the avoidance of doubt, the Stripes Intra-Group Loan Agreement and the Second Lien Credit Agreement constitute Junior Financing.

"*Junior Financing Documentation*" means any documentation governing any Junior Financing.

"*Laws*" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities and executive orders, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"*Lender*" means the Initial Lender and each other financial institution or other entity that (a) is listed on the signature pages hereof as a "Lender" or (b) from time to time becomes a party hereto by execution of an Assignment and Assumption.

"*Lending Office*" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"*LIBO Rate*" has the meaning specified in the definition of "Eurocurrency Rate".

"*Lien*" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing); provided, that in no event shall an operating lease in and of itself be deemed a Lien.

"*Lien Acknowledgment Agreement*" means each Collateral Access Agreement and Customs Broker Agreement.

"*Liquidation*" means the exercise by the Collateral Agent or the Administrative Agent of those rights and remedies accorded to the Collateral Agent or the Administrative Agent under the Loan Documents and applicable Law as a creditor of the Loan Parties with respect to the

realization on the Collateral, including (after the occurrence and continuation of an Event of Default) the conduct by the Loan Parties acting with the consent of the Collateral Agent or the Administrative Agent, of any public, private or "going out of business" sale or other disposition of the Collateral for the purpose of liquidating the Collateral. Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"*Loan*" means any term loan made by any Lender pursuant to this Agreement.

"*Loan Documents*" means, collectively, (a) this Agreement, (b) the Notes, (c) the Guaranty, (d) the Commitment Letter, (e) the Collateral Documents, (f) any Customary Intercreditor Agreement, (g) the Fee Letter and (h) the DIP Intercreditor Agreement.

"*Loan Parties*" means, collectively, (a) Holdings, (b) the Borrower and (c) each other Guarantor.

"*Margin Stock*" has the meaning set forth in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"*Master Agreement*" has the meaning specified in the definition of "Swap Contract".

"*Material Adverse Effect*" means any event, facts, or circumstances, which, after the Closing Date, has a material adverse effect on (a) the business, assets, operations, financial condition or income of the Loan Parties taken as a whole, or (b) the validity or enforceability of the Loan Documents or any of the rights or remedies of the Administrative Agent, the Collateral Agent, or the Lenders thereunder (it being understood that Material Adverse Effect shall exclude (i) any matters publicly disclosed prior to the Petition Date and (ii) matters resulting from the Cases and the events and conditions related and/or leading up to the Cases and the effects thereof).

"*Material Domestic Subsidiary*" means, at any date of determination, each of the Borrower's Domestic Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with IFRS; *provided* that if, at any time and from time to time after the Closing Date, Domestic Subsidiaries that are not Guarantors solely because they do not meet the thresholds set forth in clauses (a) or (b) comprise in the aggregate more than 5.0% of Total Assets as of the end of the most recently ended Fiscal Quarter of the Borrower for which financial statements have been delivered pursuant to Section 7.1 or more than 5.0% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries for the period of four consecutive Fiscal Quarters ending as of the last day of such Fiscal Quarter, then the Borrower shall, not later than forty-five (45) days after the date by which financial statements for such quarter are required to be delivered pursuant to this Agreement (or such longer period as may be agreed by the Administrative Agent in its reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Domestic Subsidiaries as "Material Domestic Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of Sections 8.11, 8.12 and 8.13 applicable to such Subsidiary.

"*Material Foreign Subsidiary*" means, at any date of determination, each of the Borrower's Foreign Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with IFRS.

"*Material Subsidiary*" means any Material Domestic Subsidiary or any Material Foreign Subsidiary.

"*Mattress Firm Card*" means the private label credit card issued by Synchrony Bank pursuant to the Credit Card Agreement of the Borrower or any Subsidiary Guarantor with such bank (or any subsequent Credit Card Issuer with respect to such private label credit card) to customers or prospective customers of the Borrower or a Subsidiary Guarantor.

"*Maturity Date*" means the date that is 3 months after the Closing Date.

"*Maximum Rate*" has the meaning specified in Section 12.27.

"*Moody's*" means Moody's Investors Service, Inc. and any successor thereto.

"*Mortgage Policies*" has the meaning specified in paragraph (e) of the definition of "Collateral and Guarantee Requirement".

"*Mortgaged Properties*" has the meaning specified in paragraph (e) of the definition of "Collateral and Guarantee Requirement".

"*Mortgages*" means, collectively, the deeds of trust, trust deeds, hypothecs and mortgages made by the Loan Parties in favor or for the benefit of the Collateral Agent on behalf of the Lenders in form and substance reasonably satisfactory to the Collateral Agent (taking account of relevant local Law matters), and any other mortgages executed and delivered pursuant to Sections 8.11or 8.13.

"*Multiemployer Plan*" means any multiemployer plan as defined in Section 4001(a)(3) of ERISA and subject to Title IV of ERISA, to which any Loan Party or any of their respective ERISA Affiliates makes or is obligated to make contributions, or during the preceding five plan years has made or been obligated to make contributions.

"*Net Cash Proceeds*" means:

(a)    with respect to (x) the Disposition of any asset by the Borrower or any of the Restricted Subsidiaries or (y) with respect to any casualty or condemnation event, (i) insurance proceeds paid on account of any loss of or damage to or (ii) awards of compensation arising from the taking by eminent domain or condemnation of, in each case, any assets of the Borrower or any of the Restricted Subsidiaries (any such event in this clause (y), a "C&C Event"), the excess, if any, of (i) the sum of cash and Cash Equivalents received by the Borrower or any of the Restricted Subsidiaries in connection with such Disposition (including any cash and Cash Equivalents received by way of

deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) or C&C Event, as applicable, over (ii) the sum of (A) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness that is secured by the asset subject to such Disposition or C&C Event and that is required to be repaid in connection with such Disposition or C&C Event (other than Indebtedness under the Loan Documents), (B) the out-of-pocket fees and expenses (including attorneys' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees) actually incurred by the Borrower or such Restricted Subsidiary in connection with such Disposition or C&C Event, (C) taxes or distributions made pursuant to Section 9.6(g)(A) or (g)(C) paid or reasonably estimated to be payable, directly or indirectly, in connection therewith (including taxes imposed on the distribution or repatriation of any such Net Cash Proceeds), (D) in the case of any Disposition or C&C Event by a non-wholly owned Restricted Subsidiary, the pro-rata portion of the Net Cash Proceeds thereof (calculated without regard to this clause (D)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a wholly owned Restricted Subsidiary as a result thereof, and (E) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with IFRS and (y) any liabilities associated with such asset or assets and retained by the Borrower or any Restricted Subsidiary after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction, it being understood that "Net Cash Proceeds" shall include the amount of any reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in this clause (E) as of the date of such reversal; and

(b)     (i) with respect to the incurrence or issuance of any Indebtedness by the Borrower or any Restricted Subsidiary or any Permitted Equity Issuance by the Borrower or any direct or indirect parent of the Borrower, the excess, if any, of (A) the sum of the cash and Cash Equivalents received in connection with such incurrence or issuance over (B) the investment banking fees, underwriting discounts, commissions, costs and other out-of-pocket expenses and other customary expenses, incurred by the Borrower or such Restricted Subsidiary in connection with such incurrence or issuance and (ii) with respect to any Permitted Equity Issuance by any direct or indirect parent of the Borrower, the amount of cash from such Permitted Equity Issuance contributed to the capital of the Borrower.

"*Net Income*" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with IFRS and before any reduction in respect of preferred stock dividends.

"*Non-Bank Certificate*" has the meaning specified in Section 3.1(b).

"*Non-Consenting Lender*" has the meaning specified in Section 3.7.

"*Non-Loan Party*" means any Subsidiary of the Borrower that is not a Loan Party.

"*Note*" means a promissory note of the Borrower payable to any Lender in a principal amount equal to the amount of such Lender's outstanding Loans evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the Loans of a given Class owing to such Lender substantially in the form of Exhibit B hereto.

"*Notice of Borrowing*" has the meaning specified in Section 2.2.

"*Notice of Conversion or Continuation*" has the meaning specified in Section 2.11(a).

"*Notice of Intent to Cure*" has the meaning specified in Section 7.2.

"*Obligations*" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.  Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and any of their Restricted Subsidiaries to the extent they have obligations under the Loan Documents) include the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document.

"*OFAC*" has the meaning specified in Section 5.18.

"*OID*" means original issue discount.

"*Orders*" means, together, the Interim Order and the Final Order.

"*Ordinary Course of Business*" shall mean, with respect to any Person, any ordinary course business practices engaged in by such Person or other business practice reasonably related thereto or that is a reasonable extension, development or expansion thereof.

"*Organization Documents*" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"*Other Taxes*" has the meaning specified in Section 3.1.

"*Overnight Rate*" means, for any day, the greater of (a) the Federal Funds Rate and (b) an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"*Parent*" means Stripes US Holding, Inc.

"*Participant*" has the meaning specified in Section 12.2(d).

"*Participant Register*" has the meaning specified in Section 12.2(e).

"*Participating Member State*" means each state so described in any EMU Legislation.

"*PBGC*" means the Pension Benefit Guaranty Corporation.

"*Pension Plan*" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or any of their respective ERISA Affiliates or to which any Loan Party or any of their respective ERISA Affiliates contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time in the preceding five plan years.

"*Permitted Acquisition*" means the purchase or other acquisition, in each case, prior to the Petition Date by Borrower or any of its Restricted Subsidiaries of property and assets or businesses of any Person or of assets constituting a business unit, a line of business or division of such Person, a Store or Equity Interests in a Person that, upon the consummation thereof, will be a wholly owned Restricted Subsidiary of the Borrower (including as a result of a merger or consolidation).

"*Permitted Discretion*" means a determination made by the Administrative Agent or the Collateral Agent (as applicable) in good faith in the exercise of its reasonable (from the perspective of an asset-based lender) business judgment.

"*Permitted Equity Issuance*" means any sale or issuance of any Qualified Equity Interests of the Borrower or any direct or indirect parent of the Borrower (in which case the Net Cash Proceeds have been received by the Borrower as cash common equity), in each case to the extent permitted hereunder.

"*Permitted Variances*" has the meaning set forth in Section 8.17.

"*Petition Date*" has the meaning specified in the recitals hereto.

"*Person*" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"*Plan*" means any material "employee benefit plan" (as such term is defined in Section 3(3) of ERISA, whether or not such plan is subject to ERISA) established or contributed to by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any of their respective ERISA Affiliates.

"*Platform*" has the meaning specified in Section 7.2.

"*Pledged Debt*" has the meaning specified in the Security Agreement.

"*Pledged Equity*" has the meaning specified in the Security Agreement.

"*Pre-Petition*" means the time period ending immediately prior to the filing of the Cases.

"*Pre-Petition Credit Agreement*" has the meaning specified in the recitals hereto.

"*Pre-Petition Loan Documents*" means the "*Loan Documents*" as set forth in the Pre-Petition Credit Agreement.

"*Pre-Petition Obligations*" means all of the "Obligations" as set forth in the Pre-Petition Credit Agreement.

"*Pro Forma Basis*" and "Pro Forma Effect" mean, with respect to compliance with any test or covenant or calculation hereunder, the determination or calculation of such test, covenant or ratio (including in connection with Specified Transactions) in accordance with Section 1.9.

"*Proceeds*" has the meaning given to such term in Article 9 of the UCC.

"*Professional Persons*" has the meaning specified in the definition of "Carve Out".

"*Projections*" shall have the meaning specified in Section 7.1(d).

"*Public Lender*" has the meaning specified in Section 7.2.

"*Qualified Equity Interests*" means any Equity Interests that are not Disqualified Equity Interests.

"*Ratable Portion*", "*Pro Rata Share*", "*ratable share*" or (other than in the expression "equally and ratably") "*ratably*" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Term Loan Commitments and, if applicable and without duplication, Loans of such Lender under the applicable Class or Classes at such time and the denominator of which is the amount of the Aggregate Commitments and, if applicable and without duplication, Loans under the applicable Class or Classes at such time.

"*Register*" has the meaning specified in Section 12.2(c).

"*Related Indemnified Person*" of an Indemnitee means (a) any controlling person or controlled affiliate of such Indemnitee, (b) the respective directors, officers, or employees of such Indemnitee or any of its controlling persons or controlled affiliates and (c) the respective agents of such Indemnitee or any of its controlling persons or controlled affiliates, in the case of this clause (c), acting at the instructions of such Indemnitee, controlling person or such controlled affiliate; provided that each reference to a controlled affiliate or controlling person in

this definition shall pertain to a controlled affiliate or controlling person involved in the negotiation of the Term Loan Commitments or Loans, as the case may be.

"*Relevant Participant*" has the meaning specified in the lock-up agreement dated July 11, 2018 in respect of Steinhoff International Holdings N.V., Steinhoff Finance Holding GmbH and Steinhoff Europe AG, as amended from time to time.

"*Reportable Event*" means, with respect to any Pension Plan, any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived under applicable regulation or guidance.

"*Requisite Lenders*" means, collectively, Lenders having more than fifty percent (50%) of the aggregate outstanding amount of the Loans; provided, however, that, at any time that there are at least two, but not more than three, Lenders that are not Affiliates or Approved Funds of one another, "Requisite Lenders" shall include at least two (2) Lenders that are not Affiliates or Approved Funds of one another, "Requisite Lenders" shall include such Lender so long as such Lender is not a Defaulting Lender.

"*Responsible Officer*" means the chief executive officer, president, vice president, chief financial officer, chief operating officer, chief administrative officer, secretary or assistant secretary, treasurer or assistant treasurer or other similar officer or Person performing similar functions of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.  Unless otherwise specified, all references herein to a "Responsible Officer" shall refer to a Responsible Officer of the Borrower.

"*Restricted Payment*" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of Holdings, the Borrower or any Restricted Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to Holdings or the Borrower's stockholders, partners or members (or the equivalent Persons thereof).

"*Restricted Subsidiary*" means any Subsidiary of the Borrower other than an Unrestricted Subsidiary.

"*S&P*" means Standard & Poor's Ratings Services, a division of S&P Global, Inc., and any successor thereto.

"*Sale-Leaseback*" means any transaction or series of related transactions pursuant to which the Borrower or any of the Restricted Subsidiaries (a) sells, transfers or otherwise Disposes of any property, real or personal, whether now owned or hereafter acquired, and (b) as part of such transaction, thereafter rents or leases such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold, transferred or otherwise Disposed.

"*Same Day Funds*" means disbursements and payments in immediately available funds.

"*Sanctions*" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State.

"*Sanctioned Country*" means, at any time, a country or territory which is the subject or target of any Sanctions (as of the date of this Agreement, Cuba, Iran, North Korea, Sudan and Syria).

"*Sanctioned Person*" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State and (b) any other Person operating or organized in a Sanctioned Country or controlled (as determined by applicable law) by any Person that is a Sanctioned Person.

"*SEC*" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"*Second Day Orders*" has the meaning specified in Section 8.15(f).

"*Second Lien Credit Agreement*" means that certain Term Loan Agreement, dated as of March 26, 2018 by and among the Borrower, Holdings and Steinhoff Parent, as lender thereunder.

"*Second Lien Loan Documents*" means the Loan Documents as defined in the Second Lien Credit Agreement.

"*Secured Obligations*" means, in the case of the Borrower, the Obligations and, in the case of any other Loan Party, the "Guaranteed Obligations" under the Guaranty and any of such Loan Party's other obligations under the other Loan Documents to which it is a party.

"*Secured Parties*" means, collectively, the Lenders, the Administrative Agent, the Collateral Agent, the Supplemental Administrative Agent and each co-agent or sub-agent (if any) appointed by the Administrative Agent from time to time pursuant to Section 11.5.

"*Securities Account*" means all securities accounts of any Loan Party, including "securities accounts" within the meaning given to such term in Article 8 of the UCC.

"*Security*" means any Equity Interest, voting trust certificate, bond, debenture, note or other evidence of Indebtedness, whether secured, unsecured, convertible or subordinated, or any certificate of interest, share or participation in, any temporary or interim certificate for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing, but shall not include any evidence of the Obligations.

"*Security Agreement*" means, collectively, the Security Agreement executed by the Loan Parties, substantially in the form of Exhibit H, as amended, restated, supplemented or otherwise

modified from time to time, together with each other Security Agreement Supplement executed and delivered pursuant to Section 8.11.

"*Security Agreement Supplement*" has the meaning specified in the Security Agreement.

"*SPC*" has the meaning specified in Section 12.2(g).

"*Specified Transaction*" means (u) the Transaction, (v) any Investment that results in a Person becoming a Restricted Subsidiary, (w) any designation of a Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary, (x) any Permitted Acquisition and any Investment constituting an acquisition of assets constituting a business unit, line of business or division of another Person or a Store, (y) any Disposition that results in a Restricted Subsidiary ceasing to be a Subsidiary of the Borrower, and any Disposition of a business unit, line of business or division or a Store of the Borrower or a Restricted Subsidiary, in each case whether by merger, consolidation, amalgamation or otherwise or (z) any incurrence or repayment of Indebtedness (other than Indebtedness incurred or repaid under any revolving credit facility or line of credit), Restricted Payment, that by the terms of this Agreement requires a financial ratio or test to be calculated on a "Pro Forma Basis" or after giving "Pro Forma Effect."

"*Steinhoff Parent*" means Steinhoff International Holdings, N.V.

"*Store*" means any retail store (which includes any real property, fixtures, equipment, Inventory and other property related thereto) operated, or to be operated, by the Borrower or any Restricted Subsidiary.

"*Stripes Facilities Agreement*" means the U.S. $4,000,000,000 Acquisition Facilities Agreement, dated August 5, 2016 (as amended or supplemented prior to the Closing Date) between Steinhoff Finance Holding GMBH and Steinhoff Mobel Holding Alpha GMBH, Stripes US Holding, Inc., Bank of America Merrill Lynch International Limited, Bank of America N.A. and J.P. Morgan Limited, as arrangers, J.P. Morgan Europe Limited as agent, and the other parties from time to time party thereto.

"*Stripes Intra-Group Loan Agreement*" means the Intra-Group Loan Agreement dated September 16, 2016 (as amended or supplemented on or prior to the Closing Date) between Stripes US Holding, Inc. as borrower and Steinhoff Finance Holding GMBH and Steinhoff Mobel Holding Alpha GMBH as lenders and the other parties from time to time party thereto.

"*Subsidiary*" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (excluding, for the avoidance of doubt, charitable foundations and any other Person that meets the requirements of Section 501(c)(3) of the Code) (i) of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned by such Person, or (ii) the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, by such Person, to the extent such entity's financial results are required to be included in such Person's consolidated financial statements under IFRS. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"*Subsidiary Guarantor*" means any Guarantor other than Holdings.

"*Successor Cases*" means any case under Chapter 7 of the Bankruptcy Code commenced upon the conversion of any Cases.

"*Supplemental Administrative Agent*" and "Supplemental Administrative Agents" have the meanings specified in Section 11.12(a).

"*Swap Contract*" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"*Swap Termination Value*" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark to-market value(s) for such Swap Contracts, as determined based upon one or more mid market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"*Taxes*" has the meaning specified in Section 3.1(a).

"*Term Loan Commitments*" means, with respect to each Lender, the commitment of such Lender to make Loans expressed as an amount representing the maximum principal amount of the Loans to be made by such Lender under this Agreement. The amount of each Lender's Term Loan Commitment is set forth on Schedule I under the caption "Term Loan Commitment," as amended to reflect each Assignment and Assumption executed by such Lender. The aggregate amount of the Term Loan Commitments on the Closing Date is $100,000,000.

"*Test Period*" in effect at any time means the most recent period of four consecutive Fiscal Quarters of the Borrower ended on or prior to such time (taken as one accounting period); *provided* that, prior to the first date that financial statements have been or are required to be delivered pursuant to Section 7.1(a) or (b), the Test Period in effect shall be the period of four consecutive Fiscal Quarters of the Borrower ended [  ], 2018. A Test Period may be designated

by reference to the last day thereof (i.e., the "[ ], 2018 Test Period" refers to the period of four consecutive Fiscal Quarters of the Borrower ended [ ], 2018), and a Test Period shall be deemed to end on the last day thereof.

"*Threshold Amount*" means $18,500,000.

"*Total Assets*" means the total assets of the Borrower and the Restricted Subsidiaries on a consolidated basis in accordance with IFRS, as shown on the most recent balance sheet of the Borrower delivered pursuant to Sections 7.1(a) or 7.1(b) or, for the period prior to the time any such statements are so delivered pursuant to Sections 7.1(a) or 7.1(b), the Pro Forma Financial Statements.

"*Transaction*" means, collectively, (a) the funding of the Loans on the Closing Date, (b) the consummation of any other transactions in connection with the foregoing including the funding of the ABL DIP Facility under the ABL DIP Credit Agreement and a prepayment of any Pre-Petition Revolving Loans (as defined in the ABL DIP Credit Agreement) outstanding under the Pre-Petition Credit Agreement, and (c) the payment of the fees and expenses incurred in connection with any of the foregoing.

"*Transaction Expenses*" means any fees or expenses incurred or paid by any direct or indirect parent of the Borrower, the Borrower or any of its (or their) Subsidiaries in connection with the Transactions (including expenses in connection with close-out fees in connection with the termination of hedging transactions, if any, and payments to officers, employees and directors as change of control payments, severance payments, special or retention bonuses and charges for repurchase or rollover of, or modifications to, stock options and/or restricted stock), this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby.

"*Type*" means, with respect to a Loan, its character as a Base Rate Loan or a Eurocurrency Rate Loan.

"*Uniform Commercial Code*" or "*UCC*" means the Uniform Commercial Code or any successor provision thereof as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code or any successor provision thereof (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"*United States*" and "*U.S.*" mean the United States of America.

"*Unrestricted Subsidiary*" means any Subsidiary of the Borrower designated by the Board of Directors of the Borrower as an Unrestricted Subsidiary prior to the Closing Date. There are no Unrestricted Subsidiaries as of the Closing Date.

"*U.S. Lender*" has the meaning specified in Section 3.1.

"*U.S. Trustee*" means the United States Trustee applicable in the Cases.

38

"*USA PATRIOT Act*" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"*Variance Report*" has the meaning provided in Section 7.1(g).

"*wholly owned*" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) nominal shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

"*Write-down and Conversion Powers*" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

"*Withdrawal Liability*" means the liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.2 <u>Other Interpretive Provisions</u>.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)      The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)      (i) The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)      References in this Agreement to an Exhibit, Schedule, Article, Section, clause or sub-clause refer (A) to the appropriate Exhibit or Schedule to, or Article, Section, clause or sub-clause in this Agreement or (B) to the extent such references are not present in this Agreement, to the Loan Document in which such reference appears,

(iii)      The term "including" is by way of example and not limitation,

(iv)      The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form, and

(v)      Unless otherwise expressly indicated herein, the words "above" and "below", when following a reference to a clause or a sub-clause of any Loan Document, refer to a clause or sub-clause within, respectively, the same Section or clause.

(c)      The terms "Lender" and "Administrative Agent" include, without limitation, their respective successors.

(d)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including", the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including."

(e)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(f)    For purposes of determining compliance with any Section of Article IX at any time, except as otherwise expressly set forth herein, in the event that any Lien, Investment, Indebtedness (whether at the time of incurrence or upon application of all or a portion of the proceeds thereof), Disposition, Restricted Payment, Affiliate transaction, Contractual Obligation, or prepayment of Indebtedness meets the criteria of one or more than one of the categories of transactions permitted pursuant to any clause of such Sections, such transaction (or portion thereof) at any time, shall be permitted under one or more of such clauses as determined by the Borrower in its sole discretion at such time.

SECTION 1.3 Accounting Terms.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, IFRS (or, if the Borrower has elected to report under GAAP, GAAP), except as otherwise specifically prescribed herein.

Notwithstanding any changes in GAAP or IFRS after the Closing Date, any lease of the Loan Parties and their Subsidiaries that would be characterized as an operating lease under GAAP or IFRS in effect on the Closing Date (whether such lease is entered into before or after the Closing Date) shall not constitute Indebtedness, Attributable Indebtedness or a Capitalized Lease Obligation under this Agreement or any other Loan Document as a result of such changes in GAAP or IFRS.

SECTION 1.4 Rounding.  Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number)

SECTION 1.5 [Reserved].

SECTION 1.6 References to Agreements, Laws, Etc.  Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all appendices, exhibits and schedules thereto and all subsequent amendments, restatements, extensions, supplements and other modifications thereto (but only to the extent that such amendments, restatements, extensions, supplements and other modifications are permitted by any Loan Document); and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

SECTION 1.7 <u>Times of Day</u>.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

SECTION 1.8 <u>Timing of Payment of Performance</u>.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day.

SECTION 1.9 <u>Pro Forma Calculations</u>.

(a)     Notwithstanding anything to the contrary herein, financial ratios and tests shall be calculated in the manner prescribed by this Section 1.9; provided that, notwithstanding anything to the contrary in clauses (b), (c), (d), (e) or (f) of this Section 1.9, when calculating any such ratio or test for purposes of the incurrence of any Indebtedness, cash and Cash Equivalents resulting from the incurrence of any such Indebtedness shall be excluded from the pro forma calculation of any applicable ratio or test.  In addition, whenever a financial ratio or test is to be calculated on a pro forma basis, the reference to the "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which financial statements have been delivered pursuant to Section 7.1(a) or (b), as applicable, for the relevant Test Period.

(b)     For purposes of calculating any financial ratio or test or compliance with any covenant determined by reference to Total Assets, Specified Transactions (with any incurrence or repayment of any Indebtedness in connection therewith to be subject to clause (d) of this Section 1.9) that have been made (i) during the applicable Test Period or (ii) if applicable as described in clause (a) above, subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made shall be calculated on a pro forma basis assuming that all such Specified Transactions (and any increase or decrease in Total Assets and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period (or, in the case of Total Assets, on the last day of the applicable Test Period).  If since the beginning of any applicable Test Period any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Restricted Subsidiaries since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.9, then such financial ratio or test (or Total Assets) shall be calculated to give pro forma effect thereto in accordance with this Section 1.9.

(c)     In the event that the Borrower or any Restricted Subsidiary incurs (including by assumption or guarantees) or repays (including by redemption, repayment, retirement or extinguishment) any Indebtedness (other than Indebtedness incurred or repaid under any revolving credit facility unless such Indebtedness has been permanently repaid and not replaced), (i) during the applicable Test Period or (ii) subject to paragraph (a), subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then such financial ratio or test shall be calculated giving pro forma effect to such incurrence or repayment of Indebtedness, in each case to the extent required, as if the same had occurred on the last day of the applicable Test Period.

41

(d)      Whenever pro forma effect is to be given to a Specified Transaction, the pro forma calculations shall be made in good faith by a responsible financial or accounting officer of the Borrower.

(e)      [reserved].

(f)      If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of the event for which the calculation is made had been the applicable rate for the entire period (taking into account any interest hedging arrangements applicable to such Indebtedness); provided, in the case of repayment of any Indebtedness, to the extent actual interest related thereto was included during all or any portion of the applicable Test Period, the actual interest may be used for the applicable portion of such Test Period.  Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a Responsible Officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with IFRS.  Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a London interbank offered rate, or other rate, shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Borrower or Restricted Subsidiary may designate.

SECTION 1.10      Currency Equivalents Generally.  For purposes of determining compliance with Sections 9.1, 9.2 and 9.3 with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness or Investment is incurred (so long as such Indebtedness or Investment, at the time incurred, made or acquired, was permitted hereunder).

SECTION 1.11      Schedules.  All schedules attached hereto or to any other Loan Documents shall be deemed to incorporate by reference all information disclosed in the Orders, the Chapter 11 Plan and the Disclosure Statement, in each case as of the Petition Date, in the form delivered to the Administrative Agent and the Collateral Agent prior to date of the Commitment Letters, which Orders, the Chapter 11 Plan and the Disclosure Statement, shall have been modified or amended without the consent of the Administrative Agent and the Collateral Agent in their sole discretion.

## ARTICLE II

## THE FACILITY

SECTION 2.1 The Loans.  On the terms and subject to the conditions contained in this Agreement, each Lender severally agrees to make term loans (a "*Loan*") to the Borrower in an aggregate principal amount equal to such Lender's Term Commitment on the Closing Date. Amounts borrowed under this Section 2.01(a) and repaid or prepaid may not be reborrowed. Loans may be Base Rate Loans or Eurocurrency Rate Loans, as further provided herein.Borrowing Procedure.

(a)     The Borrowing shall be made on written notice given by the Borrower to the Administrative Agent (i) not later than [12:00 noon]. (New York, New York time) on the Closing Date, in the case of a Borrowing of Base Rate Loans or (ii) not later than 12:00 noon (New York, New York time) three (3) Business Days prior to the requested date of such Borrowing, in the case of a Borrowing of Eurocurrency Rate Loans[; *provided* that the notice referred to in this subclause (ii) may be delivered no later than one (1) Business Day prior to the Closing Date in the case of any Borrowing of Eurocurrency Rate Loans on the Closing Date]. Each such notice shall be in substantially the form of Exhibit C (a "*Notice of Borrowing*"), specifying (A) the date of such proposed Borrowing, which shall be a Business Day, (B) the aggregate amount of such proposed Borrowing, (C) whether any portion of the proposed Borrowing will be of Base Rate Loans or Eurocurrency Rate Loans, (D) the initial Interest Period or Interest Periods for any Eurocurrency Rate Loans and (E) the Class of such proposed Borrowing. The Loans shall be made as Base Rate Loans, unless, subject to Section 2.14, the Notice of Borrowing specifies that all or a portion thereof shall be Eurocurrency Rate Loans. The Borrowing shall be in an aggregate amount of not less than $500,000 or an integral multiple of $100,000 in excess thereof.

(b)     The Administrative Agent shall give to each Appropriate Lender prompt notice of the Administrative Agent's receipt of the Notice of Borrowing and, if Eurocurrency Rate Loans are properly requested in the Notice of Borrowing, the applicable interest rate determined pursuant to Section 2.14(a). Each Lender shall, before 2:00 p.m. on the date of the proposed Borrowing, make available to the Administrative Agent at its address referred to in Section 12.8, in Same Day Funds in the applicable currency, such Lender's Ratable Portion of the proposed Borrowing. Upon fulfillment (or due waiver in accordance with Section 12.1) on the Closing Date, of the applicable conditions set forth in Section 4.1 and, subject to clause (c) below, after the Administrative Agent's receipt of such funds, the Administrative Agent shall make such funds available to the Borrower as promptly as reasonably practicable.

(c)     Unless the Administrative Agent shall have received notice from a Lender prior to the date of any proposed Borrowing that such Lender will not make available to the Administrative Agent such Lender's Ratable Portion of the Borrowing (or any portion thereof), the Administrative Agent may assume that such Lender has made such Ratable Portion available to the Administrative Agent on the date of the Borrowing in accordance with this Section 2.2 and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If and to the extent that such Lender shall not have so made such Ratable Portion available to the Administrative Agent, such Lender and the Borrower severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent, at (i) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising the Borrowing and (ii) in the case of such Lender, the Federal Funds Rate for the first Business Day and thereafter at the interest rate applicable at the time to the Loans comprising the Borrowing. If such Lender shall repay to the Administrative Agent such corresponding amount, such corresponding amount so repaid shall constitute such Lender's Loan as part of the Borrowing for purposes of this Agreement. If the Borrower shall repay to the Administrative Agent such corresponding amount, such payment shall not relieve such Lender of any obligation it may have hereunder to the Borrower.

LEGAL_US_W # 95883172.13

(d)    After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than [ten(10)] Interest Periods in effect unless otherwise agreed between the Borrower and the Administrative Agent.

SECTION 2.3 [Reserved].

SECTION 2.4 [Reserved].

SECTION 2.5 Termination of the Term Loan Commitments.    The Term Loan Commitments shall automatically terminate immediately upon the making of the Loans on the Closing Date.

SECTION 2.6 Repayment of Loans.    The Borrower promises to repay to the Administrative Agent for the ratable account of the Lenders the aggregate unpaid principal amount of the Loans on the Maturity Date or earlier, if otherwise required by the terms hereof.

SECTION 2.7 Evidence of Indebtedness.

(a)    The Loans made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for purposes of Treasury Regulation Section 5f.103-1(c), as agent for the Borrower, in each case in the Ordinary Course of Business. Subject to Section 12.2(c), accounts or records maintained by the Administrative Agent and each Lender shall be *prima facie* evidence absent manifest error of the amount of the Loans made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

(b)    (i) Subject to Section 12.2(c), entries made in good faith by the Administrative Agent in the Register pursuant to Sections 2.7(a) and by each Lender in its account or accounts pursuant to Section 2.7(a) shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; provided that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

(ii)    Notwithstanding anything to the contrary contained in this Agreement, the Loans (including the Notes evidencing such Loans) are registered obligations and the right, title, and interest of the Lenders and their assignees in and to such Loans, as the case may be, shall be transferable only upon notation of such transfer in the Register.  A Note shall only evidence the Lender's or a registered assignee's right, title and interest in and to the related Loan, and in no event is any such Note to be considered a bearer

44

instrument or obligation.  This Section 2.7(b) and Section 12.2 shall be construed so that the Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related regulations (or any successor provisions of the Code or such regulations).

(c)    Notwithstanding any other provision of the Agreement, in the event that any Lender requests that the Borrower execute and deliver a promissory note or notes payable to such Lender in order to evidence the Indebtedness owing to such Lender by the Borrower hereunder, the Borrower shall promptly execute and deliver a Note to such Lender evidencing the Loans of such Lender, substantially in the form of Exhibit B. Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto; provided that the failure to do so shall in no way affect the obligations of the Borrower or any other Loan Party under any Loan Document.

SECTION 2.8 Optional Prepayments.

The Borrower may prepay, in the applicable currency, the outstanding principal amount of the Loans in whole or in part at any time; provided, however, that if any prepayment of any Eurocurrency Rate Loan is made by the Borrower other than on the last day of an Interest Period for such Loan, the Borrower shall also pay any amount owing pursuant to Section 3.5.

SECTION 2.9 Mandatory Prepayments.

(a)    Subject to the DIP Intercreditor Agreement, if at any time, any Loan Party or any of its Subsidiaries receives any Net Cash Proceeds arising from any Disposition in respect of any Collateral outside of the Ordinary Course of Business and not required to be applied to amounts outstanding under the ABL DIP Loan Documents, the Borrower shall promptly (but in any event within five (5) Business Days of such receipt) prepay the Loans in an amount equal to 100% of such Net Cash Proceeds.

(b)    Subject to the DIP Intercreditor Agreement, if at any time, any Loan Party or any of its Subsidiaries receives any Net Cash Proceeds arising from any incurrence, issuance or sale by the Borrower or any Restricted Subsidiary of any Indebtedness (including, without limitation, the Net Cash Proceeds of any bankruptcy exit financing), that it not otherwise permitted under this Agreement, the Borrower shall promptly (but in any event within five (5) Business Days of such receipt) prepay the Loans in an amount equal to 100% of such Net Cash Proceeds.

(c)    Subject to Section 3.5 hereof, all such payments in respect of the Loans pursuant to this Section 2.9 shall be without premium or penalty.  All interest accrued on the principal amount of the Loans paid pursuant to this Section 2.9 shall be paid, or may be charged by the Administrative Agent to any loan account(s) of the Borrower, at the Administrative Agent's option, on the date of such payment.  Interest shall accrue and be due, until the next Business Day, if the amount so paid by the Borrower to the bank account designated by the Administrative Agent for such purpose is received in such bank account after 3:00 p.m.

SECTION 2.10        Interest.

45

(a)    Rate of Interest.  All Loans and the outstanding amount of all other Obligations owing under the Loan Documents shall bear interest, in the case of any Class of Loans, on the unpaid principal amount thereof from the date such Loans are made and, in the case of such other Obligations, from the date such other Obligations are due and payable until, in all cases, paid in full, except as otherwise provided in clause (c) below, as follows:

(i)    if a Base Rate Loan or such other Obligation (except as otherwise provided in this Section 2.10(a)), at a rate per annum equal to the sum of (A) the Base Rate as in effect from time to time and (B) the Applicable Rate for Base Rate Loans; and

(ii)    if a Eurocurrency Rate Loan, at a rate per annum equal to the sum of (A) the Adjusted Eurocurrency Rate determined for the applicable Interest Period and (B) the Applicable Rate applicable to Eurocurrency Rate Loans in effect from time to time during such Interest Period.

(b)    Interest Payments.  (i) Interest accrued on each Base Rate Loan shall be payable in arrears (A) on the first Business Day of each month, commencing on the first such day following the making of such Base Rate Loan and (B) if not previously paid in full, at maturity (whether by acceleration or otherwise) of such Base Rate Loan, (ii) interest accrued on each Eurocurrency Rate Loan shall be payable in arrears (A) on the last day of each Interest Period applicable to such Loan and, if such Interest Period has a duration of more than one (1) month, on each date during such Interest Period occurring every one (1) month from the first day of such Interest Period, (B) upon the payment or prepayment thereof in full or in part and (C) if not previously paid in full, at maturity (whether by acceleration or otherwise) of such Eurocurrency Rate Loan and (iii) interest accrued on the amount of all other Obligations shall be payable on demand from and after the time such Obligation becomes due and payable (whether by acceleration or otherwise).

(c)    Default Interest.  At the election of the Required Lenders, upon the occurrence and during the continuation of an Event of Default, all Loans hereunder shall bear interest at a per annum rate equal to the Default Rate to the fullest extent permitted by applicable Laws. Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

SECTION 2.11        Conversion/Continuation Option.

(a)    The Borrower may elect (i) at any time on any Business Day, to convert Base Rate Loans or any portion thereof to Eurocurrency Rate Loans and (ii) at the end of any applicable Interest Period, to convert Eurocurrency Rate Loans or any portion thereof into Base Rate Loans, or to continue such Eurocurrency Rate Loans or any portion thereof for an additional Interest Period; provided, however, that the aggregate amount of the Eurocurrency Rate Loans for each Interest Period must be in the amount of at least $500,000 or an integral multiple of $100,000 in excess thereof.  Each conversion or continuation shall be allocated among the Loans of each Lender in accordance with such Lender's Ratable Portion.  Each such election shall be in substantially the form of Exhibit F (a "*Notice of Conversion or Continuation*") and shall be made by giving the Administrative Agent at least three (3) Business Days' prior written notice specifying (A) the amount and type of Loan being converted or continued, (B) in the case of a

46

conversion to or a continuation of Eurocurrency Rate Loans, the applicable Interest Period and (C) in the case of a conversion, the date of such conversion.

(b)    The Administrative Agent shall promptly notify each Lender of its receipt of a Notice of Conversion or Continuation and of the options selected therein.  Notwithstanding the foregoing, the Administrative Agent or the Requisite Lenders may require by notice to the Borrower that no conversion in whole or in part of Base Rate Loans to Eurocurrency Rate Loans and no continuation in whole or in part of Eurocurrency Rate Loans upon the expiration of any applicable Interest Period shall be permitted at any time at which (A) an Event of Default shall have occurred and be continuing or (B) the continuation of, or conversion into, a Eurocurrency Rate Loan would violate any provision of Section 2.14.  If, within the time period required under the terms of this Section 2.11, the Administrative Agent does not receive a Notice of Conversion or Continuation from the Borrower containing a permitted election to continue any Eurocurrency Rate Loans for an additional Interest Period or to convert any such Loans, then, upon the expiration of the applicable Interest Period, such Loans shall be automatically converted to Base Rate Loans.  Each Notice of Conversion or Continuation shall be irrevocable.

SECTION 2.12        Fees.  The Borrower has agreed to pay to the Administrative Agent and the Arrangers those certain fees, the amount and dates of payment of which are embodied in the Fee Letter.

SECTION 2.13        Payments and Computations.

(a)    All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  The Borrower shall make each payment and prepayment hereunder (including fees and expenses) not later than 2:00 p.m. on the day when due, (i) in the case of Loans, in the currency in which such Loan is denominated, (ii) in the case of any accrued interest payable on a Loan, in the currency of such Loan, as applicable, and (iii) in the case of all other payments under each Loan Document, in Dollars except as otherwise expressly provided herein or therein, in each case to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office for payment and in Same Day Funds without condition or deduction for any defense, recoupment, set-off or counterclaim.  The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Administrative Agent after 2:00 p.m. shall, in each case be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)    All computations of interest for Base Rate Loans shall be made on the basis of a year of 365 days or 366 days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365 day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; provided that any Loan that is repaid on the same day on which it is made

shall bear interest for one (1) day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(c)      [Reserved].

(d)      Whenever any payment hereunder shall be stated to be due on a day other than a Business Day, the due date for such payment shall be extended to the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or fees, as the case may be; provided, however, that if such extension would cause payment of interest on or principal of any Eurocurrency Rate Loan to be made in the next calendar month, such payment shall be made on the immediately preceding Business Day.  All repayments of any Loans shall be applied as follows:  first, to repay any such Loans outstanding as Base Rate Loans and then, to repay any such Loans outstanding as Eurocurrency Rate Loans, with those Eurocurrency Rate Loans having earlier expiring Interest Periods being repaid prior to those having later expiring Interest Periods.

(e)      Unless the Administrative Agent shall have received notice from the Borrower to the Lenders prior to the date on which any payment is due hereunder that the Borrower will not make such payment in full, the Administrative Agent may assume that the Borrower has made such payment in full to the Administrative Agent on such date and the Administrative Agent may (but shall not be so required to), in reliance upon such assumption, cause to be distributed to each Lender on such due date an amount equal to the amount then due such Lender.  If and to the extent that the Borrower shall not have made such payment to the Administrative Agent in Same Day Funds in the applicable currency, then each Lender shall repay to the Administrative Agent forthwith on demand the portion of such assumed payment that was made available to such Lender in Same Day Funds in the applicable currency, together with interest thereon in respect of each day from and including the date such amount was made available to such Lender to the date such amount is repaid to the Administrative Agent in Same Day Funds in the applicable currency at the applicable Overnight Rate from time to time in effect.

(f)      Except for payments and other amounts received by the Administrative Agent and applied in accordance with the provisions of Section 10.2(b) below (or required to be applied in accordance with Section 2.9), all payments and any other amounts received by the Administrative Agent from or for the benefit of the Borrower shall be applied as follows: first, to pay principal of, and interest on, any portion of the Loans the Administrative Agent may have advanced pursuant to the express provisions of this Agreement on behalf of any Lender, for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower, second, to pay all other Obligations then due and payable and third, as the Borrower so designates.  Payments in respect of Loans received by the Administrative Agent shall be distributed to each Lender in accordance with such Lender's Ratable Portion; and all payments of fees and all other payments in respect of any other Obligation shall be allocated among such of the Lenders as are entitled thereto and, for such payments allocated to the Lenders, in proportion to their respective Ratable Portions.

SECTION 2.14      Special Provisions Governing Eurocurrency Rate Loans.

(a)     Determination of Interest Rate.  The Adjusted Eurocurrency Rate for each Interest Period for Eurocurrency Rate Loans shall be determined by the Administrative Agent pursuant to the procedures set forth in the definition of "Eurocurrency Rate".  The Administrative Agent's determination shall be presumed to be correct and binding on the Loan Parties, absent manifest error.

(b)     Interest Rate Unascertainable, Inadequate or Unfair.  In the event that (i) the Administrative Agent reasonably determines that adequate and fair means do not exist for ascertaining the applicable interest rates by reference to which the Eurocurrency Rate then being determined is to be fixed or (ii) the Requisite Lenders reasonably determine and notify the Administrative Agent that the Eurocurrency Rate for any Interest Period will not adequately reflect the cost to the Lenders of making or maintaining such Loans for such Interest Period, the Administrative Agent shall forthwith so notify the Borrower and the Lenders, whereupon each Eurocurrency Rate Loan shall automatically, on the last day of the current Interest Period for such Loan, convert into a Base Rate Loan, and the obligations of the Lenders to make Eurocurrency Rate Loans or to convert Base Rate Loans into Eurocurrency Rate Loans shall be suspended until the Administrative Agent shall notify the Borrower that the Requisite Lenders have determined that the circumstances causing such suspension no longer exist.

SECTION 2.15          [Reserved].

SECTION 2.16          [Reserved].

SECTION 2.17          Certain Bankruptcy Matters.

(a)     Except to the extent expressly provided otherwise in an Order, the Loan Parties hereby agree that, subject only to the Carve Out and the DIP Intercreditor Agreement, the Obligations shall be deemed to (i) constitute DIP Superpriority Claims over all administrative expense claims and claims against the Borrower or the other Loan Parties now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order) (and all rights to charge the Collateral and all collateral securing the Pre-Petition Obligations under Section 506(c) shall be waived), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provisions of the Bankruptcy Code and all superpriority administrative expense claims granted to any other Person the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court, (ii) pursuant to Bankruptcy Code Section 364(c)(2), be secured by a perfected first-priority security interest in the Collateral, and any proceeds and products thereof in whatever form received, provided, further that the Collateral shall exclude the Debtors' claims and causes of action under Chapter 5 of the Bankruptcy Code, or other Avoidance Actions, but subject only to, and effective upon, entry of the Final Order, shall include any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise, in each case, to the extent that such Collateral is not subject to valid, perfected and non-avoidable liens as of the commencement of the Cases, (iii) pursuant to Bankruptcy Code section 364(c)(3), be secured by a perfected lien on all Collateral, to the extent that such Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties in existence at the time of the commencement of the Cases or to valid liens in existence at the time

49

of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code and (iv) pursuant to Bankruptcy Code section 364(d), be secured by a perfected priming first priority lien on all Collateral, to the extent that such Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties as of the commencement of the Cases that secure the obligations of the Loan Parties under or in connection with the Pre-Petition Credit Agreement.

(b)     In the event of a conflict between, or inconsistency among, the Orders, on the one hand, and any Loan Document, on the other hand, the Orders shall control.

(c)     Notwithstanding anything to the contrary contained herein or elsewhere (except as specifically described below):

(i)     the parties hereto agree, and the Orders shall provide, that the Loan Parties shall not be required to prepare, file, register or publish any financing statements, mortgages, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on the Collateral granted by or pursuant to this Agreement, the Orders or any other Loan Document. Subject to the limitations set forth in the definition of "Guarantee and Collateral Requirement" and in Sections 8.11 and 8.13, if the Administrative Agent (in its sole discretion), from time to time elects to prepare, file, register or publish any such financing statements, mortgages, account control agreements, notices of Lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Collateral Agent's Liens on the Collateral, (A) all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that the Interim Order is entered, and (B) shall not negate or impair the validity or effectiveness of this Section 2.17(c) or of the perfection of any other Liens in favor of the Collateral Agent, for the benefit of the Lenders and the other Loan Parties, on the Collateral; and

(ii)     except as otherwise agreed to by the Lenders (including, without limitation, in the DIP Intercreditor Agreement) or as otherwise permitted or contemplated by this Agreement, the Orders or the other Loan Documents, the Liens, Lien priorities, DIP Superpriority Claims and other rights and remedies granted to the Loan Parties pursuant to this Agreement, the Orders or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the DIP Superpriority Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by the Borrower or any other Loan Party (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of the Cases, or by any other act or omission whatsoever.

(d)     Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)     subject only to the Carve Out and the Orders, no costs or expenses of administration which have been or may be incurred in the Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of any Lender or the Administrative Agent against the Borrower in respect of any Obligations;

(ii)     other than as provided in the Orders or the Loan Documents, the Collateral Agent's Liens on the Collateral shall constitute valid, enforceable and perfected Liens, and, except with respect to the Carve Out (and as otherwise set forth in the DIP Intercreditor Agreement and in the Orders), shall be prior to all other Liens now existing or hereafter arising, in favor of any other creditor or other Person; and

(iii)     the parties hereto agree, and the Orders shall provide, that the Collateral Agent's Liens on the Collateral shall continue to be valid, enforceable and perfected without the need for the Collateral Agent or any Lender to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect the Collateral Agent's Liens under applicable non-bankruptcy law.

(e)     Upon confirmation of a Plan acceptable to the Lenders, each Lender, with respect to the outstanding principal amount of its Loans at such time, may elect to treat all such principal amount of Loans as loans outstanding under the exit term loan facility contemplated by the Exit Commitment Letter that is approved under such Plan to the extent the terms and conditions of such financing are satisfactory to such Lender as shall be evidenced pursuant to such letter agreements on terms satisfactory to such Lender and the Administrative Agent under such exit financing. Upon such approval by such Lender and consummation of such exit financing, the outstanding principal amount of such Lender's Loans shall no longer be outstanding under this Agreement.

## ARTICLE III

## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

SECTION 3.1 Taxes.

(a)     Except as required by law, any and all payments by the Borrower or any Guarantor under any Loan Document shall be made free and clear of and without deduction for any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings (including backup withholding) or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto (collectively, "*Taxes*"), excluding, in the case of each Agent and each Lender, (i) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Agent or Lender being organized under the laws of, or having its principal office in or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax, (ii) Taxes imposed on such Agent or Lender as a result of a present or former connection between such Agent or Lender and the jurisdiction imposing such Tax (other than connections arising from such Agent or Lender having executed, delivered,

become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document), (iii) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (A) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 3.7 or (B) such Lender changes its lending office, except in each case to the extent that, pursuant to this Section 3.1, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (iv) any U.S. federal withholding Taxes imposed as a result of the failure of any Agent or Lender to comply with, in the case of any Foreign Lender, as defined below, the provisions of Sections 3.1(b) and 3.1(c) or, in the case of any U.S. Lender, as defined below, the provisions of Section 3.1(d), and (v) any U.S. federal withholding taxes imposed pursuant to FATCA (all Taxes described in this Section 3.1(a)(i)-(v) being hereinafter referred to as "*Excluded Taxes*"; all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document being hereinafter referred to as "*Indemnified Taxes*").  If the Borrower or a Guarantor is required by Law (as determined in the good faith discretion of the Borrower or Guarantor) to deduct or withhold any Indemnified Taxes or Other Taxes (as defined below) from or in respect of any sum payable under any Loan Document to any Agent or any Lender, (i) the sum payable shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under this Section 3.1(a)), each of such Agent and such Lender receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the Borrower or Guarantor shall make such deductions or withholdings, (iii) the Borrower or Guarantor shall timely pay the full amount deducted or withheld to the relevant taxing authority, and (iv) within thirty (30) days after the date of such payment (or, if receipts or evidence are not available within thirty (30) days, as soon as practicable thereafter), the Borrower or Guarantor shall furnish to such Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof to the extent such a receipt has been made available to the Borrower or Guarantor (or other evidence of payment reasonably satisfactory to the Administrative Agent).  If the Borrower or Guarantor fails to pay any Indemnified Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to any Agent or any Lender the required receipts or other required documentary evidence that has been made available to the Borrower or Guarantor, the Borrower or Guarantor shall indemnify such Agent and such Lender for any incremental Indemnified Taxes and Other Taxes that may become payable by such Agent or such Lender arising out of such failure.

(b)     To the extent it is legally able to do so, each Agent or Lender (including an Eligible Assignee to which a Lender assigns its interest in accordance with Section 12.2) that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code (each, a "*Foreign Lender*") agrees to complete and deliver to the Borrower and the Administrative Agent on or prior to the date on which the Agent or Lender (or Eligible Assignee) becomes a party hereto, two (2) accurate, complete and original signed copies of whichever of the following is applicable:  (i) IRS Form W-8BEN or IRS Form W-8BEN-E certifying that it is entitled to benefits under an income tax treaty to which the United States is a party; (ii) IRS Form W-8ECI certifying that the income receivable pursuant to any Loan Document is effectively connected

with the conduct of a trade or business in the United States; (iii) if the Foreign Lender is not (A) a bank described in Section 881(c)(3)(A) of the Code, (B) a 10-percent shareholder described in Section 871(h)(3)(B) of the Code, or (C) a controlled foreign corporation related to the Borrower within the meaning of Section 864(d) of the Code, a certificate to that effect in substantially the form attached hereto as Exhibit N (a "*Non-Bank Certificate*") and an IRS Form W-8BEN or IRS Form W-8BEN-E, certifying that the Foreign Lender is not a United States person; (iv) to the extent a Lender is not the beneficial owner for U.S. federal income tax purposes, IRS Form W-8IMY (or any successor forms) of the Lender, accompanied by, as and to the extent applicable, an IRS Form W-8BEN or IRS Form W-8BEN-E, IRS Form W-8ECI, IRS Form W-9, IRS Form W-8IMY (or other successor forms), Non-Bank Certificate and any other required supporting information from each beneficial owner (it being understood that a Lender need not provide certificates or supporting documentation from beneficial owners if (x) the Lender is a "qualified intermediary" or "withholding foreign partnership" for U.S. federal income tax purposes and (y) such Lender is as a result able to establish, and does establish, that payments to such Lender are, to the extent applicable, entitled to an exemption from or, if an exemption is not available, a reduction in the rate of, U.S. federal withholding taxes without providing such certificates or supporting documentation); or (v) any other form prescribed by applicable requirements of U.S. federal income tax law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable requirements of law to permit the Borrower and the Administrative Agent to determine the withholding or deduction required to be made.

(c)    In addition, each such Lender shall, to the extent it is legally entitled to do so, (i) promptly submit to the Borrower and the Administrative Agent two (2) accurate, complete and original signed copies of such other or additional forms or certificates (or such successor forms or certificates as shall be adopted from time to time by the relevant taxing authorities) as may then be applicable or available to secure an exemption from or reduction in the rate of U.S. federal withholding tax (A) on or before the date that such Lender's most recently delivered form, certificate or other evidence expires or becomes obsolete or inaccurate in any material respect, (B) after the occurrence of a change in the Foreign Lender's circumstances requiring a change in the most recent form, certificate or evidence previously delivered by it to the Borrower and the Administrative Agent, and (C) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent, and (ii) promptly notify the Borrower and the Administrative Agent of any change in the Foreign Lender's circumstances which would modify or render invalid any claimed exemption or reduction.

(d)    Each Agent or Lender that is a "United States person" (within the meaning of Section 7701(a)(30) of the Code) (each a "*U.S. Lender*") agrees to complete and deliver to the Borrower and the Administrative Agent two (2) original copies of accurate, complete and  signed IRS Form W-9 or successor form certifying that such Agent or Lender is not subject to United States backup withholding tax (i) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement), (ii) on or before the date that such form expires or becomes obsolete or inaccurate in any material respect, (iii) after the occurrence of a change in the Agent's or Lender's circumstances requiring a change in the most recent form previously delivered by it to the Borrower and the Administrative Agent, and (iv) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.

53

(e)     If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Agent as may be necessary for the Borrower and the Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause 3.1(e)(ii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(f)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made hereunder shall deliver to the Borrower and the Agent, at the time or times reasonably requested by the Borrower or the Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Agent as will enable the Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.1(b), (d) and (e) above) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(g)     On or before the date the Administrative Agent becomes a party to this Agreement, the Administrative Agent shall provide to the Borrower, two duly-signed, properly completed copies of the documentation prescribed in clause (i) or (ii) below, as applicable (together with all required attachments thereto):  (i) IRS Form W-9 or any successor thereto, or (ii) (A) IRS Form W-8ECI or any successor thereto, and (B) with respect to payments received on account of any Lender, a U.S. branch withholding certificate on IRS Form W-8IMY or any successor thereto evidencing its agreement with the Borrower to be treated as a U.S. Person for U.S. federal withholding purposes.  At any time thereafter, the Administrative Agent shall provide updated documentation previously provided (or a successor form thereto) when any documentation previously delivered has expired or become obsolete or invalid or otherwise upon the reasonable request of the Borrower.

(h)     The Borrower agrees to pay any and all present or future stamp, court or documentary Taxes and any other similar excise, property, intangible or mortgage recording Taxes or charges or similar levies which arise from any payment made under any Loan Document or from the execution, delivery, performance, from the receipt or perfection of a security interest under, enforcement or registration of, or otherwise with respect to, any Loan Document (including additions to tax, penalties and interest related thereto) excluding, in each case, such Taxes that are described in Section 3.1(a)(ii) imposed with respect to an Assignment

and Assumption, except to the extent that any such change is requested in writing by the Borrower (all such non-Excluded Taxes described in this Section 3.1(h) being hereinafter referred to as "*Other Taxes*").

(i)      If any Indemnified Taxes or Other Taxes are directly asserted against any Agent or Lender with respect to any payment received by such Agent or Lender in respect of any Loan Document, such Agent or Lender may pay such Indemnified Taxes or Other Taxes and the Borrower will promptly indemnify and hold harmless such Agent or Lender for the full amount of such Indemnified Taxes and Other Taxes (and any Indemnified Taxes and Other Taxes imposed on amounts payable under this Section 3.1), and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted.  Payments under this Section 3.1(i) shall be made within ten (10) days after the date Borrower receives demand for payment from such Agent or Lender. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by an Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(j)      Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (x) any Indemnified Taxes or Other Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes or Other Taxes pursuant to this Agreement and without limiting the obligation of the Borrower to do so), (y) any Indemnified Taxes or Other Taxes attributable to such Lender's failure to comply with the provisions of Section 12.2(e) relating to the maintenance of a Participant Register and (z) any Taxes excluded from Indemnified Taxes or Other Taxes that are attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off an apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (j).

(k)      [Reserved].

(l)      [Reserved].

(m)      If any Administrative Agent or any Lender determines, in its sole discretion exercised in good faith, that it has received a refund in respect of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrower or Holdings, as the case may be or with respect to which the Borrower or Holdings, as the case may be has paid additional amounts pursuant to this Section 3.1, it shall remit such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower or Holdings, as the case may be under this Section 3.1 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses incurred by the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such

refund), provided that the Borrower or Holdings, as the case may be, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower or Holdings, as the case may be (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph 3.1(m), in no event will the Administrative Agent or any Lender be required to pay any amount to an indemnifying party pursuant to this paragraph 3.1(m) the payment of which would place the Administrative Agent or Lender in a less favorable net after-tax position than such Administrative Agent or Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This subsection shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower, Holdings or any other Person.

(n)     Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 3.1(a) or (i) with respect to such Lender, it will, if requested by the Borrower, use commercially reasonable efforts (subject to legal and regulatory restrictions) to mitigate the effect of any such event, including by designating another Lending Office for any Loan affected by such event and by completing and delivering or filing any tax-related forms which such Lender is legally able to deliver and which would reduce or eliminate any amount of Taxes or Other Taxes required to be deducted or withheld or paid by the Borrower; provided that such efforts are made at the Borrower's expense and on terms that, in the reasonable judgment of such Lender, cause such Lender and its Lending Office(s) to suffer no material economic, legal or regulatory disadvantage, and provided further that nothing in this paragraph 3.1(n) affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.1(a) or (i).

(o)     Notwithstanding any other provision of this Agreement, the Borrower and the Administrative Agent may deduct and withhold any taxes required by any Laws to be deducted and withheld from any payment under any of the Loan Documents, subject to the provisions of this Section 3.1.

(p)     With respect to any Lender's claim for compensation under this Section 3.1, the Borrower shall not be required to compensate such Lender for any amount incurred more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the event that gives rise to such claim; provided that, if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(q)     Each party's obligations under this Section 3.1 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 3.2 Illegality.  If any Lender reasonably determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to the Eurocurrency Rate, or to determine or charge interest rates based upon the Eurocurrency Rate or Adjusted Eurocurrency Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, (i) any obligation of such Lender to make or continue Eurocurrency Rate Loans or to convert Base Rate Loans to Eurocurrency Rate Loans shall be suspended, and (ii) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Adjusted Eurocurrency Rate component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Adjusted Eurocurrency Rate component of the Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (x) the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurocurrency Rate Loans and shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurocurrency Rate Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Adjusted Eurocurrency Rate component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Rate Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such Eurocurrency Rate Loans and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Adjusted Eurocurrency Rate component of the Base Rate with respect to any Base Rate Loans, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Adjusted Eurocurrency Rate component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal  for such Lender to determine or charge interest rates based upon the Eurocurrency Rate.  Each Lender agrees to designate a different Lending Office if such designation will avoid the need for such notice and will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

SECTION 3.3 <u>Inability to Determine Rates</u>.  If the Requisite Lenders reasonably determine that for any reason in connection with any request for a Eurocurrency Rate Loan or a conversion to or continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank eurocurrency market for the applicable amount and Interest Period of such Eurocurrency Rate Loan, (b) adequate and reasonable means do not exist for determining the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan or in connection with an existing or proposed Base Rate Loan; provided that the Administrative Agent and the Borrower shall endeavor to establish an alternate rate of interest to the Eurocurrency Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans in the United States at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such

other related changes to this Agreement as may be applicable, and notwithstanding anything to the contrary in Section 12.1, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Administrative Agent shall not have received, within five (5) Business Days of the date notice of such alternate rate of interest is provided to the Lenders, a written notice from the Required Lenders stating that such Required Lenders object to such amendment, or (c) the Eurocurrency Rate, for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain Eurocurrency Rate Loans shall be suspended, and (y) in the event of a determination described in the preceding sentence with respect to the Adjusted Eurocurrency Rate component of the Base Rate, the utilization of the Adjusted Eurocurrency Rate component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (upon the instruction of the Requisite Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurocurrency Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

SECTION 3.4 <u>Increased Cost and Reduced Return; Capital Adequacy</u>.

(a)    Increased Costs Generally.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)    subject any Lender or the Administrative Agent to any Tax of any kind whatsoever with respect to this Agreement or any Eurocurrency Rate Loan made by it, or change the basis of taxation of payments to such Lender or the Administrative Agent in respect thereof (except for Indemnified Taxes, Other Taxes or Excluded Taxes); or

(iii)    impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurocurrency Rate Loans made by such Lender or participation therein, in each case that is not otherwise accounted for in the definition of Adjusted Eurocurrency Rate or this clause (a);

and the result of any of the foregoing shall be to increase the cost to such Lender (or, in the case of clause (ii) above, the Administrative Agent) of making or maintaining any Loan the interest on which is determined by reference to the Eurocurrency Rate (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender (or, in the case of clause (ii) above, the Administrative Agent), or to reduce the amount of any sum received or receivable by such Lender hereunder (or, in the case of clause (ii) above, the Administrative Agent)  (whether of principal, interest or any other amount) then, from time to time within fifteen (15) days after receipt of the certificate referred to in Section 3.4(c) below setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender (or, in the case of clause (ii) above, the Administrative Agent), as the case may be, such additional amount or amounts as will compensate such Lender (or, in the case of clause

(ii) above, the Administrative Agent), as the case may be, for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If any Lender reasonably determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Term Loan Commitments or Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity requirements), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender, within fifteen (15) days after receipt of the certificate referred to in Section 3.4(c) below, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section 3.4 and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within fifteen (15) days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 3.4 shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 3.4 for any increased costs incurred or reductions suffered more than one hundred and eighty (180) days prior to the date that such Lender, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

SECTION 3.5 Funding Losses.  Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense actually incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day prior to the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)    any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower; or

(c)     any assignment of a Eurocurrency Rate Loan on a day prior to the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 3.7;

(d)     including any loss or expense (excluding loss of anticipated profits or margin) actually incurred by reason of the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained (and, for the avoidance of doubt, excluding the impact of clause (b) of the definition of "Adjusted Eurocurrency Rate").

SECTION 3.6 <u>Matters Applicable to All Requests for Compensation</u>.

(a)     Designation of a Different Lending Office. If any Lender requests compensation under Section 3.4, or the Borrower is required to pay any additional amount to any Lender, or any Governmental Authority for the account of any Lender pursuant to Section 3.1, or if any Lender gives a notice pursuant to Section 3.2, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.1 or 3.4, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.2, as applicable, and (ii) in each case, would not subject such Lender, as the case may be, to any material unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender, as the case may be in any material economic, legal or regulatory respect.

(b)     Suspension of Lender Obligations.  If any Lender requests compensation by the Borrower under Section 3.4, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue Eurocurrency Rate Loans from one Interest Period to another Interest Period, or to convert Base Rate Loans into Eurocurrency Rate Loans, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.6(c) shall be applicable); provided that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)     Conversion of Eurocurrency Rate Loans.  If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Sections 3.2, 3.3 or 3.4 hereof that gave rise to the conversion of such Lender's Eurocurrency Rate Loans no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurocurrency Rate Loans made by other Lenders are outstanding, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurocurrency Rate Loans, to the extent necessary so that, after giving effect thereto, all Loans of a given Class held by the Lenders of such Class holding Eurocurrency Rate Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Pro Rata Shares.

SECTION 3.7 <u>Replacement of Lenders under Certain Circumstances</u>.

If (i) any Lender requests compensation under Section 3.4 or ceases to make Eurocurrency Rate Loans as a result of any condition described in Section 3.2 or Section 3.4, (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.1 or 3.4, (iii) any Lender is a Non-Consenting Lender or (iv) any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 12.2), all of its interests, rights and obligations under this Agreement (or, with respect to clause (iii) above, all of its interests, rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related consent, waiver and amendment) and the related Loan Documents to one or more Eligible Assignees that shall assume such obligations (any of which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a)    the Borrower shall have paid to the Administrative Agent the assignment fee specified in Section 12.2(b)(iv);

(b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.5) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower;

(c)    such Lender being replaced pursuant to this Section 3.7 shall (i) execute and deliver an Assignment and Assumption with respect to all, or a portion as applicable, of such Lender's Commitment and outstanding Loans, and (ii) deliver any Notes evidencing such Loans to the Borrower or Administrative Agent (or a lost or destroyed note indemnity in lieu thereof); provided that the failure of any such Lender to execute an Assignment and Assumption or deliver such Notes shall not render such sale and purchase (and the corresponding assignment) invalid and such assignment shall be recorded in the Register and the Notes shall be deemed to be canceled upon such failure;

(d)    the Eligible Assignee shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, Term Loan Commitments and participations, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender (and, if such assigning Lender is a Non-Consenting Lender, such Eligible Assignee shall agree to the applicable consent, waiver or amendment to which such Non-Consenting Lender has not agreed);

(e)    in the case of any such assignment resulting from a claim for compensation under Section 3.4 or payments required to be made pursuant to Section 3.1, such assignment will result in a reduction in such compensation or payments thereafter;

(f)    such assignment does not conflict with applicable Laws; and

61

(g)     the Lender that acts as the Administrative Agent cannot be replaced in its capacity as Administrative Agent other than in accordance with Section 11.6.

In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each Lender, all affected Lenders or all the Lenders or all affected Lenders with respect to a certain Class or Classes of the Loans and/or Term Loan Commitments and (iii) the Requisite Lenders have agreed (but solely to the extent required by Section 12.1) to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "Non-Consenting Lender".

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

SECTION 3.8 <u>Survival</u>.  All of the Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder and resignation or removal of the Administrative Agent and the Collateral Agent.

# ARTICLE IV

# CONDITIONS PRECEDENT

SECTION 4.1 <u>Conditions Precedent to Closing Date</u>.  The Agreement became effective on the Closing Date upon the satisfaction or due waiver in accordance with Section 12.1 of each of the following conditions precedent, except as otherwise agreed between the Borrower, the Administrative Agent and the Collateral Agent:

(a)     The Administrative Agent's and Collateral Agent's receipt of the following, each of which shall be originals or pdf copies or other facsimiles (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party each in form and substance reasonably satisfactory to the Administrative Agent and its legal counsel and the Collateral Agent and its legal counsel:

(i)     a Notice of Borrowing in accordance with the requirements hereof;

(ii)     executed counterparts of this Agreement and the Guaranty;

(iii)     the Security Agreement, duly executed by each Loan Party thereto;

(iv)     an executed copy of the ABL DIP Credit Agreement (on terms and conditions reasonably satisfactory to the Administrative Agent, it being understood and agreed that the credit agreement governing the ABL DIP Loans attached as an exhibit to the Commitment Letter is satisfactory) and evidence of the substantially concurrent funding of loans thereunder;

(v)     executed copies of the engagement letters with any financial advisors of the Borrower;

(vi)     executed copies of commitment letters and fee letters providing for commitments for exit financing of the Borrower for (i) an asset-based revolving facility of not less than $125,000,000 and (ii) a term loan facility of not less than $400,000,000, each of which shall be in form and substance acceptable to the Administrative Agent and Collateral Agent including, without limitation, the conditions to funding and other terms thereof (any such commitment letter, an "***Exit Commitment Letter***"), it being understood that the terms and conditions set forth in the Exit Commitment Letters as of the Petition Date are satisfactory;

(vii)     an executed copy of the DIP Intercreditor Agreement (in substantially the form attached as Exhibit C to the Commitment Letter);

(viii)     such certificates of good standing from the applicable secretary of state of the state of organization of each Loan Party, certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent and the Collateral Agent may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date;

(ix)     an opinion from Sidley Austin LLP, New York counsel to the Loan Parties in form and substance satisfactory to the Administrative Agent and the Collateral Agent;

(x)     [reserved];

(xi)     [reserved]; and

(xii)     delivery of a Responsible Officer's Certificate, in form and substance reasonably satisfactory to Administrative Agent and the Collateral Agent, certifying as to the conditions set forth in Sections [4.1(e), 4.1(j), 4.2(b) and 4.2 (c)].

(b)     All fees and expenses required to be paid hereunder or under the Orders and invoiced at least one (1) Business Day before the Closing Date shall have been paid in full in cash.

(c)     The Arrangers shall have received (i) copies of the most recent unaudited quarterly financial statements required to be delivered by the Borrower under the Pre-Petition Credit Agreement, (ii) copies of the most recent monthly financial statements required to be delivered by the Borrower under the Pre-Petition Credit Agreement for the calendar months of year 2018 ended at least 30 days prior to the Closing Date and (iii) at least two (2) Business Days prior to the Closing Date, the Budget.

(d)     The Arrangers shall have received at least three (3) Business Days prior to the Closing Date all documentation and other information reasonably requested in writing by them at

63

least ten (10) days prior to the Closing Date in order to allow the Arrangers and the Lenders to comply with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and a certification regarding beneficial ownership required by 31 C.F.R. § 1010.230.

(e)    After giving effect to the Transactions, Excess Availability on the Closing Date shall be not less than an amount equal to (1) the aggregate amount of Loans funded on the Closing Date *less* (2) $25,000,000.

(f)    The Petition Date shall have occurred.

(g)    No later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order granting of the super-priority claim and the liens and other rights and protections contemplated hereby and customary for debtor in possession financings and authorizing the Loans order (i) shall be in full force and effect and shall not have been, in whole or in part, vacated, reversed, stayed, or set aside and (ii) shall not have been modified or amended without the consent of the Administrative Agent and the Collateral Agent.

(h)    The First Day Orders (including the Cash Management Order and approval of the cash management system) entered by the Bankruptcy Court, to the extent affecting the rights or obligations of the Administrative Agent, the Collateral Agent, the Lenders, or the agent or the lenders under the Pre-Petition Credit Agreement, or which may give rise to a post-petition claim, administrative in nature or otherwise, shall be in form and substance acceptable to the Administrative Agent and the Collateral Agent.   There shall exist no unstayed order and injunctions challenging this Agreement or any other Loan Documents, the Exit Commitment Letters, the Pre-Petition Credit Agreement or any Pre-Petition Loan Document, the ABL DIP Loan Agreement or any ABL DIP Loan Documents, the Pre-Petition Obligations, or any Liens or claims in connection therewith.

(i)    As of the Petition Date, the Loan Parties shall have filed the Disclosure Statement and the Chapter 11 Plan with the Bankruptcy Court.

(j)    Since the Petition Date there has not been any event, occurrence, development or state of circumstances or facts that has had or would reasonably be expected to have, individually or in the aggregate a Material Adverse Effect.

(k)    [reserved].

(l)    [reserved].

(m)    The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document shall be true and correct in all material respects on and as of the Closing Date; provided that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided, further that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

64

(n)    No Default or Event of Default shall have occurred or be continuing, or would result from the Borrowing of Loans on the Closing Date or from the application of the proceeds therefrom (including, without limitation, the entry of the Final Order in accordance with Section 8.16(d) hereof:

(o)    The Borrowing shall be made in accordance in all material respects with the Budget, including Permitted Variances thereto, and shall have been approved by the Interim Order or the Final Order (as then applicable), which Order shall be in full force and effect and which shall not have been modified or amended without the consent of the Administrative Agent and the Collateral Agent and not have been vacated, reversed, modified, amended or stayed.

(p)    (i) There shall not have been (x) any order granted by the Bankruptcy Court sustaining any objection by any Person, nor (y) any motion, complaint, objection or other pleading filed by any party, challenging, in either case, the validity, priority, perfection, or enforceability of the Loan Documents or any Lien granted pursuant to the Loan Documents, and (ii) no Lien granted pursuant to the Loan Documents shall have been determined to be null and void, invalid or unenforceable by the Bankruptcy Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Cases, including, without limitation, the Committee Professionals.

Without limiting the generality of the provisions of the last paragraph of Section 9.3, for purposes of determining compliance with the conditions specified in this Section 4.1, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Holdings, the Borrower and each of the Subsidiary Guarantors party hereto represent and warrant to the Agents and the Lenders that:

SECTION 5.1 <u>Existence, Qualification and Power; Compliance with Laws</u>.  Each Loan Party and each of its Restricted Subsidiaries that is a Material Subsidiary (a) is a Person duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization (to the extent such concept exists in such jurisdiction), (b) subject to the entry of the Interim Order or the Final Order, as applicable, has all requisite power and authority to (i) own or lease its assets and carry on its business as currently conducted and (ii) in the case of the Loan Parties, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (to the extent such concept exists in such jurisdiction) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) subject to the entry of the Interim Order or the Final Order, as applicable, is in compliance with all applicable Laws, orders, writs and injunctions and (e) has all requisite governmental licenses,

65

authorizations, consents and approvals to operate its business as currently conducted; except in each case referred to in clause (c), (d) or (e), to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect.

SECTION 5.2 <u>Authorization; No Contravention</u>.  (a)  Subject to the entry of the Interim Order or the Final Order, as applicable, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party have been duly authorized by all necessary corporate or other organizational action.  (b) Subject to the entry of the Interim Order or the Final Order, as applicable, neither the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, the consummation of the Transaction, nor the incurrence of any Obligations or the granting of Lien to secure the Obligations will (i) contravene the terms of any of such Person's Organization Documents, (ii) result in any breach or contravention of, or the creation of any Lien upon any of the property or assets of such Person or any of the Restricted Subsidiaries (other than as permitted by Section 9.1) under (A) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (B) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any applicable Law; except with respect to any breach, contravention or violation (but not creation of Liens) referred to in clauses (ii) and (iii), to the extent that such breach, contravention or violation would not reasonably be expected to have a Material Adverse Effect.

SECTION 5.3 <u>Governmental Authorization</u>.  Subject to the entry of the Interim Order or the Final Order, as applicable, no material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (i) filings necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings that have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or in full force and effect pursuant to the Collateral and Guarantee Requirement) and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

SECTION 5.4 <u>Binding Effect</u>.  This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto.  This Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited by (i) Debtor Relief Laws, including the entry of the Interim Order or the Final Order, as applicable, (ii) the need for filings and registrations necessary to create or perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties and (iii) the effect of foreign Laws, rules and regulations as they relate to pledges of Equity Interests in Foreign Subsidiaries.

SECTION 5.5 <u>No Material Adverse Effect</u>.  Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate that has had or would reasonably be expected to have a Material Adverse Effect.

SECTION 5.6 <u>Litigation</u>.  Except for the Cases, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, overtly threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against Holdings, the Borrower or any of the Restricted Subsidiaries that would reasonably be expected to have a Material Adverse Effect.

SECTION 5.7 <u>Labor Matters</u>.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:  (a) there are no strikes or other labor disputes against any of the Borrower or its Restricted Subsidiaries pending or, to the knowledge of the Borrower, overtly threatened in writing and (b) hours worked by and payment made based on hours worked to employees of each of the Borrower or its Restricted Subsidiaries have not been in material violation of the Fair Labor Standards Act or any other applicable Laws dealing with wage and hour matters.

SECTION 5.8 <u>Ownership of Property; Liens</u>.  The Borrower and each of its Restricted Subsidiaries has good record title to, or valid leasehold interests in, or easements or other limited property interests in, all real property necessary in the ordinary conduct of its business, free and clear of all Liens except for Pre-Petition Liens and except for minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and except for Liens permitted by Section 9.1 and except where the failure to have such title or other interest would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.9 <u>Environmental Matters</u>.  Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)      (i) each Loan Party and its respective properties and operations are, and for the past three years have been, in compliance with all Environmental Laws in all jurisdictions in which each Loan Party is currently doing business, which includes obtaining and maintaining all applicable Environmental Permits required under such Environmental Laws to carry on the business of the Loan Parties, and (ii) none of the Loan Parties is subject to any pending Environmental Claim or any other Environmental Liability, or to the knowledge of the Borrower, any Environmental Claim or any other Environmental Liability threatened in writing; and

(b)      none of the Loan Parties or any of their respective Subsidiaries has released, treated, stored, transported or disposed of Hazardous Materials at or from any currently or, to the knowledge of the Borrower, formerly operated real estate or facility relating to its business except in compliance with Environmental Laws.

SECTION 5.10      <u>Taxes</u>.  Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, Holdings, the Borrower and its Restricted Subsidiaries have timely filed all Federal and state and other tax returns and reports required to be filed by them, and have timely paid all Federal and state and other Taxes,

assessments, fees and other governmental charges (including satisfying its withholding tax obligations) levied or imposed on their properties, income or assets or otherwise due and payable, except those which are being contested in good faith by appropriate actions diligently conducted and for which adequate reserves have been provided in accordance with IFRS.

SECTION 5.11    ERISA Compliance.  (a) Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA and the Code.

(b)    (i) No ERISA Event has occurred prior to the date on which this representation is made or deemed made; and (ii) no Pension Plan has failed to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan, except, with respect to each of the foregoing clauses of this Section 5.11(b), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

SECTION 5.12    Subsidiaries.  As of the Closing Date (after giving effect to the Transaction), no Loan Party has any Material Subsidiaries other than those specifically set forth in the Disclosure Statement, and all of the outstanding Equity Interests owned by the Loan Parties in such Material Subsidiaries have been validly issued and are fully paid and (if applicable) nonassessable, and all Equity Interests owned by a Loan Party are owned free and clear of all Liens except (i) those created under the Collateral Documents and (ii) any Lien that is permitted under Section 9.1.  As of the Closing Date, the Disclosure Statement sets forth the name and jurisdiction of each Loan Party, (b) sets forth the ownership interest of Holdings, the Borrower and any other Subsidiary in each Subsidiary, including the percentage of such ownership and (c) identifies each Subsidiary that is a Subsidiary the Equity Interests of which are required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement.

SECTION 5.13    Margin Regulations; Investment Company Act.

(a)    The Borrower is not engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U of the Board of Governors of the United States Federal Reserve System.

(b)    Neither the Borrower nor any Guarantor is registered as an "investment company" under the Investment Company Act of 1940.

SECTION 5.14    Disclosure.  None of the information and data heretofore or contemporaneously furnished in writing by or on behalf of any Loan Party (other than financial estimates, forecasts and other forward-looking information, pro forma financial information and information of a general economic or industry-specific nature) to any Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or

omits to state any material fact necessary to make such information and data (taken as a whole), in the light of the circumstances under which it was delivered, not materially misleading.  With respect to any financial estimates, forecasts and other forward-looking information or any pro forma financial information, the Borrower represents that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation; it being understood that such projections may vary from actual results and that such variances may be material.

SECTION 5.15    Intellectual Property; Licenses, Etc.    The Borrower and the Restricted Subsidiaries have good and marketable title to, or a valid license or right to use, all patents, patent rights, trademarks, servicemarks, trade names, copyrights, technology, software, know-how database rights, rights of privacy and publicity, licenses and other intellectual property rights (collectively, "*IP Rights*") that are reasonably necessary for the operation of their respective businesses as currently conducted and as proposed to be conducted, except where the failure to have any such rights, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  To the knowledge of the Borrower, the operation of the respective businesses of the Borrower or any of its Restricted Subsidiaries as currently conducted does not infringe upon, misuse, misappropriate or violate any rights held by any Person except for such infringements, misuse, misappropriations or violations individually or in the aggregate, that would not reasonably be expected to have a Material Adverse Effect.  No claim or litigation regarding any IP Rights is pending or, to the knowledge of the Borrower, threatened in writing against any Loan Party or Restricted Subsidiary, that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

SECTION 5.16    Budget.  A true and complete copy of the initial Budget is attached as Schedule 5.16 hereto.

SECTION 5.17    [Reserved]USA PATRIOT Act; OFAC; FCPA.

(a)    To the extent applicable, each of Holdings and its Subsidiaries is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto and (ii) the USA PATRIOT Act.

(b)    No part of the proceeds of the Loans will be used, directly or, to the knowledge of Holdings and its Subsidiaries, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(c)    (i) None of Holdings or its Subsidiaries will directly or, to the knowledge of Holdings or such Subsidiary, indirectly, use the proceeds of the Loans in violation of applicable Sanctions or otherwise knowingly make available such proceeds to any Person for the purpose of financing the activities of any Sanctioned Person, except to the extent licensed, exempted or otherwise approved by a competent governmental body responsible for enforcing such Sanctions,

(ii) none of Holdings, any Subsidiary or to the knowledge of Holdings or such Subsidiary, their respective directors, officers or employees or, to the knowledge of the Borrower, any controlled Affiliate of Holdings, the Borrower or its Subsidiaries that will act in any capacity in connection with or benefit from any Class, is a Sanctioned Person and (iii) none of Holdings, its Subsidiaries or, to the knowledge of Holdings or such Subsidiary, their respective directors, officers and employees, are in violation of applicable Sanctions in any material respects.

SECTION 5.19    Collateral Documents.  The Collateral Documents, taken together with the Orders, create in favor of the Administrative Agent, for the benefit of the Administrative Agent, the Collateral Agent and the other Secured Parties, legal, valid and enforceable Liens, security or mortgage interests in the Collateral (subject to the DIP Intercreditor Agreement, general principles of equity, regardless of whether considered in a proceeding in equity or at law). Except for the entry of the Orders, no filing or other action will be necessary to perfect or protect such Liens, security or mortgage interests. Upon entry of and to the extent provided in the Orders, the Obligations of the Loan Parties under this Agreement will constitute allowed super-priority administrative expense claims in the Case and first priority liens under Section 364(c) of the Bankruptcy Code as further described in Section 2.17(a)(ii) and (iii), having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person (including, for the avoidance of doubt, Avoidance Actions and the proceeds of thereof), subject only to the Carve Out and the DIP Intercreditor Agreement. Notwithstanding anything to the contrary herein, the Carve Out shall be senior to all Liens and claims (including administrative and superpriority claims) securing the Obligations, adequate protection Liens, and all other Liens or claims (including administrative claims and DIP Superpriority Claims), including all other forms of adequate protection, Liens, or claims (including administrative claims and DIP Superpriority Claims) securing the Obligations granted or recognized as valid, including the Liens, security interests, and claims (including administrative claims and DIP Superpriority Claims) granted to the Agents and the other Loan Parties.Orders.  The Loan Parties are in compliance with the terms and conditions of the Orders. Each of the Interim Order (to the extent necessary during the Interim Order Period) or the Final Order (from after the date of the entry of the Final Order) is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent, the Collateral Agent and each Lender, no change, amendment or modification or any application or motion for any change, amendment or modification to any of the Orders shall be made, in each case, that is adverse to the interests of the                    Loan                    Parties

## FINANCIAL COVENANTS

So long as any Lender shall have any Term Loan Commitment hereunder, any Loan or other Obligation hereunder (other than contingent indemnification obligations as to which no claim has been asserted) shall remain unpaid or unsatisfied, the Borrower agrees with the Lenders and the Administrative Agent to the following:

SECTION 6.1 Minimum Excess Availability.  Excess Availability shall not be less than the greater of (a) 10% of the Borrowing Base and (b) $15,000,000 at any time.

## REPORTING COVENANTS

So long as any Lender shall have any Term Loan Commitment hereunder or any Loan or other Obligation hereunder (other than contingent indemnification obligations as to which no claim has been asserted), the Borrower shall, and shall (except in the case of the covenants set forth in Sections 7.1, 7.2 and 7.3) cause each of the Restricted Subsidiaries to:

SECTION 7.1 <u>Financial Statements, Etc</u>.  Deliver to the Administrative Agent and the Collateral Agent for prompt further distribution to each Lender each of the following and shall take the following actions:

(a)    commencing with the Fiscal Year ending October 2, 2018, as soon as available, but in any event within one hundred and twenty (120) days after the end of each Fiscal Year of the Borrower, a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such Fiscal Year, and the related consolidated statements of income, stockholders' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail and prepared in accordance with IFRS (or, if the Borrower has then elected to be governed by GAAP, GAAP), audited and accompanied by a report and opinion of Deloitte & Touche LLP or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards, together with management's discussion and analysis ("*MD&A*") describing results of operations for such period (which MD&A shall be deemed delivered hereunder upon the filing with the SEC (or equivalent) of a Form 10-K (or equivalent) by the Borrower or any direct or indirect parent of the Borrower);

(b)    as soon as available, but in any event within forty-five (45) days after the end of each of the first three (3) Fiscal Quarters of each Fiscal Year of the Borrower (except for the first Fiscal Quarter of Fiscal Year ending October 2, 2018, which shall be within sixty (60) days), a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such Fiscal Quarter, and the related (i) consolidated statements of income for such Fiscal Quarter and for the portion of the Fiscal Year then ended and (ii) consolidated statements of cash flows for such Fiscal Quarter and for the portion of the Fiscal Year then ended, setting forth in each case in comparative form the figures for the corresponding Fiscal Quarter of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with IFRS (or, if the Borrower has then elected to be governed by GAAP, GAAP), subject to normal year-end adjustments and the absence of footnotes, together with an MD&A describing results of operations for such period (which MD&A shall be deemed delivered hereunder upon the filing with the SEC (or equivalent) of a Form 10-Q (or equivalent) by the Borrower or any direct or indirect parent of the Borrower);

(c)    as soon as available, but in any event within thirty (30) days after the end of each month during the Cases (commencing with the first month ending after the Closing Date), a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such month, and the related consolidated statements of income and consolidated statements of cash flows for such

month, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with IFRS (or, if the Borrower has then elected to be governed by GAAP, GAAP), subject to normal year-end adjustments and the absence of footnotes;

(d)    within ninety (90) days after the end of each Fiscal Year of the Borrower, a reasonably detailed consolidated budget for the following Fiscal Year (including a projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following Fiscal Year, the related consolidated statements of projected income and projected cash flow and setting forth the material underlying assumptions applicable thereto) (collectively, the "*Projections*"), which Projections shall in each case be accompanied by a certificate of a Responsible Officer stating that such Projections have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time of preparation of such Projections, it being understood that actual results may vary from such Projections and that such variations may be material;

(e)    simultaneously with the delivery of each set of consolidated financial statements referred to in Sections 7.1(a), 7.1(b) and 7.1(c) above, the related unaudited consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) (which may be in footnote form only) from such consolidated financial statements;

(f)    upon request of the Administrative Agent, within ten Business Days after the delivery of each set of financial statements referred to in Section 7.1(a) and (b) above, a conference call (which may be password protected) to discuss such financial statements and operations for the relevant period (with the time and date of such conference call, together with all information necessary to access the call, to be provided to the Administrative Agent no fewer than three Business Days (or such shorter time as to which the Administrative Agent may agree) prior to the date of such conference call, for posting on the Platform); and

(g)    the Borrower will furnish to the Administrative Agent and the Collateral Agent, (i) on or before 5:00 p.m. (New York time) every Wednesday during the Cases (commencing on Wednesday October 17, 2018) a weekly cash flow forecast, calculated as of the Friday of the week previously ended, for the subsequent 13-week period certified by a Responsible Officer of the Borrower, together with a cash report detailing all cash and Cash Equivalents on-hand of the Loan Parties and their subsidiaries (broken out by entity) as of the close of business on such Friday date, each in form, scope and detail reasonably acceptable to the Administrative Agent and Collateral Agent, and (ii) on or before 5:00 p.m. (New York time) every Wednesday during the Cases (commencing on Wednesday October 17, 2018), a variance report certified by a Responsible Officer of the Borrower (the "*Receipts/Disbursements Variance Report*") setting forth Actual Cash Receipts and Actual Disbursements of the Loan Parties for the preceding one calendar week period calculated as of the Friday of the week previously ended (and solely for the Receipts/Disbursements Variance Report delivered on October 17, 2018, calculated for the period from the Petition Date through October 12, 2018) and cumulatively for the preceding four week period (or, prior to the fourth full week after the Petition Date, the period from the Petition Date through the end of such week period) and (iii) on or before 5:00 p.m. (New York time)

every Friday during the Cases (commencing on Friday October 19, 2018) a variance report certified by a Responsible Officer of the Borrower (the "*Inventory Variance Report*" and together with the Receipts/Disbursements Variance Report, the "*Variance Report*") setting forth Actual Inventory Levels of the Loan Parties calculated as of the prior Tuesday of the such week and, in each case of clause (ii) and (iii), setting forth all the variances (including, without limitation, variances related to Budgeted Cash Receipts, Budgeted Disbursements and Budgeted Inventory Levels), on a line-item and aggregate basis, from the amount set forth for each such periods or as of such dates as compared to the Budget delivered by the Loan Parties (and each Variance Report shall include reasonably detailed explanations for all material variances (including Permitted Variances), each in form, scope and detail reasonably acceptable to Administrative Agent and Collateral Agent.  Not later than one Business Day after the receipt of Receipts/Disbursements Variance Report, the Borrower and the Administrative Agent and Collateral Agent shall conduct a conference call to discuss the information contained therein at a mutually convenient time.Notwithstanding the foregoing, the obligations in paragraphs (a) and (b) of this Section 7.1 may be satisfied with respect to financial information of the Borrower and its Restricted Subsidiaries (including the provision of any MD&A) by furnishing (A) the applicable financial statements of any direct or indirect parent of the Borrower that holds all of the Equity Interests of the Borrower or (B) the Borrower's or such entity's Form 10-K or 10-Q (or equivalent), as applicable, filed with the SEC (or equivalent Governmental Authority applicable to such indirect parent company); *provided* that, with respect to each of clauses (A) and (B), (i) to the extent such information relates to a parent of the Borrower, the financial statements are accompanied by unaudited consolidating information that explains in reasonable detail the differences between the information relating to the Borrower (or such parent), on the one hand, and the information relating to the Borrower and the Restricted Subsidiaries on a standalone basis, on the other hand and (ii) to the extent the financial statements are in lieu of financial statements required to be provided under Section 7.1(a), such materials are, to the extent applicable, accompanied by a report and opinion of Deloitte & Touche LLP or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards.

SECTION 7.2 Certificates; Other Information.  Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)      no later than five (5) days after the delivery of the financial statements referred to in Section 7.1(a), Section 7.1(b) and Section 7.1(c), a duly completed Compliance Certificate signed by the chief financial officer of the Borrower;

(b)      promptly after the same are publicly available, copies of all annual, regular, periodic and special reports, proxy statements and registration statements which Holdings or the Borrower or any Restricted Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor or with any national securities exchange, as the case may be (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8), and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this Section 7.2;

(c)      promptly after the furnishing thereof, copies of any material notices (other than notices furnished in the ordinary course) furnished to any holder of any class or series of debt securities of any Loan Party having an aggregate outstanding principal amount greater than the Threshold Amount, so long as the aggregate outstanding principal amount thereunder is greater than the Threshold Amount and not otherwise required to be furnished to the Administrative Agent pursuant to any other clause of this Section 7.2;

(d)      together with the delivery of each Compliance Certificate delivered pursuant to Section 7.2(a), (i) a report setting forth the information required by Section 3.03(c) of the Security Agreement (or confirming that there has been no change in such information since the Closing Date or the date of the last such report), (ii) a description of each event, condition or circumstance during the last Fiscal Quarter covered by such Compliance Certificate requiring a mandatory prepayment under Section 2.9, if any, and (iii) a list of each Subsidiary of the Borrower that identifies each Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary as of the date of delivery of such Compliance Certificate or a confirmation that there is no change in such information since the later of the Closing Date and the date of the last such list;

(e)      promptly, such additional information regarding the business, legal, financial or corporate affairs (including information regarding leases and stores, notwithstanding any limitation under Section 8.6 regarding the ability to exercise inspection rights) of any Loan Party or any Restricted Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent may from time to time on its own behalf or on behalf of any Lender reasonably request; and

(f)      all information required to be delivered by the Loan Parties pursuant to the Orders regarding the Budget and the Permitted Variances.

Documents required to be delivered pursuant to Section 7.1(a), (b) or (c) or Section 7.2(c) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower (or any direct or indirect parent of the Borrower) posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 12.8; or (ii) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that:   (i) upon written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents (which may be electronic copies delivered via electronic mail) to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent and/or the Arranger will make available to the Lenders materials and/or information provided by or on

behalf of the Borrower hereunder (collectively, "*Borrower Materials*") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "*Platform*") and (b) certain of the Lenders (each, a "*Public Lender*") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Subsidiaries, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Arranger and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 12.19); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent and the Arranger shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."   Notwithstanding the foregoing, the Borrower shall be under no obligation to mark the Borrower Materials "PUBLIC".

SECTION 7.3 <u>Notices</u>.  Promptly after a Responsible Officer obtains actual knowledge thereof, notify the Administrative Agent:

(a)      of the occurrence of any Default; and

(b)      of (i) any dispute, litigation, investigation or proceeding between any Loan Party and any arbitrator or Governmental Authority, (ii) other than in connection with the Cases, the filing or commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary, including pursuant to any applicable Environmental Laws or in respect of IP Rights, the occurrence of any noncompliance by any Loan Party or any of its Subsidiaries with, or liability under, any Environmental Law or Environmental Permit, or (iii) the occurrence of any ERISA Event that, in any such case referred to in clauses (i), (ii) or (iii), has resulted or would reasonably be expected to result in a Material Adverse Effect.

Each notice pursuant to this Section 7.3 shall be accompanied by a written statement of a Responsible Officer of the Borrower (x) that such notice is being delivered pursuant to Section 7.3(a) or (b) (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

# ARTICLE VIII

## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Term Loan Commitment hereunder or any Loan or other Obligation hereunder (other than contingent indemnification obligations as to which no

claim has been asserted), Holdings and the Borrower shall, and shall cause each of the Restricted Subsidiaries to:

SECTION 8.1 <u>Preservation of Existence, Etc</u>.  (a)  Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization and (b) take all reasonable action to obtain, preserve, renew and keep in full force and effect its rights, licenses, permits and franchises material to the ordinary conduct of its business, except in the case of clause (a) or (b) to the extent (other than with respect to the preservation of the existence of Holdings and the Borrower) that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or pursuant to any merger, consolidation, liquidation, dissolution or Disposition permitted by Article IX.

SECTION 8.2 <u>Compliance with Laws, Etc</u>.  Comply in all material respects with its Organization Documents and the requirements of all Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or to its business or property, except if the failure to comply therewith would not reasonably be expected individually or in the aggregate to have a Material Adverse Effect.

SECTION 8.3 [Reserved].

SECTION 8.4 <u>Payment of Taxes, Etc</u>.  To the extent required or permitted by any Order or the Bankruptcy Code and contemplated by the Budget (subject to Permitted Variances), timely pay, discharge or otherwise satisfy, as the same shall become due and payable in the normal conduct of its business, all of its obligations and liabilities in respect of Taxes imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent (i) any such Tax is being contested in good faith and by appropriate actions for which appropriate reserves have been established in accordance with IFRS or (ii) the failure to pay or discharge the same would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

SECTION 8.5 <u>Maintenance of Insurance</u>.  Maintain with insurance companies that the Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Restricted Subsidiaries) as are customarily carried under similar circumstances by such other Persons, and will furnish to the Lenders, upon written request from the Administrative Agent or the Collateral Agent, information presented in reasonable detail as to the insurance so carried.  Each such policy of insurance shall, as appropriate, (i) name the Collateral Agent, on behalf of the Lenders, as an additional insured thereunder as its interests may appear and/or (ii) in the case of each casualty insurance policy, contain a lender loss payable clause or endorsement that names the Collateral Agent, on behalf of the Lenders as the lender loss payee thereunder.

SECTION 8.6 <u>Inspection Rights</u>.  In addition to the requirements pursuant to Section 7.4, permit representatives and independent contractors of the Administrative Agent, the Collateral

Agent, and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided that, only the Administrative Agent and the Collateral Agent, collectively, on behalf of the Lenders may elect to exercise rights of the Administrative Agent, the Collateral Agent, and the Lenders under this Section 8.6 and the Administrative Agent and the Collateral Agent, collectively, shall not exercise such rights more often than two (2) times during any calendar year and only one (1) such time shall be at the Borrower's expense; provided, further, that when an Event of Default exists and is continuing, the Administrative Agent (or any of its respective representatives or independent contractors) and the Collateral Agent may, collectively, do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice.  The Administrative Agent, the Collateral Agent, and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.  Notwithstanding anything to the contrary in this Section 8.6, none of the Borrower or any of the Restricted Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes non-financial trade secrets or non-financial proprietary information (other than with respect to any non-financial trade secrets or non-financial proprietary information related to Eligible Accounts, Eligible Credit Card Receivables, Eligible In-Transit Inventory, Eligible Inventory (each as defined in the ABL DIP Credit Agreement) or balances in deposit accounts and security accounts), (b) in respect of which disclosure to the Administrative Agent, the Collateral Agent, or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (c) is subject to attorney-client or similar privilege or constitutes attorney work product.

SECTION 8.7 <u>Books and Records</u>.  Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with IFRS shall be made of all material financial transactions and matters involving the assets and business of Holdings, the Borrower or such Restricted Subsidiary, as the case may be.

SECTION 8.8 <u>Maintenance of Properties</u>.  Except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, maintain, preserve and protect all of its material properties and equipment used in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and fire, casualty or condemnation excepted.

SECTION 8.9 <u>Use of Proceeds</u>.  In accordance with and subject to the Budget (including the Permitted Variance provisions) and the Orders, use the proceeds of Loans to finance: (i) the payment of expenses incurred in connection with the transactions contemplated hereby, (ii) the payment of fees, expenses and costs incurred in connection with the Cases, (iii) the payment of any adequate protection payments approved in the Orders, (iv) working capital, capital expenditures, and other general corporate purposes of the Loan Parties and (v) repayment of all Loans (but not, for the avoidance of doubt, Letters of Credit under the Pre-Petition Credit Agreement) under the Pre-Petition Credit Agreement.

SECTION 8.10    <u>Compliance with Environmental Laws</u>.  Except, in each case, to the extent that the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) comply, and take all reasonable actions to cause any lessees and other Persons operating or occupying its properties to comply with all applicable Environmental Laws and Environmental Permits; (b) obtain and renew all Environmental Permits necessary for its operations and properties; and, (c) in each case to the extent required by applicable Environmental Laws, conduct any investigation, remedial or other corrective action necessary to address all releases of Hazardous Materials on or from any of its properties, in accordance with the requirements of all applicable Environmental Laws.

SECTION 8.11    <u>Covenant to Guarantee Obligations and Give Security</u>.  At the Borrower's expense, subject to the limitations and exceptions of this Agreement, including, without limitation, the provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent, the Collateral Agent, or the Collateral Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(a)    (x) upon the formation or acquisition of any new direct or indirect wholly owned Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary) by any Loan Party or any Subsidiary becoming a wholly owned Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary):

(i)    within sixty (60) days (or such greater number of days specified below) after such formation, acquisition or designation or, in each case, such longer period as the Administrative Agent and the Collateral Agent may agree in their reasonable discretion:

(A)    cause each such Material Domestic Subsidiary that is required to become a Guarantor under the Collateral and Guarantee Requirement to furnish to the Collateral Agent a description of the Material Real Properties owned by such Material Domestic Subsidiary in detail reasonably satisfactory to the Collateral Agent;

(B)    within sixty (60) days after such formation, acquisition or designation, cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Collateral Agent, other than with respect to any Excluded Assets, Security Agreement Supplements, Intellectual Property Security Agreements and other security agreements and documents, as reasonably requested by and in form and substance reasonably satisfactory to the Collateral Agent (consistent with the Mortgages, Security Agreement, Intellectual Property Security Agreements and other Collateral Documents in effect on the Closing Date), in each case granting Liens required by the Collateral and Guarantee Requirement;

(C)    cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to deliver any and all certificates representing Equity Interests (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer

78

executed in blank (or any other documents customary under local law) and instruments evidencing the intercompany Indebtedness held by such Material Domestic Subsidiary and required to be pledged pursuant to the Collateral Documents, indorsed in blank to the Collateral Agent;

(D)   within sixty (60) days (or within ninety (90) days in the case of documents listed in Section 8.13(a)(ii)) after such formation, acquisition or designation, (1) take and cause the applicable Material Domestic Subsidiary and each direct or indirect parent of the applicable Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to take whatever action (including the filing of UCC financing statements and delivery of stock and membership interest certificates to the extent certificated) as may be necessary in the reasonable opinion of the Administrative Agent or the Collateral Agent to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid Liens required by the Collateral and Guarantee Requirement, enforceable against all third parties in accordance with their terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity (regardless of whether enforcement is sought in equity or at law); and

(ii)   within sixty (60) days after the reasonable request therefor by the Administrative Agent or the Collateral Agent (or such longer period as the Administrative Agent and the Collateral Agent  may agree in their respective reasonable discretion), deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties reasonably acceptable to the Administrative Agent and the Collateral Agent as to such matters set forth in this Section 8.11(a) as the Administrative Agent or the Collateral Agent may reasonably request.

SECTION 8.12      Cash Receipts  Each Loan Party shall manage all cash in accordance with the provisions below and as provided in the Orders and/or Cash Management Order, in each case, as entered by the Bankruptcy Court, and:

(a)      To the extent entered into pursuant to Section 8.12(a) of the ABL DIP Credit Agreement, enter into, the Borrower shall ensure that the Administrative Agent shall have springing control with respect to the Approved Deposit Accounts pursuant to the Cash Management Order or the Orders, as applicable.

(b)      To the extent entered into pursuant to Section 8.12(a) of the ABL DIP Credit Agreement, the Borrower shall ensure that the Administrative Agent shall have springing control with respect to the Approved Securities Accounts pursuant to the Cash Management Order or the Orders, as applicable.

(c)      Each Loan Party shall (i) instruct each Account Debtor or other Person obligated to make a payment to any of them under any Account to make payment, or to continue to make payment, to an Approved Deposit Account or Post-Petition Deposit Account (as defined in the ABL DIP Credit Agreement) that is not an Excluded Account (as defined in the ABL DIP Credit Agreement), (ii) deposit in an Approved Deposit Account or Post-Petition Deposit Account

promptly upon receipt all Cash Receipts (as defined in the ABL DIP Credit Agreement) received by any Loan Party from any other Person (provided that, any Cash Receipts may be deposited into an Excluded Account to the extent that such deposit would not cause such Excluded Account to cease to be qualified as an Excluded Account) and (iii) instruct each depository institution for a Deposit Account or Post-Petition Deposit Account to cause all amounts on deposit and available at the close of each Business Day in such Deposit Account or Post-Petition Deposit Account to be swept to one of the Loan Parties' concentration accounts no less frequently than on a daily basis, such instructions to be irrevocable unless otherwise agreed to by the Administrative Agent and the Collateral Agent (other than, in the case of clause (iii), any Excluded Account or any amounts deposited in an Excluded Account).

SECTION 8.13    Further Assurances and Post-Closing Covenants.

(a)    Subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitations in any Collateral Document and in each case at the expense of the Loan Parties:

(i)    Promptly upon reasonable request by the Administrative Agent or the Collateral Agent or the Collateral Agent or as may be required by applicable law (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent or Collateral Agent or the Collateral Agent may reasonably request from time to time in order to carry out more effectively the purposes of the Collateral Documents.

(ii)    [Reserved].

(b)    Complete and/or deliver to Administrative Agent, or cause to be completed or so delivered, in form and substance reasonably satisfactory to Administrative Agent and Collateral Agent, the actions and items described on Schedule 8.13(b) hereof on or before the dates specified with respect to such actions and items, or such later dates as may be agreed to by Administrative Agent in its sole discretion.

SECTION 8.14    [Reserved].

SECTION 8.15    Additional Information and Bankruptcy-Related Obligations.

(a)    The Borrower will, as soon as practicable in advance of filing with the Bankruptcy Court, of all material documents, motions and pleadings related to the Orders, this Agreement, proposed Store closings, asset sales and the Chapter 11 Plan and the Disclosure Statement, deliver to the Administrative Agent and the Collateral Agent all such documents to be filed and provide the Administrative Agent and the Collateral Agent with a reasonable opportunity to review and comment on all such documents, which documents shall be reasonably satisfactory to the Administrative Agent and the Collateral Agent.

(b)      Without limiting the requirements set forth in Section 8.15(a), the Borrower will deliver to the Administrative Agent and the Collateral Agent promptly after the same are available, copies of all pleadings, applications, judicial information, financial information and other documents filed on behalf of the Borrower or any Guarantor with the Bankruptcy Court in the Cases, or distributed by or on behalf of any Loan Party to the Committee Professionals; *provided* that any publicly filed documents with the Bankruptcy Court shall be deemed to have been delivered to the Administrative Agent and the Collateral Agent.

(c)      The Borrower will deliver to the Administrative Agent and the Collateral Agent promptly after the same are available, copies of all reporting and information related to any proposed Store closings, asset sales or other dispositions that could reasonably be expected to materially affect the Borrowing Base (including, without limitation, detail regarding transportation and refurbishment costs associated with any Store closings, and other information reasonably requested by the Administrative Agent).

(d)      The Borrower will allow the Administrative Agent and the Collateral Agent access to, upon reasonable notice during normal business hours, all financial advisors and advisors engaged by the Loan Parties (which engagement, with respect to any financial professionals and advisors engaged after the Closing Date, shall be on terms and conditions reasonably satisfactory to the Administrative Agent and the Collateral Agent).

(e)      The Borrower will deliver to the legal counsel to the Administrative Agent and the Collateral Agent, at least two Business Days in advance of filing with the Bankruptcy Court, copies of all proposed orders entered by the Bankruptcy Court or any other court having jurisdiction over the insolvency proceeding of any Loan Party pending outside of the Bankruptcy Court in respect of first day motions and applications ("*First Day Orders*") and second day motions and applications ("*Second Day Orders*"; together with the First Day Orders, the "*Initial Orders*") and motions seeking approval of the Initial Orders, which shall be in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent.

SECTION 8.16      Milestones.

(a)      On the Petition Date or the next Business Day thereafter, the Debtors shall have filed with the Bankruptcy Court a motion seeking approval of this Agreement and the Loans.

(b)      As of the Petition Date, the Loan Parties shall have (i) filed a disclosure statement ("*Disclosure Statement*") and the Chapter 11 Plan with the Bankruptcy Court, each in form and substance satisfactory to the Administrative Agent and the Collateral Agent, which plan and (A) provides for payment in full of all Obligations on the effective date thereof, and (B) either (I) provides that each class of claims or interests therein is not impaired or (II) has been accepted, pursuant to a solicitation (conducted in accordance with applicable law) of votes completed prior to the Petition Date, by each impaired class of claims or interests, without regard to any acceptance by any insider of the Loan Parties (the "*Chapter 11 Plan*") and (ii) provided evidence, satisfactory to the Administrative Agent and the Collateral Agent, of the agreements by holders of intercompany Indebtedness of any Debtor to support the Chapter 11 Plan.

LEGAL_US_W # 95883172.13

(c)    On or before three (3) Business Days after the Petition Date, the Interim Order shall have been entered by the Bankruptcy Court.

(d)    On or before 30 days after the Petition Date, the Final Order shall have been entered by the Bankruptcy Court.

(e)    On or before 60 days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance that is satisfactory to the Administrative Agent and Collateral Agent, confirming the Chapter 11 Plan.

(f)    (i) On the Petition Date, the Debtors shall have filed a Motion to Reject Leases with respect to no less than 200 Stores, in form and substance satisfactory to the Administrative Agent and Collateral Agent, and (ii) obtained one or more orders of the Bankruptcy Court on or before the 60th day after the Petition Date to close no less than 500 Stores, such orders to be in form and substance satisfactory to the Administrative Agent and Collateral Agent.

SECTION 8.17    <u>Performance Within Budget</u>.  At all times following the Closing Date, strictly perform in accordance with the Budget, including making all scheduled payments to the Administrative Agent and the Lenders as and when required under this Agreement, subject to the following (the "*Permitted Variances*"):

(a)    the Loan Parties' cumulative Actual Disbursements shall not exceed the Budgeted Disbursements by more than (i) 17.5% solely during the period from the Petition Date through October 12, 2018 calculated on a cumulative basis for such period, (ii) 15% solely during the period from the Petition Date through October 19, 2018 calculated on a cumulative basis for such period, (iii) 12.5% solely during the period from the Petition Date through October 26, 2018 calculated on a cumulative basis for such period, and (iv) at all times thereafter, 10%, in each case on a rolling four week cumulative basis;

(b)    the Loan Parties' Actual Cash Receipts shall not be less than (i) 90% of the Budgeted Cash Receipts, solely during each of the first two weeks ending after the Petition Date, calculated on a cumulative basis for such one or two week period, (ii) 90% of the Budgeted Cash Receipts during the succeeding week, calculated on a cumulative basis for such three week period, and (ii) at all times thereafter, 90% of the Budgeted Cash Receipts, calculated on a rolling four week cumulative basis; and

(c)    the Loan Parties' Actual Inventory Level shall not be less than 85% of the Budgeted Inventory Level at the end of each week ending after the commencement of the Cases commencing on October 19, 2018 calculated as of the Tuesday of such week.

With respect to the Actual Disbursements and Actual Cash Receipts, the foregoing shall be reported in arrears on Wednesday of each week (commencing on Wednesday, October 17 with respect to the period from the Petition Date and ending on October 12, 2018), in each case, pursuant to the Receipts/Disbursements Variance Report delivered by the Borrower to the Administrative Agent and the Collateral Agent in accordance with Section 7.1(g).

With respect to the Actual Inventory, the foregoing shall be reported in arrears on Friday of each week (commencing on Friday, October 19 with respect to Actual Inventory on

October 16, 2018), in each case, pursuant to the Inventory Variance Report delivered by the Borrower to the Administrative Agent and the Collateral Agent in accordance with Section 7.1(g).

## ARTICLE IX

## NEGATIVE COVENANTS

So long as any Lender shall have any Term Loan Commitment hereunder or any Loan or other Obligation hereunder (other than contingent indemnification obligations as to which no claim has been asserted), Holdings and the Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to:

SECTION 9.1 <u>Liens</u>.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens created pursuant to any Loan Document or the Orders;

(b)    Liens existing on the Closing Date;

(c)    Liens for Taxes, assessments or governmental charges arising after the Petition Date that are not overdue for a period of more than thirty (30) days or that are being contested in good faith and by appropriate actions for which appropriate reserves have been established in accordance with IFRS;

(d)    statutory or common law Liens of landlords, sublandlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens, or other customary Liens (other than in respect of Indebtedness) in favor of landlords, so long as, in each case, such Liens secure amounts not overdue for a period of more than thirty (30) days or, if more than thirty (30) days overdue, are unfiled and no other action has been taken to enforce such Lien or that are being contested in good faith and by appropriate actions, if and for which adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with IFRS or the equivalent accounting principles in the relevant local jurisdiction;

(e)    (i) pledges or deposits in the Ordinary Course of Business in connection with workers' compensation, health, disability or employee benefits, unemployment insurance and other social security laws or similar legislation or regulation or other insurance-related obligations (including, but not limited to, in respect of deductibles, self-insured retention amounts and premiums and adjustments thereto) and (ii) pledges and deposits in the Ordinary Course of Business securing liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty or liability insurance to Holdings, the Borrower or any Restricted Subsidiaries;

(f)    Liens to secure the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including

83

those to secure health, safety and environmental obligations) incurred in the Ordinary Course of Business or consistent with past practice or industry practice;

(g)      easements, rights-of-way, covenants, conditions, restrictions (including zoning restrictions), encroachments, protrusions and other similar encumbrances and title defects affecting real property that, in the aggregate, do not in any case materially interfere with the ordinary conduct of the business of the Borrower and its Restricted Subsidiaries taken as a whole, or the use of the property for its intended purpose, and any other exceptions to title on the final Mortgage Policies issued to the Collateral Agent in connection with the Mortgaged Properties;

(h)      Liens arising from judgments or orders for the payment of money not constituting an Event of Default under Section 10.1(g);

(i)      Liens securing obligations in respect of Indebtedness permitted under Section 9.3(e); provided that (A) such Liens attach concurrently with or within two hundred and seventy (270) days after completion of the acquisition, construction, repair, replacement or improvement (as applicable) of the property subject to such Liens, (B) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, replacements thereof and additions and accessions to such property and the proceeds and the products thereof and customary security deposits and (C) with respect to Capitalized Leases, such Liens do not at any time extend to or cover any assets (except for replacements, additions and accessions to such assets) other than the assets subject to such Capitalized Leases and the proceeds and products thereof and customary security deposits; provided that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(j)      leases, non-exclusive licenses, cross-licenses, subleases or non-exclusive sublicenses granted to others in the Ordinary Course of Business which (i) do not interfere in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole, (ii) do not secure any Indebtedness or (iii) are permitted by Section 9.5;

(k)      Liens in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods in the Ordinary Course of Business;

(l)      Liens (i) of a collection bank arising under Section 4-208 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the Ordinary Course of Business in connection with the maintenance of such accounts and not for speculative purposes so long as such liens do not secure Indebtedness for borrowed money (other than for overdraft obligations in an aggregate amount not to exceed, taken together with overdrafts permitted under clause (iii) below, $5,000,000), and (iii) in favor of a banking or other financial institution arising as a matter of Law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry or arising pursuant to such banking institution's general terms and conditions, which liens secure obligations related to the

maintenance of such accounts and do not secure Indebtedness for borrowed money (other than for overdraft obligations in an aggregate amount not to exceed, taken together with overdrafts permitted under clause (i) above, $5,000,000);

(m)     [reserved];

(n)     Liens on property of any Non-Loan Party, which Liens secure Indebtedness of any Non-Loan Party permitted under Section 9.3 or other obligations of any Non-Loan Party not constituting Indebtedness;

(o)     Liens in favor of the Borrower or a Restricted Subsidiary securing Indebtedness permitted under Section 9.3(d);

(p)     Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Restricted Subsidiary, in each case after the Closing Date (other than Liens on the Equity Interests of any Person that becomes a Restricted Subsidiary); provided that (i) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property of such acquired Restricted Subsidiary), and (ii) the Indebtedness secured thereby is permitted under Section 9.3(e) or (g);

(q)     any interest or title (and all encumbrances and other matters affecting such interest or title) of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under leases, subleases, licenses, cross-licenses or sublicenses entered into by the Borrower or any of the Restricted Subsidiaries in the Ordinary Course of Business;

(r)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of the Restricted Subsidiaries in the Ordinary Course of Business;

(s)     Liens deemed to exist in connection with Investments in repurchase agreements under Section 9.2 and reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts maintained in the Ordinary Course of Business and not for speculative purposes;

(t)     Liens that are contractual rights of setoff or rights of pledge (i) relating solely to the establishment of depository relations with banks or other deposit-taking financial institutions and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of Holdings, the Borrower or any of the Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the Ordinary Course of Business of Holdings, the Borrower or any of the Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of the Restricted Subsidiaries in the Ordinary Course of Business;

(u)     [reserved];

(v)     ground leases in respect of real property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(w)     purported Liens evidenced by the filing of precautionary Uniform Commercial Code financing statements or similar public filings;

(x)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(y)     [reserved];

(z)     [reserved];

(aa)     (i) zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business complies, and (ii) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Restricted Subsidiaries, taken as a whole;

(bb)     [reserved];

(cc)     [reserved];

(dd)     Liens or rights of setoff arising after the Petition Date against credit balances of the Borrower or any of its Subsidiaries with Credit Card Issuers or Credit Card Processors or amounts owing by such Credit Card Issuers or Credit Card Processors to the Borrower or any of its Subsidiaries in the Ordinary Course of Business, but not Liens on or rights of setoff against any other property or assets of the Borrower or any of its Subsidiaries pursuant to the Credit Card Agreements, as in effect on the Closing Date, to secure the obligations of the Borrower or any of its Subsidiaries to the Credit Card Issuers or Credit Card Processors as a result of fees and chargebacks;

(ee)     Liens on specific items of inventory or other goods and the proceeds thereof of any Person securing such Person's obligations permitted under *Section 9.3(v)* in respect of letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(ff)     deposits of cash with the owner or lessor of premises leased and operated by the Borrower or any of its Subsidiaries to secure the performance of the Borrower's or such Subsidiary's obligations under the terms of the lease for such premises;

(gg)     [reserved];

(hh)     to the extent existing as of the Petition Date, Liens on Collateral securing Indebtedness under the Second Lien Credit Agreement;

LEGAL_US_W # 95883172.13

(ii)     Liens on Collateral securing Indebtedness and other "Obligations" (as defined in the ABL DIP Credit Agreement) under the ABL DIP Credit Agreement which are subject to the DIP Intercreditor Agreement; andother Liens which are Pre-Petition claims.

The expansion of Liens by virtue of accrual of interest, the accretion of accreted value, the payment of interest or dividends in the form of additional Indebtedness, amortization of original issue discount and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an incurrence of Liens for purposes of this Section 9.1.

Notwithstanding anything to the contrary contained herein, Holdings and the Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, create, incur, assume or suffer to exist any Lien upon any of their property, assets or revenues, whether now owned or hereafter acquired, in respect of obligations in respect of the Stripes Intra-Group Loan Agreement and/or the Stripes Facilities Agreement.

SECTION 9.2 <u>Investments</u>.  Make or hold any Investments, except:

(a)     Investments by Holdings, the Borrower or any of the Restricted Subsidiaries in assets that are Cash Equivalents;

(b)     To the extent provided for in the Budget, loans or advances to officers, directors and employees of Holdings (or any direct or indirect parent thereof), the Borrower or any of the Restricted Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) in connection with such Person's purchase of Equity Interests of Holdings (or any direct or indirect parent thereof; provided that, to the extent such loans or advances are made in cash, the amount of such loans and advances used to acquire such Equity Interests shall be contributed to Holdings in cash) and (iii) for any other purpose, in an aggregate principal amount outstanding at any time not to exceed 5,000,000;

(c)     Investments by the Borrower or any Restricted Subsidiary that is a Loan Party in the Borrower or any Restricted Subsidiary that is a Loan Party.

(d)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the Ordinary Course of Business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the Ordinary Course of Business;

(e)     Investments consisting of Liens, Indebtedness, fundamental changes, Dispositions and Restricted Payments permitted under Sections 9.1, 9.3 (other than Sections 9.3(c)(ii) or (d)), 9.4 (other than Sections 9.4(c)(ii)), 9.5 (other than Sections 9.5 (e)) and 9.6 (other than Sections 9.6(d)), respectively;

(f)     Investments existing on the Closing Date or made pursuant to legally binding written contracts in existence on the Closing Date, in each case, set forth in the Disclosure Statement;

(g)     Investments in Swap Contracts permitted under Section 9.3;

87

(h)      promissory notes and other non-cash consideration that is permitted to be received in connection with Dispositions permitted by Section 9.5;

(i)      [reserved];

(j)      Investments made in accordance with the Orders;

(k)      Investments in the Ordinary Course of Business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers consistent with past practices;

(l)      Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the Ordinary Course of Business or upon the foreclosure with respect to any secured Investment;

(m)      To the extent provided for in the Budget, loans and advances to Holdings (or any direct or indirect parent thereof) in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof), Restricted Payments to the extent permitted to be made to Holdings (or such direct or indirect parent) in accordance with Section 9.6(f) or (g);

(n)      So long as no Event of Default exists or would result therefrom, other Investments that do not exceed in the aggregate at any time outstanding $1,000,000;

(o)      To the extent provided for in the Budget, advances of payroll payments to employees in the Ordinary Course of Business;

(p)      [reserved];

(q)      [reserved];

(r)      Guarantees of Holdings, the Borrower or any of the Restricted Subsidiaries of leases (other than Capitalized Leases) or of other obligations that do not constitute Indebtedness, in each case in the Ordinary Course of Business;

(s)      [reserved]; and

(t)      [reserved].

Notwithstanding anything to the contrary contained herein, Holdings and the Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, make or hold any Investments in respect of the Stripes Intra-Group Loan Agreement (other than in existence as of the Petition Date) and/or the Stripes Facilities Agreement.

SECTION 9.3 Indebtedness.  Create, incur, assume or suffer to exist any Indebtedness or issue any Disqualified Equity Interest, other than:

88

(a)        Indebtedness under the Loan Documents or the Pre-Petition Loan Documents;

(b)        Indebtedness incurred prior to the Petition Date as set forth in the Disclosure Statement;

(c)        (i) Guarantees by Holdings, the Borrower and the Restricted Subsidiaries in respect of Indebtedness of the Borrower or any of the Restricted Subsidiaries otherwise permitted hereunder (except that a Restricted Subsidiary that is not a Loan Party may not, by virtue of this Section 9.3(c), Guarantee Indebtedness that such Restricted Subsidiary could not otherwise incur under this Section 9.3); provided that (A) no Guarantee by any Restricted Subsidiary of any Junior Financing shall be permitted unless such Restricted Subsidiary shall have also provided a Guarantee of the Obligations substantially on the terms set forth in the Guaranty and (B) if the Indebtedness being Guaranteed is subordinated to the Obligations, such Guarantee shall be subordinated to the Guaranty on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness and (ii) any Guaranty by a Loan Party of Indebtedness of a Restricted Subsidiary that would have been permitted as an Investment by such Loan Party in such Restricted Subsidiary under Section 9.2(c);

(d)        Indebtedness of the Borrower or any of the Restricted Subsidiaries owing to the Borrower or any other Restricted Subsidiary (or issued or transferred to any direct or indirect parent of a Loan Party which is substantially contemporaneously transferred to a Loan Party or any Restricted Subsidiary of a Loan Party) to the extent constituting an Investment permitted by Section 9.2; provided that (i) all such Indebtedness of any Loan Party owed to any Person that is not a Loan Party shall be subject to the Intercompany Subordination Agreement and (ii) such Indebtedness shall be duly noted on the books and records of the Loan Parties as being owing in respect of Collateral;

(e)        (i) Attributable Indebtedness and other Indebtedness (including Capitalized Leases) of the Borrower and the Restricted Subsidiaries financing the acquisition, construction, repair, replacement or improvement of fixed or capital assets; provided that such Indebtedness is incurred concurrently with or within two hundred and seventy (270) days after the applicable acquisition, construction, repair, replacement or improvement and (ii) Attributable Indebtedness arising out of Sale-Leasebacks; provided that the aggregate principal amount of Indebtedness at any one time outstanding incurred pursuant to this clause (e) shall not exceed the greater of $5,000,000, in each case determined at the time of incurrence;

(f)        Unless otherwise permitted pursuant to the Budget, to the extent incurred prior to the Petition Date and outstanding as of the Closing Date, Indebtedness in respect of Swap Contracts designed to hedge against Holdings', the Borrower's or any Restricted Subsidiary's exposure to interest rates, foreign exchange rates or commodities pricing risks incurred in the Ordinary Course of Business and not for speculative purposes and Guarantees thereof so long as such Indebtedness to the extent secured does not exceed $5,000,000;

(g)        To the extent incurred prior to the Petition Date and outstanding as of the Closing Date, Acquired Indebtedness of the Borrower or any Restricted Subsidiary assumed in connection with any Permitted Acquisition of any such Indebtedness, in an aggregate principal amount at any time outstanding not to exceed $25,000,000; provided that in no event shall the

89

aggregate amount of Indebtedness incurred by Non-Loan Parties under this clause (g), together with all Indebtedness of Non-Loan Parties incurred under clauses (n) of this Section 9.3, exceed at any time outstanding $12,500,000;

(h)    To the extent incurred prior to the Petition Date and outstanding as of the Closing Date, unsecured Indebtedness of the Loan Parties in their capacities as guarantors of Indebtedness outstanding under the Stripes Intra-Group Loan Agreement on the Closing Date;

(i)    Indebtedness representing deferred compensation to employees of the Borrower (and any direct or indirect parent thereof) and its Subsidiaries incurred in the Ordinary Course of Business;

(j)    Unless otherwise permitted pursuant to the Budget to the extent incurred prior to the Petition Date and outstanding as of the Closing Date, Indebtedness to current or former officers, directors, managers, consultants and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests or other equity based awards of Holdings (or any direct or indirect parent thereof) permitted by Section 9.6;

(k)    To the extent incurred prior to the Petition Date and outstanding as of the Closing Date, unsecured Indebtedness incurred by Holdings, the Borrower or any of the Restricted Subsidiaries in a Permitted Acquisition, any other Investment expressly permitted hereunder or any Disposition, in each case to the extent constituting indemnification obligations or obligations in respect of purchase price (including earn-outs) or other similar adjustments so long as such Indebtedness in respect of earn-outs or similar adjustments (other than those existing on the Closing Date) does not exceed $5,000,000;

(l)    Unless otherwise permitted pursuant to the Budget, to the extent incurred prior to the Petition Date and outstanding as of the Closing Date, unsecured Indebtedness consisting of obligations of Holdings, the Borrower and the Restricted Subsidiaries under deferred compensation or other similar arrangements with employees incurred by such Person in connection with Permitted Acquisition or any other Investment expressly permitted hereunder so long as such Indebtedness does not exceed $5,000,000;

(m)    To the extent incurred prior to the Petition Date and outstanding as of the Closing Date, Cash Management Obligations (as defined in the ABL DIP Credit Agreement) and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the Ordinary Course of Business and any Guarantees thereof;

(n)    Indebtedness of the Borrower and the Restricted Subsidiaries in an aggregate principal amount at any time outstanding not to exceed $1,000,000;

(o)    Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the Ordinary Course of Business;

(p)    Indebtedness incurred by the Borrower or any of the Restricted Subsidiaries in respect of warehouse receipts or similar instruments issued or created in the Ordinary Course of

90

Business in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(q)    Contingent obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of the Restricted Subsidiaries, in each case in the Ordinary Course of Business or consistent with past practice;

(r)    To the extent incurred prior to the Petition Date and outstanding as of the Closing Date, Indebtedness of the Borrower and the Restricted Subsidiaries incurred under the Second Lien Credit Agreement in an aggregate original principal committed amount not to exceed $80,000,000; *provided* that such indebtedness is permitted under and subject to the terms of the automatic stay pursuant to the Interim Order;

(s)    Indebtedness of the Borrower and the Restricted Subsidiaries which are guarantors under the ABL DIP Credit Agreement in an aggregate original principal committed amount not to exceed $150,000,000, *provided* that such indebtedness is permitted under and subject to the DIP Intercreditor Agreement;

(t)    [reserved];

(u)    [reserved];

(v)    [reserved];

(w)    [reserved];

(x)    [reserved];

(y)    [reserved];

(z)    Indebtedness incurred in accordance with the Orders; and

(aa)    all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (aa) above.

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such Dollar-denominated restriction shall be deemed not to have been

exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased, plus the aggregate amount of fees, underwriting discounts, premiums (including tender premiums) and other costs and expenses (including OID) incurred in connection with such refinancing.

The accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 9.3. The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with IFRS.

Notwithstanding anything to the contrary contained herein, Holdings and the Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, create, incur, assume or suffer to exist any Indebtedness or issue any Disqualified Equity Interest in respect of the Stripes Facilities Agreement, or any obligations arising thereunder.

SECTION 9.4 Fundamental Changes. Merge, dissolve, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person other than in accordance with the Orders.

SECTION 9.5 Dispositions. Make any Disposition, except:(w) Dispositions of obsolete, worn out, used or surplus property, whether now owned or hereafter acquired, in the Ordinary Course of Business, (x) Dispositions of property no longer used or useful in the conduct of the business of the Borrower and the Restricted Subsidiaries in the Ordinary Course of Business and (y) Dispositions to landlords of improvements made to leased real property pursuant to customary terms of leases entered into in the Ordinary Course of Business;

(b)    Dispositions of inventory and goods held for sale in the Ordinary Course of Business and immaterial assets in the Ordinary Course of Business;

(c)    Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)    Dispositions of property from a Loan Party to another Loan Party;

(e)    Dispositions permitted by Sections 9.2 (other than Section 9.2(e)), 9.4) and 9.6 (other Section 9.6(d)) and Liens permitted by Section 9.1);

(f)    [reserved];

(g)    Dispositions of Cash Equivalents to the extent not otherwise prohibited by this Agreement;

(h)    (i) leases, subleases, non-exclusive licenses, cross-licenses or non-exclusive sublicenses (including the provision of software under an open source license), in each case in the Ordinary Course of Business and which do not materially interfere with the business of the Borrower and the Restricted Subsidiaries, taken as a whole and (ii) Dispositions of intellectual property that are not material to the business of the Borrower and the Restricted Subsidiaries taken as a whole;

(i)    Dispositions of property subject to casualty or condemnation events;

(j)    [reserved];

(k)    Dispositions or discounts without recourse of accounts receivable in connection with the collection or compromise thereof;

(l)    [reserved];

(m)    [reserved];

(n)    the unwinding of any Swap Contract;

(o)    [reserved];

(p)    bulk sales or other Dispositions of the inventory of a Restricted Subsidiary not in the Ordinary Course of Business; provided, however, that (i) no Default or Event of Default has occurred and is continuing and (ii) before and after giving effect thereto Excess Availability is not less than $15,000,000 on a pro forma basis;

(q)    [reserved];

(r)    the lapse or abandonment in the Ordinary Course of Business of any registrations or applications for registration of any immaterial IP Rights;

(s)    [reserved];

(t)    [reserved];

(u)    Dispositions made in accordance with the Orders; and

(v)    [reserved].

*provided* that any Disposition of any property pursuant to this Section 9.5 (except pursuant to Sections 9.5 (a), (e), (h), (l), and (s) and except for Dispositions from the Borrower or a Restricted Subsidiary that is a Loan Party to the Borrower or a Restricted Subsidiary that is a Loan Party), shall be for no less than the fair market value of such property at the time of such Disposition as determined by the Borrower in good faith.  To the extent any Collateral is Disposed of as expressly permitted by this Section 9.5 to any Person other than Holdings, the Borrower or any Restricted Subsidiary, such Collateral shall be sold free and clear of the Liens

created by the Loan Documents, and the Administrative Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

SECTION 9.6 <u>Restricted Payments</u>.    Declare or make, directly or indirectly, any Restricted Payment, except, in each case consistent with the Budget and any applicable Order:

(a)    each Restricted Subsidiary may make Restricted Payments to the Borrower and to its other Restricted Subsidiaries that are Loan Parties (and, in the case of a Restricted Payment by a non-wholly owned Restricted Subsidiary, to the Borrower and any of its other Restricted Subsidiaries that are Loan Parties and to each other owner of Equity Interests of such Restricted Subsidiary that is a Loan Party based on their relative ownership interests of the relevant class of Equity Interests);

(b)    [reserved];

(c)    [reserved];

(d)    to the extent constituting Restricted Payments, the Borrower and the Restricted Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 9.2 (other than Section 9.2(e)), 9.8 (other than Sections 9.8(a) or (i)), or Section 9.14;

(e)    [reserved];

(f)    [reserved];

(g)    [reserved]:

(h)    [reserved];

(i)    [reserved];

(j)    the Borrower may make Restricted Payments to Holdings or to any direct or indirect parent of Holdings:

(A)  with respect to any taxable period for which the Borrower and and/or its Subsidiaries are members of a consolidated, combined, unitary or affiliated tax group for U.S. federal and/or applicable state or local tax purposes of which a direct or indirect parent of the Borrower is the common parent ("Tax Group"), the proceeds of which will be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof to pay) the Tax liability to each federal, state or local jurisdiction in respect of which such Tax Group return is filed by Holdings (or such direct or indirect parent that is the common parent of such Tax Group) that includes the Borrower and/or any of its Subsidiaries, to the extent such Tax liability does not exceed the lesser of (A) the Taxes that would have been payable by the Borrower and/or its Subsidiaries as a stand-alone group and (B) the actual Tax liability of Holdings' Tax Group (or, if Holdings is not the parent of the Tax Group, the Taxes that would have been paid by Holdings, the Borrower and/or the Borrower's Subsidiaries as a stand-alone group), reduced by any such Taxes paid or to be paid directly by the Borrower or its

94

Subsidiaries; provided that Restricted Payments or other distributions in respect of an Unrestricted Subsidiary shall be permitted only to the extent that cash distributions were made by such Unrestricted Subsidiary to Borrower or any of its Restricted Subsidiaries for such purpose;

      (B)   the proceeds of which shall be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof to pay) its operating costs and expenses incurred in the Ordinary Course of Business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the Ordinary Course of Business, attributable to the ownership or operations of the Borrower and its Subsidiaries;

      (C)   the proceeds of which shall be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof which does not own other Subsidiaries besides Holdings, its Subsidiaries and the direct or indirect parents of Holdings to pay) (A) franchise Taxes and other fees, similar Taxes and expenses required to maintain its (or any of such direct or indirect parents') corporate existence or (B) costs and expenses incurred by it or any of its direct or indirect parents in connection with such entity being a public company, including costs and expenses relating to ongoing compliance with federal and state securities laws and regulations, SEC rules and regulations and the Sarbanes-Oxley Act of 2002; or

      (D)   the proceeds of which (A) shall be used to pay salary, commissions, bonus and other benefits payable to and indemnities provided on behalf of officers, employees, directors and members of management of Holdings or any direct or indirect parent company of Holdings and any payroll, social security or similar taxes hereof to the extent such salaries, commissions, bonuses and other benefits are attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries or (B) shall be used to make payments permitted under Sections 9.8(g) and (i) (but only to the extent such payments have not been and are not expected to be made by the Borrower or a Restricted Subsidiary); and

    (k)     Restricted Payments made in accordance with the Orders.

Notwithstanding anything to the contrary contained herein, Holdings and the Borrower shall not, nor shall Holdings or the Borrower permit any Restricted Subsidiary to, declare or make, directly or indirectly, Restricted Payments in respect of, or the proceeds of which will be used directly or indirectly to make payments on account of, obligations with respect to the Stripes Intra-Group Loan Agreement, the Second Lien Credit Agreement and/or the Stripes Facilities Agreement.

SECTION 9.7 <u>Change in Nature of Business</u>.  Engage in any material line of business substantially different from those lines of business conducted by the Borrower and the Restricted Subsidiaries on the Closing Date or any business or any other activities reasonably related, complementary, synergistic or ancillary thereto or reasonable extensions thereof.

95

SECTION 9.8 <u>Transactions with Affiliates</u>.  Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the Ordinary Course of Business, other than:

(a)     transactions between or among the Loan Parties (to the extent otherwise permitted hereunder),

(b)     transactions in the Ordinary Course of Business upon fair and reasonable terms fully disclosed to the Administrative Agent and Collateral Agent and on terms substantially as favorable to the Borrower or such Restricted Subsidiary as would be obtainable by the Borrower or such Restricted Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate,

(c)     [reserved],

(d)     [reserved],

(e)     To the extent provided for in the Budget and existing as of the Petition Date, employment and severance arrangements between Holdings, the Borrower and the Restricted Subsidiaries and their respective officers and employees in the Ordinary Course of Business and transactions pursuant to stock option plans and employee benefit plans and arrangements,

(f)     To the extent existing as of the Petition Date or if permitted by any applicable order of the Bankruptcy Court, the non-exclusive licensing of trademarks, copyrights or other IP Rights in the Ordinary Course of Business to permit the commercial exploitation of IP Rights between or among Affiliates and Subsidiaries of Holdings or the Borrower,

(g)     the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers and employees of Holdings and the Restricted Subsidiaries or any direct or indirect parent of Holdings in the Ordinary Course of Business to the extent attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries,

(h)     any agreement, instrument or arrangement as in effect and consummated prior to the Closing Date and set forth in the Disclosure Statement,

(i)     Restricted Payments permitted under Section 9.6,

(j)     [reserved],

(k)     the issuance or transfer of Equity Interests (other than Disqualified Equity Interests) of Holdings to any former, current or future director, manager, officer, employee or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) of the Borrower, any of its Subsidiaries or any direct or indirect parent thereof to the extent otherwise permitted by this Agreement and to the extent such issuance or transfer would not give rise to a Change of Control,

(l)     [reserved],

(m)    payments to or from, and transactions with, Joint Ventures (to the extent any such Joint Venture is only an Affiliate as a result of Investments by Holdings, the Borrower and the Restricted Subsidiaries in such Joint Venture) in the Ordinary Course of Business and consistent with past practices to the extent otherwise permitted under Section 9.2,

(n)    any transaction in accordance with the Orders; and

(o)    the ABL DIP Credit Agreement.

Notwithstanding anything to the contrary contained herein, Holdings and the Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, enter into any agreement pursuant to which it will become an obligor under the Stripes Facilities Agreement.

SECTION 9.9 <u>Burdensome Agreements</u>.  Other than as set forth in the Orders, enter into or permit to exist any Contractual Obligation (other than this Agreement, any other Loan Document,  the Pre-Petition Credit Agreement or any other Pre-Petition Loan Document) that prohibits, restricts, imposes any condition on or limits the ability of (a) any Restricted Subsidiary that is not a Loan Party to make Restricted Payments to (directly or indirectly) or to make or repay loans or advances to any Loan Party or to Guarantee the Obligations of any Loan Party under the Loan Documents or (b) any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Lenders with respect to the Obligations under the Loan Documents; provided that the foregoing clauses (a) and (b) shall not apply to Contractual Obligations that:

(a)    exist on the Closing Date and set forth in the Disclosure Statements,

(b)    represent Indebtedness of a Restricted Subsidiary that is not a Loan Party that is permitted by Section 9.3,

(c)    are customary restrictions that arise in connection with (x) any Lien permitted by Sections  9.1(a),(l), (s), (t)(i), (t)(ii) and (ee) and relate to the property subject to such Lien or (y) any Disposition permitted by Section 9.5 applicable pending such Disposition solely to the assets subject to such Disposition,

(d)    are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 9.2 and applicable solely to such joint venture,

(e)    are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 9.3 but solely to the extent any negative pledge relates to the property financed by or the subject of such Indebtedness (and excluding in any event any Indebtedness constituting any Junior Financing) and the proceeds and products thereof,

(f)    are customary restrictions on leases, subleases, licenses, cross-licenses, sublicenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the property interest, rights or the assets subject thereto,

(g)      comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Sections 9.3(e), (g), (h), (o)(i) and (w) to the extent that such restrictions apply only to the property or assets securing such Indebtedness,

(h)      are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any Restricted Subsidiary,

(i)      are customary provisions restricting assignment of any agreement entered into in the Ordinary Course of Business,

(j)      are restrictions on cash or other deposits imposed by customers under contracts entered into in the Ordinary Course of Business,

(k)      arise in connection with cash or other deposits permitted under Section 9.1 or Section 9.2,

(l)      exist in the ABL DIP Credit Agreement and related loan documents, or

(m)      entered into in accordance with the Orders

SECTION 9.10          [Reserved].

SECTION 9.11          Accounting Changes.  Make any change in Fiscal Year or any material change in accounting treatment or reporting practices, except as required by IFRS.

SECTION 9.12          Prepayments, Etc. of Indebtedness.

(a)      Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any unsecured Indebtedness for borrowed money any Indebtedness that is secured by Liens that are junior to the Liens securing the Obligations, or any Indebtedness that is subordinated in right of payment to the Obligations expressly by its terms (other than Indebtedness among the Borrower and its Restricted Subsidiaries) (collectively, "*Junior Financing*"), except payments due under the ABL DIP Credit Agreement (subject to the DIP Intercreditor Agreement), in accordance with the Orders and the Budget;

(b)      [reserved];

(c)      [reserved]

(d)      [reserved]

(e)      [reserved]; and

(f)      Amend, modify or change any term or condition of any document governing any Junior Financing without the consent of the Administrative Agent, the Collateral Agent and the Requisite Lenders.

SECTION 9.13          Holdings.  In the case of Holdings, conduct, transact or otherwise engage in any business or operations other than the following (and any activities incidental

thereto):  (i) its direct ownership of the Equity Interests of the Borrower and its indirect ownership of the Equity Interests of the Subsidiaries of the Borrower and activities incidental thereto, including payment of dividends and other amounts in respect of its Equity Interests, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) the performance of its obligations with respect to the Loan Documents, (iv) participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings and the Borrower, (v) holding any cash or property received in connection with Restricted Payments made by the Borrower in accordance with Section 9.6 pending application thereof by Holdings, (vi) providing indemnification to officers and directors and (vii) activities incidental to the businesses or activities described in clauses (i) to (vi) of this Section 9.13 or otherwise in accordance with the Orders.

SECTION 9.14    Intra-Group Debt Restricted Payments.    Holdings and the Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, make, directly or indirectly, any payment, distribution, redemption, purchase, defeasance or other satisfaction of any Indebtedness, liabilities, or other obligations (whether on account of interest, principal, or otherwise), whether now existing or arising hereafter, under or in connection with the Stripes Intra-Group Loan Agreement, the Second Lien Credit Agreement or any Second Lien Loan Document (the "*Intra-Group Debt Restricted Payments*").

SECTION 9.15    New Stores.  Open, acquire or take possession of any newly leased stores except as contemplated by the Budget.

SECTION 9.16    Chapter 11 Claims.  No Loan Party shall, until payment in full of the Obligations under this Agreement (other than contingent indemnification obligations as to which no claim has been asserted), except with respect to the Carve Out, and otherwise to the extent permitted under the Orders, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim or Lien on its property which is *pari passu* with or senior to the claims or Liens, as the case may be, of the Administrative Agent, the Collateral Agent and the Lenders hereunder or under the Orders (other than, in each case, Liens permitted under Section 9.1).

SECTION 9.17    Compliance with Budget.

(a)    No Loan Party shall, except as otherwise provided herein or approved by the Administrative Agent, directly or indirectly (i) use any cash or the proceeds of any Loans in a manner or for a purpose other than those consistent with this Agreement, the Orders and the Budget (other than a Permitted Variance), (ii) permit a disbursement causing any variance other than a Permitted Variance without the prior written consent of the Administrative Agent or (iii) make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or Indebtedness arising prior to the Petition Date other than payments consistent with the Budget or any Permitted Variance and authorized by the Bankruptcy Court.

(b)    Prior to the occurrence of an Event of Default, the Borrower shall be permitted to pay compensation and reimbursement of fees and expenses solely to the extent that such fees and expenses are consistent with the Budget or any Permitted Variance and authorized to be paid under Sections 330 and 331 of the Bankruptcy Code pursuant to an order of the Bankruptcy

Court. Upon the occurrence of an Event of Default and delivery of a Carve Out Trigger Notice, the right of the Borrower to pay professional fees of Professional Persons in excess of the Carve Out shall terminate, and the Borrower shall provide immediate notice to all Professional Persons informing them that the Borrower's ability to pay such Professional Persons is subject to and limited by the Carve Out.

SECTION 9.18    Use of Collateral.  Other than as expressly permitted by the Orders, no Loan Party shall use or permit the use of Collateral, proceeds of Loans, portion of the Carve Out or any other amounts directly or indirectly by any of the Loan Parties, the Committee Professionals, if any, or any trustee, interim receiver, receiver, receiver-manager or other estate representative appointed in the Cases (or any Successor Case) or any other Person (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):to seek authorization to obtain Liens or security interests that are senior to, or on a parity with, the Liens granted under the Loan Documents or the DIP Superpriority Claims other than in connection with any replacement debtor-in-possession financing that will discharge the Obligations in "full" in cash (other than contingent indemnification obligations as to which no claim has been asserted); or

(b)    to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against the Agents, the Lenders, the other Loan Parties, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any Avoidance Actions; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the DIP Superpriority Claims; the Liens granted under the Loan Documents, the Pre-Petition Loan Documents, the liabilities under the Pre-Petition Credit Agreement or the Liens under the Pre-Petition Credit Agreement; (iv) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the Obligations; or (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the Agents or the Lenders hereunder or under any of the other Loan Documents (including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of their assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the Loan Documents and the Orders).

Notwithstanding anything to the contrary herein, the Committee Professionals may use up to $50,000 in the aggregate amount of the Carve Out, any cash-collateral, or proceeds of the Loan to investigate the Pre-Petition Parties (the "*Committee Investigation Budget*"); *provided* that the Borrower's stipulations as to validity, priority and security of the liabilities under the Pre-Petition Credit Agreement shall be binding upon each other party in interest, including the Committee Professionals unless such party in interest commences a challenge by (x) with respect to the

Committee Professionals, 60 days after the initial appointment of the Committee, and (y) with respect to any other party in interest, 75 days after the date of entry of the Interim Order.

SECTION 9.19        Bankruptcy Related Negative Covenants.  The Borrower will not seek, consent to, or permit to exist any of the following:

(a)        Any modification or amendment to the Orders to which the Administrative Agent, the Collateral Agent and the Required Lenders have not consented in writing, or any appeal, stay, reversal, or vacatur of any of the Orders;

(b)        (i) Except to the extent provided in the DIP Intercreditor Agreement, a priority claim or administrative expense or unsecured claim against the Loan Parties (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c) (subject to entry of the Final Order) (and all rights to charge the Collateral and all collateral securing the Pre-Petition Obligations under Section 506(c) shall be waived), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Administrative Agent or Collateral Agent in respect of the Obligations or (ii) any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, in each case except with respect to the Carve Out;

(c)        Except as provided for in the Budget, without the prior written consent of the Administrative Agent and pursuant to an order of the Bankruptcy Court (including any Order) after notice and a hearing, any claim or expense with respect to any Lien or Indebtedness incurred or arising prior to the Petition Date that is subject to an automatic stay provision of the Bankruptcy Code whether by way of "adequate protection" under the Bankruptcy Code or otherwise;

(d)        Except as agreed to by the Administrative Agent, any order which authorizes the return of any of the Loan Parties' property pursuant to Section 546(h) of the Bankruptcy Code;

(e)        File a plan of reorganization other than the Chapter 11 Plan (except for any plan that contains only non-material amendments of the Chapter 11 Plan), including, without limitation, any plan that provides for treatment of the Obligations or the "Obligations" (as defined in the Pre-Petition Credit Agreement) other than repayment in full in cash on the effective date thereof (other than contingent indemnification obligations as to which no claim has been asserted);

(f)        Re-solicit votes of any class of claims or interests under the Chapter 11 Plan, or seek the entry of an order of the Bankruptcy Court directing any such re-solicitation;

(g)        Any actions relating to reclamation claims with respect to material Inventory;

(h)        Any order which (i) authorizes the payment of any Indebtedness (other than the Indebtedness reflected in the Budget (subject to Permitted Variances), and other Indebtedness approved by the Administrative Agent) incurred prior to the Petition Date, and payment of any Indebtedness owed to the Affiliates of the Debtors (but not the Debtors) or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such

Indebtedness which is secured by a Lien (other than as expressly set forth in the Orders or the Budget (subject to Permitted Variances)) or (ii) is any manner contrary to the terms of this Agreement (subject to the Permitted Variances); or

(i)     Any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents unless in connection therewith the Obligations will be paid in full in cash (other than contingent indemnification obligations as to which no claim has been asserted).

## ARTICLE X

## EVENTS OF DEFAULT AND REMEDIES

SECTION 10.1     Events of Default.  Each of the events referred to in clauses (a) through (i) of this Section 10.1 shall constitute an "Event of Default":

(a)     Non-Payment.  The Borrower fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(b)     Specific Covenants.

(i)     The Borrower, any Restricted Subsidiary or Holdings, fails to perform or observe any term, covenant or agreement contained in (A) Article VI, (B) Section 7.1(g), 7.3(a), (C) Section 8.1(a) (solely with respect to the Borrower), (D) Section 8.13(b), (E) Article IX, (F) Section 8.15, (G) Section 8.16, or (H) Section 8.17;

(ii)     The Borrower or any other Loan Party fails to perform or observe (or to cause to be performed or observed) any covenant or agreement contained in Section 8.12; or

(iii)     the Borrower or any other Loan Party fails to perform or observe (or to cause to be performed or observed) any covenant or agreement contained in Section 7.1(h), Section 7.1(i), Section 7.4(a), Section 7.4(b) or Section 7.4(e), as applicable; or

(c)     Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 10.1(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after receipt by the Borrower of written notice thereof from the Administrative Agent; or

(d)     Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by any Loan Party herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be incorrect in any material respect (or, with respect to any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language, in any respect (after giving effect to any qualification therein)) when made or deemed made; or

102

(e)    Cross-Default.  Except as a result of commencement of the Cases or unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Bankruptcy Court, any Loan Party or any Restricted Subsidiary (A) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness (other than Indebtedness hereunder) (i) having an aggregate outstanding principal amount (individually or in the aggregate with all other Indebtedness as to which such a failure shall exist) of not less than the Threshold Amount or (ii) under the ABL DIP Credit Agreement, Second Lien Credit Agreement or the Stripes Intra-Group Loan Agreement, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and not as a result of any other default thereunder by any Loan Party), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; provided that this clause (e)(B) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; provided, further, that such failure is unremedied and is not waived by the holders of such Indebtedness prior to any termination of the Aggregate Commitments or acceleration of the Loans pursuant to Section 10.2; or

(f)    Insolvency Proceedings, Etc. Holdings, the Borrower or any Material Subsidiary (in each case, other than the Debtors or in respect of the Cases) institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(g)    Judgments.  Excluding any order fixing the amount of any claim in the Cases, there is entered against any Loan Party or any Restricted Subsidiary a final judgment or order for the payment of money after the Petition Date in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied or failed to acknowledge coverage thereof) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive days; or

(h)    ERISA.  (i)  An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or would reasonably be expected to result in liability of

103

any Loan Party or their respective ERISA Affiliates under Title IV of ERISA in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect or (ii) any Loan Party or any of their respective ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect; or

(i)      Invalidity of Loan Documents.  Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 9.4 or 9.5) or the satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of repayment in full of the Obligations and termination of the Aggregate Commitments), or purports in writing to revoke or rescind any Loan Document; or

(j)      Collateral Documents.  Any Collateral Document after delivery thereof pursuant to Section 4.1 or 8.11 shall for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction permitted under Section 9.4 or 9.5) cease to create, or any Lien purported to be created by any Collateral Document or the Orders shall be asserted in writing by any Loan Party not to be, a valid and perfected lien, with the priority required by the Collateral Documents (or other security purported to be created on the applicable Collateral) on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 9.1, (x) except to the extent that any such perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or the loss of such perfection or priority results from the failure of the Administrative Agent or the Collateral Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Collateral Documents or to file UCC continuation statements and except as to Collateral consisting of real property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage; or

(a)      [Reserved]; or

(b)      Change of Control.  There occurs any Change of Control; or

(c)      [Reserved]; or

(d)      [Reserved]; or

(e)      [Reserved]; or

(f)      Except as otherwise permitted herein, the dissolution of any Loan Party; or

(g)      [Reserved]; or

(h)      The Loan Parties or any of their subsidiaries, or any person claiming by or through the Loan Parties or any of their subsidiaries, obtain court authorization to commence, or commence, join in, assist or otherwise participate as an adverse party in any suit or other

104

proceeding against any of the Administrative Agent, the Collateral Agent or the Lenders in each case relating to this Agreements; or

(i)        Any of the following shall occur in any Case:

(i)        the filing by any Loan Party of (A) a plan other than the Chapter 11 Plan, as it may be modified with the consent of the Administrative Agent and Collateral Agent and/or (B) any motion or pleading that is inconsistent with the prosecution of the Chapter 11 Plan;

(ii)        (A) any Order or provision thereof is reversed, vacated, stayed, or otherwise ceases to be in full force and effect, (B) entry of an order without the prior consent of the Administrative Agent, Collateral Agent or the Required Lenders amending, supplementing or otherwise modifying any Order in a manner adverse to the Lenders, the and Collateral Agent and/or the Administrative Agent (other than immaterial modifications to correct grammatical or typographical errors) or (C) failure by the Loan Parties to perform under any Order in a material respect;

(iii)        The filing of a motion by any Loan Party seeking entry of, or the entry of any order without the prior consent of the Administrative Agent, Collateral Agent or the Required Lenders that authorizes any of the following:

(A)        except as provided in the DIP Intercreditor Agreement, a priority claim or administrative expense or unsecured claim against the Loan Parties (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c) (subject to entry of the Final Order) (and all rights to charge the Collateral and all collateral securing the Pre-Petition Obligations under Section 506(c) shall be waived), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Administrative Agent, the Collateral Agent and the Lenders in respect of the Obligations, except with respect to the Carve Out, the ABL DIP Facility or as may be approved by the Bankruptcy Court for payments to critical vendors, such critical vendor order to be reasonably acceptable to the Administrative Agent and the Collateral Agent;

(B)        except as provided in the DIP Intercreditor Agreement or pursuant to the Orders, any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, except with respect to the Carve Out;

(C)        the consummation of any sale of all or substantially all the working capital assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Cases or otherwise that does not result in payment in full of all of the Obligations

in immediately available funds at the closing of such sale or initial payment of the purchase price or effectiveness of such plan, as applicable (other than contingent indemnification obligations as to which no claim has been asserted);

(D)    except as consented to by the Administrative Agent and Collateral Agent, the return of any of the Loan Parties' property pursuant to section 546(h) of the Bankruptcy Code;

(E)    authorizing or directing payment of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code or requiring the marshaling of assets or any other similar remedy against or with respect to any of the Collateral or from the Administrative Agent, the Collateral Agent or any of Lenders, to the extent not dismissed or denied within 45 days after the filing of such motion;

(F)    granting of (I) relief from the automatic stay in the Cases to permit foreclosure or enforcement on, or any right or remedy with respect to any material asset of the Borrower or (II) any relief that would impair the material rights and interests of the Administrative Agent, Collateral Agent and the Lenders in their capacities as such (regardless of whether such relief was sought by the Debtors or a third party);

(G)    the payment of any Indebtedness (other than Indebtedness reflected in the Budget (subject to Permitted Variances)) or as permitted by the Orders; and/or

(H)    payment of or granting adequate protection with respect to Pre-Petition Indebtedness, other than as expressly set forth in the Orders and the Budget.

(iv)    the dismissal of the Cases or conversion of the Cases to a case under Chapter 7 of the Bankruptcy Code, or the filing of any motion to so dismiss or convert brought by any Loan Party;

(v)    appointment of a Chapter 11 trustee or an examiner or any similar insolvency official or administrator, with expanded powers, or the filing of any motion to so appoint brought by any Loan Party;

(vi)    any of the Liens or the DIP Superpriority Claims granted hereunder cease to be valid, perfected and enforceable in any respect;

(vii)    the use of cash collateral by the Debtors are terminated and the Debtors fail to regain the use of cash collateral (consensually or non-consensually) pursuant to an order in form and substance acceptable to Administrative Agent and the Collateral Agent;

(viii)    the Bankruptcy Court enters an order that is adverse in any material respect, when taken as a whole, to the interests of the Administrative Agent, the Collateral Agent and the Lenders or their respective material rights and remedies in their capacities as such under this Agreement or in any of the Cases; and

(ix)    The termination, expiration or unenforceability of any Exit Commitment Letter.

SECTION 10.2    Remedies upon Event of Default. Notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the Orders,

(a)    If any Event of Default occurs and is continuing, the Administrative Agent may with the consent of, and shall at the request of, the Requisite Lenders take any or all of the following actions:

(i)    declare the Loans of each Lender to be terminated, whereupon such Loans and obligations thereunder shall be terminated;

(ii)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(iii)    exercise (or direct Collateral Agent to exercise) on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

*provided* that with respect to the enforcement of Liens or other remedies with respect to the Collateral of the Loan Parties under the preceding clause (iii), the Administrative Agent shall provide the Borrower with five (5) Business Days' written notice prior to taking the action contemplated thereby.

(b)    Without limitation of the rights of the Agents or Secured Parties under Section 8.12, the Borrower hereby irrevocably waives the right to direct the application of any and all payments in respect of the Obligations and any proceeds of Collateral after the occurrence and during the continuance of an Event of Default and agrees that during the continuance of an Event of Default, and notwithstanding Section 2.13(f) above, the Administrative Agent or Collateral Agent may in its sole discretion, and, upon either (A) the written direction of the Requisite Lenders or (B) the acceleration of the Obligations pursuant to Section 10.2(a), deliver a notice to each Approved Account Bank instructing them to cease complying with any instructions from any Loan Party and to transfer all funds therein to the Administrative Agent and the Administrative Agent shall apply all payments in respect of any Obligations and all funds on deposit in the Concentration Account and all other proceeds of Collateral in the order specified in Section 10.3 hereof.

SECTION 10.3    Application of Funds. After the exercise of remedies provided for in Section 10.2 (or after the Loans have automatically become immediately due and payable),

107

any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

*First*, to pay accrued and unpaid professional fees and expenses of the Professional Persons and to fund the [Carve Out Account (as defined in the Interim Order)] up to an aggregate amount not to exceed the [Carve Out Cap (as defined in the Interim Order)];

*Second*, ratably, pay any fees, indemnities, or expense reimbursements then due to the Administrative Agent or the Collateral Agent from the Borrower;

*Third*, ratably, to pay any fees or expense reimbursements then due to the Lenders from the Borrower;

*Fourth*, to pay interest due and payable in respect of any Loans;

*Fifth*, to pay principal on the Loans;

*Sixth*, to the payment of any other Obligation due to the Administrative Agent, Collateral Agent, or the Collateral Agent, or any Lender by the Borrower; and

*Seventh*, after all of the Obligations have been paid in full, to the Borrower or as the Borrower shall direct or as otherwise required by Law.

Notwithstanding the foregoing, if sufficient funds are not available to fund all payments to be made in respect of any Secured Obligation described in any specific level of the waterfall in clauses First through Sixth above, the available funds being applied with respect to any such Secured Obligation (unless otherwise specified in such clause) shall be allocated to the payment of such Secured Obligation ratably, based on the proportion of the Administrative Agent's, Collateral Agent's, Collateral Agent's or each Lender's interest in the aggregate outstanding Secured Obligations described in such clauses. Except as may be otherwise provided in Section 12.1, the order of priority set forth in clauses First through Fifth above may at any time and from time to time be changed by the agreement of all Lenders without necessity of notice to or consent of or approval by the Borrower, any Secured Party that is not a Lender or by any other Person that is not a Lender. Except as may be otherwise provided in Section 12.1, the order of priority set forth in clauses First through Seventh above may be changed only with the prior written consent of the Administrative Agent in addition to that of all Lenders.

Neither the Loan Parties, the Committee Professionals, nor any other party-in-interest shall have the right to contest the enforcement of remedies set forth in the Orders and the Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable Loan Documents. The Loan Parties shall cooperate fully with the Administrative Agent and the Lenders in their exercise of rights and remedies, whether against the Collateral or otherwise. The Loan Parties hereby waive any right to seek relief under the Bankruptcy Code, including under Section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the Administrative Agent and the Lenders set forth in the Orders and in the Loan Documents.

Subject to the Orders, in case any one or more of the covenants and/or agreements set forth in this Agreement or any other Loan Document shall have been breached by any Loan Party, then the Administrative Agent may proceed to protect and enforce the Lenders' rights either by suit in equity and/or by action at law, including an action for damages as a result of any such breach and/or an action for specific performance of any such covenant or agreement contained in this Agreement or such other Loan Document. Without limitation of the foregoing, the Borrower agrees that failure to comply with any of the covenants contained herein will cause irreparable harm and that specific performance shall be available in the event of any breach thereof. The Administrative Agent shall be indemnified by the Borrower against all liability, loss or damage, together with all reasonable costs and expenses related thereto (including reasonable legal and accounting fees and expenses) in accordance with the terms hereof.

## ARTICLE XI

## THE ADMINISTRATIVE AGENT AND OTHER AGENTS

SECTION 11.1    Appointment and Authority of the Administrative Agent and Collateral Agent.

(a)    Each of the Lenders hereby irrevocably appoints Barclays to act on its behalf as the Administrative Agent and Collateral Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent and Collateral Agent, as applicable, to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent or Collateral Agent, as applicable, by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.   Each of the Lenders hereby authorizes the Administrative Agent to enter into (i) the DIP Intercreditor Agreement and (ii) any Customary Intercreditor Agreements in connection with Indebtedness permitted under Section 9.1(hh).  The provisions of this Article XI (other than Sections 11.6 and 11.11) are solely for the benefit of the Administrative Agent, the Lenders and the Borrower shall not have rights as a third party beneficiary of any such provision.

(b)    The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (including in its capacities as a Lender) hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of (and to hold any security interest created by the Collateral Documents for and on behalf of or in trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" (and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent or Collateral Agent pursuant to Section 11.5 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article XI and Article XII (including Sections 11.3, 11.14, 12.3, 12.4 and 12.5, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto. Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent and the Collateral Agent to execute any and all documents (including

109

releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents and acknowledge and agree that any such action by any Agent shall bind the Lenders.

SECTION 11.2    Rights as a Lender.  Any Person serving as an Agent (including as Administrative Agent) hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each Person serving as an Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.  The Lenders acknowledge that, pursuant to such activities, any Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them.

SECTION 11.3    Exculpatory Provisions.  Neither the Administrative Agent nor any other Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, an Agent (including the Administrative Agent):

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing and without limiting the generality of the foregoing, the use of the term "agent" herein and in the other Loan Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law and instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Requisite Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by any Person serving as an Agent or any of its Affiliates in any capacity.

Neither Administrative Agent or any other Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Requisite Lenders (or such other

number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 12.1 and 12.2) or (ii) in the absence of its own gross negligence or willful misconduct as determined by the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Borrower, a Lender.

No Agent-Related Person shall be responsible for or have any duty to ascertain or inquire into (i) any recital statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or the Collateral Agent, or (vii) the inspection of the properties, books or records of any Loan Party or any Affiliate thereof.

SECTION 11.4        Reliance by the Agents.  The Administrative Agent and each other Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent and each other Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent and each other Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Other than in respect of any actions at the direction of the Borrower, the Administrative Agent and each other Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Requisite Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent and each other Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Requisite Lenders (or such greater number of Lenders as may be expressly required hereby in any

111

instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders; provided that neither the Administrative Agent not any other Agent shall be required to take any action that, in its opinion or in the opinion of its counsel, may expose the Administrative Agent or such Agent to liability or that is contrary to any Loan Document or applicable Law.

SECTION 11.5    Delegation of Duties. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Documents by or through any one or more sub agents appointed by the Administrative Agent. The Agents and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Agent-Related Persons. The exculpatory provisions of this Article shall apply to any such sub agent and to the Agent-Related Persons of the Agents and any such sub agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent or any other Agent. No Agent shall be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Agent acted with gross negligence or willful misconduct in the selection of such sub agents.

SECTION 11.6    Resignation of Administrative Agent or Collateral Agent. The Administrative Agent or Collateral Agent may resign upon ten (10) days' notice of its resignation to the Lenders and the Borrower; provided that if no successor agent is appointed in accordance with the terms set forth below within such 10-day period, the Administrative Agent and/or the Collateral Agent shall not be permitted to resign until the earlier to occur of (x) the date of the appointment of the successor agent or (y) the date that is twenty (20) days after the last day of such 10-day period. If the Administrative Agent or Collateral Agent, as applicable, is subject to an Agent-Related Distress Event, the Requisite Lenders or the Borrower may remove the Administrative Agent or the Collateral Agent, as applicable, upon ten (10) days' notice. Upon the removal or receipt of any such notice of resignation, the Requisite Lenders shall have the right, with the consent of the Borrower at all times other than during the existence of an Event of Default (which consent of the Borrower shall not be unreasonably withheld or delayed if such successor is a commercial bank with a combined capital and surplus of at least $5,000,000,000 that is a "U.S. person" and a "financial institution" within the meaning of Treasury Regulation Section 1.1441-1, and otherwise may be withheld at the Borrower's sole discretion), to appoint a successor, which shall be a Lender or a bank with an office in the United States, or an Affiliate of any such Lender or bank with an office in the United States. If no such successor shall have been so appointed by the Requisite Lenders and shall have accepted such appointment within twenty (20) days after the last day of such 10-day period, then the retiring or removed Administrative Agent or Collateral Agent, as applicable, may on behalf of the Lenders, appoint a successor Administrative Agent or Collateral Agent, as applicable, meeting the qualifications set forth above; provided that if the Administrative Agent or Collateral Agent, as applicable, shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring or removed Administrative Agent or Collateral Agent, as applicable, shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent or Collateral Agent on behalf of the Lenders under any of the Loan Documents, the

retiring or removed Agent shall continue to hold such collateral security until such time as a successor of such Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Requisite Lenders appoint a successor Administrative Agent as provided for above in this Section 11.6.   Upon the acceptance of a successor's appointment as Administrative Agent or Collateral Agent, as applicable, hereunder and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Requisite Lenders may request, in order to (i) continue the perfection of the Liens granted or purported to be granted by the Collateral Documents or (ii) otherwise ensure that the Collateral and Guarantee Requirement is satisfied, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) or removed Administrative Agent or Collateral Agent, as applicable, and the retiring or removed Administrative Agent or Collateral Agent, as applicable, shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower to a successor Administrative Agent or Collateral Agent, as applicable, shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring or removed Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Sections 12.3, 12.4 and 12.5 shall continue in effect for the benefit of such retiring or removed Agent, its sub-agents and their respective Agent-Related Persons in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Agent was acting as Administrative Agent or Collateral Agent, as applicable.

SECTION 11.7        Non-Reliance on Administrative Agent and Other Lenders; Disclosure of Information by Agents.  Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession.  Each Lender represents to each Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower and the other Loan Parties hereunder.  Each Lender also represents that it will, independently and without reliance upon the Administrative Agent , any other Agent, or any other Lender or any of their Agent-Related Persons and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent herein, such Agent shall not have any duty or responsibility to provide any Lender with

any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

SECTION 11.8        No Other Duties; Other Agents, Arrangers, Etc.  Barclays Bank PLC is hereby appointed as an Arranger hereunder on the Closing Date, and each Lender authorizes Barclays Bank PLC to act as an Arranger in accordance with the terms hereof and the other Loan Documents.  Each Agent hereby agrees to act in its capacity as such upon the express conditions contained herein and the other Loan Documents, as applicable.  Anything herein to the contrary notwithstanding, neither the Arranger nor Agents shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, the Collateral Agent, or a Lender hereunder and such Persons shall have the benefit of this Article XI.  Without limiting the foregoing, none of the Lenders or other Persons so identified shall have or be deemed to have any agency or fiduciary or trust relationship with any Lender, Holdings, the Borrower or any of their respective Subsidiaries.  Each Lender acknowledges that it has not relied, and will not rely, on the Arranger, Lenders, or other Persons so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.  Subject to Section 11.6 and 11.9, any Agent or the Arranger may resign from such role at any time, with immediate effect, by giving prior written notice thereof to the Administrative Agent and Borrower.

SECTION 11.9        [Reserved].

SECTION 11.10        Administrative Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)        to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.12, 12.3  and 12.4) allowed in such judicial proceeding; and

(b)        to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their

respective agents and counsel, and any other amounts due the Administrative Agent under Sections 2.12, 12.3 and 12.4.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

SECTION 11.11    Collateral and Guaranty Matters.  Each of the Lenders irrevocably authorizes the Administrative Agent and the Collateral Agent, and each of the Administrative Agent and the Collateral Agent agrees that it will:

(a)    automatically release any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than contingent indemnification obligations not yet accrued and payable), (ii) at the time the property subject to such Lien is transferred or to be transferred as part of or in connection with any transfer permitted hereunder or under any other Loan Document to any Person other than Holdings, the Borrower or any of its Domestic Subsidiaries that are Guarantors, (iii) subject to Section 12.1, if the release of such Lien is approved, authorized or ratified in writing by the Requisite Lenders, (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to clause (c) below or (v) if such property becomes Excluded Assets;

(b)    release or subordinate any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 9.1(i); and

(c)    release any Guarantor from its obligations under the Guaranty if (i) in the case of any Subsidiary, such Person ceases to be a Restricted Subsidiary as a result of a transaction or designation permitted hereunder or (ii) in the case of Holdings, as a result of a transaction permitted hereunder; provided that no such release shall occur if such Guarantor continues to be a guarantor in respect of any Junior Financing.

Upon request by the Administrative Agent or Collateral Agent at any time, the Requisite Lenders will confirm in writing the Administrative Agent's  and Collateral Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 11.11. In each case as specified in this Section 11.11, the applicable Agent will (and each Lender irrevocably authorizes the applicable Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 11.11.

LEGAL_US_W # 95883172.13

Notwithstanding anything contained in any of the Loan Documents to the contrary, the Loan Parties, the Agents and each Lender hereby agree that (1) no Lender shall have any right individually to realize upon any of the Collateral under any Collateral Document or to enforce the Guarantee, it being understood and agreed that all powers, rights and remedies under the Collateral Documents and the Guarantee may be exercised solely by the Administrative Agent acting as agent for and representative of Lenders in accordance with the terms thereof, and (2) in the event of a foreclosure by the Administrative Agent on any of the Collateral pursuant to a public or private sale or a sale under Section 363 of the Bankruptcy Code, the Administrative Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and the Administrative Agent, as agent for and representative of Lenders (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled (at the direction of the Required Lenders), for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Administrative Agent at such sale.

SECTION 11.12    Appointment of Supplemental Administrative Agents.

(a)    It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction. It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent deems that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, the Administrative Agent is hereby authorized to appoint an additional individual or institution selected by the Administrative Agent in its sole discretion as a separate trustee, co-trustee, administrative agent, collateral agent, administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individually as a "*Supplemental Administrative Agent*" and collectively as "*Supplemental Administrative Agents*").

(b)    In the event that the Administrative Agent appoints a Supplemental Administrative Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Administrative Agent to the extent, and only to the extent, necessary to enable such Supplemental Administrative Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Administrative Agent shall run to and be enforceable by either the Administrative Agent or such Supplemental Administrative Agent, and (ii) the provisions of this Article XI and of Sections 12.3 and 12.4 that refer to the Administrative Agent shall inure to the benefit of such Supplemental Administrative Agent and all references therein to the Administrative Agent shall be deemed to be references to

116

the Administrative Agent and/or such Supplemental Administrative Agent, as the context may require.

(c)    Should any instrument in writing from any Loan Party be required by any Supplemental Administrative Agent so appointed by the Administrative Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower or Holdings, as applicable, shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent.  In case any Supplemental Administrative Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Administrative Agent, to the extent permitted by Law, shall vest in and be exercised by the Administrative Agent until the appointment of a new Supplemental Administrative Agent.

SECTION 11.13    [Reserved].

SECTION 11.14    Indemnification of Agents.    Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand the Agents and each other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the any Agent) (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata, and hold harmless the Agents and each other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of any Agent) from and against any and all Indemnified Liabilities incurred by it; provided that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final judgment of a court of competent jurisdiction; provided that no action taken in accordance with the directions of the Requisite Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 11.14.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 11.14 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent and Collateral Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Administrative Agent or Collateral Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent or Collateral Agent is not reimbursed for such expenses by or on behalf of the Borrower, provided that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, provided further that the failure of any Lender to indemnify or reimburse the Administrative Agent or Collateral Agent shall not relieve any other Lender of its obligation in respect thereof.  The undertaking in this Section 11.14 shall survive termination of the Aggregate Commitments, the payment of all other Obligations and the resignation of the Administrative Agent or the Collateral Agent.

117

# ARTICLE XII

# MISCELLANEOUS

SECTION 12.1    <u>Amendments, Etc</u>.    Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Requisite Lenders (other than with respect to any amendment or waiver contemplated in Sections 12.1(a) through (j) below, which shall only require the consent of the Lenders expressly set forth therein and not the Requisite Lenders) (or by the Administrative Agent with the consent of the Requisite Lenders) and the Borrower or the applicable Loan Party, as the case may be and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided that, no such amendment, waiver or consent shall:

(a)    extend or increase the Term Loan Commitment or Loan of any Lender without the written consent of each Lender directly and adversely affected thereby (it being understood that the waiver of any Default, mandatory prepayment or mandatory reduction of the Term Loan Commitments shall not constitute an extension or increase of any Term Loan Commitment of any Lender);

(b)    postpone any date scheduled for, or reduce the amount of, any payment of principal or interest under Section 2.6 or 2.10 without the written consent of each Lender directly and adversely affected thereby, it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest;

(c)    reduce the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (iii) of the second proviso to this Section 12.1) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly and adversely affected thereby; provided that only the consent of the Requisite Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(d)    change any provision of this Section 12.1, Section 12.7 (in a manner that would alter the pro rata sharing of payments or setoffs required thereby), the definition of "Requisite Lenders" or any other provision specifying the number of Lenders or portion of the Loans or Term Loan Commitments required to take any action under the Loan Documents, without the written consent of each Lender affected thereby;

(e)    other than in a transaction permitted under Section 9.4 or 9.5, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(f)    other than in a transaction permitted under Section 9.4 or 9.5, release all or substantially all of the aggregate value of the Guaranty, without the written consent of each Lender;

(g)    without the prior written consent of all Lenders directly affected thereby, (i) subordinate the Obligations hereunder to any other Indebtedness, or (ii) except as provided by operation of applicable Law, subordinate the Liens granted hereunder or under the other Loan Documents to any other Lien; or

(h)    change the order of the application of funds specified in Section 10.3 without the written consent of each Lender directly affected thereby;

and *provided, further*, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent and Collateral Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent or Collateral Agent under this Agreement or any other Loan Document; (ii) no amendment, waiver or consent shall, unless in writing and signed by the Collateral Agent in addition to the Lenders required above and the Administrative Agent, affect the rights or duties of the Collateral Agent under this Agreement; (iii) Section 12.2(g) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification; (v) only the consent of the Borrower, the Administrative Agent and Citizens shall be required to effect any amendment, waiver or consent under the Fee Letter, and (iv) only the consent of the Borrower, the Administrative Agent and Citizens shall be required to effect any amendment, waiver or consent under the Commitment Letter.

Notwithstanding anything to the contrary contained in this Section 12.1, guarantees, collateral security documents and related documents executed by Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and each Collateral Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent and each Collateral Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

If the Administrative Agent, Collateral Agent and the Borrower shall have jointly identified an obvious error (including, but not limited to, an incorrect cross-reference) or any error or omission of a technical or immaterial nature, in each case, in any provision of this Agreement or any other Loan Document (including, for the avoidance of doubt, any exhibit, schedule or other attachment to any Loan Document), then the Administrative Agent and the Collateral Agent (acting in its sole discretion) and the Borrower or any other relevant Loan Party shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Document. Notification of such amendment shall be made by the Administrative Agent to the Lenders promptly upon such amendment becoming effective.

Notwithstanding anything in this Section 12.1 to the contrary, technical and conforming modifications to the Loan Documents may be made with the consent of the Borrower and the Administrative Agent (and no other Person) to the extent necessary to (i) conform to the Orders, and/or (ii) modify any other provision hereunder or under any other Loan Document in a manner

119

more favorable to the then-existing Lenders, in each case in connection with the issuance or incurrence of any other Indebtedness permitted hereunder, where the terms of any such other Indebtedness are more favorable to the lenders thereof than the corresponding terms applicable to other Loans or Term Loan Commitments then existing hereunder, and it is intended that one or more then-existing Classes of Loans or Term Loan Commitments under this Agreement share in the benefit of such more favorable terms in order to comply with the provisions hereof relating to the incurrence of such other Indebtedness.

If any Lender does not consent to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender and that has been approved by the Requisite Lenders, the Borrower may replace such non-consenting Lender in accordance with Section 3.7; provided that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Borrower to be made pursuant to this paragraph).

SECTION 12.2        Successors and Assigns.

(a)        Successors and Assigns Generally.    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither Holdings nor the Borrower may, except as permitted by Section 9.4, assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section, (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section, or (iv) to an SPC in accordance with the provisions of subsection (g) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Agent-Related Persons of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)        Assignments by Lenders.    Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Term Loan Commitment and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)        Minimum Amounts.

(A)   in the case of an assignment of the entire remaining amount of the assigning Lender's Term Loan Commitment and the Loans of any Class at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

120

(B)    in any case not described in subsection (b)(i)(A) of this Section, the aggregate unused amount of the Term Loan Commitment (plus the principal outstanding balance of the Loans) or, if the Term Loan Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000 (other than to a Relevant Participant) unless each of the Administrative Agent and, so long as no Event of Default, solely with respect to the Borrower, has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)    Proportionate Amounts.    Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Term Loan Commitment assigned;

(iii)    Required Consents.    No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)    the consent of the Borrower (such consent not to be unreasonably withheld) shall be required unless (1) other than with respect to any proposed assignment to any Person that is a Disqualified Institution, an Event of Default has occurred and is continuing at the time of such assignment, (2) such assignment is to a Lender, an Affiliate of a Lender, an Approved Fund or a Relevant Participant; provided that, other than with respect to any proposed assignment to any Person that is a Disqualified Institution as shown on a list available to the assigning Lender prior to the execution of the Assignment and Assumption, the Borrower shall be deemed to have consented to any such assignment of the Loans unless it shall have objected thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof, or (3) such assignment will become effective 45 days after the Closing Date; and

(B)    the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender;

(iv)    Assignment and Assumption.    The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; provided, however, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.    The Eligible Assignee, if it is not a

Lender, shall deliver to the Administrative Agent an Administrative Questionnaire. All assignments shall be by novation.

(v)    No Assignment to Certain Persons.  No such assignment shall be made (A) to Holdings, the Borrower or any of the Borrower's Affiliates or Subsidiaries, (B) to a natural person or (C) to any Disqualified Institution; provided, that the Administrative Agent shall have no duties or responsibilities for monitoring or enforcing prohibitions on participations to Disqualified Institutions.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to clause (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.1, 3.4, 3.5, 12.3, 12.4 and 12.5 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, and the surrender by the assigning Lender of its Note, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

(c)    Register.  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the Administrative Agent's Office  a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Term Loan Commitments of, and principal amounts (and related interest amounts) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "*Register*").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower, any Agent or any Lender (but, only in the case of a Lender, at the Administrative Agent's Office and with respect to any entry relating to such Lender's Term Loan Commitments, Loans and other Obligations), at any reasonable time and from time to time upon reasonable prior notice.  This Section 12.2(c) and Section 2.7 shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations).

(d)    Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person, a Disqualified Institution or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "*Participant*") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Term Loan Commitment and/or the Loans owing to

it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such participation is recorded in the Participant Register and (iv) the Borrower, the Agents, the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 12.1 (other than clause (d) thereof) that directly affects such Participant. Subject to subsection (e) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.1 (subject to the requirements of Sections 3.1(b), (c) or (d), as applicable), Section 3.4 and Section 3.5 (through the applicable Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section. To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 12.6 as though it were a Lender; provided such Participant agrees to be subject to Section 12.7 as though it were a Lender.

(e)     Limitations upon Participant Rights. The Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.1, 3.4 and 3.5 (subject to the requirements and limitations therein, including the requirements under Section 3.1(b), (c) or (d), as applicable, (it being understood that the documentation required under to Section 3.1(b), (c) or (d) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (i) agrees to be subject to the provisions of Sections 3.1, 3.4, 3.5 and 3.7 as if it were an assignee under paragraph (b) of this Section; and (ii) shall not be entitled to receive any greater payment under Section 3.1, 3.4 or 3.5 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation or the sale of the participation to such Participant is made with the Borrower's prior written consent. Each Lender that sells a participation shall (acting solely for this purpose as a non-fiduciary agent of the Borrower) maintain a register complying with the requirements of Sections 163(f), 871(h) and 881(c)(2) of the Code and the Treasury regulations issued thereunder relating to the exemption from withholding for portfolio interest on which is entered the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "*Participant Register*"). A Lender shall not be obligated to disclose the Participant Register to any Person except to the extent such disclosure is necessary to establish that any Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury regulations or is otherwise required thereunder. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. The portion of any Participant Register relating to any Participant or SPC requesting payment from

123

the Borrower or seeking to exercise its rights under Section 12.9 shall be available for inspection by the Borrower upon reasonable request to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations or is otherwise required thereunder.

(f)    Any Lender may, at any time, pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "SPC") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof or, if it fails to do so, to make such payment to the Administrative Agent as is required under Section 2.13(e) and (iii) such SPC and the applicable Loan or any applicable part thereof, shall be appropriately reflected in the Participant Register.  Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Sections 3.1, 3.4 and 3.5), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder.  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior debt of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceeding under the laws of the United States or any State thereof.  Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500 (which processing fee may be waived by the Administrative Agent in its sole discretion), assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

SECTION 12.3    <u>Attorney Costs and Expenses</u>.  The Borrower agrees (a) to pay or reimburse the Administrative Agent, the Collateral Agent, and the Arrangers for all reasonable and documented or invoiced out-of-pocket costs and expenses (including Attorney Costs)

124

incurred in connection with the preparation, negotiation, syndication and execution of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all Attorney Costs of Paul Hastings LLP and, if reasonably necessary, one local counsel in each relevant jurisdiction material to the interests of the Lenders taken as a whole and, solely in the case of a conflict of interest, additional counsel in each relevant jurisdiction for group members who are similarly situated, and (b) to pay or reimburse the Administrative Agent, the Collateral Agent and the Lenders for all of their reasonable and documented or invoiced out-of-pocket costs and expenses (including Attorney Costs) incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including (i) all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all Attorney Costs of Paul Hastings LLP and Richards, Layton & Finger (and, one local counsel as designated by the Administrative Agent to act in any relevant material jurisdiction and, in the event of any conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Lenders similarly situated taken as a whole) and (ii) all such costs and expenses of other advisors and professionals engaged by the Administrative Agent (including any financial advisors and, without limitation, Berkeley Research Group, LLC or replacements if conflicted)).  The agreements in this Section 12.3 shall survive the termination of the Aggregate Commitments and repayment of all other Obligations.  All amounts due under this Section 12.3 shall be paid within thirty (30) days following receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail; provided that, with respect to the Closing Date, all amounts due under this Section 12.3 shall be paid by the earlier of (x) the Closing Date solely to the extent invoiced to the Borrower within one (1) Business Day prior to the Closing Date and (y) the approval of the Bankruptcy Court of the fee applications for the payment of such expenses.  If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its sole discretion.  The Borrower and each other Loan Party hereby acknowledge that the Administrative Agent, Collateral Agent, and Collateral Agent and/or any Lender may receive a benefit, including a discount, credit or other accommodation, from any of such counsel based on the fees such counsel may receive on account of their relationship with the Administrative Agent, Collateral Agent and/or such Lender, including fees paid pursuant to this Agreement or any other Loan Document.  This Section 12.3 shall not apply to Indemnified Taxes, or amounts excluded from the definition of Indemnified Taxes pursuant to clauses (i) through (v) of the first sentence of Section 3.1(a), that are imposed with respect to payments to or for the account of any Agent or any Lender under any Loan Document, which shall be governed by Section 3.1.  This Section 12.3 also shall not apply to Other Taxes or to taxes covered by Section 3.4.

SECTION 12.4    <u>Indemnification by the Borrower</u>.  The Borrower shall indemnify and hold harmless the Agents, each Lender, the Arranger and their respective Affiliates and such Persons' and their Affiliates' respective directors, officers, employees, agents, partners, trustees or advisors and other representatives (collectively the "*Indemnitees*") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including Attorney Costs) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in

125

any way relating to or arising out of or in connection with (but limited, in the case of legal fees and expenses, to the reasonable and documented or invoiced out-of-pocket fees, disbursements and other charges of one counsel to all Indemnitees taken as a whole and, a single local counsel for all Indemnitees taken as a whole in each relevant jurisdiction that is material to the interest of the Lenders, and solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Indemnitees similarly situated taken as a whole) (i) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (ii) any Term Loan Commitment, Loan or the use or proposed use of the proceeds therefrom, or (iii) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned or operated by the Borrower, any Subsidiary or any other Loan Party, or any Environmental Liabilities arising out of the activities or operations of the Borrower, any Subsidiary or any other Loan Party, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee or a Loan Party is a party thereto (all the foregoing, collectively, the "*Indemnified Liabilities*"); provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or of any Related Indemnified Person, as determined by a final, non-appealable judgment of a court of competent jurisdiction, (y) a material breach of any obligations under any Loan Document by such Indemnitee or of any Related Indemnified Person, in each case as determined by a final, non-appealable judgment of a court of competent jurisdiction or (z) any dispute solely among Indemnitees other than any claims against an Indemnitee in its capacity or in fulfilling its role as an administrative agent, collateral agent, or arranger or any similar role under any Class of Loans and other than any claims arising out of any act or omission of the Borrower or any of its Affiliates.  To the extent that the undertakings to indemnify and hold harmless set forth in this Section 12.4 may be unenforceable in whole or in part because they are violative of any applicable law or public policy, the Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them.  No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement (except for direct (as opposed to indirect, special, punitive or consequential) damages resulting from the gross negligence, bad faith or willful misconduct, as determined by a court of competent jurisdiction in a final and non-appealable judgment, of any such Indemnitee), nor shall any Indemnitee or any Loan Party have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (other than, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party). In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 12.4 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, stockholders or creditors or

126

an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents is consummated.  All amounts due under this Section 12.4 shall be paid within the later of (x) twenty (20) Business Days after written demand therefor (together with reasonably detailed backup documentation supporting such reimbursement request) and (y) the approval of the payment thereof by the Bankruptcy Court; provided, however, that such Indemnitee shall promptly refund such amount to the extent that it is determined by a final, non-appealable judgment of a court of competent jurisdiction that such Indemnitee was not entitled to indemnification rights with respect to such payment pursuant to the express terms of this Section 12.4.  The agreements in this Section 12.4 shall survive the resignation of the Administrative Agent or the Collateral Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.  This Section 12.4 shall not apply to Indemnified Taxes, or amounts excluded from the definition of Indemnified Taxes pursuant to clauses (i) through (v) of the first sentence of Section 3.1(a), that are imposed with respect to payments to or for account of any Agent or any Lender under any Loan Document, which shall be governed by Section 3.1.  This Section 12.5 also shall not apply to Other Taxes or to taxes covered by Section 3.4.

SECTION 12.5    [Reserved].

SECTION 12.6    Right of Setoff.  Notwithstanding anything to the contrary in Section 362 of the Bankruptcy Code but subject to the Orders, if an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party  against any and all of the obligations of the Borrower or such other Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

SECTION 12.7    Sharing of Payments.  If, other than as expressly provided elsewhere herein, any Lender shall obtain payment in respect of any principal of or interest on account of the Loans made by it (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them, as the case may be, as shall be necessary to cause such purchasing Lender to share the excess payment of principal of or interest on such Loans pro rata with each of them; provided that if all

127

or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 12.15 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon. For avoidance of doubt, the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement as in effect from time to time or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant permitted hereunder. The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of set-off, but subject to Section 12.6) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation. The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 12.7 and will in each case notify the Lenders following any such purchases or repayments. Each Lender that purchases a participation pursuant to this Section 12.7 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

SECTION 12.8    <u>Notices and Other Communications; Facsimile Copies</u>.

(a)    General.   Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to Holdings, the Borrower or the Administrative Agent (which address shall also be used for Collateral Agent), to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 12.8;

(ii)    if to the Collateral Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person in the agreement pursuant to which such person is appointed as a Collateral Agent and

(iii)    if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other

communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).   Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)   Electronic Communications.   Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.   The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

(c)   Receipt.   Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(d)   The Platform.   THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall any Agent or any of its Agent-Related Persons or the Arranger (collectively, the "*Agent Parties*") have any liability to Holdings, the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to Holdings, the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

129

(e)    Change of Address.  Each of Holdings, the Borrower, the Administrative Agent and the Collateral Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

(f)    Reliance by Administrative Agent and Lenders.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Notices of Borrowing) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent, each Lender and the Agent-Related Persons of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in the absence of gross negligence, willful misconduct or bad faith of such Person, as determined by a final non-appealable judgment of a court of competent jurisdiction.   All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

SECTION 12.9    No Waiver; Cumulative Remedies.  No failure by any Lender, the Administrative Agent or the Collateral Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

SECTION 12.10    Judgment Currency.  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.  The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or

the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "*Judgment Currency*") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "*Agreement Currency*"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss.  If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable Law).

SECTION 12.11    Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrower, Holdings and the Administrative Agent and the Administrative Agent shall have been notified by each Lender, that each such Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, Holdings, each Agent and each Lender and their respective successors and assigns.

SECTION 12.12    [Reserved].

SECTION 12.13    Governing Law; Submission to Jurisdiction; Service of Process.

(a)    THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, EXCEPT TO THE EXTENT NEW YORK LAW IS SUPERSEDED BY THE BANKRUPTCY CODE.

(b)    THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT, COLLATERAL AGENT, AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, AND, TO THE EXTENT THE BANKRUPTCY COURT DECLINES OR IS OTHERWISE UNABLE TO EXERCISE JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER

JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  EACH PARTY HERETO AGREES THAT THE AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE LOAN DOCUMENTS OR IN THE EXERCISE OF ANY RIGHTS UNDER ANY COLLATERAL DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT. NOTHING CONTAINED HEREIN SHALL BE DEEMED TO CONSTITUTE A LENDER'S CONSENT TO JURISDICTION OF THE BANKRUPTCY COURT FOR ANY PURPOSES OTHER THAN THE ENFORCEMENT OF THIS AGREEMENT AND THE ORDERS. NOTHING CONTAINED HEREIN SHALL BE DEEMED CONSENT TO JURISDICTION BEFORE ANY BANKRUPTCY COURT IN THE CASES.

(c)    THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT, COLLATERAL AGENT, AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (b) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 12.8.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

SECTION 12.14    <u>Waiver of Jury Trial</u>.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 12.15    <u>Marshaling; Payments Set Aside</u>.  None of the Administrative Agent, the Collateral Agent or any Lender shall be under any obligation to marshal any assets in favor of the Loan Parties or any other party or against or in payment of any or all of the

Obligations.  To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of set-off, and such payment or the proceeds of such set-off or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such set-off had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

SECTION 12.16      [Reserved].

SECTION 12.17      Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  The Credit Agreement became effective on the Closing Date.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 12.18      Electronic Execution of Assignments and Certain Other Documents.  Delivery by telecopier, .pdf, or other electronic imaging means of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 12.19      Confidentiality.  Each of the Administrative Agent, the Collateral Agent and the Lenders agrees to maintain the confidentiality of the Information in accordance with its customary procedures (as set forth below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, advisors, service providers, and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent

133

required by applicable laws or regulations or by any subpoena or similar legal process, provided that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (other than at the request of a regulatory authority) unless such notification is prohibited by law, rule or regulation, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions at least as restrictive as those of this Section 12.19, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement (including any Relevant Participant) or (ii) any actual or prospective direct or indirect counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower; (h) to any rating agency when required by it on a customary basis and after consultation with the Borrower (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Loan Parties received by it from such Lender); or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent, any Lender, or any of their respective Affiliates on a nonconfidential basis from a source other than Holdings, the Borrower or any Subsidiary thereof, and which source is not known by such Agent or Lender to be subject to a confidentiality restriction in respect thereof in favor of the Borrower or any Affiliate of the Borrower.

For purposes of this Section, "Information" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary thereof or their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by any Loan Party or any Subsidiary thereof other than as a result of a breach of this Section 12.19, it being understood that all information received from Holdings, the Borrower or any Subsidiary after the Closing Date shall be deemed confidential unless such information is clearly identified at the time of delivery as not being confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so in accordance with its customary procedures if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent, the Collateral Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

SECTION 12.20    Use of Name, Logo, Etc.  Except in connection with the Cases, each Loan Party consents to the publication in the ordinary course by Administrative Agent or any Arranger of customary advertising material relating to the financing transactions contemplated by this Agreement using such Loan Party's name, product photographs, logo or trademark. Such consent shall remain effective until revoked by such Loan Party in writing to the Administrative Agent and the Arranger.

SECTION 12.21    <u>USA PATRIOT Act Notice</u>.  Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act.  The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

SECTION 12.22    [Reserved].

SECTION 12.23    <u>No Advisory or Fiduciary Responsibility</u>.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Borrower and Holdings  acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Agents and any Arranger are arm's-length commercial transactions between the Borrower, Holdings and their respective Affiliates, on the one hand, and the Agents and any Arranger, on the other hand, (B) each of the Borrower and Holdings has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Borrower and Holdings is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Agents, the Arranger and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, Holdings or any of their respective Affiliates, or any other Person and (B) none of the Agents, the Arranger or any Lender has any obligation to the Borrower, Holdings or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents, the Arranger, the Lender and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, Holdings their respective Affiliates, and none of the Agents, the Arranger or any Lender has any obligation to disclose any of such interests to the Borrower, Holdings or any of their respective Affiliates.  To the fullest extent permitted by law, each of the Borrower and Holdings hereby waives and releases any claims that it may have against the Agents, the Arrangers or any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 12.24    <u>Severability</u>.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or

135

unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 12.25    <u>Survival of Representations and Warranties</u>.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Agents and each Lender, regardless of any investigation made by the Agents or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Borrowing, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations as to which no claim has been asserted).

SECTION 12.26    <u>Lender Action</u>.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under any of the Loan Documents (including the exercise of any right of set-off, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Administrative Agent (which shall not be withheld in contravention of Section 11.4).  The provision of this Section 12.26 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

SECTION 12.27    <u>Interest Rate Limitation</u>.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non usurious interest permitted by applicable Law (the "*Maximum Rate*").  If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

SECTION 12.28    [Reserved].

SECTION 12.29    <u>Contractual Recognition of Bail-In</u>.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; and

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]**

LEGAL_US_W # 95883172.13

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**MATTRESS FIRM, INC.**, as Borrower

By:_____

    Name:_____

    Title:_____

**MATTRESS HOLDING CORP.**, as Holdings,

By:_____

    Name:_____

    Title:_____

**BARCLAYS BANK PLC**, as Administrative Agent, Collateral Agent and a Lender,


By:_____

    Name:_____

    Title:_____

**<u>LENDERS</u>**


[_____]